**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| A.A.B JOINT VENTURE<br>P.O. Box 37<br>Rosh Ha'Aiyn<br>68100 Israel,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-1719-C<br>Judge Damich |

**FIRST AMENDED COMPLAINT**

COMES NOW, Plaintiff A.A.B Joint Venture, by its undersigned attorneys, and for its first amended complaint against Defendant the United States of America, seeks monetary damages and other relief on its claims, and for grounds therefor states as follows:

## I. THE PARTIES

1. Plaintiff A.A.B Joint Venture ("Contractor" or "Joint Venture") is a joint venture of co-venturers ABB Susa, Inc., A. Arenson, Ltd. and Baran Group. Under the Joint Venture Agreement the parties are equal equity partners, ABB Susa, Inc. is managing partner. The Joint Venture was formed to bid on, and perform, a contract with the United States of America, which contract is the subject of this action.

2. Defendant the United States of America (the "Government") was a party to the contract at issue, acting by and through the United States Army Engineer Corps-Europe ("USACE"), located in Wiesbaden, Germany.

## II. JURISDICTION

3. This suit seeks *de novo* review of the Contracting Officer's "deemed denial" of certain certified claims by the Joint Venture relating to, *inter alia*, differing site conditions. This Court has jurisdiction over this action pursuant to § 10(a) of the Contract Disputes Act of 1978 (41 U.S.C. § 609(a)) ("CDA") and 28 U.S.C. § 1491.

## III. FACTS COMMON TO ALL COUNTS

4. The project consists of the design and construction of a storage and logistics base complex for use by the Israeli Defense Force ("IDF"), which was a party to the solicitation requirements. The project is known as the Nachshonim Military Storage Base located near Elad, approximately 20 km east of Tel Aviv, Israel (the "Project"). USACE is the owner and administrator of the project until completion. The base complex consists of approximately 200 buildings, 119 of which are Dry Storage Buildings ("DSBs") specifically designed to house heavy military equipment in a ready state within a controlled climate, minimizing environmental impacts from temperature and humidity. The DSBs consist generally of a concrete sub-structure and walls set upon drilled/cast piles or spread footings, a structural steel roof (conventional or space-type frame) and outer insulated paneling. The remaining buildings are conventional structures used for logistics, office space, and public and auxiliary use necessary for the operation of the base. The base occupies a circular area of approximately 1,600,000 square meters, or approximately 400 acres, with the buildings located in a radial pattern around two ring roads and ten radial roads, dividing the area into ten segments and one central area. Heavy earthwork, site preparation and the implementation of communications and control systems were included in the scope of the project. Design work by the Contractor was limited to the buildings and the communications and control systems. USACE provided the design, drawings and

specifications for the site infrastructure and development. The Contractor design for the buildings had to be coordinated with the overall site design and was also governed by a conceptual design based on the requirements of the solicitation's General and Special Specifications that included certain testing and performance specifications.

5. Contractor submitted its proposal and bid for the project on April 9, 2001.

6. On June 5, 2001 Contractor was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. The performance period was stipulated as three years (1,095 calendar days) after the June 19, 2001 Notice to Proceed, establishing an original completion date of June 18, 2004.

7. The Request for Proposals included, in Division 5, a detailed, government prepared and provided a Geotechnical Report. Attached to and made a part of the Geotechnical Report was a Site Investigation (Geological) Survey of the project site, prepared by Amos Israeli, dated February 22, 2000, which contained logs of test borings and photographs of the cores recovered during test borings. Ten test borings of the Project site were initially contemplated for the Geotechnical Report, but only seven test borings could be performed because of the lack of available access. The test borings were made to a depth of between ten and fifteen meters. Considerable information about properties of the sub-surface materials was also collected from a quarry area north of the Project site. The Geotechnical Report described the rock in most of the building area as "limy dolomite rock, mostly massive and hard," and the upper few meters of the rock as cracked with zones of weathered weak rock. The Geotechnical Report stated that clay penetrations may be found in the upper two to three meters of rock and that the strength and integrity of the rock mass increase with depth. A formation of coarse conglomerate and nari was noted, and was described as composed of stone fragments connected by carbonatic material. The

Geotechnical Report described a crust of clay and boulders about two meters thick in the lower zones around Mazor stream. The Geotechnical Report concluded: (1) most of the area could be excavated in hard limestone and dolomite, and that areas of weathered rock below three meters would be small; (2) the excavated rock could be used, after crushing, as backfill material; (3) it would be possible to produce stable excavated slopes with no need of retaining walls, depending on the excavation technique and precision; (4) the rock is hard and solid, enabling the construction of a portion of the buildings on flat foundations; and (5) in fill zones excavation could be performed in a controlled manner to ensure stability of building slabs, development areas and roads.

8. The Geotechnical Report contained extensive directions and recommendations for construction: (1) excavation shall be performed by mechanical tools and explosives; (2) foundations deeper than two meters should be based on a spread footing foundation; and (3) buildings designed on fill or places of shallow excavation should be founded on rock-socketed piles, i.e., drilled and cast-in-place. The report recommended spread footings and pile design and recommended which buildings should be constructed on footings and which buildings should be supported by piles. It provided maximum vertical permitted loads for the piles and set design requirements for the allowable friction for piles, stating that any pile not complying with the "requirements of this chapter must be rejected."

9. The government prepared Geological Survey, or Site Investigation Survey, contained several salient conclusions: (1) hard to medium limestone and dolomite rocks, partly weathered, were present in almost the entire area; (2) the structure and composition of the rock mass would allow for steep excavations; (3) in some hilltops and dispersed locations there might be weakening factors which could only be detected during excavation; (4) the rocky substrate

constitutes a suitable foundation for the planned buildings and roads; (5) most of the excavated material would be highly suitable for backfill and most of it may be crushed for subgrades; and (6) during the initial road building stage of construction, the contractor should try to determine the thickness and composition of the clayey cover.

10. Amendment No. 3 to the RFP responded to geotechnical questions raised by bidders. USACE responded in many cases by referring the bidders to the Geotechnical Report. For example, USACE told the bidders: (1) to design foundations in accordance with the Contract documents, "including the Geotechnical Report in Division 5;" and (2) that "subgrade and excavation requirements *are well defined* in the Geotechnical Report." [emphasis added]

11. The government prepared and provided specifications contained numerous references to the Geotechnical Report including, without limitation: (1) "The foundation design of the DSB [Dry Storage Building] shall be according to the soil report…;" (2) "When foundation on natural hard rock is not possible, drilled piles shall be used for the foundations, *in accordance with the soil report*" [emphasis added]; (3) For the logistics buildings "the pile shall be excavated *according to the directives of the attached Soil Investigation Report* [emphasis added];" (4) "The [office and public] Buildings shall be set on board piles *in accordance with the soil report*. The piles shall be excavated *according to the directives in the soil report* [emphasis added];" (5) "Design of the foundation [for the Kitchen and Dining Room Building] *shall be based* on the survey carried out by the soil engineer [emphasis added];" (6) Beams running under the concrete walls or bore piles for Auxiliary Buildings were to be designed and placed "*according to the location of the building* in the drawings and also *according to the requirements of the soil engineering report* [emphasis added];" (7) Beams running under the concrete walls or bore piles for the Electricity Supply Building were to be designed and installed "*according to the location*

*of the building in the drawings and the soil report* [emphasis added];" (8) the type of foundation for Mixed Use Storage Buildings were to be designed and installed "*according to the instructions of the soil investigation report* [emphasis added];" (9) the foundation for the Vehicle Parking Shed shall be based on bore piles, "as shown in the structural drawing and described in the soil investigation report;" and (10) the type of foundation for the Recruitment Facility Building General Storage Building Type GS, Chemical Storage Building and Ammunition Storage Buildings shall be designed and constructed "*according to the recommendations of the soil investigation report* [emphasis added]."

12. The JV based its bid in reasonable reliance upon the Geotechnical Report, its conclusions, recommendations and the Geological Survey and boring logs attached thereto. In particular the Contractor relied on the Geotechnical Report to calculate its costs for earthwork and structure foundations. Since the Project site had been a shooting range for the IDF and was not accessible, the Contractor had no opportunity to perform any subsurface investigation other than to attend the January 17, 2001 prebid site visit when only a cursory inspection was allowed.

13. For the pile foundation work, the Contractor's bid assumed that the final design would require approximately 75% of the number of piles specified in the Request for Proposal, based on three assumptions: (1) the Contractor intended to delete the diagonal or "raker" pile by designing walls bearing no lateral loads and the earth surrounding the buildings was then reinforced; (2) building loads would be carried by the pile's skin friction area and strong rock; very little load is carried by weak materials; and (3) reduction of the piles reduced the redundancy of penetrating weak materials to reach sound rock, therefore reducing the length of piles. Based on the Geotechnical Report, the Contractor also based its bid on the use of both pile foundations and footing foundations, and planned to follow the requirements of the RFP that

there would be "a minimum penetration through rock" of three meters and that the specified minimum depth of piles would be four meters.

14. For earthwork operations the Contractor again reasonably based its bid on the government prepared and provided Geotechnical Report which indicated that the contractor could expect mostly hard rock, with lesser amount of medium hard rock, even lesser of weak weathered rock and only traces of clay. During the bid process bidders were directed by the Government to nearby existing quarries for comparison of similar subsurface conditions. This reasonably led the Contractor to believe that the excess materials would be of a quality that would be produced from a quarry. The Contractor reduced its overall bid price in justified and reasonable anticipation that it would realize additional net revenue from offsite disposal and sale of excess excavated materials.

15. The Contractor divided the earthwork between two subcontractors. Biri Barashi, Land Works, Development Infrastructure and Road, Ltd. "Barashi") was to perform the earthworks in the southwest section of the site (part of segment 10, segments 11, 67, 78, 89, 91 and Road 17) and Rolider, Ltd. ("Rolider") was to perform the work in the northeast section of the site (part of segment 10, segments 12, 23, 34, 45, 56 and Ammunition Bunkers). The scope of work for both contractors included drilling, blasting, excavation, processing material for fill and fill placement. The Contractor remained responsible for offsite disposal of excess material.

16. To better understand the subsurface conditions and how they could affect the foundations, the Contractor performed exploratory borings in early January 2002 in three sections. The borings showed an unexpected large variance to attain the Government prepared and provided Geotechnical Report's requirement for piles to penetrate a depth of 3 continuous meters into rock, which varied for 5.5 to 13 meters without reaching this parameter of 3 meters

of continuous rock. On January 15, 2002 the Contractor notified the Government in writing of these developments.

17. One week later, on January 22, 2002, the Contractor gave written notice to the Government of this differing site condition, noting that the subsurface conditions encountered differed materially from those indicated in the Contract (Type I) and differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract (Type II). The notice went on to describe how these conditions could adversely impact the work: (a) Excavated material may not contain enough rock to process quantities of required fill, thereby requiring import from other sources; (b) Additional excavation/fill and construction equipment would be required to attain an adequate subgrade and foundation for structural stability; (c) Slopes on excavations would have to be flattened due to poor material, thereby increasing excavation and subbase quantities; (d) Foundation designs would require additional pile number, length, diameter, reinforcement and more cumbersome installation procedures and associated geotechnical oversight; (e) Additions to and revisions of the owner-furnished infrastructure design would be required; (f) Additional design would be required to check, confirm and recommend work procedures to establish stability of piles, pile cap and floor foundation systems; (g) Excess excavated material does not have a commercial value before and/or after processing, and additional costs would be incurred to transport and dispose of this material offsite; (h) Additional physical and design investigations, including consultants, will be required to evaluate subsurface conditions locally at each building site and over the entire project area; and (i) The Project Baseline Schedule would be impacted because of the additional design, revised logic and additional time for Project completion. The actual excavation for foundations, including the borings for the foundation micropiles, showed that the

subsurface geology was extremely heterogeneous, comprised of a variety of material, including a large quantity of clay and very little hard rock, a situation which was completely different from and differed materially from the subsurface conditions described in the Geotechnical Report.

18. The Contractor's records, including records of a full time geologist, established six separate classifications for the actual subsurface materials encountered: (1) fat clay; (2) clay with rock fragments; (3) weak rock; (4) medium rock; (5) medium hard rock; and (6) hard rock.

**COUNT I**
**(Excess Material Disposal)**

19. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

20. In preparing its bid price, the Contractor used the descriptions of the subsurface material in the Geotechnical Report to adjust its overall bid price after careful evaluation of the expected overall cost of the earthmoving operations, including an assessment of the expected qualities and quantities of cut, fill and disposal of excess materials. The Contractor was able to reduce its bid costs involved in cutting, crushing, filling and loading for removal of the excess materials from the site based on the reasonable assumption that the excess material had a good commercial value, i.e., it could be sold for offsite use.

21. Since the actual subsurface materials encountered were materially different from those represented in the Geotechnical Report, the Contractor incurred additional costs involved in the work of sorting, screening and double handling of the excavated materials. This resulted in the offsite removal of approximately 2,700,000 metric tons of unusable excess materials which in turn resulted in a net loss for the Contractor. In the context of the current market value of select fill material at 5 NIS per ton and the subbase material at 12.00 NIS per ton, the lost revenue and ultimate cost of removal of unsuitable materials from the site is $6,510,301.

22. The actual subsurface materials encountered had an unexpectedly high clay content which meant the materials had to be separated and removed for spoil. A large portion of this excess material was totally uneconomical for crushing, was of no commercial value, and over 1,000,000 tons were disposed off site without screening or crushing. The balance of the material required unexpected screening to eliminate clay materials. Once screening was accomplished, the remaining material could be crushed for onsite fill or could be removed as excess for sale.

23. The large amount of shallow layers and pockets of expansive clay increased the thickness of subgrade layers beneath the floors that were to be cast on grades; in some cases this necessitated subgrade removal, disposal, and replacement, thereby doubling or tripling the layers of subgrade. Even more critical, due to the heterogeneity of the material, each building foundation had to be individually evaluated.

24. The upper limits for economic use of suitable crushed subbase material allows no more than five to ten percent clay. Because the actual materials excavated at the site greatly exceeded this limit, the excavated materials had to be selected, screened and separated (a costly and unanticipated enterprise) to identify suitable material to crush for onsite requirements, let alone for sale offsite.

25. The excess materials that could be sold were sold for less than one-quarter of the amount which the Contractor had reasonably contemplated and used in developing its bid price thereby causing significant loss of contemplated revenue from construction operations.

26. As a result of the differing materials which were unsuitable for commercial sale, Contractor incurred unexpected additional costs which, after adjustment for bond and insurance, administrative overhead and fee resulted in a total additional cost, or loss of revenue to the Contractor, of $6,510,301.

27. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.233-1, Disputes and FAR 52.243-4, Changes.

28. The Government impliedly warranted the accuracy of the Geological Report under Division 5 of the Contract and impliedly warranted that excess materials were suitable for commercial use.

29. The Contractor reasonably relied upon the Geological Report in developing its proposal price for the Contract.

30. The Geological Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume the excess excavated material had a significant commercial value.

31. Commencing on January 22, 2002, the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter the Contractor provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from said conditions.

32. By letter dated June 6, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of excavation and earthworking operations incurred because of the affect of the differing site conditions encountered on the site. The equitable adjustment consists of the unrealized commercial value of the excess excavated material, the added costs of processing materials for reuse, and the added cost to remove to spoil or land fill the excess unusable material, in contrast to that which was reasonably anticipated from the data

and warranties in the Geotechnical Report which was provided to the bidders as part of the Request for Proposals.

33. By letter dated July 23, 2003 the Contractor submitted to the government its certified claim for an equitable adjustment in the amount of $6,885,115 for the unanticipated costs related to the excess material disposal on the site. This certification was made in reference to FAR 52.233-1, Disputes, thereby imposing on the Government the obligation to render a Contracting Officer's decision within 60 days or to notify the Contractor of the date by which the final decision would be made. Subsequent to the date of this certification, the Contractor revised its claim downward to $6,510,301.

34. By letter dated March 1, 2004 the Contractor again requested a contracting officer's final decision on its claim.

35. The Government failed within 60 days of receipt of the certified claim to issue a Contracting Officer's final decision or to notify Contractor of the time within which a decision would be issued.

36. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to make this appeal.

37. In addition, due to the conditions described in Paragraph 23, the subgrade material under many of the structures could not be used for foundation support and had to be replaced with suitable subgrade material. In areas under some roads and slopes, USACE issued change orders to compensate the Contractor for the cost of replacing the unsuitable subgrade material, the content of which contained significantly more clay than represented in the Geotechnical

Report. USACE agreed to compensate the Contractor for subgrade replacement under some roads and slopes but refused to compensate the Contractor for replacement of unsuitable subgrade material under structures. Contractor incurred additional costs of $412,239 to replace unsuitable material under structures, which material was not as represented in the Geotechnical Report. The replacement of this unsuitable material under the structures was a differing site condition/change to the Contract, and is based on the same underlying operative set forth herein; that is, the actual subsurface material differed materially from the conditions represented in the Geotechnical Report.

38. The Contractor's subcontractor, Barashi, incurred additional costs $629,070 as a result of the unsuitable material encountered in its work. The operations required to remove the unsuitable material delayed Barashi's operations and resulted in increased costs to Barashi of $629,070. These costs were directly related to the incorrect description of the subsurface materials contained in the Geotechnical Report, and are based on the same underlying operative facts set forth herein; that is, the actual subsurface materials differed materially from the conditions represented in the Geotechnical Report.

39. The Contractor's subcontractor, Rolider, incurred significant increased costs in its excavation and subgrade fill operations due to the changed subsurface conditions. Because the subsurface conditions actually encountered, as described above, differed materially from the conditions represented in the Geotechnical Report, Rolider had to utilize different methods to excavate and process the subsurface materials. These added costs and delay costs caused by the differing site conditions, including Contractor's markup, total $4,037,203. On November 23, 2003 the Contractor submitted a certified claim to the Contracting Officer for the additional costs associated with Rolider's excavation operations. This certification was made in reference to

FAR 52.233-1, Disputes, thereby imposing on the Government the obligation within 60 days to render a Contracting Officer's decision or to notify the Contractor of the date by which a final decision would be issued.

40. The Government failed within 60 days of receipt of the certified claim to issue a Contracting Officer's final decision or to notify Contractor of the time within which a decision would be issued.

41. As of this date, the Government has failed to issue a Contracting Officer's final decision on the Rolider earthwork claim. In accordance with the Contract Disputes Act, the Government's failure to issue a final decision on the Rolider earthworks claim constitutes a "deemed denial," entitling the Contractor to appeal to this Court.

42. The presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $11,588.813.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count I in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems just and proper.

**COUNT II**
**(Additional Pile Length Segment #67)**

43. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

44. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used for particular buildings were "intended to help in financial estimates."

45. In Segment #67, the Geotechnical Report recommended that spread footings be used for Buildings 9, 10, 13, 14, 17, 18 and 19.

46. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the Project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 *additional* piles throughout the Project.

47. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

48. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government agreed mutually to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30% in an effort to mitigate damages.

49. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in length of piles anticipated from the

Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

50. In Segment #67 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 850 piles, 140 (16%) contained over two meters of fat clay and clay with rock fragments, and several piles were nearly full length clay.

(b) There was no dolomite (calcium magnesium carbonate) and only 3% hard limestone.

(c) Over 60% of the subsurface materials had only one-half of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) Only five of the 850 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (3%), clay with rock fragments (13%), weak rock (soft chalk) (48%), medium strength rock (24%), medium hard rock (9%) and hard rock (3%).

(f) In 346 of the 850 piles bored (41%) in Segment #67, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) Spread footings were not practical and could not be used. The cost for spread footings were credited to USACE in the form of reducing the number and length of piles claimed

to allow 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The average cumulative thickness of medium strength, medium hard and hard rock was only 2.3 meters, which did not meet the minimum of three cumulative meters into rock.

(i) The Contractor had to use B40 concrete, a higher strength and more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

51. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

52. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

53. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

54. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

55. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #67.

56. By letter dated April 1, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #67. The equitable adjustment consisted of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, which allowance for the costs not incurred because spread footings were not used.

57. By letter dated July 18, 2003 the Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #67 in the amount of $225,474. As noted above the claim has been subsequently revised to $173,813. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to render a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which the decision would be issued. Since that time, the JV has further revised its claim for this item downward to $114,963.

58. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

59. The Government failed to issue a Contracting Officer's final decision or to notify Contractor of the time within which a decision would be issued.

60. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

61. In Segment #67, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown

physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $114,963.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count II in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

## COUNT III
## (Additional Pile Length Segment #45)

62. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

63. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings.

64. In Segment #45, the Geotechnical Report recommended that spread footings be used for fourteen of the nineteen buildings.

65. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 *additional* piles throughout the project.

66. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

67. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

68. The total length of piles for the overall project increased significantly from that anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

69. In Segment #45 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 850 piles, 136 (16%) contained over one meter of fat clay and clay with rock fragments, and a few piles were in nearly full length clay.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 11% hard limestone.

(c) Over 45% of the subsurface materials had only one-half of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 54 of the 850 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (2%), clay with rock fragments (5%), weak rock (soft chalk) (38%), medium strength rock (23%), medium hard rock (21%) and hard rock (11%).

(f) In 467 of the 850 piles bored (55%) in Segment #45, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) Spread footings were not practical and could not be used. The cost for spread footings was credited to USACE in the form of reducing the number and length of piles claimed to allow for 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The average cumulative thickness of hard rock for all 850 piles was only 0.7 meters per pile. To obtain the required penetration of three meters drilled into rock, the piles had to be lengthened considerably.

(i) The Contractor had to use B40 concrete, a higher strength and more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

70. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

71. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

72. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

73. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

74. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #45.

75. By letter dated April 15, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #45. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

76. By letter dated July 8, 2003 the Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #45 in the amount of $285,667. The claim was subsequently revised to $147,077. This certification was made in reference to FAR 52.233-1, Disputes, thereby imposing on the Government the obligation to render a Contracting Officer's decision within 60 days or to notify the Contractor of the date by which a decision would be issued. Since that time, the JV has further revised its claim for this item downward to $99,679.

77. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

78. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

79. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

80. In Segment #45, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $99,679.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count III in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT IV**
**(Additional Pile Length Segment #56)**

81. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

82. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

83. In Segment #56, the Geotechnical Report recommended that spread footings be used for three of the nineteen buildings.

84. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

85. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

86. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

87. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface

material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

88. In Segment #56 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 850 piles, 240 (28%) contained over one meter of fat clay and clay with rock fragments, and several piles were nearly full length clay, and an average of 20% of the subsurface material was fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 7% hard limestone.

(c) Over 55% of the subsurface materials had only one-half of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 44 of the 850 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (2%), clay with rock fragments (18%), weak rock (soft chalk) (35%), medium strength rock (24%), medium hard rock (14%) and hard rock (7%).

(f) In 380 of the 850 piles bored (45%) in Segment #56, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) Spread footings were not practical and could not be used. The cost for spread footings was credited to USACE in the form of reducing the number and length of piles claimed

to allow for 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The average cumulative thickness of medium strength, medium-hard and hard rock for the full pile length was only 2.9 meters, not yet reaching the minimum requirement of 3 meters.

(i) The Contractor had to use B40 concrete, a higher strength and more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

89. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

90. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

91. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

92. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

93. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it

had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #56.

94. By letter dated April 21, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #56. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

95. By letter dated July 8, 2003 the Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #56 in the amount of $212,407. The claim was subsequently revised to $173,460. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $117,205.

96. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

97. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

98. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

99. In Segment #56, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $117,205.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count IV in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT V**
**(Additional Pile Length Segment #34)**

100. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

101. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

102. In Segment #34, the Geotechnical Report recommended that spread footings be used for three of the nineteen buildings.

103. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

104. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

105. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

106. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

107. In Segment #34 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 974 piles, 415 (43%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 10% hard limestone.

(c) Over 36% of the subsurface materials had only one-half of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 53 of the 974 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (2%), clay with rock fragments (19%), weak rock (soft chalk) (15%), medium strength rock (34%), medium hard rock (19%) and hard rock (10%).

(f) In 413 of the 974 piles bored (42%) in Segment #34, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) Spread footings were not practical and could not be used. The cost for spread footings was credited to USACE in the form of reducing the number and length of piles claimed to allow for 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The Contractor had to use B40 concrete, a higher strength and a more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

108. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

109. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

110. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

111. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

112. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #34.

113. By letter dated April 28, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #34. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

114. By letter dated July 8, 2003 the Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #34 in the amount of $195,068. The claim was subsequently revised to $173,251. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the

Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $118,836.

115. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

116. The Government failed to issue a Contracting Officer's final decision or to notify Contractor of the time within which a decision would be issued.

117. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

118. In Segment #34, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $118,836.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count V in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT VI**
**(Additional Pile Length Segments 10, 78 and 89)**

119. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

120. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended pile foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

121. In Segments #10, #78 and #89 the Geotechnical Report stated backfill of six to seven meters was planned, and described the subgrade as clay.

122. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

123. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

124. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

125. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the

Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much weaker and more fractured than indicated in the Geotechnical Report.

126. In Segments # 10, #78 and #89 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 771 piles, 171 (22%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 5% hard limestone.

(c) Over 40% of the subsurface materials had only one-half of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) Only 47 of the 771 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (1%), clay with rock fragments (7%), weak rock (soft ) (33%), medium strength rock (40%), medium hard rock (14%) and hard rock (5%).

(f) In 89 of the 771 piles bored (12%) in Segments #10, #78 and #89, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) The Contractor had to use B40 concrete, a higher strength and a more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

127. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

128. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

129. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

130. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that the depth of pile would be significantly shorter than was actually required.

131. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segments #10, #78 and #89.

132. By letter dated July 3, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segments #10, #78 and #89. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

133. By letter dated July 18, 2003 the Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segments #10, #78 and #89 in the amount of $467,809. The claim was subsequently revised to $456,543. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $292,089.

134. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

135. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

136. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

137. In Segments #10, #78 and #89 the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $292,089.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count VI in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

## COUNT VII
## (Additional Pile Length Segment 91)

138. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

139. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

140. In Segment #91 the Geotechnical Report recommended that spread footings be used for fourteen of the twenty buildings.

141. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

142. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

143. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

144. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

145. In Segment #91 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 968 piles, 536 (55%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 10% hard limestone.

(c) Over 31% of the subsurface materials had only one-fifth of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 55 of the 968 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (5%), clay with rock fragments (26%), medium strength rock (38%), medium hard rock (21%) and hard rock (10%).

(f) In 395 of the 968 piles bored (41%) in Segment #91, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) The Contractor had to use B40 concrete, a higher strength and a more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

146. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

147. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

148. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

149. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

150. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #91.

151. By letter dated July 28, 2003 the Contractor submitted its certified claim and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #91. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

152. The Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #91 in the amount of $297,088. The claim was subsequently revised to $141,252. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $117,828.

153. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

154. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

155. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

156. In Segment #91 the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown

physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $117,828.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable court grant judgment on Count VII in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT VIII**
**(Additional Pile Length Segment #11)**

157. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

158. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

159. In Segment #11, the Geotechnical Report recommended that spread footings be used for eight of the fourteen buildings.

160. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

161. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

162. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

163. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

164. In Segment #11 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 562 piles, 340 (60%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 6% hard limestone.

(c) Over 37% of the subsurface materials had only one-fifth of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 39 of the 562 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (4%), clay with rock fragments (33%), medium strength rock (38%), medium hard rock (30%) and hard rock (6%).

(f) In 73 of the 562 piles bored (13%) in Segment #11, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) Spread footings were not practical and could not be used. The cost for spread footings was credited to USACE in the form of reducing the number and length of piles claimed to allow for 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The Contractor had to use B40 concrete, a higher strength and a more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

165. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

166. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

167. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

168. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

169. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #11.

170. By letter dated July 30, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #11. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material, with allowance for the costs not incurred because spread footings were not used.

171. The Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #11 in the amount of $180,335. The claim was subsequently revised to $112,523. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $91,123.

172. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

173. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

174. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

175. In Segment #11, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $91,123.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count VIII in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT IX**
**(Additional Pile Length Segment #12)**

176. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

177. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended pile foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

178. In Segment #12, the Geotechnical Report stated the buildings would be founded on piles.

179. Due to the extreme diversity of subsurface materials and the unexpectedly large amount of clay throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

180. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

181. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

182. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface

material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

183. In Segment #12 the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 1302 piles, 570 (44%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 8% hard limestone.

(c) Over 22% of the subsurface materials had only one-fifth of the compressive strength of the minimum strength stated in the Geotechnical Report.

(d) 52 of the 1302 piles were bored through a unified three meters length of hard rock; to obtain the required accumulation of three meters in rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (3%), clay with rock fragments (19%), medium strength rock (41%), medium hard rock (29%) and hard rock (8%).

(f) In 256 of the 1302 piles bored (20%) in Segment #12, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) The Contractor had to use B40 concrete, a higher strength and a more expensive concrete, to account for the imperfections in boring operations and weaker subsurface materials.

184. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work, FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

185. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

186. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

187. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that the depth of pile would be significantly shorter than was actually required.

188. Commencing on January 22, 2002 the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional notification and information to the Government, in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #12.

189. By letter dated August 4, 2003 the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #12. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater length in much poorer quality material.

190. The Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #12 in the amount of $591,049. The claim was

subsequently revised to $601,822. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $417,471.

191. By letter dated March 1, 2004 the Contractor again requested a Contracting Officer's final decision on its claim.

192. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

193. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contracts Disputes Act, the Contractor considers the Government's failure to issue a final decision to constitute a "deemed denial," entitling the Contractor to file the subject appeal.

194. In Segment #12, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $417,471 .

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count IX in favor of A.A.B Joint Venture against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems proper.

**COUNT X**
**(Additional Pile Length Segment #23)**

195. Paragraphs 1 through 18 are repeated and incorporated herein by reference.

196. The Contractor reasonably relied upon the Geotechnical Report, and in the case of foundation design, based its bid price on those provisions which recommended both pile and spread footing foundations, as well as on the provision which described the selection of foundation methods for the buildings. In the express language of the Geotechnical Report, the notes regarding the types of foundations to be used on particular buildings were "intended to help in financial estimates."

197. In Segment #23, the Geotechnical Report recommended that spread footings be used for thirteen of the sixteen buildings.

198. Due to the extreme diversity of subsurface materials, and the unexpectedly large amount of clay and/or rock fragment throughout the project site, the Contractor had to design all foundations with the use of piles, resulting in approximately 2,200 additional piles throughout the project.

199. The Contractor's bid price assumed that without unusual efforts it could meet the Contract requirements that "minimum penetration through rock" would be three meters and that the minimum pile depth would be four meters.

200. Because of the poor quality of subsurface materials, i.e., much more clay and much less good rock experienced in the initial piling phase, the Contractor and the Government

mutually agreed to undertake a pilot load test program which allowed the pile lengths to be shortened by approximately 30%, in an effort to mitigate damages.

201. The total length of piles for the overall project increased from 32,000 meters to 66,000 meters, which was more than a 100% increase in the length of piles anticipated in the Contract documents. Pile cage steel was increased to resist lateral loads in weak subsurface material and concrete strength had to be increased to allow for the actual subsurface materials which were much more weak and fractured than indicated in the Geotechnical Report.

202. In Segment #23, the records of the actual pile boring showed that the subsurface conditions differed from those indicated in the Geotechnical Report as follows:

(a) Of the 654 piles, 449 (68%) contained over one meter of fat clay and clay with rock fragments.

(b) There was nearly no dolomite (calcium magnesium carbonate) and only 4% hard limestone.

(c) Over 32% of the subsurface materials had only one-half of the compressive strength of the minimum compressive strength stated in the Geotechnical Report.

(d) Thirty-one of the 654 piles were drilled through a unified three meter length of hard rock; to obtain the required accumulation of three meters in hard rock, the pile lengths were considerably increased.

(e) The actual subsurface materials encountered consisted of fat clay (1%), clay with rock fragments (31%), medium strength rock (54%), medium hard rock (10%) and hard rock (4%).

(f) In 159 of the 654 piles bored (24%) in Segment #23, the rock reversed strength with depth, requiring deeper pile boring and additional materials to attain the required three meters of cumulative rock penetration.

(g) The use of a spread footing design was impractical due to the actual soil conditions. The cost for spread footings were credited to USACE in the form of reducing the number and length of piles claimed to allow 4 meters length for actual piles for buildings where the Geotechnical Report recommended spread footings.

(h) The Contractor had to use B40 concrete , a higher strength and a more expensive concrete, to counter the imperfections in boring operations and weaker subsurface materials.

203. The contractual basis for the Contractor's claim is FAR 52.236-2, Differing Site Conditions, FAR 52.236-3, Site Investigation and Conditions Affecting the Work,
FAR 52.236-1, Disputes and FAR 52.243-4, Changes.

204. The Government impliedly warranted the accuracy of the Geotechnical Report under Division 5 of the Contract and impliedly warranted that the Contractor would be able to bore pilings through three meters of cumulative rock.

205. The Contractor reasonably relied upon the Geotechnical Report in developing its price for the Contract.

206. The Geotechnical Report provided by the Government was deficient in several material aspects, as described above, which led the Contractor to assume that it could utilize spread footings where indicated and that the depth of pile would be significantly shorter than was actually required.

207. Commencing on January 22, 2002, the Contractor notified the Government in writing of the existence of the differing site conditions and thereafter provided additional

notification and information to the Government in which it provided detailed support for its position that it had encountered differing site conditions and for the cost impact resulting from the additional pile lengths in Segment #23.

208. By letter dated August 22, 2003, the Contractor submitted its cost proposal and request for equitable adjustment for the added costs of pile work incurred because of the differing site conditions encountered in Segment #23. The equitable adjustment consists of the additional pile lengths and associated costs resulting from having to bore more piles than anticipated to greater lengths in much poorer quality material, with allowance for the costs not incurred because the spread footings were not used.

209. The Contractor submitted to the Government its certified claim for an equitable adjustment for the added pile lengths in Segment #23 in the amount of $230,457. This claim was subsequently revised to $118,568. This certification was made in reference to FAR 52.233.1, Disputes, thereby imposing on the Government the obligation to issue a Contracting Officer's final decision within 60 days or to notify the Contractor of the date by which a final decision would be issued. Since that time, the JV has further revised its claim for this item downward to $89,360.

210. By letter dated March 1, 2004, the Contractor again requested a Contracting Officer's final decision on its claim.

211. The Government failed to issue a Contracting Officer's final decision or to notify the Contractor of the time within which a decision would be issued.

212. As of this date, the Government has failed to issue a Contracting Officer's final decision. In accordance with the Contract Disputes Act, the Contractor considers the

Government's failure to issue a final decision a "deemed denial," entitling the Contractor to file the subject appeal.

213. In Segment #23, the presence of subsurface or latent physical conditions at the site which differed materially from those indicated in the Contract or the presence of unknown physical conditions at the site of an unusual nature which differed materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract, entitle the Contractor to an equitable adjustment pursuant to FAR 52.236-2, Differing Site Conditions, for all additional costs incurred as a result of said differing site conditions in the amount of $89,360.

WHEREFORE, A.A.B Joint Venture, by counsel, respectfully requests this honorable Court grant judgment on Count XII in favor of A.A.B Joint Venture and against Defendant the United States of America as follows:

(a) Monetary relief in such sums as the Court, based on the evidence produced at trial, deems appropriate;

(b) Statutory interest under the Contract Disputes Act; and

(c) Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/__________________________

Brian Cohen
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW
Suite 1200
Washington, D.C. 20036
(202) 466-6300
Attorney for Appellant

Of Counsel:

Robert J. Sciaroni, Esq.
Lawrence M. Prosen, Esq.
BELL, BOYD & LLOYD, PLLC
1615 L Street, NW, Suite 1200
Washington, D.C. 20036
(202) 466-6300

Devorah Patt, Esq.
Zell, Goldberg

**CERTIFICATE OF SERVICE**

THE UNDERSIGNED DOES HEREBY CERTIFY that a copy of the foregoing First Amended Complaint, was mailed via first class, U.S. Mail, postage pre-paid this 20th day of December, 2004, upon:

Shalom Brilliant
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attention: Classification Unit
8th Floor, 1100 L Street, N.W.
Washington, D.C. 20530

/s/ ____________________
Brian Cohen