**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **A.A.B JOINT VENTURE,** | ) | |
| | ) | |
| ` **Plaintiff,** | ) | |
| | ) | **Case Nos. 04-1719C, 04-1792C, and** |
| **v.** | ) | **05-114C (CONSOLIDATED)** |
| | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER COMPELLING DISCOVERY WITH RESPECT TO DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS IN CASE NOS. 04-1719C, 04-1792C AND 05-114C**

Dated: August 4, 2006

Brian Cohen
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300
Attorney for Plaintiff

TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER COMPELLING DISCOVERY WITH RESPECT TO DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS IN CASE NOS. 04-1719C, 04-1792C AND 05-114C ........ 1

I. FACTUAL BACKGROUND ........ 1

II. ARGUMENT ........ 14

A. Introduction ........ 14

B. The Government's Failure to Produce Documents Pertaining To The Design/Pre-Award Phase Is A Material Breach of Its Discovery Obligations ........ 15

C. The Government Breached Its Duty To Preserve Evidence ........ 19

(1). The Government Failed to Produce E-mail From 29 Individuals Who Are Known To Have Generated E-mail Related To The Subject Matter Of The Litigation ........ 22

(2). Even For The Individuals For Whom E-mail Was Produced The Document Production Violated The Government's Duty To Preserve Evidence ........ 23

(3). The Government Failed To Preserve Its Backup Tapes ........ 24

D. The Government Has Erroneously Claimed Privilege For A Significant Number Of Documents ........ 26

(1). Defendant's Work-Product Doctrine Objections Are Baseless ........ 26

(2). The Government's Attorney-Client Privilege Arguments Are Not Well Founded With Respect To Many Of The Documents ........ 28

E. Documents Produced By The Government In January 2006 Establish There Are Other Claim Related Documents That Are Not Privileged Which Must Be Produced ........ 31

F. Miscellaneous Production Failures Noted In Plaintiff's Good Faith Effort Letters .....33

III. CONCLUSION .....34

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Applied Telematics v. Sprint Commc'ns Co.*, No. 94-4603, 1996 US Dist. Lexis 14053 (E.D. Pa. Sept. 17, 1996) ........ 25

*Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429 (W.D. Pa. 2004). ........ 19

*Carter v. Gibbs*, 909 F.2d 1450 (Fed. Cir. 1990) ........ 29

*First Fed. Sav. Bank of Hegewisch v. United States*, 55 Fed. Cl. 263 (2003) ........ 28

*In Re CI Host, Inc.*, 92 S.W. 3d 514 (Texas 2002) ........ 25

*Kleiner v. Burns*, 48 Fed. R. Serv. 3d (Callahan) 644 (D. Kan. 2000) ........ 25

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998) ........ 20

*Linnen v. AH Robins Co.*, No. 97-2307, 1999 Mass. Super Lexis 240 (June 16, 1999) ........ 25, 26

*Pac. Gas and Elec. Co. v. United States*, 69 Fed. Cl. 784 (2006) ........ 27

*Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57 (2003) ........ 20, 21, 25

*Residential Funding Corp. v. The DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002) ........ 25

*Silvestri v. GMC*, 271 F.3d 583 (4th Cir. 2001) ........ 19

*Smithkline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467 (E.D. Pa. 2005) ........ 29

*Thompson v. United States Dep't. of Hous. and Urban Dev.*, 219 F.R.D. 93 (D. Md. 2003) ........ 22

*Ukiah Auto. Inv. v. Mitsubishi Motors of N. Am., Inc.*, No. C-04-3932, 2006 US Dist. Lexis 33352 (N.D. Cal. May 17, 2006 ........ 26

*Xpedior Creditor Trust v. Credit Suisse First Boston, Inc.*, 309 F. Supp. 2d 459 (S.D.N.Y. 2003) ........ 26

*Zubulake v. USB Warburg, LLC.*, 220 F.R.D. 212 (S.D.N.Y. 2003); ........ 19, 20, 21, 26

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **A.A.B JOINT VENTURE,** | ) | |
| | ) | |
| ` **Plaintiff,** | ) | |
| | ) | **Case Nos. 04-1719C, 04-1792C, and** |
| **vi.** | ) | **05-114C (CONSOLIDATED)** |
| | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ______________________________ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR ORDER COMPELLING DISCOVERY WITH RESPECT TO DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS IN CASE NOS. 04-1719C, 04-1792C AND 05-114C**

Plaintiff ("A.A.B") hereby moves pursuant to Rules 5.2, 7(b), 26 and 37 of the United States Court of Federal Claims for an Order compelling Defendant the United States to produce certain documents, file declarations/certifications as enumerated herein and pay Plaintiff its reasonable expenses incurred in making the motion, including attorney's fees.

## I. FACTUAL BACKGROUND

1. On July 19, 2005 Plaintiff filed its first request for production of documents to Defendant the United States of America in Case No. 04-1719C. (Exhibit 1).

2. On July 20, 2005 Plaintiff filed its second request for production of documents to Defendant the United States of America in Case No. 04-1719C. (Exhibit 2).

3. On July 20, 2005 Plaintiff filed its first request for production of documents to Defendant the United States of America in Case No. 04-1792C. (Exhibit 3).

4. On August 19, 2005 Defendant filed its response to Plaintiff's first request for production of documents in Case No. 04-1792C. (Exhibit 4).

5. On August 19, 2005 Defendant filed its response to Plaintiff's first and second requests for production of documents in Case No. 04-1719C. (Exhibit 5).

6. On August 5, 2005 Plaintiff filed its first request for production of documents to Defendant the United States of America in Case No. 05-114C. (Exhibit 6).

7. On September 7, 2005 Defendant filed its response to Plaintiff's first request for production of documents in Case No. 05-114C. (Exhibit 7).

8. Pursuant to the aforementioned document requests Plaintiff inspected the documents produced by the Defendant at the Nachshonim Military Storage Base in El'ad, Israel between October 23 and October 28, 2005.

9. During the course of the document production in Israel, counsel for Plaintiff raised numerous concerns and objections to the Government's production.

10. At that time, counsel for Defendant stated that the Government was <u>in the midst of locating the "stored" e-mails prior to June, 2001</u>. <u>Second, Plaintiff was informed during the document production in Israel that for e-mails from June 2001 forward the Government had possession of such e-mails but they were stored on magnetic tape</u>.

11. The Government's document production in Israel was deficient, incomplete and represents a material failure by the Government to meet its discovery obligations.

12. As a result, on November 11, 2005 Plaintiff's sent the Government a 26 page, single spaced letter detailing the Government's deficient production as part of its good faith effort as required by RCFC 37 and the Court's Special Procedures Order. (Exhibit 8). In the interest of economy, Plaintiff will summarize the letter with the understanding that many of the details will be addressed in any subsequent hearing on this motion:

(a) Plaintiff noted 77 document deficiencies pertaining to case 04-1719C, 50 deficiencies with respect to case 04-1792C and over 50 deficiencies with respect to case 05-114C;

(b) On an overall basis, aside from a July 27, 2002 report from government geologist, Doug Bonham, and a February 24, 2003 report from Israel Klar, the Government did not appear to have produced any documents regarding any analyses of the claims submitted by Plaintiff; and

(c) Other than draft one of the Geotechnical Report (April 2, 2000) the Geotechnical Report and an Appendix dated May 2000 of the specifications and some very brief government notes on one small section of draft specifications, no pre-award documents were produced.

13. Plaintiff's November 11, 2005 letter noted that the Government's failure to produce pre-award documents was particularly troubling and pointed out that the Letter of Offer and Acceptance ("LOA") which implemented the Wye River Accords imposed an express obligation on the government to ". . . review, correct, revise, and/or repackage designs and bidding documents provided by the GOI [Government of Israel] . . . ." (Note 5, Section h, Page 5 of 19) and that "all records created by the USG under the terms of this LOA will be maintained in a form that may be audited, in accordance with USG standards and regulations." (Note 5, Section k, Page 6 of 19).

14. Based on the LOA the Government had an express obligation to review correct, revise and/or repackage the design and bidding documents provided by the GOI, and a corresponding obligation to maintain all such records in a form that may be audited in accordance with US Government standards and regulations.

15. Under such circumstances, it is inconceivable that the Government did not create a significant quantity of pre-award documents pursuant to its review, correction, revision and/or repackaging of the GOI design for this $125 million project. As noted, those records were required to be maintained in an auditable form.

16. On this basis alone, namely the Government's failure to produce practically any documents pertaining to the pre-award period, the motion to compel should be granted. The Government should be required to produce all such documents and should it fail to do so, appropriate sanctions should be entered by the Court.

17. Other deficiencies noted in the November 11, 2005 letter included the following:

(a) During the production counsel for the Government stated that a number of videos would be produced, those videos have not been produced;

(b) Some but not all progress photos were subsequently produced;

(c) Other than a few documents, no personal files, diaries, logs, notes or other material were produced;

(d) A number of documents referenced in the Government's answers to interrogatories in 04-1719C were not produced;

(e) The Government produced QC box 1, section 09-quality QA/QC file – that file was empty;

(f) The Government originally represented to Plaintiff that at least ten boxes from Wiesbaden would be produced. However, only approximately 1½ small boxes were produced; and

(g) As part of the Wiesbaden production C.O. Mills' correspondence was purportedly produced. However, internal notes, internal meeting memoranda or diaries were not produced. Plaintiff submits that it strains credulity to suggest that the contracting officer on a $125 million project would not have maintained significantly more detailed files than were produced.

18. Other deficiencies noted in the November 11 letter are equally significant including the following:

(a) The Government's response to interrogatory 2 of Plaintiff's first set of interrogatories in 04-1719C identified the following individuals who participated in the preparation of the RFP: (1) Louis Brackett (2) Pat Brady (3) Ragan Glandon (4) Anne Gunzel (5) Jim Noble (6) Rob Saari and (7) Mark Shore. Based upon counsel's review, aside from a few notes from Jim Noble no documents have been produced, e-mail or otherwise, for the aforementioned individuals;

(b) Similarly, the letter referenced the Government's response to interrogatory no. 1 of Plaintiff's first set of interrogatories, in 04-1719C, which identified the following individuals, all of whom participated in preparing answers to the interrogatories, but for whom files have not been produced: (1) Leslie Bearden (2) Mike Iarosis (3) and William Thievon. As of this date no documents, e-mail or otherwise, have been produced for any of the aforementioned individuals.

19. Though not mentioned in the November 11, 2005 letter Plaintiff further notes that in response to interrogatory no. 28 in 04-1719C the Government identified the following individuals who were principally involved in the preparation of estimates for the cost of earthworks and/or foundation excavation operations, and cut and fill quantities for the

contract: (1) Mark Fascher (2) Raoul Gonzales (3) Reemt Pauw (4) Dagobert Goebel (5) Mark Shore and (6) Wolf Wolfram.

20. To date, the Government has produced no documents, e-mail or otherwise, from the aforementioned individuals all of whom by the Government's admission have participated in key aspects of the preparation of earthworks, foundation and cut and fill quantity estimates prepared prior to the award of the contract.

21. In response to interrogatory 29 to Plaintiff's first set of interrogatories, (04-1719C) the Government also identified the following individuals, all of whom observed Plaintiff's and/or its subcontractors earthwork and/or foundation excavation operations on the project: (1) Colonel Liberman; (2) Lt. Colonel Einat Rozen; (3) Lt. Colonel Roitman; and (4) Rami Kerekesh (all from the Israeli Defense Force) (1) Tsimchi Manoach and (2) Uria Ayal (from the Ministry of Defense) and (1) August Carrillo (2) Bryan Jordan (3) Douglas Bonham (4) Helmut Walter (5) LTC John Rovero (6) William Granderson (7) Yacov Shafa; (8) Yair Shani and (9) Zvi Sarti (all from the United States Army Corps of Engineers).

22. To date, no documents, e-mail or otherwise, have been produced from the aforementioned individuals all of whom possess discoverable information.[1]

23. By letter dated November 23, 2005 the Government responded to Plaintiff's letter of November 11, 2005. (Exhibit 9). With respect to the November 11 letter the Government stated the following:

> (a) It would inquire if the purportedly missing documents were available in paper format or if these items were in electronic format; and

---

[1] Pursuant to a Hague Convention Request, Plaintiff received emails from Mr. Kerekesh on July 20, 2006.

(b) With respect to electronic document production:

(i) The Government's electronic documents were still undergoing review; and

(ii) It was agreed based on a discussion with Plaintiff's counsel that the Government would produce electronic documents both before and after the date of the filing of the cases.

24. Significantly, the letter noted the following additional information with respect to e-mails:

(a) With respect to e-mails of individuals the Government has collected the e-mails "stored" by individuals on their computers. For individuals no longer employed or no longer in a position on the project any documents left behind or archived have been collected where possible for production;

(b) With respect to the e-mail residing on the Israeli server:

a. All e-mail from employees that have been backed up on the server have been collected for production;

b. These documents are "relatively accessible" dating back until June 2001;

c. Prior to June 2001 the only copies of these e-mails are in an archived format, i.e. on magnetic tape only. Thus, according to the Government the good-news bad-news is, while copies of the e-mails prior to June 2001 "technically exist" (the good-news), "it will be an expensive and time consuming process to restore the data" (the bad-news); and

d. There was a period of time for which the project did not have any e-mail connectivity at all. This was sometime prior to June 2001 and the Government stated it would confirm the actual dates

for which there were no e-mails available.

25. As of this date, the Government has not produced any e-mails prior to June 2001 nor has it identified the period of time prior to June 2001 for which there was no connectivity and therefore no e-mails available. It is also unclear whether the Government has produced the contents of its server from June 2001.

26. By letter dated December 8, 2005 Plaintiff responded to the Government's letter of November 23. (Exhibit 10). In that letter Plaintiff reiterated its significant concerns, including the failure of the Government to produce internal meeting minutes, documents supporting the Division 5 Geotechnical Report, bids which the Government refused to produce without a protective order, Powerpoint presentations, status reports and the complete failure to produce any documentation prior to the award of the contract. The letter further noted that the Government's November 23 letter shed little light on these issues.

27. Plaintiff also reiterated its concern over the fact that it was initially informed that no less than 10 boxes of material would be produced from the Government's Wiesbaden office but ultimately the Government produced 1½ small boxes of material. The Wiesbaden office is the division headquarters where the C.O. resides.

28. The letter also reiterated Plaintiff's concern that none of the files, notes and/or minutes or comments of individuals identified by the Government in its initial disclosures and interrogatory responses were produced, including but not limited to (1) Louis Brackett (2) Pat Brady (3) Rob Saari (4) Jim Noble and (5) Ragan Glandon.

29. Plaintiff also renewed its request, unanswered as of the filing of this motion, that the Government provide Plaintiff access to the original borings which are depicted

in the Division 05 Geotechnical Report. The Government's failure even as of this late date to produce the borings is inexcusable.

30. With respect to electronic production, the letter noted that the Government had repeatedly stated that it would provide a response to Plaintiff as to what documents were available prior to June 2001; however, no further response had been provided.

31. The letter concluded by stating that Plaintiff expected a more complete detailed response and production in the near future and if the Government failed to do so by December 19, 2005 Plaintiff reserved its right to pursue other avenues of recourse, including filing a motion to compel.

32. By letter dated December 22, 2005 the Government produced its privilege log. (Exhibit 11). As discussed herein, many of the documents identified are not privileged.

33. By letter dated January 13, 2006, over one month after Plaintiff's letter of December 8, 2005, Defendant provided information in regard to electronic documents stored on backup media. (Exhibit 12). This information is inconsistent with its letter of November 23, 2005. In its November 23, 2005 letter the Government stated it had backup e-mails stored on electronic media <u>prior to June 2001</u>; however, in its January 13, 2006 letter the Government stated for the first time that it had no backup media prior to 2003. The Government contended that the restoration of any backup media, which includes backup in Exchange 5.5 format, would be costly and difficult because the software is obsolete and no longer owned by the agency. With regard to Wiesbaden European District e-mail, the Government's letter stated that recovering e-mail prior to March 2004 would be costly and time consuming; requiring the agency to build a server. The Government then stated there were some e-mails that could be easily restored that are located on individual's accounts or hard drives. The Government

proffered that any e-mails prior to March 2004 could be imported without great difficulty if they are in PST format and located on individual hard drives.

34. By letter dated February 22, 2006 (Exhibit 13) Plaintiff noted the following:

(a) The Government's failure to produce practically any pre-award documents including e-mail was causing material prejudice to the Joint Venture;

(b) The agency had a duty to protect, maintain and secure e-mail including maintaining and preventing the loss of evidence associated with the claims and the project;

(c) Given the cost associated with the claims, the costs referenced in the Government's January 13, 2006 letter ($30,000) were miniscule. The letter also noted that Plaintiff expected to receive a response by no later than February 28, 2006 and that should the Government fail to do so Plaintiff would be forced to file a motion to compel and other possible motions.

35. On May 5, 2006 Plaintiff filed a Request for Production of Documents (Exhibit 14) and a set of Interrogatories (Exhibit 15). The discovery requests sought additional information and documents pertaining to the Government's electronic documents, computer systems and document retention policies.

36. On June 5, 2006 Defendant filed its responses to Plaintiff's Interrogatories. ( Exhibit 16). The responses contained the following information:

(a) Twenty-seven Corps of Engineers employees are known to have generated email related to the subject matter of the litigation. (Def.'s Resp. to Pl.'s to Interrog. # 1(f)).

(b) No backup tapes exist prior to July 2003. (Def.'s Resp. to Pl.'s Interrog. # 5(a)).

(c) From July 2003 until April 2004 data was in Exchange 5.5 format and backed up using Computer Associates Arcserve software. From April 2004 until present, data is in Exchange 2003 format and backed up using Veritas software. (Def.'s Resp. to Pl.'s Interrog. # 5(a)).

(d) Defendant has produced electronic documents for only six employees. (Def.'s Resp. to Pl.'s Interrog. # 5 (f)).

(e) Defendant did not preserve its email back up tapes for January – December 2002, January – June 2003, August – October 2003, April – August 2004, and February – March 2006. (Def.'s Resp. to Pl.'s Interrog. # 5(f)).

(f) Commencing in June 2001, the Government did not issue any instruction regarding the suspension of document destruction until July 11, 2005. (Def.'s Resp. to Pl.'s Interrog. # 8(c)).

(g) The government does not maintain any record of data that is deleted, physically destroyed, discarded, damaged or overwritten. (Def.'s Resp. to Pl.'s Interrog. # 11).

37. On June 5, 2006 Defendant filed its responses to Plaintiff's Request For Production of Documents (Exhibit 17). In its responses, Defendant noted that additional documents were available for inspection and copying. To date, those documents have not been produced.

38. By letter dated January 22, 2002 Plaintiff gave written notice to the Government of a differing site condition in three sections of the project, noting that the subsurface conditions encountered differed materially from those indicated in the contract and from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the

contract. (Exhibit 18). The notice described how these conditions could adversely impact the work.[2]

39. Thereafter, Plaintiff provided additional notification and information to the Government in support of its position that it had encountered differing site conditions and the cost impact resulting from said conditions.

40. By letter dated February 6, 2002 the Government responded to Plaintiff's January 22, 2002 letter. (Exhibit 19).

41. By letter dated July 16, 2002 (JV letter 0157 ) Plaintiff provided a comparison between the Geotechnical Report and the actual micro pile drilling logs for Segment 56, and requested consideration in accordance with FAR 52.243-4 for an equitable adjustment for the cost of additional piles and additional pile lengths for the 12 type A DSBs in Segment 56. (Exhibit 20).

42. By letter dated July 25, 2002, (JV letter 0165) entitled "Unanticipated Subsurface Conditions – Additional Pile Length – Addendum," Plaintiff provided certain geotechnical reports which were referenced in the M. Yuger Report dated May 26, 2002. (Exhibit 21). The letter noted that the reports support Plaintiff's requests for consideration in accordance with FAR 52.243-4 for an equitable adjustment for the cost of additional piles and additional pile lengths in Segment # 56.

43. Between August 2002 and July 2003, the JV submitted additional written notifications of unanticipated subsurface conditions for various segments of the project. In

---

2 Paragraphs 38-51 provide the Court with information related to the Plaintiff's submission of claim notices and certified claims. This information, discussed in section III. C, is pertinent to determining when Defendant's duty to preserve evidence commenced.

addition, on numerous occasions the JV requested meetings to review and discuss the requests for adjustments based upon the subsurface conditions.

44. By letter dated July 18, 2003 (JV letter 347), the JV submitted certified claims under the Contract Disputes Act requesting compensation for unanticipated subsurface conditions for Segments 67, 56, 45, 34, 10, 78 and 89. (Exhibit 22).

45. By letter dated June 6, 2003 (JV letter 316) the Joint Venture submitted its claim for excess material disposal in the amount of $8,624,930. (Exhibit 23).

46. By letter dated July 23, 2003 (JV letter 348-1) the Joint Venture submitted its certified claim for excess material disposal (deleting the exposure to Land Authority fees) in the amount of $6,885,115. (Exhibit 24).

47. By letter dated July 28, 2003 (JV letter 360) the Joint Venture submitted its certified claim for Segment 91, including a comparison between the Geotechnical Report and the actual micro pile drilling logs for that segment. (Exhibit 25).

48. By letter dated July 30, 2003 (JV letter 361) the Joint Venture submitted its certified claim for unanticipated subsurface conditions for Segment 11. (Exhibit 26).

49. By letter dated August 4, 2003 (JV letter 367) the Joint Venture submitted its certified claim for Segment 12. (Exhibit 27).

50. By letter dated August 22, 2003 (JV letter 371) the Joint Venture submitted its certified claim for differing site conditions for Segment 23. (Exhibit 28).

51. The Joint Venture provided written notice of TCN problems repeatedly to the Government, including Joint Venture letter dated May 1, 2002 (JV letter 125) and November 11, 2002 (JV letter 223). (Exhibits 29 and 30). In addition, problems associated with the inability to import third country nationals were specifically noted in connection with the submission of pay

estimates 6 through 18, and 23 through 44 covering the period from February 2002 to October 2004. The Joint Venture's concerns with its inability to utilize TCN labor was also discussed as early as March 2002 and at numerous weekly meetings thereafter with the Government.

## II. ARGUMENT

### A. Introduction

The Government's numerous material breaches of its discovery obligations have seriously prejudiced Plaintiff and warrant the imposition of Rule 37(a)(4) sanctions. The Government's production of documents is materially deficient, violative of both its obligations under the discovery rules and the provisions of the Wye River Accords as implemented by the Letter of Offer and Acceptance.

As detailed in Section I, the Government's production has been incomplete, and it has failed to meet its basic obligations under the rules as well as completely failing to fulfill promises made after those deficiencies were repeatedly pointed out.

The following sections discuss in detail the Government failures:

(1) The Government's failure to produce documents pertaining to the design phase;

(2) The Government's breach of its duty to preserve evidence;

(3) The Government's erroneous claims of privilege;

(4) The Government's failure to produce identified claim related documents; and

(5) Miscellaneous production failures as noted in Plaintiff's good faith effort letters.

**B. <u>The Government's Failure To Produce Documents Pertaining To The Design/Pre-Award Phase Is A Material Breach Of Its Discovery Obligations</u>**

The Nachshonim project was authorized by the Wye River Accords and implemented by a 19 page Letter of Offer and Acceptance ("LOA") between the Government of Israel and the U.S. Army Corps of Engineers (Exhibit 31). Under the LOA the U.S. Army Corps of Engineers agreed to provide design and construction services in connection with the construction of the facility.

Because of its relevance to this aspect of the motion Plaintiff notes several pertinent LOA provisions:

1. The LOA clearly states that the U.S. Government is to provide "Management, <u>design</u>, <u>design review</u>, acquisition, contract administration, quality assurance, technical services, and construction of two infantry training bases and a reserves division storage and logistics base in Israel"(Page 2 of 19) (emphasis added).

2. Note 5 GENERAL, Section h at page 5 of 19 states, in pertinent part "<u>The USG shall review, correct, revise, and/or repackage designs and bidding documents provided by the GOI</u>, and these efforts shall be program/project funded under this LOA. Any design or engineering design services provided by the USG shall be program/project funded under this LOA. For any planning or design services provided by the USG, the USG may elect to accomplish such services with its own personnel or to contract for the services of architect-engineer (A-E) firms" (emphasis added).

3. Note 5 GENERAL, Section k at page 6 of 19 states "<u>All records created by the USG under the terms of this LOA will be maintained in a form that may be audited, in accordance with USG standards and regulations</u>" (emphasis added).

4. Note 7 Design and Construction Services, subparagraph c states "The USG will review all designs provided by the GOI for facilities included in the scope of this LOA. The costs of USG review, as well as any costs for corrections, revisions and/or repackaging required prior to procurement will be program funded under this LOA" (page 8 of 19).

In short, the LOA established an express obligation on the Government to review, correct, revise and/or repackage the design and bidding documents provided by the Government of Israel, and a corresponding obligation to maintain all such records in a form that may be audited in accordance with U.S. Government standards and regulations.

It is clear from the Government's answers to interrogatories that a number of Defendant's employees were actively involved in reviewing the GOI design. Defendant's response to interrogatory no. 2 in 04-1719C states that the "principal participants in the development and preparation of the RFP" included the following individuals, each of whom the response states "reviewed designs and specifications provided by IDF": Lewis Brackett, Pat Brady, Ragan Glandon, Anne Gunzel, Jim Noble, Rob Saari and Gordon Simmons.

The answer also identifies William Mills the contracting officer and Mark Shore. Mr. Shore is identified as the individual who prepared the independent Government estimate for the Corps. Ezra Abraham is also identified in response to Interrogatory No. 7 (04-1719C) as having assisted in preparation of amendments to the solicitation.

In the Government's answer to Interrogatory 28 (04-1719C) it identified Mark Fascher, Raoul Gonzales, Reemt Pauw and Dagobert Goebel all of whom were "principally involved" in preparation of estimates prior to award for the cost of earthwork and/or foundation excavation and cut and fill quantities.

The Government has produced no documents, e-mail or otherwise, from the aforementioned individuals all of whom by the Government's admission have participated in key aspects of the preparation of estimates for earthworks foundations and cut and fill quantity estimates prior to the award of the contract.

Further, based upon Plaintiff's review, no documents, e-mail or otherwise, have been produced for Messrs. Brackett, Brady, Glandon, Gunzel, Noble, Rob Saari or Mark Shore with respect to their review of the designs and specifications provided by IDF.[3]

Based on the foregoing, the following is clear: (1) the Government was under an express obligation to review, correct, revise and/or repackage the design prepared by the Government of Israel; (2) the Government was under an express obligation to maintain all documentation generated under the LOA in an auditable form in accordance with U.S. standards and regulations; (3) numerous Government employees reviewed and commented on the Government of Israel design; and (4) with the exception of 3 documents, none of these documents have been produced by the Government in discovery.

The Government's failure to produce any correspondence or e-mail from the noted individuals, all of whom were active participants in either the review of the design or preparation of the Government estimate, including estimates of the cost of earthwork and/or foundation excavation and cut and fill quantities is a material deficiency.

In addition, Plaintiff has submitted a myriad of document requests which are highly relevant pertaining to the design period, including without limitation, the following:

With respect to case 04-1719C:

---

[3] E-mails were produced for Mr. Abraham from December 6, 2001 through December 14, 2004 and for Mr. Simmons from June 22, 2001 through May 17, 2002. However, it is apparent that no e-mails were produced for either individual during the pre-award phase.

(a) Requests concerning the review, preparation, analysis and all aspects pertaining to the development of the Geotechnical Report – 24, 62, 68, 69, 70, 71, 72, 85, 88, 91, 97 and 98;

(b) Review, analysis and other documents pertaining to the analysis of pre-proposal geological borings and subsurface conditions – 53, 63, 64, 65, 66, 67, 68, 73 and 86;

(c) All aspects of the development of the request for proposals – 50 and 52;

(d) Documents pertaining to the planned removal or disposal, reuse or sale of excess soils and excavated material – 29, 30, 34, 35, 36, 94, 99, 100 and 102.

With respect to Docket 05-114C:

(a) Documents concerning A.A.B's technical and management proposal – 23, 24 and 25;

(b) Documents concerning or analyzing contract provisions SR-13, SR-14, SR-22 or the third country national tax plan – requests 26 through 29;

(c) Documents pertaining to the design, drawings and/or specifications relating to the paint system – 46, 47, 48, 49, 50 and 65;

(d) Documents pertaining to the development of the RFP with regard to labor and/or the use of TCN labor – 64;

(e) Documents pertaining to communications from bidders concerning either TCN labor or the paint system – 66 and 67;

(f) Documents concerning criteria for the DSB insulated panel exterior facing paint system – 73.[4]

The requests for production noted above clearly sought relevant documents in all of the cases pertaining to the design phase. The Government's failure to produce documents responsive to these requests is an additional material deficiency. Plaintiff requests that the Court Order the Government to produce all documents pertaining to the design phase, or require Defendant to certify under oath that such documents do not exist. If these documents do not exist, Plaintiff requests that further sanctions be imposed.

### C. <u>The Government Breached Its Duty To Preserve Evidence</u>

The duty to preserve evidence arises when a party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *Zubulake v. USB Warburg, LLC.*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003); *Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001). It is an affirmative obligation requiring a party to preserve any and all discoverable evidence in accordance with Fed. R. Civ. P. 26(b)(1). *Capricorn Power Co. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 434 (W.D. Pa. 2004).

It extends to any documents or tangible things made by individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses." The duty also extends to information that is relevant to the claims or defenses of any party. Fed. R. Civ. P. 26(b)(1); *Zubulake, supra*.

---

4 The Government has made an informal production of documents in to the DSB case (05-1172). On June 30, 2006 Plaintiff filed its formal request for production of documents in that case. (Exhibit 32). The request contains numerous additional requests for documents relating to the design period, including but not limited to, requests 123 through 127, 131, 133, 143 through 146 and 149.

The duty requires a party to retain all relevant documents in existence at the time the duty to preserve attaches, and any relevant documents created thereafter. *Zubulake*, 220 F.R.D. at 218. This includes unique, relevant evidence that might be useful to an adversary. *Id*. at 217. Further, once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to insure the preservation of relevant documents. *Id.*

In the government contracts context, this Court held in *Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57 (2003) that the Corps of Engineers had a legal obligation to preserve evidence relating to Plaintiff's claim for differing site conditions "upon notice that litigation might occur." *Renda Marine* at 60, 61, *citing with approval Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

The Court specifically addressed the issue of when the duty to preserve evidence arose, applying the "litigation might occur" standard. It observed that if plaintiff's purported oral communication in October 1999 concerning the alleged differing site condition had been proven it could be construed as notice that a potential litigation claim existed. However, there was no dispute regarding a cure notice issued on March 8, 2000. Therefore, the court held that Defendant reasonably should have known of a potential litigation claim in March 2000. *Renda Marine* at 62.

Based on this finding, the Court directed the government to produce <u>at its expense</u> all backup tapes that were created on or after March 8, 2000, and hard drives that predated March 8, 2000 in accordance with the terms of the protective order.

In the case at bar, Plaintiff provided <u>written</u> notice to the Government of a differing site condition by letter dated January 22, 2002. (Motion, paragraph 38). The letter described how the

subsurface conditions encountered differed from those indicated in the contract as well as the adverse impact on Plaintiff's work. The Government responded by letter dated February 6, 2002. (Motion, paragraph 40). Plaintiff provided further notices of differing site conditions and certified claims pertaining to different segments of the project between July 2002 and July 2003. (Motion, paragraphs 41-50).

The Joint Venture also provided written notice of problems pertaining to its TCN claim by letter dated May 1, 2002. (Motion, paragraph 51). The Joint Venture's concerns with its inability to utilize TCN labor were also discussed as early as March 2002 and thereafter at numerous weekly meetings with the Government.

Based on *Renda Marine*, Plaintiff submits that by no later than January 2002 the United States was under an affirmative obligation requiring it to preserve any and all unique, relevant evidence that might be useful to Plaintiff. In addition, the Government was obligated as of that date to suspend its routine document retention/destruction policies and put in place a "litigation hold" to ensure the preservation of relevant documents. *Zubulake, supra*.

The Government did neither.

First, the Government failed to place a litigation hold to ensure the preservation of relevant documents. In fact, the Government did not issue any instruction regarding the suspension of data destruction until July 11, 2005, 3½ years after the duty to preserve arose. (Motion, Paragraph 36). The failure to suspend document destruction until July 2005 is a clear violation of the Government's duty.

Second, it is obvious that the Government failed miserably in its duty to preserve any and all properly discoverable evidence, including information that is relevant to the claims or defenses of any party.

Specifically, the Government has failed to comply with its obligation to preserve evidence in numerous respects as discussed below.

**(1). The Government Failed to Produce E-mail From 29 Individuals Who Are Known To Have Generated E-mail Related To The Subject Matter Of The Litigation**

In the Government's answers to interrogatories dated June 5, 2006 it identified 27 individuals who were "known to have generated e-mail related to the subject matter of this litigation." (Motion, Paragraph 36). However, in response to interrogatory 5(f) the Government produced a chart of what it contends to be all of its electronic documents. This chart reflects the fact that e-mails have only been produced for six individuals (Abraham, Bearden (five e-mails), Blackburn, McPeters, Roach and Simmons).[5]

Therefore, no e-mail production has been made for the following individuals, all of whom are known to have generated e-mail related to the subject matter of the litigation:[6]

| | |
|---|---|
| Doug Bonham | Colonel Larry D. McCallister |
| Lewis Brackett | William Mills |
| Pat Brady | James Noble |
| Steven J. Buckel | Robert Kreienheder |
| August Carrillo | John Rovero |
| Mark Fascher | Robert Saari |
| Ragan Glandon | Mark Shore |
| William Granderson | Colonel Lee A. Staab |
| Anne Gunzel | William Thievon |
| Michael Iarosis | Helmut Walter |
| Bryan Jordan | |

5 There is also a designation for local e-mail which contains 136 items.

6 The Government's obligation to preserve material evidence includes the preservation of electronic records of key players, regardless of whether a preservation order is obtained. *Thompson v. United States Dep't. of Hous. and Urban Dev.*, 219 F.R.D. 93, 99-100 (D. Md. 2003).

In addition no e-mail production has been made for Messrs. Shafat, Shani, Sarti, Bearden, Gonzales, Pauw, Goebel, and Wolfram, all of whom were employed by the United States Army Corps of Engineers. (Motion, paragraphs 18, 19 and 21).

With respect to all of these 29 individuals Plaintiff requests that the Court issue an Order directing the Government to produce these documents, or certify under oath that such documents do not exist. If these documents do not exist, Plaintiff requests that further sanctions be imposed.

**(2). Even For The Individuals For Whom E-mail Was Produced The Document Production Violated The Government's Duty To Preserve Evidence**

The Government's duty to preserve evidence arose by January 2002 and continues to this date. For the 6 individuals for whom e-mail was produced, each production failed to comply with the Government's duty to preserve as noted below:

(a) Ezra Abraham – no e-mails were produced after December 14, 2004.

(b) Leslie Bearden – only five e-mails were produced for the 8½ month period March 3, 2003 through November 23, 2004. The Government failed to produce any e-mails from the beginning of the project through March 3, 2003 or subsequent to November 23, 2004.

(c) Jody Blackburn – Mr. Blackburn participated during the entire project; no e-mails were produced prior to November 1, 2002 or subsequent to July 13, 2005.

(d) Ron McPeters – Mr. McPeters was involved in the project from its inception; no e-mails were produced prior to May 29, 2002 or subsequent to May 10, 2004.

(e) Michael Roach – Mr. Roach was the contracting officer's representative and subsequently administrative contracting officer; no e-mails

were produced prior to March 5, 2002 or subsequent to September 1, 2004.

(f) Gordon Simmons – Mr. Simmons was involved in the project from its inception; no e-mails were produced after May 17, 2002.

Plaintiff requests that the Court issue an Order directing the Government to produce these documents, or certify under oath that such documents do not exist. If these documents do not exist, Plaintiff requests that further sanctions be imposed.

**(3). The Government Failed To Preserve Its Backup Tapes**

In addition to the failings noted in Sections II. C.1 and II. C.2 the Government compounded its manifest failures by not preserving backup tapes prior to July 2003. (Gov. Resp. to Pl.'s Interrog. # 5(a)). This failure is particularly egregious given the fact that the duty to preserve arose 18 months earlier (January 2002), combined with the Government's complete failure to provide any e-mails for the 29 people noted above, and its materially deficient production of e-mail for the 6 individuals for whom e-mail was produced.[7]

Plaintiff submits the following with respect to the Government's backup tapes:

(a) The Government's failure to preserve its backup tapes for its e-mails from January 2002 through June 2003 is a clear breach of the duty to preserve.

7 As previously noted that the Government's statements in its letter of November 23, 2005 are at material variance with its current position. In that letter, the Government stated that e-mails dating back to June 2001 were relatively accessible. Other than 3 Gordon Simmons e-mails, none have been produced for any individual as far back as June 2001. Second, and more significantly, the Government's letter stated that it had e-mails prior to June 2001 on magnetic tape. The Government now appears to be saying in its answers to interrogatories that it only has backup tapes to July 2003. If it did have backup tapes prior to July 2003 going back even prior to June 2001 and those tapes were destroyed or overwritten after January 2002 that would constitute an additional material breach of the duty to preserve.

(b) The Government also breached its duty to preserve by not maintaining backup tapes for its e-mails for August 2003 through October 2003, April through August 2004, and February and March 2006. Government Answer to Interrogatory (5(f).

(c) Plaintiff requests that the Court issue an Order requiring Defendant to file a Declaration explaining in detail its failure to preserve backup tapes for January 2002 – June 2003, August 2003 – October 2003, April – August 2004, February 2006 and March 2006 within 7 days. Plaintiff also requests that the Order specify that after reviewing the Declaration, the Court if appropriate, will consider the imposition of additional sanctions.

(d) The Court should require Defendant, in light of its egregious failures, to produce at its expense, including restoration, those backup tapes that were maintained from July 2003 and to provide Plaintiff with access to all hard drives. *Renda Marine*, 58 Fed. Cl. at 62.[8]

(e) The fact that it may be expensive to restore the backup tapes from July 2003 to April 2004 because the Government chose to put that data in Exchange 5.5 format and backed up using Computer Associate Arcserve software should not shift the cost burden to Plaintiff. The Government had been under a duty to preserve for a year and a half prior to making the determination to backup material in that format. Indeed, by July 2003 several

8 *See for example*, *In Re CI Host, Inc.*, 92 S.W. 3d 514 (Texas 2002) (party failed to meet burden to show why backup tapes should not be produced); *Residential Funding Corp. v. The DeGeorge Financial Corp*., 306 F.3d 99 (2d Cir. 2002) (sanctions for negligence in failing to produce electronic information, including information from backup tapes); *Kleiner v. Burns*, 48 Fed. R. Serv. 3d (Callahan) 644 (D. Kan. 2000) (court granted motion to compel electronic data, including e-mail, voice mail, web pages and all other forms of electronic data in defendant's possession, including deleted e-mails and other information from backup tapes); *Linnen v. AH Robins Co.*, No. 97-2307, 1999 Mass. Super Lexis 240 (June 16, 1999) (risk undertaken by companies choosing electronic storage media); *Applied Telematics v. Sprint Commc'ns Co.*, No. 94-4603, 1996 US Dist. Lexis 14053 (E.D. Pa. Sept. 17, 1996) (court allowed monetary sanctions for spoliation of evidence when backup information was destroyed during routine deletions of computer information).

certified claims had been filed. (Motion, paragraphs 44-50). Under such circumstances, the fact that the Government chose a more expensive backup medium substantially after its duty to preserve arose, provides no justification to shift the cost of producing these clearly discoverable documents to Plaintiff.[9]

**D. The Government Has Erroneously Claimed Privilege For A Significant Number Of Documents**

By letter dated December 22, 2005 the Government produced its privilege log. Plaintiff submits that the Government's assertions of attorney-client privilege and work-product doctrine with respect to many of the documents is erroneous as discussed below.

**(1). Defendant's Work-Product Doctrine Objections Are Baseless**

---

9 Cases in which the producing party paid the cost of production include, without limitation, *Ukiah Auto. Inv. v. Mitsubishi Motors of N. Am., Inc.*, No. C-04-3932, 2006 US Dist. Lexis 33352 (N.D. Cal. May 17, 2006); *Xpedior Creditor Trust v. Credit Suisse First Boston, Inc.*, 309 F. Supp. 2d 459 (S.D.N.Y. 2003) (defendant ordered to bear its own costs in producing inaccessible data). *Linnen v. A.H. Robins Co.*, No. 97-2307, 999 Mass. Super Lexis 240 (June 16, 1999) (court acknowledged significant expense in restoring backup tapes but ordered restoration reasoning that such a risk is undertaken by companies choosing electronic storage media).

Even if the Court were to apply the *Zubulake* cost shifting analysis the Government should bear all costs: (1) the document requests are specifically tailored to ascertain relevant and pertinent information regarding each of the claims; and (2) it is obvious that the information requested is not available from any other source. Further, the documents sought are Government created documents, both prior to and subsequent to award of the contract. To the extent that these documents are not obtained through other sources, which Plaintiff seeks at this time, they are clearly not available otherwise; (3) Given the fact that the need to incur these costs is a direct result of the Government's failure to comply with its obligations under the Wye River Accords and its duty to preserve material evidence there is no basis for considering cost shifting. Further, the cost is less than ½ of 1 percent of the amount in controversy; and 4) it is obvious that the relative resources of the parties tilts heavily in favor of the United States Government. The other factors though considered by the *Zubulake* court to be less significant also dictate that cost shifting should be denied. The issues at stake are important and there are significant benefits to both the Court and Plaintiff if the documents are produced.

This Court recently held that whether the "primary motivating purpose" or the "because of" approach is utilized, "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected. *Pac. Gas and Elec. Co. v. United States*, 69 Fed. Cl. 784, 798 (2006). Therefore, if it appears to the Court that a document would have been created in essentially similar form irrespective of the litigation and was not created either "because of" or with a "primary motivating purpose" to assist in the potential adversarial aspects, it should not be protected under the work-product doctrine. *Id.*

In addition, this Court made it clear in *Pac. Gas* that as a general matter, any documents prepared or generated "because of a public or business duty," or "assembled in the ordinary course of business or pursuant to public requirements unrelated to the adversarial aspects of the proceedings" should not be protected under the work-product doctrine. *Id*. at 808 (emphasis added).

When these factors are applied it is apparent that many of the documents are not privileged. First, it is obvious that many of the documents would have been created in essentially similar form irrespective of the litigation, since they are documents that the Government generated to assist it in reviewing and analyzing Plaintiff's claims. Second, these documents were prepared because of a public duty. Namely, the Contract Disputes Act imposed an affirmative duty, not met here by the Government, to review, analyze and issue contracting officer's decisions on these claims.

Therefore, either analysis leads to the conclusion that many of these documents are not protected by the work-product doctrine.[10]

**(2). <u>The Government's Attorney-Client Privilege Arguments Are Not Well Founded With Respect To Many Of The Documents</u>**

The attorney-client privilege is properly invoked where: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court [and] . . . (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services of (iii) assistance in some legal proceeding [and] . . . (4) the privilege has been (a) claimed and (b) not waived by the client. *First Fed. Sav. Bank of Hegewisch v. United States*, 55 Fed. Cl. 263, 266 (2003).

The attorney-client privilege does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered. *First Fed. Sav. Bank of Hegewisch, supra.* Without a showing that the communications are part of an effort to secure legal advice every communication could be confidential which would expand the privilege far beyond its bounds. *Id.* at 268.

---

10 Board of Contract Appeals decisions are to the same effect, recognizing that the work-product doctrine does not extend to documents and materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes. *See, e.g.*, *B.D. Click*, ASBCA Nos. 25609, 25972, 83-1 BCA ¶ 16,328 at 81,176-77. Rather, the work-product doctrine applies to material generated for use in litigation, i.e. to documents that would not have been created "but for" pendency or imminence of litigation. *SAE/Americon – Mid-Atlantic, Inc.*, GSBCA No. 12294 et al., 95-2 BCA ¶ 27,737.

Since the attorney-client privilege impedes the search for truth it is strictly construed. *Id.* at 266. The following restrictions on the application of the privilege are pertinent to various documents in Defendant's privilege log:

(a) The privilege evaporates upon any voluntary disclosure of confidential information to a third party. *Carter v. Gibbs*, 909 F.2d 1450, 1451 (Fed. Cir. 1990);

(b) The privilege does not shield documents merely because they were transferred to or routed through an attorney. *Smithkline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 478 (E.D. Pa. 2005);

(c) An attorney's mere attendance at a meeting cannot protect the notes produced from that meeting where they would otherwise be discoverable but for their creation in the presence of a lawyer. *Smithkline*, at 479.

(d) The description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of the privilege have been established. Failing this the documents must be produced. *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534 (E.D. Ill. 2000).

Based on the foregoing discussion the following documents listed in Defendant's privilege log are not privileged and should be produced:

**Summary of Plaintiff's Objections to Documents Listed in Defendant's Privilege Log**

| Doc. No. | Date | Subject/Contents | Basis of Objection |
|---|---|---|---|
| 2 | 31 Mar 03 | E-mail to OC re TCN Issue | No basis for work product-routine contract administration |
| 7 | Undated | Draft CO decision on unanticipated subsurface conditions-additional pile length | No indication of confidential communications; undated therefore fails to establish work product |
| 9 | Undated | Draft CO decision on unanticipated subsurface conditions – Subbase replacement | No indication of confidential communications; undated therefore fails to establish work product |

| | | | |
|---|---|---|---|
| 17 | 1 Mar 04 | Geotechnical Claims-3 Inch vs 6 Inch Material; Rolider Means and Methods | Waiver of privilege |
| 18 | 9 Apr 04 | Insulated Panel Issues | No basis for work product-routine contract administration |
| 19 | 14 Apr 04 | E-mail: Insulated Panel Issues | No basis for work product-routine contract administration |
| 20 | 21 Apr 04 | Insulated Panel Issues | No basis for work product-routine contract administration |
| 21 | 29 July 02 | Contractor REA for Unanticipated Subsurface Conditions and Geotechnical Report | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 22 | 22 July 02 | Memorandum re: Geotechnical Assessment of Nachshonim Storage Base | No basis for work product; routine contract administration |
| 24 | 29 July 02 | Contractor REA for Unanticipated Subsurface Conditions and Geotechnical Report | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 26 | 24 Jan 02 | RE: Team meeting to address Nachshonim Geotech Issue | No basis for work product; routine contract administration |
| 27 | 29 Jan 02 | Powerpoint presentation entitled “Nachshonim Storage Base Geotechnical Issues” | No indication of confidential communication; routine contract administration |
| 28 | 14 Jun 02 | (E-mail) Geotechnical Issues | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 29 | 20 Jun 02 | Notes from Geotech Issues Meeting | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 30 | 20 Jun 02 | Notes from Geotech Issues Meeting | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 31 | 27 Jun 02 | (E-mail) re Geotechnical Issues | No basis for work product; routine contract administration |
| 32 | 22 July 02 | Geotechnical Assessment of Nachshonim Storage Base | No basis for work product; routine contract administration |
| 33 | 26 July 02 | Meeting note, Israel Klar, COE Mike Roach | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 34 | 28 July 02 | GEO Consultant | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 35 | 28 July 02 | E-mail forwarding two memos regarding Nachshonim Geotechnical Issues | No indication of confidential communication; routine contract administration |
| 36 | 29 July 02 | Unanticipated Subsurface Conditions and Geotechnical Report | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 37 | 30 Jul 02 | (E-mail) Independent Geotechnical Review-Nachshonim | No indication of confidential communication; waiver of privilege |

| | | | |
|---|---|---|---|
| 38 | 30 Jul 02 | (E-mail) Independent Geotechnical Review-Nachshonim | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 39 | 30 Jul 02 | (E-mail) Independent Geotechnical Review-Nachshonim | No basis for work product; routine contract administration |
| 41 | 30 Jul 02 | COE note Agenda – Geotech Briefing IPO | No basis for work product; routine contract administration |
| 42 | 31 Jul 02 | (E-mail) RE: Independent Geotechnical Review-Nachshonim | No basis for work product; routine contract administration |
| 43 | 1 Aug 02 | (E-mail ) Independent Geotechnical Review-Nachshonim | No basis for work product; routine contract administration |
| 44 | 4 Aug 02 | COE Notes re: Israel Klar | No basis for work product; routine contract administration |
| 45 | 8 Aug 02 | Meeting – Informal notes Sub: Geotech. Mtg. w/attached emails | No basis for work product; routine contract administration |
| 46 | 19 Aug 02 | Meeting with OC and KO re: Geotechnical issues | No indication of confidential communication; routine contract administration |
| 47 | 16 Dec 02 | Sub: Nachshonim Geotech Status | No basis for work product; routine contract administration |
| 61 | 4 Oct 03 | Meeting with NAU OC and CT, Claim Issues | No indication of confidential communication; routine contract administration |
| 62 | 6 Nov 03 | Meeting with NAU OC and CT, Claim Issues | No indication of confidential communication; routine contract administration |
| 63 | 10 Nov 03 | Geotechnical Claims Meetings | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |
| 64 | 12 Nov 03 | Contractor Geotechnical Claims | Nonexistent rule cited (Rule 34(b)(3)); routine contract administration, waiver of privilege |

Plaintiff requests that the Court issue an Order requiring the production of these documents within 7 days.

**E. <u>Documents Produced By The Government In January 2006 Establish There Are Other Claim Related Documents That Are Not Privileged Which Must Be Produced</u>**

The Government has produced various documents which refer to comments, analyses, and reports. These documents are listed below:

(a) Memo dated July 26, 2002 requested comments from IDF and MOD on segment 56 claim (Exhibit 33); such comments if submitted in writing have not been produced;

(b) Memo dated March 2, 2004 from Michael Roach to counsel for MOD refers to December 23, 2003 fax from MOD to Government regarding DSB panel specifications-the fax has not been produced (Exhibit 34);

(c) March 5, 2004 memo from Roach to counsel for MOD inclosing analysis of 3”- 6” and Rolider claims – the analysis has not been produced – (Exhibit 35);

(d) May 10, 2004 memo from Roach to counsel for MOD requesting comments on insulated panel reprocurement; - the comments if submitted in writing have not been produced (Exhibit 36);

(e) June 14, 2002 email Roach to Kerekesh directs Kerekesh to record the actual conditions found at each building site – (Exhibit 37) – the actual recorded conditions have not been produced;

(f) December 16, 2002 email Roach to Rovero, Blackburn, Abraham and Iarosis - states “The IDF has gotten their original geotech to investigate the site and to write a report along with attending the various meetings regarding the pile loading test program. I also understand that they have consulted with other geotech’s to comment on the contract versus actual conditions on site.” They are finalizing their reports and the Government should get a consolidated report in the next few weeks. The IDF consolidated report has not been produced (Exhibit 38).

(g) February 18, 2003 memo from Colonel Staab to MOD refers to a February 10, 2003 letter from MOD regarding geotechnical issues. The letter also states that the geotechnical aspects of the problem have been studied in depth by several geotechnical engineers (Exhibit 39). The February 10, 2003 letter and the studies if in writing, have not been produced.

(h) November 12, 2003 memo from Roach to counsel for MOD Re: Geotechnical claims -

"I have enclosed our field analysis for your use. I have also tabbed the sections of our analysis where your input could become particularly helpful." (Exhibit 40). The Government's field analysis is not privileged and has not been produced. Moreover, any possible privilege was waived as a result of forwarding the analysis to MOD.

(i) December 3, 2003 memo from M. Roach to counsel for MOD forwarding ten binders pertaining to geotechnical claims. (Exhibit 41). The binders are not privileged. Further, any possible privilege was waived as a result of forwarding the binders to MOD.

These comments, analyses, and reports are discoverable. Accordingly, Plaintiff requests that the Court issue an Order requiring that these documents be produced within 7 days.

**F. Miscellaneous Production Failures Noted In Plaintiff's Good Faith Effort Letters**

Numerous specific production failures were noted in Plaintiff's letters of November 11, 2005, December 8, 2005 and February 22, 2006 which are set forth below:

(a) Videos which the Government stated would be produced have not been produced;

(b) Personal files, diaries, logs, and notes not produced;

(c) QA/QC files not produced;

(d) Failure to produce the ten boxes from Wiesbaden as represented by the Government;

(e) Failure to produce internal notes, internal meeting memoranda or diaries of Mr. Mills;

(f) Failure to produce documents supporting or relating to the Geotechnical Report;

(g) Failure to produce the other bids;

(h) Failure to produce Power Point presentations or status reports; and

(i) Failure to produce or provide access to the original boring cores depicted in the Geotechnical Report.

Plaintiff requests that the Court issue an Order requiring the Defendant to produce items (a) – (i) within 7 days.

## III. **CONCLUSION**

Based on the foregoing Plaintiff submits that the Government has failed to comply with its discovery obligations in numerous material respects. These failures have resulted in substantial prejudice to Plaintiff. Accordingly, Plaintiff respectfully requests that the Court issue an Order compelling Defendant to: (1) produce the documents and other tangible things identified in Sections II. B. through II. F.; (2) require Defendant to file declarations/certifications as noted in Sections II. B., II. C.(1), II. C(2) and II. C. (3); and (3) require Defendant to pay Plaintiff its reasonable expenses incurred in making the motion, including attorney's fees.

August 4, 2006

Respectfully submitted

/s/______________________________

Brian Cohen
BELL, BOYD & LLOYD PLLC
1615 L Street, N.W.
Suite 1200
Washington, DC 20036
(202) 466-6300

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing Plaintiff's Motion for Order Compelling Discovery With Respect To Defendant's Responses to Plaintiff's Requests For Production of Documents In Case Nos. 04-1719C, 04-1792C and 05-114C, and Memorandum of Points and Authorities, was served by electronic transmission this 4th day of August, 2006 on:

Shalom Brilliant, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., Room 8012
Classification Unit
Washington, D.C. 20530

/s/______________________________
Brian Cohen