**Request for International Judicial Assistance**
**pursuant to the Hague Convention of 18 March 1970**
**on the Taking of Evidence Abroad in Civil or Commercial Matters**

# Request for Production of Documents and Oral Deposition of Israel Defense Forces

| | |
|---|---|
| 1. Sender: | Honorable Judge Edward J. Damich, Chief Judge<br>United States Court of Federal Claims<br>717 Madison Place<br>Washington, D.C. 20001 |
| 2. Central Authority of the Requested State: | Director of Courts<br>22 Kanfei Nesharim St.<br>Jerusalem, 95464 Israel<br>Telephone (972) (2) 655-6843<br>Facsimile (972) (2) 655-6846 |
| 3. Person/entity to whom the executed request is to be served upon: | Israel Defense Forces<br>c/o Office of the Legal Advisor<br>Ministry of Defense<br>22 Kaplan Street<br>The Kiryah<br>Tel Aviv 61909, Israel |
| **IN CONFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOUR TO SUBMIT THE FOLLOWING REQUEST:** | |
| 4. a. Requesting judicial authority (article 3,a): | Honorable Judge Edward J. Damich, Chief Judge<br>United States Court of Federal Claims<br>717 Madison Place<br>Washington, D.C. 20001 |
| b. To the competent authority of (article 3,a): | The State of Israel |
| c. Name of the case and any identifying number: | A.A.B Joint Venture v. United States, United States Court of Federal Claims, Case No. 04-1719-C (Consolidated) |

| | |
|---|---|
| 5. Name and addresses of the parties and their representatives (including representatives in the requested State) (article 3,b) | |
| a. Plaintiff: | A.A.B Joint Venture<br>P.O. Box 37, Rosh HaAyin, 68100 Israel<br>Attn: Mr. S. Denison Keeney |
| Representatives/Attorneys: | Brian Cohen, Esquire<br>Lawrence M. Prosen, Esquire<br>Philip Clark Jones, Esq.<br>Bell, Boyd & Lloyd PLLC<br>1615 L Street, N.W.<br>Suite 1200<br>Washington, D.C. 20036-5610 USA<br>202-955-6834 (telephone)<br>202-955-4117 (facsimile)<br>bcohen@bellboyd.com<br><br>Yoram Bonen, Adv.<br>Noya Kislev, Adv.<br>Fischer Behar Chen Well Orion & Co.<br>3 Daniel Frisch Street<br>Tel Aviv 64731, Israel<br>T+972.3.6944249 F+972.3.6944265<br>nkislev@fbclawyers.com |
| b. Defendant: | United States of America |
| Representatives/Attorneys: | Shalom Brilliant, Esquire<br>Senior Trial Counsel<br>Commercial Litigation Branch, Civil Division<br>United States Department of Justice<br>Attention: Classification Unit<br>8th Floor, 1100 L Street, N.W.<br>Washington, D.C. 20530 USA<br>202-305-7561 (telephone)<br>202-305-7643 (facsimile)<br>Shalom.Brilliant@usdoj.gov |
| c. Other parties: | None |
| d. Representatives: | None |

| | |
|---|---|
| 6. a. Nature of the proceedings (divorce, paternity, breach of contract, product liability, etc.) (article 3,c): | Claims by contractor for equitable adjustment of contract price and time pursuant to Federal Contract Disputes Act, arising out of construction of Nachshonim Military Storage Base, Elad, Israel. |
| b. Summary of complaint: | Contractor asserts claims for extra compensation (including delay damages) and time extensions arising out of the inconsistencies between the Geotechnical Report and actual subsequent conditions, issues concerning performance of earthworks, issues concerning the design and construction of the dry storage buildings, issues concerning the paint selection for dry storage building panels, and Governmental restrictions on the use of Third Country National labor. |
| c. Summary of defense and counterclaim: | The United States denies liability. |
| d. Other necessary information or documents: | None |
| 7. a. Evidence to be obtained or other judicial act to be performed (article 3,d): | A.A.B Joint Venture seeks to take oral testimony, under oath, of the designee(s) of the Ministry of Defense concerning the topics described in Exhibit B; and the production of documents from the Israel Defense Forces responsive to the topics and categories described in Exhibit C.<br><br>Unless the parties agree to different time or place, the deposition (oral examination) will be conducted as follows:<br><br>**Time / Date:** 9:30 a.m. on Tuesday, November 28, 2006<br>**Place:** Fischer Behar Chen Well Orion & Co.<br>3 Daniel Frisch Street<br>Tel Aviv 64731, Israel |
| b. Purpose of the evidence or judicial act sought: | Collection of evidence in aid of prosecuting the litigation identified above in Block 6. |

| | |
|---|---|
| 8. Identity and address of any person to be examined (article 3,e): | Person(s) designated by Israel Defense Forces as knowledgeable concerning the topics listed in Exhibit B. NOTE: If there is no one knowledgeable about all topics, multiple persons can be designated so that all topics may be covered. If only one person is designated, that person will be responsible to investigate in advance each topic and be prepared to testify concerning all topics. |
| 9. Questions to be put to the persons to be examined or statement of the subject-matter about which they are to be examined (article 3,f): | *See,* Exhibit B for the topics on which A.A.B Joint Venture seeks to examine the Israel Defense Forces designee(s). |
| 10. Documents or other property to be inspected (article 3,g): | No less than one week prior to the scheduled deposition (see block 7 above), the IDF shall produce for inspection and copying the documents described in Exhibit C. If no time and place are agreed to between the parties, the documents will be produced as follows:<br><br>**Time/ Date:** 9:30 a.m., Tuesday, November 21, 2006,<br>**Place:** Fischer Behar Chen Well Orion & Co.<br>3 Daniel Frisch Street<br>Tel Aviv 64731, Israel<br><br>NOTE: Counsel for the United States has advised that he reserves the right to object to the production of documents or the disclosure of information in the possession of IDF as to which the U.S. Government may have a claim to the attorney-client privilege or the attorney work-product privilege under the "common interest" doctrine. |
| 11. Any requirement that the evidence be given on oath or affirmation and any special form to be used (article 3,h): | The oral examination will be under oath or affirmation. |
| 12. Special methods or procedure to be followed (e.g. oral or in writing, verbatim, transcript or summary, cross-examination, etc.) (articles 3,i and 9): | The examination by the attorney for the A.A.B Joint Venture of the IDF's designee(s) will be conducted in English by oral questions and answers to be recorded and transcribed verbatim. If counsel for the United States so desires he may cross-examine the witness. |

96902/F/1

| | |
|---|---|
| 13. Request for notification of the time and place for the execution of the Request and identity and address of any person to be notified (article 7): | Please notify Plaintiff's Counsel, Brian Cohen, Esquire, Bell, Boyd & Lloyd PLLC, 1615 L Street, N.W., Suite 1200, Washington, D.C. 20036-5610 USA; 202-955-6834 (telephone), 202-955-4117 (facsimile); bcohen@bellboyd.com, both verbally and in writing immediately upon service of this document upon the party identified in block 3 above.<br><br>Note: Coordination of the time and place of the document production and deposition should be coordinated with:<br><br>Noya Kislev, Adv., or Yoram Bonen, Adv.<br>Fischer Behar Chen Well Orion & Co.<br>3 Daniel Frisch Street<br>Tel Aviv 64731, Israel<br>T+972.3.6944249 F+972.3.6944265<br>nkislev@fbclawyers.com |
| 14. Request for attendance or participation of judicial personnel of the requesting authority at the execution of the Letter of Request (article 8): | Not applicable |
| 15. Specification of privilege or duty to refuse to give evidence under the law of the State of origin (article 11,b): | Counsel for the United States has advised that he reserves the right to object to the production of documents or the disclosure of information in the possession of IDF as to which the U.S. Government may have a claim to the attorney-client privilege or the attorney work-product privilege under the "common interest" doctrine. |

| | |
|---|---|
| 16. The fees and costs incurred which are reimbursable under the second paragraph of article 14 or under article 26 of the Convention will be borne by: | Plaintiff, A.A.B Joint Venture, care of<br>Brian Cohen, Esquire<br>Bell, Boyd & Lloyd PLLC<br>1615 L Street, N.W.<br>Suite 1200<br>Washington, D.C. 20036-5610 USA<br>202-955-6834 (telephone)<br>202-955-4117 (facsimile)<br>bcohen@bellboyd.com |
| DATE OF REQUEST | So requested this ______ day of ______________, 2006. |
| SIGNATURE AND SEAL OF THE REQUESTING AUTHORITY | ______________________________<br>The Honorable Edward J. Damich<br>Chief Judge, United States Court of Federal Claims |

# EXHIBIT A

## Instructions and Definitions

All of the topics for oral examination (Exhibit B) and the documents to be produced for inspection and copying (Exhibit C) relate to the Nachshonim Military Storage Base, near Elad, Israel, which was constructed by the Plaintiff, A.A.B Joint Venture, under Contract No. DACA90-01-C-0043 with the United States Army Corps of Engineers for the use and benefit of the Israel Ministry of Defense and/or Israel Defense Forces.

With respect to the deposition (oral inquiry, under oath), the Israel Defense Forces ("IDF") will be examined on all aspects of the following:

1. Design of the Dry Storage Buildings ("DSB") and the paint specification for the Dry Storage Building exterior panels, earthworks and subgrade replacement issues, piling and/or spread footing recommendations, the geotechnical report identified below, use of Third County National labor, the design and development of the Project and resulting Contract Documents.

2. Exhibit B hereto sets forth some of the specific topics of inquiry, but the oral examination will not be limited to just those topics.

For purposes of the Oral examination, pursuant to United States Court of Federal Claims ("COFC") Rule 30(b)(6), the oral examination or deposition is intended to be a deposition of the entity known as Israel Defense Forces. As such, pursuant to that Rule, IDF shall designate one or more individuals to testify on IDF's behalf and answer questions based upon the topics set forth in Exhibit B, hereto. For ease of reference a copy of COFC Rule 30 is appended hereto as Exhibit D.

The following definitions and instructions apply to the requests set forth herein.

1. In the Topics for Inquiry, "you" or "your" refers both to IDF and to the knowledge of IDF and/or its agents, officials, designers, consultants, employees, military officers and personnel; counsel (to the extent not privileged) and others.

2. "Defendant," "Government," and/or "USACE" shall mean The United States of America, its departments and agencies, including, but not limited to the U.S. Army Corps of Engineers ("USACE"), its employees, agents, representatives, attorneys, independent contractors, consultants and anyone acting for or on its behalf.

3. "You" shall mean the recipient of these requests.

4. "IDF" shall mean Israel Defense Forces, its officers, directors, employees, agents, representatives, attorneys, independent contractors, consultants and anyone acting for or on its behalf.

5. "MOD" shall mean the Israel Ministry of Defense, its officers, directors, employees, agents, representatives, attorneys, independent contractors, consultants, designers and anyone acting for or on its behalf.

6. "A.A.B" shall mean plaintiff, A.A.B Joint Venture, its officers, directors, employees, agents, representatives, attorneys, independent contractors, consultants and anyone acting for or on its behalf, including such officers, directors, employees, agents, representatives, attorneys, consultants and anyone acting for or on behalf of its constituent members consisting of ABB Susa, Inc., A. Arenson Ltd. and the Baran Group.

7. The "Project" shall mean the Nachshonim Military Storage Base, being constructed by A.A.B for the USACE near Elad, Israel.

8. The "Contract" unless otherwise identified, shall mean Contract No. DACA90-01-C-0043 between A.A.B Joint Venture and the USACE.

9. "Communication" shall mean any form or transmission of information between or among natural persons, corporations, limited liability companies, partnerships, associations or other like entities.

10. As used herein, "documents" means writings, graphs, charts, photographs, phone records, data compilations (from which information can be obtained or translated, if necessary, by A.A.B through detection devices into reasonably usable form), letters, correspondence, memoranda, minutes, notes, contracts, agreements, notes or memoranda of conversations, films, studies, transcripts, microfilm, desk calendars, appointment books, diaries, timesheets, logs, bulletins, circulars, notices, rules, regulations, prospectuses, directions, teletype messages, interoffice communications, reports, company sheets, credit files, evidences of indebtedness, negotiable instruments, telegrams, mailgrams, cables, teletypes, electronic mail images, facsimiles, books, news releases, newspapers, magazines, advertisements, periodicals, pamphlets, sketches, drawings, statements, reports, articles of incorporation, by-laws, resolutions, directives, minutes of meetings, balance sheets, income and loss statements, profit and loss statements, inventories, operating budgets, accounting worksheets, financial statements, stock transfer books, ledgers, journals, books of accounts, bills, vouchers, bank checks, proposals, offers, orders, receipts, invoices, checks, working papers, telephone messages, notebooks, postcards, evaluations, recommendations, annual reports, confirmations, leases, analyses, feasibility or market studies, disbursement requests or orders, charts, graph indices, projections, forms, data sheets, electronic media, data processing disks or readable computer-produced interpretations, booklets, articles, manuals, speeches, stenographic notes, maps,

studies, tests, surveys, cables, tape and disk recordings (audio, video, or computer), computer programs, computer codes or logs or indices, photographs, blueprints, slides, audit reports, personal interviews, summaries or paraphrases of any of the foregoing or material similar to any of the foregoing, however denominated, whether handwritten, typewritten, printed, copied, microfilmed, or printed by computer on cards or tapes or contained in computers or in any machine readable format.

Any document which contains any additional comment, notation, addition, insertion or marking of any kind of which is not a part of another document within the scope of these requests is to be considered as a separate document.

"Documents" also includes documents in existence, available, or otherwise retrievable, and/or in the custody, possession or control of IDF, its agents, employees, or attorneys, and includes all documents to which Defendant has access.

11. "Blank-Lehrer" shall mean A. Blank-A. Lehrer Consulting Engineers Ltd., its officers, directors, agents, employees, representatives, independent contractors, attorneys, consultants and anyone acting for or on its behalf.

12. "Geotechnical Report" shall mean the geotechnical report and annexes included in Division 5 of the Contract.

13. "RFP" shall mean the Request for Proposals for the Project.

14. Unless otherwise indicated in the Requests below the documents requested concern the Project.

15. "Tahal" means Tahal Consulting Engineers, its officers, directors, agents, employees, representatives, independent contractors, attorneys, consultants, subcontractors, designers, and anyone acting for or on its behalf.

16. Where there are documents in both Hebrew and English, produce both versions of such documents.

# EXHIBIT B

## Topics for Inquiry – Oral Deposition - Israel Defense Forces

### Personal Background of Witness(es)

1. Describe in detail each IDF Designee's educational and professional background and experience.

### Subject # 1: Dry Storage Buildings / /Alternate Paint

2. Describe in detail IDF's involvement in the design and construction of the Dry Storage Buildings ("DSBs"), from January 1, 1999 to the completion of the Project.

3. Describe IDF's previous experience or involvement in designing or supervising the design of dry storage buildings.

4. Describe in detail your involvement in the preparation of the specifications and drawings for the Project.

5. Identify any other buildings that were visited by IDF in connection with the design of the DSBs (prior to bid, or after the commencement of construction), specifically with regard to the sealing of the envelope, placement of steel, or pressure testing.

6. Identify each design professional with IDF that participated in the Project, and the details of each such person's involvement.

7. Identify all design professionals outside IDF with whom you consulted concerning the design of the Dry Storage Buildings, and the details of the advice or information provided by each such design professional.

8. Describe in detail IDF's involvement in establishing the criteria for the pressure tests, all sources of information IDF consulted with respect to such pressure tests, and IDF's involvement in the performance of the pressure tests.

9. Describe in detail IDF's involvement or participation in the Project after award of the contract to A.A.B Joint Venture.

10. Describe in detail IDF's involvement in responding to requests on the part of A.A.B to change the design requirements and/or the air tightness requirements for the Dry Storage Buildings.

11. Describe in detail IDF's involvement in responding to requests by A.A.B to change the required tests for air tightness of the Dry Storage Buildings.

12. Describe in detail the reasons and engineering justification for the requirement for external panel cladding and internal structural steel.

13. Describe in detail the reasons and engineering justification for the requirement that the exterior panels meet an L/600 deflection requirement.

14. Describe in detail the reasons and engineering justification for the initial choice of "M-20" space frame bolts, and reasons for any changes that were made to this requirement.

15. Describe in detail IDF's involvement in preparation of any cost estimates (prior to or after contract award) for construction of the Dry Storage Buildings or any components thereof.

16. Identify all meetings IDF or your staff attended related in any way to the design or construction of the Dry Storage Buildings (including but not limited to panel cladding, roof, walls, and/or placement of structural steel), identify the date of each such meeting, the identity of the attendees, and if no written record of such meeting was prepared, to the best of IDF's recollection, the details of the subjects or issues that were discussed at each such meeting.

17. Describe in detail each site visit IDF or your staff made to the Project, including the date thereof, what you observed, who was present, and the details of what was discussed during such visit.

18. State whether IDF is/was aware of any other buildings in existence in the world that maintained equal or nearly equal pressure to that required for the design of the Dry Storage Buildings.

19. Describe exactly what was being tested for in the required pressure tests, that is, whether the test was to determine the degree to which the building could contain the air inside the building, or the degree to which external air was allowed into the building.

20. Describe in detail IDF's knowledge and opinions concerning the mock-up of the Dry Storage Building panels that was performed by the A.A.B. Joint Venture in Ashdod.

21. State whether prior to bid or at any point after bid IDF became aware of any concern or doubt on the part of any person, including but not limited to the Israel Defense Forces, Ministry of Defense or United States Army Corps of Engineers, concerning the feasibility of meeting the pressure test requirements for the Dry Storage Buildings, and if so, identify each such person and relate the full details of what was expressed and when and to whom it was expressed.

22. Describe in detail each change to the design requirements for the Dry Storage Buildings that was made before or after issuance of the contract by the U.S. Army Corps of Engineers to the A.A.B Joint Venture, and the reasons for each such change.

23. State whether in IDF's opinion based on the information available to it today the pressure test requirements as set forth in the original contract requirements were capable of being met.

24. Describe in detail IDF's involvement in the preparation of the specifications for the paint on the Dry Storage Building panels and any revisions / amendments thereto, including but not limited to all sources of information consulted with respect to the preparation of such specifications.

25. Describe in detail the reasons and engineering justification for each of the

requirements for the Dry Storage Building panel paint.

26. Describe in detail IDF's involvement in consideration of requests on the part of the A.A.B Joint Venture for changes / proposed alternates to the paint specifications, and the reasons and engineering justification for your recommendations with respect to each such request for changes / proposed alternates.

**Subject # 2: Earthworks**

27. Describe in detail IDF's involvement in the preparation of the Geotechnical Report (including the Site Investigation Survey).

28. Describe in detail IDF's involvement in the preparation of the Request for Proposals and any revisions / amendments thereto.

29. Describe in detail IDF's involvement or participation in the Project after award of the contract to A.A.B Joint Venture, including but not limited to observing or analyzing piling, borings, subgrade replacement, excavation, fill preparation and/or excess material removal work performed by the Joint Venture and observation of subsurface conditions.

30. At the time the Geotechnical Report (including the Site Investigation Survey) was being prepared, what restrictions existed on access to the site of the Project?

31. Who made the decision to plan ten borings, and what factors were taken into consideration in making that decision?

32. Why were only seven borings taken, of the ten planned borings?

33. How was the location of the borings determined?

34. Were IDF personnel present when the borings were taken?

35. Did IDF receive reports concerning the results of the borings?

36. In IDF's opinion, were seven borings adequate upon which to base the opinions of the nature of the subsurface conditions which were included in the Geotechnical Report?

37. Describe the process by which the boring material was collected and analyzed?

38. Who performed the analysis of the material collected by the borings?

39. What is the geotechnical meaning of "hard" rock, "weathered" rock, and "medium hard" rock.

40. Is rock mass with a uniaxial compressive strength of 500-800 kg/sq. cm. considered "hard" rock?

41. With respect to the statement in Paragraph 4.5 of the Geotechnical Report to "our experience in the region," whose experience does that statement make reference to, and what were the details of such experience?

42. In the references at Conclusions, Section 6.1 to "most of the area" will be excavated in hard limestone and dolomite and that "[w]eathered rock areas in depths exceeding 3.0 m" would be "small," what was the intended meaning of "most" and "small"? Is there a percentage or a range of percentages that can reasonably be applied to these terms?

43. With respect to the statement at Section 6.4 of the Geotechnical Report that "[t]he excavated rock is hard and solid, enabling the construction of the buildings on flat foundations," who made or participated in making that determination, and what factors were taken into consideration?

44. With respect to the statement at Section 7.2.4.1 of the Geotechnical Report that horizontal pressures developed by earth pressure shall be calculated according to earth pressure coefficient "at rest" of Ka=0.5, how was this directive determined, what factors were taken into account, and who was involved in the decision to include this directive in the Report?

45. With respect to the statement at Section 7.2.3.2 of the Geotechnical Report that penetration length of piles shall be determined according to an allowable friction of 15 ton/sq. m., how was this directive determined, what factors were taken into account, and who was involved in the decision to include this directive in the Report?

46. What factors were taken into account with respect to the determination in Section 7.2.5 of the Geotechnical Report that the foundation method for the buildings referenced therein be footings as opposed to piles.

47. Was it anticipated that the contractors would formulate their bids based on their forecast of the expected costs utilizing the foundation methods described in Section 7.2.5 of the Geotechnical Report.

48. Whether the witness has any knowledge concerning the extent of the market in Israel for the sale of crushed rock for use as fill material for the period 2001 – 2003.

49. Whether any estimates were performed concerning the availability of on-site material for grading and fill operations on the Project; and if so, the details pertaining to such estimates.

50. Whether any analysis was performed concerning whether there would be excess material that would have to be removed from the site, and if so, the details pertaining to such analysis, including what if any quantities were anticipated to be disposed and/or sold, and whether during RFP preparations or after Contract award there was consideration given to raising the site to reduce the amount of excess material. Include in your answer full details of discussions concerning such matters.

51. What permits, licenses, or other such documents were required from the Israeli Land Authority with respect to export, re-use or sale of material excavated from the Project site.

52. Whether the Host Nation Technical Requirements set forth in the Contract represented custom and usage in the construction industry in Israel for the issues addressed therein.

53. With respect to the statement in the Geotechnical Report, at Section 3, that "considerable information" about the properties of the rock was collected from the quarry area north of the site, what information does this statement refer to, and which quarry is referred to.

Was it reasonable for bidders to assume that the subsurface conditions at the Project site were similar in nature to that quarry?

54. Whether it was anticipated that the contractors would formulate their bids based on the assumption that there would be excess material of a quality such that it could be sold for off-site use. If so, explain in detail the basis for such assumption.

55. Describe in detail the nature and quantity of clay material that was anticipated.

56. Whether you anticipated a specific total length and number of piles and how you made these determinations.

57. The percentage and/or quantity of the various types of subsurface material which was anticipated.

58. Describe in detail any analyses or information which you have prepared, whether or not discussed or provided to anyone, concerning the JV's claims.

59. Whether any IDF personnel analyzed the claim submitted by Rolider, Ltd. and the expert report attached thereto, with respect to the Geotechnical Report, and if so, his/her opinions concerning such claim.

60. Describe in detail any comments provided to anyone pertaining to A.A.B's differing site conditions claim relating to Segment 56 of the project.

61. Describe in detail the actual subsurface conditions encountered at every building site.

62. Describe in detail the substance of any reports in your possession which comment on the contract versus actual subsurface conditions at the site.

**Subject # 3: Subgrade Replacement**

63. Identify who was responsible for the design for earthworks and site development, and the role each person who participated in such design played in the process.

64. Identify which if any sections of the Project specifications dealing with earthworks and site development were designed exclusively by IDF.

65. Was any distinction made in the Geotechnical Report for subsurface conditions under roads as compared to under buildings?

66. Was the IDF consulted by the USACE with respect to change orders issued by USACE concerning replacement of subgrade on slopes of Road 16 and in Roads 12 and 17?

67. Did the IDF agree with USACE that AABJV was entitled to extra compensation for replacing unsuitable and weak bearing material under roadways?

68. With respect to the IDF's involvement in design of roads, did the IDF rely on the Geotechnical Report in performing such design?

**Subject # 4: Use of Third County National Labor**

69. Was there a well-established practice in the State of Israel prior to the issuance of the RFP up to the date the contract was executed that Third Country Nationals ("TCNs") from countries having diplomatic relations with Israel were utilized to perform construction work in Israel. If so, state all facts upon which your knowledge of such practice is based, identify each person from whom each such fact was derived or learned and identify any documents pertaining thereto.

70. Describe any Israeli trade custom or practices regarding use of TCNs or other foreign nationals on this Project or similar projects.

71. In your opinion did A.A.B act reasonably in anticipating the use of TCNs to perform a significant portion of the work? If so, state all facts upon which such opinion is based, identify each person from whom each such fact was derived or learned and identify all documents pertaining to said opinion.

72. Identify each person who considered, evaluated or reviewed plaintiff's claim for TCN labor and (a) describe in detail the particular consideration, evaluation or review given and

(b) identify each document and oral communication which in any way concerns the consideration, evaluation, or review of the claim.

73. Identify and produce any schedules or schedule analyses prepared, reviewed or which were prepared for the use of IDF, MOD or defendant, relating or pertaining to the TCN labor claim.

74. Describe in detail any MOD or IDF review, analysis or evaluation of plaintiff's claim for equitable adjustment and/or certified claim for TCN labor, including (a) the dates of such review, analysis or evaluation; (b) the result of the review, analysis or evaluation; (c) the identity of any documents concerning such review, analysis or evaluation; and (d) the identity of all persons with knowledge of such review, analysis or evaluation.

75. Identify all estimates, prepared prior to and after contract award, including but not limited to cost estimates, which refer or relate in any way to the use of TCNs on the Project.

76. Describe in detail all communications, written or oral, between or among USACE, IDF, MOD, and/or any other entity or person, concerning (a) the practice in Israel prior to and up to the date of contract execution of utilizing TCNs from countries having diplomatic relations with Israel to perform construction work in Israel; (b) the reasonableness of plaintiff's assumption that it would utilize such TCN labor; (c) review, analysis or evaluation of SR-22, Specification Section 00100, paragraph 13, or SR-14; and (d) Israeli government decrees enacted after contract award relating to foreign workers, including but not limited to, the "Closed Sky" policy and the "Deserters" Policy.

77. State whether the IDF represented, promised or otherwise warranted that plaintiff could utilize, as necessary, TCNs from countries having diplomatic relations with Israel in performing the work, state in detail all facts, contract provisions and legal bases upon which you rely to support your contention, identify each person from whom such fact was derived or

learned and identify and produce every document relating or pertaining in any way to your contention.

78. Discuss any contractual risks surrounding TCN labor importation visas and whether such risk was contractually assigned to plaintiff, state in detail all facts, contract provisions and legal bases upon which your contention is based, identify each person from whom such fact was derived or learned, and identify each and every document relating or pertaining in any way to your contention.

# EXHIBIT C

# Documents to be Produced for Inspection and Copying

**General**

1. All documents concerning the formation of the Contract, including your contribution to the preparation of the Contract Documents (including plans and specifications).

2. All documents concerning meetings between A.A.B and you relating to the Project.

3. All documents provided by Amos Israeli, Israel Klar, Adi Lehrer, Rami Kerekesh, GeoProspect and any other consultant, as requested in Lt. Col. Einat Rozen's 10 October 2005 letter to these individuals, with particular reference to bullet item G. See attached Exhibit E.

**DSB & Alternate Paint Rejection**

4. Any contract which IDF, MOD or Tahal let, awarded or issued to outside, third-party designers for the performance of design and other services for the Project.

5. The final drawings for the Dry Storage Buildings, and all earlier drafts.

6. The final specifications for the Dry Storage Buildings and panel paint, and all earlier amendments and drafts.

7. All communications with other persons/institutions related to the Project, including but not limited to letters, emails, notes, reports, submittals, etc. Your response should include (but not be limited to) all communications with the United States Army Corps of Engineers, Israel Defense Forces, Ministry of Defense, and outside consultants or design professionals.

8. All internal documents related to the Project, including but not limited to meeting minutes, inspection reports, trip reports, memoranda, speed memos, etc.

9. All documents related to the deflection requirements for exterior panels.

10. All documents related to the choice of bolt size for the space frame.

11. All documents related to the specifications for the paint for the Dry Storage Building panels.

12. All documents related to requests by the Contractor for changes in the specifications.

13. All documents concerning:

a) any communications, whether written or oral, between or among you, A.A.B, IDF, MOD and/or any other entity concerning the Contract requirements for insulation;

b) any discussions of PPDVF (Primer Paravinil de Fluor) coatings; and/or

c) design requirements for the DSB insulated panel system.

14. All documents concerning any analyses or review of the DSB insulated panel systems, including, but not limited to, the exterior facing paint system for the Project.

15. All documents concerning any analyses of A.A.B's proposals and/or submittals for wall and roof panel systems for the DSBs.

16. All documents which were used, referred to, and/or consulted in preparation of Division 02, Section 003 of the Contract.

17. All documents concerning quality control, inspection(s), survey(s) and observations concerning the design, fabrication, transportation, storage, insulation, finishing and erection of the DSB wall and roof panel system and paint system of the Project.

18. All documents concerning any analyses of the DSB insulated panel system and paint system.

19. All documents concerning any analyses of the exterior paint coating of the DSB insulated panel system and paint system.

20. All documents concerning the design, drawings and/or specifications relating to the DSB insulated panel system and paint system.

21. All documents concerning the design, drawings and/or specifications relating to the DSB insulated panel exterior facing paint systems.

22. All documents concerning any analyses of the design, drawings and specifications for the DSB insulated panel system including, without limitation, the exterior facing paint system.

23. All documents concerning any estimates and/or analyses by IDF, MOD, and/or any other entity concerning the DSB insulated panel system and/or the DSB insulated panel exterior paint system.

24. All documents concerning any instance where A.A.B failed to comply with any Contract requirements for the design, acquisition and installation of the DSB insulated panel system and/or the exterior facing paint system for said panels.

25. All documents concerning any review and/or analyses of A.A.B's proposed methods/operations for manufacture, transport, storage, installation and/or protection of the DSB insulated panel system.

26. All documents concerning any review and/or analyses of A.A.B's proposed methods/operations for manufacture, transport, storage, installation and protection of the DSB exterior face paint system of the insulated panels.

27. All documents concerning USACE's consideration of alternative DSB insulated panels and/or paint systems.

28. All documents concerning USACE's statement that it would consider alternative paint systems and/or panels for DSB panels.

29. All documents concerning any analysis of the DSB insulated panel system exterior facing paint system's thickness, percentage of resin, make-up, ingredients, chemical composition and/or warranty requirements.

30. All documents concerning USACE's rejection of the Italpannelli panels and/or Thyssen Krupp panels proposed paint systems.

31. All documents concerning USACE's rejection of Duracor 40 and/or Thyssen Krupp panel and paint systems.

32. All documents concerning all communications, whether written or oral, between IDF, USACE, MOD, or any consultants or designers concerning the insulated panels and their exterior paint system.

33. All documents used, prepared or analyzed by IDF, MOD, and/or any other entity in development of the RFP for the Project with regard to labor and/or the use of TCN labor.

34. All documents used, prepared or analyzed by IDF, MOD, and/or any other entity in development of the design specifications and requirements for insulated panel and/or the exterior facing paint systems for said insulated panels.

35. All documents concerning any review or analysis of the paint system actually utilized on the DSB insulated panel exterior facing for the Project.

36. All documents concerning any communications, whether written or oral, between or among USACE, IDF, MOD, any consultants, designers and/or any other entity regarding the criteria for the DSB insulated panel exterior facing paint system.

37. All documents concerning any assertion that the requirements in Division 2, Section 003, Page 28, Chapter J, Building Envelope, Paragraph 2, Insulated Panels, are a minimum thickness for paint systems.

38. All documents concerning limitation, analyses, testing, meeting minutes and other similar materials involving and/or discussing the Government's April 30, 2004 approval of the

Italpannelli/La Magona S4 20/20/20 micron paint system, including, without limitation, any analyses, tests, inspections or meeting minutes related thereto.

39. All documents concerning USACE's rejection of the Italpannelli (La Magona) 20/20 micron (Duracor 40) and/or Thyssen Krupp 15/20/15 micron paint systems.

**TCN Labor**

40. All documents concerning any meeting attended by IDF personnel, agents, consultants or designers relating to the Project, including without limitation:

a) Any meeting concerning Third Country National ("TCN") labor;

b) Any meeting concerning A.A.B's applications and/or requests for use of TCN labor on the Project;

c) Any meeting concerning the Israel Government's "Closed Skies" policy;

d) Any meeting concerning the paint systems for the DSB insulated panels; and/or

e) Any meeting which reviewed, analyzed or evaluated any of A.A.B's claims which are the subject matter of this action.

41. All documents concerning any communications, whether written or oral, between or among A.A.B, MOD, IDF, any IDF consultant or designer and any other entity, individual or agency concerning the use of TCNs on the Project.

42. All documents concerning any analyses prepared by or for you, or reviewed by or for IDF, concerning A.A.B's use of TCNs on the Project.

43. All documents referring or relating to the use of TCNs on the Project.

44. All documents prepared by or for you which involve or relate to TCNs.

45. All documents concerning any analyses of the Contract requirements for the use or non-use of TCNs on the Project.

46. All documents concerning any analyses of the use of TCNs under the terms of the Contract.

47. All documents concerning any analysis of the Contract requirements and any industry standard or practices in Israel pertaining to the utilization of TCNs in Israel.

48. All documents concerning any industry standard or practices in Israel pertaining to the use of TCNs to perform construction work in Israel.

49. All documents concerning A.A.B's Technical and Management Proposal.

50. All documents concerning A.A.B's Technical and Management Proposal, Early Mobilization and Procurement Measures ("EMPM") and/or all analyses thereof made by or for you.

51. All documents concerning or analyzing Section 3.2.2 of A.A.B's EMPM.

52. All documents concerning or analyzing Contract Sections SR-13 and/or SR-14 of the Special Contract Requirements (Section 0800).

53. All documents concerning or analyzing A.A.B's Third-Country National Tax Plan for the Project.

54. All documents concerning or analyzing SR-22 of the Special Contract requirements (Section 0800).

55. All documents concerning or analyzing Instruction to Bidders Section 00100 ¶ 13 "Third Country National Tax Plan."

56. All documents concerning or analyzing use of TCNs on the Project.

57. All documents concerning any analyses of A.A.B's use and proposed use of TCN labor on the Project.

58. All documents concerning Israel Government Resolution 642, dated September 2, 2001.

59. All documents concerning the Israel Government's December 2001 action and/or policy decreasing the number of permits available for bringing TCNs into Israel.

60. All documents concerning the Israel Government's December 4, 2001 policy barring import of TCNs into Israel, also known as the "Closed Sky" policy.

61. All documents concerning the Israel Government's July 1, 2002 imposition of punitive levies on the employment of TCNs on Israeli projects.

62. All documents concerning the Israel Ministry of Interior's "Deserters" Policy.

63. All documents concerning staffing and labor issues on the Project.

64. All documents concerning the impact of the availability of TCN labor on the progress of work on the Project.

65. All documents concerning the impact of the Israeli Government's "Closed Skies" policy on the availability of TCN labor for the Project.

66. All documents concerning the impact of the Israeli Government's "Closed Skies" policy on the progress of work on the Project.

67. All documents concerning the applications or requests by A.A.B for use of TCN labor on the Project.

68. All documents concerning any denial by the Israeli Government of A.A.B's applications or requests for use of TCN labor on the Project.

69. All documents concerning the impact of any denial by the Israeli Government or any agency, ministry or subdivision thereof, including without limitation, IDF and MOD, of A.A.B's applications or requests for use of TCN labor on the Project.

70. All documents concerning any delays to the Project as a result of the Israeli Government's "Closed Skies" policy.

71. All documents concerning any delays to the Project as a result of the lack of availability of TCN labor for the Project.

72. All documents concerning any analyses performed by or for you at any time of the impact of the lack of availability of TCN labor for the Project.

73. All documents concerning any review, analysis or evaluation of any of A.A.B's claims which are the subject matter of this action.

74. All documents concerning any review, analysis or evaluation of the schedules submitted by A.A.B for the Project.

75. All documents concerning any request by A.A.B for a time extension for or on account of the availability or lack of availability of TCN labor for the Project.

76. All documents concerning any review, analysis or evaluation of any request by A.A.B for a time extension for or on account of the lack of availability of TCN labor for the Project.

**Earthworks**

77. All documents concerning communications, written or oral, between you and ILA, MOD and/or Blank-Lehrer concerning in any way the facts and circumstances involving the design, specifications, or otherwise relating to the Project.

78. All documents concerning any meetings attended by IDF relating to the Project.

79. All documents concerning any meetings attended by IDF concerning the Geotechnical Report, subsurface or subgrade design and specifications, and/or actual subsurface or subgrade material and conditions encountered.

80. All documents concerning any analyses of the type and quantity of foundation work, including pilings and footings, performed on the Project.

81. All documents concerning any analyses or review of the excavation work performed on the Project.

82. All documents concerning any analyses, calculations, estimates, take-offs and other like documents regarding A.A.B's excavation operations, including cut and fill operations, piling excavations and foundations excavations, on the Project.

83. All documents, treatises and other documents or materials upon which the Geotechnical Report was based.

84. All documents concerning site surveys, subsurface investigations, subsurface explorations and other like operations performed at any time in the area of the Project.

85. All documents concerning descriptions, measurements, quantity take-offs, logs of the depth of foundation excavations, including footings and/or pilings on the Project, and/or the quantity and composition of the materials excavated on the Project.

86. All documents concerning quality control, inspection, survey and other like activity by or for you concerning the geotechnical conditions, geological conditions, subsurface conditions, civil engineering, excavation, cut/fill operations and/or foundation work on the Project.

87. All documents concerning differing site conditions and/or claims of differing site conditions on the Project.

88. All documents concerning the use(s) of the Project site prior to the current construction operations under the Contract.

89. All documents concerning bidders' access to the Project site prior to award of the Contract.

90. All documents concerning the quantity, location and depth of exploratory borings on the Project site performed at any time by IDF, MOD, ILA, Blank-Lehrer, Tahal, USACE or any other entity.

91. All documents concerning any analyses of the Geotechnical Report performed at any time by IDF, MOD, ILA, Blank-Lehrer, Tahal, USACE or any other entity.

92. All documents concerning the design, drawings, specifications, and other documentation concerning the geotechnical, geological and civil engineering work on the Project.

93. All documents concerning any analyses of the design, drawings and specifications for the subgrade work at the Project, including excavation and foundations requirements.

94. All documents concerning any estimates, take-offs, and/or analyses performed by or for IDF, Tahal, Blank-Lehrer, MOD, USACE or any other entity concerning the cut and fill operations on the Project.

95. All documents concerning any analyses of available on-site material for grading and excavation operations on the Project.

96. All documents concerning any analyses of anticipated or planned removal of excess soils and excavated material for the Project.

97. All documents concerning any analyses of anticipated import of replacement fill materials for the Project.

98. All documents concerning any industry trade custom or practice regarding the cut and fill operations for the Project.

99. All documents concerning any industry trade custom or practice concerning the disposal of excess excavated material from the Project site.

100. All documents concerning any requirements for a franchise, permit, license or other like document or approval from ILA to export, reuse or sell excavated material from the Project site.

101. All documents concerning ILA requirements concerning disposal, re-use or sale of excavated materials from the Project.

102. All documents concerning requirements of the Contract with regard to the disposal, re-use and/or sale of excavated materials from the Project.

103. All documents concerning any communications, written or oral, between or among A.A.B, IDF, MOD, USACE and ILA concerning disposal, re-use or sale of excavated materials from the Project

104. All documents concerning any instance when A.A.B excavated excess materials for subgrade foundations on the Project.

105. All documents concerning any excessive excavation by A.A.B on the Project.

106. All documents concerning any communications, written or oral, between or among A.A.B, IDF, MOD, USACE and ILA or any other entity regarding any excess excavation for subgrade foundation on the Project.

107. All documents concerning loading, pile test loading, foundation design and civil engineering design calculations concerning the Project that were prepared by or for IDF, MOD, ILA, USACE or any other entity.

108. All documents concerning any failure of A.A.B to comply with the contract requirements for excavation work at the Project.

109. All documents concerning any instance when A.A.B. failed to comply with the Contract with regard to:

a. Excavation;
b. Foundation design;
c. Foundation work;
d. Placement of fill; and/or
e. Disposal of excess material.

110. All documents concerning A.A.B's pile load test operations on the Project.

111. All documents concerning any review and/or analyses of A.A.B's pile load tests for the Project.

112. All documents concerning review and/or analyses of A.A.B's foundation designs or submissions for the Project.

113. All documents concerning A.A.B's foundation designs or submissions for the Project.

114. All documents concerning review and/or analyses of A.A.B's submissions concerning excavation work on the Project.

115. All documents concerning the preparation of the RFP for the Project.

116. All documents used, prepared or analyzed by you in development of the RFP for the Project with regard to subgrade excavation, disposal of excess materials, foundation design and foundation work for the Project.

117. All documents concerning any communications, written or oral, received by you from bidders for the Project.

118. All documents concerning any communications, written or oral, between or among IDF, ILA, MOD, USACE or any other entity concerning the RFP for the Project with regard to:

a. Excavation;
b. Foundations;
c. Cut and fill operations;
d. Pilings;
e. Footings;
f. Disposal of excess excavated materials; and/or
g. Sale of excess excavated materials.

119. All documents concerning any analyses by or for USACE, Tahal, Blank-Lehrer, IDF, MOD, ILA or any other entity with regard to the subsurface conditions at the Project.

120. All documents concerning any communications, written or oral, between or among IDF, MOD, ILA, Blank-Lehrer, Tahal, USACE or any other entity concerning Plaintiff's claims which are the subject matter of this action.

121. All personal diaries, appointment books, desk calendars, field diaries, minutes of meetings, field books or logs, notebooks, daily or other reports, or similar documents concerning the Project.

122. All documents used or developed in preparation of the Geotechnical Report for the Project.

123. All documents concerning any analyses of the geological or subsurface conditions at the Project site.

124. All documents concerning any pre-proposal/bid geological or subsurface explorations of the Project site.

125. All documents concerning the pre-proposal/bid subsurface borings taken at the Project site.

126. All documents concerning any analysis of pre-proposal/bid subsurface borings taken at the Project site.

127. All documents concerning any communications, written or oral, between or among IDF, MOD, ILA, Tahal, USACE or any other entity concerning the pre-proposal/bid subsurface borings taken at the Project site.

128. All documents concerning any analysis or evaluation of the boring logs included in the Geotechnical Report.

129. All documents concerning any pre-proposal/bid communications, written or oral, between IDF, MOD, ILA, Tahal, USACE and any other entity regarding the Geotechnical Report.

130. All documents concerning any communications, written or oral, between IDF, MOD, ILA, Blank-Lehrer, Tahal, USACE, A.A.B and any other entity concerning any analyses or evaluation of the Geotechnical Report.

131. All documents concerning any pre-proposal/bid communications, written or oral, between USACE, IDF, MOD, ILA, Tahal, Blank-Lehrer, or any other person or entity regarding:

a. The subsurface or geological conditions at the Project site;
b. The Geotechnical Report;
c. The pre-proposal/bid borings taken at the Project; and

d. The adequacy of the Geotechnical Report.

132. All documents concerning any communications, written or oral, among or between USACE, IDF, ILA, MOD, Tahal, Blank-Lehrer and any other entity concerning the expected subsurface conditions and/or properties of the subsurface materials and/or rock to be excavated at the Project.

133. All documents concerning any review or analysis of the design of the building foundations on the Project.

134. All documents concerning any communications, written or oral, between or among IDF, MOD, ILA, A.A.B, Tahal, Blank-Lehrer or any other entity regarding the subsurface conditions actually encountered during construction of the Project.

135. All documents concerning any communications, written or oral, between or among IDF, ILA, MOD, A.A.B, Tahal, Blank-Lehrer or any entity concerning the quantity, properties, type and/or classification of materials actually encountered and/or excavated at the Project.

136. All documents concerning any descriptions of materials which were actually excavated at the Project.

137. All documents concerning the excavation operations actually performed at the Project.

138. All documents concerning any review or analysis of the subsurface materials which were actually excavated at the Project.

139. All documents concerning any analysis or comparison of the subsurface materials anticipated based on the Geotechnical Report with the subsurface materials actually encountered at the Project.

140. All communications between IDF, MOD, Blank-Lehrer, Tahal, USACE and/or any other entity concerning Plaintiff's claims in this action.

141. All documents concerning any analyses of Plaintiff's requests for equitable adjustment for differing site conditions which are the subject of this action.

142. All documents concerning any communications, written or oral, between or among USACE, IDF, MOD, ILA, Tahal, Blank-Lehrer and any other entity regarding the criteria for preparation at any time of any geotechnical report or geological survey of all or any portion of the Project site, including any such report(s) or survey(s) made after the award of the Contract to A.A.B.

143. All documents concerning any communications, written or oral, between or among USACE, IDF, MOD, ILA, Tahal, Blank-Lehrer and any other entity regarding criteria for subsurface exploration of all or a portion of the Project site, including any such exploration(s) made after the award of the Contract to A.A.B.

144. All documents concerning any subsurface exploration(s) of all or a portion of the Project site at any time, including any such exploration(s) made after award of the Contract to A.A.B.

145. All documents concerning any actual or alleged deficiency, misstatement or error in the Geotechnical Report.

146. All documents concerning any inspection, survey or visit to the "quarry area north of the site" as identified in Paragraph 3 of the Geotechnical Report.

147. All documents concerning the "[c]onsiderable information about the properties of the rock" that was "collected from the quarry area north of the site," as alleged in Paragraph 3 of the Geotechnical Report.

148. All documents concerning any communications, written of oral, between or among USACE, IDF, MOD, ILA, Tahal, Blank-Lehrer, and any other entity regarding the "[c]onsiderable information about the properties of the rock" that was "collected from the quarry area north of the site" as alleged in paragraph 3 of the Geotechnical Report.

149. All documents concerning:

a. The requirements for cut and fill operations to attain the design profile/base elevation of the project site;
b. The design profile/base elevation of the Project site;
c. Any change or proposed change to the design profile/base elevation of the Project site;
d. The disposal of excess excavated material from or off the project site; and/or
e. The disposal of excess excavated material to areas on the Project site.

150. All documents concerning any communications, written or oral, among or between USACE, IDF, MOD, ILA, Tahal, Israel Ministry of Environment/Authority of Wildlife and Reservations concerning:

a. The requirements for cut and fill operations to attain the design profile/base elevation of the Project site;
b. The design profile/base elevation of the Project site;
c. Any change or proposed change to the design profile/base elevation of the Project site;
d. The disposal of excess excavated material from or off the Project site; and/or
e. The disposal of excess excavated material to areas on the Project site.

151. All documents prepared at any time by or on behalf of USACE, IDF, MOD, Tahal, Blank-Lehrer and/or any other entity concerning the estimated or actual costs on the Project of:

a. Excavation;
b. Excavation for pilings;
c. Excavation for building foundation footings;
d. Excavation for roads;
e. Installation/placement of pilings;
f. Installation/placement of building foundation footings,
g. Construction of roads; and/or
h. Disposal, use, re-use and/or sale of excess excavated materials.

152. All documents concerning any communications, written or oral, among or between USACE, IDF, MOD, Tahal, Blank-Lehrer and/or any other entity discussing, evaluating or providing instructions how to prepare a geotechnical report for a 400 acre construction site based on seven bore holes, with most of them located close to the circumference of the site.

153. All documents concerning any communications, written or oral, between or among USACE, IDF, MOD, Tahal, Blank-Lehrer and/or any other entity discussing, evaluating and/or providing instruction why there is a need to generate another geotechnical report based on additional bore holes for the Project site for additional building(s) to be added to the Project some time in the future.

154. All documents concerning the use, sale or disposal of excess excavated material from the Project site.

155. All documents concerning any estimates prepared by or on behalf of USACE, IDF, MOD, ILA, Blank-Lehrer, Tahal and/or any other entity of:

a. The value of the excess excavated materials that would be available from the Project site; and/or

b. The amount of excess excavated material that would be available from the Project site.

156. All documents concerning any communications between or among USACE, IDF, MOD, ILA, Blank-Lehrer, Tahal and/or any other entity concerning:

a. The value of excess of excess excavated materials that would be available from the Project site; and/or

b. The amount of excess excavated material that would be available from the Project site.

157. All documents concerning any communications, written or oral, among or between USACE, IDF, ILA, MOD, Tahal and/or Blank-Lehrer concerning any ILA regulations, restrictions, conditions and/or requirements concerning the use, sale, and/or disposal of excess excavated material from the Project site.

158. All documents concerning any ILA regulations, restrictions, conditions and/or

requirements concerning the use, sale and/or disposal of excess excavated material from the Project site.

159. All documents concerning any fees, payments, licenses, royalties or taxes which you allege are owed to ILA, IDF or MOD for excess excavated materials removed by A.A.B from the Project site.

160. All documents concerning any communications, written or oral, between or among USACE, IDF, MOD, ILA, Tahal, Blank-Lehrer and/or any other entity concerning any fees, payments, licenses, royalties or taxes which you allege are owed to ILA, IDF or MOD for excess excavated materials removed by A.A.B from the Project site.

161. All documents concerning any estimate(s) prepared at any time of the fees, payments, licenses, royalties or taxes which you allege are owed or could be owed to ILA, IDF or MOD for excess excavated materials removed by A.A.B from the Project site.

162. All documents concerning any communications, written or oral, at any time between USACE and the other bidders who submitted a proposal in response to the RFP for the Project, including any communications which occurred at any time after award of the Contract to A.A.B.

163. All documents which were prepared by any of the bidders who submitted a proposal in response to the RFP for the project and which was received by USACE after award of the Contract to A.A.B.

164. All photographs, whether black and white or color, of the core borings that are included in the Geotechnical Report.

165. All documents concerning any pre-bid meeting at the Project site.

166. All documents prepared at any time by or on behalf of USACE, IDF, MOD, Tahal, Blank-Lehrer and/or any other entity concerning the costs of (1) excavation, (2) excavation for pilings, (3) excavation for footings, (4) excavation for roads,

(5) installation/placement of pilings, (6) installation/placement of footings, (7) installation of roads, and/or (8) disposal of excess excavated materials for the Project.

**General Communications**

167. All documents concerning communications, written or oral, between you and MOD, Blank-Lehrer, Tahal, any consultants of MOD, and/or IDF concerning in any way the facts and circumstances involving the Project, Geotechnical Report or RFP.

168. All documents concerning communications, written or oral, between you and any other person or entity concerning, in any way, the facts and circumstances involving the Project.

169. All documents concerning any meetings attended by you relating to the Project.

# EXHIBIT D

Rule 30. Depositions Upon Oral Examination

(a) When Depositions May Be Taken; When Leave Required.

(1) A party may take the testimony of any person, including a party, by deposition upon oral examination without leave of court except as provided in paragraph (2). The attendance of witnesses may be compelled by subpoena as provided in RCFC 45.

(2) A party must obtain leave of court, which shall be granted to the extent consistent with the principles stated in RCFC 26(b)(2), if the person to be examined is confined in prison or if, without the written stipulation of the parties,

(A) a proposed deposition would result in more than ten depositions being taken under this rule or RCFC 31 by the plaintiffs, or by the defendants, or by third-party defendants;

(B) the person to be examined already has been deposed in the case; or

(C) a party seeks to take a deposition before the time specified in RCFC 26(d) unless the notice contains a certification, with supporting facts, that the person to be examined is expected to leave the United States and be unavailable for examination in this country unless deposed before that time.

(b) Notice of Examination: General Requirements; Method of Recording; Production of Documents and Things; Deposition of Organization; Deposition by Telephone.

(1) A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action. The notice shall state the time and place for taking the deposition and the name and address of each person to be examined, if known, and, if the name is not known, a general description sufficient to identify the person or the particular class or group to which the person belongs. If a subpoena duces tecum is to be served on the person to be examined, the designation of the materials to be produced as set forth in the subpoena shall be attached to, or included in, the notice.

(2) The party taking the deposition shall state in the notice the method by which the testimony shall be recorded. Unless the court orders otherwise, it may be recorded by sound, sound-and-visual, or stenographic means, and the party taking the deposition shall bear the cost of the recording. Any party may arrange for a transcription to be made from the recording of a deposition taken by non-stenographic means.

(3) With prior notice to the deponent and other parties, any party may designate another method to record the deponent's testimony in addition to the method specified by the person taking the deposition. The additional record or transcript shall be made at that party's expense unless the court otherwise orders.

(4) Unless otherwise agreed by the parties, a deposition shall be conducted before an officer appointed or designated under RCFC 28 and shall begin with a statement on the record by the officer that includes (A) the officer's name and business address; (B) the date, time, and place of the deposition; (C) the name of the deponent; (D) the administration of the oath or affirmation to the deponent; and (E) an identification of all persons present. If the deposition is recorded other than stenographically, the officer shall repeat items (A) through (C) at the beginning of each unit of recorded tape or other recording medium. The appearance or demeanor of deponents or attorneys shall not be distorted through camera or sound-recording techniques. At the end of the deposition, the officer shall state on the record that the deposition is complete and shall set forth any stipulations made by counsel concerning the custody of the transcript or recording and the exhibits, or concerning other pertinent matters.

(5) The notice to a party deponent may be accompanied by a request made in compliance with RCFC 34 for the production of documents and tangible things at the taking of the deposition. The procedure of RCFC 34 shall apply to the request.

(6) A party may in the party's notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.

(7) The parties may stipulate in writing or the court may upon motion order that a deposition be taken by telephone or other remote electronic means. For the purposes of this rule and RCFC 28(a), a deposition taken by such means is taken at the place where the deponent is to answer questions.

(c) Examination and Cross-Examination; Record of Examination; Oath; Objections. Examination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of the Federal Rules of Evidence except Rules 103 and 615. The officer before whom the deposition is to be taken shall put the witness on oath or affirmation and shall personally, or by someone acting under the officer's direction and in the officer's presence, record the testimony of the witness. The testimony shall be taken stenographically or recorded by any other method authorized by subdivision (b)(2) of this rule. All objections made at the time of the examination to the qualifications of the officer taking the deposition, to the manner of taking it, to the evidence presented, to the conduct of any party, or to any other aspect of the proceedings shall be noted by the officer upon the record of the deposition; but the examination shall proceed, with the testimony being taken subject to the objections. In lieu of participating in the oral examination, parties may serve written questions in a sealed envelope on the party taking the deposition and the party taking the deposition shall transmit them to the officer, who shall propound them to the witness and record the answers verbatim.

(d) Schedule and Duration; Motion to Terminate or Limit Examination.

(1) Any objection during a deposition must be stated concisely and in a non-argumentative and non-suggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation directed by the court, or to present a motion under RCFC 30(d)(4).

(2) Unless otherwise authorized by the court or stipulated by the parties, a deposition is limited to one day of seven hours. The court must allow additional time consistent with RCFC 26(b)(2) if needed for a fair examination of the deponent or if the deponent or another person, or other circumstance, impedes or delays the examination.

(3) If the court finds that any impediment, delay, or other conduct has frustrated the fair examination of the deponent, it may impose upon the persons responsible an appropriate sanction, including the reasonable costs and attorney's fees incurred by any parties as a result thereof.

(4) At any time during the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and

manner of the taking of the deposition as provided in RCFC 26(c). If the order made terminates the examination, it may be resumed thereafter only upon the order of the court. Upon demand of the objecting party or deponent, the taking of the deposition must be suspended for the time necessary to make a motion for an order. The provisions of RCFC 37(a)(4) apply to the award of expenses incurred in relation to the motion.

(e) Review by Witness; Changes; Signing. If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them. The officer shall indicate in the certificate prescribed by subdivision (f)(1) whether any review was requested and, if so, shall append any changes made by the deponent during the period allowed.

(f) Certification and Delivery by Officer; Exhibits; Copies.

(1) The officer must certify that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. This certificate must be in writing and accompany the record of the deposition. Unless otherwise ordered by the court, the officer must securely seal the deposition in an envelope or package indorsed with the title of the action and marked "Deposition of [here insert name of witness]" and must promptly send it to the attorney who arranged for the transcript or recording, who must store it under conditions that will protect it against loss, destruction, tampering, or deterioration. Documents and things produced for inspection during the examination of the witness must, upon the request of a party, be marked for identification and annexed to the deposition and may be inspected and copied by any party, except that if the person producing the materials desires to retain them the person may (A) offer copies to be marked for identification and annexed to the deposition and to serve thereafter as originals if the person affords to all parties fair opportunity to verify the copies by comparison with the originals, or (B) offer the originals to be marked for identification, after giving to each party an opportunity to inspect and copy them, in which event the materials may then be used in the same manner as if annexed to the deposition. Any party may move for an order that the original be annexed to and returned with the deposition to the court, pending final disposition of the case.

(2) Unless otherwise ordered by the court or agreed by the parties, the officer shall retain stenographic notes of any deposition taken stenographically or a copy of the recording of any deposition taken by another method. Upon payment of reasonable charges therefor, the officer shall furnish a copy of the transcript or other recording of the deposition to any party or to the deponent.

(3) [Not used.]

(g) Failure to Attend or to Serve Subpoena; Expenses.

(1) If the party giving the notice of the taking of a deposition fails to attend and proceed therewith and another party attends in person or by attorney pursuant to the notice, the court may order the party giving the notice to pay to such other party the reasonable expenses incurred by that party and that party's attorney in attending, including reasonable attorney's fees.

(2) If the party giving the notice of the taking of a deposition of a witness fails to serve a subpoena upon the witness and the witness because of such failure does not attend, and if another party attends in person or by attorney because that party expects the deposition of

that witness to be taken, the court may order the party giving the notice to pay to such other party the reasonable expenses incurred by that party and that party's attorney in attending, including reasonable attorney's fees.