No. 05-114C
(Consolidated with Case Nos.
04-1719C, 05-1172C, and 06-49C)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

Filed electronically:

BRIAN COHEN
Bell, Boyd & Lloyd LLP
1615 L Street, N.W.
Suite 1200
Washington, D.C. 20036
(202) 466-6300

May 1, 2007

Attorney for Plaintiff

TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ..... 1

I. ISSUES PRESENTED AND SUMMARY OF ARGUMENT ..... 1

II. IN RELIANCE ON CONTRACTUAL REPRESENTATIONS BY THE U.S. GOVERNMENT, PLAINTIFF'S BID WAS PRICED BASED ON USE OF THE SKILLED LABOR PROVIDED BY THIRD COUNTRY NATIONALS ..... 4

III. THE GOVERNMENT OF ISRAEL'S DECEMBER 2001 "CLOSED SKY POLICY" PREVENTED THE JOINT VENTURE FROM IMPORTING NEW TCN WORKERS ..... 10

IV. THE CONTRACTOR FULLY DOCUMENTED THE SEVERE IMPACT OF ITS INABILITY TO BRING NEW TCNs INTO ISRAEL ..... 17

V. THE CORPS OF ENGINEERS RECEIVED UNCHALLENGED REPORTS DOCUMENTING THE IMPACT OF THE PROHIBITION ON IMPORTING NEW TCNs THROUGHOUT THE DURATION OF THE PROJECT ..... 20

VI. THE CORPS OF ENGINEERS DOCUMENTED THE IMPACT OF THE TCN RESTRICTIONS ON CORPS PROJECTS IN ISRAEL ..... 23

VII. THE CONTRACTOR MADE EXTRAORDINARY EFFORTS TO OVERCOME THE UNANTICIPATED ISRAELI GOVERNMENT RESTRICTIONS ON IMPORTATION OF TCN LABOR, WITH LITTLE OR NO HELP FROM THE CORPS OF ENGINEERS ..... 25

VIII. THE JOINT VENTURE IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR AS TO ENTITLEMENT ..... 30

A. The Applicable Legal Standard ..... 30

B. The Representations In SR-22 And SR-14 Together With The Relevant Surrounding Circumstances Demonstrate That The U.S. Government Warranted That The Joint Venture Would Be Able to Utilize, As Necessary, Nationals of Third-Countries Having Diplomatic Relations With Israel ..... 31

C. The Drastic Changes In The Government Of Israel Policy With Respect To TCNs Breached The Warranty ..... 39

D. In The Alternative The Contractor Is Entitled To An Excusable Time Extension Under The Default Clause ............................................. 40

IX. CONCLUSION ............................................................................................. 42

TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Amino Bros. Co. v. U.S.*,

372 F.2d 485, *cert. denied* 389 U.S. 846 (1957) ....32

*Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242 (1986). ....30

*Avia Group Int'l v. L.A. Gear California, Inc.*,

853 F.2d 1557 (Fed. Cir. 1988). ....30

*Aydin Corp. (West) v. Widnall*,

61 F.3d 1571 (Fed. Cir. 1995) ....31

*Blinderman Constr. Co. v. United States*,

695 F.2d 552 (Fed. Cir. 1982). ....31

*Celotex Corp. v. Catrett*,

477 U.S. 317 (1986) ....30

*D & L Constr. Co. & Assoc. v. United States*,

*402 F.2d 990* (Ct.Cl. 1968) ....32

*Dale Construction Co. v. United States*,

168 Ct. Cl. 692 (1964) ....31

*Everett Plywood & Door Corp. v. United States*,

419 F.2d 425 (Ct. Cl. 1969). ....32

*Gerhardt F. Meyne Co. v. United States*,

110 Ct.Cl. 527 (1948) ....33

*Gould, Inc. v. United States*,

935 F.2d 1271 (Fed. Cir. 1991). ....38

*Hills Materials Co. v. Rice*,

982 F.2d 514 (Fed. Cir. 1992) .......................................................................................38

*Hol-Gar Mfg. Corp. v. United States*,

169 Ct.Cl. 384, 395, 351 F.2d 972 (1965)......................................................................38

*Pac. Gas & Elec. Co. v. United States*,

73 Fed. Cl. 333, 391 (2006), *recon. denied,* 74 Fed. Cl. 779 (2006). ..........................................37

*Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*,

739 F.2d 624 (Fed. Cir. 1984) .......................................................................................30

*Rutgers v. United States*,

41 Fed. Cl. 764 (1998)...................................................................................................31

*Sweats Fashions, Inc. v. Pannill Knitting Co.*,

833 F.2d 1560 (Fed. Cir. 1987) .....................................................................................30

*United States v. Windstar Corp.*,

518 U.S. 839, 909, n.58 (1996) .....................................................................................32

*Walter Dawgie Ski Corp. v. United States*,

30 Fed. Cl. 115 (1993)...................................................................................................31

<u>Administrative Decisions</u>

*ABC Demolition Corp.*,

GSBCA No. 2288, 68-2 BCA ¶ 7,069.............................................................................33

*Berglund-Johnson, Inc.*,

VACAB No. 965, 71-1 BCA ¶ 8834..............................................................................41

*Carl W. Linder Co.*,

Eng. BCA No. 3526, 78-1 BCA ¶ 13,114 ...................................................................32, 34

*Dravo Corp.*,

Eng. BCA No. 3800, 79-1 BCA ¶ 13,575 ....................................................................33

*E.L. David Constr. Co., Inc.*,

ASBCA Nos. 29225, 34387, 89-3 BCA ¶ 22,140 ..........................................................41

*E-Systems, Inc.*,

ASBCA No. 18877, 76-1 BCA ¶ 11,797.........................................................................36

*George C. Alvarez*,

ASBCA No. 22441, 81-1 BCA ¶ 14,859.........................................................................41

*Henderson, Inc.*,

DOTBCNA No. 2423, 2500, 94-2 BCA ¶ 26,728.........................................31, 32, 33

*J.W. Bateson Co., Inc.*,

GSBCNA No. 4687, 80-2 BCA ¶ 14,608.................................................................31, 33

*Keno and Sons Constr. Co.*,

Eng. BCA No. 5837, 95-2 BCA ¶ 27,687 ....................................................................36

*Marine Transport Lines, Inc.*,

ASBCA No. 28962, 86-3 BCA ¶ 19,164.........................................................................41

*Meems Bros. & Ward*,

ASBCA No. 3982, 58-1 BCA ¶ 1786...............................................................................41

*Odebrecht Contractors of California Inc.*,

Eng., BCA No. 6372, 00-2 BCA ¶ 30,999 ...................................................34, 36, 40

*Old Dominion Security*,

ASBCA No. 40062, 91-3 BCA ¶ 24,173.........................................................................32

*Philco Ford Corp.*,

ASBCA No. 14623, 72-1 BCA ¶ 9390.............................................................................38

*Robert McMullan & Son, Inc.*,

ASBCA No. 11998, 68-1 BCA ¶ 7068 ........ 41

*Southland Mfg. Corp.*,

ASBCA No. 12500, 69-1 BCA ¶ 7714 ........ 41

*Swinerton & Belvoir*,

ASBCA No. 24022, 81-1 BCA ¶ 15,156 ........ 34

RULES

RCFC 56(c) ........ 30

TREATISES

*John Cibinic, JR. & Ralph C. Nash, Jr., Administration of Government Contracts*, 179 (2d ed. 1986). ........ 32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-114C |
| | ) | (Consolidated with Case Nos. |
| THE UNITED STATES OF AMERICA | ) | 04-1719C, 05-1172C, and 06-49C |
| | ) | (Chief Judge Damich) |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff A.A.B. Joint Venture, in support of its Motion for Summary Judgment as to entitlement, states and represents as follows:

## I. ISSUES PRESENTED AND SUMMARY OF ARGUMENT

The events leading up to the execution of the contract for the Nachshonim Military Storage Base ("the Project") demonstrate an intent on the part of the United States Corps of Engineers ("the Corps") that a substantial portion of the skilled labor would be provided – consistent with the existing practice at bid time for large construction projects in Israel -- by workers who were trained and experienced in various construction trades who would be brought into Israel for that purpose from other countries, primarily Romania and Turkey.

The contract itself contains both an express representation and an implied representation that Third Country National ("TCN") workers could be brought into Israel by the Contractor. Moreover, it is undisputed that the Plaintiff relied thereon in formulating its bid, which was documented by the Contractor's submission as part of its bid package of its plan showing the number of TCNs it anticipated using for each month of performance and reducing its bid costs, as directed, by the income tax which would be reimbursed to the Contractor.

Due to unanticipated drastic changes in Israeli Government policy, the A.A.B Joint Venture was prevented from bringing into Israel any new TCN workers during the entire duration of the Project. The situation that resulted from what became known as Israel's "Closed Sky Policy" was accurately described in a letter (*see* Ex. 42-B) which the Corps of Engineers' Israel Program Office drafted in July 2002 for the U.S. Embassy to send to the Government of Israel:

> *This letter addresses the problem associated with the Government of Israel (GOI) restrictions on importing Third Country National (TCN) workers into Israel.*
>
> *The U.S. Army Corps of Engineers is managing military construction projects in Israel in support of the Wye River Accords.* * * *
>
> *The LOAs negotiated between the GOI, DSCA and the Corps of Engineers, envision that contractors will make use of third Country National (TCN) construction workers. The LOA provisions were reflected in the contract documents and all of the contractors priced their proposals assuming extensive use of TCN labor. TCN labor for construction is significantly less expensive than Israeli labor.*
>
> *In the past five months the GOI has imposed restrictions upon the number of visas issued for TCNs, which have resulted in a serious shortage of TCN construction workers.* * * * *Skilled finish workers are in particularly short supply. This labor shortfall is expected to delay project completion on projects under construction beyond need dates of the IDF and could result in contractor claims for increased cost.*
>
> * * *
> *Contractors have notified us that considerable delays and increased cost have already been experienced. As described above, the impact is that project completions may be delayed beyond military need dates and other necessary projects may not be awardable due to increased cost.*
>
> *Your immediate assistance is requested to expedite resolution of this problem to our mutual benefit.*

The primary issues presented in this Motion are (1) whether an express representation and an implied representation in the contract that TCN workers could be brought into Israel by the Contractor constituted an express warranty; and (2) whether the advent of the "Closed Sky

Policy," by which the Government of Israel in December 2001 effectively banned importation of new foreign workers, constituted a breach of such warranty.

The material facts in this case are undisputed, and the issues presented are questions of law, appropriate for resolution by summary judgment.

First, it is undisputed that in accordance with standard construction practices in Israel[1] at the time of the bid, the Corps of Engineers intended that the winning contractor would perform much of the construction with TCN skilled labor. That intention is reflected in the document which established the program under which the Project was built, as well as the advertisement for the Solicitation for Bids. That same intention is also reflected in the Instructions to Bidders, which required each bidder to submit a plan showing anticipated TCN usage.

Moreover, the Corps' intention that TCNs would be used as the primary labor for the Project is reflected in two non-standard, "Special Requirement" contract clauses, one expressly representing that TCNs could be used on the Project, and the other implying that TCNs would be used, by providing a financial incentive for the use of TCNs brought into Israel

---

1 The background and history of how Israel came to rely on foreign workers for the construction trades as well as other types of employment is discussed in the deposition of Avie Arenson, President of one of the three Joint Venture partners, A. Arenson Ltd. (Exhibit 5), at pages 13-18, and the deposition of Yehuda Segev, the former Director General of the Israel Contractors Association (Exhibit 3 ), at pages 7-12. In summary, from roughly 1968 through 1996, there were approximately 250,000 Palestinians who would travel from their villages in the West Bank into Israel to work, including roughly 90,000 construction workers. During this period skilled construction labor in "wet works" – concrete, paint, floor laying, and so on -- was provided predominantly by Palestinian workers. There were virtually no Israeli workers employed in those trades. The uprising of Palestinians in the occupied territories of the West Bank that started in the late 1980s -- which has come to be known as "Intifada I" -- eventually led to the closing of the Israel border with the West Bank in 1996. During the period 1989-1996, use of workers from Turkey and Romania had gradually increased, and when the border was closed in 1996, TCNs became the main source of construction labor in Israel. By the year 2000, when the Corps of Engineers issued its Solicitation for Bids for the Nachshonim Project, the reliance by Israeli construction companies on foreign workers for large construction projects was well established.

exclusively for the Nachshonim Project. The Special Requirements went further to reduce the cost of the work by requiring that bid prices shall not include the value of taxes for which the contractor will be reimbursed.

Second, the Contractor's reliance on the contractual representations that TCNs could be used on the Project is also undisputed. That reliance is evidenced by the Contractor's plan for TCN usage which was included in its bid, as well as its plan for building a TCN labor camp.

Third, it is undisputed that in December 2001 the Government of Israel made a drastic change in its policy with respect to importation of foreign workers, effectively banning the admission into Israel of any new foreign workers. As a result of what became known as the "Closed Sky Policy," the Joint Venture was prevented from bringing a single new foreign construction worker into Israel during the entire duration of the Project.

Lastly, there is ample evidence that establishes beyond dispute that the enforcement of Israel's Closed Sky Policy did in fact severely hamper the Joint Venture's ability to perform its work, in terms of both increased cost and extended durations.[2]

## II. IN RELIANCE ON CONTRACTUAL REPRESENTATIONS BY THE U.S. GOVERNMENT, PLAINTIFF'S BID WAS PRICED BASED ON USE OF THE SKILLED LABOR PROVIDED BY THIRD COUNTRY NATIONALS

The Nachshonim Military Storage Base was one of several construction projects in Israel which were funded by a $200,000,000 credit provided by the United States to Israel pursuant to the Wye River Accords.[3] The Letter of Acceptance ("LOA"), signed by

---

[2] Indeed, as is discussed in detail *infra,* upon announcement of the Closed Sky Policy, the Corps of Engineers immediately recognized that the inability of contractors to bring in new foreign workers put all of the Wye River Accords projects in jeopardy.

[3] The Wye River Accords were signed at the White House on October 23, 1998, by Israeli Prime Minister Benjamin Netanyahu and PLO Chairman Yasser Arafat, witnessed by President Bill Clinton. *See* http://www.state.gov/www/regions/nea/981023_agent.hmtl.

representatives of the United States Government ("USG") and Government of Israel ("GOI") in February 2000, evidences an intent even before the design of the Project had commenced that labor for the Project would be provided by third country nationals. *See* Attachment A to Exhibit 1, Affidavit of S. Denison Keeney (attachments cited hereafter, as "Att.-__ to Ex. _").

Note 5, paragraphs "n" and "o" of the Wye River Accords LOA provides:

> *n. The USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA. The GOI reserves the right, on the grounds of secrecy, security or public order, to limit access to designated security areas and to refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice. USG and GOI shall agree on the nature of information to be provided to the GOI concerning the backgrounds of third country national employees in order to determine their eligibility for admission into Israel and employment in the work implementing this agreement. (emphasis added).*
>
> *o. The GOI will receive, without regard to race, religion, sex, ethnic, or national origin persons of other than Israeli nationality from countries having diplomatic relations with Israel; imported into Israel in accordance with Israeli law and regulation to work exclusively on efforts covered by the provisions of this LOA, provided they are technically qualified for the work and individually meet the security requirements of the GOI.*

In addition, note 8, paragraph "b," provides:

> *... It is understood that processing delays for materiel or personnel may result in cost increases and/or delays to the program. In order to minimize such delays, the GOI shall take appropriate action, as needed, to expedite the required materiel and personnel clearances associated with the execution and performance efforts authorized under this LOA.*

Among the conditions negotiated by the United States Government with the Government of Israel as part of the Wye River Accords was an exemption from Israeli employment taxes for the contractor's third country national work force. Note 10 of the LOA provided in that regard:

> *TAX EXEMPTION FOR THIRD COUNTRY NATIONALS. Third country nationals (non-U.S. or Israeli nationals) imported into Israel as work force*

> *employees of contractor(s) and or subcontractor(s) to work exclusively on efforts covered by the provisions of this LOA shall be exempted by the GOI from liability for or payment of Israeli personal income tax on earnings resulting from such employment nor shall they be subject to importation or exportation taxation of personal property imported into Israel or acquired there for personal use.*

The Corps of Engineers' announcement (Ex. 2) in the Commerce Business Daily of the Solicitation for Bids confirms the pre-contractual intent on the part of the Corps of Engineers that foreign labor would be used on the Project. The "Description" section of that announcement notes:

> *Contractors may bring into Israel nationals of the U.S. and third countries having diplomatic relations with Israel for the purpose of accomplishing the work.*

The Request for Proposals' Instructions to Bidders (Att.-B to Ex. 1.), at paragraph 13, required each bidder to submit a TCN Tax Plan, which would include the bidder's estimate of the amount of TCN personal income and employment taxes the bidder expected to incur in performance of the contract, and a projected expenditure schedule showing when the bidder would incur such taxes.

As explained in the affidavit of S. Denison Keeney (Ex. 1) at ¶¶ 8-10, the Project was part traditional design-bid-build, and part design-build. The first stage of the Project involved performing the excavation work, pursuant to a completed design by the Israel Defense Forces, while the Contractor concurrently performed the balance of the design work. The excavation portion of the Project was equipment-intensive, and minimal TCN labor was needed until concrete work commenced. The Contractor anticipated performing the initial site work using Israeli subcontractors who maintained their own work forces. The Contractor further anticipated using TCN labor for what are known as "wet" works – concrete, masonry, plaster, tiling, flooring and painting. The Contractor was also aware of the fact that the prospective space frame and

panel erection subcontractors would likely use their own TCN erection crews (Keeney Affidavit, Ex. 1 at ¶ 23 & 24).

Pursuant to the Instructions to Bidders, the A.A.B Joint Venture submitted to the Corps as part of its bid package a chart (Att.-C to Ex. 1) showing that it planned to start using TCN labor in month 15 of the Project, with 75 TCNs on staff. The chart shows TCN labor increasing to 125 for months 18-20, then to 200 TCNs for months 21-23, then 300 TCNs for months 24-26, with a gradual decrease thereafter. The number of anticipated TCNs on the chart did not include TCNs to be employed by subcontractors. (Keeney Affidavit, Ex. 1 at ¶ 9). The chart further showed that the Joint Venture anticipated that roughly one-third of its own work force would be TCNs. The total amount of the anticipated tax reimbursement in the Joint Venture's bid was $601,246. The contract Special Requirement, SR-14, directed, "Bid prices shall not include the value of taxes for which the contractor will be reimbursed." (Att.-F to Ex. 1).

The planned use of TCNs for concrete work was advanced from September 2002 (as forecast in the TCN usage plan submitted with the Joint Venture's bid) to March 2002, due to the Corps' agreement to advance the start of concrete works. (Ex. 1, Keeney Affidavit, at ¶ 12).

Volume I of the Joint Venture's bid package, entitled Schedule and Mobilization (Att.-D to Ex. 1, Section 2.1.1) under "Early Mobilization and Procurement Measures," includes a line item "Make final arrangements for location and subcontracting of TCN camp." Section 3.2.2 thereof, entitled "Labor and Labor Camp," states:

> *SAB* [later changed to A.A.B.] *proposes to utilize one of the local manpower companies to provide third country nationals (TCNs) for unskilled, semi-skilled and skilled labor. Workers will come from either Romania or Turkey. Approximately 500 TCN workers are needed at peak production.*
>
> *Foremen are generally Israeli national employees of subcontractors. Highest level construction supervisors and management are SAB employees.*

> *It is common to bring TCNs into Israel to perform construction labor. There are several Israeli manpower firms specializing in providing TCN labor . . . The manpower firms also construct the worker camps, and provide services for feeding, and daily transportation from camp to the job site. ....*

The contract between the United States Corps of Engineers and the A.A.B Joint Venture confirms the pre-contract intent of the Corps, which was relied upon by the Contractor, that third country nationals would be used as the Contractor's work force. SR-22 (Att-G to Ex. 1) provides in that regard:

> *SR-22 – CONTRACTOR WORKFORCE*
>
> *Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel, for purposes of employment in carrying out this contract work. Information concerning third country nationals which will be required include the following: ID number, Passport Number, Age, Place of Birth, Citizenship, and Picture – passport size.*
>
> *Contractors shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses, or permits. The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency.*
>
> *Offerors are advised that the Government of Israel reserves the right to limit access to designated security areas and refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice. (emphasis added).*

The contract also contained, at SR-14, entitled "TAX CLAUSE", the tax exemption provided for in the United States / Israel LOA. (*See* Att.-F to Ex. 1.) The clause required the Contractor to provide to the Corps, for submission to the GOI, information that would establish that the person was qualified for the tax exemption. The qualification was set forth at SR-14, paragraph 4(b), as follows:

> *b. The tax exemption for TCN personal income and employment taxes on earnings is limited to those third*

> *country nationals who enter Israel as employees of the contractor or subcontractors to work exclusively on this contract or other contracts under LOA # IS-B-HAC.*

The procedure established by the Tax Clause, as set forth in SR-14, at paragraphs 4(d) to (f), was as follows: The Contractor would make payment of "qualified" TCN employees' income and employment taxes, in shekels, to the Government of Israel. The Contractor would then include the amount and date of each payment as a supplemental invoice to the Contractor's monthly invoice to the Corps. The Contractor was then reimbursed by the Corps the following month, in dollars, at the exchange rate in effect on the day of each tax payment.

The fact that the Corps of Engineers included in the Invitation to Bid a requirement that each bidder submit a plan showing the extent of its anticipated use of TCN labor and direction not to include taxes on TCN labor in the bid demonstrates conclusively, that the Corps intended at bid time that TCN labor would be used on the Project.

It is also undisputed that the Contractor did in fact rely on anticipated use of TCN labor in formulating its bid. The labor rates used in the bid were based on then-current rates for TCNs. (Ex. 6, Affidavit of Micky Moav). Moreover, as is explained by the Joint Venture's Project Manager (Ex. 1, Keeney Affidavit at ¶ 7), the reimbursement of employment taxes provided a substantial financial incentive to use TCNs brought into Israel exclusively to work on the Nachshonim project. Moreover, Avie Arenson, the President of Arenson, Ltd. (hereafter, "the Arenson Company"), one of the three Joint Venture members, testified in his deposition that had he known about the TCN restrictions before the bid, "we would have put in a higher bid or not a bid at all." (Ex. 5, Arenson Dep. at 129).

## III. THE GOVERNMENT OF ISRAEL'S DECEMBER 2001 "CLOSED SKY POLICY" PREVENTED THE JOINT VENTURE FROM IMPORTING NEW TCN WORKERS

On December 24, 2001, six months after the June 19, 2001 Notice to Proceed on the Nachshonim Project, the Government of Israel issued Decision No. 1141 (Att-A to Ex. 4, Arenson Affidavit), which came to be known as the "Closed Sky Policy." Although the Decision itself does not by its terms ban all new TCNs, on October 3, 2002, the then Prime Minister of Israel, Ariel Sharon, announced that the Government was implementing a complete ban on the admission of foreign workers. (Keeney Affidavit, Ex. 1 at ¶ 14, *See also* Att-C to Ex. 4, Arenson Affidavit).

As noted by Yehuda Segev, the former Director General of the Israeli Contractors Association, the Government did not "carry out this decision like they wrote it." Ex. 3, Segev Dep. at 15. Although the Order itself did not require it, the new policy was to "close the sky." Segev, Ex. 3 at 14. Contractors were still permitted to use foreign labor, but no *new* TCNs were permitted to come into the country. At no point throughout the entire Project was the Joint Venture successful in arranging for any new TCNs to come into Israel to work on the Nachshonim Project. (Arenson Dep., Ex. 5 at 75-76, 81). Further, the inability of the Turkish space frame subcontractor and panel erection subcontractor to utilize their erection crews was one of the primary factors leading to the termination of these subcontracts. (Ex. 1, Keeney Affidavit at ¶ 23 & 24).

By the time the Corps of Engineers put the Nachshonim project out for bid in October 2000, it had become common practice in Israel for contractors on large construction projects to use third country nationals for their skilled labor. (Ex. 4, Arenson Affidavit, at ¶ 5).

The first indication that the Contractor might have a problem bringing in foreign workers arose during a discussion at the weekly meeting among the Corps of Engineers, the Israeli Ministry of Defense, and the Contractor which occurred on January 3, 2002. The minutes of that meeting (Ex. 7) reflect the following at Section 5, under the heading of "Administration:"

> *5.2* ***TCN Visas:*** *JV informed that no Block Visas had been issued by the Ministry of Labor.*
>
> *JV trying to set up meeting with Ministry of Labor in order to move forward on this critical issue.*

The fact that the Government of Israel had effected a change in policy with respect to bringing in foreign construction workers was first noted in the Weekly Status Update for January 4, 2002 (Ex. 8), which was prepared by the Corps of Engineers with respect to all Wye River projects. That Corps' Weekly Status Update reported:

> *Received unofficial notice this week from MOD* [Ministry of Defense] *that the Ministry of Labor has issued a restriction on the processing of Third Country National (TCNs) block visas for all construction in Israel, not just our work. If this continues, this could impact our projects as TCNs are the major source of labor for all projects.*

The Corps' Weekly Status Update for January 25, 2002 (Ex. 9) stated at paragraph 1.d:

> *The Ministry of Defense, Construction Division, is working with the Ministry of Labor to resolve the lack of TCN visas that are being allowed for the Wye River Projects. The restriction of number of TCN labor allowed into Israel will have significant implications on cost and time for these very large projects.*

The Corps' Weekly Update for February 8, 2002 (Ex. 10) states at paragraph 1.d:

> *The Ministry of Defense, Construction Division, has authorized a temporary relief of the TCN tax reimbursement issue for the Nachshonim Storage Base project. Due to Ministry of Labor decision to restrict TCN visas, the contractors are not able to get tax reimbursement for TCN workers if they were not recruited exclusively to work on the Wye Projects. This exemption is being negotiated with MOD to include all projects under contract in Israel as the TCN restriction affects all projects.*

The Arenson Company on behalf of both itself and the Joint Venture had applied for a supplemental 2001 visa allotment for Nachshonim on September 24, 2001, and in January 2002, submitted a request for a 2002 visa allotment. Arenson had included in its application a request for an allocation of roughly 500 visas for use by the Joint Venture. The employees of the Ministry of Labor engaged in a strike that extended from October 16 through November 29, 2001, and as a result, the 2001 application was never considered. The 2002 application had still not been considered when the Ministry of Labor personnel went on strike again on February 14, 2002. (Ex. 4, Arenson Affidavit, at ¶ 13).

The first entry in the record of the Nachshonim Project evidencing progress in obtaining foreign workers is set forth in minutes of the weekly Corps/MOD / Contractor meeting for August 8, 2002 (Ex. 11) which states:

> ***TCN Labor:*** *MOL has officially released BLOCK visas for the year 2002, including 784 to ARENSON, with 519 specific to the Nachshonim Project. However, MOI will not allow import of new TCN's until they are satisfied that all TCN's presently in the country have been employed. Amnon Barkai is checking as to how such a ruling could be implemented.*
>
> *No change, problem remains unsolved.*
>
> *No action from MOL/MOI on JV request for temporary visas for 5 Turkish Nationals required for Pilot Spatial Frame. Action still urgent and critical for these 5 as well as for 25 additional Turkish Nationals in the near future.*

It is important to note that these 25 additional Turkish nationals were agreed to be sponsored by the JV in the Uskon/DS subcontract, which conclusively established TCNs as an integral part of Uskon/DS's bid. (Ex. 1, Keeney Affidavit, at ¶ 23-24).

In order to comprehend how one part of the Government of Israel could block the efficient construction of a project being built for another part of the Government requires some

understanding of both the nature of Israel's coalition government, where different political parties with their own political and economic agendas control different Ministries, as well as recognition of what must appear to non-Israelis as the fluid if not inconsistent nature by which the Israeli Government chooses to enforce or not enforce its laws.[4]

In the Fall of 2001, when the Joint Venture commenced its effort to obtain TCN labor for the Nachshonim Project, there were three ministries involved: the Ministry of Labor, the Ministry of the Interior, and the Ministry of Foreign Affairs. The first step in the process was an annual determination on the part of the Ministry of Labor, which forecast the need for foreign workers for the coming year. It was the Ministry of Labor's responsibility to decide how many new foreign workers would be admitted to Israel each year by segment of the economy (agriculture, construction, industrial, food service and health care). Within the construction segment, the Ministry of Labor would issue "block visa allocations," which authorized the construction company applicants to obtain a specified number of foreign worker visas for the coming year. (Ex. 4, Arenson Affidavit, at ¶11).

The second step, after a company had been allocated a block visa, was for the company to apply to the Ministry of Interior for approval of visas for individual foreign workers. Upon approval by the Ministry of Interior, the actual visas would then be issued by the Israeli Embassy in the worker's home country.

---

[4] By way of example, Avie Arenson describes in detail in his deposition the process by which the Government of Israel, at the highest levels, made a formal decision to simply disregard a new law which banned the use of foreign workers on Government construction projects, and to permit the contractors to use foreign workers to construct the new airport for the Israeli Air Force. (Ex. 5, Arenson Dep. At 64-65).

Early in the Project, when assistance of the Corps was requested by the Contractor, the Corps responded that since the Arenson Company had previous experience they were the best source of information as to how to get TCNs approved and into the country (Att.-D to Ex. 4).

The Arenson Company was able to apply for and in fact receive from the Ministry of Labor an allocation of a block of 784 visas, 519 of which were specific to Nachshonim. However, such allocation turned out to be worthless, since the actual visas themselves had to be approved by the Ministry of Interior. Pursuant to the Closed Sky Policy the Ministry of Interior issued no visas for new TCNs to work at Nachshonim during the entire life of the Project. (Ex. 4, Arenson Affidavit, at ¶ 13 & 14).

As related by Avie Arenson in his deposition (Arenson Dep., Ex. 5 at 30-37, 66-70) and further explained in the attached Arenson affidavit (Ex. 4, ¶ 14-15), the first obstacle to issuance of visas by the Ministry of Interior was its adoption of a policy that any applicant for new visas who was unable to prove that the applicant's prior TCNs had not departed the country would have each so-called "deserter" counted against its allocation. Since the Arenson Company was one of the first construction companies in Israel to bring in TCNs, and had been awarded thousands of prior visas, the company was counted as having a large number of "deserters," going back to the 1990s. Thus the Ministry of Labor considered that the Arenson Company had more deserters than the 2002 visa allotment by the Ministry of Labor -- none of whom had anything to do with the Nachshonim Project – and the Ministry of Interior refused to approve any visas to Arenson, either for the Nachshonim Project or its own projects.

When faced with the Ministry of Interior's "deserters" policy, the Arenson Company obtained a list of the purported deserters and brought to the Ministry of Interior documentation of repatriation– including receipts and flight stubs for airline tickets purchased by the Arenson

Company for the return flights of such workers -- for 102 of them. (Ex. 5, Arenson Dep. at 70-71). Thereafter, the Ministry of Interior simply stopped referring to deserters, and the matter became a "non-issue." (Arenson Dep., Ex. 5 at 37-38).

Concurrently with Arenson's efforts to obtain visas from the Ministry of Interior for its allocation from the Ministry of Labor, the Joint Venture obtained an exemption from registration as an Israeli contractor, and filed its own application for an allocation of visas. By this time the Ministry of Labor had been folded into the Ministry of Trade and Commerce, which was controlled by a different political party which was formally opposed to the use of foreign labor. The Ministry of Interior refused to permit the transfer of the Ministry of Labor's visa allocation to the Joint Venture, asserting that the transfer request amounted to an attempt to circumvent the Ministry of Interior's rules. (Att. O to Ex. 1).

The chaos in the construction industry that resulted from the Israeli Government ban on new foreign workers was not limited to the Joint Venture and the Arenson Company. (Ex. 4, Arenson Dep. at ¶ 13). The Director General of The Israeli Contractors Association described it as a "big mess because the contractors couldn't continue and to build and to fulfill their contracts." (Ex. 3, Segev Dep. at 10-11.) During the period 2002-2004, 74 Israeli contractors went bankrupt and closed their businesses, the main reason being workers. *Id.* at 18. With respect to the value of a visa allocation from the Ministry of Labor, Mr. Segev testified:

> Q. What, if any, effect did the advent, the start of the Closed Sky Policy have on contractors who had visas as of that date?
>
> A. Very, very simple. You can get from one Government, from the labor, the department, the Labor Ministry, permission to bring 100 foreign workers. And the Interior Ministry don't allow to bring it. Why? Because the sky is closed. Two policies.

Segev Dep at pages 29-30.

On May 1, 2003, the minutes of the joint weekly meeting of the Corps, MOD and Joint Venture (Ex. 12) reported:

> ***Block Visa:*** *After final request to ministries, after the last elections, for TCN visa issue, legal action by JV to be initiated against MOL and MOI over refusal to allocate block visa to ABB SUSA, as authorized by the Contractor's Registrar in December 2002 and recommended by the judge in Arenson's previous suit against the ministries.*
>
> *JV restated that neither the JV nor any of its partners have ever received one visa for the Nachshonim Project.*

The advent of the Government of Israel's Closed Sky Policy impacted the Joint Venture's subcontractors as well. For example, in the narrative portion of the Joint Venture's July 2003 Payment Application (Ex. 13) the Joint Venture reported:

> *For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and Gal Asbest & Koor (insulated panels installation) there is a shortage of TCN labor and lack of Israeli labor with adequate craft skills, which will impact the work in cost and time of completion. The JV has finally received the ability, through Arenson's allotment, to make "legal" existing TCNs with less than 54 months in country. Now that many contractors are afforded the same opportunity, the TCN demand is far greater than the existing supply in Israel. This supply shall continue to reduce, as the GOI have not removed the "closed skies" policy. Additionally, the cost of available TCNs continues to rise, due to short supply.*

The Monthly Narrative for June 2003 (Ex. 14) stated:

> *The problem of unavailability of manpower continues to affect the site production, not only for the concrete works, but also for ongoing works such as steel structure erection, finishing works and landscaping stone works.*

On July 13, 2003, the Joint Venture's counsel prepared a detailed analysis of the various restrictions the Government of Israel had placed on importing TCNs for submission to the Corps of Engineers. (Ex. 15)

The final result of all the efforts expended by both the Arenson Company and by the Joint Venture to obtain visas for the admittance of new TCNs for employment at the Nachshonim Project were rejected, and no visas for new TCNs were ever approved. (Ex. 4, Arenson Affidavit at ¶ 17).

On July 30, 2004, the Joint Venture submitted a certified claim (Ex. 16) seeking a 55-day time extension and compensation in the amount of $4,823,964, asserting a breach of warranty with respect to importation of new TCNs for use in the Project.

## IV. THE CONTRACTOR FULLY DOCUMENTED THE SEVERE IMPACT OF ITS INABILITY TO BRING NEW TCNs INTO ISRAEL

Although the damages caused by the inability of the Joint Venture to bring new TCNs into Israel were somewhat mitigated by its use of TCNs previously brought into the country, some by the Arenson Company and some from recruitment efforts by the Joint Venture, the severe impact of the Israel Government's Closed Sky Policy on the Joint Venture's costs and the Project's duration was well documented by the Joint Venture, which provided numerous notices to the Corps of Engineers on the continuing impact on Project's cost and duration.

The Israeli Government's restrictions on TCNs was first reported to be having an impact on job progress in the Contractor's Narrative Report for the month of April 2002, (Ex. 17), which discussed consumption of 18 days of float, and stated:

> *...The primary cause of delay is attributed to the unavailability of TCN labor due to the Israeli Government continuing restrictions on importing foreign labor.*

Nearly one year later, the situation had not changed, and no progress had been made in obtaining new TCNs. In the Contractor's report for March 2003 (Ex. 18) the Contractor reported, after noting weather delays for the month:

> *... Additionally, and continuing as a prime concern, is continuing lack of ability to import foreign labor, both for the JV and subcontractors. JV is using the available workers to their optimum by increasing working hours. In March the JV experienced a 30% labor turnover due to TCNs lost to immigration authorities, as visas had expired. Most were replaced by Israeli Arabs, which are 50% more costly and 50% less productive. The JV has lost 4 of 5 experienced concrete foremen. Labor brokers advise extremely low availability of TCN labor.*

Even as late as February 2005 (Ex. 19) , the Contractor reported:

> *There continues a shortage of TCN labor and lack of Israeli labor with adequate craft skills, which has severely impacted the costs to perform the work in both efficiency and time of completion. GOI "closed skies" policy has severely limited the TCNs available for work in Israel.*

Throughout the Project, the Joint Venture kept the Corps on notice of the continuing impact of the TCN restrictions. The first such notice was by letter dated May 1, 2002 (Att.-H to Ex. 1), the Joint Venture placed the Corps on formal notice that it was being delayed by its inability to find labor, noting that:

> *The AAB Joint Venture bid this project on having the ability to import Third Country National (TCN) labor to perform the majority of the work. As you are aware, the Ministry of Labor and Interior have, since last November, put a hold on any visas and ability to import labor into Israel.*
>
> *... Due to import restrictions, this labor is not sufficient to sustain the demanding present and future project schedule.*

On November 11, 2002, the Joint Venture provided an update to the Corps on the TCN issue (Att.-J to Ex. 1), noting that "All efforts exerted to date by the Contractor to import new TCN labor from abroad have been unsuccessful."

Commencing in the early fall of 2002, the Contractor had been attempting to arrange a meeting with the Corps to discuss the TCN issue. The meeting was originally scheduled to be held in the Corps Europe headquarters in Wiesbaden, Germany in October 2002, was rescheduled for early December 2002, and then rescheduled again for March 5, 2003. In anticipation of that meeting the Joint Venture submitted "talking points" (Att.-K to Ex. 1), which

discussed in detail the impact the lack of TCNs was having on job progress. Of particular importance was the impact on the lack of TCNs on the spatial frame erection (*Id.* at 3, section 5):

> *Note that in addition to several other issues, the replacement of the original spatial frame supplier/erector, USKON/DS Construction, was made necessary because the erector relied wholly on Turkish labor, presently restricted by the Israeli Government.*
>
> *On-going negotiations with several spatial frame erection sub-contractors, are indicating an exorbitant increase in price, due to the mandatory use of Israel labor. Estimated exposure is $1,000,000.*

Also notable was the estimated impact of the lack of TCNs on panel cladding over the spatial and conventional steel frames (*Id.* at 3-4, section 7):

> *Insulated panel installation is the most critical activity in the schedule. ...*
>
> *The subcontractor for installation, Bidud Projects (BP), which the JV contracted with in 2001, relies largely (to nearly 80%) on Palestinian and/or foreign workers for it's work. Since the Contract precludes the use of Palestinians, they will now be forced to use either foreign workers or Israeli workers. In this instance and because of the restrictions on foreign labor, we anticipate a claim for approximately $1,500,000 from this subcontractor for additional costs. Furthermore during the installation, training Israeli workers not previously experienced in this work must be expected to cause delays.*

On March 16, 2003, the Contractor formally requested a time extension and equitable adjustment due to the labor shortage caused by the Government of Israel's restrictions on bringing in TCNs. (Ex. 20)

By letter dated June 8, 2003, the Contractor submitted to the Corps a schedule analysis showing the projected impact on Project completion assuming three different scenarios of labor availability. (Ex. 21) The attached report noted:

> *Out of the above major concerns, the TCN labor is the most critical and a continuing factor that has a direct impact on the project completion.*

On July 28, 2003, the Joint Venture submitted a notice to the Corps (Ex. 22) of the continuing impact of the lack of TCN labor on job progress, advising:

*The project had been progressing gradually for the past few months. The reason for this gradual progress is due to the main scheduling constraint, which is the inability to import Third Country National (TCN) labor.*

## V. THE CORPS OF ENGINEERS RECEIVED UNCHALLENGED REPORTS DOCUMENTING THE IMPACT OF THE PROHIBITION ON IMPORTING NEW TCNs THROUGHOUT THE DURATION OF THE PROJECT

The inability of the Contractor to bring in new TCNs, and the impact the skilled labor shortage had on the Project were also well documented in meetings attended by the Corps of Engineers. In the minutes of the Corps' weekly meetings with MOD and the Contractor (prepared by the Contractor for submission to the Corps and MOD), there were continuous reports which evidenced the impact the lack of TCNs was having throughout the Project:

September 5, 2002 (Ex. 23):

> ***TCN Labor:*** *Lack of TCN labor affecting JV morale with increase in work activities and increased scrutiny on safety, quality and environmental concerns.*
>
> *JV now receiving subcontractors' claims due to shortage of TCN labor.*

September 19, 2002 (Ex. 24):

> *Lack of TCN labor affecting job progress. Another complaint received from Subcontractor on lack of TCN labor to start Rockeries and stone walls activity.*

October 31, 2002 (Ex. 25):

> *Analysis of Critical Path days lost due to labor shortage showing 29 days delay through September 2002 submitted to COE.*

February 20, 2003 (Ex. 26):

> *Shortage of labor for "stoneworks" poses serious problem. Such work is usually done with Palestinians and Arabs. Foreign Labor urgently needed for retaining walls, curbs, stones, small rockeries, etc.*

April 10, 2003 (Ex. 27):

> ***TCN Personnel:*** *4 of 5 Foremen detained by Immigration Authority this past week, including the best concrete finisher. JV employing Israeli Arabs with high turnover and much less production and quality.*
>
> *Continued shortage of TCN Labor severely impacting job progress.*

April 24, 2003 (Ex. 28):

> ***Block Visa:*** *After final request to ministries, after last elections, for visa issue, legal action by JV to be initiated against MOL and MOI over refusal to allocate block visa to ABB SUSA, as authorized by the Contractors' Registrar in December 2002 and recommended by the judge in Arenson's previous suit against the ministries. In process of additional request to new ministry administrations.*
>
> ***TCN Personnel:*** *Continued shortage of TCN Labor severely impacting job progress. 20 new hires this week, including 8 Israeli Arabs. Experiencing high turnover and less production with Israeli Arabs.*

May 1, 2003 (Ex. 12):

> ***Block Visa:*** *JV restated that neither the JV nor any of its partners have ever received one visa for the Nachshonim Project.*
>
> ***TCN Personnel:*** *COE commented on the need to beef up training of Israeli Arabs, as quality is much inferior than Romanians.*

May 22, 2003 (Ex. 29):

> ***TCN Personnel:*** *Shortage of TCN Labor has reached catastrophic proportions. The Immigration Police raided several buses carrying TCN concrete workers to work on Sunday 18 May and took 178 of them away to various locations for questioning. Only 11 returned to work that day. On Monday 19 May, 139 showed up. As of today, 22 May, the project is 101 men short of the total work force of 240 on the payroll the previous week. Concrete work force schedule to peak at 350 on 01 June 03.*

June 26, 2003 (Ex. 30):

> ***TCN/Israeli/Arabs Personnel:*** *Turnover of personnel remains extremely high and concrete workforce of 200 at 26 June is still 150 short of total requirement of 350.*
>
> *Concrete workforce at beginning of June stood at 132 out of 148 new hires during the month, 80 left within a few days, mostly due to time for commute (Israeli Arabs live in the north) and inexperience.*

*Shortage of labor remains critical to all phases of work.*

July 3, 2003 (Ex. 31):

> ***Block Visa:*** *JV to respond to COE letter with definitive data to support the fact that no block visas have been received for Nachshonim project.*
>
> * * *
>
> ***TCN/Israeli/Arabs Personnel:*** *The month of June shows an average of 180 workers on site against 350 required.*
>
> *Shortage of labor remains critical to all phases of the work.*

August 28, 2003 (Ex. 32):

> *Very high turnover continues to affect progress. JV had 260 workers on payroll at 31 July, 147 new workers were hired in August and 249 were at work on 27 August, still 101 short of requirements. Note: These are labor requirements before consideration of pending recovery schedule.*

October 23, 2003 (Ex. 33):

> *Getting resolution from the ministries for "industrial" visa allotment, when the strike ends and possibly be able to import new TCNs for panel installation.*

November 13, 2003 (Ex. 34):

> *Received visa allotment from Ministry of Trade & Industry for 32 "industrial workers" for import. These slots will be submitted to MOL and MOI for TCN Panel Workers. Strike action a.k.a. "work slowdown" in Ministries delaying start of implementation of TCN imports.*

December 18, 2003 (Ex. 35):

> *Received visa allotment from Ministry of Trade & Industry for 32 "industrial workers" for import. These slots will be submitted to MOL and MOI for TCN Panel Workers as soon as strike by Government workers is settled. No sign of progress in negotiations to end strike.*

January 8, 2004 (Ex. 36):

> *Strike by Government sectors settled as of 05 January.*
>
> *JV has requested visa allotment for 2004.*

February 26, 2004 (Ex. 37):

> *JV continues to wait for 2004 visa allocation from Ministry.*

March 4, 2004 (Ex. 38):

> *JV continues to wait for 2004 visa allocation from Ministry.*

April 22, 2004 (Ex. 39):

> *JV request for additional visa allocation for panel labor (industrial workers) denied by Ministry of Trade & Industry. JV asked COE for support letter from MOD for project needs.*

Each of the foregoing excerpts are from JV reports of meetings attended by the Corps of Engineers. The foregoing unchallenged JV reports demonstrate, conclusively, that the Corps of Engineers was aware throughout the duration of the Project that the Contractor was being impacted by a lack of foreign workers.

## VI. THE CORPS OF ENGINEERS ALSO DOCUMENTED THE IMPACT OF THE TCN RESTRICTIONS ON NACHSONIM AND ITS OTHER PROJECTS

In the Corps of Engineers "Situation Report" for May 9, 2002 (Ex. 40) – reporting on Corps' activities worldwide -- the report on activities in Israel focused on one issue: the impact of the lack of TCN workers. In a document prepared by the Corps' Israel Program Office listing the Corps "top ten" issues (Ex. 41), issue number one was "TCN labor issue – insufficient labor for timely project completion." In its Weekly Status Updates starting in mid-2002 and through 2003, the continuing impact of the TCN problem on the ability of construction contractors on Corps projects in Israel to perform their work was a constant issue. For example on July 19, 2002, in describing current issues on the Nachshonim Project, the Report (Ex. 42-A) stated in paragraph 2.e:

> *The primary concern of this project remains the lack of available TCN labor. Contractor confirmed that TCN visa allocations have been granted but stipulations associated with the visas may preclude their attainment.*

During the week following the drafting of the letter prepared by the Corps for the U.S. Embassy (Ex. 43), the Report dated July 26, 2002 states:

> *...The Ambassador informed LTG Flowers that he had discussed the TCN issue with the Prime Minister.*

The Report for September 26, 2002 (Ex. 44) noted, at paragraphs 2.g and 2.i:

> *Work on the initial DSB will be delayed unless visas are granted for the 5 technicians from Turkey. These technicians are the "experts" that are needed to ensure that the space frames are properly erected. ...*
>
> * * *
>
> *The JV stated that subcontractors are beginning to submit claims due to the lack of available TCNs. The critical activities of space frame and panel installation are believed to be the activities that will be most affected by the lack of TCNs. The contractor's current update indicates 22 days of negative float of which most is attributed to the lack of TCNs and the erection of the space frames.*

The Report for November 1, 2002 (Ex. 45) advised with respect to Nachshonim (paragraph 2.f):

> *According to newspaper reports, the Israeli Government will not allow any more TCNs into the country until the end of 2003. The contractor is analyzing his schedule and indicates that he will submit a request for time and compensation. Subcontractors are already submitting claims to the prime contractor regarding this issue.*

The Report for February 14, 2003 at paragraph 2.f (Ex. 46) advised:

> *...TCN non-availability continues to impact progress and could affect a large delay (6 months to 1 year). Contractor has scheduled a meeting with the contracting officer on 6 March to discuss the TCN issue and how to minimize impact to the construction project.*

There are also a series of internal emails in which the Corps documents the impact lack of TCNs was having on the Project. For example, in discussing a draft letter that was under consideration from the Corps to the Ministry of Defense, a May 15, 2002 email (Ex. 47) from Corps headquarters in Washington to the Israel Program Office director noted:

> *The bigger issue in terms of overall cost is the TCN labor issue, where the GOI is clearly in violation of the LOA and causing schedule slippage and impact costs.*

On June 12, 2002, the Contracting Officer's Representative for Nachshonim, Michael Roach, reported to the senior Corps / IDF team (Ex. 48):

> *Most issues appear to be minor when compared to the lack of TCNs. The delay in progress will become more apparent next month unless there is a change in the current situation.*

In a follow-up to that email on July 12, 2002 (Ex. 49) the COR advised:

> *The schedule is anticipated worsen at an exponential rate until the TCN issue is resolved.*

Notwithstanding the Corps' denial of additional compensation to the Contractor resulting from construction delays, the Corps itself sought additional funding from the Israel Ministry of Defense for its own additional costs arising out of extended project duration caused by the TCN restrictions. (*See* Exs. 50, 51, 52 and 53).

## VII. THE CONTRACTOR MADE EXTRAORDINARY EFFORTS TO OVERCOME THE UNANTICIPATED ISRAELI GOVERNMENT RESTRICTIONS ON IMPORTATION OF TCN LABOR, WITH LITTLE OR NO HELP FROM THE CORPS OF ENGINEERS

When faced with the Government of Israel's Closed Sky Policy, the Joint Venture and the Arenson Company went to extraordinary lengths to mitigate the damages it was suffering due to lack of manpower. Such efforts included, for example, increasing the pay for its work force to match Israeli labor rates, advertising for in-country TCNs in Romanian language newspapers, urging the local office of the Labor Authority to hold a job fair for the purpose of recruiting Israeli employees for the Nachshonim Project, and engaging in its own recruitment efforts to hire and train Israelis. (Ex. 4, Arenson Affidavit, at ¶ 16).

The Joint Venture even went so far as to file suit against the Labor Authority and the Ministry of Interior (Ex. 54), attempting to force the Ministry of Interior to honor the block visas

issued by the Labor Authority. The Arenson Company filed its own lawsuit as well. (*See* Att.-E to Ex. 4) In addition, both the Arenson Company and the Joint Venture, through their counsel, engaged in a letter-writing campaign, seeking the support of the top management of the Labor Authority, the Ministry of Interior and Ministry of Defense. (*See* Exs. 55, 56, and 57).

The contract between the United States Government and the Government of Israel (Att. A to Ex. 1, entitled "Letter of Offer and Acceptance") acknowledged, at Note 8 b., page 9, that the cost estimates for the program funded by the United States thereunder were based on cost estimates that anticipated "normal and customary processing times" for, among other things, work and entry visas. In that regard the LOA provides:

> *It is understood that processing delays for materiel or personnel may result in cost increases and/or delays to the program. In order to minimize such delays, the GOI shall take appropriate action, as needed, to expedite the required materiel and personnel clearances associated with the execution and performance efforts authorized under this LOA.*

The obvious intended beneficiaries of this contract clause were the contractors undertaking the construction of the Wye River Accords projects. Given that the United States was funding the projects, when faced with a change in Government of Israel policy that threatened the ability of the contractors to perform on time and within budget, the United States could have used its leverage to demand that the Government of Israel permit the importation of third country nationals for the Wye River Accords projects, as the Government of Israel had warranted in paragraph "n" of Note 5 of the LOA. Instead, the policy adopted by the U.S. Embassy was that the United States fully supported the Government of Israel's efforts to deal with the problem of Israeli unemployment by restricting entry of foreign workers. No exception was made for the Wye River Accords projects. In conformance with overall U.S. Government policy, the Corps of Engineers adopted a "hands off" stance with respect to the Joint Venture's

efforts to obtain permission to bring in new TCNs. In the Minutes of the Weekly Meeting held on May 29, 2003 (Ex. 58), the Corps reported:

> *COE indicated that the current USG position is to support GOI efforts to reduce unemployment with continued restrictions on import of TCN labor.*

The Corps Contracting Officer's Representative, Michael Roach, testified in the Corps' Rule 30(b)(6) deposition at 87-90 (Ex. 59) in that regard as follows:

> Q. How did it come to your attention that it was the U.S. government's policy to support the government of Israel in continued restrictions on import of TCN labor?
>
> A. As the Corps of Engineers is attached to the U.S. Embassy in Israel, we serve with the embassy. That's the embassy's position. We were seeking assistance to help the contractor in any way we could.
>
> Q. And you approached the embassy?
>
> A. That's what I understood.
>
> Q. And the embassy said, no, it's our policy to support the government of Israel?
>
> A. That's my understanding of the meaning of that statement
>
> * * *
>
> Q. But as of May 2003, the end of May, the indication was that the U.S. government was supporting the restrictions on TCN labor, correct?
>
> A. That's a general policy, not a specific policy to Nachshonim.

Similarly, although during the early stages of the Project the MOD did in fact encourage the Ministry of Labor to provide the necessary visa allocations required by the Contractor, when it became official Israeli Government policy to ban the admission of new TCNs, the Ministry of Defense provided no further assistance to the Joint Venture in that regard. When the Israeli

Ministry of Defense concluded, on the basis of erroneous information, that no time extension and no compensation should be granted, the Corps simply adopted the MOD's position.

In an internal Corps of Engineers email dated June 18, 2002 (Ex. 60) prepared by the Corps' Contracting Officer's Representative, Michael Roach, he described the situation as:

> *The Corps wants to build, the JV wants to build, elements within GOI are blocking us.*

The critical meeting at which the Corps of Engineers, Ministry of Defense and Israeli Defense Forces decided that the Joint Venture was not entitled to any relief with respect to the TCN issue occurred on June 30, 2003. *See* Memorandum for the Record dated July 1, 2003 (Ex. 61). Notwithstanding that the MOD's counsel advised during the meeting that there was in fact a labor shortage in the construction industry, the MOD made its decision that the Contractor was entitled to no relief, which the Corps deferred to, based on MOD's erroneous belief that the award by the Ministry of Labor of visas to the Arenson Company was the end of the story.

Both the MOD and the Corps appear to have been wholly oblivious to the fact that the award of allocations for block visas by the Ministry of Labor was just the starting point of the process, and that it was actually the Ministry of Interior which approved individual visas. Moreover, the decision was based in part on the MOD's mistaken belief that the Arenson Company was using TCNs that should have gone to the Nachshonim Project on its other projects. The conclusion of the meeting (*Id.* at 2) was that Mr. Roach would reject the Contractor's request for relief, stating

> *It was agreed that I would draft a short letter to the contractor informing him that according to Government officials, Arenson was granted a total of 549 TCN visas in 2003 and all of them were for the Nachshonim Storage Base only. Therefore, the project should not have a labor shortage problem.*

The factual basis for denying relief to the Joint Venture was distributed internally within the Corps of Engineers by email (Ex. 62) from Mr. Roach the day following the meeting:

> *IDF and MOD are adamant that a time extension is not justified for the TCN issue. They believe that the contractor is using his workers on other projects throughout the country.*

The Corps deferred to the decision of MOD notwithstanding actual knowledge that not only was Arenson not using Nachshonim TCNs on its other jobs, in fact the exact opposite was true: Arenson provided the Joint Venture with its available TCNs that had been allocated to Arenson and brought to Israel by Arenson prior to the Nachshonim Project for use on its other projects. (Ex. 4, Arenson Affidavit, at ¶ 19). *See, e.g.,* the Corps' Weekly Status Update for February 14, 2003, at page 5, item "f," reporting that "Arenson is presently supplying TCNs for concrete work. (Ex. 46). Further, the "Talking Points" memorandum (Att. K to Ex. 1) submitted by the Joint Venture to the Corps prior to the March 2003 TCN meeting in Wiesbaden states at page 8, first numbered item under "Other Considerations:"

> *Because the Contract forbids the use of Palestinian labor, the A.A.B. Joint Venture partner, A. Arenson Ltd., is recruiting Palestinians to replace foreign workers on their other ongoing projects and sending these foreign workers to Nachshonim.*

It is readily apparent from the foregoing that the Contractor made a substantial good faith effort to mitigate the effect of the change in Government of Israel policy with respect to importing TCN labor. It is also evident that Corps of Engineers' rejection of the Joint Venture's claim for compensation and a time extension was based in part on its decision to defer to the U.S. Embassy's policy of supporting restrictions on foreign workers, and in part on its decision to defer to the Ministry of Defense, which had taken what is now known to be a mistaken view of the facts concerning the use of the Arenson Company's visas.

## VIII. THE JOINT VENTURE IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR AS TO ENTITLEMENT

### A. The Applicable Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).

It is equally well established that the burden on the moving party is to demonstrate that there was no genuine issue of material fact, and may be discharged upon a showing "that there is an absence of evidence to support the non-moving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (*quoting Celotex* 106 S. Ct. 2548 at 2554). The burden then shifts to the non-moving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex,* 477 U.S. at 322. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) (holding that the non-movement must set out, usually in an affidavit by one with knowledge of specific facts, which specific evidence could be offered at trial). To create a genuine issue of fact the non-movement must do more than present some evidence on an issue it asserts is disputed. *Avia Group Int'l v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

Summary judgment is appropriate where the outcome-determinative issue is a question of contract interpretation, since interpretation of a contract involves an issue of law. *Aydin Corp. (West) v. Widnall,* 61 F.3d 1571, 1577 (Fed. Cir. 1995); *Rutgers v. United States,* 41 Fed. Cl. 764, 769 (1998).

For the reasons set forth below, A.A.B. Joint Venture respectfully submits that there are no material issues of fact in dispute, and that judgment in its favor as to liability should be granted as a matter of law.

**B. The Representations In SR-22 And SR-14 Together With The Relevant Surrounding Circumstances Demonstrate That The U.S. Government Warranted That The Joint Venture Would Be Able to Utilize, As Necessary, Nationals of Third-Countries Having Diplomatic Relations With Israel**

A warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely. *Walter Dawgie Ski Corp. v. United States*, 30 Fed. Cl. 115, 126 (1993). Implicit in a warranty is a promise to indemnify the promissee for any loss if the fact warranted proves untrue. *Dale Construction Co. v. United States*, 168 Ct. Cl. 692 (1964). Further, where a warranty is found, it is irrelevant that the warranted use is prevented by a third party, rather than by the Government. *Id.* at 699. *Henderson, Inc.*, DOTBCNA No. 2423, 2500, 94-2 BCA ¶ 26,728; *J.W. Bateson Co., Inc.*, GSBCNA No. 4687, 80-2 BCA ¶ 14,608.

The assurance does not need to be express. For example, an obligation to give access to a work site so that a contractor could complete its work within the required time may be implied. *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 557 (Fed. Cir. 1982).

A review of the case law in this area also reveals that where the Government affirmatively, or impliedly gives contractual assurances to the contractor regarding future events which entitle the contractor to rely upon the occurrence or nonoccurrence of the event in pricing the contract, a warranty with respect to the continuing existence of that condition will be found. *John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts*, 179 (2d ed. 1986).

There is no requirement that the contract explicitly state that a warranty has been furnished. *Everett Plywood & Door Corp. v. United States*, 419 F.2d 425, 429 (Ct. Cl. 1969). The court may consider the contract language and surrounding circumstances to determine whether or not a warranty exists. *Henderson Inc., supra,* 94-2 BCA ¶ 26,728.

It is also well established that the representation at issue does not have to explicitly state that the contractor will be entitled to compensation in the event the representation is no longer accurate. *D & L Constr. Co. & Assoc. v. United States. 402 F.2d 990,* 999 (Ct.Cl. 1968); *Amino Bros. Co. v. U.S.*, 372 F.2d 485, *cert. denied* 389 U.S. 846 (1957): *United States v. Windstar Corp.*, 518 U.S. 839, 909, n.58 (1996); *Old Dominion Security*, ASBCA No. 40062, 91-3 BCA ¶ 24,173. Once the existence of a warranty is determined, all that is necessary for liability to attach is a change in the condition as represented in the contract. In other words, when the government has given a warranty in its contractual capacity and the subject matter of the warranty is frustrated by any intervening cause, the contractor should be entitled to relief. *Carl W. Linder Co.*, Eng. BCA No. 3526, 78-1 BCA ¶ 13,114.

For example, in *D & L Constr.*, the Government had provided a map in the contract documents depicting the main roads in the vicinity of the military base on which the project was being constructed. On the date the contract was signed the Contracting Officer sent a letter to the contractor providing assurances that the contractor would have suitable access to the site. The combination of the map and the Contracting Officer's assurances were deemed adequate to constitute a warranty, which was found to have been breached during a period in which union picketing prevented use of the normal means of access. The Court of Claims held that the contractual representations constituted a warranty, and that the existence of such warranty "carried with it the implied promise" that if the warranty was breached, that the Government

would stand the resulting increased costs. 402 F.2d at 999. *Accord Gerhardt F. Meyne Co. v. United States,* 110 Ct.Cl. 527, 550 (1948) [Warranty found where contract represented that certain road was available for the contractor's use.].

The courts and boards have found a warranty, with resultant government liability, in numerous cases based upon a combination of a contractual representation by the government, reliance thereon by the contractor, and an unanticipated change resulting in the fact as warranted by the government proving untrue.

The following cases are illustrative: *Henderson, supra,* 94-2 BCA ¶ 26,728 (contract provisions stating that dredging was prohibited during a certain portion of the year was found to constitute a warranty that dredging would be allowed during the remainder of the year – equitable adjustment granted where actions of the state of North Carolina prevented dredging); *J.W. Bateson Co., Inc.*, *supra*, 80-2 BCA ¶ 14,608 (contract drawing depicting work site combined with specifications and prebid discussions collectively constituted a warranty that street providing site access would remain open – equitable adjustment granted where local government closed street); *Dravo Corp.,* Eng. BCA No. 3800, 79-1 BCA ¶ 13,575 (specific designation in the contract of work/storage areas and lack of specific restrictions on these areas constituted warranty of availability-equitable adjustment granted where access to one area was prevented by the local government): *ABC Demolition Corp.*, GSBCA No. 2288, 68-2 BCA ¶ 7,069 (although demolition contract did not specify access route, a contract clause limited access by paved drives, and there were no restrictions on contractor's planned access route – contractor entitled to equitable adjustment where another government agency restricted use of planned route); *Odebrecht Contractors of California Inc.*, Eng., BCA No. 6372, 00-2 BCA ¶ 30,999 (board held that contract language and conduct of the parties before award and during contract

performance collectively constituted warranty as to the availability of a well for the contractor's use during dam construction – contractor entitled to equitable adjustment when Corps of Engineers in conjunction with local authority withdrew contractor's right to use well water); *Carl W. Linder, supra,* 78-1 BCA ¶ 13,114 (contract documents sufficient to constitute warranty of the availability of the 15th Street gate for truck access – government liable even thought the frustration of the warranty was caused by an intervening non-contractual agent).

The closest case factually to the case at bar is *Swinerton & Belvoir*, ASBCA No. 24022, 81-1 BCA ¶ 15,156. *Swinerton* involved a construction project in Guam in which the contract contained a clause advising bidders that it could take as long as ninety days to import temporary alien workers. This clause was interpreted as constituting a warranty that alien workers could be brought into Guam within ninety days, and entitlement was found for compensation and a time extension for the impact of clearance times in excess of ninety days.

The specific language which Plaintiff relies upon for a finding of an express warranty is found in Special Requirement clause # 22, which states:

> *Contractor may arrange, through the appropriate Government of Israel Offices, to bring into Israel U.S. Nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work.*

This is exactly the sort of "unmistakable language" that the courts and boards have required in order to find the existence of a contractual warranty. The record in this case demonstrates quite clearly that the Corps of Engineers intended that the Contractor would make substantial use of foreign labor and would receive a substantial financial incentive, which would be reflected in a lower bid price, benefiting the U.S. Government. It is also undisputed that the Contractor relied upon the contractual representation that such labor would be available in formulating its bid. It turned out, however, that there was a sudden and substantial change of

Government of Israel policy after the contract was executed. As a result, the Contractor was unable to obtain any visas, during the entire term of the Project, for the admission of new TCN workers.

The express representation contained in SR-22 is bolstered by an implied representation contained in the Tax Clause, SR-14, which obligated the Corps of Engineers to reimburse the Contractor for employment and income taxes paid to TCNs brought into Israel exclusively to work on the Nachshonim Project or other Wye River Accords projects and expressly directed the Contractor to exclude said taxes from its bid. This implied representation is further reinforced by the Instructions to Bidders which required that each bidder include in its bid a projection of the extent of its planned use of TCNs. The fact that the Contractor was required as part of its bid package to submit a plan for the use of TCNs surely implies an ability to do so.

These contract provisions, by themselves, are sufficient based upon the case law cited above, to constitute a warranty. However, the existence of a warranty here is even more compelling in light of the relevant surrounding circumstances.

In that regard, it is uncontroverted that, before award, the Corps of Engineers and the Joint Venture <u>both</u> interpreted the pertinent contract language as providing for the Joint Venture's ability to utilize, as necessary, nationals of third countries having diplomatic relations with Israel. This is clear from the following:

(a) The Letter Of Acceptance ("LOA") which specifically stated "The USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA";

(b) The Commerce Business Daily announcement which stated in pertinent part "Contractors may bring into Israel nationals of the U.S. and third countries having diplomatic relations with Israel for the purpose of accomplishing the work";

(c) The inclusion of special requirements SR-22 and SR-14 in the contract by the Corps of Engineers to implement the LOA provisions;

(d) The Joint Venture's technical and management proposal specifically noted in paragraph 2.1.1 that it would "make final arrangements for location and subcontracting of TCN camp," and paragraph 3.2.2 which stated "Approximately 500 TCN workers are needed at peek production" and "It is common to bring TCN's into Israel to perform construction labor."[5]

Based on these surrounding circumstances, it is obvious that the Corps of Engineers had actual knowledge of the Joint Venture's reasonable interpretation, and indeed had the same interpretation, prior to the execution of the contract. It is well established that a party who enters into a contract with actual or imputed knowledge of the other party's reasonable interpretation of the contract terms is bound by that party's interpretation. *Odebrecht, supra,* 00-2 BCA ¶ 30,999; *Keno and Sons Constr. Co.* Eng. BCA No. 5837, 95-2 BCA ¶ 27,687; *E-Systems, Inc.*, ASBCA No. 18877, 76-1 BCA ¶ 11,797 ("It is accepted doctrine that where one party's interpretation is made known to the other at the time of contracting, that party's interpretation will govern.")

Finally, the consistent interpretation by the government and the Joint Venture prior to when the dispute arose, demonstrates that both parties contemporaneously interpreted the

---

[5] Plaintiff has still not received the other proposals that were submitted in response to the RFP. It may well be that, as with the JV's proposal, the other bidders also reasonably based their bids on utilization of TCN labor, further supporting the reasonableness of plaintiff's interpretation.

contract as promising the Joint Venture freedom to use nationals of third countries having diplomatic relations with Israel. It is well established that the parties' contemporaneous construction of the contract before it has become the subject of dispute, is entitled to great weight in its interpretation. *Pac. Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 391 (2006), *recon. denied,* 74 Fed. Cl. 779 (2006).

There is one clause in the contract, set forth at SR-13 (Att.-E to Ex. 1), which the Corps has relied on for denying the Joint Venture's TCN claim. That clause provides that the Contractor has sole responsibility to investigate, estimate as to cost, and assume the risk, of:

> *Entry and exit visas, residence permits, and residence laws applicable to aliens. This includes any special requirements of the Host Government, including those required by local Labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.*
>
> * * *
>
> *Arranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor. . . .*
>
> *Operating under local laws, practices, customs and controls, and with local unions, in connection with hiring and firing . . . .*

The scope of the risks allocated to the Contractor in SR-13 is modified and limited by the phrase "as normally encountered by Contractors." If, for example, when the Joint Venture sent recruiters to, say, Turkey or Romania to find skilled concrete workers and none had been found who were willing to go to Israel, that would certainly have been the type of risk "normally encountered by Contractors." Similarly, the ability of prospective workers to pass medical exams, required as part of the documentation for visas by the Ministry of Interior, as well as the costs thereof, are the type of responsibility normally encountered by a contractor.

Contractual risks are normally vested in the party best able to control them. A change in host government policy after contract award with respect to admission of foreign workers is not the type of risk that would normally be vested in a contractor.[6]

Moreover, it is a well-recognized principle of contract interpretation that a contract must be construed as a whole, giving deference to all parts, and attempting to harmonize seemingly contradictory clauses. *Hol-Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void or superfluous. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

SR-13 can be harmonized with SR-22 and SR-14 by limiting the risks assigned to the Contractor to only those explicitly identified in SR-13, and which are of a nature "normally encountered by Contractors." The general language of SR-13 does not specifically place the risk on the Contractor of a <u>change</u> after award in Host Country law and policy.[7] In contrast, SR-22 specifically represents and warrants that the Contractor "may arrange" to bring into Israel workers from other countries having diplomatic relations with Israel. Any costs or legal obstacles of the type listed in SR-13 which could have reasonably been foreseen and addressed by the Contractor, based on Israeli law and policy as they existed on the date on which the contract was

---

[6] This approach to contract interpretation was in fact followed by the Corps with respect to the scope of the Contractor's risk of strikes. SR-13 places the risks of "strikes" on the Contractor. Yet when job progress was impacted by a port strike which prevented critical materials from being delivered to the job site, the Corps recognized the Contractor's entitlement to a time extension. While a strike of a Contractor's own employees is frequently a common risk of a Contractor, a strike of port employees is not the type of risk normally encountered by a contractor, and hence not a risk assigned to the Joint Venture by SR-13.

[7] Court and Board cases have held that compliance with post-award changes in laws or regulations will serve as the basis for relief under the Changes clause. *Hills Materials Co. v. Rice*, 982 F.2d 514 (Fed. Cir. 1992); *Philco Ford Corp.*, ASBCA No. 14623, 72-1 BCA ¶ 9390.

entered into, should properly be vested in the Contractor. Those risks, and only those risks, should be deemed to trump the warranty created by SR-22 and SR-14.

In conclusion, the relevant contract language and surrounding circumstances establish the existence of a government warranty that the Joint Venture would be able to utilize, as necessary, nationals of countries having diplomatic relations with Israel. This interpretation is the only reasonable interpretation which harmonizes all the contract provisions. Moreover, the undisputed material facts show that the Joint Venture interpreted the provisions in this manner and based its bid on such reasonable interpretation. The Joint Venture expressly communicated this interpretation to the Government prior to award, and the Government did not object thereto. Finally, it is equally clear that the conduct of the Joint Venture and the Corps prior to the time the dispute arose demonstrates that both parties contemporaneously interpreted the contract as promising the Joint Venture the ability to use, as necessary, nationals of such countries.

### C. The Drastic Changes In The Government Of Israel Policy With Respect To <u>TCNs Breached The Warranty</u>

The contractor submitted its bid on the Nachshonim project in reliance on the representation set forth at SR-22, as confirmed and reinforced by SR-14 that it would be permitted to use TCNs as its labor force. These contractual representations constitute a warranty and carried with them the implied promise that if the warranty was breached the U.S. Government would be liable for the resulting increase in costs and compensable time.

The undisputed material facts set forth herein clearly demonstrate that the policies enacted by the Government of Israel, after contract award, principally the "closed sky policy" combined with the deserters policy and the implementation of these policies by the Ministry of Interior prevented the Joint Venture from importing <u>any</u> <u>new</u> TCN workers to carry out the contract work. In fact, at no point throughout the entire project was the Joint Venture successful

in arranging for any new TCNs to come into Israel to work on the Nachshonim project. Arenson Dep., Ex. 5 at 75-76, 81.

It is also undisputed that the Joint Venture repeatedly documented the severe impact of its inability to bring new TCNs into Israel and provided constant notice of these impacts to the defendant.

Finally, although the Joint Venture made extraordinary efforts to overcome the Israeli Government's restrictions with little or no help from the Corps of Engineers, the final result was that no new visas for new TCNs were ever approved.[8] As a result both the Joint Venture and certain of its subcontractors incurred significant additional costs and delays as set forth in the July 30, 2004 certified claim submitted by plaintiff under the Contract Disputes Act.

Based on the foregoing Plaintiff submits that it has established the existence and breach of an express warranty for which it is entitled, as a matter of laws to an equitable adjustment under the Changes clause.

### D. In The Alternative The Contractor Is Entitled To An Excusable Time Extension Under The Default Clause

Alternatively, A.A.B is entitled to an excusable non-compensable time extension, pursuant to the Default clause. Under FAR 52.249-10 the Joint Venture is entitled to an excusable time extension for events that caused delay which was unforeseeable and beyond the contractor's control and without its fault or negligence.

---

8 The Corps' deference to the U.S. Embassy's policy of supporting restrictions on foreign workers and acceptance without inquiry of the erroneous factual assumption concerning the use of the Arenson Company's visas, in light of the warranty included in the contract, was a breach of its duty of good faith and fair dealing and its companion duty to render reasonable cooperation. *Celeron Gathering Corp. v. United States,* 34 Fed. Cl. 745 (1996); *Odebrecht, supra.*

The clause sets out certain examples of delays that are normally excusable, such as acts of God or the public enemy, acts of the government in either its sovereign or contractual capacity, fires, floods, epidemics, strikes and unusually severe weather. Thus, the clause specifically allows excusable delays for legislative or executive acts by the U.S. Government. *See, e.g., Southland Mfg. Corp.*, ASBCA No. 12500, 69-1 BCA ¶ 7714.

It is well established that the operative phrase in the FAR Clause, "acts of the government in either its sovereign or contractual capacity" has equal applicability to the sovereign acts of a foreign government when the contract is being performed in a foreign country. *See E.L. David Constr. Co., Inc.*, ASBCA Nos. 29225, 34387, 89-3 BCA ¶ 22,140 (holding that ". . . there is no doubt that the reference to actions of the government in either its sovereign or contractual capacity has equal applicability to a foreign government when the contract is being performed in a foreign country."; *Meems Bros. & Ward*, ASBCA No. 3982, 58-1 BCA ¶ 1786 (actions of the government of The Republic of The Philippines, taken in its sovereign capacity, delayed the performance of appellant's contract and such delays were excusable); *George C. Alvarez*, ASBCA No. 22441, 81-1 BCA ¶ 14,859.[9]

The drastic changes of policies enacted by the Israeli Government were events that were unforeseeable and beyond the control and without the fault or negligence of the Joint Venture. Since these acts were acts of a sovereign, i.e. the Israeli Government, and the contract was performed in Israel, they constitute sovereign acts which in accordance with FAR 52.249-10

[9] Case law also would support a non-compensable time extension based upon labor shortages due to abnormal circumstances which the Joint Venture could not have reasonably anticipated at the time of contract award. *See generally Robert McMullan & Son, Inc.*, ASBCA No. 11998, 68-1 BCA ¶ 7068; *Berglund-Johnson, Inc.* VACAB No. 965, 71-1 BCA ¶ 8834; *Marine Transport Lines, Inc.*, ASBCA No. 28962, 86-3 BCA ¶ 19,164.

entitle the Joint Venture to all provable excusable delay caused by its inability to utilize TCN labor.

## IX. CONCLUSION

Contract clause SR-22, combined with SR-14, together establish an express warranty on the part of the U.S. Government that the Contractor would be able to bring new third country nationals into Israel for use as its primary skilled work force. The relevant surrounding circumstances reinforce this conclusion. As is evidenced by the TCN plan submitted by the Contractor in its bid package, the Contractor affirmatively relied upon the contractual representations in question is formulating its bid. The contractual language in question establishes a warranty, which carries with it an implied promise to stand the resulting increased cost and grant an appropriate compensable time extension.

The record in this matter is also clear that in denying the subject claim the Corps of Engineers deferred to the Israel Ministry of Defense, which in turn based its decision on erroneous information, specifically regarding an allocation of the right to obtain TCN visas issued by the Ministry of Labor as the equivalent of an actual visa.

The material facts are undisputed, and the question of the existence of a warranty is an issue of law. Summary Judgment should be granted in favor of plaintiff A.A. B. Joint Venture.

Date: May 1, 2007 Respectfully submitted,

s/ Brian Cohen

Brian Cohen
BELL BOYD & LLOYD, LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I, Brian Cohen, hereby certify under penalty of perjury that the foregoing A.A.B's Memorandum of Points and Authorities In Support Of Motion For Summary Judgment and exhibits were served automatically via "shalom.brilliant.usdoj.gov" upon ECF filing this 1st day of May, 2007 upon:

Shalom Brilliant, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

s/ Brian Cohen
Brian Cohen