IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-114C |
| | ) | (Consolidated with Case Nos. |
| THE UNITED STATES OF AMERICA | ) | 05-1172C, and 06-49C |
| | ) | (Chief Judge Damich) |
| Defendants. | ) | |

**AFFIDAVIT OF S. DENISON KEENEY**

S. Denison Keeney, first being duly sworn on oath and subject to the penalties for perjury, states and represents as follows:

1. I am employed by ABB SUSA, one of the members of the A.A.B. Joint Venture. I acted as the on-site Project Manager for the Nachshonim Military Storage Base Project near Elad, Israel, and am thoroughly familiar with the details of the construction of the Project.

2. The contract between the parties, at Special Requirement (SR) No. 22, states:

> Contractor may arrange, through appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work. * * * *

3. I understood the foregoing contract clause to constitute a representation or warranty by the U.S. Corps of Engineers that the Joint Venture would be able to bring into Israel a Third County National ("TCN") work force.

4. Although I did not participate in the preparation of the Joint Venture's bid, I reviewed the bid documents in the early stages of preparation for the Project.



**EXHIBIT**
**1**

5. Appended hereto as Attachment A is a copy of the Letter of Acceptance, between the United States and Israel, for the Wye River Accords military facilities relocation assistance, which was the source of funding of the Project. Note 10 on page 11, provides for an exemption from income taxes for third county nationals imported into Israel as work force employees of the contractor or subcontractors.

6. In the Instructions to Bidders for the Project, the relevant section of which is appended hereto as Attachment B, there was a requirement, set forth at Paragraph 13, that bidders submit a "Third County National Tax Plan," showing anticipated usage of TCNs, by month. The purpose of the Tax Plan was to calculate the projected amount of tax reimbursement that would be due from the Government of Israel to the United States Government, which would in turn reimburse the contractor for the taxes paid on behalf of qualified TCNs.

7. The tax exemption in question provided a substantial financial incentive for the winning bidder to use third county nationals brought to Israel to work exclusively on the Project.. The Joint Venture's bid was based on reliance on the ability to use TCN labor for the Project, and in further reliance on the promised reimbursement of taxes paid to TCNs.

8. The Project was partly a traditional design-bid-build one, and partly design-build. Designers employed by the Israeli Defense Forces had completed the design for the Infrastructure and Site Development, and had prepared a partial design (roughly 35%) of the balance of the Project. The Joint Venture completed the remaining design concurrent with performing the earthwork.

9. The initial earthwork and site development was equipment-intensive, and was performed by Israeli earthworks subcontractors who had their own forces which were also somewhat reliant on foreign workers. The Joint Venture planned on using TCNs for its skilled labor in the "wet" trades – concrete, masonry, plaster, tiling, flooring, and painting. The Joint Venture anticipated a need for a substantial TCN work force when the concrete elements for the Dry Storage Buildings were ready for casting, with the number of TCNs steadily increasing. Appended hereto as Attachment C is the Third County National Tax Plan, which shows the Joint Venture's plans for use of TCNs at the time of its bid and submitted with its bid as directed by the Instructions to Bidders. This TCN Tax Plan did not include TCNs to be employed by the Joint Venture's subcontractors.

10. The fact that the Joint Venture planned to use TCNs for its primary work force is further documented by the Technical and Management Proposal submitted as part of its bid package. Appended hereto as Attachment D is the section of that Proposal dealing with Schedule and Mobilization; In Section 2.1.1, under "Early Mobilization & Procurement Measures" is the line item "Make final arrangements for location and subcontracting of TCN camp." Section 3.2.2 sets forth in detail the Joint Venture's plan for a labor camp capable of housing and feeding up to 500 TCN workers.

11. The Notice to Proceed was issued on June 19, 2001, and according to our TCN Tax Plan, the usage of TCNs was anticipated to commence in month 15 of the Project, which would have been in September 2002.

12. The need for foreign workers was advanced from September 2002, in the as-bid Tax Reimbursement plan, to March 2002, due to the Corps of Engineer's agreement to advance the start of Dry Storage Building concrete foundation works.

13. During the early stages of the Project the Joint Venture began the standard procedures for recruiting foreign workers, primarily from Romania and Turkey, from which the skilled trades were traditionally recruited. Our Joint Venture Partner, A. Arenson Ltd, was charged with execution of the wet works, due to its experience in this type of construction. On September 24, 2001, A. Arenson Ltd submitted a supplemental application to MOL for 150 additional TCN's for 2001 and on January 22, 2002, submitted its annual Application to MOL for 750 TCN Labor for the year 2002 for all its projects in Israel. The allocation of foreign worker visas, normally issued yearly in March, was not processed by the appropriate Israeli ministries throughout 2002.

14. In December 2001, the Government of Israel announced what became to be known as the "Closed Sky Policy." Although the Order in question did not by its terms ban all new third country national workers, the Government ministries implemented the Order in a manner that had such effect. In October 2002, Prime Minister Sharon made official the Government policy banning the entry of new TCNs into Israel.

15. The three contract clauses directly relevant to the TCN issues are SR-13, SR-14 and SR-22, copies of which are attached hereto, respectively, as Attachments E, F and G.

16. The inability to bring new TCNs into Israel began to have an effect on Project progress in the Spring of 2002. The Joint Venture put the Corps on notice of the impact of the lack of TCNs by letter dated May 1, 2002 (Attachment H).

17. On October 27, 2002, the Joint Venture submitted a formal request for time extension of 29 days, for the impact of the lack of TCNs in May-August, 2002 (Attachment I, CPM not included).

18. On November 11, 2002, upon the Corps' request, the Joint Venture submitted to the Corps of Engineers a chronology (Attachment J) of the events concerning the events up to that date concerning the TCN issue.

19. In early Fall 2002, the impact on Project progress and costs was becoming steadily more severe, and the Joint Venture requested a meeting with the Corps to discuss the matter. The Corps agreed to a meeting, which was originally scheduled for October 2002, then rescheduled for December 2002, then rescheduled again for March 5, 2003. The Joint Venture's "talking points" for that meeting are appended as Attachment K. A group representing the Joint Venture consisting of A. Arenson, CEO of A. Arenson Ltd,, Yom Tov Samia, Group V.P. Baran Group, Enrique Popowski and Paul Salvato, CEO and V.P. Operations, respectively, for ABB SUSA, Yael Baratz, Partner of Baratz Bar-Nathan, AAB JV counsel, and myself flew from Tel Aviv to Wiesbaden, Germany, with the hope that the Corps would be receptive to our plight and offer some form of assistance. In spite of the fact that the Joint Venture perceived this as a critical meeting, no one at the decision-making level from the Corps attended the meeting. The representatives of the Corps merely listened to AAB JV's presentation without comment, thanked the delegation for coming and concluded the meeting. It thus came as no surprise that by letter dated March 31, 2003, the Corps denied the Joint Venture's "TCN" claim. See Attachment L.

20. Upon our return from Wiesbaden, where it became apparent that the Corps was not going to provide any assistance, the Joint Venture turned to its Israeli attorneys, in an attempt to obtain relief through the Israeli courts. By letter dated March 9, 2003, our attorneys submitted an Administrative Petition (Attachment M hereto) to the Labor Authority. The Labor Authority rejected the Joint Venture's Petition dated March 11, 2003 (Attachment N).

21. Following the rejection of the Joint Venture's Administrative Petition by the Ministry of Labor, our attorneys submitted a letter request dated March 25, 2003, seeking intervention by the key Israel Government ministries. (Attachment O). When no response was received to this letter, follow-up letters were sent to each Minister individually, and no response was received to those letters as well.

22. When no response was received to the Joint Venture's counsel's letters, the Joint Venture filed suit against the ministries in question, seeking judicial intervention.

23. In addition to impacting the work of the Joint Venture's own forces, the labor shortage also impacted the Joint Venture's subcontractors. One of the most severely impacted subcontractors was USKON/DS, the fabricator/erector of the spatial frames for the Dry Storage Buildings. USKON/DS was located in Istanbul, Turkey, and had its own erection crews, which were not permitted to enter Israel under the Closed Sky Policy. The inability to import these Turkish workers to perform the erection portion of its subcontract was a primary factor in the termination of the USKON/DS subcontract.

24. The other severely impacted subcontractor was BP/Izopoli, of which BP (Bidud Projects) was to install insulated panels manufactured by Izopoli, another Turkish

firm. BP relied nearly 80% on Palestinian and foreign workers for panel erection work in Israel. Since the Nachshonim contract restricted use of Palestinian workers, BP was forced to use either Israeli or foreign workers. BP negotiated to terminate its subcontract due in part to the ban on importing foreign workers. In addition to the additional cost of Israeli workers, BP expressed concern about possible delays to the schedule due to the need to train inexperienced Israeli workers.

The foregoing is true and correct to my personal knowledge.

S. Denison Keeney

מדינת ישראל

GOVERNMENT OF ISRAEL
MINISTRY OF DEFENSE
MISSION TO THE U.S.

L-348

21 December 1999
210-690-955

Aly Samahy
Chief Defense Agencies/Support for Others Branch
Programs Management Division
Directorate of Military Programs
Department of the Army
U.S. Army Corps of Engineers
Washington D.C. 20314-1000

**Subject: LETTER OF REQUEST (L-348) FOR MILITARY FACILITIES**

Dear Mr. Samahy,

The G.O.I – M.O.D kindly requests an LOA for implementation of the military facilities relocation assistance related to the Wye River Accords.

The requested case is for planning, design, acquisition, contract administration, and management for construction of two infantry-training bases and a reserves division storage and logistics base in Israel.

The total case value should be [redacted]-

Please send the LOA to the attention of Ltc. Efi Dell here in the New York Mission. Ltc. Efi Dell is the G.O.I – M.O.D point of contact for this case (Tel: 212 551-0230, Fax: 212 551-0412).

Thank you for all of your assistance with this matter.

Sincerely,

Yoram Atzmon
Deputy Director

Cc: DSCA / Mr. John Rowe

800 SECOND AVENUE - ELEVENTH FLOOR - NEW YORK, NY 10017 - (212) 551-0400

ATTACHMENT A

# United States of America
# Letter of Offer and Acceptance (LOA)
## IS-B-HAC

Based on letter from Israel Ministry of Defense, LOR No. (continued on page 2)

Pursuant to the Arms Export Control Act, the Government of the United States (USG) offers to sell to the Government of Israel, Ministry of Defense, [redacted] Mission to the United States, [redacted] articles or defense services (which may include defense design and construction services) collectively referred to as "items," set forth herein, subject to the provisions, terms, and conditions in this LOA.

This LOA is for the services of the US Army Corps of Engineers in providing the design and construction of military facilities in Israel for two infantry (continued on page 2)

Initial Deposit: $7,000,000

Estimated Cost: $200,000,000

Terms of Sale:
FMS Credit (Non-Repayable) PL101-231 $200,000,000.00 (Wye River Accords)

Congressional Notification: 0027

This offer expires on 15 April 2000. Unless a request for extension is made by the Purchaser and granted by the USG, the offer will terminate on the expiration date.

This LOA consists of page 1 through page 19.

The undersigned are authorized representatives of their Governments and hereby offer and accept, respectively, this LOA:

| | | | |
|---|---|---|---|
| US Signature | Date: 2/25/2000 | Purchaser Signature | Date |
| Aly Samahy<br>Chief, Def/SFO Branch<br>Typed Name and Title | | Typed Name and Title | |
| Headquarters, U.S. Army Corps of Engineers<br>Implementing Agency | | Agency | |
| DSCA | Date | | |

Information to be provided by the Purchaser:
Mark For Code___, Freight Forwarder Code___, Purchaser Procuring Agency Code___, Name and Address of the Purchaser's Paying Office:___

Customer reference continued: L-348, for Military Facilities, dated 21 December 1999.

Case description continued: training bases and a reserves division storage and logistics base.

Items to be Supplied (costs and months for delivery are estimates):

| (1) Itm Nbr | (2) Description/Condition | (3) Qty, Unit of Issue | (4) Costs (a) Unit | (4) Costs (b) Total | (5) SC/MOS/TA | (6) Ofr Rel Cde | (7) Del Trm Cde |
|---|---|---|---|---|---|---|---|
| 001 2 | Q2A 061100C0N0000 (N) CONSTRUCTION CONTRACT<br><br>Management, design, design review, acquisition, contract administration, quality assurance, technical services, and construction of two infantry training bases and a reserves division storage and logistics base in Israel. (Note(s) 4) | XX | | [redacted] | X(1-41) TAN | - | - |

Estimated Cost Summary:

| | |
|---|---|
| (8) Net Estimated Cost | [redacted] |
| (9) Packing, Crating, and Handling | 0 |
| (10) Administrative Charge | [redacted] |
| (11) Transportation | 0 |
| (12) Other | 0 |
| (13) Total Estimated Cost | [redacted] |

To assist in fiscal planning, the USG provides the following anticipated costs of the LOA:

ESTIMATED PAYMENT SCHEDULE

| Payment Date | Quarterly | Cumulative |
|---|---|---|
| Initial Deposit | [redacted] | [redacted] |
| 15 Sep 2000 | [redacted] | [redacted] |
| 15 Dec 2000 | [redacted] | [redacted] |
| 15 Mar 2001 | [redacted] | [redacted] |
| 15 Jun 2001 | [redacted] | [redacted] |
| 15 Sep 2001 | [redacted] | [redacted] |
| 15 Dec 2001 | [redacted] | [redacted] |
| 15 Mar 2002 | [redacted] | [redacted] |
| 15 Jun 2002 | [redacted] | [redacted] |
| 15 Sep 2002 | [redacted] | [redacted] |
| 15 Dec 2002 | [redacted] | [redacted] |

| Payment Date | Quarterly | Cumulative |
| --- | --- | --- |
| 15 Mar 2003 | [redacted] | [redacted] |
| 15 Jun 2003 | | |

Explanation for acronyms and codes, and financial information, may be found in the "Letter of Offer and Acceptance Information."

Signed Copy Distribution:

1. Upon acceptance, the Purchaser should return one signed copy of this LOA to Defense Finance and Accounting Service - Denver Center, ATTN: DFAS-DE/I, 6760 E. Irvington Place, Denver, CO 80279-2000. Simultaneously, wire transfer of the initial deposit (if required) should be made to: United States Treasury, New York, NY, 021030004, DFAS-DE, Agency Code 3801, showing "Payment from Israel for IS-B-HAC"; or, a check for initial deposit should accompany the signed copy of the LOA or be sent simultaneously to DFAS-DE, with a letter identifying the Purchaser and the LOA identifier.

2. One signed copy should be returned to Department of the Army, U.S Army Corps of Engineers 20 Massachusetts Avenue N.W. Washington, DC 20314-1000.

**Note 1. INCORPORATION OF STATUS OF FORCES AGREEMENT.** Except as otherwise expressly provided in this LOA, the Agreement between the United States and Israel on the Status of United States Personnel, with annexes and related letter signed at Jerusalem, January 22, 1991, and entered into force January 12, 1994 (hereinafter, the "SOFA") is incorporated by reference. In case of a conflict between this LOA and the SOFA, this LOA shall prevail for the purposes of executing the work that is the subject of this LOA.

**Note 2. DEFINITIONS.** The parties agree to the following definitions for terms and acronyms used in this LOA:

a. Program - The group of projects, products, services, and other activities performed by the United States Government and funded by the Government of Israel (GOI) under the terms of this LOA for the relocation of military facilities for the GOI, which are the purposes of this LOA.

b. Project - Any work, products, services or other activities intended to produce a specified outcome; having a defined scope, schedule, cost, and criteria for performance measurement; and authorized and funded under the terms of this LOA for the relocation of military facilities for the GOI, which are the purposes of this LOA.

c. Program funded or project funded - Any activity funded within the defined scope and terms of this LOA for the relocation of military facilities for the GOI, which are the purposes of this LOA.

d. USG - United States Government

e. GOI - Government of Israel

f. LOA - Letter of Offer and Acceptance

g. LO - Liaison Officer

h. FAR - Federal Acquisition Regulation (U.S.)

i. USACE - U.S. Army Corps of Engineers

j. FMS - Foreign Military Sales

k. AECA - Arms Export Control Act (U.S.)

l. PMP - Project Management Plan

**Note 3. ADMINISTRATIVE CHARGES.** An administrative surcharge of 2.5% (value of Item Number 10 on page 2 of this LOA) has been applied to Line Item 001.

(A4Q)

**Note 4. CONTRACT ADMINISTRATION SERVICES.** A contract administative surcharge (CAS) is included in the value of line item 001. The CAS is a U.S. Government cost charged at 0.5% of the value of contracts issued under this LOA.

**Note 5. GENERAL.**

a. The GOI shall pay all costs associated with the United States Government's (USG) provision of goods and services pursuant to this LOA. Such payment shall be made by the GOI from the funds made available under the LOA, or from such other sources as the GOI may make available prior to the USG incurring obligations.

b. The GOI understands that with regard to Foreign Military Sales (FMS) cases and in accordance with the Arms Export Control Act (AECA), U.S. law requires that all costs, inclusive of but not limited to facility leases, accelerated personnel retirement, and personnel benefit contributions, incurred by the USG on behalf of the GOI are fully reimbursable by the GOI to the USG. The USG shall establish appropriate accounting systems to assure accurate compilation of cost expenditures and obligations in accordance with and pursuant to the AECA.

c. All projects, products, services, and other activities authorized to be performed and provided under the terms of this LOA will be defined and funded under the terms of this LOA.

d. The GOI shall have the right to define the scope and requirements of the program executed and funded under the terms of this LOA. The USG will consult with the GOI in advance regarding any change in program requirements and/or project scope, and the USG will not take any action resulting in an increase, decrease, or change of scope or requirements without the agreement of the GOI.

e. The USG will solicit, award, and administer all contracts associated with this LOA in accordance with U.S procurement law and regulations, except as otherwise specified in this LOA. Competition for all contracts and subcontracts will be limited to U.S., Israel, or U.S.-Israel Joint Venture firms.

f. All contracts awarded pursuant to the terms of this LOA shall be awarded and paid in U.S. dollars.

g. All U.S. Government contracts shall contain one of the following provisions, unless, the sales commission and fee have been identified and GOI written authorization approving payment thereof is received prior to contract award:

(1) For firm fixed-price contracts or fixed-price contracts with economic price adjustment:

"The contractor certifies that the contract price (including any subcontracts awarded hereunder) does not include any direct or indirect costs of sales commissions or fees for contractor sales representatives for the solicitation or promotion or otherwise to secure the conclusion of the sale of any of the supplies or services called for by this contract to the GOI."

(2) For all other types of contracts:

"Notwithstanding any other provision of this contract, any direct or indirect costs of sales commissions or fees for contractor (or subcontractor) sales representatives for the solicitation or promotion or otherwise to secure the conclusion of the sale of any of the supplies or services called for by this contract to the GOI shall be considered as an unallowable item of cost under this contract."

h. As part of the acquisition strategy for the program, the USG and the GOI agree that the GOI will provide full and complete engineering designs and bidding documents for infrastructure facilities and designs for buildings in such detail as GOI deems necessary to specify functional requirements and support the contract needs. The USG shall review, correct, revise, and/or repackage designs and bidding documents provided by the GOI, and these efforts shall be program/project funded under this LOA. Any design or engineering design services provided by the USG shall be program/project funded under this LOA. For any planning or design services provided by the USG, the USG may elect to accomplish such services with its own personnel or to contract for the services of architect-engineer (A-E) firms. Reimbursement to the GOI for engineering or design services procured by GOI will be handled pursuant to separate arrangements to be made by the GOI and the USG. Such reimbursement shall not be paid from this LOA.

i. A GOI representative may serve as a voting member on architect-engineer evaluation boards. Similarly, a GOI representative may observe contract bid or proposal openings, provided the representatives comply with such Procurement Integrity Act requirements as the USG determines necessary.

j. The USG will have the right to determine the automated systems used to manage and account for resources, schedules, and funds under the terms of this LOA.

k. All records created by the USG under the terms of this LOA will be maintained in a form that may be audited, in accordance with USG standards and regulations.

l. Activities undertaken by the USG under the terms of this LOA shall not be considered major U.S. Federal actions for purposes of the National Environmental Policy Act (NEPA), and will be exempt from the provisions of NEPA. The GOI is responsible for compliance with all procedural requirements of Israeli environmental, archeological, or other cultural law and regulations, without charge to program funds under the LOA. Work performed by the USG under the terms of this LOA will comply with all applicable environmental laws and regulations of Israel, and GOI shall be responsible for identifying for USG all environmental laws and regulations that apply to the program. The cost of any cultural resources studies, excavations, or other preservation activities shall be the responsibility of the GOI and shall not be paid from this LOA or any other Foreign Military Financing program funds. Any contractor costs associated with such activities, to the extent the USG after consultation with the GOI determines such costs are appropriate contract costs, will be paid from this LOA.

m. All U.S. nationals who are present in Israel solely for the purpose of executing this agreement shall not be considered residents or nationals of Israel.

n. The USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA. The GOI reserves the right, on the grounds of secrecy, security or public order, to limit access to designated security areas and to refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice. USG and GOI shall agree on the nature of information to be provided to the GOI concerning the backgrounds of third country national employees in order to determine their eligibility for admission into Israel and employment in the work implementing this agreement.

o. The GOI will receive, without regard to race, religion, sex, ethnic, or national origin, persons of other than Israeli nationality from countries having diplomatic relations with Israel; imported into Israel in accordance with Israeli law and regulation to work exclusively on efforts covered by the provisions of this LOA, provided they are technically qualified for the work and individually meet the security requirements of the GOI.

p. The USG shall have the right to lease property in Israel as necessary to implement this LOA.

q. All projects being implemented under the terms of this LOA shall be designed and constructed in compliance with the applicable Israeli codes, standards, and specifications. The GOI will provide to the USG English translations of all applicable Israeli codes, standards, and specifications. Procurement and contract administration for all projects implemented under the terms of this LOA will be conducted in accordance with U.S. procurement law and regulations.

r. Construction contracts awarded pursuant to this LOA shall require that all construction materials being incorporated into the military facilities be manufactured in Israel; provided such materials satisfy contract requirements.

s. Procurement consideration for any major mechanical equipment to be provided should be limited to equipment produced by companies with qualified service representatives located in Israel. This condition is necessary to ensure that continued support can be contracted for after the expiration of any warranties.

t. Offset costs may be included in this LOA if it is financed wholly by Purchaser cash or repayment credit. The DoD is not a party to any offset agreements/arrangements which may be required by the Purchaser in relation to the sales made in this LOA and assumes no obligation to administer or satisfy any offset requirements or bear any of the associated costs.

**Note 6. PROJECT MANAGEMENT.**

a. The USG will designate a project manager (PM) with overall responsibility for exercising USG management and operational control over the development and delivery of all projects, products, services, and activities under this LOA.

b. The GOI will designate a project Liaison Officer (LO) who will serve as a point of contact for authoritative communications, direct coordination, and liaison between the GOI authorities and the USG program and project management elements. The LO shall coordinate GOI project requirements with the USG project manager. Responsibilities of the LO will include, but not be limited to: serving as the control point for staffing operations with appropriate GOI officials; developing the functional requirements of the project; assisting in the coordination for required clearances for USG and contractor shipment of materiel, equipment, and supplies into Israel; and monitoring progress of the project. The LO shall also provide assistance for facilitating customs clearances, work, entry, or exit visas; and work, vehicle, operator, residence, or in-country travel permits. Salaries, travel, and per diem costs of the GOI LO and his/her staff are not project funded under this LOA and must be funded directly by the GOI.

c. The USG PM will prepare and maintain a project management plan (PMP) documenting the scope, schedule, budget, and acquisition strategy for all projects, products, and services to be provided. The PMP will be developed in coordination and cooperation with the GOI and will accurately reflect the GOI's requirements, consistent with the scope and funding of this LOA. The PMP will also include the GOI's insurance requirements.

d. The USG shall provide all project and program information requested by the GOI LO and other authorized GOI representatives, except for information whose release is restricted by U.S. law or regulation. An example of restricted information is procurement sensitive information, such as the contents of proposals before contract award. The USG may, at its discretion, agree to provide procurement sensitive information requested by GOI representatives, provided that all GOI representatives receiving this information comply with such Procurement Integrity Act requirements as the USG determines necessary.

e. The USG and the GOI will attend joint In-Progress Reviews (IPRs) at least quarterly. IPRs will encompass a senior level review of all aspects of the program implementation, including scope, budget, schedule, and financial management. The USG PM and GOI LO will jointly determine the location of each IPR. Senior level managers from both the USG and GOI, as jointly agreed and

documented in the PMP, will jointly chair the IPRs. Procedures for the conduct of IPRs and for the resolution of issues raised at the IPRs will be jointly agreed and documented in the PMP.

f. Proposed and estimated costs and delivery schedules for projects, products, and services provided under the terms of this LOA will be based on the following assumptions:

(1) That US personnel in Israel will be provided, at no cost, reasonable access to all data, plans, reports, or other information and all existing and proposed offices, sites, and areas within Israel required to implement the program authorized under the terms of this LOA.

(2) Construction will be accomplished either by a U.S. contractor, an Israeli contractor or a joint venture organization of U.S and Israeli firms.

(3) Contractor(s) will be provided with adequate storage areas in the immediate vicinity of the construction site.

If any of the above-specified assumptions are not valid, estimated costs and schedules will be revised accordingly, and any cost increases will be project funded under this LOA.

g. Prior to the arrival of USG technical assistance personnel, the GOI will arrange and publish area clearances for visits to all agencies, offices, activities, installations, and sites required.

h. The USG will rent temporary office space from funds under this LOA with water, electricity, heating, cooling, and access to toilets and provisioned with office furnishings that are within a reasonable proximity of the workplace of the GOI LO and that are suitable to and dedicated for use of the USG project manager and technical assistance staff while on duty in Israel. Typical office furnishings shall include desks/tables, chairs, filing cabinets, telephones, personal computers, office supplies, and office cleaning services.

i. The PM and the LO, or other designated GOI representatives that possesses the requisite authority, are authorized to conclude implementing agreements as necessary to execute the appropriate provisions of Note 5 through 8, Note 12, and Note 13 of this LOA.

**Note 7. DESIGN AND CONSTRUCTION SERVICES.**

a. Upon receipt of GOI approval of master planning and preliminary design layouts, and upon receipt of written authorization to proceed, the USG shall proceed to execute the program in accordance with the approved project management plan.

b. The GOI shall review and provide comments to the USG on any design submittals in accordance with procedures to be established in the PMP.

c. The USG will review all designs provided by the GOI for facilities included in the scope of this LOA. The costs of USG review, as well as any costs for corrections, revisions and/or repackaging required prior to procurement will be program funded under this LOA.

d. The USG may establish office(s) in Israel for the purpose of supervising and inspecting construction and related work accomplished under this LOA. The cost of such office(s) will be funded under this LOA. The USG shall furnish a sufficient number of qualified engineers, technicians, and other personnel to assure that the construction meets the criteria and standards established for the facilities being constructed, and that the terms of the contracts are being complied with by the construction contractors.

e. The GOI shall acquire and make available to USACE, at no cost to the program funded under this LOA, all rights of entry to and real estate for construction sites required for approved projects. USACE will assure that the areas agreed upon are used only for work authorized under terms of this LOA. Relocation of facilities and structures located on real property required by and approved for use for a military facility being constructed under this LOA shall be accomplished by the GOI at no cost to the program funded under this LOA and shall be completed in time so as not to interfere with orderly and economical prosecution of the work.

**Note 8. CONSTRUCTION CONDITIONS.**

a. Estimated project construction costs will be based upon the understanding that the GOI shall, at no cost to the program funded under this LOA, provide land, rights of way, and easements for all facilities required under terms of this LOA, provide access and site passes to the construction site, provide all required permits, licenses, and approvals, and designate areas at the construction sites to accommodate heavy equipment, materials, storage, and movement, including land for on-site housing and other support facilities for USG and contractor personnel and dependents. Land, buildings or facilities, base passes, and designated areas must be available prior to the date on which the construction contractor(s) is to move to and occupy the site for construction purposes. The GOI is responsible for assuring that utilities are available within a reasonable proximity to the project sites, and for providing all necessary utility permits and licenses, and utility easements and rights of way for bringing utility services to the project sites. The GOI will ensure vehicular access to within a reasonable proximity to the project sites. To the extent that USG contractor(s) cause damage or accelerated deterioration of existing roads, USG contractor(s) will be responsible to maintain such roads to their pre-construction condition.

b. Cost estimates provided for performance of efforts associated with this LOA will anticipate the normal and customary processing times, consistent with Israeli law and regulations, for the issuance of customs clearances; work, entry, or exit visas; work, vehicle operator, residence, or in-country travel permits; and any other appropriate licenses or permits required of USG and/or contractor(s) personnel. It is understood that processing delays for materiel or personnel may result in cost increases and/or delays to the program. In order to minimize such delays, the GOI shall take appropriate action, as needed, to expedite the required materiel and personnel clearances associated with the execution and performance efforts authorized under this LOA.

c. Contractor(s) shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses, or permits. The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency.

d. The GOI shall allow the construction contractor(s) to have site access passes valid for the duration of the project or, as a minimum, for annual periods.

e. The GOI shall allow the construction contractor(s) to move equipment and materials, when required, on and off project site(s).

f. The required offices, contractor mobilization facilities, and support facilities at the construction sites, assembled by and for the contractor(s) in Israel, shall be installed on GOI land unless prior approval for use of private land has been obtained from the GOI. In either case, the required land will be provided by the GOI at no cost to the program funded under this LOA.

g. Unrestricted mobilization access/land shall be provided by the GOI; unrestricted so that the Contractor(s) can have 24 hours per day access to the mobilization area and construction sites.

h. The GOI shall exert its best efforts to assist USG and contractor(s) efforts to ensure the availability of adequate port and freight handling facilities for the processing, forwarding, and storage of materials, equipment, and supplies for the projects funded under this LOA. Both governments shall exert their best efforts to prevent interruption in such treatment by strikes, labor unrest, or other causes.

i. USACE and its contractors shall be permitted to operate a radio communication system within Israel for communicating between offices and job sites; subject to Israeli telecommunications law, regulations, and practice.

j. Upon final completion of each facility under any construction contract, the GOI and the USG shall make a joint inspection of the facilities. The USG and the GOI shall mutually agree on the format and content of real property transfer documents. The USG will prepare property transfer documents for each completed facility. The signature(s) of authorized GOI representative(s) on the property transfer document will indicate GOI acceptance of the facility. The GOI must sign a transfer document prior to occupancy or use of each facility.

k. The GOI shall be responsible for performing an initial sweep of the sites to remove any unexploded ordnance, munitions or similar material prior to providing access to such sites. This sweep shall be performed at the GOI expense and shall not be paid from the proceeds of this LOA. If subsequent to the GOI sweep and removal, any additional unexploded ordnance, munitions or similar material is discovered, the contractor shall notify the GOI which shall at its expense (as above) remove such material. The contractor will cease work in the area until the material has been removed.

**Note 9. CLAIMS, DISPUTES, AND LIABILITIES.**

a. The provisions of Article X of the SOFA will not be applied to the work conducted under this LOA.

b. The GOI waives all claims against the USG and all U.S. personnel (as defined in the SOFA) for damage, loss, or destruction of property owned or used by its land, sea, or air armed services that

was caused in the performance of official duties, or injury or death suffered by any member of its armed forces while such member was engaged in the performance of official duties.

c. The GOI agrees to pay all claims arising out of damage to USG property, or any injury or death suffered by U.S. personnel (as defined in the SOFA) caused by the GOI or its personnel.

d. All claims and disputes by contractors arising under or relating to contracts awarded by the USG shall be resolved in accordance with U.S. Federal law and the terms of the individual contract. The USG shall have dispute resolution authority for these claims. Any contracting officer's final decision may be appealed by the contractor pursuant to the Contract Disputes Act of 1978 (41 U.S.C. "601-613). The U.S. Army Corps of Engineers Board of Contract Appeals (ENG BCA) is designated as the appropriate board of contract appeals. In lieu of appealing to the ENG BCA, the contractor may bring an action directly to the United States Court of Federal Claims.

e. The USG shall be responsible for handling all litigation involving disputes and appeals arising under or relating to contracts awarded by the USG, and for coordinating with the U.S. Department of Justice as appropriate. The USG shall notify the GOI of any such litigation and afford the GOI an opportunity to review and comment on the litigation proceedings and any resulting settlement negotiations.

f. The GOI agrees to make such funds available, as may be necessary, to cover the payment of successful contract claims. In the event that the amount of an award associated with any claim or dispute exceeds the amount of funds provided for in this LOA, the GOI shall remain responsible for providing such additional amounts that will satisfy the award and all related costs.

g. If any action taken by either designated agency is not satisfactory to the other, the PM and the LO, or other designated GOI official, will consult for the purpose of resolving the problem. If the dispute cannot be resolved between the two representatives, it may be referred for resolution by designated senior USG and GOI officials, with the right by either party to appeal to the Secretary of Defense of the United States and the Minister of Defense of Israel.

**Note 10. TAX EXEMPTIONS FOR THIRD COUNTRY NATIONALS.** Third country nationals (non-U.S. or Israeli nationals) imported into Israel as work force employees of contractor(s) and/or subcontractor(s) to work exclusively on efforts covered by the provisions of this LOA shall be exempted by the GOI from liability for or payment of Israeli personal income tax on earnings resulting from such employment nor shall they be subject to importation or exportation taxation of personal property imported into Israel or acquired there for personal use.

**Note 11. EXEMPTION FROM CERTAIN ISRAELI TAXES.** The GOI expressly relieves and exempts the USG and/or its contractors from imposition of or liability for any type of value added taxes on equipment, materials, and labor pursuant to all efforts provided under the terms of this LOA.

**Note 12. REIMBURSEMENT.** It is understood and agreed by the GOI that, in the event USG contractor(s) are required to pay any duties, taxes, or other charges (collectively, the "fees") levied by the GOI, that the contractor is not required to pay under this LOA, the GOI shall through the USG, provide reimbursement in accordance with the principle of "making the contractor(s) whole". The GOI shall ensure that the necessary funds in US dollars are made available to the USG in

advance (to support forecasted requirements) in an amount that makes the contractor(s) whole. The actual mechanism to be used to determine the correct amount of reimbursement shall be agreed upon by the GOI and USG.

**Note 13. SECURITY AND SAFEGUARDS FOR U.S. GOVERNMENT PERSONNEL OVERSEAS.**

a. The routine physical security of the construction sites and support facilities will be the responsibility of the USG's contractors. The security of the construction sites and support facilities against hostilities will be the responsibility of the GOI, subject to Israeli law, regulations, and practice. The specific responsibilities for internal physical security of the construction sites and support facilities will be agreed to between the USG and the GOI in the PMP. Upon any part of a military facility becoming operational, the GOI may impose additional security measures with respect to such part of the military facility. In the event of damage to the site due to hostilities, it will be the GOI's responsibility, if it wants the damage repaired, to make funds available for such repair. Compensation to USG personnel and contractor personnel for injury, death, or property damage due to hostilities shall be in accordance with Israeli law.

b. In the event of hostilities, civil disturbance, or natural disaster, the GOI shall use all reasonable means, including evacuation, if necessary, to ensure the safety of U.S. personnel, and U.S. and third country national contractor personnel brought into Israel specifically for this program and their dependents, together with the safety of their personal property. In the event the USG determines that, due to war, armed conflict, insurrection, civil or military strife, or other adverse conditions, the safety, health or welfare of U.S. personnel or U.S. and third country national contractor personnel is threatened, the GOI shall be responsible for any additional costs incurred by the USG to retain such personnel or secure replacements thereof, as applicable. In lieu of retention or replacement, the USG may elect to terminate the services being provided by those personnel. Whether to retain, replace, or terminate services of such personnel under the foregoing circumstances shall be within the sole discretion of the USG. The GOI will provide for the protection and safety of USG or contractor employees who are Israeli nationals or residents in accordance with Israeli law, regulations, and practice.

c. Security regulations and the protection and distribution of classified information will be governed by the Security of Information Agreement between the Governments of Israel and the United States, entered into force on December 10, 1982.

d. USG shall ensure that contractors and their personnel are advised of all security measures applicable to them. USG shall report to GOI any security violations that involve Israeli classified information.

e. US personnel will not be required to handle GOI munitions in the performance of their duties under the terms of this LOA.

f. US personnel, contractors, or subcontractors shall not be required or expected to deliver to the GOI, nor to any person or entity not a citizen of the United States of America, any technical data produced or utilized under this LOA until US personnel, contractors, or subcontractors have been

furnished with clear evidence that such delivery of the data is (1) approved by the U.S. State Department pursuant to the International Traffic in Arms Regulation, or (2) approval is not required.

**Note 14. OFFICIAL LANGUAGE.** All documents, publications, technical data, and operations and maintenance manuals provided under project funds under the terms of this LOA will be in the English language only. The responsibility and costs for the translation of any document from English rests solely with GOI and shall not be charged to program funds under this LOA. However, when information is translated, the English text is still the officially binding document.

**Note 15. PURCHASER PROGRAM COSTS.** It is expressly agreed among the parties to this LOA, that the GOI is solely responsible for payment of all its military and civilian personnel costs, inclusive of labor, travel, and per diem, related to GOI performance pursuant to or resulting from the terms of this LOA.

**Note 16. U.S. FLAG VESSELS AND AIR CARRIERS.**

a. The USG and the GOI agree that, with respect to supplies that may require ocean transportation, the Cargo Preference Act of 1954 (46 U.S.C. 1241(b)) shall determine the percentage of supplies that must be transported on privately-owned U.S. flag commercial vessels.

b. The USG and the GOI agree that international air travel and transportation shall be governed by Federal Acquisition Regulation 47.4.

**Note 17. AMENDMENT AND MODIFICATION.** This LOA may be modified or amended only by written, mutual agreement of the Parties, except as provided in paragraph 5.b of the Letter of Offer and Acceptance Information.

**Note 18. ENTRY INTO FORCE.**

a. This LOA shall enter into force upon signature by both Parties and certification of funding availability by the Defense Finance and Accounting Service.

b. Both signatories to this LOA certify that each possesses the authority to bind his government to this LOA. In the event that additional ratification or legislative action is necessary to fulfill the aforementioned commitments, the signatory will notify his counterpart in writing.

**Note 19. FOREIGN MILITARY FINANCING.** If terms of sale specify payment under a Foreign Military Financing (FMF) agreement between the purchaser and DOD, purchaser will pay to the U.S. Government, on a dependable undertaking basis, such costs as may be in excess of the amount funded by the FMF agreement. (F3)

**Note 20. SHORT OFFER EXPIRATION DATE.** The Offer Expiration Date of 15 April 2000 is required to comply with schedules for solicitation and award of construction contracts established to satisfy GOI objectives for completion of facilities construction.

LETTER OF OFFER AND ACCEPTANCE STANDARD TERMS AND CONDITIONS

Section

1 Conditions - United States Government (USG) Obligations
2 Conditions - General Purchaser Agreements
3 Indemnification and Assumption of Risks
4 Financial Terms and Conditions
5 Transportation and Discrepancy Provisions
6 Warranties
7 Dispute Resolution

1 Conditions - United States Government (USG) Obligations

1.1 Unless otherwise specified, items will be those which are standard to the US Department of Defense (DOD), without regard to make or model.

1.2 The USG will furnish the items from its stocks and resources, or will procure them under terms and conditions consistent with DOD regulations and procedures. When procuring for the Purchaser, DOD will, in general, employ the same contract clauses, the same contract administration, and the same quality and audit inspection procedures as would be used in procuring for itself, except as otherwise requested by the Purchaser and as agreed to by DOD and set forth in this LOA. Unless the Purchaser has requested, in writing, that a sole source contractor be designated, and this LOA reflects acceptance of such designation by DOD, the Purchaser understands that selection of the contractor source to fill requirements is the responsibility of the USG, which will select the contractor on the same basis used to select contractors for USG requirements. Further, the Purchaser agrees that the US DOD is solely responsible for negotiating the terms and conditions of contracts necessary to fulfill the requirements in this LOA.

1.3 The USG will use its best efforts to provide the items for the dollar amount and within the availability cited.

1.4 Under unusual and compelling circumstances, when the national interest of the US requires, the USG reserves the right to cancel or suspend all or part of this LOA at any time prior to the delivery of defense articles or performance of defense services. The USG shall be responsible for termination costs of its suppliers resulting from cancellation or suspension under this section. Termination by the USG of its contracts with its suppliers, other actions pertaining to such contracts, or cessation of deliveries or performance of defense services is not to be construed as cancellation or suspension of this LOA itself under this section.

1.5 US personnel performing defense services under this LOA will not perform duties of a combatant nature, including duties relating to training and advising that may engage US personnel in combat activities outside the US, in connection with the performance of these defense services.

1.6 The assignment or employment of US personnel for the performance of this LOA by the USG will not take into account race, religion, national origin, or sex.

1.7 Unless otherwise specified, this LOA may be made available for public inspection consistent with the national security of the United States.

2 Conditions - General Purchaser Agreements

2.1 The Purchaser may cancel this LOA or delete items at any time prior to delivery of defense articles or performance of defense services. The Purchaser is responsible for all costs resulting from cancellation under this section.

2.2 The Purchaser agrees, except as may otherwise be mutually agreed in writing, to use the defense articles sold hereunder only:
2.2.1 For purposes specified in any Mutual Defense Assistance Agreement between the USG and the Purchaser;
2.2.2 For purposes specified in any bilateral or regional defense treaty to which the USG and the Purchaser are both parties, if section 2.2.1 is inapplicable; or,
2.2.3 For internal security, individual self-defense, or civic action, if sections 2.2.1 and 2.2.2 are inapplicable.

2.3 The Purchaser will not transfer title to, or possession of, the defense articles, components and associated support material, related training or other defense services (including plans, specifications, or information), or technology furnished under this LOA to anyone who is not an officer, employee, or agent of the Purchaser (excluding transportation agencies), and shall not use or permit their use for purposes other than those authorized, unless the written consent of the USG has first been obtained. The Purchaser will ensure, by all means available to it, respect for proprietary rights in any items and any plans, specifications, or information furnished, whether patented or not. The Purchaser also agrees that the defense articles offered will not be transferred to Cyprus or otherwise used to further the severance or division of Cyprus, and recognizes that the US Congress is required to be notified of any substantial evidence that the defense articles sold in this LOA have been used in a manner which is inconsistent with this provision.

2.4. To the extent that items, including plans, designs, specifications, technical data, or information, furnished in connection with this LOA may be classified by the USG for security purposes, the Purchaser certifies that it will maintain a similar classification and employ measures necessary to preserve such security, equivalent to those employed by the USG and commensurate with security agreements between the USG and the Purchaser. If such security agreements do not exist, the Purchaser certifies that classified items will be provided only to those individuals having an adequate security clearance and a specific need to know in order to carry out the LOA program and that it will promptly

and fully inform the USG of any compromise, or possible compromise, of US classified material or information furnished pursuant to this LOA. The Purchaser further certifies that if a US classified item is to be furnished to its contractor pursuant to this LOA: (a) items will be exchanged through official government channels, (b) the specified contractor has been granted a facility security clearance by the Purchaser at a level at least equal to the classification level of the US information involved, (c) all contractor personnel requiring access to such items have been cleared to the appropriate level by the Purchaser, and (d) the Purchaser will assume responsibility for administering security measures while in the contractor's possession. If a commercial transportation agent is to be used for shipment, the Purchaser certifies that such agent has been cleared at the appropriate level for handling classified items. These measures will be maintained throughout the period during which the USG may maintain such classification. The USG will use its best efforts to notify the Purchaser if the classification is changed.

3 Indemnification and Assumption of Risks.

3.1 The Purchaser recognizes that the USG will procure and furnish the items described in this LOA on a non-profit basis for the benefit of the Purchaser. The Purchaser therefore undertakes to indemnify and hold the USG, its agents, officers, and employees harmless from any and all loss or liability (whether in tort or in contract) which might arise in connection with this LOA because of:
3.1.1 Injury to or death of personnel of Purchaser or third parties, or
3.1.2 Damage to or destruction of (a) property of DOD furnished to Purchaser or suppliers specifically to implement this LOA, (b) property of Purchaser (including the items ordered by Purchaser pursuant to this LOA, before or after passage of title to Purchaser), or (3) property of third parties, or
3.1.3 Infringement or other violations of intellectual property or technical data rights.

3.2 Subject to express, special contractual warranties obtained for the Purchaser, the Purchaser agrees to relieve the contractors and subcontractors of the USG from liability for, and will assume the risk of, loss or damage to:
3.2.1 Purchaser's property (including items procured pursuant to this LOA, before or after passage of title to Purchaser), and
3.2.2 Property of DOD furnished to suppliers to implement this LOA, to the same extent that the USG would assume for its property if it were procuring for itself the items being procured.

4 Financial Terms and Conditions

4.1 The prices of items to be procured will be billed at their total cost to the USG. Unless otherwise specified, the cost of items to be procured, availability determination, payment schedule, and delivery projections quoted are estimates based on the best available data. The USG will use its best efforts to advise the Purchaser or its authorized representatives of:
4.1.1 Identifiable cost increases that might result in an overall increase in the estimated costs in excess of ten percent of the total value of this LOA,
4.1.2 Changes in the payment schedule, and
4.1.3 Delays which might significantly affect estimated delivery dates. USG failure to advise of the above will not change the Purchaser's obligation under all subsections of section 4.4.

4.2 The USG will refund any payments received for this LOA which prove to be in excess of the final total cost of delivery and performance and which are not required to cover arrearages on other LOAs of the Purchaser.

4.3 Purchaser failure to make timely payments in the amounts due may result in delays in contract performance by DOD contractors, claims by contractors for increased costs, claims by contractors for termination liability for breach of contract, claims by USG or DOD contractors for storage costs, or termination of contracts by the USG under this or other open Letters of Offer and Acceptance of the Purchaser at the Purchaser's expense.

4.4 The Purchaser agrees:
4.4.1 To pay to the USG the total cost to the USG of the items even if costs exceed the amounts estimated in this LOA.
4.4.2 To make payment(s) by check or wire transfer payable in US dollars to the Treasurer of the United States.
4.4.3 If Terms of Sale specify "Cash with acceptance", to forward with this LOA a check or wire transfer in the full amount shown as the estimated Total cost, and agrees to make additional payment(s) upon notification of cost increase(s) and request(s) for funds to cover such increase(s).
4.4.4 If Terms of Sale specify payment to be "Cash prior to delivery", to pay to the USG such amounts at such times as may be specified by the USG (including initial deposit) in order to meet payment requirements for items to be furnished from the resources of DOD. USG requests for funds may be based on estimated costs to cover forecasted deliveries of items. Payments are required 90 days in advance of the time DOD plans such deliveries or incurs such expenses on behalf of the Purchaser.
4.4.5 If Terms of Sale specify payment by "Dependable Undertaking", to pay to the USG such amounts at such times as may be specified by the USG (including initial deposit) in order to meet payments required by contracts under which items are being procured, and any damages and costs that may accrue from termination of contracts by the USG because of Purchaser's cancellation of this LOA. USG requests for funds may be based upon estimated requirements for advance and progress payments to suppliers, estimated termination liability, delivery forecasts, or evidence of constructive delivery, as the case may be. Payments are required 90 days in advance of the time USG makes payments on behalf of the Purchaser.
4.4.6 If Terms of Sale specify "Payment on delivery", that bills may be dated as of the date(s) of delivery of the items, or upon forecasts of the date(s) thereof.
4.4.7 That requests for funds or billings are due and payable in full on presentation or, if a payment date is specified in the request for funds or bill, on the payment date so specified, even if such payment date is not in accord with the estimated payment schedule, if any, contained in this LOA. Without affecting Purchaser's obligation to make such payment(s) when due, documentation concerning advance and progress payments, estimated termination liability, or evidence of constructive delivery or shipment in support of requests for funds or bills will be made available to the Purchaser by DOD upon request. When appropriate, the Purchaser may request adjustment of any questioned billed items by subsequent

submission of a discrepancy report.

4.4.8 To pay interest on any net amount by which it is in arrears on payments, determined by considering collectively all of the Purchaser's open LOAs with DOD. Interest will be calculated on a daily basis. The principal amount of the arrearage will be computed as the excess of cumulative financial requirements of the Purchaser over total cumulative payments after quarterly billing payment due dates. The rate of interest paid will be a rate not less than a rate determined by the Secretary of the Treasury taking into consideration the current average market yield on outstanding short-term obligations of the USG as of the last day of the month preceding the net arrearage and shall be computed from the date of net arrearage.

4.4.9 To designate the Procuring Agency and responsible Paying Office and address thereof to which the USG will submit requests for funds and bills under this LOA.

5 Transportation and Discrepancy Provisions

5.1 The USG agrees to deliver and pass title to the Purchaser at the initial point of shipment unless otherwise specified in this LOA. With respect to items procured for sale to the Purchaser, this will normally be at the manufacturer's loading facility; with respect to items furnished from USG stocks, this will normally be at the US depot. Articles will be packed, crated, or otherwise prepared for shipment prior to the time title passes. If "Point of Delivery" is specified other than the initial point of shipment, the supplying US Department or Agency will arrange movement of the articles to the authorized delivery point as a reimbursable service but will pass title at the initial point of shipment. The USG disclaims any liability for damage or loss to the items incurred after passage of title irrespective of whether transportation is by common carrier or by the US Defense Transportation System.

5.2 The Purchaser agrees to furnish shipping instructions which include Mark For and Freight Forwarder Codes based on the Offer/Release Code.

5.3 The Purchaser is responsible for obtaining insurance coverage and customs clearances. Except for articles exported by the USG, the Purchaser is responsible for ensuring that export licenses are obtained prior to export of US defense articles. The USG incurs no liability if export licenses are not granted or they are withdrawn before items are exported.

5.4 The Purchaser agrees to accept DD Forms 645 or other delivery documents as evidence that title has passed and items have been delivered. Title to defense articles transported by parcel post passes to the Purchaser at the time of parcel post shipment. Standard Form 364 will be used in submitting claims to the USG for overage, shortage, damage, duplicate billing, item deficiency, improper identification, improper documentation, or non-shipment of defense articles and non-performance of defense services and will be submitted promptly by the Purchaser. DOD will not accept claims related to items of $200 or less for overages, shortages, damages, non-shipment, or non-performance. Any claim, including a claim for shortage (but excluding a claim for nonshipment/nonreceipt of an entire lot), received after one year from passage of title to the article or from scheduled performance of the service will be disallowed by the USG unless the USG determines that unusual and compelling circumstances involving latent defects justify consideration of the claim. Claims, received after one year from date of passage of title or initial billing, whichever is later, for nonshipment/nonreceipt of an entire lot will be disallowed by the USG. The Purchaser agrees to return discrepant articles to USG custody within 180 days from the date of USG approval of such return.

6 Warranties

6.1 The USG does not warrant or guarantee any of the items sold pursuant to this LOA except as provided in section 6.1.1. DOD contracts include warranty clauses only on an exception basis. If requested by the Purchaser, the USG will, with respect to items being procured, and upon timely notice, attempt to obtain contract provisions to provide the requested warranties. The USG further agrees to exercise, upon the Purchaser's request, rights (including those arising under any warranties) the USG may have under contracts connected with the procurement of these items. Additional costs resulting from obtaining special contract provisions or warranties, or the exercise of rights under such provisions or warranties, will be charged to the Purchaser.

6.1.1 The USG warrants the title of items sold to the Purchaser hereunder but makes no warranties other than those set forth herein. In particular the USG disclaims liability resulting from infringement or other violation of intellectual property or technical data rights occasioned by the use or manufacture outside the US by or for the Purchaser of items supplied hereunder.

6.1.2 The USG agrees to exercise warranties on behalf of the Purchaser to assure, to the extent provided by the warranty, replacement or correction of such items found to be defective, when such materiel is procured for the Purchaser.

6.2 Unless the condition of defense articles is identified to be other than serviceable (for example, "As-is"), DOD will repair or replace at no extra cost defense articles supplied from DOD stocks which are damaged or found to be defective in respect to material or workmanship when it is established that these deficiencies existed prior to passage of title, or found to be defective in design to such a degree that the items cannot be used for the purpose for which they were designed. Qualified representatives of the USG and of the Purchaser will agree on the liability hereunder and the corrective steps to be taken.

7 Dispute Resolution

7.1 This LOA is subject to US Federal procurement law.

7.2 The USG and the Purchaser agree to resolve any disagreement regarding this LOA by consultations between the USG and the Purchaser and not to refer any such disagreement to any international tribunal or third party for settlement.

# LETTER OF OFFER AND ACCEPTANCE INFORMATION

1. GENERAL. This provides basic information pertaining to the LOA for US and Purchaser use. Additional information may be obtained from the Security Assistance Management Manual, DOD 5105.38-M, the in-country Security Assistance Office, the DSCA Country Director, or from the implementing agency.

2. INFORMATION ENTERED BY THE USG.

a. Terms of Sale, and Purchaser responsibilities under those Terms, are described on the LOA. A list of all Terms of Sale, with explanations for each, are shown in DOD 5105.38-M.

b. Description/Condition. The item description consists of coding for use in US management of the LOA (starting with Generic/MASL and MDE "(Y)" or non-MDE "(N)" data such as that in DOD 5105.38-M, Appendix D) plus a short description of what is to be provided. When items are serviceable, Code "A" (new, repaired, or reconditioned material which meets US Armed Forces standards of serviceability) may be used; otherwise, Code "B" (unserviceable or mixed condition without repair, restoration, or rehabilitation which may be required) may be used. In some instances, reference to a note in the Terms and Conditions may complement or replace these codes.

c. The Unit of Issue is normally "EA" (each, or one; for example, 40 EA) or blank (unit of issue not applicable; for example, services or several less significant items consolidated under one LOA Item Number). When blank, a quantity or Unit Cost is not shown.

d. The Source Code (SC) in the Articles or Services to be Supplied Section is one or more of the following:
S - Shipment from DOD stocks or performance by DOD personnel
P - From new procurement
R - From rebuild, repair, or modification by the USG
X - Mixed source, such as stock and procurement, or undetermined
E - Excess items, as-is
F - Special Defense Acquisition Fund (SDAF) items

e. Availability leadtime cited is the number of months (MOS) estimated for complete delivery of defense articles or performance of defense services. The leadtime starts with Acceptance of this Offer, including the conclusion of appropriate financial arrangements, and ends when items are made available to transportation.

f. Type of Assistance (TA) Codes are as follows:
3 - Source Code S, R, or E; based on Arms Export Control Act (AECA) Section 21(b).
4 - Source Code X; AECA Sections 21(b), 22(a), 29, or source undetermined.
5 - Source Code P; AECA Section 22(a).
6 - Source Code S, R, or E, payment on delivery; AECA Section 21(d).
7 - Source Code P, dependable undertaking with 120 days payment after delivery; AECA Section 22(b).
8 - Source Code S, R, or E, stock sales with 120 days payment after delivery; AECA Section 21(d).
M - MAP Merger; Foreign Assistance Act (FAA) Section 503(a)(3).
N - FMS Credit (Nonrepayable); AECA Sections 23 or 24.
U - Source Code P; Cooperative Logistics Supply Support Arrangement (CLSSA) Foreign Military Sales Order (FMSO) I.
V - Source Code S; CLSSA FMSO II stocks acquired under FMSO I.
Z - FMS Credit; AECA Sections 23 or 24.

g. Training notes: AP - Annual training program; SP - Special training designed to support purchases of US equipment; NC - This offer does not constitute a commitment to provide US training; SC - US training concurrently being addressed in separate LOA; NR - No US training is required in support of this purchase.

h. Offer Release Codes (Ofr Rel Cde) and Delivery Term Codes (Del Trm Cde) below may also be found in DOD 4500.32-R, MILSTAMP, Appendix M, Figure M-1. The following Offer Release Codes also pertain to release of items for shipment back to Purchaser on repair LOAs:

A - Freight and parcel post shipments will be released automatically by the shipping activity without advance notice of availability.
Y - Advance notice is required before release of shipment, but shipment can be released automatically if release instructions are not received by shipping activity within 15 calendar days. Parcel post shipments will be automatically released.
Z - Advance notice is required, before release of shipment. Shipping activity will follow-up on the notice of availability until release instructions are furnished. Parcel post shipments will be automatically released.
X - The Implementing Agency (IA) and country representative have agreed that the:

-- IA will sponsor the shipment to a country address. Under this agreement, the Freight Forwarder Code must also contain X and a Customer-within-Country (CC) Code must be entered in the Mark For Code on the front page of the LOA. The MAPAD must contain the CC Code and addresses for each type of shipment (parcel post or freight).

-- Shipments are to be made to an assembly point or staging area as indicated by clear instructions on exception requisitions. Under this agreement, the Freight Forwarder Code must contain W. A Mark For Code may be entered in the Mark For Code space on the front page of the LOA and the MAPAD must contain the Mark For Code if the Mark For Address is to be used on the shipment to the assembly point or staging area.

i. For the following Delivery Term Codes, DOD delivers:

2 - To a CONUS inland point (or overseas inland point when the origin and destination are both in the same geographic area)
3 - At the CONUS POE alongside the vessel or aircraft
4 - Not applicable (Purchaser has full responsibility at the point of origin. Often forwarded collect to country freight forwarder.)
5 - At the CONUS POE on the inland carrier's equipment
6 - At the overseas POD on board the vessel or aircraft
7 - At the overseas inland destination on board the inland carrier's equipment
8 - At the CONUS POE on board the vessel or aircraft
9 - At the overseas POD alongside the vessel or aircraft

Delivery Term Codes showing DOD transportation responsibility for repair LOAs are shown below. The LOA will provide a CONUS address for each item identified for repair. The customer must assure this address is shown on all containers and documentation when materiel is returned.

A - From overseas POE through CONUS destination to overseas POD on board the vessel or aircraft
B - From overseas POE through CONUS destination to CONUS POE on board the vessel or aircraft
C - From CONUS POD on board the vessel or aircraft through CONUS destination to CONUS POE on board the vessel or aircraft
D - From CONUS POD on board the vessel or aircraft through the CONUS destination to overseas POD on board the vessel or aircraft
E - Not applicable (Purchaser has complete responsibility.)
F - From overseas inland point through CONUS destination to overseas inland destination
G - From overseas POE through CONUS destination to overseas POD alongside vessel or aircraft
H - (For classified items) From CONUS inland point to CONUS POE alongside vessel or aircraft
J - (For classified cryptographic items) From CONUS inland point to overseas inland destination

3. INFORMATION TO BE ENTERED BY THE PURCHASER. Mark For and Freight Forwarder Codes are maintained in the Military Assistance Program Address Directory (MAPAD), DOD 4000.25-8. The Purchaser Procuring Agency should show the code for the Purchaser's Army, Navy, Air Force, or other agency which is purchasing the item(s). The Name and Address of the Purchaser's Paying Office is also required.

a. Mark For Code. This Code should be entered for use in identifying the address of the organization in the Purchaser country which is to receive the items. This includes return of items repaired under an LOA.

(1) This address will be added by the US DOD to the Ship To address on all freight containers. It will also appear on items forwarded by small parcel delivery service, including parcel post. The address should include the port of discharge name and designator (water or air); country name, country service name, street, city, state or province, and (if applicable) in-country zip or similar address code.

(2) Shippers are not authorized to apply shipment markings. If codes and addresses are not published, containers will be received at the freight forwarder or US military representative in-country unmarked for onward shipment with resultant losses, delays, and added costs. The USG will sponsor shipment of this materiel to FOB US point of origin.

b. Freight Forwarder Code. When Offer Release Code X applies, Code X or W, discussed under Offer Release Code X above, must be entered.

4. FINANCIAL.

a. The method of financing is shown in the LOA, Amendment, or Modification. The initial deposit required with Purchaser signature of the LOA is an integral part of the acceptance.

b. LOA payment schedules are estimates, for planning purposes. DFAS-DE/I will request payment in accordance with the payment schedule unless DOD costs, including 90-day forecasted requirements, exceed amounts required by the payment schedule. When this occurs, the US will use its best efforts to provide a new schedule via LOA Modification at least 45 days prior to the next payment due date. The Purchaser is required to make payments in accordance with quarterly DD Forms 645 issued by DFAS-DE/I regardless of the existing payment schedule.

c. The DD Form 645 serves as the bill and statement of account. An FMS Delivery Listing, identifying items physically or constructively delivered and services performed during the billing period, will be attached to the DD Form 645. DFAS-DE/I forwards these forms to the Purchaser within 45 days before payments are due and Purchasers must forward payments in US dollars to the USG in time to meet prescribed due dates. Costs in excess of amounts funded by FMF agreements must be paid by the Purchaser. Questions concerning the content of DD Forms 645 and requests for billing adjustments should be submitted to the Defense Finance and Accounting Service, ATTN: DFAS-DE/I, 6760 E. Irvington Place, Denver, CO 80279-2000.

d. The preferred method for forwarding cash payments is by bank wire transfer to the Department of the Treasury account at the Federal Reserve Bank of New York using the standard federal reserve funds transfer format. Wire transfers will be accepted by the Federal Reserve System (FRS) only from banks that are members of the FRS, therefore, non-US banks must go through a US correspondent FRS member bank. The following information is applicable to cash payments:

Wire transfer--
United States Treasury
New York, New York
021030004
DFAS-DE/I

Agency Code 3801
Payment from (country or international organization) for
Letter of Offer and Acceptance (Identifier at
the top of the first page of the LOA)

Check mailing address—
Defense Finance and Accounting Service, ATTN: DFAS-DE/I
6760 E. Irvington Place
Denver, CO 80279-2000

e. To authorize payments from funds available under FMF loan or grant agreements, the Purchaser may be required to submit a letter of request to the Defense Finance and Accounting Service, ATTN: DFAS-DE/I, 6760 E. Irvington Place, Denver, CO 80279-2000. Purchasers should consult applicable FMF agreements for explicit instructions. Questions pertaining to the status of FMF financing and balances should be directed to DSCA/COMPT-FM.

f. Payments not received by DFAS-DE/I by the due date may be subject to interest charges as outlined in paragraph 4.4.3 of the LOA Standard Terms and Conditions.

g. The values on the LOA are estimates. The final amount will be equal to the cost to the USG. When deliveries are made and known costs are billed and collected, DFAS-DE/I will provide a "Final Statement of Account" which will summarize final costs. Excess funds will be available to pay unpaid billings on other statements or distributed as agreed upon between the Purchaser and the Comptroller, DSCA.

h. The Purchaser may cancel this LOA upon request to the implementing agency. An administrative charge that equals one-half of the applicable administrative charge rate times the ordered LOA value, which is earned on LOA acceptance, or the applicable administrative charge rate times the actual LOA value at closure, whichever is higher, may be assessed if this LOA is canceled after implementation.

5. CHANGES TO THE LOA. Changes may be initiated by the USG or by requests from the Purchaser. After acceptance of the basic LOA, these changes will take the form of Amendments or Modifications.

a. Amendments encompass changes in scope, such as those which affect the type or number of significant items to be provided. Amendments require acceptance by the USG and the Purchaser in the same manner as the original LOA.

b. Modifications include changes which do not constitute a change in scope, such as increases or decreases in estimated costs or delivery schedule changes. Modifications require signature only to acknowledge receipt by the Purchaser.

c. When signed, and unless alternate instructions are provided, copies of Amendments and Modifications should be given the same US distribution as the basic LOA.

d. Requests for changes required prior to acceptance by the Purchaser should be submitted to the implementing agency for consideration. See DOD 5105.38-M.

6. CORRESPONDENCE. Questions or comments regarding this LOA should identify the Purchaser request reference and the identification assigned by the implementing agency within DOD.

**PROJECT STATUS SHEET**
**U.S. ARMY CORPS OF ENGINEERS**
**EUROPE DISTRICT, ISRAEL PROGRAM OFFICE**
**CENTRAL RESIDENT OFFICE**

6 Dec 01

1. PROJECT TITLE: Nachshonim Storage Base
2. PROJECT LOCATION: Elad, Israel
3. FMS CASE/PROJECT NUMBER/PROGRAM YEAR: IS-B-HAC/165640/ FY 00
4. CURRENT WORKING ESTIMATE: [redacted]
5. CONTRACT NUMBER: DACA90-01-C-0043
6. CONTRACTOR NAME: ABB SUSA/A. Arenson/Baran Group (Joint Venture)
7. DATE OF AWARD: 5 Jun 01 — ADMIN NTP DATE: 19 Jun 01
   CONSTRUCTION NTP DATE: 19 Jun 01 — START DATE: 31 Jul 01
8. CONTRACT STATUS:
   a. AWARD AMOUNT: $124,089,176
   b. LAST MOD NUMBER: none
   c. CURRENT CONTRACT AMOUNT: $124,089,176
   d. CONTR. COMPLETION DATE (Orig/Curr): 18 Jun 04 / 18 Jun 04
   e. OCCUPANCY DATE (Orig/Curr): 19 Jun 04 / 19 Jun 04
   f. SCHEDULED (SCHED/ACT): 6% / 5%
   g. UPCOMING CHANGES: 1

**SECTION 00100**

**INSTRUCTIONS, CONDITIONS, AND NOTICES TO BIDDERS**

**PROPOSALS**

1. Proposals

Proposals for the work described herein, will be received until the date and time indicated on Standard Form 1442 in Section 00010, at the following address:

U.S. Army Engineer District - Europe
Contracting Division (CENAU-CT) Box 7
ATTN: CENAU-CT/A. Gunzel
Konrad Adenauer Ring 39
65187 Wiesbaden Germany

2. Proposal Format

a. The proposals shall be in the following format:

| Proposal Document | Original | Copies |
|---|---|---|
| **TECHNICAL AND MANAGEMENT PROPOSAL:** | | |
| VOLUME 1, FACTOR 1: Experience | 1 | 3 |
| VOLUME 1, FACTOR 2: Management | 1 | 3 |
| VOLUME 1, FACTOR 3:Technical | 1 | 3 |
| VOLUME 1, FACTOR 4:Past Performance | 1 | 3 |
| **PRICE PROPOSAL:** | | |
| VOLUME 2, FACTOR 5: Price Proposal | 1 | 3 |

b. Proposal Characteristics.

(1). All text must be legible and easily read. All text shall be typed single-spaced. Margins (1-inch) shall be clean and clear. Each volume shall be contained within a separate 2- or 3-ring binder (no heat or spiral bound volumes).

(2). All proposals shall contain the requirements stated herein and every volume shall be identified by the volume number and name, address, and telephone number of the prime on the cover. Each volume shall also contain a Table of Contents, List of Tables, List of Figures, List of Appendices, List of Acronyms and at the bottom left side of each page the volume number shall be

**ATTACHMENT B**

discrepancies found on the face of bidding schedule as submitted by the bidder:

(1) Obviously misplaced decimal points will be corrected ;

(2) Discrepancy between unit price and extended price, the unit price will govern;

(3) Apparent errors in extension of unit prices will be corrected; (4) Apparent errors in addition of lump-sum and extended prices will be corrected.

(b) For the purpose of bid evaluation, the government will proceed on the assumption that the bidder intends his bid to be evaluated on basis of the unit prices, the totals arrived at by resolution of arithmetic discrepancies as provided above and the bid will be so reflected on the abstract of bids.

(c) These correction procedures shall not be used to resolve any ambiguity concerning which bid is low.

**(End of statement)**

## 13. THIRD COUNTRY NATIONAL TAX PLAN

**Reference SR-14 ''Tax Clause'' of this solicitation. The proposal submitted under this solicitation shall include a Third Country National (TCN) tax plan which shall include: (1) an estimate of the amount of TCN personal income and employment taxes expected to be incurred in performance of the contract; and, (2) a projected expenditure schedule showing when the contractor expects to incur these costs over the duration of the contract. Submission of the plan and acceptance of the contractor's proposal by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor. The plan must address subcontractors as well as the prime contractor. An updated plan, along with justification for any changes, must be resubmitted by the contractor for Contracting Officer approval in the event of significant changes in expenditure levels or timing of TCN workers during the performance of the contract. This updated plan should be submitted no later than 60 days after notice to proceed. The Contracting Officer will not unreasonably withhold approval for changes in the plan.**

**(end of statement)**

JV PROPOSAL

ABB-A. ARENSON-BARAN GROUP - JOINT VENTURE

## NACHSHONIM STORAGE FACILITY , ISRAEL

### Third Contry National Tax Plan - SR-14

| Asumptions | | |
|---|---|---|
| One Individual Average Monthly Personal Income Tax = | 123.4 | $ |
| Social Security = | 4.6 | $ |
| Total Per Month Per one Individual (Average) = | 128.0 | $ |

Continued on the next Page →

| Month | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total No. of Employees | 108 | 184 | 218 | 226 | 226 | 252 | 269 | 269 | 269 | 269 | 269 | 269 | 269 | 269 | 395 | 395 | 412 | 539 | 539 | 539 | 691 | 707 | 741 | 918 |
| Expected No. of TCN's | | | | | | | | | | | | | | | 75 | 75 | 75 | 125 | 125 | 125 | 200 | 200 | 200 | 300 |
| Expected Monthly Reimbursment ($) | | | | | | | | | | | | | | | | 12,187 | 12,187 | 12,187 | 20,312 | 20,312 | 20,312 | 32,500 | 32,500 | 32,500 |
| Accumulated | | | | | | | | | | | | | | | | 12,187 | 24,375 | 36,562 | 56,875 | 77,187 | 97,499 | 129,999 | 162,499 | 194,999 |

ATTACHMENT
C

| Asumptions | | |
|---|---|---|
| One Individual Average Monthly Personal Income Tax = | 123.4 | $ |
| Social Security = | 4.6 | $ |
| Total Per Month Per one Individual (Average) = | 128.0 | $ |

| 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 927 | 927 | 834 | 834 | 826 | 741 | 724 | 615 | 496 | 404 | 243 | 176 | 49 | 7 |
| 300 | 300 | 250 | 250 | 250 | 200 | 200 | 150 | 100 | 100 | 50 | 50 | | |
| 48,750 | 48,750 | 48,750 | 40,625 | 40,625 | 40,625 | 32,500 | 32,500 | 24,375 | 16,250 | 16,250 | 8,125 | 8,125 | |
| 243,748 | 292,498 | 341,247 | 381,872 | 422,497 | 463,122 | 495,621 | 528,121 | 552,496 | 568,746 | 584,996 | 593,121 | 601,246 | 601,246 |

FROM: SUSA's Proposal, "Vol. I, Tech & Mgmt Proposal

# Schedule and Mobilization

**ATTACHMENT D**

# 2 SCHEDULE AND MOBILIZATION

## 2.1 Schedule

SAB proposes to execute this project in 1093 days (36 months), in accordance with the requirements of RFP. The critical schedule activities are the mass excavation (blasting), the construction and successful testing of the first Dry Storage Building (DSB) which facilitates subsequent construction of the other DSB's, and the concrete work required for all buildings in the project. The bulk of the concrete work is contained in the construction of DSB's. The design schedule will be construction driven. In order to better present our proposal, we have included a detailed construction schedule at the tab labeled "Schedules." The schedule shows that it is well within SAB's capability to design-build this project within the time required.

The normal work hours for the US design team is 40 hours per week

The normal work hours for the Israeli design team is 42 hours per week

The construction schedule is based upon normal working hours as follows:

- 11 hours/day Sunday-Thursday
- 6 hr/day Friday
- No work Sat in accordance with Israeli law

### 2.1.1 Accelerated Schedule

SAB takes a number of steps to accelerate the schedule, ensuring completion within the contract requirement of 1093 days, and creating the potential to complete the project ahead of schedule. The following specific steps are taken to compress the construction schedule, and ensure the proposed schedule can be maintained:

- **Design Measures**
  - Mobilization of Technical Design Manager and Chief Design Engineer immediately after Notice of Award
  - Use of dedicated design team, who work full time on this project
  - Senior construction management fully integrated into design effort ensures coordination and constructability of design effort
  - Use of primary Israeli designers who have established proven track records working with Baran in the past
  - Utilization of proven Israeli designers in preparation of quantity take-offs for this proposal ensures designers have thorough knowledge of contract documents, and are ready to start immediately upon contract award
  - Identification and prioritization of specific design parameters and packages which must be completed and approved for earliest possible construction start (submitted with this proposal)
  - Use of dry storage facilities previously designed by Stanley as the design basis for dry storage facilities on this project speeds up design process
  - Use of CAD systems to allow geographically separate design teams to simultaneously work on the same drawings
  - Use of CAD systems to allow Independent Israeli Design Review conducted simultaneously with Stanley's technical review.
  - Detailed preliminary blasting plan submitted with this proposal

- **Early Mobilization & Procurement Measures** (performed immediately after notice of award):
  - Mobilization of Project Manager and senior project staff
  - Contact local authorities and firms
  - Procure cars, field office facilities, and living facilities including those for USACE staff
  - Identify sources for on-site office services
  - Negotiate subcontracts and local suppliers
  - Make final arrangements for location and subcontracting of TCN camp
  - Prepare submittals: materials & equipment list, CQC plan, project schedule, safety plan
  - Verify quantity take-off
  - Pre-submittal briefing (ensures submittals are correct the first time
  - Early procurement of long lead items including roof and wall panels, space frames, transformers and switchgear, SF6 breakers, and synagogue furniture (immediately after approval of equipment specifications)

- **Construction Measures**
  - Self-performance of wet works including concrete placement and masonry

| Quantity | Equipment | Mobilization Date |
|---|---|---|
| 2 | Surveying teams | NTP + 15 days |
| 1 | Bulldozers (Cat.D8) | NTP + 40 days |
| 1 | Backhoe Loader (Cat. 970) | NTP + 40 days |
| 1 | Bulldozers (Cat.D8) | NTP + 50 days |
| 1 | Wheel Loader (Cat.970) | NTP + 50 days |
| 2 | 40 t. Trucks (Cat.771) | NTP + 50 days |
| 2 | Crushing Plant (300t/h) | NPT + 50 days |
| 5 | Track Drills (AC.ROC D7) | NPT + 80 days |
| 1 | Bulldozer (Cat.D8) | NPT + 80 days |
| 2 | Excavators (Cat.350L) | NPT + 80 days |
| 1 | Wheel Loader (Cat.970) | NPT + 80 days |
| 8 | 40t. Trucks (Cat.771) | NPT + 80 days |
| 1 | Bulldozer (Cat. D8) | NPT + 90 days |
| 2 | Excavators (Cat. 350L) | NPT + 90 days |
| 4 | Wheel Loaders (Cat. 970) | NPT + 90 days |
| 6 | 40t. Trucks (Cat. 771) | NPT + 90 days |
| 1 | Water Truck | NPT + 90 days |
| 2 | Bulldozers (Cat. D8 | NPT + 120 days |
| 2 | Wheel Loaders | NPT + 120 days |
| 3 | 40t Trucks (Cat. 771) | NPT + 120 days |
| 2 | Motor Scrapers ( Cat 631E) | NPT + 120 days |
| 3 | Graders (Cat. 12G) | NPT + 120 days |
| 2 | Sheepsft Comptrs (Cat.815) | NTP + 120 days |
| 1 | Water trucks | NTP + 120 days |
| 1 | Fuel & Lube Truck | NPT + 120 days |

Support facilities are mobilized according to the following schedule:

| Facility/Item | Mobilization Complete |
|---|---|
| USACE field office | NTP + 40 |
| SAB field office | NTP + 40 |
| USACE automobiles | NTP + 60 |
| USACE housing | NTP + 80 |
| TCN camp | NTP + 90 |

In the sixth month of the project, these will be supplemented with the addition of a warehouse, a mechanics shop and a construction camp for housing non-local and TCN workers.

### 3.2.1 Self-Performed Work

SAB self-performs wet works including the following:

- Concrete formwork
- Concrete placement & finishing
- Masonry
- Plaster
- Tiling
- Flooring
- Painting

All other construction tasks are competitively subcontracted to reputable Israeli firms with whom A. Arenson has a long-standing business relationship. Some construction tasks may be subcontracted to two or more subcontractors to optimize price, production capability, or quality, as appropriate.

### 3.2.2 Labor and Labor Camp

SAB proposes to utilize one of the local manpower companies to provide third country nationals (TCNs) for unskilled, semi-skilled, and skilled labor. Workers will come from either Romania or Turkey. Approximately 500 TCN workers are needed at peak production.

Foremen are generally Israeli national employees of subcontractors. Highest level construction supervisors and management are SAB employees.

It is common to bring TCNs into Israel to perform construction labor. There are several Israeli manpower firms specializing in providing TCN labor, who can readily supply all TCN workers. The manpower firms also construct the worker camps, and provide services for feeding, and daily transportation from camp to the job site. ABB SUSA is currently discussing this project with the following local manpower firms:

| | |
|---|---|
| • Kineton Ltd. | Tel Aviv |
| • Mundi Ltd. | Tel Aviv |
| • Oz Atid Ltd. | Tel Aviv |
| • Yad Hamisaj Ltd. | Tel Aviv |
| • Mazor Ltd. | Tel Aviv |
| • Talnir Ltd. | Netanya |

The worker camp will be located adjacent to the principal site activity on project property. The camp consists of modular units for housing, bath, dining, and

kitchen facilities, and portable latrines. Bath units provide hot and cold running water, showers, sinks. Latrines are pumped out and cleaned regularly. Centralized kitchen and dining units serve two hot meals per day (breakfast and dinner), and a sack lunch for eating on the job site. Camp staff also arranges laundry, mail, and weekend shopping/recreation trips to the Tel Aviv area.

### 3.2.3 Major Subcontracts

- **Site Work**

Clearing and grubbing, earthworks, roads, drainage, and asphalt paving are subcontracted to one of, or a combination of the following subcontractors:

| Contractors: | Location: |
| --- | --- |
| • Dan Rolider Ltd. | Haifa |
| • E. Ben Ari Ltd. | Ashdod |
| • Abu Kosh & Sons Ltd. | Dimona |
| • Madan Ltd. | Rehovot |

Arenson has a good and long-standing working relationship with each of the above firms. Each of the above firms by itself has the capability to handle all clearing and grubbing, drilling, blasting, mass excavation, backfill, roads, drainage, and asphalt paving for this job, especially given the recent slowdown in the Israeli construction industry. As a conservative measure, however, to ensure one firm is not overloaded SAB anticipates awarding subcontracts for defined portions of the work.

- **Utilities and Electro-Mechanical Works:**

The Utilities and Electro-mechanical scope of work includes:

- Supply and installation electrical ductbanks in trenching;
- Supply and installation of piping systems including underground piping in trenches;
- Supply and installation of transformers, switchgear, panelboards and electrical controls;
- Supply and installation of battery chargers;
- Supply, installation, pulling and termination of conductor and cable;
- Supply and installation of the HVAC systems;
- Supply and installation of the dehumidifying systems in the dry storage buildings.

"Vol I: Tech & Mgmt Proposal"



PROJECT: NACHSHONIM STORAGE BASE
LOCATION: Nachshonim, Israel

SR-13 **COMPLIANCE WITH HOST COUNTRY RULES AND CUSTOMS**

a. The laws of Host Country may prohibit access to certain areas of the country which are under military control. The Contractor shall be responsible for advising the Contracting Officer's Representative of the names of personnel, type, and amounts of equipment, dates and length of time required at the site, and purpose of entering the host country, so that proper clearances may be obtained from the Host Government. It is understood that areas to which rights of entry are provided by the Host Government are to be used only for work carried out under the contract and no destruction or damages shall be caused, except through normal usage, without concurrence of the Host Government.

b. The following items are the sole responsibility of the Contractor to investigate, estimate as to cost, and assume the risk, as normally encountered by Contractors. The Contractor shall be responsible for determining the effect of the following on his own cost of performance of the contract and for including sufficient amount in the contract price:

- Official language and type of accounts required to satisfy the officials of the Local Government.

- Entry and exit visas, residence permits, and residence laws applicable to aliens. This includes any special requirements of the Host Government, including those required by local Labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.

- Passports, health and immunization certificates, and quarantine clearance.

- Compliance with local labor and insurance laws, including payment of employer's share of contribution, collecting balance from employee and paying into insurance funds.

- Strikes, demonstrations and work stoppage.

- Collection through withholding and payment to local Government, of any Host Country income tax on employees subject to tax.

- Arranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor, to receive

**ATTACHMENT E**

payments and to remove such funds from the country.

- Operating under local laws, practices, customs and controls, and with local unions, in connection with hiring and firing, mandatory wage scales, vacation pay, severance pay, overtime, holiday pay, 7th day of rest, legal notice or pay in lieu thereof for dismissal of employees, slowdown and curtailed schedules during religious holidays, and ratio of local labor employed in comparison to others.

- Possibility of claims in local bureaus, litigation in local courts, or attachment of local bank accounts.

- Compliance with workmen's compensation laws and contributions into funds. Provisions of necessary medical service for Contractor employees.

- Special license required by the local Government for setting up and operating any manufacturing plant in the Host Country, e.g. concrete batching, precast concrete, concrete blocks, etc.

- Sales within the host country of Contractor-owned materials, and equipment.

- Special licenses for physicians, mechanics, tradesmen, drivers, etc.

- Identification and/or registration with local police of imported personnel.

- Stamp tax on documents, payments and payrolls.

- Base passes for permanent staff, day laborers, motor vehicles, etc.

- Compliance with all customs and import rules, regulations and restrictions, including, but not limited to, local purchase requirements.

**SR-14 <u>TAX CLAUSE:</u>**

TAXES IMPOSED BY THE GOVERNMENT OF ISRAEL

1. General:

payments and to remove such funds from the country.

- Operating under local laws, practices, customs and controls, and with local unions, in connection with hiring and firing, mandatory wage scales, vacation pay, severance pay, overtime, holiday pay, 7th day of rest, legal notice or pay in lieu thereof for dismissal of employees, slowdown and curtailed schedules during religious holidays, and ratio of local labor employed in comparison to others.

- Possibility of claims in local bureaus, litigation in local courts, or attachment of local bank accounts.

- Compliance with workmen's compensation laws and contributions into funds. Provisions of necessary medical service for Contractor employees.

- Special license required by the local Government for setting up and operating any manufacturing plant in the Host Country, e.g. concrete batching, precast concrete, concrete blocks, etc.

- Sales within the host country of Contractor-owned materials, and equipment.

- Special licenses for physicians, mechanics, tradesmen, drivers, etc.

- Identification and/or registration with local police of imported personnel.

- Stamp tax on documents, payments and payrolls.

- Base passes for permanent staff, day laborers, motor vehicles, etc.

- Compliance with all customs and import rules, regulations and restrictions, including, but not limited to, local purchase requirements.

SR-14 **TAX CLAUSE:**

TAXES IMPOSED BY THE GOVERNMENT OF ISRAEL

1. General:

..

**ATTACHMENT F**

PROJECT: NACHSHONIM STORAGE BASE
LOCATION: Nachshonim, Israel

Contractors and subcontractors will be required to pay all taxes, duties, or other charges levied by the Government of Israel (GOI) in accordance with Israeli law and regulations. Certain expenditures for taxes, duties or similar charges will be reimbursable to the prime contractor as provided in this clause. Bid prices shall not include the value of taxes for which the contractor will be reimbursed.

2. Definitions:
a. Direct Taxes: As used in this clause, direct taxes are: (a) personal income and ~~employment~~ taxes for third country national workers imported into Israel exclusively for work on this contract or other contracts under LOA # IS-B-HAC; and (b) Value Added Taxes (VAT). Direct taxes will be reimbursed based upon actual expenses incurred by the contractor and subcontractors under procedures set out in this clause.

(b) Indirect Taxes: As used in this clause, all duties, charges and fees levied by the GOI other than those defined in this clause as 'direct taxes' will be considered to be 'indirect taxes'.

3. Value Added Taxes:
a. The contractor will apply for reimbursement of VAT directly with the appropriate GOI tax authorities. In seeking reimbursement, the contractor will comply with all applicable GOI laws, regulations and administrative procedures. Payments from GOI tax authorities to the contractor for VAT will be in Israeli Shekels (NIS).
b. The GOI has agreed that payments to the contractor for VAT reimbursements will be made promptly in accordance with the requirements of Israeli law and regulations. Any claim to the Contracting Officer based upon unreasonable denial or delay of VAT reimbursements will be considered by the Contracting Officer under the Disputes provision of the contract. In evaluating a claim of unreasonable delay, the Contracting Officer will consider all relevant factors, including the normal processing time for reimbursement of VAT by the GOI.

4. Personal Income and Employment Taxes for Third Country Nationals:
a. For purposes of this clause, Third Country Nationals (TCNs) are those persons who are nationals of countries other than the United States or Israel.
b. The tax exemption for TCN personal income and employment taxes on earnings is limited to those third country nationals who enter Israel as employees of the contractor or subcontractors to work exclusively on this contract or other

**PROJECT: NACHSHONIM STORAGE BASE**
**LOCATION: Nachshonim, Israel**

contracts under LOA # IS-B-HAC.

c. At least 15 days prior to the arrival of TCNs at the job site, the Contractor will provide the Contracting Officer with the following information for each TCN employee:

Full Name
Date of Birth
Place of Birth
Citizenship
Passport Number, date and place of issuance
Visa Information
Current Residence

The Contracting Officer will forward this information to the GOI and the GOI will verify eligibility for tax exemption. The Contracting Officer will notify the contractor upon verification by the GOI that the submitted employees have qualified for tax exempt status.

d. The contractor and/or subcontractors shall not withhold personal income taxes from the wages of qualifying TCN employees. The contractor and/or subcontractors will pay all income taxes required by Israeli law to the appropriate agencies/jurisdictions for qualifying TCN employees.

e. Income and employment taxes paid for qualifying employees of the contractor and subcontractors will be itemized on monthly contractor invoices to the U.S. Government. For each qualifying employee, invoices will include the amount and type of taxes paid, period for which taxes were paid, and employee earnings for the period. The contractor will require all subcontractors to provide this information to the contractor for qualifying employees of the subcontractors. Invoices submitted more than 90 days after the taxes were paid by the contractor will not be reimbursed.

f. TCN personal income and employment taxes paid will be reimbursed in U.S. dollars to contractors as part of their regular periodic payments, after approval of invoices by the Contracting Officer. Reimbursement will be based upon exchange rates in effect on the date the contractor paid the taxes. For this purpose, the exchanger rate shall be the rate in use by the U.S. Embassy in Tel Aviv.

5. Indirect Taxes:

a. Reimbursement of indirect taxes will not be done on an actual cost basis. Indirect taxes will be reimbursed to the contractor as a percentage of contract amount. Under this contract, ~~0.85~~% of the contract price will be paid to the contractor in U.S. dollars as a full and complete reimbursement for indirect taxes paid. The percentage of reimbursement is not subject to adjustment and can not be the subject of a claim under the disputes provision of this

contract.

b. Payments to the contractor for indirect taxes will be based upon contract earnings as shown on approved invoices to the U.S. Government for progress payments.

6. The TCN Tax Plan submitted as part of the contractor's proposal is made a part of this contract. In the event of significant changes in expenditure levels or timing of TCN workers during performance of the contract, an updated plan, along with justification for any changes, must be resubmitted by the contractor for Contracting Officer approval. Submission of the plan and acceptance by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor. The Contracting Officer will not unreasonably withhold approval for changes in the plan.

SOLICITATION PROVISION:

Third Country National Tax Plan:

The proposal submitted under this solicitation shall include a Third Country National (TCN) tax Plan which shall include: (1) an estimate of the amount of TCN personal income and employment taxes expected to be incurred in performance of the contract; and, (2) a projected expenditure schedule showing when the contractor expects to incur these costs over the duration of the contract. Submission of the plan and acceptance of the contractor's proposal by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor. The plan must address subcontractors as well as the prime contractor. An updated plan, along with justification for any changes, must be resubmitted by the contractor for Contracting Officer approval in the event of significant changes in expenditure levels or timing of TCN workers during performance of the contract. The Contracting Officer will not unreasonably withhold approval for changes in the plan.

**SR-15 <u>CONTRACTOR LIAISON WITH HOST GOVERNMENT</u>.**

All communication by the Contractor with all officials, representatives and/or offices of the Host Government in all matters pertaining to the design or construction of this contract, shall be through and in full liaison with the Contracting Officer. This does not relinquish Contractor responsibility for obtaining routine items to conduct day-to-day business, such as visas, permits, and custom clearances.

business in Israel.

g. If the contractor determines that additional or complementary insurance is appropriate, or required by host nation law, the contractor will obtain such additional or complimentary insurance. Any additional or complimentary insurance shall be subject to the conditions specified in this clause.

**SR-20 LOCAL CONSTRUCTION MATERIALS**

All Construction materials incorporated into military facilities must be manufactured in Israel provided such materials satisfy contract requirements. If Israeli materials are not available, the contractor will submit a certification to that effect along with the product submittal for the non-Israeli materials prior to purchase. The purchase must be approved in advance. In order that continued support for major mechanical equipment can be contracted for after warranty expiration, major mechanical equipment should be obtained from companies with qualified service representatives located in Israel.

**SR-21 DESIGNATED COUNTRY CITIZEN**

Designated country citizens (passport holders) are not authorized access to the project site. Performance under this contractual document does not authorize designated country citizens access to such installations.

Designated country as used in this provision includes Afghanistan, Algeria, Burma, Cambodia, Cuba, Iran, Iraq, Laos, Libya, Mongolia, North Korea, People's Republic of China (including Tibet), Syria, Yemen, and Former Yugoslavia (Serbia, Montenegro, and Bosnia Herzegovina), Egypt, and Jordan. Individuals from Serbia and Montenegro will hold a Yugoslavian Passport. Individuals from Bosnia Herzegovina have their own passport.

The list of designated countries is subject to change upon notification by the COR.

The contractor agrees to insert the substance of this provision, including this paragraph, in all subcontracts.

**SR-22 CONTRACTOR WORKFORCE**

Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and

PROJECT: NACHSHONIM STORAGE BASE
LOCATION: Nachshonim, Israel

nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work. Information concerning third country nationals which will be required include the following: ID number, Passport Number, Age, Place of Birth, Citizenship, and Picture - passport size.

Contractors shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses, or permits. The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency.
Offerors are advised that the Government of Israel reserves the right to limit access to designated security areas and refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice.

**SR-23** **DELIVERY OF TECHNICAL DATA**

Contractors and subcontractors will not provide any technical data produced or utilized under this contract to the GOI or any person or entity not a citizen of the United States of American until the contractors/subcontractors are furnished with clear evidence that such delivery of the data is (1) approved by the U.S. State Department pursuant to the International Traffic in Arms Regulation, or (2) approval is not required.

**SR-24** **COMPLIANCE WITH HOST COUNTRY CONSTRUCTION LAWS**

In addition to the requirements to comply with Host Nation laws as prescribed elsewhere in this contract, the contractor's attention is directed to comply, where applicable, with the various Israeli Laws pertaining to construction including The Law of Construction and Planning, The Law of Concrete, The Law of Electricity, and the Antiquities Act of 1978.

**SR-25** **USE OF SIMILAR MATERIAL FOR AESTHETIC CONSISTENCY**

Wherever similar material is being used that affects the visual appearance of the facilities (IE exposed masonry, plaster, paint, metal trims), all material shall come from one source and be of a consistent appearance across the project boundaries.

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

א. א. ב. - יזם משותף
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD
פרוייקט בסיס אחסון נחשונים, אלעד

01 May 2002

Ref. USACE/02-0125

**DISTRIBUTION**

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CH DESIGN ENG | | |
| SITE MGR | | ✓ |
| ADMIN MGR | | |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BAREN | | ✓ |
| ABB,N.J. OFFICE | | ✓ |
| | | |
| | | |
| | | |
| SUBJECT FILE | 1505 | |

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

RE: DACA90-01-C-0043
NACHSHONIM STORAGE BASE

**SUBJECT: TCN Labor Shortage**

Dear Sir,

The AAB Joint Venture bid this project on having the ability to import Third Country National (TCN) labor to perform the majority of the work. As you are aware, the Ministry of Labor and Interior have, since last November, put a hold on any visas and ability to import labor into Israel.

A month ago we had a lead on 100 TCNs for the project. Now that we have need for labor, this group has been absorbed into other projects or has re-patriated to their home country. Recently, 11 laborers were assigned to this project and only one showed for work. The following work has been affected and delayed by our inability to find labor:

1. Start work on 4 lots, #67-A9, #67-A10, #67-A13 and #67-A18

   Pile caps

   Lean concrete

   Waterproofing

   Protective concrete

   Underdrains

2. Production on 50% of remaining culvert (280M). We have formwork to produce 24 meters a day and have enough labor for only 12 meters per day.
3. Start work on wall concrete for DSBs #56-A7, #56-A8 and #56-A16
4. Start work on precast stairs and bumpers
5. Underdrains in 3 lots in Segment #56
6. Piling rig is back to work and the JV cannot supply enough labor for steel cage fabrication and casting pile.

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקסי: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL). TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: השיטה 5, פארק התעשייה קיסריה טל. 04-6231111 פקס 04-6230230
J.V.office: 5 HASHITA ST. CEASAREA INDUSTRIAL PARK (ISRAEL) 38900 P.O.B 3566, TEL 972-4-6231111 FAX 972-4-6230230

**ATTACHMENT H**

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

**א. א. ב. - יזם משותף**
אבב – סוסח/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE. ELAD
פרוייקט בסיס אחסון נחשונים, אלעד

The JV appreciates the cooperation of the COE and MOD in allowing labor, already in Israel, to participate on this project. Due to import restrictions, this labor is not sufficient to sustain the demanding present and future project schedule.

In accordance with Contract Clauses, Section 00700-33, FAR 52.243-4, Changes, Contractor reserves its rights for an equitable adjustment for additional costs and time of project completion due to past, present and future restrictions on importing labor.

Sincerely,

S. Denison Keeney
Project Director

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקס: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL). TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: השיטה 5, פארק התעשיית קיסריה טל. 04-6231111 פקס 04-6230230
J.V.office: 5 HASHITA ST. CEASAREA INDUSTRIAL PARK (ISRAEL) 38900 P.O.B 3566. TEL 972-4-6231111 FAX 972-4-623023