Loren Data Corp.

COMMERCE BUSINESS DAILY ISSUE OF OCTOBER 30, 2000 PSA #2716
SOLICITATIONS

# Y -- FIRM FIXED PRICE CONTRACT FOR DESIGN/CONSTRUCTION SERVICES FOR NACHSHONIM STORAGE BASE, ELAD, ISRAEL

**Notice Date**
October 26, 2000

**Contracting Office**
Department of The Army, US Army Engineer District, Europe, Attn: CENAU-CT, Cmr 410, Box 7 APO AE 09096

**ZIP Code**
09096

**Solicitation Number**
DACA90-01-R-0001

**Response Due**
January 22, 2001

**Point of Contact**
PM-Robert Saari, phone 011-49-611-816-2820 or C S- Ann Gunzel, phone 011-49-611-2624.

**Description**
Firm Fixed Price (FFP) Contract for Design/Construction of military facilities, Nachshonim Storage Base, located approximately 20km east of Tel Aviv, Israel. The proposed facilities construction will be administered under Foreign Military Sales (FMS), and United States procurement laws and regulations. Contract will be awarded and paid in U.S. dollars. Under the Wye River Accords, this procurement is restricted to United States firms, Israeli firms OR United States/Israeli Joint Ventures. In addition, construction materials must be manufactured in Israel, to the extent such materials satisfy contract requirements. Contractors may bring into Israel nationals of the U.S and third countries having diplomatic relations with Israel for the purpose of accomplishing the work. Principal features of this project are as follows: The Nachshonim Storage Base shall be designed and constructed for the long-term storage and maintenance of a large number of vehicles and equipment. The work includes the follow-on design and construction of storage buildings, office buildings, residential storage and services buildings and the construction of all related infrastructure. The Base occupies an area of approximately 1,600,000 square meters. The total building area is approximately 227,000 square meters for 204 different buildings. Infrastructure and Site Development is currently fully 100% designed. The contractor will be responsible for follow-on detailed design of the external utilities connections, all buildings, and communications and control systems. The buildings, external utility connections, and communications and control systems have been designed through approximately 35%. Responses are desired from firms who can demonstrate

EXHIBIT
2

recent experience and excellent past performance in design/construction of similar facilities. If the offeror does not have in-house design and construction capabilities, joint ventures will be acceptable. The qualifications of both the design and construction firm will be evaluated. The offeror will also have to demonstrate scheduling capability, proposed schedule for this procurement, and submit a management plan. Solicitation will be issued on or about 20 November 2000. Proposals will be received on or about 22 January 2001. Estimated cost of proposed procurement is more than $100,000,000. Estimated time of completion: 1095 Calendar Days: SIC code 1541. Plans and specifications will be issued on CD ROM only and limited to one (1) set per contractor. A site visit has been scheduled for 20 December 2000, 10:00 at the site. Questions of a technical nature may be addressed to Mr. Robert Saari at telephone number 011 49 611 816-2820 or electronic mail Rob.B.Saari@nau02.usace.army.mil. Questions of a contractual nature may be addressed to Ann Gunzel at 011-49 611 816-2624 or electronic mail Ann.L.Gunzel@nau02.usace.army.mil or faxed to 011 49 611 816-2618.

**Web Link**

Ann.L.Gunzel@NAU02.usace.army.mil (Rob.B.Saari@NAU02.usace.army.mil or Ann.L.Gunzel@NAU02.usace.army.mil)

**Record**

Loren Data Corp. 20001030/YSOL005.HTM (W-300 SN505248)

| Y - Construction of Structures and Facilities Index | Issue Index |

---

*Created on October 26, 2000 by Loren Data Corp. -- info@ld.com*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x
A.A.B. JOINT VENTURE, :
Plaintiff, :
v. : No. 04-1719C, No. 05-114C,
THE UNITED STATES, : No. 05-1172C, and
Defendant. : No. 06-49C (Consolidated)
- - - - - - - - - - - - - - x

Tel Aviv, Israel
Thursday, November 30, 2006

Videotaped deposition of YEHUDA SEGEV, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Sixth Floor, Tel Aviv, Israel, at 7:10 p.m., Thursday, November 30, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.

ORIGINAL



EXHIBIT
3

APPEARANCES:

On behalf of the Plaintiff:

PHILIP C. JONES, ESQ.
Bell, Boyd & Lloyd, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
202.955.7050
pjones@bellboyd.com

On behalf of the Defendant:

SHALOM BRILLIANT, ESQ.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
202.305.7561
shalom.brilliant@usdoj.gov

Also present:

YANIV SOMEKH, Videographer
MOSHE TOPROVSKY, Advocate
STEPHEN DENISON KEENEY

## C O N T E N T S



| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| YEHUDA SEGEV | PLAINTIFF | DEFENDANT |
| By Mr. Jones | 5 | |
| By Mr. Brilliant | | 30 |



## E X H I B I T S



| EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 14 | Hebrew Document, Dated December 24, 2001 | 12 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We're on record. Cassette No. 4.

MR. JONES: Good evening. I'm Phil Jones. We're here in the case of A.A.B. Joint Venture versus the United States, in the United States Court of Federal Claims, Case No. 1719C (Consolidated), under Chief Judge Damich.

We are here for the deposition of Yehudou -- Yehuda Segev, who is the former director general of the Association of Contractors & Builders in Israel. And with him is the deputy director general of the association, Advocate Moshe Toprovsky.

Could we swear the witness.

Whereupon,

YEHUDA SEGEV,

was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

MR. BRILLIANT: Before we proceed, I want to state for the record: I'm Shalom Brilliant with

the Department of Justice, representing the defendant in this case and that I'm here, but I object to this entire deposition on the grounds that I was first given notice of this deposition yesterday evening.

I have had absolutely no time within which to prepare for this deposition. If there's any need for cross-examination, since I'm here, I may try to just do the best I can. But I -- I don't waive anything in that regard. And I believe that it's procedurally inappropriate to conduct a deposition on one day's notice. And I reserve all my rights to object to the use of this deposition or any part of it.

MR. JONES: Very well.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. JONES:

Q. Sir, could you please --

MR. BRILLIANT: And also -- excuse me -- the unreasonableness of having a deposition at -- after 7:00 o'clock in the evening.

MR. JONES: Very well.

Q. Sir, could you please state your full name and spell your last name.

A. Segev, Yehuda. Today I am director general of the Industry Association. But I was, between 2000 until 2006, the director general of the Contractors & Entrepreneurs Association in Israel.

Q. In addition to that position, are you also engaged in military service in Israel?

A. Until 2000, I was in the Israel Military, in the Army. The last job was the human res -- in charge of the human research. And my rank is major general.

Q. Prior to -- let me just start again.

During the time that you were director general of the Contractors Association, what, if any, involvement did you have in the issue of the admittance of third country nationals for use in the construction industry, for employment in the construction industry?

A. In my job in the Contractors Association, I was in charge of the policy and carry out the policy of our association with the Government, or maybe against the Government, about all the employees of our branch.

Q. Uh-huh. And who were members of the association?

A. The members. The members is about 2,400 contractors who deal with building, with infrastructures, and all the world of build -- of contractors.

Q. In the course of your work, did you become familiar with the history of the use of third country national skilled workers in Israel?

A. Yes, of course. I know -- I know the -- the problem of the manpower and workers in our branch, specifically in contractors branch, and all other branch. Because this is not just my hobby. It was my job to know it.

Q. Okay. Could you give us a history of the use of third country nationals as skilled workers in the construction trade in Israel?

A. Until from -- from what -- what year?

Q. Whenever --

A. Okay.

Q. -- it became --

A. Okay.

Q. Just how it came about --

A. Okay.

Q. -- that the importation of skilled workers became common.

MR. BRILLIANT: Are you confining the

question to the period of the witness' experience in this area?

MR. JONES: No. No.

THE WITNESS: Okay.

MR. JONES: He did testify that he'd become familiar with the history in the course of his work. And I'm asking him about that history.

THE WITNESS: Okay. And we're talking about -- I -- I want to start from 1967. From 1967, after the six war -- Six Day War, the -- the border between the Jordan, Egypt -- no -- between Jordan, it's open Aza -- Gaza Strip. And Palestinian workers start to became to Israel with license and with the permission of the Government to come and work in a lot of area, not just in the contractors.

We're talking about two thousand and fifty -- two -- two thousand fifty thousand (sic) Palestinian workers who came to work in Israel.

Usually, most of them come every day from the villages, come to work from 5:00 o'clock, 6:00 o'clock until the evening. And they go back to the village.

BY MR. JONES:

Q. And I'm sorry to interrupt.

A. In our -- in our branch, in the contractor branch, until 1996, we -- the number of the Pales -- Palestinian workers who work in our branch was about 90,000 -- "nine-oh" thousand -- Palestinian workers who work in our branch.

Q. In what trades would these workers tend to concentrate?

A. What --

Q. What -- what trades, skills?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. The skills was -- let's say, we call it wet jobs. It -- it mean people who work with iron. People who work with cement. People who work with --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Concrete, floors.

THE WITNESS: -- concrete, floors.

If we -- if you -- we split the workers in our industry, third of the people work with the hard works. Third of the people work with the professional work, like electricity, wood, and et cetera, et cetera. And third it's, let's say, another skills. Okay?

The -- the problem was in the -- what we called hard work -- hard workers. This was the problem. Until 1996, everything it was okay. But when the Intifada will start, in one day, all the 90,000 Palestinians disappear in one days.

BY MR. JONES:

Q. Approximately when did this Intifada start? This was in -- during 1996?

A. Yes. '96. Yes.

Q. Okay.

A. This was the first time that they disappear in one day because the Government -- huh?

MR. MOSHE TOPROVSKY: Borders.

THE WITNESS: -- the borders -- the border was blocked. The Government decided, because the security problem, not allow them to come to work in Israel.

And for us, in one day, all the areas that you start to build in and you're building, we have a big problem. And it was a big mess because the contractors couldn't continue and to build and to fulfill their contracts -- contracts and to stand in their schedule.

Because, you know, every -- every contracts, you have schedule that you have to

finish it. And if you don't finish it, there is a fee plus.

MR. MOSHE TOPROVSKY: Fine.

THE WITNESS: Fine. A fine. Okay?

BY MR. JONES:

Q. Uh-huh.

A. You have to pay money. It's a lot of money.

So we go to the Government, and we -- we ask him to -- to bring to Israel foreign workers. Foreign workers, it's mean workers who come from other countries, from Romania, from China, from Ukraine, from Turkish (sic). And the Government allowed us -- allowed to bring foreign workers.

The number was -- we start in 1996, 1997. And the peak of the number of foreign workers was in 2000 -- about 2000, it was about sixty, 65,000 foreign worker who walk -- who work in our branch.

In those times, what happened is start a new phenomena in Israel. What happened? And the Government allowed to bring agriculture foreign workers, our industry, contractors foreign workers --

MR. MOSHE TOPROVSKY: Industrial.

THE WITNESS: -- industrial foreign

workers --
MR. MOSHE TOPROVSKY: Restaurants.
THE WITNESS: -- restaurant foreign workers. And the numbers grow and grow up until we found ourselves in about 350,000 foreign workers in Israel. And the unemployment start to increase, and the Government decided to do something with this phenomena.
MR. JONES: Mr. Segev, I wanted to hand you a document that I'll have marked as Plaintiff's Supplemental Exhibit No. 14. This is in Hebrew. And I've also got an unofficial translation of the document.
(Plaintiff's Exhibit No. 14 marked for identification.)
BY MR. JONES:
Q. First of all, what is the date on that document?
A. The date of the decision, of the document, is our Government -- the Israeli Government decision. The number is 1141 from 24 of December, 2001.
Q. In --
MR. BRILLIANT: Before we proceed, just in terms of the document, can you identify who made

the translation.

MR. JONES: Actually, we just had someone in -- in our office make it. We didn't -- there was not time to get it done by Word Power.

MR. BRILLIANT: Because we have a stipulation in the Court order, providing that translations made for purposes of deposition exhibits and trial exhibits will be made by Word Power.

MR. JONES: Right. And we will have Word Power make this translation. And when we have the official translation, we'll add it into the record.

MR. BRILLIANT: All right. But in that event, the testimony shouldn't be about this translation because that's not going to be the one in the record.

MR. JONES: No, we -- he will be discussing it from the Hebrew.

MR. BRILLIANT: Okay.

BY MR. JONES:

Q. Do you -- could you explain what the significance is of this decis -- governmental decision that you just identified.

A. (Examining.) Okay. From this period of

time in December 2001, the number of the foreign workers who work in our industry was about, let's say, fifty, 55,000 foreign workers. And the Government decide to do three things.

First of all, to close the sky. And there is a big influence in our branch, and I will explain you later -- later.

The second was to -- to put a quota of number of foreign workers who can work in our -- all the country. And the decision was that in two branches, in agricultures and our industry, it will be 45,000 foreign workers.

Q. Was that 45,000 each or total?

A. No. Together in our branch and the agriculture. And in point No. 1. And it's -- this was the second vector.

And the third vector was to arrange the system how to split --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: To split.

THE WITNESS: Huh?

MR. MOSHE TOPROVSKY: To split.

THE WITNESS: -- how to split the foreign workers between the contractors.

I can tell you that it was a big mess between 2001 until 2003, end of 2003, because they don't carry out this decision like they wrote it.

And the contractors who need foreign workers couldn't -- couldn't find foreign workers because it was a problem with the license. It was a problem with the number of the foreign workers.

Each contractors have a -- have a right to -- to hire. And it was a lot of strike -- Government strike that they stop to -- to treat to the contractors.

Okay? I -- you understand?

BY MR. JONES:

Q. Yes.

A. What I can tell you: That until 2004, we -- it was a big debate between our association and the Government.

And just in the end of 2004, we start to make an order in this field, in this problem. And we signed an agreement with the Government, our association and the treasure minister and the labor minister. We signed an agreement to arrange and fix all the big mess with the foreign workers in our industry. But it was just in December 2 -- December 2004.

The lead time between December 2001 until in December 2004, for the contractor, it was -- I cannot describe the problem. But it was a -- a big, big problem.

Why? Every two months, three months, the Government carry out another regulation, another order, a strike. The labor minister, who -- who have to deal with this and supply the services to contractors doesn't do it because a lot of mean -- reasons. And what happened it's --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Uncertainty.

THE WITNESS: -- uncertainty for the contractor, uncertainty time to know how many workers he can work with them tomorrow morning. I don't only talk about one month, two months, one year. Tomorrow morning, they don't know. They don't know how many foreign workers came to work in -- "shetach habneya" -- in the field area of the contractors.

The reason was: First of all, you cannot know what is the number that you have the permission to work. After that, the police start to --

MR. MOSHE TOPROVSKY: Hunt.

THE WITNESS: -- hunt the foreign worker -- unlegal foreign workers who work. And if you come to the area that you -- building area, the police doesn't know that you are legal foreign worker and you are not legal or unlegal foreign worker.

So they came to the area, to the field, contractor area, stopped the building, stopped the build, called to foreign workers, and they took them four hour, six hour, to check if you are legal or illegal. And it's make a lot of damages to the contractors.

The foreign workers start to fraid. So they leave the site. And I can tell you it was a very -- a very big problem. And there is no alternative to take another for -- workers. Why? Because we don't have Israeli workers with the professional skills. Okay?

BY MR. JONES:

Q. Skills?

A. Skills. Prof -- professional skills. Sorry about my language. I didn't say it.

This was the first -- there is no Israelis who can come to work. The border was

blocked. So the Palestinians doesn't come. So it was a very big problem.

I can tell you that we -- a lot of contractors lose a lot of money. In my period of time between 2002 until 2004, 74 firms, contract -- contractor's firms go to bre -- bankrupt and close the business. And the main reason was workers. Workers, workers, and workers. Okay?

Q. Uh-huh. There was one other area that I was curious about. There has been testimony in the record already of a certain lack of cooperation on the part of the ministries that were responsible for allocation of visas.

Was -- was this -- to what extent was this a problem during the 2002 to 2004 period?

MR. BRILLIANT: Objection. Leading.

THE WITNESS: I will describe you the system, what was the system, to understand what was the results.

If I'm contractors and I need the workers, first of all, I have to prove that I have a site and building, how much square meter I build, and if it's building -- it's industrial building, it's infrastructure building. It was --

//

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: The keys. You -- in order to get the quota, the numbers of skilled --

MR. BRILLIANT: Objection. We should only have testimony by the witness.

MR. JONES: Yeah. We can only have testimony by one person.

THE WITNESS: Okay. But he can help me to translate?

BY MR. JONES:

Q. Yes.

A. Okay. Thank you.

As I say, you have to prove the demands, how you do it. I'm go -- I have permission to build, et cetera, et cetera, number of square meter. Okay? I build a site with infrastructure or building or industrial -- industrial site. You have a key. And they give you the permission after you prove your demands. Okay? This was the first step.

The second step, the Government send people, clerks, who come to check if the contractor give the -- all the data, all the right data.

Okay?

The second -- the third step was that to give you a permission to bring foreign workers. Now, after tell the minister of labor give you a permission, you have to go to interior minister -- "nachon"? -- interior minister to ask them the permission to go to overseas and bring foreign workers.

After you go to Romania -- let's take the example in Romania. You take from Romania foreign workers. You have to test them and to check if they have a skill and they know how to build the building.

They bring -- they -- they bring it -- they bring -- they -- they get the name. They get the permission from the Romanian country that they can come to work in Israel. And after that, you have to ta -- to check them with --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Health.

THE WITNESS: -- health checks and other checks. And it's take time. After you have a list, you come back to Israel. And they have to -- to -- to give you the permission to bring them.

Okay. Let's say -- I give you a real example. Let's say that the contractors have a list with 100 foreign workers and he can bring it and everyone passed all the checks and everything it's okay.

But I told you that there are a lot of changes of regulations. Okay. We are going to cut the quota from one number to another wonder -- number. So it stopped to bring the foreign workers.

Now we are going to split the quota for all the contractors. And it's take another month and another month and another month. And now you have to go to do all the process again.

And I can tell you: This mess take six months, eight months, even one year. So even you have the license to bring foreign workers, it's took three months, six months, nine months. You cannot know. You cannot know. In those time, we cannot know nothing. Uncertainty of -- you cannot know. This is the word.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. Another issue was foreign worker. Okay. I am a contractor. I

brought 100 foreign workers, and I start to work.

I told you that it was a gap between the demands and the number of the foreign workers. The demand was here and the -- and the foreign workers was here. (Indicating.) And it was a gap.

So how the contractors know -- can continue to work? What they do? Or -- what they do? And I will explain you two seconds.

Or foreign worker who come with visas or license to work in our branch, but they go to work in food industry. Why? They get more money there. So they leave the site and go to work in the agriculture or food or mechanic or you name it.

Why? Because if the contractor paid them, let's say, $5, $6 per hour, another people -- another people pay them half dollar more, they leave the site. They go to work in another work. So this was the system of -- to create unlegal foreign workers.

If I come back, an -- a lot of foreign workers, about 30, 35 percent, doesn't work through the license. They work in another contractor, another branch, another area, but not in the site.

BY MR. JONES:

Q. Was there also a policy developed during

this 2002 to 2004 period with respect to the obligation of a contractor to retrieve, for lack of a better term, if you can understand that, or find the people who have deserted them?

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

THE WITNESS: Just a minute. Let me make sure that I understand the question.

MR. MOSHE TOPROVSKY: Ask again, please, the question.

BY MR. JONES:

Q. Right. Basically what I'm asking about is the deserters policy.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: The policy was very funny because the Government account the number of the illegal foreign workers --

MR. MOSHE TOPROVSKY: Deserters.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Deserters?

MR. MOSHE TOPROVSKY: Uh-huh.

THE WITNESS: Okay. Deserters. They account them like they in the site, they belong to

the contractor. It's the contractor problem, not the Government problem, not the police problem, not the law problem. Contract -- the contractor's. He in charge of these people, and he has to -- to find them. No tools. No law to do it.

Let's say if I found you in the restaurant and you have a visa in my site, I can enforce you to come to work in my site? What is the authority to force you to come to work in my site? I can hit you? I can arrest you? What I can do? Nothing. But the policy of the Government it's was: You in charge. We don't care.

BY MR. JONES:

Q. Now, did there come a time during this 2002 to 2004 period that enforcement of the law and a method of enforcing the law was created, the -- the establishment of the immigration police?

A. Okay. In -- there is a lot of Government decision about set up immigration police. But they carry out the decision just, let's say, in -- in the end of 2003. I don't remember the month.

And in 2003, the Government decided to give 400 policemen and to build -- set up a -- a new department, immigration police. And all the job was to catch the -- the people who live here

unlegally.

I can tell you that the influence of -- of this start in 2004. And they really success. They cut the number between 350,000 to 250,000. That's all. One hundred -- about 100,000 foreign worker, they enforce them to leave to their country.

Q. What, if any, impact did the establishment of the immigration police have on contractors?

A. I told you before it was a disaster. Because they come every day to the site. And they check the people. And -- and they check the foreign workers and they --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

THE WITNESS: -- they --

MR. MOSHE TOPROVSKY: Stop.

THE WITNESS: -- they -- they don't give them --

(Discussion in Hebrew between Mr. Brilliant, Mr. Moshe Toprovsky, and the witness.)

MR. BRILLIANT: "Interfere."

THE WITNESS: Interfere. Okay.

-- interfere them, and they stopped the worker. It was influence --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Outcome.

THE WITNESS: Outcome?

-- the outcome of the -- the -- the project. Because, let's say -- I will give you the example. Let's say, to build 100 square meter, you need eight foreign workers. Okay. And we know that the eight foreign workers can do it with -- with 30 day. Okay? But we take -- we -- when we make the count, we assume that these people work from 6:00 o'clock until 4:00 o'clock afternoon.

So what happened? They don't work for 6:00 o'clock until 4:00 o'clock. Four hour, six hour. The -- the immigration police come, and they don't let them to work. They check them. They make their research. They took them to the police.

(Court reporter interruption.)

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Research.

THE WITNESS: Research.

MR. MOSHE TOPROVSKY: Investigation.

THE WITNESS: Investigation. They take them to the police station.

How the contractor can work? He need ten people. The police take five. And when they come, they don't want to work, et cetera, et cetera.

BY MR. JONES:

Q. The last area I wanted to ask you about was this.

I understand that even -- even before 2001, it was illegal for foreign workers to work on Government projects; is that correct?

A. We have an -- an example. It's published in the newspapers, so I can spoke about it.

Our Parliament were built with foreign workers. You understand the joke? This is a joke.

Q. Uh-huh.

A. The Government didn't give us permission or give us -- didn't give us foreign workers to build private projects. But for them, no problem. They give a license to bring foreign workers.

Q. Is this despite the fact that it was actually technically illegal for them to -- to be on the job?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: No. The police -- the -- the immigration police come to check them. They found legal foreign workers and illegal foreign workers. No problem.

BY MR. JONES:

Q. But -- but there was a -- there was a period of time, was there not, where on Government jobs, there weren't supposed to be any foreign workers? Is that true?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. Listen, it was my -- my big fight against the Government. They carry out decision that they don't give visas and license to foreign workers for infrastructures or national projects.

BY MR. JONES:

Q. None?

A. Infrastru -- no. No. You cannot take foreign workers to work in the site that belong to the Government. Okay? This was the decision.

But they understand they cannot carry out this decision. So the decision was a paper. But in the fields, foreign worker works. And the police -- police immigration -- immigration police

not enforce this decision.
It was agreement -- "ech omrim"? -- nonofficial agreement between me and the Government that they close their eyes. There is a decision, but you can -- you can take foreign workers, and you can continue for -- for work for the Government projects. Okay?
Q. Last question. I -- I wanted to get a little bit of clarification as to what you meant by "closing the skies."
Let's say, for example, the minis -- which ministry gave the visas?
A. Okay.
Q. Was it the Labor?
A. The Labor --
Q. Okay.
A. -- give the visas. But the permission to bring the foreign worker to Israel is Interior --
Q. Okay.
A. -- Ministry.
Q. Let -- let's say, for example, the -- the -- the Labor Ministry issues approval to a company for 100 foreign workers.
A. Foreign workers. Okay.
Q. What, if any, effect did the advent, the

start of the Closed Sky policy have on contractors who had visas as of that date?

A. Very, very simple. You can get from one Government, from the Labor, the department, the Labor Ministry permission to bring 100 foreign workers. And the Interior Ministry don't allow to bring it. Why? Because the sky is closed. Two policies --

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

MR. JONES: Okay. I have nothing further. Thank you.

MR. BRILLIANT: I -- just one quick question.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. BRILLIANT:

Q. Without -- without waiving my prior objection, since there hasn't been any ruling on it, with regard to the exhibit that's been shown -- what's that exhibit? -- Plaintiff's Supplemental Exhibit No. --

MR. JONES: Thirteen.

BY MR. BRILLIANT:

Q. -- 13 --

MR. MOSHE TOPROVSKY: Fourteen, I think.
MR. JONES: Oh, I'm sorry. Fourteen.
THE WITNESS: Fourteen.
BY MR. JONES: Fourteen. Yeah, we've already used 13.
BY MR. BRILLIANT:
Q. I think you testified before, in connection with this, that this arose as a result of a concern about rising unemployment?
(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)
THE WITNESS: No. Two reasons. Unemployment is increase, and the number of the foreign workers was also increased.
BY MR. BRILLIANT:
Q. This concern -- did that -- did that concern happen suddenly, like in December 2001, or was it a period of time that the Government became concerned about these -- these two problems?
A. This was the first time that they carry out a decision to decline the numbers, to cut the numbers of the foreign workers.
Q. No, I'm -- I understand that this is the first -- this is when the decision came out.
A. Yes.

Q. But was this something where they just suddenly woke up on December 24th and --

A. Aah. No, no, no, no. As you know, the Government, before they make a decision, they have to set up a committee. So they set up a committee, and the committee recommend them to take these decisions.

Q. Do you know around, like, when -- when that committee was set up, when it made its recommendation and so on?

A. It was three, four, six months before the decision, something like that. I cannot mention the number -- the date, the exact date.

Q. And was there any -- during this period of time, was there any what we call a lobbying, like, let's say, trade associations like your association making recommendations to the Government or urging them to do this or not to do this or --

A. I can tell you that I spend a lot of money, a lot, a lot of money for lobbying, for media, for research, from the expert research, to convince the Government to give us a permission for foreign workers because there was no alternative. No alternative.

Q. Was this after this committee was formed or before the committee was formed?

A. Before and after. We -- we -- I can tell you, according to our association's history, we start the fight in 1999. In 19 -- from 1999 until December 2004, until we signed an agreement between the Government, it was a big fight, a big debate and a big fight. Because we go to the Government. We go to the Parliament. We go to the ministers. We go to the Prime Minister. There is no -- there is no field area that we don't push.

Q. But -- but this -- you say, in 1999, we started the fight, the debate, and so on.

A. Yes.

Q. What was the fight about that made that time -- they did not have this restriction on foreign labor; right?

A. The number was -- no. I -- I -- the number of the permission to bring foreign labor was 40,000, something like that. And our demand was 65,000. So this was the -- the -- our -- our request from the Government in those time.

Until this time, the bargaining between the association and the Government was about the quota. And we enforce them to -- to raise the

number of the foreign work -- workers.
Q. No, what I'm asking about is in connection with -- you mentioned before about that this -- this December --
A. 2001.
Q. -- 2001 restriction was a result of -- of follow -- after the formation of a committee to look into this problem about the increase in foreign workers and the rising unemployment --
A. Yes.
Q. -- and that that committee was formed several months, maybe six -- four or six months, whatever --
A. Something like that.
Q. -- before December and you were involved in -- what I was concerned with is: When did you start getting involved in -- not in the issue of increasing foreign workers specifically, but in the issue about the plan to decrease foreign workers in accordance with -- with this -- what ultimately came out to be this -- this law.
(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)
THE WITNESS: Something around 2001, something like that. I cannot tell you exactly the

date.

BY MR. BRILLIANT:

Q. I mean, but late? Middle of the year? Early in the year?

A. I don't know. Something -- during the year of 2001, we start to do. But they -- I -- I described what happened. It was the decision, but it was a big gap between the decision and what happened in the field area.

MR. BRILLIANT: I have no other questions.

MR. JONES: I have nothing further. Thank you.

THE WITNESS: Thank you very much.

THE VIDEOGRAPHER: Going off the record.

MR. JONES: Just as a -- if you want to read the transcript to make sure it's accurate, you have that right to do so.

THE WITNESS: No problem. You have my email.

MR. JONES: Okay.

MR. MOSHE TOPROVSKY: Please send him.

MR. JONES: We'll send you a copy.

THE WITNESS: Okay. And we will check it.

MR. JONES: Thank you.
THE WITNESS: Thank you very much.
(The deposition concluded at 7:55 p.m.)

CERTIFICATE OF WITNESS

I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read the same; and that I have made the corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this ______ day of ____________________________ 2006.

____________________________
Yehuda Segev

REPORTER'S CERTIFICATE

I, BRENDA MATZOV, CA CSR No. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

IN WITNESS WHEREOF, I have subscribed my name this 14th day of December, 2006.

Brenda Matzov

Brenda Matzov, CA CSR No. 9243

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>Defendants. | ) ) ) ) ) ) ) ) ) | Case No. 05-114C<br>(Consolidated with Case Nos. 05-1172C, and 06-49C<br>(Chief Judge Damich) |

**AFFIDAVIT OF AVRUM JOEL ARENSON**

AVRUM JOEL ARENSON, first being duly sworn on oath, subject to the penalties for perjury and based on his personal knowledge, states as follows:

1. I am the founder and President of A. Arenson, Ltd. ("the Arenson Company"), an Israeli construction company which is one of the three members of the A.A.B. Joint Venture.

2. The Arenson Company was among the first Israeli construction companies to bring foreign workers into Israel. The first occasion on which we used a substantial number of foreign workers was for a project for the Israeli Electric Corporation, which had instituted a policy in 1988 of not permitted Israeli Arabs to work on their projects, in light of a violent incident involving Arab workers. For that project the foreign workers came from Portugal. Later on we obtained most of our skilled labor in the "wet" trades – concrete, masonry, tile, painting, etc., from Turkey and Romania.

3. After the 1967 Six Day War, in which Israel gained control of the West Bank, an ever growing number of construction workers in Israel were Palestinians, who would travel from their villages into Israel to work, and then return in the evening.



**EXHIBIT 4**

4. As a result of the uprising in the West Bank in the late 1980s and early 1990s, which became known as the first Intifada, for security reasons many contractors began shifting their work force from Palestinians to foreign workers. In 1996, the border between Israel and the West Bank was closed, and at that time there was an almost complete shift to the use of foreign workers in the construction trades.

5. By the year 2000, it had became standard practice on large Israeli construction projects to use predominantly foreign labor. At that time a substantial majority of our company's labor was provided by third country nationals. For example, on the Open University project, a $17,000,000 job, 94% of our labor was provided by TCNs. Similarly, on the Main Office Building for the Israeli Electric Corporation, a $20,000,000 job, 86% of our labor was provided by TCNs.

6. The Notice to Proceed for the Nachshonim Project was issued by the Corps of Engineers on June 19, 2001. On December 24, 2001, the Government of Israel announced a major shift in policy with respect to importation of foreign labor. In what became known as the "Closed Sky Policy," Government Decision No. 1141, a translation of which is appended to this affidavit as Attachment A, decreed a number of initiatives that were designed to reduce the number of foreign workers in Israel.

7. As part of the implementation of the Closed Sky Policy, the Economical Administration issued Temporary Order 2001/44, effective January 1, 2002, which provided that no Foreign Workers were permitted to be employed on Israeli Government projects. See Attachment B.

8. In the Fall of 2002, Prime Minister Sharon declared an immediate moratorium on the admission into Israel of foreign workers, until the end of 2003. A press report which fixes the date of that announcement as being released on October 2, 2002, is appended hereto as Attachment C.

9. Had the Corps of Engineers not provided assurance to prospective bidders that foreign labor could be used on the Nachsonim Project, the Arenson Company would not have participated in the Project.

10. The first step in obtaining visas for bringing foreign workers into Israel is an annual determination, made by the Ministry of Labor, as to what the need is for such labor for the coming year for each segment of the economy. Construction companies apply for "block visas" based on the volume of construction of the work-in-hand at time of application for the coming year. Once the Ministry of Labor issues its decision as to how many workers will be permitted with respect to the construction segment, the Ministry of Labor (which was later incorporated into the Ministry of Trade and Commerce) divides those visas among construction company applicants. The next step is to obtain approval of individual visas from the Ministry of Interior.

11. After the contract was awarded, the Joint Venture inquired of the Corps of Engineers concerning the procedure that would be used to obtain third county national worker visas, and the Corps suggested that since the Arenson Company was already familiar with the process that the Joint Venture rely on the Arenson Company to obtain the needed foreign workers.

12. In 2002 there were lengthy delays in the issuance of the Ministry of Labor's visa allocations due to a strike by the employees of the Ministry. The Arenson Company on behalf of the Joint Venture applied for a 2002 visa allotment on September 24, 2001. The employees of the Ministry of Labor went on strike from October 16 through November 29, 2002. The application had still not been considered when the there was another strike in February 14, 2002. Finally on July 3, 2002, the Ministry of Labor released its block visas for 2002, which included 784 visas for the Arenson Company, 519 of which were specific for use in the Nachshonim Project.

13. The Ministry of Labor block visa allocation turned out to be worthless, since the Ministry of Interior refused to issue any visas for new third county nationals to either the Arenson Company or to the Joint Venture. The bureaucratic excuse given by the Ministry of Interior for not issuing the visas in question was that their records showed that there were a number of foreign workers previously brought into Israel by the Arenson Company, over a period dating back to the beginning of the licensing period, and for which the Ministry had no documentation that the workers had returned to their home county.

14. Our company obtained a list of the purported "deserters" ( 306 in number) and assembled documentation, including airline tickets, showing that 102 of the claimed deserters had returned to their home country. We were able to convince the clerks at the Ministry of Interior that the workers in question had in fact returned, but it made no difference as far as the Ministry of Interior was concerned. After that the Ministry of Labor just stopped referring to the "deserter" issue, but nonetheless, no visas were forthcoming.

as the Ministry of Interior was concerned. After that the Ministry of Labor just stopped referring to the "deserter" issue, but nonetheless, no visas were forthcoming.

16. The Joint Venture and the Arenson Company developed various strategies for dealing with the TCN issue, including increasing the rates were we paying for labor in the hope of attracting Israeli workers, advertising for workers in Romanian language newspapers, approaching the local labor office to hold a Job Fair for the purpose of recruiting Israelis, and engaging in our own direct recruitment efforts.

17. There were no visas issued by the Ministry of Interior for new TCNs to be brought into Israel for use either by the Arenson Company or the Joint Venture during the entire duration of the Nachshonim Project.

18. The effect of labor shortage in Israel in the construction trades in the 2002-2005 period was by no means limited to the Arenson Company. There was a shortage of labor throughout the construction industry, which led the Israeli Contractors Association to file suit against the Ministries in question, seeking relief from the Closed Sky Policy.

19. I have been shown documentation by the Joint Venture counsel that the decision by the Corps of Engineers to deny the Joint Venture any relief in connection with the labor shortage issue based on advice from the Israel Ministry of Defense believed that the Arenson Company was using TCNs on its other projects that should have or could have been used on the Nachshonim Project. Not only is that not true, in fact the exact opposite is true. The Arenson Company permitted TCNs which we had brought into Israel before the advent of the Closed Sky Policy to be used on the Nachshonim Project. The first I learned of such an allegation by the MOD was during this litigation.

litigation. No one at either the MOD or the Corps had ever made in inquiry of me or to my knowledge anyone at our company to confirm their erroneous belief.

The foregoing is true and correct based on my personal knowledge.

AVRUM Joel (Avie) Arenson

103362/F/1

REF: F:/US-Dept_Of-Justice/GovernmentDecision1141/BSR/25.3.07
[TRANSLATED FROM THE HEBREW]

# GOVERNMENT DECISION NO. 1141 OF 24TH DECEMBER 2001

## Reduction in the Employment of Foreign Workers

**Decided:**

With a view to increasing the employment options of Israeli workers by substantially reducing the number of foreign workers employed in Israel, with and without a permit, so that, as a long-term target, it does not exceed the number of foreign workers who were employed as aforesaid at the beginning of the 1990s -

1. To determine that in 2002, the maximum number of annual permits for the employment of foreign workers in all industries will be 48,000, of which 45,000 at the most will be in the building and agricultural industries; the aforegoing will not apply to foreign workers in the nursing industry.

2. To require the interministerial committee on consolidating governmental powers and responsibility with regard to the treatment of foreign workers, which the Minister of Labour and Social Affairs set up in accordance with paragraph 13 of decision no. 642 of 2nd September 2001 (hereinafter referred to as "decision 642"), to submit to the ministerial committee on foreign workers by no later than 15th March 2002 a plan for the establishment of a central agency that will consolidate the responsibility and powers of all the government entities currently charged with implementing policy on foreign workers under a single roof. Such plan shall include timetables and performance milestones.

3. To require the Minister of the Interior immediately to submit the regulations subjecting the employer of a foreign worker to an application fee and permit fee on under section 1J of the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991 (hereinafter referred to as "the Foreign Workers Law") in the maximum amounts prescribed in the said Law, to the Labour, Welfare and Health Committee of the Knesset and to act for the said regulations to be approved as soon as possible. Should such regulations not be submitted by 1st January 2002, the Prime Minister shall assume the power to make the said regulations in accordance with the provisions of section 39(b) of the Basic Law: The Government, and he shall make the said regulations forthwith.

4. To require the Foreign Workers Directorate to conduct a targeted information campaign to increase the awareness of employers and foreign workers of the provisions of law and the regulations of the Directorate with regard to the employment of foreign workers and the implications involved in the unlawful

**ATTACHMENT**

**A**

employment of foreign workers. In the scope of the said campaign it shall be stressed to the public that a report may be made to the appropriate authority by voice mail of specific cases of the unlawful employment of foreign workers; to allocate to the Foreign Workers Directorate in the 2002 budget for the implementation of this paragraph the sum of NIS 3 million.

5. To require the Minister of Labour and Social Affairs to give a report to the government at every government meeting that is held on and after 1st January 2002 on the progress of the combined activity to deport foreign workers who are staying in Israel unlawfully in accordance with government decision no. 642, on the number of foreign workers employed in Israel with and without a permit, on the number of foreign workers who have been deported from Israel due to staying here unlawfully and on the number of persons refused entry into Israel, all from the beginning of 2002 and since the date of the last report.

6. To require the Minister of Internal Security to prepare, in coordination with the Minister of Finance and by no later than 1st February 2002, an operative plan for increasing the number of places of custody intended for keeping persons who are staying in Israel unlawfully and intended for deportation from Israel; such increase shall not include places of custody in prisons and remand centres.

7. To add to the basic budget of the Ministry of the Interior for 2002 a sum of NIS 2 million and 10 public employee positions for implementing the provisions of the Entry to Israel (Amendment No. 9) Law, 5761-2001 with regard to bringing those who are staying in custody before the Commissioner of Border Control and the Custody Tribunal.

8. To require the Minister of Finance to appoint a team with the participation of representatives of the Employment Service and the Ministries of Labour & Social Affairs, Justice and Finance for the preparation of a tender for the award of concessions for bringing to Israel and temporarily employing foreign workers to a limited number of corporations in consideration for the payment of concession fees and in compliance with the obligations required by law, including with regard to the payment of wages and the provision of reasonable conditions for the foreign workers, and such other obligations as imposed upon them as conditions for the award of the concession; such tender shall be prepared subject to legal examination in consultation with independent experts and be published by no later than 1st March 2002, and the concessions pursuant thereto shall be allocated by no later than 1st June 2002; in accordance with the aforegoing, the Employment Service shall limit the validity of permits for the employment of foreign workers to employers who are not such concessionaires as aforesaid until 1st June 2002 at the latest.

# ECONOMY & FINANCE REGULATIONS (EFR)
# ECONOMICAL ADMINISTRATION BOOK

| Publication Date | Chapter 3<br>Clause 3<br>Sub-clause 3 | Purchases<br>Public Tender<br>Specifications | Valid from day |
|---|---|---|---|
| | | | 01 January 2002 |

Temporary Order 2001/44

To: Government Offices Accountants
Physical resources Managers in Governmental Offices
Government Offices' legal Advisers

Re: Enhancing Employment Possibilities of Israeli Workers by Decreasing the Extent of Foreign Workers Employment
Ref. Government Decision No. 642 of September 2nd 2001

EFR: 2-03.03.03.01 2-13.02.05

According to the referenced government decision, the officers-in-charge in the govement offices are to act according to the following:

Definitions in this Temporary Order:

"Foreign Workers" – excluding foreign workers, which chapter 6 to the Law for implementation of the agreement regarding Gaza strip & Jericho Area (Financial settlements and other orders) (Legislation amendments) 1994, applies to.

[Meaning residents of the autonomy in Judea, Samaria and Gaza Strip, which have valid working permission from the Employment Services to work in Israel].

"Foreign Expert" - As defined in regulation 1 in the Income Tax Regulations (Deducting stay expenses for foreign residents), 1979 – foreign resident that fulfills the following:

(1) He was invited from abroad to Israel by an Israeli citizen who is not a manpower contractor or manpower mediator, to provide services to that Israeli citizen in a field where the foreign resident holds unique expertise;
(2) He legally stays in Israel;
(3) During his stay in Israel he has worked only in the field on his unique expertise;
(4) For his work in the field of his expertise he was paid a sum exceeding 10,000 NIS, multiplied by the number of months he stayed in Israel and from which income tax was legally deducted; had he stayed in Israel less than a month – the above sum will be calculated when it is divided by 30 and multiplied by the number of days he stayed in Israel; the aforesaid sum will be coordinated according to clause 120b to the order as if it was a social benefit and rounded to the closest 100 NIS.

**ATTACHMENT**
**B**

1. In a connection to perform works in the construction and infrastructure field it is obligatory to include in the tender's documents, within the preconditions, in addition to the preconditions specified in paragraph 3.3.3.1 and in sub-clause 13.2.5 in the administrative EFR, additional condition, according to which the winning supplier will oblige in the agreement, that for the performance of the works that are specified in the agreement, he will not employ "foreign workers" excluding "foreign experts" as defined above.
   Such order will be included also in any connection other than tender.
2. The state's agreement will include, in addition to the above obligation, a special clause regarding the remedies for breaching the contract according to which: a violation of the aforementioned obligation substitutes for a fundamental Infringement and it will enable the office, according to its best judgment, to Rescind the contract or confiscate the guarantee they posses, or both, without detracting from the office' rights by law, including the Contracts Law (Remedies for breach of contract) 1971.
3. The above orders will be included also in other contractual agreements for the performance of works in the construction and infrastructure field performed by governments financing. Therefore, every finance transfer will be conditioned by the aforesaid obligation and by an obligation that additional contractual agreements for the performance of such works with third parties will be made with those who will pre-obligate – as aforesaid. The contractual agreements will include a clause regarding the remedies due to breach of contract as aforesaid.
4. These orders must be applied to tenders that will be published starting January 1st 2002, and on works in the field on construction and infrastructure that are performed with government financing given starting January 1st 2002.
5. Please transfer the content of this order to all the relevant position holders and prepare accordingly.

Regards,

Nir Gil'ad
Accountant General

*Turning good science into hard cash*

**Ora Koren, Page 9**

HA'A
English
Israel's Leading Daily Newspaper, Established 1919 Thursday, C
03 Oct 2002

# PM: No entry of foreign workers till end of 2003

## *Illegals in Israel will be offered jobs in place of imported workers, in de facto amnesty program*

*By Ruth Sinai*
*Ha'aretz Correspondent*

In an unprecedented decision, Prime Minister Ariel Sharon last night declared an immediate moratorium on all imports of foreign workers until the end of 2003.

Employers with authorization to import foreign workers who have yet to arrive will be able to employ illegal workers already in the country.

Sharon made the decision at a meeting with Public Security Minister Uzi Landau, Police Commissioner Shlomo Aharonishki, the head of the Deportation Authority, Police Commander Yaakov Ganot, and representatives from the Labor, Finance, and Interior Ministries.

"The entry of foreign workers to Israel is prohibited," according to an announcement issued by the Prime Minister's Office after the meeting. "The Interior Ministry and the Deportation Authority promised that employers will be able to get appropriately skilled laborers from the pool of workers in Israel."

The decision means that the state will grant a de facto amnesty to foreign workers who quit their legal jobs – due to poor conditions or because they were tempted by better conditions elsewhere – and went to work for employers not authorized to employ them. Some of those workers still have work visas.

The decision is expected to be vehemently opposed by manpower companies that bring tens of thousands of workers to Israel, earning hundreds of millions of dollars in brokerage fees. There are 350 such companies listed with the government. The agriculture and construction sectors are also expected to protest the decision, as they had objected to previous attempts to "launder" illegal workers in Israel.

### *Benizri welcomes 'courageous' decision*

"I welcome the prime minister's brave decision," said Labor Minister Shlomo Benizri. "Closing the skies will prevent the disgrace of all the middlemen making money off this phenomenon. I hope there won't be pressure from various interest groups on the prime minister as has happened in the past."

Benizri was referring to the farmer's lobby, represented in the government by Agriculture Minister Shalom Simhon, which pressured the government to allow the import of an additional 6,000 foreign workers beyond the 22,000 previously authorized. Benizri was opposed to the additional quota, and, with his Shas colleague Interior Minister Eli Yishai, tried to block the decision, infuriating the prime minister. Ultimately, the Shas ministers lost the battle.

The idea to prevent new foreign workers into the country came from the treasury, which has witnessed a bizarre paradox in recent weeks: while the state began a mass deportation program of foreign workers ordered by the prime minister, convoys of airplanes loaded with foreign workers arrived daily, bringing new construction and agriculture workers.

In August, airplanes filled with workers brought by a new manpower company, Speed, owned by Ephraim Mimoni, a close associate of Simhon, arrived here.

However, 150 of the Thai workers brought in by Speed complained to the Thai Embassy that there was no work for them, even though each of them had paid $5,000 for the right to work here. Mimoni denied that there was no work for the Thais, while Simhon denied any connection to Mimoni's businesses.

### *Caregivers may be exempt*

It is not clear if last night's decision will affect foreign workers providing care for the elderly and chronically ill.

Such workers have enjoyed a special status due to the humanitarian nature of their work, and they have not been subject to the quotas limiting the number of people who can be employed as caregivers. There are some 40,000 Israelis with authorization to employ caregivers, a number which grows by about 500 a month.

The treasury says that yesterday's decision should include caregivers, since tens of thousands of them have left their employers and are working as house cleaners or as caregivers to those without authorization. Benizri said the decision regarding caregivers should be more flexible, and he plans to emphasize that point to the prime minister.

According to the plan worked out last night, the Interior Ministry and the Deportation Authority, established to expel 50,000 foreign workers without visas, will find workers with visas who left their original employers or whose visas have recently expired and offer them work with employers who would otherwise import workers.

Until now, the employers have objected to such an arrangement, saying they did not want to employ "escapees," since it would reward law-breakers. But human rights groups that work with foreign workers said the employers prefer new workers unfamiliar with their rights over veterans aware of such rights.

ATTACHMENT
C

MFR Subject: Tax Issues on DACA90-01-C-0043 26 October 2001

WHAT THE JV WANTS WITH RESPECT TO SR 14, 28, 29, AND 30

1. SR 14: JV is assuming that, because the Contract sets no limit on the number of TCNs, it will be given approval by GOI to import as many TCNs as it deems necessary to complete the project on time. JV wants the details of the process and procedures which must be followed in order to get approval of the visas for TCNs. I have told Deni that Arenson because they have had previous experience is his best source of information for getting TCNs approved and into the country. Deni has asked both me and Uria for copies of the Hebrew version of the letter from Meir Ran to the Ministry of Labor and Wages requesting that the Ministry of Labor and Wages provide whatever assistance necessary to the JV in order to get the necessary manpower in country. The English translation is not much help when the JV approaches the GOI.

2. SR 28: JV wants a letter from the Ministry of Finance agreeing that ABB SUSA is exempt from Corporate Tax. This letter will be made part of the JV's tax file for future use. JV's cash from our payments is currently being held in the U.S. JV wants to bring that cash into Israel to fund the execution of the project. At some point in the future, the JV will make payments to the partners. ABB SUSA and the JV want to be certain that the tax collection authorities will not require income tax to be collected and paid on SUSA's share when SUSA wants to transfer cash out of Israel.

3. Car dealers have told U.S. National employees of the JV that in order to purchase a car tax free, a bond must be posted for the tax. If the car is not exported or sold to another qualifying individual within one year the bond is forfeited and the money is used to pay the tax that normally would have been paid at purchase. JV employees want to purchase cars tax free without posting a bond.

4. The JV currently has 3 U.S. National employees who are paying U.S. income taxes and of course do not want to pay income tax to GOI. The number may increase in the future. The JV wants a Ministry of Finance letter to document their tax file agreeing that U.S. Nationals receiving income from the JV are not required to pay any tax to GOI on that income.

JWB

**ATTACHMENT**
**D**

Courts

In the Jerusalem District Court
Sitting as a Court for Administrative Affairs
Before: His Honour Zvi Segal

A.P. 582/03

Date: 07/08/02

In the matter of: A. Arenson Ltd

**Petitioner**

- versus -

1. Minister of Industry, Commerce and Labor
2. Minister of Interior

**Respondents**

Present: For the Petitioner: Advocate Krispin, Advocate Blecher, Advocate Halperin
For the Respondent: Advocate S. Edry
The Deputy General Manager of the Labor Authority: Mr. Nizri
Advocate A. Bar-On
Mrs. R. Confareti
Advocate N. Elba

Advocate Blecher, for the Petitioner:

After more than three hours of discussions and negotiations both in court and out of court, the sole application that I am seeking subject to which I would be prepared to withdraw the Petition without any order as to costs is the following:

1. That the Honorable Court recommend to the Registrar of Contractors to contemplate the application that will be submitted to her by ABB SUSA, which is the Petitioner's partner in the Nachshonim Project, to receive an exemption from registration in the Register of Contractors since it is not an Israeli company. We would request that the recommendation specify a reasonable period, that we assess to be 14 days, to receive the Registrar's decision. We undertake to file the request with the Registrar of Contractors within 7 days of today.

2. As the last date for filing new applications with the Labor Authority, namely 28 July, 2002, has passed, in light of what has occurred during the negotiations and the hearing, I seek the Court's recommendation to extend the date for filing the application on behalf of ABB SUSA to convert the allocation of 523 workers that was issued to the Petitioner for the Nachshonim Project, by an allocation to ABB SUSA, with the concurrent waiver by the Petitioner of the allocation that was issued to it. I hereby elucidate that the partnership between the Petitioner and ABB SUSA and Baran Group is a duly registered partnership, and the implication of filing the new application would be to vary the conduit of the allocation from the Petitioner to ABB SUSA.

Advocate Edry, for the Respondent:

There is no objection to the approval of the Petitioner's request to extend the requested date within a specified period and an undertaking on our part to deal with the foregoing application within 21 days of the date it will be submitted to us.

**ATTACHMENT**
**E**

\\BGB-PPC\SYS\SYSOLD\DOC\Office1\14064-27\Trans\Rulling A.P 582-02 1.doc

With respect to my colleague's first request, I would like to mention that the Registrar of Contractors is not a party to the hearing of the Petition, and therefore, from our standpoint I can not to accede to his request, since my colleague ought to have initiated another proceeding or to join her to the hearing of this petition. Thus I believe that it would be going too far to issue an order in that respect, but if the court finds it appropriate to recommend, I have no position on the subject.

I am not familiar with the load and constraints of the Registrar of Contractors but I have no doubt that 14 days is a totally unreasonable period of time.

Counsel for the parties:

Everything that has been agreed above is on the basis that all the rights and claims of each party are reserved and without any of them being waived.

## Judgment

1. As agreed above.
2. As the Registrar of Contractors is not a party to the hearing, I can not direct an order to hold a discussion on ABB SUSA's application (which is also not a party to the hearing of the Petition), to obtain an exemption from registration in the Register of Contractors. Nevertheless, due to the essential nature of this procedure for the purpose of the additional application mentioned, which has been agreed upon by the parties' counsels and which, without such a discussion with the Registrar of Contractors, would be impractical, I sincerely recommend to the Registrar of Contractors to do her outmost from her standpoint and to deal with the application that will be so submitted, within 30 days of the date of its being submitted.
3. Subject to the foregoing, the Petition is dismissed without any order as to costs.

Granted this day, 29 Av, 5762 (August 7, 2002) in the presence of the parties.

Zvi Segal, Judge