IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - x

A.A.B. JOINT VENTURE, :

Plaintiff, :

v. : No. 04-1719C, No. 05-114C,

THE UNITED STATES, : No. 05-1172C, and

Defendant. : No. 06-49C (Consolidated)

\- - - - - - - - - - - - - x

Tel Aviv, Israel

Wednesday, November 29, 2006

Deposition of AVIE ARENSON, a witness herein, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Seventh Floor, Tel Aviv, Israel, at 9:20 a.m., Wednesday, November 29, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.

Certified Copy

EXHIBIT 5

APPEARANCES:

On behalf of the Plaintiff:

PHILIP C. JONES, ESQ.
Bell, Boyd & Lloyd, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
202.955.7050
pjones@bellboyd.com

On behalf of the Defendant:

SHALOM BRILLIANT, ESQ.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
202.305.7561
shalom.brilliant@usdoj.gov

Also present:

STEPHEN DENISON KEENEY
AMNON BARKAI
AVI RAVIV

P R O C E E D I N G S

Whereupon,

AVIE ARENSON,

was called as a witness by counsel for Defendant, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. BRILLIANT:

Q. Good morning, Mr. Arenson. Let me ask you first if you could state your full name and address for the record.

A. My name is Avrum Joel Arenson. My home address is 9 Hatamar Street, Cluster 2, Caesarea.

Q. Now, I understand that you have been designated as a witness or one of the witnesses to testify in response to a Notice of Deposition that we served pursuant to Rule 30(b)(6) of the rules of the U.S. Court of Federal Claims.

In that regard, I want to show you, first of all, a Notice of Deposition, which I'll ask to have marked as Defendant's Deposition Exhibit 21. I believe that's where we left off at the last defendant's deposition.

//

partner in a construction company or the owner of a construction company.

Q. What companies were those?

A. Pardon me?

Q. What companies were they?

A. That I worked for?

Q. Yes.

A. In North America, I worked for a company named McNamara Construction, which is a company very similar to what I have now, a company involved in civil engineering work. And I worked in West Africa for a local company, which was controlled by Solel Boneh. This was in the early '60s.

And when I came back, I worked for two or three privately owned companies that don't exist anymore. And I set up my own company in '69.

Q. That's the company that you're with now?

A. Yes.

Q. And the name of that company is?

A. A. Arenson Ltd.

Q. And that's one of the joint venturers in the plaintiff, A.A.B. Joint Venture?

A. Exactly.

Q. How would you characterize your position in A. Arenson?

facts alleged in this Complaint; is that correct?
A. Yes.
Q. Let me direct your attention to the allegation in paragraph 13 of the Complaint.
The paragraph 13 states -- this is following up on some more general allegations leading up to it. In 13, the allegation is, quote:
"Specifically, through the 1990s and up to the execution of the Nachshonim contract, the well-established practice in Israel was that substantial numbers of third country nationals ('TCNs') were utilized to perform construction work in Israel." End of quote.
Firstly, I note that this follows on from paragraph 12 that makes reference to familiarity with practices by virtue of the experience described -- the experience of A. Arenson Ltd. and Baran Group described in the preceding paragraphs.
My first question to you is: Did Arenson and Baran, prior to the Nachshonim project, have prior experience in hiring third country nationals?
A. I can't answer for Baran.
Q. And for Arenson?
A. Yes.
Q. And can you describe that experience

generally.

A. The history of our hiring?

Q. Yes.

A. In 1988, actually, the first -- we hired Portuguese labor for one of the power stations we were building. This was actually as a result of a personal tragedy. The general manager of the Israel Electric Corporation's son was killed by Arabs, actually by Israeli Arabs, brutally murdered and put in a well near Haifa.

He then decided that he would have an overall order disallowing any Arabs on any of the corporation's projects. And we were and are a major contractor for the things.

So we were given special permission to bring in a group of Portuguese workers. At that time, Eastern Europe was still not an open place to bring labor from. We were actually the first contractors to bring them in.

Later on, we brought in more workers. We were building the Schneider's Children's Hospital in Petach Tikva. And we got permission to bring in workers. At that point, they were Turkish workers.

At that point, there was a great deal of practical pressure as to why third country

nationals -- by the way, third country nationals is the term in the contract. If you were to ask an Israeli contractor, he would call them "strange workers" or "foreign workers."

MR. BRILLIANT: Off the record.

(Discussion held off the record.)

MR. BRILLIANT: Back on the record.

THE WITNESS: It went through a series of changes, that whole TCN scene in the country. But very quickly, because of the Intifada, the first Intifada that started at the end of the '80s, I think, or 1990, more or less stopped the West Bank people from coming in. And they were our source of labor.

In particular for wet works, we had more and more third country people until, ultimately, we were using in our major jobs -- in the jobs that we built, which were major jobs, we had 100 percent foreign labor. By the time we were bidding this job, it was more or less standard practice.

BY MR. BRILLIANT:

Q. Was it generally the practice during that period for the employer to make arrangements to obtain work visas?

A. Yes.

Q. And was there any particular practice with respect to the employer's responsibility with regard to workers whose employment was terminated?

A. Yes.

Q. What was that?

A. Well, it was developed throughout the time. It wasn't the same kind of a -- the same kind of responsibility at any one time.

But we were supposed to have made sure that our workers would leave the country. In fact, we had no way of doing it other than asking the police to come and get them.

In fact, a subcontractor/labor supplier of mine, who was involved in servicing and serving the contractors, was put in jail because he forcibly took one of his workers from Haifa to Tel Aviv to the airport. At the airport, the worker was let go, and he was arrested.

So we had a problem with getting workers out of the country. After that, subsequently, we had notified police where these foreign workers were, but nothing happened because of that. These were the ones that didn't leave.

The ones that did leave -- and they were the vast majority -- we escorted them with their

cooperation, obviously, to the airport. We bought tickets for them, and they went off.

Nothing very much was done with this fact that they left or that they didn't leave until, I think, in the early '90s when they started talking about all this huge number of foreign workers in the country. And they meant, in general, foreign workers.

We have four or five different fields where foreign workers are active in the country, including industry, including agriculture. And there was a big problem of the public perception that there was a high rate of unemployment and a huge number of foreign workers in the country, some of which -- or many of whom were illegally in the country.

At which point they started looking at things that could be cut back. And the Government decided that they would cut back on the foreign labor in the construction field.

Q. Well, this concern that you described about the large number of foreign workers in the country, around when was that coming to a head, let's say?

A. Well, I think that it was the beginning

of 2000, and from then on, it started getting more and more. Politicians started making an issue of it, et cetera.

Q. Was it not an issue prior or just not as intense?

A. It depends. I think you probably could consider it an issue. There was always an issue about their physical arrangements, how they were housed and how they were treated, et cetera.

But I don't think there was a question that there was an actual popular or a political movement to cut down the number of foreign workers.

Q. Was there a concern about foreign workers being, essentially, competition for domestic workers in terms of unemployment?

A. Theoretically, yes. Theoretically. Because there were no and hadn't been Israeli workers in the construction business since 1968, since we took over the West Bank and we had Palestinian workers. There were basically no Israeli workers in what we call the wet works, in the concrete, the steel, the paint, floor laying, and so on.

So there was no competition. There was no group of people saying: We have no work. I

don't even think that their fathers remembered when they had this work.

Q. Did this change at all in the early '90s when there was a substantial influx of immigrants from the former Soviet Union?

A. No. No. They moved into the -- the foreign immigrants, the Russians in particular, actually solved another problem.

Because up until the middle '90s, we still had foremen and team leaders from the Arabs -- from the Israeli Arabs of the middle '60s. But by that time, they were getting old and retiring. And the Russian immigrants came in, and they took their place.

The backbone of our company, the middle management is Russians, people that we took in the '90s. And they replaced a lot of the Arabs that were just too old to keep on working.

Q. But they didn't go into the --

A. They weren't laborers.

Q. Looking down to paragraph 15 of the Complaint -- strike that.

Turning to page 8, paragraph 35 -- now, this is after a number of allegations describing the -- well, actually, let me ask you this way.

You make reference in paragraph 35 to -- well, let me focus on the first sentence, and I have a few questions about that. Now, the first sentence of that paragraph reads:

"On information and belief, critical activities, in particular, concrete construction, steel frame erection, and insulated panel installation were adversely impacted by the Government's breach of warranty pertaining to TCN labor." End of quote.

First of all, since I obviously skipped over a whole list of allegations leading up to this, just to put this in context, when you refer -- without repeating in detail all the allegations, when the Complaint refers to "the Government's breach of warranty pertaining to TCN labor," can you basically summarize what you're referring to there.

A. It's my belief and understanding that our bid was put in and the work was commenced on the assumption that we were going to be allowed to use this labor. And, in fact, the Government -- the Governments together had expected us to use the labor and had warrantied the use of the labor.

Q. You say the "Governments" plural. And

putting aside what those Governments expected, you said they warrantied.

Now, which Government warrantied what?

A. Well, our contract was with the American Government. Obviously, they were the ones who were doing the warranting.

Q. So what do you say that the American Government warrantied with respect to foreign labor?

A. That we would have access to foreign labor from certain countries listed in the documents, and we had to bring these people in from these countries, and that we would be entitled to tax rebates based on the taxes paid for these TCNs.

Q. But, I mean, you are not contending that the U.S. Government did anything to preclude the Joint Venture from bringing in foreign laborers, are you?

A. The U.S. Government?

Q. Yeah.

A. I'd have to think about that.

Well, in a sense, I think that they didn't do what they should have done to make sure we got the laborers.

Q. And what was that?

A. Well, I have seen, for instance -- I don't know if you want to get into this. I have seen the Wye agreements where the U.S. Government has requested and required the Israeli Government to supply liaison people who are supposed to solve these kinds of problems.

And as far as I know, there was no such liaison officer. As far as I know. We certainly didn't see any results of this work. So in this sense, I think they neglected to do what they should have done.

Q. Was it your understanding or the Joint Venture's understanding going into this progress that the --

A. Going into what?

Q. Going into the -- when preparing and submitting its bid --

A. Yes.

Q. -- that the U.S. Government ultimately had control over the Israeli Government with respect to the immigration policies and visas and the like?

A. I didn't have an opinion on that. I don't know.

Q. Moving to the specific allegation that I

which lawyer represented us.

Do you remember, Deni? I'm sorry.

In any case, I think that this June 10th stuff was our own company problems, not the Joint Venture problems. Although later on, the Joint Venture, it was advised -- it's mentioned here that, if ABB SUSA is registered as a foreign company, then the Joint Venture would be entitled to bring in its own labor.

This was in answer to the Ministry of Labor and the Ministry of the Interior's allegation that the people that we had, the deserters -- if you like, I'll explain what deserters are -- that we had collected over the 14 or 15 years of activity numbered several hundred, almost 400, I think, and effectively stopped us from bringing in workers even if A. Arenson Ltd. was entitled to a visa.

Because we were only allowed to bring in net numbers of workers, so we tried to separate A. Arenson Ltd. from the Joint Venture because A. Arenson Ltd.'s problems were of a different kind and from different -- had nothing to do with the Joint Venture.

In fact, ultimately, the Joint Venture

was -- there was an agreement made that the Joint Venture would be allowed to get the visas in its own name, which was never initiated. It was never done by the company.

I'd like to explain also that throughout this period of time of 2001 and on, there was various changes in the identification of the Government units which handled the foreign labor. This was never very easy in any case. It always involved the Ministry of the Interior in the country and the Ministry of Labor, which decided whether the jobs -- whether there was a requirement for foreign workers or not, the initial visas.

And there had to be cooperation at all stages. There had to be cooperation with the Ministry of Foreign Affairs because the visas were actually administered in the various embassies of Israel in these foreign countries.

During the period of time that we were involved, the Ministry of Labor disappeared and became part of the Ministry of Trade and Commerce. And this involved a complete change of personnel. Not only did it change the ministry, it changed the political party who had power over these ministries.

Without going into great detail, the Shas was the one that was involved in the -- they had the control over the ministry which issued the requirement for visas, the Ministry of Labor, and the Ministry of the Interior to allow the actual bringing in of the workers.

Shas lost part of its power. Shas had a lot of scandals, a lot of financial scandals. There's still criminal cases going on against Ben Izri, one of the ministers who was being accused of corruption involving foreign labor and their visas. And it became very, very difficult to get any visas.

Arenson's problem -- if you would like me to elaborate on what Arenson's problem involved, I would be happy to do so.

Q. Sure.

A. Like I said, we started in 1988 to bring in foreign workers. And as a rule, we got them out. We certainly had no complaints from anybody until early 2000, 2001 maybe, where suddenly they said that you have 400 or so deserters.

We, in the middle '80s, had thousands of foreign workers with visas. We may have had three or 4,000 workers. We were doing very large jobs

with very large numbers of foreign workers. We had, I think, a thousand on the southern power station at one time.

And these workers, they didn't come in 1988 and leave in 2001. They came for two years, one year, five years. And I would guess that of the -- in those years, we may have had something like 20,000 workers that came in and went out in the 12 or 14 years we were involved. Maybe less, but thousands and thousands and thousands of workers.

Of those thousands and thousands, there was no record in the Ministry of the Interior. In the border police's records of people leaving, they had missed 400 people, and they called them deserters. They said they're still in the country.

One of the subjects of our court cases was that we went back in time and we found actually that we had definite proof or fairly definite proof -- we had stamped ticket stubs with names of people that were supposed to be deserters that we knew had left the country. And we had their ticket stubs that they had left the country. We thought it was a computer mix-up, which could be easily solved by showing that these people had had tickets

purchased for them and they had used the tickets, involved identification, et cetera.

Like I said earlier -- mentioned earlier, we had actually found -- I think we believed at one time that we had possibly up to 50 workers who actually were in the country of these tens of thousands that we had brought into the country.

And of the hundreds that was alleged that they were deserters, we thought we knew of about 50 of whom we actually gave to the border police. At this time, the police set up a special unit to take care of foreign workers. And we actually gave them a list, addresses and names of these people, and they were not taken out of the country.

On the basis of that, we went to court, Arenson did, to cut down the number of deserters that we had because the deserters themselves became a very heavy burden because we were only allowed to bring in the net number of workers. This had nothing to do with the Joint Venture, and we never claimed it did.

The reason, by the way, that we went from a company that had thousands of workers to a company that had just a few hundred workers, if you notice, our net -- our contribution to the six or

700 workers that we were allowed, there was only about 200, and the rest were Nachshonim.

The reason was that the Israeli Cabinet made a decision to not allow public jobs to have foreign workers on them. In practice, what this meant was that there were no visas issued on the basis of contracts for public works. So since most of our jobs were public works, we couldn't get the visas. It wasn't that we didn't have the same amount of work, but we couldn't get the visas.

And for us, it was terrible. Because if we had a shortage of workers -- if we have no foreign workers at all, it didn't really matter whether we had -- say we were allowed to bring in 200 workers, but we had 500 deserters, or we weren't allowed to bring in any at all. It was exactly the same difference. We weren't allowed to bring in people with or without visas.

The simplest way for us to approach the problem was to separate the Joint Venture from A. Arenson Ltd. while we continued fighting A. Arenson's particular issues. And we did.

Q. In this effort that you mentioned to -- I don't know if that was a judicial -- a suit in court or an administrative proceeding or both.

But you said you wanted to reduce the number of deserters.

I assume that you mean, in other words, reduce the number --

A. The roll call of the deserters.

Q. -- in a sense, in the Government's records, so to speak?

A. Yes. Yes.

Q. And you attempted to prove that many of these ostensible deserters, in fact, did leave the country, I think is what you described?

A. Yes.

Q. Did the court or whatever administrative body was involved make any findings on that subject?

A. I believe that we had our deserters substantially reduced at one point.

I would like to mention some of the efforts that we made. For instance, when we realized that we had a problem with deserters, we put up a campaign to recall our deserters. And we actually had -- we put ads in the Romanian newspapers. Because most of our employees through the '90s were Romanians and most the deserters were Romanians.

And we put ads in the Romanian-language papers in the country: Come back. Everything is forgiven. We won't punish you. We'll give you a bonus. We'll buy you a ticket out if you want to go out or reapply for a visa if you want to come in.

We actually got a few people that came back on that basis. And they told us about the others who didn't. That was the basis for our believing that there were about 50 deserters in the country.

Q. I mean, now, this effort that you made, was that specifically in the court or before one of the ministries, or what body was that?

A. All bodies. Because any one of these bodies could say no. And when the special foreign labor police came in, a lot of it was involved with the foreign workers police.

Q. So did the Israeli Government ultimately reach a conclusion that the number of deserters was something less than they originally said? And, if so, approximately what number is that?

A. They may have. But what, in fact, happened was that they quit referring to the deserters. It became a nonissue. Why they decided

to make it a nonissue, I don't know. I guess it was because they realized that these were just incorrect numbers. I wouldn't like to say fictitious, but incorrect.

Q. Now, if we look back at Exhibit 24, the next line item after the reference to lawsuits --

A. Yes.

Q. -- is an item with reference to July 3rd, 2002. And it says here:

"Contractor" --

And I assume that means the Joint Venture; right?

A. Yes.

Q. (Reading.)

"Contractor received list of block visas issued by MOL to various companies for 26,827 slots."

What does "slots" mean here? Does this mean allocations?

A. It means visas.

Q. Okay.

A. Or allocations. Yes.

Q. Of visas?

A. Yes.

Q. (Reading.)

hundreds of dunams -- hundreds of square meters of -- thousands of square meters that we started with. And we finished -- we didn't wait until everything was done to start the site development.

If I could just tell you an anecdote. We're just across the road from the project called Canarit. Canarit is the Israel Air Force headquarters. I am building it. The project was being bid in the midst of -- towards the end of all of these problems with the TCNs.

We were invited to bid. Three or four contractors were invited to bid. And we said we wouldn't take part in the bid. They said: Why? And we said: Because we can't build a building like this without TCNs. And we're not going to bid. We learned from experience you can't do it and they won't let us do it.

It turned out that my colleagues, the competitors, also had the same sense, or at least some of them did. The Ministry of Defense was very concerned about this. And they called a meeting with the bidding contractors -- with the Ministry of Labor and with the contractors.

Ranon Denur, who is now the manager -- the director of the Prime Minister's office, was

then the director of the Ministry of Trade, Commerce, and Labor, which was the same -- Ehud Olmert was then the minister. And he sat together with Amos Yaron, who was the head of the -- and with all of their people, dozens and dozens of people, and also some of the contractors or maybe even all of the contractors.

We said: We are not going to obligate ourselves to places or timetables unless we're guaranteed TCNs. And the outcome was -- and it's in the minutes -- that the Ministry of Labor notes that the contractors will use TCNs on this project without official permission.

This was in the Ministry of Defense in the presence of most of the people who were involved in enforcing the law. It was specifically designated as a job that everybody would just pretend didn't exist. And, in fact, we're building it with TCNs, only with TCNs, which is strictly against all the rules.

Q. Going back to the Nachshonim project and this issue about deserters, you mentioned earlier in your testimony about some efforts to convince the relevant ministries that the number of actual deserters among TCNs that Arenson had hired was a

lot smaller than what the ministries thought it was.

You might have answered this, but -- well, approximately what was the number again that the ministry was saying -- the number of deserters that the ministry was saying Arenson had and what was the number that Arenson was contending was the correct one?

A. Well, as I said earlier, we were advised we had 500. We found tens and hundreds of paper proof that the people had actually left. And we knew from our own sources that there were about 50 left in the country for various reasons. So if these are the numbers that you're asking, that's what I said earlier.

Q. Now, as to those 50 who were left in the country, what, if anything, did Arenson do with respect to them?

A. I told you two things that we did. We did several things. But two particular things was: Early on in this problem, we had some people escort, physically escort a group of laborers -- there may have been only one, but somehow I think there was a group -- from Haifa to the airport. And in the airport -- the workers had notified

whoever they had notified. And at the airport, the workers were set free and went back into the country, and our escorts were arrested.

Q. You did mention that.

When did this happen?

A. This happened, I think, in 2002.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. 2002.

Another time, we advised -- we located a group of 20-odd people who had deserted us, and we knew exactly where they were, their addresses and the names.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. We put into the Holon police station the names and the addresses of the people, and nothing immediately happened. I think a few months later, Amnon was held for questioning overnight so they wouldn't bother them anymore.

MR. JONES: I'm sorry. Who was?

THE WITNESS: Amnon.

MR. JONES: Could you --

THE WITNESS: Amnon Barkai.

MR. BRILLIANT: Let me ask the questions.
MR. JONES: The record wasn't clear who he was referring to.
MR. BRILLIANT: He said Amnon. Amnon, I think, was previously identified somewhere along the line as being in the room here.
THE WITNESS: Yes.
MR. BRILLIANT: And if not, he is now.
Q. Okay. So if I understand, there were these efforts that you described with respect to about 50 workers?
A. We guessed at about 50.
Q. I mean, approximately --
A. Approximately.
Q. -- about 50 who were in the country.
And that would leave roughly 450 that, I guess, the Ministry of Interior were saying were in the country and Arenson were saying were not in the country?
A. They didn't even say that. They said: We have no record of them leaving. That was their position. They didn't have any proof that they were here, but they didn't have any record that they had left.
Q. Normally, if they had left, if they had

left through than airport or something like that, through passport control, there would be a record?
A. You would think so. Yes.
Q. And it would be quite difficult, wouldn't it be, for them to leave the country just by walking across the border?
A. There would be no point to it. Why would they do that? They wouldn't do it. If they left, they would probably leave of their own volition.
In Romania at least -- a Romanian worker going back to Romania who couldn't show a legal exit was not allowed to leave Romania to work outside of the country again. Because the Romanians themselves had control of their own.
Q. So now, if there was no record of these people leaving the country, are you saying -- I'm trying to understand what you're saying.
Are you contending that they, in fact, did leave the country?
A. I'd like to just state slightly differently what you just said.
The Ministry of the Interior claimed there was no record. But, in fact, these are foreign names. It wasn't only Romanians. It was also Turks. And it was very difficult for them to

control it. They sometimes gave -- the numbers, the identification numbers or the passport numbers were changed when and if they had a new passport issued to them.

In terms of the tens of thousands of workers that we had or the hundreds of thousands of workers that had gone in and out of the country, there was an insignificant number of people that the Ministry of the Interior couldn't see the record for them.

In some cases, we showed them the canceled ticket stubs, I mentioned earlier, the airport ticket stubs. We showed them airport lists of passengers. We showed them all kinds of stuff. And at least at the level of the clerks, we convinced them that, in fact, they had left the country.

It didn't help us with our deserter thing because that wasn't -- the purpose of the exercise was not to find the deserters. The purpose of the exercise was to disallow us any visas whatsoever or any workers whatsoever.

Q. Isn't that speculation on your part?

A. I am willing to speculate that. Yes.

Q. But the number of deserters or so-called

deserters, depending on your point of view, as to whom you presented evidence such as canceled tickets and that sort of thing, roughly how many are we talking about?

A. I didn't understand the question.

Q. Roughly how many workers are we talking about?

A. Who deserted?

Q. No, no. Those who you submitted evidence such as canceled tickets, indicating that they did leave the country.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: 102.

BY MR. BRILLIANT:

Q. Okay. So that would still leave about 350 or so unaccounted for by --

A. By the Ministry of the Interior. Yes.

Q. And as to which Arenson could not specifically prove that they did leave the country?

A. Yes. At least not in a paper way.

Q. Well, was there other proof?

A. People said they had gone back, their families. We probably could have gone to Romania and found them as well if we wanted to.

Q. But you didn't have any correspondence from them or that sort of thing?

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. I'm just recalling, 102 was after a great deal of effort. We put in all this paper proof, and they refused to check them. And they weren't interested in receiving them, at which point we realized it was just a waste of effort.

It was a lot of effort to find them and to find the proof. We were going through everywhere. The first 102 was more or less ironclad, and they just ignored them. So we decided we weren't going to beat our heads against the wall.

MR. BRILLIANT: I have no further questions for Mr. Arenson.

MR. JONES: Could we take a two-minute break?

MR. BRILLIANT: Sure.

(Recess.)

//

//

//

what the whole document is.

MR. JONES: This is part of SR14.

MR. BRILLIANT: Okay.

THE WITNESS: Which part to read? 4.B?

"The tax exemption for TCN personnel income and employment taxes on earnings is limited to those third country nationals who entered Israel as employees of the contractor or subcontractors to work exclusively on this contract or other contracts under LOA ISB" -- something -- "HAC."

BY MR. JONES:

Q. And do you understand that that "LOA" is the limited -- the letter of authority for the Wye River accords?

A. I recognize it. Yes.

MR. BRILLIANT: Letter of agreement?

MR. JONES: Letter of agreement.

Q. Was it your understanding that the Joint Venture would only get a tax break if it brought in new TCNs?

A. Yes.

Q. Was this tax break ever actually applied to new TCNs?

A. We had no new TCNs.

Q. At any point during the project, were you

able to bring into Israel any TCNs to which this clause would apply?

A. I believe that ABB brought in some professionals, timetable specialists, engineers. Deni himself, I think, came in under that. We may have gotten the reductions. I don't remember. But we had no laborers of any kind, third country nationals.

Q. I would like to direct your attention to Exhibit 3 of Volume VIII-A. That would be SR22. Perhaps you could just, so that the record is clear, read this first sentence of SR22 into the record.

I might note that the volume that I have starts at page 7, and it's inserted wrong. It's actually part of Exhibit 3 instead of Exhibit 4. So we'll just switch over to Exhibit 4.

Could you just read this for the record.

A. (Reading.)

"Contractor may arrange through the appropriate Government of Israel offices to bring into Israel U.S. nationals and nationals of third countries having diplomatic relations with Israel for purpose of employment in carrying out this contract work."

A. For the TCNs who were onsite.
Q. Okay. But these were not TCNs who were specifically brought into the country?
A. No.
Q. Okay. The next thing I'd like to ask you about is a document that appears at Tab 51 of our exhibits, page 138. Again, we're continuing in Volume VIII-A.
This is a memorandum, for the record, internal to, apparently, the Corps of Engineers, dated 1 July, 2003. And the specific statement that I'd like to direct your attention to starts at the bottom of the page and then goes over to the next page. And what it says is this:
"According to Eran and Uriah, the MOI is not allowing Arenson to bring in additional TCNs until an accounting is made for those TCNs already within the country under Arenson's visas."
And then this is the specific part I want to ask you about:
"The MOI and MOD suspect that Arenson is using its TCNs on other projects within the country."
Was that true?
A. We used TCNs on the airport job, where

we had a specific allocation of TCNs, where the Airport Authority had, in fact, managed to convince the ministry to allow us to have TCNs onsite. But whatever TCNs we had available, we brought to this site.

Q. Okay. Was there ever an occasion where TCNs who were allocated by the Ministry of Labor, or anyone else for that matter, to the Nachshonim project were used on any of the other Arenson projects?

A. We never actually brought any laborers because of the Nachshonim allocation. All of the laborers we had were from other jobs. Or were from previous jobs, not other jobs.

Q. So if I'm understanding you correctly, what you're saying is just the opposite is true, that you took laborers from other jobs and sent them to Nachshonim, not the reverse?

A. Yeah. Because on most of our other jobs, we were able to use Palestinians. On this job, we weren't. So the other jobs, we had some kind of alternative.

Q. We are now switching to Volume VIII-B of plaintiff's exhibits. And I would like to direct your attention to Tab 2, which starts at page 16,

MR. BRILLIANT: Well, in terms of --

THE WITNESS: I can answer that. I'd like to answer, if I could.

MR. JONES: Okay.

THE WITNESS: I have no objection to the Israeli Government deciding that there should be no more foreign workers. There's good reasons for it, and I agree with the reasons.

My objection was to the complete arbitrariness and lack of preparation and the amount of distortions that resulted from their implementation of the policy.

It's not only my position. It's my position and the Contractors Association's position. What we objected to was them telling us to put in these applications, run around like chickens without heads, become illegal whatever you do. We're changing the law every three days so that you're always breaking the law. This is what drove us crazy.

BY MR. BRILLIANT:

Q. Well, okay. Apart from these aspects of implementation and administration of the policy that you're referring to, though, then it's true, though, that the overall decision of disallowing

further foreign workers, in itself, did not come as a big surprise? I mean, it's something that one might expect?

A. It definitely came as a surprise.

I'll tell you something else. If we had known before the bid, we would have put in a higher bid or not a bid at all, like in the Ministry of the Air Force/Defense things.

There is nothing technically difficult about training Israeli Arabs to work on a project. We're doing it now. Today, there is no difference in my company between jobs -- no difference in my company in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs. And I have hundreds of them.

They more or less have the same salary now. They more or less have the same skills. The Arabs, because they're close to home, they tend to take more holidays and they're slightly less efficient. But they're better workers.

And the Romanians and the Turks are willing to work longer hours, but they're a little less -- they're a little dumber than the Arabs. They're a little less competent. Our Israeli Arabs

are fine, upstanding people. And when there was a place for them to work and proper payment, it turned out that they are very good workers like I remember them in 1961 and '62 when I first started.

Q. So, I mean, the kind of suddenness, perhaps, or the abruptness of the decision --

A. That's what killed us. Yeah.

Q. -- that took you by surprise, if I understand you?

A. Yes.

Q. But with hindsight, the fact of this problem of foreign workers coming in and no way to enforce the need to make them leave when they're done, sooner or later the Government was going to put a stop to that. I mean, that one might expect even though you might not expect it to kind of come suddenly.

A. I think it came because of -- I think it came because, ultimately, in 2000, plus minus, the Israeli Government realized that they would never be able to use Palestinians within the country. And at that time, they decided that, if they weren't going to have Palestinians, they didn't want foreigners.

This was a period of years, three or four

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| A.A.B JOINT VENTURE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 05-114C |
| | ) (Consolidated with Case Nos. |
| THE UNITED STATES OF AMERICA | ) 05-1172C, and 06-49C |
| | ) (Chief Judge Damich) |
| Defendants. | ) |

**AFFIDAVIT OF MICKY MOAV**

Micky Moav, first being duly sworn on oath and subject to the penalties for perjury, states and represents as follows:

1. I am employed by A. Arenson, Ltd. as the company's Chief Estimator.

2. I was responsible for preparing the estimate of construction costs of the Nachshonim Military Storage Base in preparation of the A.A.B. Joint Venture's bid. A. Arenson, Ltd. was one of the three partners in the Joint Venture.

3. The currency in use in Israel is the New Israeli Scheckel ("NIS"). At the time of the bid, one U.S. Dollar equaled 4.17 NIS.

4. The number we used for the bid for most of the labor was 25 NIS per labor hour, which included all labor-related costs, including operation of the TCN labor camp, but excluding income and payroll taxes, which were to reimbursed by our customer. That number worked out to roughly US$ 6 per hour. For steel reinforcing works, we used a slightly lower hourly rate of US$ 5.50 per hour. Those figures were based on the costs at the time of bid of using foreign workers, mostly from Romania.



**EXHIBIT**
**6**

5. Had we known at the time of the bid that we would not be able to bring in foreign workers, our bid would have been significantly higher if we had decided to bid the job under such circumstances.

The foregoing is true and correct to my personal knowledge.

Meir Moav

NACHSHONIM
MINUTES OF MEETING
USACE/IDF/MOD/ABB/JV
**03 JANUARY 2002**

| ITEM | DESCRIPTION | ACTION |
|---|---|---|
| | JV had Subcontractor open a few areas to determine whether fill contained rock that was too large and if material was too moist. Results indicated fill activities are being conducted in a proper manner. | |
| 3.4 | **Subsurface Drainage:** COE has RFI pertaining to subsurface drainage.<br>Need answer as soon as possible as the excavated ditch in Sector 78 must be filled.<br>Pile exploratory borings in Sector 56 revealed subsurface material has high water content. This water is likely to migrate to valley floor on top of the subsurface rock layer and, with time, cause the fill in the valley to become less dense. This moist subsurface condition is believed to exist in other site locations.<br>The entire subsurface drainage condition needs to be considered in responding to the RFI. | **COE/AAB** |
| **4** | **PROCEUREMENT** | |
| **4.1** | **Excess Material:** Negotiations continue for disposal of excess material. | **AAB** |
| **4.2** | **Waterproofing:** Negotiations ongoing. Preparing technical data from all 3 suppliers to submit to COE.<br>In answer to JV question as to submittal of Technical data, COE responded that the Designer must sign off on such submittal before transmittal to COE. | **AAB**<br><br>**AAB** |

| | | |
|---|---|---|
| **5** | **ADMINISTRATION** | |
| **5.1** | **Tax Clauses SR 28, 29, & 30:** Awaiting recommendations from JV Tax Advisors for follow-up with COE/MOD. | **AAB** |
| **5.2** | **TCN Visas:** JV informed that no Block Visa has been issued by the Ministry of Labor.<br>JV trying to set up meeting with Ministry of Labor in order to move forward on this critical issue. | <br><br>**AAB** |
| **6.** | **SCHEDULE** | |
| **6.1** | Not discussed | |

**EXHIBIT**
**7**

WYE RIVER & ISRAEL PROGRAM

FMS Cases IS-B-HAC, HAD & HAF

US Army Corps of Engineers
North Atlantic Division, Europe District
Israel Program Office

WEEKLY STATUS UPDATE

4 Jan 02

**NOTE: This status report shows only significant changes from the 28 Dec 01 update.**

**HQ - EUROPE DISTRICT & ISRAEL PROGRAM OFFICE:**

1. Current Activities:

a. Rain has hampered all Wye River projects this week to varying degrees, but especially for the SITB where site access is a problem in wet weather.
b. The contracting officer received the re-submittals of the NITB proposals from bidders. The technical evaluation board will convene telephonically on 7 Jan 02 to revaluate the changes and the contracting officer will make his decision of award, most likely next week.
c. Received unofficial notice this week from MOD that the Ministry of Labor has issued a restriction on the processing of Third Country National (TCNs) block visas for all construction in Israel, not just our work. If this is continues, this could impact our projects as TCNs are the major source of labor for all projects.
d. At a meeting with MOD and IAF personnel this week to discuss the Hatzor Flight Simulator, a request was made by the IAF to evaluate the possibility of shortening the construction period for the project. It was pointed out that currently the contractor is awaiting a KO decision to extend the contract completion period due to problems of coordination with the IAF flight simulator contractor Lockheed-Martin (LM). The IAF, contractor and MOD representatives traveled this week to the U.S. to discuss the design issues with LM and to solicit their co-operation with completing the design.

2. Israel Program Office (IPO) Staffing:

a. Working to consolidate the selection criteria matrix from each panel member for the GS15 Resident Program Manager and proceed to the interview and Gallop Poll process.
b. The NSDD-38 request to hire local national engineers/inspectors was forwarded from DSCA to the Department of State this week. Have asked DSCA to check with DoS on the previous NSDD-38 request to staff the Eastern Resident Office that was submitted to DoS in Nov 01.

3. Future Activities:

a. Award the NITB contract next week, once the technical evaluation review is complete. A request for release of funds will be forthcoming.
b. The NITB ground breaking ceremony is scheduled for 30 Jan 02 to be held in conjunction with a visit by BG Rhoades. The next IPR (#5) will be 29 Jan 02 in Israel.
c. Complete the selection process for the GS-15 Program Manager.
d. Complete the classification process, advertising and hiring of the local national engineers/inspectors.
e. Start the hiring process to replace the Chief of Technical Assistance, IPO.
f. The MOD has requested a site visit and update brief for various personnel in the MOD to the Nachshonim and Southern Training bases. The visits are scheduled for 16 Jan 02.

**EXHIBIT**
**8**

4. Security Update:

a. The number of violent incidences within Israel this past week remain at reduced levels compared to incidences a month ago. The U.S. envoy, General Zinni, arrives back in Israel this week to discuss the issues and encourage Chairman Arafat to do more to reduce violent activities and to encourage Prime Minister Sharon to continue to remove restrictions in the Occupied Territories. There is no change to the U.S. personnel security requirements or threat as assessed by the RSO.

b. The three armored vehicles were delivered to the IPO this week.

c. A security site survey of the IPO is still scheduled for the week of 15 Jan 02. This survey will look at the best means of implementing previously suggested improvements.

**LOA IS-B-HAC: SOUTHERN INFANTRY TRAINING BASE (SITB)**

1. Construction Schedule:

| | Percent Complete (Schedule/Actual) | Contract Completion Dates (Schedule/Current) |
|---|---|---|
| Phase 1 (North Firing Ranges): | 100%/99% | 13 Nov 01/21 Jan 01 |
| Phase 2 (Remaining Base): | 34%/34% | 16 Sep 02/16 Sep 02 |

2. Current Activities:

a. Contractor continues to make final touches to Phase 1 deficiencies noted at the final inspection. Some of the minor earthwork deficiencies can be completed once the weather allows and the ground dries sufficiently. Rain hampered some access to the site of this week.

b. Continuing foundation, form-work and vertical construction on 38 buildings and 7 training sheds, as well as installation of sewage, drainage, and electrical infrastructure.

c. Continuing to work on the excavation and placement of the Main Access Road, up to the section that will need to be relocated.

3. Southern Resident Office (SRO) Staffing: No significant change.

4. Future Activities:

a. Continue pile drilling, foundation, formwork and vertical construction and placement in the base core, company areas.

b. Coordinate a meeting with the Israel Electric company and the electrical designer for the routing of the high voltage power lines to the base.

c. Dry out the earthwork and continue to finish the deficiencies noted during the Phase 1 final inspection.

d. The IDF have stated that the plans for the new ammunition bunker are complete and will be given to us next week. However, the MOD has still not given official notification that they approve of the additional structure. Continuing to coordinate a decision with MOD.

e. The IDF and MOD have once again encountered trouble with the location of the main access road location around the Kibbutz Shomeria. It will have to be redesigned once again but will not be completed until the MOD has complete approval from the kibbutz and the GOI on the final location. The contractor has notified the Resident Engineer, that unless the final design and approval Is made available by mid-Mar 02, there will be schedule impacts.

f. Working on a change order for final payment reconciliation of drilled pier lengths and reinforcement.

**LOA IS-B-HAC: NACHSHONIM STORAGE BASE (CENTRAL BASE or NSB)**

1. Construction Schedule:

| | Percent Complete (Schedule/Actual) | Contract Completion Dates (Schedule/Current) |
|---|---|---|
| Nachshonim Base | 10%/10% | 18 Jun 04/18 Jun 04 |

2. Current Activities:

Design

a. Received corrected 100% design of Segment 1 this week.

b. The contractor continues to work on the re-submittal of the 60% design of the Segment 2 portion of the project. It is estimated that the JV will resubmit the design in mid-January.

Construction

a. Still waiting the contracting officer's issuance of the two modification packages; the box culvert redesign and the additional security upgrades. The two modifications were negotiated for a total of $381K.

b. Rain interrupted earthwork this week on much of the site.

c. Micro-pile test borings performed this week for initial DSB encountered an extensive clay layer resting above the bedrock that was not shown in the original IDF provided geotechnical report. This will require some modification to the initial foundation design.

d. Continuing forming and casting of the 2 meter by 2 meter box culvert. The box culvert is 1.5 km in length and is progressing well.

e. The Resident Office was unofficially notified by MOD that the Ministry of Labor has instituted restrictions on processing block visas for TCNs coming to Israel for all construction work. If this remains true, this could have serious impacts on construction schedules for this and future projects. We are investigating what impacts this may have.

3. Central Resident Office (CRO) Staffing:

a. The NSDD-38 request for hiring local nation engineers/inspectors was sent from DSCA to DoS this week.

4. Future Activities:

a. Work with the JV to resubmit the complete 60% design for segment 2 as soon as possible.

b. Start the work on the DSB as this will be the prototype for testing all DSB associated systems.

**LOA IS-B-HAC: NORTHERN INFANTRY TRAINING BASE (NITB)**

1. Contract Award Schedule:

a. Contracting officer received the revised proposals from bidders this week. The technical evaluation board will review the clarifications and makes their recommendations on 7 Jan 02. Anticipate that the award will be made next week.

2. Current Activities:

a. KO is completing his recommendation for award. Technical evaluation of resubmittals in progress.

b. A request of release of funds will be sent up the HQUSACE as soon as the KO has made his determination of award.

3. Northern Resident Office (NRO) Staffing:

a. Continuing to coordinate the arrival of three NRO personnel. The first family arrives on 7 Jan 02 and the second family arrives 26 Jan 02 and the third employee arrives on 14 Feb 02.

4. Future Activities:

a. Award the contract next week.
b. Bring all personnel and families on board in Jan/Feb 02.
c. The Groundbreaking ceremony remains scheduled for 30 Jan 02.

**LOA IS-B-HAC: SITE 276**

1. Contract Award Schedule: No significant change

2. Current Activities: No Significant Changes

3. Eastern Resident Office (ERO) Staffing:

a. Still awaiting NSDD-38 staffing approval request to be sent from Department of State to US Embassy Tel Aviv. Have asked DSCA to investigate where this request is within the DoS as it has not reached the US Embassy staff yet, although it was sent to DoS from DSCA in Nov 01.

4. Future Activities: No significant change

**LOA IS-B-HAD: PALMACHIM/HATZOR PROJECTS (IAF)**

1. Contract Construction Schedule:

| | Percent Complete (Schedule/Actual) | Contract Completion Dates (Schedule/Actual) |
|---|---|---|
| Flight Simulator, Hatzor | 11%/11% | 5 Sep 02/5 Sep 02 |
| Flight Simulator, Palmachim | 1%/1% | 6 Mar 03 /6 Mar 03 |

1. Current Activities:

a. Haztor –

1) Grade beams were completed and electrical/communications ducts were installed on the SE section of the site. Continuing to place hollow core floor sections. The enegry center construction is on hold until the design can be finalized.

2) Representatives from the designer, IAF, and MOD traveled to the U.S. this week to meet with representatives from the Lockheed-Martin flight simulator manufactures. This meeting is to coordinate design criteria between the flight simulator and the building contractors. The contractor and IAF have been having problems getting information from the LM designers, resulting in a contractor request for a schedule delay.

3) The contractor is working on design modifications based on the 60% design review.

b. Palmachim –

1) The project site is at rough grade, fenced and temporary utilities have been installed.

2) The contractor and IAF personnel traveled to the U.S. to meet with the helicopter flight simulator company, CAE, to collect data on the simulator structure criteria.

c. The contractor submitted two schedules this week that were rejected as not meeting the timelines as specified in the contract documents.

d. Have issued two RFPs to the contractors for changes to the contract. The first changes the way the VAT reimbursement is paid to bring this project in line with MOD requests and the other is for several changes to the requirements. The contractor has requested additional time to prepare the proposals.

3. Palmachim Project Office (PPO) Staffing: No significant changes

4. Future Activities:

a. Working with the contractor to submit correct baseline schedules for both projects.

b. Waiting to receive the contractor's proposals for the VAT reimbursement process and the design related changes.

**LOA IS-B-HAF: NEVATIM PROJECT (IAF)**

1. Contract Construction Schedule: No significant changes

2. Current Activities:

a. Consolidating the review comments from the 60% design review to pass on to the IAF.

b. Awaiting the completion of the specifications and remaining drawings for completion of the 60% design review.

3. Nevatim Project Office (NPO) Staffing: TBD

5. Future Activities:

a. Develop the PMP, final schedule and solicitation package.

Israel Program Office Project Manager: Rob Saari, +49-611-816-2566
Israel Program Office DDE/Program Manager: LTC Larry McCallister, +972-9-957-7950/7942