**From:** Jones, John M HQ02
**Sent:** Wednesday, May 15, 2002 8:34 AM
**To:** Iarosis, Mike NAU
**Cc:** McCallister, Larry D NAU; Weirick, Kim G HQ02
**Subject:** RE: Draft Letter for Coordination Responding to MOD Concerns Regarding USACE Costs

Mike:

Thanks. I'm not sure we should be too assertive in the letter in making the point that MOD is not providing as many QA personnel as originally promised. I have included a "positive" statement that reminds him that their providing on-site personnel helps control costs. Mr. Haber already knows that we are hiring 3 additional folks for the Central Resident Office because they could not provide as many MOD personnel as promised.

As I recall, Mr. Haber's committment with regard to personnel was "up to 14", and then "up to 11". It was always understood that the provision of a specific number was not guaranteed. I think we also had some internal reluctance to be overly reliant on their personnel for QA, in terms of cutting our staff to the point where we compromise our ability to independently do our work. Ultimately, we are responsible for quality and for controlling our costs. MOD is responsible for paying our actual costs.

My feeling is that we should softpedal the issue of them providing QA personnel in the letter, and you can certainly reinforce that point more directly in your discussions with Mr. Haber and Pini.

The bigger issue in terms of overall costs is the TCN labor issue, where the GOI is clearly in violation of the LOA and causing schedule slippage and impact costs.

On another topic... we are briefing the Chief later this morning on the itinerary for his Africa/Israel trip. Reaction from Mr. Brown and others within Military Programs is that the schedule may be too hectic. My feeling is that if he is going to visit, he should see all the projects and meet all of the USACE staff. We will let you know the reaction later today, and whether he wants to free up some time. One thought I had in this regard is that you might be able to give him more downtime the morning of his arrival on 28 Jul by skipping the program briefing at the IPO (1000-1200). He could meet the IPO staff at the dinner in the evening, or maybe you could do a brownbag lunch at the IPO prior to the office calls. We can do a formal briefing stateside before he leaves, and you and LTC Rovero can do a more informal update. Let me know if you think that idea would work.

Thanks for the input. Let me know if you and Larry feel strongly about beefing up the statement in the letter regarding MOD QA personnel.

John

-----Original Message-----
**From:** Iarosis, Mike NAU
**Sent:** Wednesday, May 15, 2002 2:05 AM
**To:** Jones, John M HQ02
**Cc:** McCallister, Larry D NAU
**Subject:** RE: Draft Letter for Coordination Responding to MOD Concerns Regarding USACE Costs
**Importance:** High

John:
Please don't misinterpret my comment concerning Pini at the IPR. We are not having quality problems in the work. The local AEs are very diligent and there has always been a very agressive AE - Contractor relationship. This aggressiveness sometimes leads to a lack of trust between the parties. I plan to meet with the AEs and Pini on a

**EXHIBIT 47**

**From:** Roach, Michael A NAU
**Sent:** Wednesday, June 12, 2002 2:15 AM
**To:** Iarosis, Mike NAU; McCallister, Larry D NAU; Saari, Rob B NAU
**Cc:** Abraham, Ezra E NAU; Blackburn JR, Joseph W NAU; 'Einat Rozen (E-mail) ' (E-mail); 'Rami Kerekesh (E-mail) ' (E-mail)
**Subject:** Nachshonim Payment No. 9

Everyone,

Enclosed is the contractor's billing information for PE No. 9. The contractor was paid $1.5 million for May 02. As you can see from the narrative provided by the contractor, progress is starting to fall behind due to the lack of TCN's. He is 19.5% complete financially. He should have been 21% complete. At this time his CPM does not indicate negative float, but we believe that this will change next month.

The information enclosed tells the full story of what is happening on the project. Detailed information concerning the pile lengths and over excavation has been included. I expect to get a request for additional payment for this "extra" work in the next couple of weeks. My position is that limited areas in sector 56 are "differing site conditions" but will fight anything broader in scope than that. This issue is coming down to the fact that his pile lengths are averaging 6M and I expect him to say that from the geo report he bid 4M. At this time, I believe this is unreasonable and will challenge it accordingly.

Most issues appear to be minor when compared to the lack of TCN's. The delay in progress will become more apparent next month unless there is a change in the current situation. A letter was sent to the contractor rebutting his initial correspondence, but we understand that the JV will take issue with our rebuttal and press the issue further. A formal request for a CO's decision appears likely in the near future.

Billing Narrative 09-MAY 02.do... | Equipment Jtilization Schedule. | Manpower Jtilization Schedule.. | Master Schedule ( Revision 02)... | Pay Estimate May 2002.xls (76 ... | Project S-Curve.xls (48 KB)

Michael A. Roach, P.E.
Project Engineer, Nachshonim Storage Base
USACE, Israel Program Office

Field Office Phone: 03-933-1565

**EXHIBIT**
**48**

**From:** Roach, Michael A NAU
**Sent:** Friday, July 12, 2002 3:21 AM
**To:** Iarosis, Mike NAU; 'Einat Rozen (E-mail) ' (E-mail)
**Cc:** Saari, Rob B NAU; Blackburn JR, Joseph W NAU; 'Rami Kerekesh (E-mail) ' (E-mail); McPeters, Ronald L NAU; Abraham, Ezra E NAU
**Subject:** Nachshonim PE 10

Mike, Einat

Enclosed is the contractor's progress update and payment estimate information for work completed in June 02.

Please note that the contractor is now indicating 14 days of negative float - meaning they are now expecting to complete the project 2 weeks late. Their narrative explains that the lack of available workers (TCN's) is the primary cause for this delay.

Their schedule indicates that they are 20.74% complete with 21.26% scheduled. Which means they are .52% behind schedule. In my update this week I reported that they are 21% complete with 23% scheduled. In my judgment, this is the more correct %'s to use in reporting to management. The project is 14 days behind schedule, which is about 1.3% of the original duration. Next month I expect them to lose even more time.

The schedule is anticipated worsen at an exponential rate until the TCN issue is resolved.

Billing Narrative 10-JUNE 02.d... Equipment Jtilization Schedule. Manpower Itilization Schedule.. Master Schedule ( June 2002).x... Pay Estimate June 2002.xls (81... Project S-Curve.xls (47 KB)

Michael A. Roach, P.E.
Project Engineer, Nachshonim Storage Base
USACE, Israel Program Office

Field Office Phone: 03-933-1565
Field Office Fax: 03-933-1462

**EXHIBIT**
**49**

DEPARTMENT OF THE ARMY
US ARMY CORPS OF ENGINEERS, EUROPE DISTRICT
ISRAEL PROGRAM OFFICE
UNIT 7228, BOX 42
APO AE 09830

11 April 2002

REPLY TO
ATTENTION OF

CENAU-IP

MEMORANDUM FOR Mr. Avraham Haber, Head of Construction, Ministry of Defense

SUBJECT: Request for Assistance in Obtaining TCN Worker Visas

1. As you are aware, the Ministry of Labor decision to restrict Third Country National (TCN) visa last December has had a severe impact on the labor pool available for contractors working under contract with the US Army Corps of Engineers in Israel. This situation is now becoming critical and will result in significant delays to all construction projects unless some allowance is made by the Ministry of Labor to allow additional workers in to the country.

2. We have received notice from M. Gordon Construction Co. (Haztor and Palmachim Flight Simulators projects) that their request for TCN visas was denied by the Ministry of Labor (MOL) on 21 March 02. The MOL also informed the contractor that since these projects were not on the MOL "urgent list" that the chance of receiving TCN visas for these projects in the near future are "non-existent".

3. The joint venture of Soleh Bohen/Minrav is reaching critical stages in the completion of the Southern Infantry Training Base. The lack of sufficient finish workers on this project are evident in their weekly progress in which they are consistently lagging behind their schedule with the very real potential to fall further behind. The USACE has aggressively worked with the JV to develop resource constrained and unconstrained schedules to meet the current construction completion date of 22 Oct 02. It is clearly evident that unless additional workers are found immediately, this project may not have enough workers to meet the current schedule, and without the additional workers, there is no chance to accelerate the work rate (for example, perform two shifts) that may be necessary to meet the IDF beneficial occupancy date.

4. Although I've highlighted only two of the projects we have under contract, the labor situation will also become an issue in the very near future for the other projects as well. Request that you continue to work aggressively with the Ministry of Labor to grant TCN visas for additional workers on the Wye River and other USACE projects. It is vital that you do everything possible to help us help the contractors to meet their contractual schedules. If you need additional contract or background information from me or the contractor, I will be glad to provide the information.

3. Thank you for your support on all of our projects and for helping us to keep these projects on schedule.

**EXHIBIT**
**50**

LARRY D. MCCALLISTER
COL, EN
Deputy District Engineer
Europe District, Israel Program Office

CF:
LTC Pini Liberman
CRO Resident Engineer
SRO Resident Engineer
CRO Resident Engineer
PPO Project Engineer

**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
WASHINGTON, D.C. 20314-1000

REPLY TO
ATTENTION OF:

Military Programs

MAY 16 2002

Mr. Abraham Haber
Head of Construction Department
Government of Israel
Ministry of Defense
24 Kaplan Street
Tel Aviv 61909, Israel

Dear Mr. Haber:

Thank you for your recent visit to brief my staff on the progress of ongoing construction projects and potential future work. It is always valuable to meet face-to-face with our customers, and I am pleased to have had the opportunity. During our discussion, you expressed concern with USACE costs for executing the Wye Program (Foreign Military Sales (FMS) Case IS-B-HAC). I agreed to conduct a review to evaluate whether currently projected USACE costs to implement the case are reasonable and appropriate. I am writing to share the results of that review.

As you suggested during your visit, our review confirmed that estimated total U.S. Government charges for the FMS case are approximately $27.5 million, representing 11.45% of the total case funding available for construction. A summary of all currently estimated U.S. Government administrative and management charges is enclosed. The summary illustrates that mandatory Foreign Military Sales administrative charges account for nearly $7.8 million, or 3.24% of total available construction funding. These charges are established in accordance with the Arms Export Control Act (as amended) in order to comply with the statutory requirement that the U.S. Government fully recover the costs of administering security assistance programs. As such, the administrative charges are mandatory.

As you know, we are required to charge actual costs for USACE services to implement Foreign Military Sales cases. Our costs to manage and execute the Wye River construction program fall into two basic categories. First, we have costs incurred prior to construction contract award for coordination and review of your facility designs, preparation of solicitation documents, advertising for construction contracts, evaluating proposals, and awarding construction contracts. Total estimated pre-award costs are less than 0.75% of total funding available for construction. I think you would agree that these costs are very reasonable considering the extensive design review and coordination that has been provided. These pre-award efforts are a good value because they help to avoid costly problems during construction.

**EXHIBIT**
**51**

Construction phase costs are the other major category. We currently expect that our total construction management costs will total slightly more than 7% of construction costs (excluding the cost of reviewing the contractor's design for the Nachshonim Storage Base and leasing of armored vehicles). These costs consist entirely of construction management including contract administration, on-site quality assurance, and related services. These costs are consistent with our experience managing construction projects in other areas outside the continental U.S., particularly in locations where USACE has not had a long-term presence. In addition, we believe our costs compare favorably with the private sector construction management industry.

Overall, I believe that our costs are reasonable considering the costs associated with establishing and maintaining a new organization in Israel, including the costs of salaries, staff relocation, travel, offices, housing, vehicles, security and U.S. Embassy support. We have incurred additional costs for security measures that were not anticipated at the time the original budgets were established, including the cost of leasing armored vehicles and making security improvements at our office in Hertzliya. These measures were taken in accordance with guidance received from the Regional Security Officer and our internal USACE security offices.

Since the inception of the program, our goal has been to execute the projects using the smallest possible staff, while assuring the quality of service you expect. We have achieved this goal by performing as much work as possible at our Europe District headquarters in Wiesbaden, Germany, and by augmenting our staff in Israel with temporary duty personnel from Wiesbaden only when necessary. We recognize and appreciate your contribution to containing USACE costs by providing MOD engineers and technicians to assist with on-site quality assurance at no cost to the U.S. Government. Based on our discussions and the feedback you provided on progress to date, it seems clear that our partnership is producing high quality facilities. I firmly believe that reducing USACE costs to any significant extent could have serious consequences regarding the quality of the facilities.

I have been monitoring the program execution and am concerned that the current shortage of Third Country National (TCN) construction labor in Israel will cause the cost of USACE services to rise. As the lack of sufficient construction labor causes construction durations to lengthen, there will be a corresponding need to maintain our on-site resident offices for longer than originally planned. This will cause USACE costs to rise. This increase in USACE management costs will be in addition to any contract cost impacts resulting from the labor shortage. COL McCallister and his staff are beginning their annual process of updating the USACE budget based on actual costs incurred and anticipated future costs. The projected impacts of the labor shortage will be reflected in the updated USACE budget, which will be completed later this summer. I know that you have been working diligently to secure relief from the Ministry of Labor restrictions on TCN work visas, and I urge you to continue your efforts.

I welcome your input regarding our performance in the partnership to deliver quality facilities for the Israel Defense Forces. We will continue to monitor the quality and cost of USACE services, and I invite your continued feedback regarding the success of our partnership. Please feel free to contact Kim Weirick, John Jones, or myself if you have any additional questions or concerns.

Sincerely,

J. Joseph Tyler, P.E.
Chief, Programs Management Division
Directorate of Military Programs

Enclosure

Copy Furnished:

Commander, North Atlantic Division
Commander, Europe District

Summary of
Foreign Military Sales Administrative Charges
and U.S. Army Corps of Engineers Costs
FMS Case IS-B-HAC
14 May 2002

| Description of Cost Item | | | % of Total $ Available for Construction Contracts | % of Total Case Value |
|---|---|---|---|---|
| Total Case Value | $266,000,000 | | | |
| Total Estimated Funding Available for Construction Contracts (see Note 1) | $240,002,431 | | | |
| **Mandatory FMS Case Charges** | | | | |
| FMS Administrative Charge (2.5%) | $6,487,805 | | | |
| Contract Admin. Surcharge (0.5%) | $1,291,105 | | | |
| **Total Mandatory FMS Charges** | | **$7,778,910** | **3.24%** | **2.92%** |
| **USACE Costs to Implement the Case** | | | | |
| Pre-Award Costs for Southern Infantry Training Base | $489,765 | | | |
| Pre-Award Costs for Reserves Division Storage/Logistics Base | $564,184 | | | |
| Pre-Award Costs for Northern Infantry Training Base (Estimated) | $285,000 | | | |
| Pre-Award Costs for Site 276 Facility | $328,530 | | | |
| Pre-Award Costs for Brigade Relocation Facility | $100,000 | | | |
| **Estimated Total Pre-Award Costs for Wye Projects** | | **$1,767,479** | **0.74%** | **0.66%** |
| **USACE Construction Phase Costs** | | | | |
| Review of Contractor Design for Nachshonim Storage Base | $517,000 | | | |
| Leasing of Security Vehicles - required IAW RSO & USACE security guidance | $570,000 | | | |
| USACE Construction Mgt Costs (Jun 01 Budget) – excluding contractor provided support | $15,364,180 | | 6.40% | |
| Contractor Provided Support to USACE (see Note 1) | $1,484,424 | | 0.62% | |
| **Estimated Total Construction Phase Costs** | | **$17,935,604** | **7.47%** | **6.74%** |
| Total of Non-Contract Costs | | $25,997,569 | | |
| **Grand Total of "Non Bricks & Mortar" Costs** | | **$27,481,993** | **11.45%** | **10.33%** |

Note 1: Construction contracts include support to USACE operations (office space, housing, etc...) totaling $1,484,424

**DEPARTMENT OF THE ARMY**
US ARMY CORPS OF ENGINEERS, EUROPE DISTRICT
ISRAEL PROGRAM OFFICE
UNIT 7226, BOX 42
APO AE 09830

REPLY TO
ATTENTION OF

CENAU-IP 04 October 2002

MEMORANDUM FOR Mr. Avraham Haber, Head of Construction, Government of Israel, Ministry of Defense, 24 Kaplan Street, Hakirya, Tel Aviv, 64734 Israel

SUBJECT: Increased Program Costs

Dear Mr. Haber:

At our 4 September 2002 program review meeting, the Israel Program Office briefed anticipated management cost increases. The TCN labor shortage will extend the project durations and our corresponding management services. In addition, our management costs will increase to reflect the quality assurance support you are unable to provide. It was briefed that the overall affect of the cost increase is currently estimated to be $2.7M. Our increase in costs means less money available for future projects.

In our budget estimate, we did not reserve funds to cover potential contractor claims related to the TCN issue. If however future conditions warrant reconsideration, funds will be reserved from the program.

We will continually reassess our operating costs and keep you well informed on changes as the program continues.

On a less sober note, it was truly my pleasure to have met you last September. I look forward to our future meeting during the January Program Review in Germany.

Sincerely,

Lee A. Staab
Colonel, US Army
District Engineer

**EXHIBIT**
**52**

**DEPARTMENT OF THE ARMY**
US ARMY CORPS OF ENGINEERS, EUROPE DISTRICT
ISRAEL PROGRAM OFFICE
UNIT 7228, BOX 42
APO AE 09830

CENAU-IP 12 November 2002

MEMORANDUM FOR Mr. Avraham Haber, Head of Construction, Government of Israel, Ministry of Defense, 24 Kaplan Street, Hakirya, Tel Aviv, 64734 Israel

SUBJECT: IPR #7

Dear Mr. Haber:

On 4 September 2002, the quarterly In-progress Review (IPR) Meeting number 7 was held at the Israel Program Office. This memo represents the minutes of that meeting. Please provide any additional comments or corrections to these minutes and provide your signature in the space provided below.

The following people attended the IPR

| | |
|---|---|
| COL Lee A. Stabb | European District, District Engineer |
| Avraham Haber | Director, MOD/DOC |
| LTC Pini Leberman | IDF Program Manager, Wye Projects |
| LTC Dan Shenbach | IAF Program Manager, IAF Proects |
| Uria Ayal | MOD / DOC Liaison Officer |
| LTC John Rovero | European District, DDE, IPO |
| Mike Iarosis | Resident Program Manager, IPO |

**OLD Issues**: The meeting commenced with general introductions followed by a review of the action items associated with the IPR#6.

**Item 1**: Look at options for Acquisition Strategy on new IAF simulators

Discussion: Although the new IAF simulators were no longer a priority item. LTC Shenbach requested that the District continue to review the best alternatives for acquisition.

**Item 2**: Implement additional Quality Management measures (SITB)

Discussion: Since the last IPR, all of the IPO Quality Assurance staff including local hires and MOD / DOC personnel

**EXHIBIT 53**

have attended special Quality Assurance training. Three Contractor Quality Management training sessions were conducted. Thirty-three contractor Quality Control Staff were trained and certified.
IDF designers were invited, and they have participated, in the IPO quality management program by attending Preparatory and Initial Inspection Meetings.

**Item 3**: Transition replacement for Gordy Simmons

Discussion: Ezra Abraham was hired to replace Gordy. The IPO has been successful in the transition process.

**Item 4**: Resolve VAT Tax issue on IAF Simulator Project

Discussion: Resolved by contract modification.

**Item 5**: Estimate "potential" impacts of TCN problem

Discussion: Increased IPO costs were discussed during the IPR.

**Item 6**. Ensure adequate staffing for SITB

Discussion: During the IPR, recruitment plans and temporary support was discussed. It was noted that the MOD/DOC and IDF were taking actions to supplement IPO staffing at the SITB and NITB as a result of the reduced MOD/DOC QA personnel.

**NEW Issues**:

a. It was recognized that the projects were being delayed as a result of reduced labor associated with the restrictions being placed by the GOI on TCNs. The project delays will extend the duration of the program and result in increased IPO costs. In addition, since the MOD/DOC is unable to provide the necessary Quality Assurance personnel to support the program, the IPO would hire the additional personnel. The anticipated cost increases were discussed.

b. LTC Shenbach asked the District to reconsider the inclusion of the project items and quantities into the Nevatim solicitation. There was concern that the Government could be liable for mistakes. Mr. Haber noted that the MOD utilizes special wording in their solicitation that precludes responsibilities for mistakes in the items or quantities. He noted that he would provide a copy of this wording to the IPO.

c. LTC Shenbach discussed the timetable for the Nevatim

Project. He noted that the air force plans to have squadrons operational next year and it was necessity to have the project completed to accommodate the squadrons.

d. Mr. Ayal noted that the procedure for future VAT reimbursements would be directly to the contractor from the VAT authorities.

e. Representatives of the Israeli Navy were present at the IPR to brief their proposed project in Haifa.

**ACTION Items** :

a. The Navy requested a proposed timeline for the award of their project based on design-build and design-bid-built approaches.

b. Mr. Haber requested a breakout of costs for the IAF Program and the WYE Program.

c. Mr. Haber was requested to provide the verbiage used in the MOD solicitations to preclude responsibility when items and quantities are included for information purposes only.

d. MOD / DOC supplemental QA support at the Northern and Southern Infantry Training Base Projects.

e. Review alternatives for acquisition of the future IAF simulators.

f. The IPO would prepare an evacuation plan to identify the MOD / DOC project support that would be required in the event that the IPO was evacuated from country.

g. The IPO requested that the MOD/DOC complete their review of the proposed MOU on Transfer and Warranty procedures.

h. IPR #7 was tentatively scheduled for 7 January 2003 in Garmish Germany.

MICHAEL F. IAROSIS P.E.
Resident Program Manager
Israel Program Office

CF:
Pini Liberman, IDF Program Manager
Uria Ayal, MOD / DOC

Approved:

______________________
Avraham Haber
Director, MOD / DOC

______________________
Lee A. Staab
COL, EN
Commanding

In the Jerusalem District Court
sitting as a Court for Administrative Affairs

A.Pet. /03

In the matter of:

1. **ABB SUSA - A. Arenson - Baran Group (Joint Venture)**
   Registered partnership No. 4-020882-54
   C/o Arenson Ltd., of 5 Hashita St., Industrial Park, Caesaria 38900

2. **ABB SUSA, Inc.**
   1460 Livingston Avenue, Bldg. B. North Brunswick
   of New Jersey 08902-6005 U.S.A.

3. **A. Arenson Ltd.**
   of 5. Hashita St., Industrial Park, Caesaria 38900

4. **Baran Group Ltd.**
   of 8 Omarim street, Omer Industrial Zone 84965

All four represented by their Attorneys Advocate B. Baratz, and/or Y. Baratz, and/or Z. Bar-Nathan, and/or L. Almouli-Confino, and/or B. Luchtenstein, and/or R. Avni, and/or Y. Fruchtman and/or R. Ephrati, and/or I. Rubanenko, and/or T. Erlich Goldman, and/or R. Peled and/or Y. Evron, and/or S. Alster, and/or E. Belkind, and/or S. Shahmoon, and/or T. Sheinkin-Japhet, and/or G. Ashkenazy, and/or A. Halfon, and/or M. Nissani, and/or M. Baruch, and/or H. Geva-Medalia, Adv. Z. Glickman, and/or O. Vaisben, and/or E. Bardugo, and/or D. Dilbary, and/or E. Shani

of 1 Azrieli Center, Round Tower, 18th Floor, Tel Aviv 67021
Telephone: 03 607 3777; Fax: 03 607 3778

Petitioners

- versus -

1. **The Labor Authority**

2. **The Foreign Workers Permits Support Unit, Ministry of Industry, Trade and Labor**

3. **Minister of Industry, Trade and Labor**

4. **Minister of Interior**

All four represented by the Jerusalem District Attorney's Office
of 4 Uzi Hasson Street, Jerusalem

Respondents

5. **Mr. Shaul Mofaz, Minister of Defense**
   Represented by the Jerusalem District Attorney's Office,
   of 4 Uzi Hasson Street, Jerusalem

Formal Respondent

**EXHIBIT**
**54**

## ADMINISTRATIVE PETITION

This Honorable Court is hereby petitioned to exercise its power and grant the Petitioners the following relief:

(a) Grant an order directing Respondents 2 and 3 to issue to the Petitioner No. 2, the American company, ABB Susa Inc., 523 valid permits to employ foreign workers in the Nachshonim Project (as defined in paragraph 4 hereof), against a corresponding reduction in the number of permits that were issued by them for the purpose of the Project during 2002 to the Petitioner No. 3, A. Arenson Ltd.

(b) Grant an order directing Respondent No. 4 to remove its opposition to issuing the permits requested in sub-paragraph (a) if and to the extent such opposition is still in force.

## The following are the grounds of the Petition:

### Introduction

1. This Petition deals with the Labor Authority's unjustified and unreasonable refusal in the circumstances to issue 523 permits to employ foreign workers, to Petitioner No. 2, ABB Susa Inc., against a corresponding reduction in the number of permits that were allocated by it to Petitioner No. 3, A. Arenson Ltd., during 2002 for the "Nachshonim Project", **in disregard of the proceeding that took place in this Honorable Court before his honorable Justice C. Segal, on 7 August 2002, within Administrative Petition No. 582/02**, while grounding his opposition in purportedly upholding the **Ministry of the Interior's procedures**, the enforcement of which it is not even charged with.

2. Moreover, the Ministry of Interior, which was also a party to the hearing that took place within the scope of the Administrative Petition No. 582/02 mentioned, and which is the proper address, according to the version of the Labor Authority, for resolving the problem in which the Joint Venture has found itself, and which will be described at length below, **has been totally ignoring** all the Joint Venture's entreaties and effectively has disassociated itself from handling the matter.

3. The Ministry of Defense, which has a clear interest in the setting up of the Nachshonim Project and the delivery thereof to IDF without delay, is also doing nothing in order to assist the Joint Venture in resolving the bureaucratic problem that the Joint Venture has now found itself, and which could cause unnecessary delays in completing the essential project, and damage of tens of millions of dollars.

### The Parties to the Petition

4. Petitioner No. 1 (hereinafter: "**the Joint Venture**") is a registered partnership in Israel, which was set up by Petitioners 2-4 for the purpose of erecting one of the largest and most complex projects currently being carried out in Israel - "the Nachshonim Project" - within the scope of which a large land-based military storage base for tanks and armored vehicles is being set up in Nachshonim by the Joint Venture, as commissioned by the US Army Corps of Engineers, in conjunction with the Israeli Ministry of Defense, for the IDF (hereinafter:" **the Nachshonim Project**").

5. Petitioner No. 2, ABB Susa Inc., (hereinafter: "**ABB**") is an international contracting company, duly incorporated in the United States.

ABB belongs to one of the largest construction groups in the world and its activity focuses mainly on the planning and execution of broad-based infrastructure and construction works.

6. Petitioner No. 3, A. Arenson Ltd., (hereinafter: "**Arenson** "), is a very well established contracting company, numbered amongst the largest, leading Israeli companies in the building engineering works industry, and is duly registered in the Register of Contractors according to the Registration of Contractors for Engineering and Construction Works Law, 5729-1969.

7. Petitioner No. 4, the Baran Group Ltd. (hereinafter: "**Baran**"), is one of the largest, leading companies in the field of engineering consulting in Israel.

8. Respondent No. 1, the Labor Authority, is an authority which was, until May 1, 2003, charged with approving the employment of foreign workers for employers in Israel, according to the terms of the Labor Authority Law, 5719-1959 (hereinafter: "**the Labor Authority Law**").

9. Respondent No. 2, the Foreign Workers Permits Support Unit, at the Ministry of Industry, Trade and Employment (hereinafter: "**Support Unit**"), is the authority to which the powers of the Labor Authority, with respect to granting permits to foreign workers, were transferred, according to Government decision No. 2327 of May 1, 2003.

10. Respondent No. 3, the Minister of Industry, Trade and Labor, is the minister charged with the Labor Authority and the Support Unit.

11. Respondent No. 4, the Minister of Interior, is the head of the authority empowered to grant visas and residence licenses to foreign workers, according to the provisions of the Entry Into Israel Law, 5712-1952 (hereinafter: "**Entry into Israel Law**").

12. The Formal Respondent No. 5, the Minister of Defense, is the Head of the Ministry of Defense which was, together with the US Army Corps of Engineers, a partner in drafting the Solicitation documentation for setting up the Nachshonim Project and the representations that were made therein, and has a clear interest in establishing the Project and to deliver the same to the IDF, without delay.

**The Nachshonim Project**

13. On December 31, 2000, and as part of implementing the "Wye River Accords", which were signed between the Government of Israel and the Palestinian Authority on October 23rd, 1998, an international tender for setting up a large military land-based storage base at Nachshonim, was published by the US Army Corps of Engineers in conjunction with the Israeli Ministry of Defense (hereinafter: "**the Tender**").

**Schedule 1** A true copy of the first page of the tender documentation (which, due to its large volume, has not been attached in full) is attached hereto and marked Schedule 1, and constitutes an integral part of the Petition.

14. On June 5, 2001, the Joint Venture was awarded the tender for setting up the Project, **the financial volume of which stands at some $125 million,** and on 20 July 2001, the Contract was signed with it.

Schedule 2 A true copy of the notice of the Joint Venture winning the tender of 5 June 2001 is attached hereto and marked Schedule 2 and constitutes an integral part of this Petition.

15. The entire project is being managed by the US Army Corps of Engineers, as the party who commissioned the work and is being funded by the American assistance funds that were approved by Congress.

16. By Israeli standards this is an enormous project and has national significance that extends over an area of some 1600 dunams within which the Joint Venture has, since July 2001, been executing the most complex work under an extremely tight and stringent schedule in order to enable it to be delivered to the IDF during 2004.

17. For the purpose of erecting the Project, the Joint Venture has been required, inter alia, to carry out extensive excavation works that include some 3,200,000 cubic metres of earth removal and some 1,800,000 cubic metres of filler; infrastructure works that also include the paving of roads 29 kilometres long and construction works within which more than 200 buildings and land-based storage sheds will be set up by the Joint Venture for tanks and armored vehicles on an overall area of some 227,000 square metres.

18. However, as will be explained below, despite the fact that all the relevant authorities are cognizant of the unusual volume, special nature, complexity and national importance of the Nachshonim Project, in practice, due to the sloppiness of the authorities and lack of ability of the decision-makers to exercise broad discretion and examine each case on its merits, the Joint Venture has been unable to resolve the severe crisis which the Project is now facing as a result of the inability to realize an approved allocation for the foreign workers that it needs in order to execute the Project.

## Relevant Factual Background

### A. July 2000 - commencement of the Nachshonim Project works and the Joint Venture's decision to authorize Arenson to handle, on its behalf, obtaining allocations to employ foreign workers in the Project.

19. In July 2001 and shortly after being awarded the Tender, the Joint Venture began carrying out works to set up the Project. Concurrently, the Joint Venture began recruiting foreign workers having the necessary expertise to carry out the complex works.

20. It is appropriate to emphasize at this point that the Joint Venture's entering into an engagement with the American Corps of Engineers by way of contract to execute the Project, while assuming broad financial obligations, including in connection with meeting the severe time schedule required for the execution thereof, was based and predicated on, inter alia, the Joint Venture's ability to bring foreign workers to Israel to carry out the major part of the work.

21. It is proper to emphasize that the necessity of foreign workers to carry out the construction of the complex engineering project, was also envisaged by the US Army

Corps of Engineers and Ministry of Defense at the early stage of formulating the Solicitation documentation.

Thus, for example, paragraph SR-22 of the solicitation documentation prescribed that the winning contractor would be entitled to bring foreign workers into Israel from the United States and other countries, which have diplomatic relations with the State of Israel:

> "Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work".

Moreover, the terms of the Solicitation contained in paragraph SR-14, a demand from the contenders in the Tender, to present a plan for employing foreign workers as part of their bid:

> "The proposal submitted under this solicitation shall include a Third Country National (TCN) tax plan which shall include: (1) an estimate of the amount of TCN personal income and employment taxes expected to be incurred in performance of the contract, and (2) a projected expenditure schedule showing when the contractor expects to incur these costs over the duration of the contract."

Schedule 3 A true copy of the relevant pages of the solicitation documentation is attached hereto and marked Schedule 3, and constitutes an integral part of this Petition.

22. As, at that time, Arenson was the only member of the Joint Venture registered as a registered contractor in the Register of Contractors and, therefore, the only one entitled by law to file an application to obtain an allocation to employ foreign workers for the Project, the Joint Venture decided that Arenson would act on its behalf vis-a-vis the relevant authorities, in order to obtain an allocation for foreign employees for the Project.

23. It is here appropriate to mention that even before the Joint Venture was awarded the tender, Arenson employed a considerable number of foreign workers within the scope of other extensive projects which were being carried out by it, including the Ben Gurion Airport 2000 Project, the Ministry of Foreign Affairs building in Jerusalem, an office building and electrical sub-station for the Electric Corporation, and others.

B. **January 2000 - Arenson filed on behalf of the Joint Venture, an application with the Labor Authority to obtain permits to employ foreign workers in the Nachshonim Project for 2002**

24. Following the Joint Venture's decision mentioned above, Arenson filed with the Labor Authority on January 22, 2002, an application to issue permits to employ foreign workers for the Nachshonim Project for 2002. In its letter to the Labor Authority of January 24, 2002, Arenson asked that the Project be treated as a national project of supreme importance and that appropriate allocation be approved for it quickly.

Schedule 4 A true copy of Arenson's request of January 22, 2002 to issue permits to employ foreign workers for the Project for 2002 is attached hereto and marked Schedule 4 and constitutes an integral part of this Petition.

Schedule 5 A true copy of Arenson's letter to the Employment Authority of January 24, 2002 is attached hereto and marked Schedule 5 and constitutes an integral part of this Petition.

25. In addition, the relevant parties at the Ministry of Defense also turned, concurrently with Arenson's foregoing request and even prior thereto, to the Labor Authority in order to bring about the urgent approval of visas for the foreign workers for the Project, whilst emphasizing the national importance of the Project.

Thus, for example, in the letter of Mr. Ran Meyer, the director of the Liaison, Control and Foreign Currency Unit of the Ministry of Defense's construction department, to the Ministry of Labor and Welfare of August 29, 2001, the writer stated, inter alia, that:

> "it is of supreme importance for the defense establishment to set up the camp in general and meet the time schedule in particular.
> As an extension of this, we would ask you to assist to the extent possible the Contractor in receiving an approval for a work licence for the required number of foreign workers in order to enable it to meet the time schedule."

Schedule 6 A true copy of the letter of the Construction Department of the Ministry of Defense to the Ministry of Labor and Welfare of August 29, 2001 is attached hereto and marked Schedule 6 and constitutes an integral part of this Petition.

Schedule 7 A true copy of the US Army Corps of Engineers' letter in connection with the volume of the Project dated August 29, 2002 which was mentioned in the above mentioned letter from the Construction Department, is attached hereto and marked Schedule 7 and constitutes an integral part of this Petition.

And, in the letter from Mr. Eyal Uria, the Director of the Central Unit for Liaison, Control and Foreign Currency at the Ministry of Defense to the Director-General of the Labor Authority dated January 13, 2002, the following clear statements were made:

> "Further to my telephone conversation with your assistant, Mr. Jacob Bochari, I would request your intervention and urgent approval for the allocation of visas for foreign workers for the Arenson company, which is a partner with the American company, ABB SUSA, in constructing a base for the IDF adjacent to the Nachshonim base.
> I would like to emphasize:
> a. The contract of 2001, and the fact that the Company has been working at the site for some months.
> b. The financing of the work by the U.S. Government through the FMF Assistance Funds.
> c. The project is American and is being administered by the US Corps of Engineers. The contract between the Israeli Government and the American Government permits the employment of foreign workers and the Contract of the Contractor is with the US Army Corps of Engineers, (USACE) and predicated on the above permit.
>
> **The failure to allocate the visas will cause the shutdown of the work and, thereby, IDF to be severely harmed as a result of a freeze in the time schedules for terminating the work.**
> **In addition, our relationship with the US Army Corps of Engineers. and the US Government will be severely harmed.**
> I would request your personal intervention and approval of the allocation for the Nachshonim Project:..."
> (Emphases supplied)

Schedule 8 A copy of the Construction Department's letter at the Ministry of Defense to the Director-General of the Labor Authority of January 13, 2002 is attached hereto and marked Schedule 8 and constitutes an integral part of this Petition.

26. Representatives of the Construction Department of the Ministry of Defense also met, on January 27, 2002 with the Director-General of the Labor Authority and further to that

meeting, they turned to the assistant director-general of the Labor Authority by letter of January 30, 2002, which stated, inter alia, the following:

> "The non-approval of the allocations will cause:
> a. The stoppage of work and filing of legal claims on the part of contractors against the US Army Corps of Engineers.
> b. A serious disruption of the IDF's organization setup.
> c. The loss of an entire IDF camp construction budget of some $270 million."

Schedule 9 A true copy of the Construction Department's letter at the Ministry of Defense to the Director-General of the Labor Authority of January 30, 2002 is attached hereto and marked Schedule 9 and constitutes an integral part of this Petition.

C. The "closed sky" policy declared by the Minister of Labor

27. On December 24, 2001, the Government adopted Decision 1141, whereby in 2002, the quota of foreign workers in Israel would be cut back so that the quota in general for the different branches of the economy (except for nursing) would stand at 48,000 workers, of whom 45,000 at the most would be employed in the construction and agricultural sectors.

Schedule 10 A true copy of Government Decision no. 1141, is attached hereto and marked Schedule 10 and constitutes an integral part of this Petition.

28. Following that Government decision, the former Minister of Labor and Welfare, Mr. Shlomo Benizri, published on January 1, 2002 a notice whereby commencing January 1, 2002, the entry of foreign workers into Israel would be totally prohibited and the quota of foreign workers in the building trade stand at 23,000 employees.

Schedule 11 A true copy of the notice by the Minister, Ben-Izri, is attached hereto and marked Schedule 11 and constitutes an integral part of this Petition.

D. January - June 2002: - Arenson awaits developments on the issue of employing the foreign workers and the publication of the allocations for 2002

29. Following the above decision Arenson was unable to obtain for the Joint Venture visas for bringing foreign workers over for the Nachshonim Project.

30. Concurrently, the Association of Contractors and Builders in Israel petitioned the High Court of Justice in H.C. 8722/00, in which the Association requested the High Court to issue an interim order which would prevent the exercise of the foregoing Decisions.

Schedule 12 A copy of the amended petition in H.C. 8722/00 is attached hereto and marked Schedule 12 and constitutes an integral part of this Petition.

31. In light of the Petition, the Ministers of Labor and the Interior advised that they would take no action to remove foreign workers from their employers in the building trade, on condition the permits had been granted in 2001 for projects, the execution of which continued also during 2002 and which had not yet been concluded, or where the contractors were employing foreign workers under a permit in 2001 who had begun a new project in respect whereof they had filed an application for a permit to employ foreign workers for 2002.

Schedule 13 A copy of the notice that was filed in H.C. 8722/00 above, is attached hereto and marked Schedule 13 and constitutes an integral part of this Petition.

32. Thus, during the first half of 2002 and similar to other contractors in the State of Israel, Arenson and the Joint Venture awaited the adjudication of the High Court and the decisions of the Labor Authority in connection with the publication of the allocations for the employment of foreign workers for 2002.

E. June 2002 - Arenson's petition with this Honorable Court within the framework of A.P. 582/02

33. On June 10, 2002, once Arenson realized that the Labor Authority was not publishing its decision in connection with the applications for the allocation of foreign workers for 2002 and that the Ministry of Interior was not allowing it to bring to Israel foreign workers on the basis of permits which had been granted to it in 2001 for other projects, Arenson filed an administrative petition within the framework of A.P. 582/02, with this Honorable Court against the Ministers of Labor and Welfare and the Interior (hereinafter: "**A.P. 582/02**").

Within the framework of A.P. 582/02, the Honorable Court was petitioned to declare the cancellation of the Honorable Benizri's decision whereby commencing January 1, 2002, the borders of the State of Israel would be closed to the entry of new foreign workers as mentioned above and also to direct the Minister of Welfare and the Ministry of Interior to allow the entry of foreign workers into Israel pursuant to permits which had been granted to Arenson by the Labor Authority in 2001.

Schedule 14 A copy of the petition that was filed by Arenson in A.P. 582/02 (without the schedules thereto) is attached hereto and marked Schedule 14 and constitutes an integral part of this Petition.

F. July 2002 - publication of the allocations for 2002 within the framework of which 523 foreign workers were allocated to the Nachshonim Project

34. On July 3, 2002 while Arenson's petition was still pending in A.P. 582/02 before this Honorable Court, the Ministry of Labor and Welfare published a list of allocations for 2002, within which 784 permits were allocated to Arenson, of whom 523 permits were for the Nachshonim Project.

Schedule 15 A true copy of the permit to employ foreign workers which was granted to Arenson for 2002 is attached hereto and marked Schedule 15 and constitutes an integral part of this Petition.

G. Arenson's lack of ability to realize the allocation for foreign workers for the Nachshonim Project due to the problem of abandoning workers

35. However, immediately after the allocations had been received and Arenson requesting to exercise the 523 permits that had been granted to it for the Nachshonim Project and the issue of working visas for them from the Ministry of Interior, it became clear to it that this was not possible due to the problem of "abandoning workers".

36. It should be explained thus: for a long period, contractors in Israel who employ foreign workers, including Arenson, have been suffering from the phenomenon of foreign workers abandoning them, meaning that foreign workers who had been lawfully been brought to Israel according to work visas that were issued in their name at the employer's (the contractor's) request, abandoned the work place and moved on to work, apparently, for other employers without a lawful permit.

According to the policy adopted by the Ministry of the Interior some time ago, an employer who employed a foreign worker who abandoned his employer and his workplace, but who has not lawfully left Israel, cannot bring to Israel another foreign worker in place of the one who abandoned, even if he has made every effort to locate that worker and induce his departure from Israel.

In contrast, and pursuant to that policy, an employer who employed a foreign worker who stopped working and left Israel, for any reason, may be "credited" with the worker and bring to Israel another foreign worker in his place.

37. According to Arenson's records as of **January 1, 2002, and before it requested the allocation of foreign workers on behalf of the Joint Venture, and for the Nachshonim Project** there were registered in its name 498 workers who had left their place of work, at **other projects** of Arenson between April 1, 1999 and January 1, 2002, and in addition, there were registered in his name 47 additional workers who had left the borders of the State between those dates but for whom, for some reason, it had not received in exchange any "credit".

<u>Schedule 16</u> A true copy of the table including all the details of the foreign workers who abandoned their work in Arenson's other projects between April 1, 1999 and January 1, 2002 is attached hereto and marked Schedule 16 and constitutes an integral part of this Petition.

38. At the beginning of July 2002, on the date on which the allocation for 2002 including also the Nachshonim Project, was received, effectively 485 foreign workers were employed at all of Arenson's sites.

However, according to the records of the Ministry of Interior there were registered in Arenson's name at that time also, 506 workers who had disappeared and who were deemed in their eyes to be Arenson's employees for all intents and purposes.

That is, to say, according to the Ministry of the Interior, Arenson employed at that time, 991 foreign workers, (485 foreign workers who were actually working at the various sites, plus 506 workers who had abandoned it) while its allocation for 2002 stood at 784 workers only.

39. Thus, according to the Ministry of Interior's approach, not only was Arenson not entitled to bring to Israel other workers in reliance on the allocation for 2002, but it was also required to send out of Israel 207 workers out of 485 who were actually employed by it at that time.[1]

40. **And thus, as a result of the fact that a few hundred workers who had been brought by Arenson to Israel between 1997 and 2001, <u>for the purpose of other projects that had been carried out by it, and which had no connection with the Nachshonim Project</u>, had abandoned its ranks of employees, Arenson could not actually realize on the Joint Venture's behalf the allocation of 523 foreign workers who had been allocated in July 2002 for the Nachshonim Project, within the scope of the quota that had been approved by the Labor Authority for 2002.**

[1] 991 less 784 = 207.

H. Attempts to transfer the allocation for the Nachshonim Project from Arenson to the American Partnership ABB

41. In order for the Nachshonim Project and the Joint Venture (that had first received only in July 2002 and in the scope of Arenson's overall allocation, the allocation of foreign workers for the Project) would not find themselves "penalized" due to foreign workers having abandoned Arenson, **which abandonment as stated had taken place even before the beginning of the execution of the Project and without any connection thereto,** Arenson suggested transferring the allocation of the foreign workers who had been approved for the Nachshonim Project out of its name into that of the Partnership for executing the Nachshonim Project, namely, that of ABB, which had not in the past effected, and was not effecting currently, other works in Israel, except for the Project.

This transfer was supposed to cause the number of permits allocated to Arenson for other projects being executed by it and having no connection with the Nachshonim Project, to be 261 (784-523) whereas ABB would receive an independent and separate allocation of 523 permits, all of which were designed exclusively for the Nachshonim Project.

42. **As will be explained below, the attempt to proceed to transfer the allocations from Arenson to ABB immediately after they had been received in July 2002 was done openly and in a declared manner, including in particular at the time of the ongoing hearing which took place on August 7, 2002 before the Honorable Justice Segal in A.P. 582/02.**

**This transfer was designed to accomplish a worthy cause and ensure that the allocations that had been lawfully granted for the Project would indeed be used by it.**

43. For the purpose of implementing the transfer of the allocation mentioned shortly after it was received, the Joint Venture had to overcome two not inconsiderable bureaucratic obstacles which were placed in its path: the first, due to the fact that the last date for submitting applications to the Labor Authority in connection with the allocations for 2002 had passed on July 28, 2002, and the other, that was founded in the fact that ABB - being a foreign contracting company - was obliged to request an exemption from registration in the Register of Contractors as a condition for obtaining the allocation in its name.

44. On August 7, 2002, at the hearing of A.P. 582/02 which took place in this Honorable Court before Justice Segal, and after the problem which had arisen in connection with the allocation of the foreign workers for the Nachshonim Project had been explained to the Court, Arenson's proposal mentioned above won a sympathetic ear.

**After more than three hours of discussion and negotiation both in the presence of the Court and with the assistance of Justice Zvi Segal, Arenson's attornies and the representative of the State Attorney's Office on behalf of the Ministry of Interior and the Ministry of Labor and Welfare reached - after receiving the consent of the Director-General of the Labor Authority, Mr. Nizri, and the representative of the Ministry of Interior, Ms. Conforti, who were present at the hearing, - a procedural arrangement which was designed to enable the transfer of the allocations to the Project from Arenson's name into that of ABB, as Arenson had suggested.**

This was the <u>sole purpose</u> of the procedural arrangement and of the judgment that approved it, and it would never have come about had this Honorable Court or the representatives of the Ministry of the Interior and the Labor Authority believed that it was tainted in any way.

Within the scope of the procedural arrangement that had been validated as a judgment and in order to enable ABB to overcome the two bureaucratic obstacles it was faced with as explained above in a manner which would allow it to file an application with the Labor Authority to change into its name the allocation of 523 foreign workers that had been granted to Arenson for the Nachshonim Project, the date for filing new applications with the Labor Authority was extended (as the deadline of July 28, 2002, had expired) and the Honorable Court sincerely recommended to the Registrar of Contractors, who was not a party to the hearing, to speedily discuss the application which would be filed with her by ABB for exempting it from registration in the Register of Contractors.

<u>Schedule 17</u> A true copy of the transcript of the hearing and the judgment of the Honorable Justice Segal in A.P. 582/02 of August 7, 2002 is attached hereto and marked Schedule 17 and constitutes an integral part of this Petition.

45. In the wake of the judgment which was handed down in A.P. 582/02 on August 7, 2002, and in order to enable ABB to exercise its rights according to that procedural arrangement, ABB turned on September 2, 2002 to the Registrar of Contractors with an urgent application to obtain an exemption from registration in the Register of Contractors according to section 14(a) of the Registration of Contractors Law.

<u>Schedule 18</u> A true copy of the application to obtain an exemption from registration in the Registry of Contractors is attached hereto and marked Schedule 18 and constitutes an integral part of this Petition.

46. The handling of ABB's urgent application took almost four months, and on the termination thereof on December 26, 2002, the former Minister of Construction and Housing, Mr. Nathan Sharansky, granted to ABB an exemption from the application of the Registration of Contractors Law, with respect to the making of civil engineering works for the purpose of erecting the Nachshonim Project.

<u>Schedule 19</u> A true copy of the exemption letter that was granted to ABB on December 26, 2002 is attached hereto and marked Schedule 19 and constitutes an integral part of this Petition.

## I. <u>The additional and separate legal process that Arenson instituted, having no connection with the Joint Venture, in connection with the failure to obtain visas in respect of the foreign workers that had abandoned it</u>

47. In order to complete the picture, it is proper to state that on August 21, 2002, independently and irrespective of the Joint Venture, Arenson filed with this Honorable Court in A.P. 738/02, an administrative petition against the Minister of the Interior, the Minister of Labor and Welfare and Internal Security, which petition addressed the failure to obtain the employment visas in respect of the employees that had abandoned it (hereinafter: "**A.P. 738/02**").

<u>Schedule 20</u> A true copy of the petition filed by Arenson in A.P. 738/02 (without schedules) is attached hereto and marked Schedule 20 and constitutes an integral part of this Petition.

48. On October 3, 2002, with the consent of the Respondents, an interim order was granted in A.P. 738/02 freezing the status quo, so that Arenson was not bound to remove from Israel the foreign workers that were actually employed by it, so long as their number did not exceed the quota of permits for employing foreign workers that it had received from the Labor Authority for 2002.

Schedule 21 A true copy of the Court's decision of October 3, 2002 is attached hereto and marked Schedule 21 and constitutes an integral part of this Petition.

49. On May 26, 2003, this Honorable Court decided by judgment which was granted on a number of petitions dealing with the same issue, that the interim orders that had been granted would remain in force until a decision was granted on the subject by the Respondents, and that the entire issue would be submitted to the Minister of Interior who would consider the questions raised by the petitions, while studying the judgment.

Schedule 22 A true copy of the judgment which, inter alia, was granted in A.P. 738/02 is attached hereto and marked Schedule 22 and constitutes an integral part of this Petition.

J. December 2002 - the filing of an application to obtain an allocation of foreign workers by ABB for 2003 for the Nachshonim Project

50. In light of the fact that obtaining the exemption from registration in the Register of Contractors had taken some 4 months and was only completed on December 26, 2002, and so that the visas that would be granted to it would remain in force for the duration of 2003, ABB filed an application to obtain the permits to employ foreign workers for the Nachshonim Project for 2003, in December 2002, with the offices of the Labor Authority in Afula.

Schedule 23 A true copy of ABB's application to obtain permits to employ foreign workers for the Nachshonim Project for 2003 is attached hereto and marked Schedule 23 and constitutes an integral part of this Petition.

51. Arenson concurrently filed independently a separate application to obtain allocations for 2003 for the other projects being carried out by it, irrespective of the Nachshonim Project.

Schedule 24 A true copy of Arenson's application to obtain permits to employ foreign workers for 2003 is attached hereto and marked Schedule 24 and constitutes an integral part of this Petition.

52. On February 25, 2003, since the approval of the Labor Authority to receive the permits for the Nachshonim Project for 2003 had not yet been received, Arenson turned by way of application to the Director-General of the Labor Authority to intervene in the subject and take action to allocate 523 permits to ABB to employ foreign workers for the purpose of the Nachshonim Project, against a similar reduction of Arenson's allocations as had been agreed in the procedural arrangement in A.P. 582/02.

Schedule 25 A true copy of Arenson's letter to the Director-General of the Labor Authority of February 25, 2003 is attached hereto and marked Schedule 25 and constitutes an integral part of this Petition.

53. On March 9, 2003, since the Respondent no. 1's reply was slow in coming, ABB and Arenson again turned to the Director-General of the Labor Authority with an urgent application to transfer the 523 permits that had been allocated to Arenson in respect of the Project for 2002, out of Arenson's name into that of ABB.

Schedule 26 A true copy of ABB's and Arenson's letter of March 9, 2003 to the Director-General of the Labor Authority is attached hereto and marked Schedule 26 and constitutes an integral part of this Petition.

K. March 2003 - decision of the Labor Authority to dismiss ABB's and Arenson's applications to transfer the allocations of the Nachshonim Project from Arenson's name into that of ABB

54. On March 11, 2003 to the amazement of the Petitioners, and completely contrary to all the understandings that lay at the basis of the agreed judgment of this Honorable Court dated August 7, 2002, which had been given with the concurrence, in the presence and with the consent of the Director-General of the Labor Authority, the respective representatives of the Ministry of Interior and the State Attorney's Office, the Labor Authority's Legal Advisor, Advocate Matityahu Tal, advised that the Labor Authority had not agreed to accede to the application to transfer the allocations for the Nachshonim Project from Arenson's name into that of ABB.

In its letter, the Honorable Advocate Tal argued, inter alia, that:

> "The transfer requested by you - has no real content and the Labor Authority, like any other public authority, is not entitled to assist and attempt to circumvent the procedure of the Ministry of Interior. Moreover, the transfer of the employees requested is completely fictitious, since it is solely designed to circumvent the Ministry of Interior and thus - this assignment must be revoked by virtue of the provisions of sections 13 and 61 of the Contracts (General Part) Law, 5733-1973".

Advocate Tal in his letter referred the Petitioners to the "proper method" which was, according to him:

> "To apply to the Ministry of Interior's authorities and attempt to persuade them that there were exceptional circumstances justifying a departure from the practice in a manner whereby the Arenson company would be "credited" with the full quota so that it would be enabled to realize the permit that had been granted to it in 2002."

Schedule 27 A true copy of Advocate Matityahu Tal's letter of March 11, 2003 is attached hereto and marked Schedule 27 and constitutes an integral part of this Petition.

55. Thus, we have a situation whereby the contents of Advocate Tal's letter, which totally disregarded the hearing that had taken place before the Honorable Justice Segal in A.P. 582/02, sought to send the Petitioners back to the starting point of early 2002, and suggested the Petitioners continue to knock on doors in the maze of Israeli bureaucracy as if the establishment of a gigantic project essential to the State of Israel, could be carried by conducting correspondence and diverse legal proceedings against the various authorities.

L. The Joint Venture's attempt to resolve the urgent problem out of court, with the intervention also of all the relevant Government ministers

56. Due to the exclusive nature, complexity and national importance of the Nachshonim Project, as explained above and in the hope that the personal intervention of all the relevant ministers would lead to a resolution of the problem and make redundant the need to resort to legal proceedings, the Joint Venture turned on March 25, 2003 to the Minister of Labor and Welfare, the Minister of Interior and the Minister of Defense with

an urgent application to obtain assistance in realizing permits to employ foreign workers.

A copy of the letter was also forwarded to the Director-General of the Labor Authority, Mr. Avner Oferi, in order to receive his comments.

Schedule 28 A true copy of the Joint Venture's application to the ministers of March 25, 2003 (without schedules) is attached hereto and marked Schedule 28 and constitutes an integral part of this Petition.

57. On April 3, 2003, and after it became clear to the Joint Venture that the Labor Authority had been transferred, with the establishment of the new Government, to the authority of the Honorable Minister Olmert, who had been appointed to the Ministry of Industry, Trade and Labor, the undersigned sent him a copy of the letter to the ministers of March 25, 2003, mentioned above.

Schedule 29 A true copy of the undersigned's letter to the Honorable Minister Olmert of April 3, 2003 is attached hereto and marked Schedule 29 and constitutes an integral part of this Petition.

Schedule 30 A true copy of the reply received from the Honorable Minister of Welfare, Mr. Zevulun Orlev of April 7, 2003, recommending the letter be referred to the Honorable Mr. Olmert, is attached hereto and marked Schedule 30 and constitutes an integral part of this Petition.

## M. The Ministers' total disregard of the Joint Venture's letter

58. Until this very day, and despite the reminder, which was sent to him on April 27, 2003, the Minister of Interior has not found the time to make any response at all to the Joint Venture's letter.

Schedule 31 A true copy of the reminder sent to the Minister of the Interior on April 27, 2003 is attached hereto and marked Schedule 31 and constitutes an integral part of this Petition.

59. There was a similar lack of response (or, more correctly, no response was received) from the Minister of Defense also, who has also been too busy to make any response whatsoever to the Joint Venture's application, until the present day.

60. In contrast, the Minister of Industry, Trade and Labor replied to the Joint Venture on April 13, 2003 (through his secretariat) that the letter had been forwarded for the perusal and comments of the professional advisors and that upon receiving their comments, he would respond to the application.

However, down to the present day, and except for the disappointing response received from the Director-General of the Labor Authority, as will be described below, the Minister of Industry, Trade and Employment has not found the time either to make any personal response to the Joint Venture's application.

Schedule 32 A true copy of the letter from the Secretariat of the Minister of Industry, Trade and Employment of April 13, 2003 is attached hereto and marked Schedule 32 and constitutes an integral part of this Petition.

61. Moreover, the additional reminders that were sent to the Honorable Ministers on May 27, 2003 did not earn any response.

Schedule 33 True copies of the letters of the undersigned to the Honorable Ministers of May 27, 2003 are attached hereto and marked Schedule 33 and constitutes an integral part of this Petition.

M. Response by the Director-General of the Labor Authority to the Joint Venture's application

62. On April 2, 2003, Mr. Avner Ofer, Director-General of the Labor Authority, replied to the Joint Venture's application to the ministers, described above.

In his reply, the Honorable Director-General argued that in the proceeding that had taken place in A.P. 582/02, the Petitioners had been promised nothing with respect to fate of the handling of the application.

Moreover, in his letter, the Director-General of the Labor Authority "rolled over" the solution to the problem to the court of the Ministry of Interior claiming that:

> "realizing the permit that was granted by the Labor Authority **has encountered difficulties on the part of the Ministry of Interior** in light of the fact that a large number of employees who were employed by your client, left it. **The Ministry the Interior has refused, for its own reasons,** to enable other foreign residents to be brought over in lieu of those who disappeared ((Emphasis in the original)."

The Director-General thereby reiterated the opinion of the Legal Advisor of the Labor Authority, Advocate Mattityahu Tal, as stated in his letter of March 11, 2003.

Schedule 34 A true copy of the letter of the Director-General of the Labor Authority of April 2, 2003 is attached hereto and marked Schedule 34 and constitutes an integral part of this Petition.

63. However, it appears from his letter, that the Director-General of the Labor Authority erred in thinking that the Petitioners' application was intended to bring about a solution of the problem of crediting Arenson in respect of foreign workers who had abandoned it in other projects that were carried out by it prior to ABB's application, while suggesting that they should wait in regard to the subject for the determination of the Court within the framework of A.P. 738/02, and act in accordance therewith.

The Honorable Director-General went on to argue that even if the Labor Authority had acceded to the application, ABB would not then have been entitled to obtain an entry visa for foreign workers before "redeeming itself" for the workers that had abandoned Arenson .

In these statements, the Honorable Director-General ignored the Joint Venture's main argument that the abandonment of Arenson's employees had taken place even before the commencement of the Nachshonim Project, in other projects of Arenson, and irrespective of the special allocation that had been granted for the Nachshonim Project only in July 2002, by virtue of which not a single other foreign worker had been brought to Israel for the Project!

Thus, had the application to obtain allocations for 2002 been filed from the outset in the name of ABB, in July 2002, at the time the application was accepted and permits issued to employ 523 foreign workers for the Nachshonim Project, no claim would have been brought against ABB in connection with the abandonment of foreign workers.

64. On April 7, 2003, the Joint Venture, through the undersigned, responded to the letter of the Director-General of the Labor Authority requesting, on a practical basis, that the Director-General of the Labor Authority urgently call a meeting with the participation

of all the relevant parties, namely, the Labor Authority, the Ministry of Interior and the Ministry of Defense, in order to reach a solution which would be acceptable to all parties.

The Joint Venture also wished to know when the Labor Authority could be expected to publish the list of allocations for 2003 within the scope of which ABB's application was also supposed to be clarified.

<u>Schedule 35</u> A true copy of the undersigned's letter on behalf of the Joint Venture to the Director-General of the Labor Authority, dated April 7, 2003 is attached hereto and marked Schedule 35 and constitutes an integral part of this Petition.

65. In his letter of reply dated April 15, 2003, the Director-General of the Labor Authority repeated his position as it had been stated in previous correspondence, referring the Joint Venture to the Ministry of Interior to handle the matter, and did not assist in any respect in solving the problem.

<u>Schedule 36</u> A true copy of the reply of the Director-General of the Labor Authority dated April 15, 2003 is attached hereto and marked Schedule 36 and constitutes an integral part of this Petition.

66. In practice, until this very day, the position of the ministers themselves has not been received and no allocation whatsoever has been granted to ABB for foreign workers for the Nachshonim Project.

Moreover, until the present day, the Labor Authority has not published the list of allocations for 2003 and, therefore, has not granted its decision on ABB's application to receive allocations for 2003 either.

O. <u>Arenson's attempts to recruit Israeli manpower on behalf of the Joint Venture for the works required in the Nachshonim Project</u>

67. It must be emphasized that concurrently with its efforts to resolve the problem of foreign workers vis-a-vis the Respondents, Arenson did everything it could to recruit Israeli workers for the purpose of carrying out the works in the Nachshonim Project.

68. In doing so, Arenson turned on many occasions to the bureau of the Respondent no. 1 in Rosh Haayin in order to recruit and take on 300 Israeli construction workers (150 scaffolders and 150 welders).

69. However, despite the claim by the representatives of the Labor Authority that the grant of employment permits for foreign workers should be disallowed in order to reduce unemployment among Israeli workers, not a single Israeli worker was referred to Arenson for the purpose of the Nachshonim Project.

Furthermore, in a telephone conversation that took place between Mr. Amnon Barkai, the Director of Human Resources at Arenson with the Director of the Labor Authority at Rosh Haayin, following Arenson's application of November 24, 2002, the latter undertook to hold an employment fair for the purpose of recruiting Israeli workers for carrying out the Nachshonim Project.

The Director of the Rosh Haayain Labor Authority repeated this undertaking on June 10, 2003 in another conversation he had with Mr. Amnon Barkai, but such a fair has never taken place.

70. As of the date of the filing of this Petition, despite Arenson's many attempts to recruit Israeli manpower to carry out the Nachshonim Project, it has been unsuccessful in recruiting even a single Israeli worker for the purpose of executing the Project.

Schedule 37 True copies of Arenson's applications to the Labor Authority Bureau for recruiting Israeli workers to carry out the Nachshonim Project are attached hereto and marked Schedule 37 and constitute an integral part of this Petition.

## The legal arguments

**The Respondents are estopped and cannot raise claims pertaining to the very compliance of the Petitioners' application with the legal requirements since they granted their prior agreement to the method of operation which was intended to enable the filing of the application**

71. It is a well-known rule that once a legal question has been determined between litigating parties in a judicial process, the litigating parties or their successors are estopped from re-opening the trial at a later stage. This legal rule has earned the name of "issue estoppel".

For the purpose of applying the rule of issue estoppel, there is no difference between a judgment that was granted with the consent of the litigating parties and a final judgment based on a substantive determination of litigation which took place between the parties, and, in the language of President Shamgar in the matter of C.A. 601/88 Estate of Michael Rodda deceased -v- Varda Shreiber, P.D. 47 (2) 441:

> "The judgment creates - according to the argument - issue estoppel in our case namely, namely, a judgment which confirms the agreement of the parties to the litigation. Naturally, such a judgment is not based on a substantive judicial ruling in a dispute which arose between the parties ... and the fashioning thereof could be affected by various considerations of the litigants that do not necessarily match the solution which the relevant legal rules would have led to. Despite this difference between a judgment by consent and an "ordinary" judgment, the rules of estoppel, in their various branches, may similarly be valid in circumstances in which a dispute by judgment by consent has been settled.... At the basis of this approach lies the consideration of finality of the hearing: once judicial backing has been granted to the parties' consent by way of settling the dispute, there is no longer any room to enable them to go back in time and re-open the contest, otherwise a judgment would have no force in fulfilling the essence for which it is designed, namely - the final settlement of disputes..." (Emphases supplied)
>
> (*ibid.* p. 450)

72. Thus, in order to determine whether, in the issue, the Respondents are estopped from raising claims pertaining to the very compliance of the application to issue 523 visas to ABB against a concurrent reduction of the number of permits which were issued by them for the purpose of the Nachshonim Project in 2002, by Arenson, with the legal requirements, we must first define the understandings and the agreements that were before this Honorable Court when it validated by judgment the procedural arrangement that was reached by the parties on August 7, 2002 within the scope of the hearing of A.P. 582/02.

73. As to the manner in which the extent of the application of the agreed determination between the parties must be determined, President Shamgar, in C.A. 601/88 above, ruled the following:

> "…. In the case before us, the agreed judgment was attained within the scope of proceedings for the grant of a succession order. In such a proceeding, there are no pleadings on the basis of which one can deduce what the "cause of action" is, enabling a conclusion to be reached as to whether there is application for the rule of issue estoppel. **The main factual foundation which can expressly or impliedly express the grounds which were to be heard and determined between the parties are inherent in the circumstances of the case, in the settlement agreement and in the circumstances in which it was made.** Thus, there is room to address the interpretation of the agreement in order to deduce which matters the parties sought to regulate within the scope thereof finally… and what is the extent of the application of the agreed determination regarding the parties' share…. In light of the clear contractual nature of the agreed judgment, it is only natural that the interpretation thereof will be in accordance with the ordinary rules of interpretation that apply to agreements. The basic rule in such a case is embedded in the provision contained in section 25(a) of Contracts (General Part) Law, 5733-1973, which directs that **"A contract is to be interpreted according to the intention of the parties as it is implied from the contract itself, and to the extent it is not implied therefrom - from the circumstances"** (Emphases supplied)
> (*ibid*, pp 450–451)

74. As described above, on August 7, 2002 within the scope of the procedural arrangement in A.P. 582/02, counsel for Arenson and the representative of the State Attorney's office on behalf of the Ministry of Interior and Ministry of Labor and Welfare, reached a procedural arrangement which was validated as a judgment.

Within the scope of the arrangement, the parties agreed to extend the date for filing new applications with the Labor Authority in order to enable ABB to file an application to convert the allocation of 523 foreign workers that had been granted to Arenson for the Nachshonim Project, and the Court thus recommended "with all sincerity" to all the Registrar of Contractors to speedily deal with the application that would be filed with her by ABB to exempt it from registration in the Register of Contractors.

75. **As the transcript of the hearing shows, <u>the sole</u> purpose of the arrangement was to enable the transfer of allocations for the Nachshonim Project from Arenson's name into that of ABB,** as Arenson had suggested, on the conclusion of a protracted hearing, with the assistance of the Honorable Justice Zvi Segal and after receiving the consent of the Director-General of the Labor Authority, Mr. Nizri, and the representative of the Ministry of Interior, Ms. Conforti, who were present at the hearing.

The statements in the transcript of the hearing appear as below, as stated by counsel for Arenson, Advocate Blecher:

> **"After more than three hours of discussion and negotiation both in the presence of the court and out of court, the only application that I seek, subject to which I would be prepared to withdraw the petition without any order as to costs, is as follows:**
> 1. That the Honorable Court recommend to the Registrar of Contractors to deal with an application that would be filed with her by ABB SUSA (which is a partner of the Petitioner in the Nachshonim Project), to receive an exemption from registration in the Register of Contractors by virtue of its not being an Israeli company. We would ask that the recommendation allocate a reasonable time - that we assess to be 14 days, to receive the Registrar's decision. We undertake to file the application with the Registrar of Contractors within 7 days of today.

> 2. As the last date for filing new applications with the Labor Authority has already passed, namely July 28, 2002, in light of what has occurred during the course of the negotiations and the hearing, I seek the recommendation of the court to extend the date for filing an application by ABB SUSA to convert the allocation of 523 workers that was granted to the Petitioner with respect to the Nachshonim Project, by an allocation to ABB SUSA, while at the same time the Petitioner would waive the allocation that was granted to it. I would make it clear that the partnership between the Petitioner and ABB SUSA and the Baran Group is one which has been lawfully registered, <u>and the meaning of the filing of the new application is to alter the path of the allocation from the Petitioner to ABB SUSA</u>. (Emphases supplied)

Advocate Edry, counsel for the Respondents at that hearing, (the Minister of the Interior and the Minister of Labor and Welfare who was then charged with the Labor Authority) granted her consent to extend the date which was required by ABB for the purpose of filing the application; did not express any opposition to the declared method of operation which was intended to pave the way for filing the application by ABB and did not at that time raise any claim to the effect that this was a fiction which did not meet the requirements of the law.

76. A study of the judgment of the Honorable Justice Segal, who approved the procedural arrangement, also indicates the favorable attitude of the Court to a practical solution which had been suggested by Arenson's counsel and that the Honorable Court did not believe that the method suggested was in any way tainted with illegality, as is now being pleaded by the Labor Authority (**whose Director-General was present at the hearing**):

> "1. As agreed above.
>
> 2. As the Registrar of Contractors is not a party to the proceeding I am unable to direct by order the holding of a hearing on ABB SUSA's application (which is similarly not a party to the hearing of the Petition) to receive an exemption from registration in the Register of Contractors. At the same time, due to the essential nature of such a procedure for the purpose of the foregoing additional application which has been agreed on by counsel for the parties, and without such a discussion with the Registrar of Contractors would be impractical, **I recommend with all sincerity** (emphasis in the original!) to the Registrar of Contractors to do everything from her point of view to deal with the application that will be filed, within 30 days of the date it is filed."

It is also to be emphasized - only following this procedural arrangement did Arenson agree to withdraw the Petition that was filed by it in A.P. 582/02 without any order as to costs.

77. However, to the Petitioners' surprise, their application to transfer the allocations for the Nachshonim Project from Arenson's name into that of ABB that was filed according to the particulars of the above procedural arrangement and after ABB was granted the exemption requested from registration in the Registrar of Contractors, was rejected by the Labor Authority on the ground that it was a "fictitious" application which "had no real content" and "was solely designed for the purpose of circumventing the Ministry of the Interior" - **all this completely contrary to all the understandings and agreements which lay at the basis of the agreed judgment of this Honorable Court.**

78. Notwithstanding the clear statements that emerge from the transcript of the hearing and the judgment as cited above, the Director-General of the Labor Authority, in his letter of April 2, 2003, claims that:

> "In our opinion, the only thing that was agreed on was the extension of the date for filing an application by counsel for the Petitioner, Arenson Ltd. This and **nothing else. Nothing was promised with respect to the fate of the handling of the application, if and when this would be filed and with respect to the position of the Authority after it considered the application in substance.**" (Emphases in the original)

**Is this so....????**
**Is this the feigning of innocence, at best, or evil and blatant lack of good faith on the part of the Labor Authority, at worst....???**
**Is it possible that in order to extend the date by a few days (the date passed on July 28, 2002 and the hearing took place on August 7, 2002), the parties needed a discussion of more than three hours and negotiations both in and out of court and with the presence and involvement of the Director-General of the Labor Authority and the representative of the Ministry of the Interior...???**
**And why would the Honorable Court specify in its judgment that it recommended with all sincerity to the Registrar of Contractors to deal with the application that would be filed with her by ABB to receive an exemption from registration in the Registrar of Contractors - if not to pave the way for assigning the allocations from Arenson to ABB???**

79. The truth is that within the framework of the procedural arrangement, the Respondents did not undertake to automatically accept the Petitioners' application.

However, the procedural arrangement and the circumstances in which it was made obligated the Respondents to deal with the application in substance and not to dismiss it out of hand and with the wave of their hand whilst negating the possibility of carrying out the assignment of the allocations lying at the basis thereof, claiming, without any foundation, that the application was "totally fictitious" and was contrary to law and designed to circumvent the procedures of the Ministry of the Interior.

80. And how does this manifest itself? If we assume that the Labor Authority believed, after exercising its independent discretion on the subject in substance, that for the five months that had passed since the allocation was granted to Arenson for the Project until the date on which it was required to deal with ABB's application to assign the allocation, any changes had occurred in the volume of the Project which justified a change in the number of visas that were granted for it, then it is clear that the Labor Authority would not have been prevented or estopped from reaching such a decision on account of the procedural arrangement.

However, once the Respondents gave their consent to the method of operation which was designed in a **declared manner**, to enable ABB to file the application with the Labor Authority, they cannot again argue that the method of operation itself is defective and unlawful.

In this connection the words of the Honorable Justice Dorner in L.A. 4976/00 Piano House -v- Dalia Mor *et al*, P.D. 56 (1) 577, are appropriate:

> "A judgment which grants validity to a settlement that was reached between litigants is characterized by three things. Firstly, it is based on a contract. Secondly, the contract is the fruit of a compromise between litigants in a judicial process. Thirdly, the contract becomes an application by the litigants for a judgment, and this if the Court finds it appropriate and confirms the same. These characteristics do not stand alone, but have ramifications on one another, since the very achieving of a compromise like also the existence of the judicial process as a framework for the conduct of negotiations, secures the contract that was made against claims that could negate the existence of the engagement from the outset - such as the absence of finality of opinion, or against claims which give rise to a claim to rescind the contract such as mistake, misleading, coercion and oppression. Thus, a compromise is based on a mutual waiver of the parties of some of their claims, one against the other. This waiver could give rise to claims against the compromise, the very discussion of which is contrary to the essence thereof which is designed to bring about a complete termination of the dispute and also harms the expectations of the parties in this matter." (Emphases supplied).
> (*ibid*, p. 585).

81. It is proper to point out yet again that the above procedural arrangement, the declared purpose of which was known to all, received the consent of the Director-General of the Labor Authority, Mr. Nizri, and the representative of the Ministry of the Interior, Ms. Conforti, who were present at the hearing, and won the blessing of the Honorable Justice Segal.

It is thus clear that the Employment Office's present claim that the Petitioners' application is "fictitious" and that "it is soley designed to circumvent the Ministry of the Interior" destroys the basis of the procedural arrangement in its entirety, and is totally contrary to the calculated opinion of the parties before it was made, as emerges from the transcript of the hearing.

82. As will be set out below, the grounds of the Labor Authority for rejecting the application are defective by reason of extreme unreasonableness and this, in disregard also of the procedure that took place in A.P. 582/02.

## The refusal of the Labor Authority to issue permits to ABB to employ foreign workers in the Nachshonim Project, against a concurrent reduction of the number of permits that were issued to Arenson, is defective through extreme lack of reasonableness

83. An administrative decision may be disqualified if it is defective by extreme or material unreasonableness.

When the decision of the authority is cancelled in respect of unreasonableness, it will mainly be because the authority has failed in the process of balancing the interests and did not give appropriate weight to the relevant considerations that it weighed up.

And, in the language of the Honorable Justice Barak (as he then was) in H.C. 389/80 Golden Pages Ltd., -v- the Broadcasting Authority *et al*, P.D. 35 (1), 421:

> "In these cases the administrative authority acted in good faith and not in an arbitrary manner, considered the relevant factors and declined to consider irrelevant factors. The main defect that is to be found in its decision is the improper form of balancing between the relevant factors themselves. This is a defect of administrative unreasonableness. A reasonable authority in the administrative authority's position in these examples which gives its opinion in the statutory purpose with which it is faced, would have attributed different weight to the various interests, and the Court disqualified the opinion, only on the ground that such proper weight was not attributed... (Emphases supplied) "
> (*ibid*, p. 446).

84. The decision of the Labor Authority to reject ABB's application out of hand, was grounded on the following arguments:

    a. That the assignment requested had no real content except for the wish to circumvent a reasonable procedure of the Ministry of the Interior which provides that a "full credit" is not to be granted to an employer whose employees have abandoned it, and before they have left the country.

    b. That the Labor Authority, like any public authority, is not entitled to assist in an attempt to circumvent the procedure of the Ministry of the Interior.

    c. That the assignment of the workers requested is totally fictitious since it is solely designed to circumvent the Ministry of the Interior and that being the case, it must be cancelled by virtue of the provisions contained in sections 13 and 61 of the Contracts (General Part) Law, 5733-1973.

    d. That there is no justification "to reconstitute" a permit previously granted but only partially realized by Arenson by determining, in March 2003, that the permit is granted to another company, whatever the relationship between them might be.

    The Petitioners believe that with all due respect and, as will be shown below, each of the grounds for rejecting the application is erroneous and disregards the overall facts, which are relevant, and is defective by its extreme unreasonableness.

85. The purpose of the legislation, procedures and directives that deal with the issue of foreign workers is to provide an appropriate response to the shortage of skilled manpower in specific trades, but this while overseeing the number of foreign workers residing in Israel, in order to secure the State's interest in limiting foreign labor in Israel, while maintaining the dignity of the foreign workers who are brought to Israel.

86. According to the procedure of the Labor Authority for granting work permits to foreign workers in the building trade, dated July 15, 2002, (hereinafter: "**the Labor Authority Procedure**"), the formula for allocating foreign workers in the building trade, as a function of the annual quota fixed by the Government, is set in accordance with the volume of construction being carried out in each and every project. Thus, according to the Labor Authority Procedure, an employer wishing to employ foreign workers for the purpose of a number of projects must file an application with the Labor Authority and detail separately the volume of each project (see, for example, paragraph 12 of the Labor Authority Procedure).

<u>Schedule 38</u> A true copy of the Labor Authority Procedure for granting working permits dated June 2, 2002, (without schedules), is attached hereto and marked Schedule 38 and constitutes an integral part of this Petition.

87. The Labor Authority Procedure also provides (in paragraph 12.2) that a sub-contractor will be allowed to file an application for permits to employ foreign workers for the purpose of a particular project, provided the main contractor declares that he has not received an allocation of foreign workers for the same project, and that he waives any allocation in favour of the sub-contractor registered in the application.

88. The Ministry of the Interior, that is responsible by law for granting visas for the entry and residence of foreign workers into Israel for the purpose of the work, set a procedure of "crediting workers abandoning their employers" (hereinafter: "**the Abandonment Procedure**") within which it was provided that an employer whose worker has abandoned him and has not yet left the country, will be unable to bring into Israel another foreign worker in lieu of the one who has abandoned him. The procedure goes on to provide that the smaller the number of workers who abandon a specific employer is, the percentage of the credits that he will receive will be higher.

89. An examination of these Procedures in light of the overall purpose of the laws dealing with the employment of foreign workers and in light of the facts of the Nachshonim Project and its special circumstances show that acceding to ABB's application will not compromise in any way the laws. The reverse is the case.

90. Firstly it is clear that acceding to the application will not increase the quota of allocations that were granted for the Nachshonim Project, since against the grant of the allocation to ABB, the allocation which was granted to Arenson is correspondingly reduced.

91. Secondly it is clear that in light of the closure of the State's skies to the entry of foreign workers, the assignment of the allocation from Arenson's name to that of ABB, will not cause an increase in the number of foreign workers residing in Israel.

All that the Petitioners seek at this stage is to make use of the permits that were already issued some time ago for the purpose of the Nachshonim Project in order to employ foreign workers in carrying out the Nachshonim Project, out of the reserve of foreign workers who are already in Israel, and in co-operation with the State authorities.

As regards the need to allow the use of permits to employ foreign workers out of the reserve of foreign workers residing in Israel, this Honorable Court in A.P. 738/02 gave its views in examining the Procedure of the Ministry of the Interior in connection with the issue of "abandoning workers":

> "At the same time it seems that a satisfactory solution to some of the problematic issues has yet to be found. Thus, for example, the respondents must give their opinion on the question as to whether it is inappropriate to extent the crediting procedure mentioned in a manner which would enable the employers to fill up all the visas that they received from the respondent no. 2 (the Minister of the Interior - B.B.). **Extending this crediting procedure would not bring with it an increase in the number of foreign workers residing in Israel if, for example, it is provided that the filling up process would be carried out of the reserve of foreign workers existing in Israel in the particular industry.** This solution appears to be consistent with the closed skies policy decided by the Government. Moreover, this solution appears to be fair, not only from the standpoint of the employers but also from the standpoint of the workers... (Emphases supplied - B.B.)."

<u>Schedule 39</u> A true copy of the judgment in A.P. 738/02 of May 26, 2003 is attached hereto and marked Schedule 39 and constitutes an integral part of this Petition.

92. Thirdly, and as explained at length in the chapter dealing with the facts set out above, since, even after the transfer of the allocation from Arenson's name into that of ABB, Arenson will continue to employ foreign workers according to the allocations which were lawfully granted to it in respect of other projects being carried out by it, it is clear that it will be possible to "make with it an account" in all aspects relating to the workers who abandoned it in the past, according to the Abandonment Procedure, without causing a severe blow to the Joint Venture and the Nachshonim Project, for absolutely no reason.

And further it should be remembered: those who abandoned are registered in Arenson's name but abandoned it in other projects which were being carried out by it in the past, even before the Nachshonim Project started, and without any connection to it.

In these circumstances in which it is possible to continue to uphold the Abandonment Procedure in relation to an employer whose employees have abandoned him, even after the transfer of the allocation which was granted to it in respect of a specific project to another person, the proper balance of interests obligates the approval of the application.

93. In addition, the partial use which has been made by the Joint Venture of the allocation which was granted to Arenson for the Nachshonim Project in July 2002, was temporary only, for a few months, until after ABB received the exemption from the Registrar of Contractors, while shortly after receiving the allocation, Arenson declared its wish to transfer the allocation to ABB.

94. Moreover, the decision not to grant ABB permits to employ foreign workers in the Nachshonim Project against a parallel reduction of the number of permits that were granted to Arenson, totally disregards the volume of the Project, its importance, the fact that it is being financed out of American assistance funds and the damage that is being caused to the Petitioners as well as to the Ministry of Defense and the US Army Corps of Engineers, as a result of any delay that will occur in the completion thereof.

95. Already, in light of the lack of ability to bring foreign workers for the Project, the Petitioners have encountered delays in the time schedule of the Nachshonim Project, which could cause them enormous financial damage and which might lead to a delay in the delivery date of the storage base to the IDF.

96. Logic dictates that when weighing the Petitioners' application the Labor Authority ought to have considered all these factors overall and attribute to them substantial weight, and, in the language of the Honorable Justice Barak (as he then was) in H.C. 156/75, <u>Daka -v- Minister of Transport</u>, P.D. 30(b) 94:

> "There could arise circumstances in which an outside consideration was not considered by the ministerial authority and there were brought into account only considerations which are relevant to the matter, although the various considerations will be imputed a weight which in proportion is so distorted between them until the final conclusion reached becomes essentially outlandish and, by reason thereof, totally unreasonable."
>
> (*ibid*, p. 105).

97. This claim becomes even more important in light of what is stated in the tender documentation, which was published in conjunction with the Ministry of Defense whereby the winning contractor will be entitled to bring foreign workers into Israel

from the United States and other countries having diplomatic relations with the State of Israel. It would have been appropriate for such a declaration to have been given genuine weighting otherwise it would merely be constrained by way of lip-service.

## The existence of the administrative directives do not exempt the authority from weighing up the special circumstances of the Petitioners' application

98. The refusal of the Petitioners' application was attributed by the Labor Authority to the policy of the Ministry of the Interior with respect to foreign workers who abandon their Israeli employers, whereby an employer who has employed a foreign worker who has abandoned the employer and his place of work and not lawfully departed Israel, is unable to bring another foreign worker instead of the one who abandoned him, even if he has made every effort to locate such worker and induce his departure from Israel.

99. From the letter of the Director-General of the Labor Authority of April 2, 2003 it appears that the latter treats the directives of the Ministry of the Interior regarding "abandoning" workers as severe norms, which are to be upheld without question, as if they were principal legislation or regulations:

> **"The real and only reason for this application is to circumvent the procedures of the Ministry of the Interior while disregarding the condition imposed by the Ministry - in which case it would be inconceivable that the Authority assist in "an arrangement to circumvent such Procedure".**

100. Basic tenets of Israeli law are that an administrative authority that has set administrative directives, is not exempt from considering each and every case on its merits. The exercise of administrative discretion always applies to a specific case and must take into account the peculiar data and circumstances of that case. In this connection this Honorable Court is referred to the words of the Honorable Justice Heshin in H.C. 540/84 Mustaffa Yosef -v- Director of the Central Prison in Judea and Samaria, P.D. 40 (1) 567:

> **"Where a general policy exists, this does not permit special cases to be disregarded. Each special case must be examined in light of the general policy, with the party exercising authority evaluating whether it is appropriate to exercise the general policy in the circumstances of the particular case".**
>
> (*ibid*, p. 572).

101. And if this is the case with regard to a sovereign authority acting according to its own directives then *a fortiori* with respect to an authority that refuses the request of the citizen on account of internal directives, that have been laid down by another authority.

102. In the case in reference, not only did the Labor Authority not consider the circumstances of the application of the Petitioners, but in the letters of the Director-General of the Labor Authority it appears that the Petitioners' request effectively was not considered at all, because it was an "arrangement to circumvent a procedure" and "unfounded".

103. It is settled caselaw that a directive of itself does not serve as a ground to reject a concrete application to exercise authority. In this respect, this Honorable Court is referred to the words of the Honorable Justice Heshin in H.C. 5537/91 Efratti -v- Ostfeld, P.D. 46(3) 501:

> "And as to all this - it is settled caselaw that has been laid down and accepted that an authority that has acquired discretion is prohibited from rejecting an application which is submitted to it merely on reliance on internal directives that it has set for itself, and it must examine each and every application on its merits, while examining it in light of such directives".
>
> (*ibid*, p. 515).

104. It is appropriate to emphasize that notwithstanding the fact that the Respondent no.1 is pegging its refusal on the position adapted by the Ministry of the Interior, until now the Petitioners have not earned any response from the Ministry of the Interior or the Respondent no. 3 in connection with the application to which this Petition relates.

## Conclusion

105. From everything stated above it emerges that the decision of the Labor Authority to dismiss the Petitioners' application to issue ABB 523 permits to employ foreign workers against a corresponding reduction in the permits issued to Arenson for the purpose of the Nachshonim Project is tainted with extreme unreasonableness, disregards the Petitioners' distress and the national importance of the Nachshonim Project and above all is totally repugnant to the intention and content of the judgment that was handed down by this Honorable Court in A.P. 582/02.

106. Since the jurisdiction to issue permits to employ foreign workers has been transferred from the Labor Authority to the Respondent no. 2, the support unit for granting permits to foreign workers in the Ministry of Industry, Trade and Employment as stated in paragraph 9 above, and in order to validate the order that the Petitioners are seeking from this Honorable Court, the Respondent no. 2 has been joined to this Petition albeit formally, although it has not refused the Petitioners' application.

107. Therefore and given everything stated above, this Honorable Court is petitioned to exercise its power and direct as follows:

(a) Grant an order directing Respondents 2 and 3 to issue to ABB, 523 valid permits to employ foreign workers in the Nachshonim Projects against a corresponding reduction in the number of permits that were issued by them for the purpose of the Project during 2002 to A. Arenson Ltd.

(b) Grant an order directing the Ministry of the Interior to remove its opposition to the assignment of permits requested in sub-paragraph (a) of A. Arenson Ltd., into the name of ABB SUSA Inc., if and to the extent such opposition is still in force.

108. This Petition is supported by the affidavit of Mr. Amnon Barkai, the Director of Manpower at the Petitioner no. 3.

109. It is just and equitable to accede to the Petition sought.

| | | |
|---|---|---|
| Benjamin Baratz, Advocate<br>L.N. 9306 | Yoram Evron, Advocate<br>L.N. 19773 | Danny Dilberry, Advocate<br>L.N. 35553 |

Baratz, Bar-Nathan & Co.
Attornies at-law & Notaries
Counsel for the Petitioners

15.10.06

Benjamin Baratz
Yael Baratz
Zvi Bar-Nathan
Lori Aimouli-Confino*
Barak Luchtenstein
Roni Avni
Yoav Fruchtman
Ram Ephrati
Itta Rubanenko
Tsafi Erlich Goldman
Rakefet Peled
Yoram Evron
Sharon Alster
Eli Belkind
Sagit Shahmoon
Tammar Sheinkin-Japhet
Gil Ashkenazy
Avishai Halfon
Michal Nissani
Merav Baruch
Hadas Geva-Medalia
Ziv Glickman*
Ophir Vaisben
Elad Berougo

*Al... ...r of the New York Bar

ברץ, בר-נתן ושות'
עורכי-דין ונוטריונים

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

Tel-Aviv, March 25, 2003
Ref: 14064-34

DRAFT

Mr. Zvulun Orlev
Minister of Labor and Welfare
Ministry of Labor and Welfare
2 Kaplan St., Building B
Jerusalem

Mr. Abraham Poraz

Minister of Interior
Ministry of Interior
2 Kaplan St.
Jerusalem

Mr. Shaul Mofaz

Minister of Defense
Ministry of Defense
Kaplan St.
Tel Aviv

Dear Ministers,

**Re: The Establishment of a Military Base in Nachshonim Financed by the US-**
**Urgent Request for Assistance in Implementing the Permit For the Employment of Foreign Workers**

On behalf of the joint venture, engaged in the construction of the

Commercial Department
Tel: +972-3-6073757
Fax: +972-3-6962262

Israel
1 Azrieli Center
Round Tower, 18th floor
Tel-Aviv 67021, Israel
Tel: +972-3-6073777
Fax: +972-3-6073778
E-mail: office@bar-law.com

Romania
Baratz & Associates
57 Romulus Street
Sector 3
Bucharest
Romania
Telefax: +4021 3253996/7
E-mail: st.ghemes@bar-law.ro

**EXHIBIT 55**

Nachshonim military base, which includes the American Company ABB SUSA Inc. and the Israeli companies A. Arenson Ltd. and the Baran Group Ltd. (the "**Joint Venture**"), we hereby respectfully address the following to you:

**Introduction**:

1. For some time now the Joint Venture has been unsuccessfully attempting to import foreign workers into Israel. Most of these workers possess special skills that are not available and are needed for the erection of a security project of national importance (the "**Project**"), fully financed by the government of the United States.

2. On July 3, 2002 the Labor Authority (the "**LA**") allocated 523 TCN permits for the Project, within the framework of annual allocations for the construction sector for 2002.

3. However, due to the diverse bureaucratic hurdles that the Joint Venture encountered, as described below, it had been impossible for the Joint Venture to import the foreign labor required in order to execute the Project as allocated to the Joint Venture for 2002.

4. Although all the relevant authorities are aware of the national importance of this Project and its extraordinary dimensions, the allocation of foreign workers for the Project could not be implemented and the Joint Venture is unable to solve the terrible shortfall it is experiencing.

5. Therefore, the Joint Venture has no alternative other than to kindly address Your Excellencies with a request, to exert the full weight of your influence, in order to assist in solving this bureaucratic obstacle, in order to avoid any additional delays in the completion of this essential project.

**General Background:**

6. On December 31 2000, as part of the implementation of the Wye River Accords, the USA Corps of Engineers (the **USACE**") published an international tender, in cooperation with the Israeli Ministry of Defense (the "**MOD**"), for the construction of a large military base for dry storage in Nachshonim.

7. The Project is managed by the USACE and is fully financed by American aid funds, approved by the US Congress.

8. On June 5 2001, the Joint Venture was awarded the construction contract, having an estimated value of US$ 125 million, and the contract was signed on July 20, 2001.

9. This is a huge Project that is essential in national terms. The Project extends over an area of approximately 1600 square kilometers. The Joint Venture is expected to execute, at the order of the USACE and for the IDF, very sophisticated work within an extremely limited time, with the aim of completing the Project and handing it over to the IDF during the course of 2004.

10. In order to execute this Project, the Joint Venture is requested, inter alia, to execute extensive earthwork, which includes excavating ~~to the depth of~~ 2,600,000 meters and filling 1,800,000 meters. The infrastructure work includes paving 29 kilometers of roads and construction work, encompassing 200 buildings and storage huts for tanks and armored carriers, having a total area of about 227,000 meters.

11. In signing the contract with the USACE, the Joint Venture assumed substantial obligations. These obligations include meeting a very tight time frame for the execution of the Project, based on the assumption that the Joint Venture would be able to import foreign workers to carry out a major portion of the work.

12. The USACE and the MOD anticipated the need for foreign workers and included clauses in the tender, requesting the bidders to propose a "Third Country National" or "TCN" Plan to form part of the proposal.

13. It is noteworthy that, due to the complexity of this unique Project, there is a need for specially skilled workers in order to execute a substantial part of the work. These can not be found among construction workers in Israel at this time (whether local or foreign).

14. The Joint Venture commenced the work ~~at the end of~~ 2001. Although this Project is essential in national terms, having been commissioned by the USACE and fully financed by the US, ever since the government's policy changed in 2001 with respect to the import of foreign labor, the Joint Venture cannot import the labor required for the execution of Project.

15. A short time after the award, the Joint Venture began recruiting specially skilled foreign workers for carrying out the Project. Since, at the time, A. Arenson Ltd. ("**Arenson**") was the only partner that was registered with the Israeli Registrar of Contractors, it was agreed among the Joint Venture's members, that Arenson would act vis-a-vis the relevant authorities, to process the allocation of foreign workers for the Project. Prior to the time that the Joint Venture was awarded the contract, Arenson employed foreign workers for its various projects on a large scale, including for the Ben Gurion 2000 Airport Project, the Foreign Ministry Building in Jerusalem, an

office building and a power station for the Israeli Electric Company. and more.

**Arenson's Attempts. On Behalf of the Joint Venture to Bring In Foreign Workers**

16. On January 22. 2002. Arenson applied to the LA asking for allocations for the Project for the year 2002. In its letter to the LA dated January 24, 2002. Arenson asked to treat the Project as a national project of the highest priority. and to approve the necessary allocation as soon as possible.

17. In parallel. the relevant officials at the MOD also addressed the LA. and a meeting was held on January 27. 2002, at which the LA's Deputy General Manager participated. The purpose of the meeting was to obtain the immediate approval of the authorities for the granting of visas to foreign workers for the Project. while stressing the national importance of the matter.

18. In consequence of the Government's decision of December 24, 2001, according to which the maximum annual amount of permits granted in the construction industry for 2002 would be for 45,000 foreigners, and due to the decision of Mr. Shlomo Benizri, the former Minister of Labor, of January 1, 2002, according to which as of that day the entrance of new foreign labor into Israel would be prohibited, Arenson was not successful in obtaining the said permits for the Project, despite the specific provisions of the tender in this regard.

> It is worth noting that in June 2002, the Ministers' Committee with respect to foreign workers, decided to decrease the number of foreign workers working in the construction industry from 45,000 workers to a mere 30,000.

19. During the first half of 2002, Arenson waited for the LA to publicize its decision regarding allocations of foreign workers for the year 2002 as did the rest of the contractors in Israel.

20. On June 10, 2002, when Arenson saws that the LA had not published its decision regarding the allocations for 2002, and the Ministry of Interior (the "**MOI**") prohibited Arenson from importing labor on the basis of the permits allocated for 2001, Arenson filed an administrative action to the Israeli Court of Administrative Matters in Jerusalem (File Number 582/02) against the Ministry of Labor and Welfare (the "**MOL**") and the MOI (the "**Motion**"). By this Motion. the court was requested to pronounce Minister Benizri's aforementioned decision of January 1. 2002 as void. Furthermore, Arenson petitioned the court to order the ministers to allow the entry into Israel of foreign workers, in

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

accordance with the permits granted to Arenson by the LA in 2001.

21. On July 3 2002, while the motion was still pending, the MOL published its list of the allocations for the year 2002. Arenson was allocated 784 permits, 523 of which were dedicated to the Project. However, when Arenson attempted to utilize the 523 permits and to have visas issued by the MOI, it evolved that implementation was not possible, due to the problem posed by "deserting" foreign workers.

22. By way of explanation, its been a while now that many contractors in Israel, including Arenson, have been suffering from "deserting" foreign workers. The workers entering into Israel by law, in accordance with the work permits granted at the request of the employer (contractor), have been "deserting" their work place in order to allegedly work illegally for other employers. According to the prevailing policy at the MOI and the MOL, an employer who hired foreign workers who "deserted" their work place but did not leave Israel, may not bring in another worker in his stead. This is true even if the employer made all possible efforts to locate the employee and to get him exiled. On the other hand, as per this same policy, an employer who hired a foreign worker who chose to quit his job and leave the country, for any reason, would be able to receive a "credit" for that same employee, and to bring another employee in his stead.

23. As per Arenson's records, as of January 1, 2002 and prior to requesting the permits for the Joint Venture, Arenson had 498 employees registered in its name, working on other projects, who had deserted between April 1, 1999 and January 1, 2002. Moreover, Arenson had 47 additional employees registered in its name, who had exited Israel during such time period but for some reason Arenson had not received any "credit" for them.

24. At the beginning of July 2002, at the time that the allocations for 2002 were granted, 485 foreign workers actually worked for Arenson at all of its construction sites. As per the MOI's records, however, Arenson also had 506 registered "deserting" workers that were viewed by the MOI as employees of Arenson for all intents and purposes. As per the MOI's method of calculation, Arenson was employing 991 foreign workers at that time (i.e. 485 workers actually on the job plus 506 registered workers who "deserted" Arenson), while its allocation for 2002 stood at only 784 foreign workers.

25. Thus, as per the MOI's position, not only was Arenson prohibited from importing additional employees in 2002, but was also obligated to ensure the repatriation of 207 foreign employees (out of the 485 that were working for Arenson at that time).

26. As a result of the fact that a few hundred foreign workers who were imported into the country by Arenson during 1999-2001. without any connection with the Nachshonim Project. had deserted their work place. Arenson could not process the allocation of 523 permits for the Joint Venture as approved for the year 2002.

**The Attempt to Transfer the Allocation from Arenson to ABB Susa:**

27. In order for the Nachshonim Project and the Joint Venture not to be "penalized" due to the fact that the foreign workers deserted Arenson. Arenson suggested to transfer the approved allocations for the Project to ABB SUSA. ABB SUSA had never executed work in Israel previously.

28. In order to execute the transfer of the allocated permits, the Joint Venture had to overcome two additional bureaucratic hurdles. The first was that the deadline for submitting requests for 2002 allocations had expired. The second was that ABB SUSA, as a foreign company, had to obtain an exemption from being registered as a registered contractor with the Israeli Registrar of Contractors, since by law, only a registered contractor or an entity exempt from such registration could file for an allocation of foreign workers.

29. On August 7, 2002 at the hearing of Arenson's Motion that was held at the District Court in Jerusalem acting as the Court for Administrative matters, Arenson's suggestion fell on receptive ears and with the assistance of the Honorable Justice Zvi Segal, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the Ministries reached an understanding with the aim of facilitating the transfer of the allocations from Arenson to ABB SUSA. This understanding was approved by LA's Deputy General Manager, Mr. Nazri and the representative of the MOI, Mrs. Conforty, who were present at the hearing. Within the framework of this understanding, which received the status of a judgement handed down by the court, the timetable for the filing of a new application to the LA, to enable ABB SUSA to submit a request to transfer the said allocations from Arenson to itself, was extended, with the LA undertaking to consider such application within 21 days. The counsel also recommended to the Registrar of Contractors to process ABB SUSA's application for an exemption expediously

30. On September 2. 2002 ABB SUSA filed an urgent application for an exemption from registering as a registered contractor with the Israeli Registrar of Contractors, based on Article 14a to the Registration of Contractors Law of 1969.

31. The processing of ABB SUSA's request lasted almost four months. On December 26, 2002 the former Minister of Construction and Housing, Mr. Natan Sharansky, finally granted the exemption.

32. In parallel, in December 2002, ABB SUSA submitted a request for allocations to the LA branch located in the city of Afula.

33. On February 25, 2003, as no allocations had been made for the Project, Arenson appealed to the Managing Director of the LA with a request that he intervene and transfer to ABB SUSA the 523 allocations from Arenson for 2002.

34. On March 9, 2003, as no response was received to said request, Arenson and ABB SUSA addressed the Managing Director of the LA once again, and requested him to transfer the 523 allocations for 2002 to ABB SUSA.

35. On March 11 2003, **to the complete surprise of the Joint Venture, and in contrast to all the understandings reached within the framework of the Court's decision of August 7, 2002, which was approved by LA's Deputy Managing Director, the MOI's representative and the representative of the Attorney General**. The LA's Legal Advisor, Attorney Matetyahu Tal, advised that the LA had turned down the transfer request. Attorney Tal was of the position that the request is baseless and is aimed at bypassing the MOI's procedures. Furthermore, as per attorney Tal, the aforementioned transfer of the allocated permits is "completely fictious" (this is an accurate quote), since it is aimed at bypassing the MOI. In light of the foregoing, Attorney Tal believes that the applicants should address the officials at the MOI and convince them that the unusual circumstances of this case justify deviation from the procedures, so that Arenson is "credited" with the full allocation for 2002.

36. Attorney Tal's letter brings the Joint Venture back to square one, by inviting the Joint Venture to continue the long journey through the Israeli Bureaucracy, as though such a huge and important national project could be built by way of correspondence and legal proceedings vis-a-vis the authorities.

37. It is noteworthy that the "appropriate way" described by Attorney Tal, had been long tried by Arenson, but without success. Since this approach failed, Arenson filed another motion to the District Court in Jerusalem on August 21, 2002, and this time focusing upon the MOI's procedures and its refusal to grant "credit" for the deserting workers. To date, this motion is still pending.

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

## The Urgent Interference Requested

38. As described above. the Joint Venture began executing the Project a year and a half ago, and has not yet succeeded in the import of the essential and skilled laborers required for this Project. This may cause major delays in the timeframe of the Project.

39. This Project is of national priority, and it is fully financed by American aid. The Project is administered by the USACE.

40. Due to the Israeli bureaucracy, an absurd situation has been created. whereby delays in the Project timetable will increase the cost of the Project to the American taxpayer. whose sole "sin" was to provide assistance to the State of Israel.

41. We would like to stress that the authorized authority, meaning the LA. had already approved the allocation of 523 permits for 2002. These permits have not been exercised to date.

42. The Joint Venture does not know when the LA will determine the allocation of foreign workers for 2003, but given the pace so far (a quick reminder: the permits for 2002 were officially allocated in July 2002). the Joint Venture cannot continue waiting for this allocation.

Furthermore, the Joint Venture fears that even after the allocation of the 2003 permits, the MOI will not provide the necessary visas, due to the new "closed sky" policy which was announced and which bars the entrance of foreign workers.
We would like to take this opportunity to mention again, that due to the nature of this Project, most of the workers that are needed have special skills that, unfortunately, do not exist in Israel at this time.

43. Therefore, and in light of all the foregoing, we are urgently addressing you with a request to you to authorize and order the immediate allocation of 523 permits to ABB SUSA, while deducting same from Arenson's allocation for 2002, and to allow the entry of these workers or other workers for the Project.

44. For the sake of good order, we hereby attach to this letter Arenson's consent to the aforementioned transfer.

45. We would be pleased to provide you with any additional information you may request.

Sincerely.

Benjamin Baratz, Adv

cc: Adv. Dov Weissglass, Prime Minister's Office

**Appendices:**

1. The first page of the tender.
2. The announcement of award dated June 5. 2001.
3. The USACE's approval. dated August 29. 2001. regarding the scope of work for the Project.
4. The approval of the Construction Diovision of the MOD. dated August 29. 2001, with respect to the scope of work for the Project.
5. A request to allocate foreign workers for the Project for the year 2002.
6. Arenson's letter to the LA, dated January 24, 2002.
7. The letter sent by the MOD's representative to the LA's Managing Director, dated January 13, 2002.
8. The letter sent by MOD's representative to the LA's Deputy Managing Director, dated January 30, 2002.
9. A copy of the Administrative Motion (File No. 582/02), dated June 10, 2002 (without annexes).
10. A list of foreign workers who were employed by Arenson, but not "credited", as of January 1, 2002.
11. A permit granted to Arenson with respect to employing foreign workers in the Construction Sector in 2002, dated July 3, 2002.
12. The Jerusalem District Court's decision, dated August 7, 2002 (File No. 582/02).
13. The exemption provided by Minister of Construction and Housing to ABB SUSA, with respect to the registration with the Israeli Registrar of Contractors, dated December 26, 2002.
14. A request filed by ABB SUSA to the LA, to allocate foreign workers.
15. A letter sent by Arenson to LA's General Manager, dated February 25, 2003.
16. A letter sent by Attorney Krispin to LA's General Manager, dated March 9, 2003.
17. A letter written by Attorney Matityahu Tal, dated March 11, 2003.

*BGB-PPC SYS SYSOLD DOC Office1 14064-34 let Letter to ministers-logo*