**No. 05-114C**
**(Consolidated with Case Nos.**
**04-1719C, 05-1172C, and 06-49C)**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**A.A.B JOINT VENTURE**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**APPENDIX PART 2**

---

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP
NACHSHONIM STORAGE BASE, ELAD

א. א. ב. - יזם משותף
אבב - סוסה/ א. ארנסון/ קבוצת ברן
פרוייקט בסיס אחסון נחשונים, אלעד

01 May 2002

Ref. USACE/02-0125

**DISTRIBUTION**

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CH DESIGN ENG | | |
| SITE MGR | | ✓ |
| ADMIN MGR | | |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BAREN | | ✓ |
| ABB.N.J. OFFICE | | ✓ |
| | | |
| | | |
| | | |
| SUBJECT FILE | 15o5 | |

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

RE: DACA90-01-C-0043
NACHSHONIM STORAGE BASE

**SUBJECT: TCN Labor Shortage**

Dear Sir,

The AAB Joint Venture bid this project on having the ability to import Third Country National (TCN) labor to perform the majority of the work. As you are aware, the Ministry of Labor and Interior have, since last November, put a hold on any visas and ability to import labor into Israel.

A month ago we had a lead on 100 TCNs for the project. Now that we have need for labor, this group has been absorbed into other projects or has re-patriated to their home country. Recently, 11 laborers were assigned to this project and only one showed for work. The following work has been affected and delayed by our inability to find labor:

1. Start work on 4 lots, #67-A9, #67-A10, #67-A13 and #67-A18

   Pile caps

   Lean concrete

   Waterproofing

   Protective concrete

   Underdrains

2. Production on 50% of remaining culvert (280M). We have formwork to produce 24 meters a day and have enough labor for only 12 meters per day.
3. Start work on wall concrete for DSBs #56-A7, #56-A8 and #56-A16
4. Start work on precast stairs and bumpers
5. Underdrains in 3 lots in Segment #56
6. Piling rig is back to work and the JV cannot supply enough labor for steel cage fabrication and casting pile.

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקסי: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL). TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: השיטה 5, פארק התעשייה קיסריה טל. 04-6231111 פקס 04-6230230
J.V.office: 5 HASHITA ST. CEASAREA INDUSTRIAL PARK (ISRAEL) 38900 P.O.B 3566, TEL 972-4-6231111 FAX 972-4-623023

**ATTACHMENT**
**H**

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

**א. א. ב. - יזם משותף**
אבב – סוטה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE. ELAD
פרוייקט בסיס אחסון נחשונים, אלעד

The JV appreciates the cooperation of the COE and MOD in allowing labor, already in Israel, to participate on this project. Due to import restrictions, this labor is not sufficient to sustain the demanding present and future project schedule.

In accordance with Contract Clauses, Section 00700-33, FAR 52.243-4, Changes, Contractor reserves its rights for an equitable adjustment for additional costs and time of project completion due to past, present and future restrictions on importing labor.

Sincerely,

S. Denison Keeney
Project Director

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקסי: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL). TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: השיטה 5, פארק התעשיות קיסריה טל. 04-6231111 פקס 04-6230230
J.V.office: 5 HASHITA ST. CEASAREA INDUSTRIAL PARK (ISRAEL) 38900 P.O.B 3566. TEL 972-4-6231111 FAX 972-4-6230230

A.A.B JOINT VENTURE
ABB SUSA\ A. ARENSON\ BARAN GROUP
NACHSHONIM STORAGE BASE, ELAD

א.א.ב. - יזם משותף
אבב – סוסה/ א. ארנסון/ קבוצת ברן
פרוייקט בסיס אחסון נחשונים, אלעד

27 October 2002 Ref. USACE/02-0214

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

RE: DACA90-01-C-0043
NACHSHONIM STORAGE BASE

**SUBJECT: TCN Labor Delays**

Dear Sir,

Attached per your request, please find critical path analysis for project delays due to lack of ability to import TCN labor.

Sincerely,

S. Denison Keeney
Project Director

# ATTACHMENT
# I

DISTRIBUTION

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CH DESIGN ENG | | |
| SITE MGR | | |
| ADMIN MGR | | |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BARAN | | ✓ |
| ABB.N.J. OFFICE | | ✓ |
| | | |
| | | |
| | | |
| SUBJECT FILE | 15406 | |

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקסי: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL), TEL 972-3-933-1473 FAX 972-3-933-1366

## Time Extension

**This analysis is prepared for a claim of Time Extension due to lack of TCN Labor.**

The construction of DSB's, 127 buildings, has always been considered the critical works in the NAS (Network Analysis System). The critical path starts specifically from the construction of DSB walls, erection of spatial frames, installation of insulated panels and sealing of the buildings.

This analysis focuses only on the months where the construction of DSB walls are considered critical, that is the months of May, June and July 2002. From August 2002, the erection of the pilot spatial frame became the most critical activity in the schedule. Based on the May 2002 revised Baseline Schedule, the erection of spatial frame was scheduled from 24 July to 13 August 2002. The revision of the Baseline Schedule was made due to the additional time granted up to 31 March 2002 by the COE totaling 40 days due to weather delays.

The table below shows the history of accomplishment and status of the project when construction of DSB walls was in progress.

Progress Status Table

| Item | Months | | | | Remarks |
|---|---|---|---|---|---|
| | May | June | July | Aug | |
| Planned Progress | 21.75% | 21.26% | 22.96% | 24.68% | |
| Actual Progress | 19.52% | 20.74% | 22.09% | 23.82% | |
| Variance | -2.23% | -0.52% | -0.87% | -0.86% | |
| Cumulative Time extension granted | 40 | 40 | 40 | 40 | |
| Slippage (days) | 0 | (14) | (9) | (22) | |
| Planned Concrete Volume | 1,473 | 2,697 | 5,030 | 5,472 | |
| Actual Concrete Volume | 1,202 | 1,780 | 3,517 | 5,119 | |
| Variance | (271) | (917) | (1,513) | (353) | |
| Planned Manpower | 53 | 64 | 127 | 129 | |
| Actual Manpower | 47 | 50 | 70 | 82 | |
| Variance | (6) | (14) | (57) | (47) | |
| Actual Man-hours | 10,475 | 13,310 | 17,922 | 20,741 | |
| Production Rate (hr/m³) | 8.71 | 7.48 | 5.10 | 4.05 | |

Manpower and man-hours pertain only to the construction of DSB.

The granting of additional time due to weather delays zeroed the slippage in May 2002. The slippage in June 2002 was due to lack of labor and the recovery of the slippage in July 2002 was due to the additional manpower. The slippage in August 2002 was mainly due to the delay in the erection of spatial frame for Pilot DSB, but concrete works continues to recover.

Construction of DSB walls started 16 April 2002 with only one building, although there was already four sets wall forms available on site. This is due to lack of TCN manpower. The four sets wall forms were fully utilized only from May 2002, but at a reduced rate due to lack of labor.

In reference to the attached "DSB Buildings Formworks Utilization" schedule, the planned duration for construction of DSB "A" walls is 24 days per building. With four wall forms available, the completed buildings



3/6

should have been at least 20 at the end of July 2002 and not 16 buildings as actually completed, 10 in Lot 56 and 6 in Lot 67. See attached Concrete Accomplishment schedule updated as of 30 July 2002.

Two additional sets of wall forms for DSB D, E, F, G & L were delivered in May 2002, however they were not utilized because of the difficulty in mobilizing additional TCN labor. These additional wall forms should have also completed at least two buildings.

To compensate the foreseen delay in the DSB D-G & L, the available four wall forms for DSB "A" were planned to be in full utilization. To do this, additional hours were required, meaning additional manpower or additional overtime hours. Workers have been working an average of 12 hours per day as recorded in the attached Daily Time Reports. The optimization of the manpower was the result of 16 buildings completed as stated above. In the above table, the additional 20 workers shown in July 2002 recovered 5 days from the 14 days delay in June 2002. Nevertheless, this additional manpower was not all directly involved in the construction of DSB walls.

With the facts outlined above, the equivalent number of days can be calculated proportionately to the volume of concrete that were not attained.

$$\text{Equivalent Number of Days} = \frac{\text{(Total concrete variance)(Productivity Rate)}}{\text{(Working hours/day)(Current Manpower)}}$$

Where;

- Total concrete variance = 271 + 917 + 1,513
  = 2,701 $m^3$
- Productivity Rate (Average for 3 months) = $\frac{\text{Total man-hours spent for 3 months}}{\text{Total volume achieved for 3 months}}$
  = $\frac{10{,}475 + 13{,}310 + 17{,}922}{1{,}202 + 1{,}780 + 3{,}517}$
  = $\frac{41{,}707\text{hrs}}{6{,}499\text{m}^3}$
  = 6.42hrs/$m^3$
- Working Hours = Regular working hours is 10 hrs a day
- Current Manpower = 84 men

Thus,

$$\text{Equivalent Number of Days} = \frac{(2{,}701\text{m}^3)(6.42\text{hr/m}^3)}{(10\text{hrs/man-day})(70\text{ men})}$$

= 25 working days + 4 non-working days

= 29 calendar days

**In view of this, a total 29 calendar days can be claimed as Time Extension due to the lack of TCN manpower for the months from May to August 2002.**

**A.A.B.. JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP
NACHSHONIM STORAGE BASE, ELAD

**א.א.ב. - מיזם משותף**
אבב – סוסה/ א. ארנסון/ קבוצת ברן
פרוייקט בסיס אחסון נחשונים, אלעד

11 November 2002

Ref. USACE/02-0223

**DISTRIBUTION**

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CH DESIGN ENG | | |
| SITE MGR | | |
| ADMIN MGR | | |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BARAN | | ✓ |
| ABB.M.J. OFFICE | | ✓ |
| | | |
| | | |
| SUBJECT FILE | 11.03 | |

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

RE: DACA90-01-C-0043
NACHSHONIM STORAGE BASE

**SUBJECT: TCN Labor**

Dear Sir,

In response to the request for an up-to-date status of past and present efforts to obtain a Block Visa to import new TCN Labor, the Contractor offers the following:

All efforts exerted to date by the Contractor to import new TCN labor from abroad have been unsuccessful.

Following is a narrative on how the whole issue of TCN Labor evolved from the beginning of the project:

| Date | Subject |
|---|---|
| 29 August 01 | Letter from COE confirming scope of work of the Contract |
| 06 September 01 | Letter from MOD to MOL transmitting copy of above COE letter and requesting MOL assistance to supply a labor license (i.e. Block Visa) to the Contractor. |
| 24 September 01 | Contractor submitted application to MOL for 150 additional TCN's with above letters attached in support of the application. |
| Oct/Nov 01 | Ministry of Labor employees on strike from 16 October to 29 November. No action taken on Contractor's request for Block Visa for 150 TCN's. |

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקס: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL), TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: חשיטה 5, רק התעשייה קיסריה טל. 04-6231111 פקס 04-6230230

**ATTACHMENT J**

| | |
|---|---|
| 24 January 02 | Contractor submitted Application to MOL for 750 TCN Labor for the year 2002. |
| 14 February 02 | MOD informed Contractor that Ministry of Labor personnel went on strike again. |
| 01 May 02 | Contractor wrote letter to COE (Ref. No. 02-0125) regarding negative impact to schedule due to shortage of TCN Labor. |
| 22 May 02 | MOL informed Contractor that they would extend existing visas for TCN's already in country. |
| 06 June 02 | COE responded to Contractor's letter Ref. 02-0125 of 01 May. |
| 10 June 02 | A. ARENSON Ltd. filed lawsuits against MOL and MOI over inability to import Foreign Labor. |
| 03 July 02 | Contractor received list of Block Visas issued by MOL to various companies for 26,827 slots, including 5 for ABB SUSA and 784 to A. ARENSON Ltd. Subsequent inquiry to MOL revealed that 539 of the 784 slots are specific to Nachshonim.<br><br>The problem remains that MOI will not allow import of new TCN's until "proof" that every effort has been exhausted to employ TCN's presently in country. |
| 28 August 02 | Contractor received indication from unofficial source that the Block Visa for 539 slots, specific to Nachshonim, could be transferred from ARENSON to ABB SUSA. This would require ABB SUSA to register as a foreign Company in Israel. Registration formalities were promptly initiated and a Registration Certificate, issued by the Companies' Registrar, was received on 18 September. |
| 18 September 02 | 5 Chinese Labors assigned to Barashi ran off the job after only a few days; "work too hard!" |
| 03 October 02 | Prime Minister Sharon declared immediate moratorium on all imports of foreign workers until the end of 2003. |
| 10 October 02 | Contractor submitted to COE (letter Ref.No. 02-0208) a request from a Subcontractor to employ 24 Palestinians on the Nachshonim Project. |

**A.A.B.. JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

א. א. ב. - מיזם משותף
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD

פרוייקט בסיס אחסון נחשונים, אלעד

| | |
|---|---|
| 22 October 02 | COE replied to above Contractor's letter advising that the request had been passed to MOD & IDF however, no favorable response anticipated. |
| 05 November 02 | Avie Arenson wrote to Major General Amos Yaron as a follow-up to the above 2 letters. |
| Other Enclosure: | Memorandum prepared by Baratz Law Firm titled "Third Country Nationals ("foreign workers")- Review of the Governmental approach and current status. |

Sincerely,

S. Denison Keeney
Project Director

משרד האתר: ת"ד 37, ראש העין, טל: 03-933-1473 פקסי: 03-933-1366
J.V.office: P.O.Box 37, Rosh HaAiyn 68100 (ISRAEL), TEL 972-3-933-1473 FAX 972-3-933-1366
משרד העסקה: השיטה 5, רק התעשייה קיסריה טל. 04-6231111 פקס 04-6230230

# A.A.B. Jc:.:t Venture

ABB SUSA Inc./A.ARENSO:: Ltd./BARAN GROUP Ltd.

NACHSHONIM STORAGE BA: : PROJECT, ELAD, ISRAEL

**Manpower Requirements vs. Availability**

**Talking Points for Meeting in Wiesbaden, March 5, 2003.**

## CONSTRUCTION SCHEDULES

- ORIGINAL BASELINE AND MANPOWER SCHEDULE

The original manpower schedule was prepared in accordance to the Network Analysis System (NAS) Baseline Schedule, with a project completion of 18 June 2004. The schedule was cost and resource loaded based on the bid quantities and price. Man-hours were calculated using "base standard productivity" data gathered.

The original schedule **(see Attachment 1)**, shows a peak with an average progress of 5~6% from January through July 2003 and manpower peaking from January 2003 through August 2003 with an average of 1,130 workers **(see Attachment 2)**. The concrete crews peak March through May 2003, but start to increase in September 2002. This was due to the Contract restriction for DSB concrete work not to proceed until performing 2 successful pressure tests in the Pilot DSB.

By the end of April 2002, the project had fallen **4.13%** behind schedule, mainly due to adverse weather conditions and a shortage of manpower for earthworks. Earthwork subcontractors mobilized 145 workers against the required 229 workers, only 63% of the planned workforce.

- REVISED SCHEDULE

On 08 March and 20 May 2002, the COE issued a cumulative time extension of 40 days due to adverse weather conditions during the months of December 2001 through April 2002. On 31 May 2002, the COE issued a change order officially recognizing the 13 December 01 agreement to allow DSB concrete work to proceed before testing the Pilot DSB. A revised schedule was submitted in May 2002 update, reflecting these two parameters, with a new completion date of 28 July 2004 **(see Attachment 3)**, together with a revised manpower schedule. Starting in May 02, the concrete manpower requirement increased to 127 for July-September 2002, 230 for October-December 2003 and 270 for January-February 2003 **(see Attachment 4)**. This required manpower was never attained, due to the Israeli Government's restrictions placed on importing foreign workers, or third country nationals (TCNs), after the contract was awarded and construction was under way.

From month to month, the contractor's inability to import TCN labor for site development and concrete works continues to contribute to delays in project execution. Construction of DSB walls started 16 April 2002 with only one building, even though there were four sets of wall forms available on site. Due to lack of TCN manpower, the four sets of wall forms were not fully utilized until the end of May 2002.

At the end of July 2002, walls were complete in 16 buildings (10 Seg. 56 and 6 in Seg. 67) versus 20 buildings planned. Two additional sets of wall forms for DSB Types D, E, F, G & L were delivered in May 2002, however they were not utilized due to shortage of TCN labor.

In an attempt to recover from the delay in starting walls in DSB D, E, F, G & L, the work day for available labor was increased to 12-13 hours, maximizing the utilization of the four DSB "A" forms.



**ATTACHMENT K**

**A.A.'3. Joint Venture**

**ABB SUSA Inc./A.ARENSON Ltd./BARAN GROUP Ltd.**

**NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL**

**Manpower Requirements vs. Availability**

**Talking Points for Meeting in Wiesbaden, March 5, 2003.**

Concrete construction in Segment 10 started in August 2002. Although the building works in Segment 10 was not then on the critical path, additional manpower was still required to perform per the schedule.

- RECOVERY SCHEDULE

During the month of December 2002, the project recorded a delay of **2.68%**, mainly due to adverse weather shutting down the project site for 5 days, and to the shortage of labor. By January 2003, the project delay increased by **1.41%**, totaling **4.09%** to date, due to additional adverse weather, a quarry strike and shortage of manpower.

A recovery schedule (**see Attachment 5**) was submitted in the January 2003 update to recoup the delay of about 4 months from the original schedule (17 October 2004 completion date as of December 2002 update). Some details of the recovery schedule include:

1. General Earthworks

- Complete excavation and lot preparation for Segment 23 by February 2003
- Complete excavation and lot preparation for Segment 11 by March 2003
- Complete excavation and lot preparation for Segment 91 by March 2003

Due to the change in priority from spatial frame to conventional steel roof erection, 15 buildings in Segment 23 and 12 buildings in Segment 11 became the new critical path.

2. Pilot DSB (56A8)

Electro-Mechanical works, building completion and systems are in progress. First pressure test was done on 23 January 2003. The second and final pressure test will occur in early March 03 on the complete envelope (specific COE requirement), including CSF, flashing and all systems.

3. Critical Path

The recovery schedule shows that there are two critical paths.

The first critical path starts with concrete work for conventional frame structure, allowing an early start installing insulated panels for these types of buildings. Conventional frame buildings in Segment 23 became critical, but limited only to two building types (E4 and F4), due to different size wall forms. Concrete work is followed by conventional steel erection, insulated panels, two pressure tests and finally testing and commissioning.

The second critical path is the development and acceleration of the spatial frame erection, followed by spatial frame insulated panels, two pressure tests and finally testing and commissioning.

Of the two critical paths, the most critical from the labor standpoint is the spatial frame erection that is heavily dependent on highly skilled and experienced foreign workers. Any delay in the activity of spatial frames will directly affect the completion of the project.

# A.A.B. Joint Venture

ABB SUSA Inc./A.ARENSON Ltd./BARAN GROUP Ltd.

NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL

Manpower Requirements vs. Availability

Talking Points for Meeting in Wiesbaden, March 5, 2003.

4. Concrete Works

DSB concrete walls are scheduled to be complete in December 2003 with 5 sets of wall forms working in parallel; 3 working DSB A, B, C, and H, and 2 working DSB D, E, F, G, and L. Right now the site has 1½ wall forms for D, E, F, G, and L. One additional form was ordered for use on the first building in Segment 23. This shall ensure continuity for the following critical activity, the insulated panels.

**Unavailability of foreign workers is a major constraint on these activities.**

5. Spatial Frame Steel Structure

The MERO space frames will commence delivery at end of April '03 and erection will start 18 May 2003, to be completed 28 February 2004. To meet the duration of 240 days to erect 115,500m², the minimum required production is 9 to 10 erected buildings per month with 6 working teams. This requires a minimum of 2 subcontractors working with 3 teams each or preferably 3 subcontractors working with 2 teams each.

Note that in addition to several other issues, the replacement of the original spatial frame supplier/erector, USKON/DS Construction, was made necessary because the erector relied wholly on Turkish labor, presently restricted by the Israeli Government.

On-going negotiations with several spatial frame erection sub-contractors, are indicating an exorbitant increase in price, due to the mandatory use of Israel labor. Estimated exposure is $1,000,000.

**Unavailability of foreign workers is a major constraint on these activities.**

6. Conventional Steel Structures

Koor Metals started 26 January 03 on the first DSB with conventional steel structure ($56E_54$). The progress of concrete works for conventional steel DSBs will determine the progress of erection. By the end of June 2003 erection is scheduled to be complete for 3 buildings in Segment 67, 3 buildings in Segment 56 and 3 buildings in Segment 45. Conventional steel erection is scheduled to complete end of February 2004. This includes buildings in Segment 12 and Armory area. A minimum of 4 teams is required.

Negotiations and subcontract agreement for this work was concluded after the restrictions on importing foreign labor were imposed by the Israeli Government. Therefore, the final price agreed for this work was definitely influenced by the forced use of 100% Israeli labor.

**Unavailability of foreign workers is a major constraint on these activities.**

7. Insulated Panel Installation

Insulated panel installation is the most critical activity in the schedule. This activity can resume only after the success/approval of the final pressure test on the Pilot DSB. Assuming that the final test will be a success, the insulated panels can resume on conventional steel structures in March 2003, with completion of 7 buildings before starting panel installation on spatial frame structures.

**A.A.B. Joint Venture**

**ASB SUSA Inc./A.ARENSON Ltd./BARAN GROUP Ltd.**

**NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL**

**Manpower Requirements vs. Availability**

**Talking Points for Meeting in Wiesbaden, March 5, 2003.**

By June 2003 the installation requires 9 teams: 6 teams working spatial frame structures and 3 teams working conventional structures. Spatial frame erection is scheduled to complete end of March 2004.

The subcontractor for installation, Bidud Projects, (BP), which the JV contracted with in 2001. relies largely (to nearly 80%) on Palestinian and/or foreign workers for it's work. Since the Contract precludes the use of Palestinians, they will now be forced to use either foreign workers or Israeli workers. In this instance and because of the restrictions on foreign labor, we anticipate a claim for approximately $1,500,000 from this subcontractor for additional costs. Furthermore during the installation, training Israeli workers not previously experienced in this work must be expected to cause delays.

**Unavailability of foreign workers is a major constraint on these activities.**

8. Insulated Panels other than DSB

The non-DSB insulated panels are not considered critical. Installation of panels is scheduled to start in the Logistics building by the last week of June 2003. A minimum of three teams are required to complete the scope of work: 1 team for the Logistics buildings, 1 team for the remaining auxiliary buildings in Segment 12 and 1 team for the Armory area. Completion is scheduled for February 2004.

For the same reasons as indicated in para.7 above. we anticipate a claim for approximately $200,000 from this subcontractor (Caesarea Polymer) due to the impossibility to import foreign workers.

**Unavailability of foreign workers is a major constraint on these activities.**

**Note that Palestinian workers (specifically excluded by the Contract) have the longest experience (up to 20 years) installing insulated panels in Israel.**

9. Offices and Logistics

Building 10/02 is scheduled to complete first and will serve as the pilot building regarding architectural finishes. Ytong block works and suspended ceilings are progressing on the Kitchen and Dining Buildings. Buildings are scheduled to complete in Segment 10 by January 2004, Segment 78 by December 2003 and Segment 89 by December 2003. Priority buildings after 10/02 are scheduled to be 10/08, 10/09, 10/11 and 89/01. These buildings include utility systems, communication, chiller and boiler, emergency power and control systems. Piling work for the Logistics Complex is in progress, with 22% of the total 969 piles complete and 100% scheduled for end of March 2003. Concrete works for pile caps started first week of February 2003. Final completion of the Logistics Complex is scheduled for March 2004.

Finishing works are traditionally executed by experienced foreign workers. Training of inexperienced Israeli labor is again expected to cause project delays while the additional costs of Israeli labor and premiums to be paid for utilizing foreign labor presently in country, are anticipated to expose the Joint Venture up to $500,000 in additional costs.

**Unavailability of foreign workers is a major constraint on these activities.**

**A.A.B. Joint Venture**

**ABB SUSA Inc./A.ARENSON Ltd./BARAN GROUP Ltd.**

**NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL**

**Manpower Requirements vs. Availability**

**Talking Points for Meeting in Wiesbaden, March 5, 2003.**

10. Electrical and Communication Infrastructure and Water Supply System

High Voltage direct burial cable is scheduled to start from the Main Electrical Substation to Segment #67 - #56 - #45 - #34 - #23 - #10 - #12 - #11 and #91 in sequence. The low voltage electrical cables will follow the same sequence as the high voltage.

Communication manholes and conduits are to be done simultaneously with power cable installation. Cable pulling and termination inside the building will follow after the control room building is complete up to doors and windows installation. All buildings will be controlled and monitored in building 89/01.

Water supply piping network can start right after laying HV cable and conduits for communication in each Segment. Segment 10 will have a "ring" water main with branches to each Segment along the roads. Early start is scheduled for June 2003 in Segment #10, followed by Segments #78 – #67 – #56 – #45 – #34 – #23 – #12 – #11 – #91 in a clockwise direction.

Foreign labor is traditionally employed by sub-contractors to assist skilled labor for these activities. The Joint Venture is certain to receive claims for additional cost in the range of $500,000 from sub-contractors forced to employ more costly Israelis as "helpers".

11. Landscaping and Development Works

Rockeries to cover the DSB berms are to start in parallel with the stabilized cement fill (SCF) on the sides of the buildings. The rockery mock-up will start in February 2003, simultaneously with the stabilized cement fill. The progress of the remaining rockeries is to follow the progress of DSB wall construction. Foundation under-drain along the DSB walls must precede the SCF. The amphitheater for each Segment should be constructed simultaneously with the construction of the retaining wall. The amphitheater is also a requirement preceding cable installation.

Roadside DSB stoned-face retaining walls is scheduled to start in May 2003.

**Unavailability of foreign workers is a major constraint on all of the above activities. The Joint Venture shall propose reinforced concrete substitute for labor-intensive rockwork.**

12. Planting and Irrigation

Upon completion of building works, concrete infrastructure and underground utilities, agricultural topsoil can be spread on the final grade of each segment. Planting and irrigation shall follow. The subcontract for these activities is presently under final negotiations and due to the present restrictions on foreign labor, the prices are approximately $300,000 above JV estimates at bid time.

13. Surface Pavement and Roads

Pathways inside each segment can start when construction of retaining walls is complete, electrical and communication infrastructure is complete, amphitheater is complete and most of the rockeries are complete. All pathways are connected to the main Road 01 in Segment10, and on the inner "spoke" roads that lead to the

outer circumference Road 12. Pathways can also be a requirement of road construction.

Road construction will not commence until the latter months, as most of the roads will be used for construction access, especially Road #01, Road #16 and Road #17. Gravel roads along side the buildings can only be constructed after the completion of the building, and pathways in each Segment. Roads in Segment #78 and #67 should be constructed first, then road building will develop in a clockwise direction.

Road 12 grading preparation must start immediately after the winter rains to allow early start of perimeter fencing.

14. Perimeter Fence

Erection of perimeter fence will follow the progress of final grading, from Segment 78 to Segment 91 in clockwise direction. Late erection start is October 2003, with completion in March 2004.

15. Street Lighting

Street lighting will be erected 2m off the roads, thus the final grading is a requirement for commencement of the street lighting activity. This activity can start after the electrical transformer rooms and final road grading are complete. Street lighting on perimeter Road #12 will require that the perimeter fence be erected first. This will prevent any damage to the street lighting.

16. Perimeter Security Detection System

Before perimeter Intrusion Detection System (IDS) installation, the perimeter fence and gates, control room and communication and control manhole/conduits must be completed. The Intrusion Detection System is mounted on the perimeter fence and monitored in control building 89/01. Cable pulling and loop test is scheduled to require four months time, starting in March 2004 with completion in June 2004.

17. Testing and Commissioning

A preliminary test for each system is to be done phase-by-phase, system-by-system and building-by-building upon completion of the control building system and with permanent power supply. The object of this program of works is to complete testing and commissioning earlier so that preparation for turn over can be expedited.

## Project Completion Date

**Based on the above schedule and sequence of works, the project is now expected to complete on 19 September 2004, versus the completion date of 25 September, 2004 deriving from the latest time extension of 57 days.**

**However, due to recent developments the JV has now determined that this recovery schedule is no longer realistic.**

**These developments can be summarized as follows:**

**Manpower Requirements vs. Availability**

**Talking Points for Meeting in Wiesbaden, March 5, 2003.**

- On February 15, 2003, Ministry of Labor failed to grant allotment of foreign workers to ABB SUSA (following its exemption from Registrar of Contractors and application for TCN's for the Project).
- Verbal notification by USACE to JV that MOD had approved waiver to allow Palestinians on Project subject to strict security measures. However, USACE also stated they would most likely refuse the waiver.
- There was widespread anticipation that the new Israeli Government (Minister of Labor and Minister of Interior) would have changed policy to provide relief to contractors and others on the foreign worker issue. Per the new ministerial appointments announced this week, the Ministry of Labor is expected to remain unchanged.
- Stricter enforcement of immigration policies leading to expulsion of TCNs with expired visas, thus exacerbating an already critical situation.
- Demand for Israeli Arabs exceeds supply particularly in the center of the country.

## CONCLUSIONS AND CONSIDERATIONS

- Manpower Requirement

The above recovery schedule is driven by material and labor resources, of which labor is most critical. From the start of the construction, the Joint Venture and it's subcontractors have been affected by the preclusion to import labor for this project. To maximize production, longer hours and additional shifts have been implemented, specifically for concrete and earthworks.

For the past 4 months, an average of 10~15 workers per month were hired for concrete works. Earthwork subcontractors have reduced labor for earthworks that are currently some 94% complete. Now the same subcontractors are having major difficulties increasing manpower for landscaping and stone works, where foreign workers and Palestinians hold traditional experience.

As described on **Attachment 6**, the following are the basic manpower requirements:

- Concrete works require peak manpower from May through September 2003 with an average of 350 workers per month.
- Spatial frame erector must mobilize a minimum of 48 workers (6 teams of 8 men).
- Conventional steel erector must mobilize a minimum of 32 workers (4 teams of 8 men).
- Insulated panel installers must mobilize a minimum of 96 workers (12 teams of 8 men).
- For Electrical activities the JV must mobilize a minimum of 80 workers, for Mechanical activities 40 workers and for Low Voltage/Communication activities another 40 workers.

# A.A.B. Joint Venture

ABB SUSA Inc./A.ARENSON Ltd./BARAN GROUP Ltd.

NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL

Manpower Requirements vs. Availability

Talking Points for Meeting in Wiesbaden, March 5, 2003.

The increased manpower required by this recovery schedule is due to the activities on the 1st critical path (conventional steel erection) affected by delays in progress of concrete and earthworks, constrained by the chronic manpower shortage, and by the activities on the 2nd critical path (erection of the space frames).

- **Other considerations:**
  1. Because the Contract forbids the use of Palestinian labor, the A.A.B. Joint Venture partner, A. Arenson Ltd, is recruiting Palestinians to replace foreign workers on their other ongoing projects and sending these foreign workers to Nachshonim.
  2. The Joint Venture had requested a Contract waiver of the restriction on the use of Palestinian workers to man the activities traditionally executed by Palestinians (panel installation, stonework and some finishing works). As stated above this waiver is expected to be denied by the USACE.
  3. Anticipating that certain subcontractors (e.g. for panel installation) will not be able to provide the number of experienced teams required for the recovery schedule, the Joint Venture is contacting other Subcontractors who utilize either foreign workers already in country or Israeli workers. It is too early to determine how effective this may be and there will be a significant cost impact.
  4. To retain foreign workers residing in Israel and keep them from joining another employer, the Joint Venture is paying a $100 inducement "bonus" per month for each worker present for the entire month. This constitutes an already realized cost impact. Furthermore due to the market conditions created by the shortage of supply and the high demand for in-country foreign workers, the Joint Venture is paying a 25% premium per man-hour to labor brokers supplying workers. This constitutes an already realized cost impact. These two unanticipated measures are expected to result in approximately $900,000 additional costs for the labor required to complete wet (concrete) works alone. A similar very significant cost impact is to be expected on the other activities.
  5. The Joint Venture is reviewing design to propose changes from labor-intensive activities (i.e. stonework) to less labor-intensive activities (i.e. reinforced concrete). The cost impact of such changes is yet to be determined.
  6. A. Arenson Ltd., a Joint Venture Partner and one of the leading contractors in Israel, has filed several suits against the Israeli Minister of Interior and the Minister of Employment and Welfare, seeking to be allowed to import foreign workers for the Nachshonim Project, among others. One of these suits has been enjoined with other suits filed by the Israeli Association of Contractors and others, and is still pending. Within the framework of an earlier suit filed by Arenson in February of 2002, it was suggested, with the warm recommendation of the court (recorded in the court protocol of August 7, 2002), that ABB SUSA make a direct application to the Ministry of Labor and Welfare for a foreign worker block visa, specifically for this project. Filing of such application necessitated the prior registration of ABB SUSA as a foreign company and the difficult task of obtaining an exemption for ABB SUSA from the Israeli Registrar of Contractors, a government agency within the Israeli Minister of Industry and Trade.

# A.A.B. Joint Venture

## ABB SUSA Inc./A.A. ENSON Ltd./BARAN GROUP Ltd.

## NACHSHONIM STORAGE BASE PROJECT, ELAD, ISRAEL

### Manpower Requirements vs. Availability

### Talking Points for Meeting in Wiesbaden, March 5, 2003.

Registration of ABB SUSA with the Registrar of Companies was completed on September 18, 2002. After significant effort by the JV, exemption from registration with the Registrar of Contractors was finally issued by the Minister of Industry and Trade on December 26, 2002. ABB SUSA's application for a foreign worker block visa for 2003 in respect of the Nachshonim Project was filed at the end of December, 2002. Despite the undertaking given at such hearing by counsel to the respondents that such application would be dealt with within 21 days of filing, no response has been received from the Ministry of Labor and Welfare, to date".

The Joint Venture is exerting maximum efforts to hire and mobilize the required manpower to complete the project within the time frame shown in the recovery schedule. **The ability to do so depends wholly on the availability of the necessary labor, in terms of both numbers and skill levels.** As stated above the Joint Venture is also implementing other practical means of mitigating the schedule and cost impact deriving from the lack of the necessary labor created by the veto imposed on the importation of TCN workers. **Ultimately, however, the success of these efforts is highly at risk, given the current conditions, and there could be a very significant delay in the completion of the Project.**

- **Conclusion:**

At this time the project shows an accumulated schedule delay of four months with respect to the original schedule, against which the Joint Venture has received a non-compensable relief of 99 days. Current indications show an overall direct cost impact (that is without considering overheads for the four months) of some $5,000,000 directly or indirectly attributable to the manpower situation created by the Israeli Government restrictions on the importation of foreign labor, as indicated above. If the already steep manpower curve of the recovery schedule shown in Attachment 6 is not attainable due to the present circumstances which are outside the control of the Joint venture, each additional month of overheads for the Joint Venture and it's sub-contractors is anticipated to represent an additional cost of up to $400,000. Thus a 6-month delay in completion relative to the recovery schedule may result in a total cost impact of over $8,000,000 (including the non-compensated delay) and a 12 month delay may result in a total cost impact of over $10,000,000. It is to be noted that all anticipated additional cost figures given in this document are only a rough order of magnitude assessment, to which the JV cannot be bound.

DEPARTMENT OF THE ARMY
U. S. ARMY CORPS OF ENGINEERS
EUROPE DISTRICT, ISRAEL PROGRAM OFFICE
CENTRAL RESIDENT OFFICE
Unit 7228, Box 42
APO, AE 09830

March 31, 2003

CENAU-IP-C

Subject: Nachshonim Storage Base, Elad, Israel Contract No. DACA90-01-C-0043, TCN Labor (COE-03-042)

ABB Susa/A. Arenson/Baran Group
P.O. Box 3566
5 Hashita Street
Caesarea, Israel 38900

Gentlemen:

Please reference your letter of 16 March 2003, (USACE/03-0270) "TCN Labor Delays – Request for Time Extension and Equitable Adjustment" along with your 11 November 2002 correspondence (USACE/02-0223) "TCN Labor".

I have reviewed the information provided along with the various contract documents associated with this issue. While I am sympathetic to your situation, the availability of labor resources and associated costs are solely your responsibility. Unless more compelling justification is provided, your request for a time extension and equitable adjustment is denied.

Your attention is directed to the Disputes Clause, should you wish to pursue this matter.

Sincerely yours,

J. W. Blackburn, Jr. P.E.
Administrative Contracting Officer

**DISTRIBUTION**

| NAME | ACTION | INFO |
|---|---|---|
| PROJECT DIR | | |
| CH DESIGN ENG | | |
| SITE MGR | | ✓ |
| ADMIN MGR | | ✓ |
| PROC MGR | | |
| Q.C. MGR | | |
| SAFETY MGR | | |
| SCHEDULER | | ✓ |
| | | |
| STANLEY | | |
| ARENSON | | ✓ |
| BARAN | | ✓ |
| ABB B.J. OFFICE | | ✓ |
| YAEL BARATZ | | ✓ |
| | | |
| | | |
| SUBJECT FILE | 1.02 | |

15.10.06

FAX: Arenson
ATTN: A. Arenson
I. Itzhaki
A. Glick

FAX: BARAN
ATTN: Yom-Tov Samia
I. Friedman
S. Vaxman

FAX: ABB SUSA
ATTN: Paul Salvato
E. Poporski
R. Delin

**ATTACHMENT**
**L**

M. SELIGMAN & CO.
ADVOCATES & NOTARIES
23 PETACH TIKVAH ROAD, P.O.B. 36090, TEL AVIV 66184
TEL: 972-3-7101616; FAX: 972-3-7101617

Date: 9 March, 2003
File no. 230847/5

By fax and registered mail
Urgent

Mr. Avner Oferi, General Manager
The Labor Authority
2 Kaplan Street,
Jerusalem

Dear Sir,

RE: Administrative Petition 528/02 - A. Arenson and ABB SUSA

On behalf of our clients, A. Arenson Ltd., and ABB SUSA Inc., we hereby address you in respect of the referenced subject, as follows:

1. On June 10, 2002, Arenson petitioned to the Court to direct the Minister of Labor, the Minister of Interior and the Labor Authority to allow it to bring foreign workers from abroad, in order to realize the permits for employing foreign workers that had been lawfully allotted to it.

2. After filing the petition, it became clear to the parties that in 2002 only 784 permits to employ foreign workers had been allotted to Arenson, and of these 784 permits, 523 had been allotted to the Petitioner for the purpose of constructing the military base in Nachshonim for the U.S. Army (hereinafter: the "Project").

3. The execution of the project is being carried out jointly by Arenson and ABB. However, as ABB is a foreign company, which is not registered in the Register of Contractors, ABB could not have, at that date, received permits to employ foreign workers. In those circumstances, it was Arenson that received the total quota of the permits to employ foreign workers in respect of the Project.

4. However, with the allocation of the permits for 2002 it became clear to Arenson that according to the Ministry of Interior, it was entitled to employ only 278 foreign workers, as 506 workers were registered in its name who had "deserted" it.

5. It thus follows that our clients' ability to execute the Project and punctually fulfill their commitments towards the U.S. Army, have been harmed solely as a result of the fact that the Ministry of Interior maintains that there are 506 foreign workers who left their employment at Arenson, but have failed to leave Israel.

6. Therefore, and in order not to be prejudiced because of the fact that a large number of deserting workers are registered in Arenson's name, our clients requested to transfer those 523 permits which had been allotted in respect of the Project from Arenson's name into that of ABB.

**ATTACHMENT
M**

7. For the purpose of accomplishing this transfer, ABB was first required to receive an exemption from registration in the Register of Contractors, from the Registrar of Contractors, and thereafter turn with the application to the Labor Authority to allocate the permits.

8. In those circumstances, the parties reached an understanding, which was validated by way of a judgment, within the framework of A.P No. 582/02, that upon receiving the exemption from registration in the Register of Contractors, ABB would be entitled to apply to the Labor Authority and request the transfer of the permits from Arenson's name into that of ABB. The Labor Authority on its part undertook to deal with ABB's application within 21 days of its being submitted to it.

A copy of the transcript of the hearing and the judgment in A.P. No. 582/02 is attached to my letter as Schedule A.

9. ABB indeed turned to the Registrar of Contractors with an application to obtain an exemption and ultimately, after many efforts, on December 25, 2002, it was notified that it was about to receive the exemption on the next day.

10. In those circumstances, ABB submitted to the Labor Authority the application to transfer 523 permits on the same day, and on the next day, December 26, 2002, forwarded the exemption from registration in the Register of Contractors.

A copy of the request to grant the permits and the exemption from registration in the Register of Contractors are attached to my letter as Schedules B and C.

11. After some two months our clients turned to you verbally in order to inquire what had happened to the request, without receiving any response, Arenson turned to you on February 25, 2003, demanding to fulfill the Labor Authority's undertaking and the judgment, and deal with the application immediately.

A copy of the letter is attached to my letter as Schedule D.

12. Since this application similarly remained unanswered, we turned to Adv. Sharon Edry, the attorney who represented you in A.P. No. 582/02, requesting to receive your decision urgently.

13. On March 9, 2003 Ms. Edry informed us that ABB's application related to 2003 and therefore, you did not intend dealing with it now.

14. In those circumstances, I would like to make it clear that in no way did our clients demand that you discuss ABB's application to allocate permits to employ foreign workers for 2003. This application will be discussed together with all the applications for 2003, and my clients have no claim in this regard.

15. At the same time, in light of the fact that we are still acting according to the allocations of the permits to employ foreign workers for 2002, our clients reiterate their demand that the Labor Authority fulfill its commitment and the judgment in A.P No. 582/02 and immediately discuss their application to transfer the 523 permits that were allocated to Arenson in respect of the Project to ABB.

16. In light of the enormous damages being caused to our clients in respect of each day that passes without their application being discussed, you are hereby required to advise us by tomorrow, March 10, 2003, as to whether you intend dealing with the application and making a decision thereon by Thursday, March 13, 2003, otherwise our clients will be obliged to take all available proceedings.

Yours sincerely,
Amit Krispin, Advocate
M. Seligman & Co.
(signed)

c.c. Mr. Avi Arenson
Adv. Tomer Moskovitz - Legal Advisor, Ministry of Labor.
Adv. Mattityahu Tal, Legal Advisor - Labor Authority.
Adv. Sharon Edry - District Attorney' Office – Jerusalem.

Labor Authority Legal Advisor
Head Office

Jerusalem, 7 Adar B, 5763
March 11, 2003

Foreign - D6500

Advocate Amit Krispin,
Seligman Law Office,
P.O.B. 36090,
Tel Aviv 66154

By mail and fax

Dear Colleague,

RE: Administrative Petition 528/02 Arenson
Reference: Your letter of March 9

The General Manager of the Labor Authority, Mr. Avner Oferi, has requested me to reply to your referenced letter, and the following is my reply:

1. In your letter you stated that in 2002, the Arenson received a permit to employ 784 foreign workers, although when realizing these permits at the Ministry of Interior it was told that it would be able to realize only 278 workers, as 506 workers registered in its name that were still residing in Israel – "deserting workers".

2. You also mentioned that 523 permits out of the 784, were allotted for the execution of construction works of the Military Base at Nachshonim, a joint project of Arenson and ABB SUSA, although the permits were issued in Arenson's name as the ABB is not registered with the Registrar of Contractors and on the relevant date, did not hold an exemption from such registration. Now, once that exemption has been received, and in order to circumvent the restriction that was imposed by the Ministry of Interior in respect to the realization of the permits, you are asking that the Labor Authority allow the transfer of the permits for 2002 from Arenson to ABB, with the consent of both the companies.

3. After perusing the application we have reached the conclusion that we will be unable to accede thereto, on the following grounds:

4. The procedure of the Ministry of Interior, that directs that no "full credit" is to be granted to an employer whose employees have deserted him and not yet left the country, is not exaggerated or unreasonable since if a new entry visa were granted whenever an employee left his employer, the country would be flooded with many foreign workers far and beyond the quotas that had been laid down by the Government. Moreover, the Ministry of Interior wishes to create an incentive for employers to maintain the workers and the terms of their employment, lest they leave their employers.

**ATTACHMENT**
**N**

5. It is clear that under the circumstances of the matter, even if the permit had been granted from the outset in the name of the ABB, this would not have prevented their deserting, and notwithstanding this the Ministry of Interior would have acted in the same manner. That being the case, the transfer requested by you - is devoid of any real content and the Labor Authority, like any other public authority, is not entitled to be an accomplice to an attempt to circumvent the procedure of the Ministry of Interior.

6. In addition, the transfer of the workers requested is totally fictitious and is solely intended for circumventing the Ministry of Interior, and this being so - the transfer is to be cancelled by virtue of the provisions contained in sections 13 and 61 of the Contracts (General Part) Law, 5733-1973.

7. It is doubtful also if under the circumstances of the matter, there is any justification for "reviving" a permit that was granted in the past - and in this respect - once the permit was granted in 2002 to Arenson to employ foreign workers and had been realized in part, it seems that there is no room to wipe out the past and determine, in March 2003, that the permit be granted to another company, whatever the relationship between them might be.

8. I would add that if the requested transfer were approved, this would mean that whenever a project was carried out by two contractors, the workers would be registered in the name of one of them, so that in a case where they deserted their employers, the permit would be retroactively amended in order to avoid complying with the procedure of the Ministry of Interior.

9. With respect to your claims in paragraphs 10 and 11 of your letter regarding the delay in handling your request, it is proper to put matters in their proper perspective - the application was filed by you as part of the applications for the allocation for the year 2003, and this being so - will be discussed with all the applications and the reply thereto will be granted in that framework. Now that you have turned with a request to amend the allocation for 2002, my reply is being given to you hereby without any delay.

10. The proper way of dealing with the matter in reference is to turn to the authorities at the Ministry of Interior and try to persuade them that there are exceptional circumstances existing that justify a deviation from the procedure in a manner whereby the Arenson "be credited" with the full quota so that it will be able to realize the permit that was granted to it in 2002.

Yours faithfully,
Mattityahu Tal, Advocate
Legal Advisor
(signed)

c.c. Mr. Avner Oferi, General Manager of the Labor Authority.
Adv. Tomer Moskovitz - Legal Advisor, Ministry of Labor.
Mr. Aharon Barazani, Director Payments Section, the Labor Authority.
Adv. Sharon Edry - District Attorney's Office, Jerusalem.

Benjamin Baratz
Yael Baratz
Zvi Bar-Nathan
Lori Almouli-Confino*
Barak Lichtenstein
Roni Avni
Yoav Fruchtman
Ram Ephrati
Itta Rubanenko
Tsafi Erlich Goldman
Rakefet Peled
Yoram Evron
Sharon Alster
Eli Belkind
Sagit Shahmoon
Tammar Sheinkin-Jachet
Gil Ashkenazy
Avishai Halfon
Michal Nissani
Marav Baruch
Hadas Geva-Medalia
Ziv Glickman*
Ophir Vaisben
Elad Bercugo

*Also Member of the New York Bar

ברץ, בר-נתן ושות'
עורכי-דין ונוטריונים

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

Tel-Aviv, March 25, 2003
Ref: 14064-34

Mr. Zvulun Orlev
Minister of Labor and Welfare
Ministry of Labor and Welfare
2 Kaplan St., Building B
Jerusalem

Mr. Abraham Poraz
Minister of Interior
Ministry of Interior
2 Kaplan St.
Jerusalem

Mr. Shaul Mofaz
Minister of Defense
Ministry of Defense
Kaplan St.
Tel Aviv

Dear Ministers,

**Re: The Establishment of a Military Base in Nachshonim Financed by the US-**
**Urgent Request for Assistance in Implementing the Permit For the Employment of Foreign Workers**

On behalf of the joint venture, engaged in the construction of the Nachshonim military base, which includes the American Company ABB

Commercial Department
Tel: +972-3-6073767
Fax: +972-3-6962252

Israel
1 Azrieli Center,
Round Tower, 18th floor
Tel-Aviv 67021, Israel
Tel: +972-3-6073777
Fax: +972-3-6073778
E-mail: office@bar-law.com

Romania
Baratz & Associates
57 Romulus Street,
Sector 3
Bucharest
Romania
Telefax: +4021 3263996/7
E-mail: st.ghemes@bar-law.ro

**ATTACHMENT O**

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

SUSA Inc. and the Israeli companies A. Arenson Ltd. and the Baran Group Ltd. (the "**Joint Venture**"), we hereby respectfully address the following to you:

**Introduction:**

1. For some time now the Joint Venture has been unsuccessfully attempting to import foreign workers into Israel. Most of these workers possess special skills that are not available and are needed for the erection of a security project of national importance (the "**Project**"), fully financed by the government of the United States.
2. On July 3, 2002 the Labor Authority (the "LA") allocated 523 TCN permits for the Project, within the framework of annual allocations for the construction sector for 2002.
3. However, due to the diverse bureaucratic hurdles that the Joint Venture encountered, as described below, it had been impossible for the Joint Venture to import the foreign labor required in order to execute the Project as allocated to the Joint Venture for 2002.
4. Although all the relevant authorities are aware of the national importance of this Project and its extraordinary dimensions, the allocation of foreign workers for the Project could not be implemented and the Joint Venture is unable to solve the terrible shortfall it is experiencing.
5. Therefore, the Joint Venture has no alternative other than to kindly address Your Excellencies with a request, to exert the full weight of your influence, in order to assist in solving this bureaucratic obstacle, in order to avoid any additional delays in the completion of this essential project.

**General Background:**

6. On December 31 2000, as part of the implementation of the Wye River Accords, the USA Corps of Engineers (the **USACE**") published an international tender, in cooperation with the Israeli Ministry of Defense (the "**MOD**"), for the construction of a large military base for dry storage in Nachshonim.
7. The Project is managed by the USACE and is fully financed by American aid funds, approved by the US Congress.
8. On June 5 2001, the Joint Venture was awarded the construction contract, having an estimated value of US$ 125 million, and the contract was signed on July 20, 2001.
9. This is a huge Project that is essential in national terms. The Project extends over an area of approximately 1600 square kilometers. The

Joint Venture is expected to execute, at the order of the USACE and for the IDF, very sophisticated work within an extremely limited time, with the aim of completing the Project and handing it over to the IDF during the course of 2004.

10. In order to execute this Project, the Joint Venture is requested, inter alia, to execute extensive earthwork, which includes excavating to the depth of 2,600,000 meters and filling 1,800,000 meters. The infrastructure work includes paving 29 kilometers of roads and construction work, encompassing 200 buildings and storage huts for tanks and armored carriers, having a total area of about 227,000 meters.

11. In signing the contract with the USACE, the Joint Venture assumed substantial obligations. These obligations include meeting a very tight time frame for the execution of the Project, based on the assumption that the Joint Venture would be able to import foreign workers to carry out a major portion of the work.

12. The USACE and the MOD anticipated the need for foreign workers and included clauses in the tender, requesting the bidders to propose a "Third Country National" or "TCN" Plan to form part of the proposal.

13. It is noteworthy that, due to the complexity of this unique Project, there is a need for specially skilled workers in order to execute a substantial part of the work. These can not be found among construction workers in Israel at this time (whether local or foreign).

14. The Joint Venture commenced the work at the end of 2001. Although this Project is essential in national terms, having been commissioned by the USACE and fully financed by the US, ever since the government's policy changed in 2001 with respect to the import of foreign labor, the Joint Venture cannot import the labor required for the execution of Project.

15. A short time after the award, the Joint Venture began recruiting specially skilled foreign workers for carrying out the Project. Since, at the time, A. Arenson Ltd. (**"Arenson"**) was the only partner that was registered with the Israeli Registrar of Contractors, it was agreed among the Joint Venture's members, that Arenson would act vis-a-vis the relevant authorities, to process the allocation of foreign workers for the Project. Prior to the time that the Joint Venture was awarded the contract, Arenson employed foreign workers for its various projects on a large scale, including for the Ben Gurion 2000 Airport Project, the Foreign Ministry Building in Jerusalem, an office building and a power station for the Israeli Electric Company, and more.

<u>Arenson's Attempts, On Behalf of the Joint Venture to Bring In Foreign Workers</u>

16. On January 22, 2002, Arenson applied to the LA asking for allocations for the Project for the year 2002. In its letter to the LA dated January 24, 2002, Arenson asked to treat the Project as a national project of the highest priority, and to approve the necessary allocation as soon as possible.

17. In parallel, the relevant officials at the MOD also addressed the LA, and a meeting was held on January 27, 2002, at which the LA's Deputy General Manager participated. The purpose of the meeting was to obtain the immediate approval of the authorities for the granting of visas to foreign workers for the Project, while stressing the national importance of the matter.

18. In consequence of the Government's decision of December 24, 2001, according to which the maximum annual amount of permits granted in the construction industry for 2002 would be for 45,000 foreigners, and due to the decision of Mr. Shlomo Benizri, the former Minister of Labor, of January 1, 2002, according to which as of that day the entrance of new foreign labor into Israel would be prohibited, Arenson was not successful in obtaining the said permits for the Project, despite the specific provisions of the tender in this regard.

    It is worth noting that in June 2002, the Ministers' Committee with respect to foreign workers, decided to decrease the number of foreign workers working in the construction industry from 45,000 workers to a mere 30,000.

19. During the first half of 2002, Arenson waited for the LA to publicize its decision regarding allocations of foreign workers for the year 2002 as did the rest of the contractors in Israel.

20. On June 10, 2002, when Arenson saws that the LA had not published its decision regarding the allocations for 2002, and the Ministry of Interior (the "MOI") prohibited Arenson from importing labor on the basis of the permits allocated for 2001, Arenson filed an administrative action to the Israeli Court of Administrative Matters in Jerusalem (File Number 582/02) against the Ministry of Labor and Welfare (the "MOL") and the MOI (the "Motion"). By this Motion, the court was requested to pronounce Minister Benizri's aforementioned decision of January 1, 2002 as void. Furthermore, Arenson petitioned the court to order the ministers to allow the entry into Israel of foreign workers, in accordance with the permits granted to Arenson by the LA in 2001.

21. On July 3 2002, while the motion was still pending, the MOL published its list of the allocations for the year 2002. Arenson was allocated 784 permits, 523 of which were dedicated to the Project. However, when Arenson attempted to utilize the 523 permits and to have visas issued by the MOI, it evolved that implementation was not possible, due to the problem posed by "deserting" foreign workers.

22. By way of explanation, its been a while now that many contractors in Israel, including Arenson, have been suffering from "deserting" foreign workers. The workers entering into Israel by law, in accordance with the work permits granted at the request of the employer (contractor), have been "deserting" their work place in order to allegedly work illegally for other employers. According to the prevailing policy at the MOI and the MOL, an employer who hired foreign workers who "deserted" their work place but did not leave Israel, may not bring in another worker in his stead. This is true even if the employer made all possible efforts to locate the employee and to get him exiled. On the other hand, as per this same policy, an employer who hired a foreign worker who chose to quit his job and leave the country, for any reason, would be able to receive a "credit" for that same employee, and to bring another employee in his stead.

23. As per Arenson's records, as of January 1, 2002 and prior to requesting the permits for the Joint Venture, Arenson had 498 employees registered in its name, working on other projects, who had deserted between April 1, 1999 and January 1, 2002. Moreover, Arenson had 47 additional employees registered in its name, who had exited Israel during such time period but for some reason Arenson had not received any "credit" for them.

24. At the beginning of July 2002, at the time that the allocations for 2002 were granted, 485 foreign workers actually worked for Arenson at all of its construction sites. As per the MOI's records, however, Arenson also had 506 registered "deserting" workers that were viewed by the MOI as employees of Arenson for all intents and purposes. As per the MOI's method of calculation, Arenson was employing 991 foreign workers at that time (i.e. 485 workers actually on the job plus 506 registered workers who "deserted" Arenson), while its allocation for 2002 stood at only 784 foreign workers.

25. Thus, as per the MOI's position, not only was Arenson prohibited from importing additional employees in 2002, but was also obligated to ensure the repatriation of 207 foreign employees (out of the 485 that were working for Arenson at that time).

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

26. As a result of the fact that a few hundred foreign workers who were imported into the country by Arenson during 1999-2001, without any connection with the Nachshonim Project, had deserted their work place, Arenson could not process the allocation of 523 permits for the Joint Venture as approved for the year 2002.

The Attempt to Transfer the Allocation from Arenson to ABB Susa:

27. In order for the Nachshonim Project and the Joint Venture not to be "penalized" due to the fact that the foreign workers deserted Arenson, Arenson suggested to transfer the approved allocations for the Project to ABB SUSA. ABB SUSA had never executed work in Israel previously.

28. In order to execute the transfer of the allocated permits, the Joint Venture had to overcome two additional bureaucratic hurdles. The first was that the deadline for submitting requests for 2002 allocations had expired. The second was that ABB SUSA, as a foreign company, had to obtain an exemption from being registered as a registered contractor with the Israeli Registrar of Contractors, since by law, only a registered contractor or an entity exempt from such registration could file for an allocation of foreign workers.

29. On August 7, 2002 at the hearing of Arenson's Motion that was held at the District Court in Jerusalem acting as the Court for Administrative matters, Arenson's suggestion fell on receptive ears and with the assistance of the Honorable Justice Zvi Segal, Arenson's counsel and the District Attorney for Jerusalem who was acting as counsel for the Ministries reached an understanding with the aim of facilitating the transfer of the allocations from Arenson to ABB SUSA. This understanding was approved by LA's Deputy General Manager, Mr. Nazri and the representative of the MOI, Mrs. Conforty, who were present at the hearing. Within the framework of this understanding, which received the status of a judgement handed down by the court, the timetable for the filing of a new application to the LA, to enable ABB SUSA to submit a request to transfer the said allocations from Arenson to itself, was extended, with the LA undertaking to consider such application within 21 days. The counsel also recommended to the Registrar of Contractors to process ABB SUSA's application for an exemption expediously

30. On September 2, 2002 ABB SUSA filed an urgent application for an exemption from registering as a registered contractor with the Israeli Registrar of Contractors, based on Article 14a to the Registration of Contractors Law of 1969.

31. The processing of ABB SUSA's request lasted almost four months. On December 26, 2002 the former Minister of Construction and Housing, Mr. Natan Sharansky, finally granted the exemption.

32. In parallel, in December 2002, ABB SUSA submitted a request for allocations to the LA branch located in the city of Afula.

33. On February 25, 2003, as no allocations had been made for the Project, Arenson appealed to the Managing Director of the LA with a request that he intervene and transfer to ABB SUSA the 523 allocations from Arenson for 2002.

34. On March 9, 2003, as no response was received to said request, Arenson and ABB SUSA addressed the Managing Director of the LA once again, and requested him to transfer the 523 allocations for 2002 to ABB SUSA.

35. On March 11 2003, **to the complete surprise of the Joint Venture, and in contrast to all the understandings reached within the framework of the Court's decision of August 7, 2002, which was approved by LA's Deputy Managing Director, the MOI's representative and the representative of the Attorney General,** The LA's. Legal Advisor, Attorney Matetyahu Tal, advised that the LA had turned down the transfer request. Attorney Tal was of the position that the request is baseless and is aimed at bypassing the MOI's procedures. Furthermore, as per attorney Tal, the aforementioned transfer of the allocated permits is "completely fictious" (this is an accurate quote), since it is aimed at bypassing the MOI. In light of the foregoing, Attorney Tal believes that the applicants should address the officials at the MOI and convince them that the unusual circumstances of this case justify deviation from the procedures, so that Arenson is "credited" with the full allocation for 2002.

36. Attorney Tal's letter brings the Joint Venture back to square one, by inviting the Joint Venture to continue the long journey through the Israeli Bureaucracy, as though such a huge and important national project could be built by way of correspondence and legal proceedings vis-a-vis the authorities.

37. It is noteworthy that the "appropriate way" described by Attorney Tal, had been long tried by Arenson, but without success. Since this approach failed, Arenson filed another motion to the District Court in Jerusalem on August 21, 2002, and this time focusing upon the MOI's procedures and its refusal to grant "credit" for the deserting workers. To date, this motion is still pending.

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

## The Urgent Interference Requested

38. As described above, the Joint Venture began executing the Project a year and a half ago, and has not yet succeeded in the import of the essential and skilled laborers required for this Project. This may cause major delays in the timeframe of the Project.

39. This Project is of national priority, and it is fully financed by American aid. The Project is administered by the USACE.

40. Due to the Israeli bureaucracy, an absurd situation has been created, whereby delays in the Project timetable will increase the cost of the Project to the American taxpayer, whose sole "sin" was to provide assistance to the State of Israel.

41. We would like to stress that the authorized authority, meaning the LA, had already approved the allocation of 523 permits for 2002. These permits have not been exercised to date.

42. The Joint Venture does not know when the LA will determine the allocation of foreign workers for 2003, but given the pace so far (a quick reminder: the permits for 2002 were officially allocated in July 2002), the Joint Venture cannot continue waiting for this allocation.

    Furthermore, the Joint Venture fears that even after the allocation of the 2003 permits, the MOI will not provide the necessary visas, due to the new "closed sky" policy which was announced and which bars the entrance of foreign workers. We would like to take this opportunity to mention again, that due to the nature of this Project, most of the workers that are needed have special skills that, unfortunately, do not exist in Israel at this time.

43. Therefore, and in light of all the foregoing, we are urgently addressing you with a request to you to authorize and order the immediate allocation of 523 permits to ABB SUSA, while deducting same from Arenson's allocation for 2002, and to allow the entry of these workers or other workers for the Project.

44. For the sake of good order, we hereby attach to this letter Arenson's consent to the aforementioned transfer.

45. We would be pleased to provide you with any additional information you may request.

Sincerely,

Benjamin Baratz, Adv

cc: Adv. Dov Weissglass, Prime Minister's Office

Baratz, Bar-Nathan & Co.
Attorneys-at-Law & Notaries

Appendices:

1. The first page of the tender.
2. The announcement of award dated June 5, 2001.
3. The USACE's approval, dated August 29, 2001, regarding the scope of work for the Project.
4. The approval of the Construction Diovision of the MOD, dated August 29, 2001, with respect to the scope of work for the Project.
5. A request to allocate foreign workers for the Project for the year 2002.
6. Arenson's letter to the LA, dated January 24, 2002.
7. The letter sent by the MOD's representative to the LA's Managing Director, dated January 13, 2002.
8. The letter sent by MOD's representative to the LA's Deputy Managing Director, dated January 30, 2002.
9. A copy of the Administrative Motion (File No. 582/02), dated June 10, 2002 (without annexes).
10. A list of foreign workers who were employed by Arenson, but not "credited", as of January 1, 2002.
11. A permit granted to Arenson with respect to employing foreign workers in the Construction Sector in 2002, dated July 3, 2002.
12. The Jerusalem District Court's decision, dated August 7, 2002 (File No. 582/02).
13. The exemption provided by Minister of Construction and Housing to ABB SUSA, with respect to the registration with the Israeli Registrar of Contractors, dated December 26, 2002.
14. A request filed by ABB SUSA to the LA, to allocate foreign workers.
15. A letter sent by Arenson to LA's General Manager, dated February 25, 2003.
16. A letter sent by Attorney Krispin to LA's General Manager, dated March 9, 2003.
17. A letter written by Attorney Matityahu Tal, dated March 11, 2003.