**No. 05-114C**
**(Consolidated with Case Nos.**
**04-1719C, 05-1172C, and 06-49C)**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**A.A.B JOINT VENTURE**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# APPENDIX PART 3

---

UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

A.A.B. JOINT VENTURE, )
Plaintiff, )
v. ) No. 04-1719-C
THE UNITED STATES, ) (Consolidated)
Defendant. )

- - - - - - - - - - -

DEPOSITION OF JOHN MERLE JONES

Friday, August 24, 2007

Washington, D.C.

Reported by: Cheryl A. Lord, RPR, CRR

Job No. 182824

**Exhibit 2**

August 24, 2007

10:01 AM

DEPOSITION OF JOHN MERLE JONES, held at the offices of:

BELL, BOYD & LLOYD LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036

Pursuant to notice before Cheryl A. Lord, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public in and for the District of Columbia.

APPEARANCES

For Plaintiff:
Brian Cohen, Esquire
BELL, BOYD & LLOYD LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

For Defendant:
Shalom Brilliant, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION, COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8275

CONTENTS


| EXAMINATION BY | PAGE |
| --- | --- |
| Mr. Cohen | 6 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Letter, 12-21-99, and attachments | 18 |
| 2 | Attachment to the Special Contract Requirements | 21 |
| 3 | Email, 3-15-02, pages 50 and 51 of 188 | 52 |
| 4 | Email, 3-22-02, pages 52 and 53 of 188 | 59 |
| 5 | Email, 4-15-02, pages 22 and 23 of 188, and attachments | 62 |
| 6 | Email, 4-22-02, page 2 of 2 | 69 |
| 7 | Email, 5-10-02, pages 24 and 25 of 188 | 73 |
| 8 | Email, 5-15-02, pages 1-3 | |

EXHIBITS CONTINUED


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | of 3 | 76 |
| 9 | Email, 5-17-02, pages 2 and 3 of 3, and attachments | 89 |
| 10 | Email, 7-5-02, page 2 of 2, and attachments | 93 |
| 11 | Email, 7-5-02, pages 1 and 2 of 2, and attachments | 95 |
| 12 | Email, 7-15-02, pages 16 and 17 of 188 | 101 |
| 13 | Email, 10-4-02, pages 1-3 of 3 and attachments | 106 |
| 14 | Email, 4-3-03, pages 1-3 of 3 | 110 |

PROCEEDINGS

JOHN MERLE JONES,

a witness called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. COHEN:

Q. Would you state your name and address for the record, please.

A. John Merle Jones, 6 Burr, B-U-R-R, Oak Court, Randallstown, Maryland.

Q. I used to live in Randallstown a long time ago. Okay.

What's your educational background, Mr. Jones?

A. I have a bachelor's degree from the University of Maine and a master's in business from Boston University, overseas program.

Q. What's your bachelor's degree in?

A. Forest engineering.

A. And there were other participants from the mission in New York as well as -- I don't recall Pini Lieberman's predecessor's name. There was another officer in that role before he became --

Q. Okay. Were there -- to your knowledge, were minutes taken with respect to those negotiation meetings?

A. There were not formal minutes.

As I recall, what we did is, we basically started with a draft, which we were calling the terms and conditions or something like that initially. And we would have discussions, and we would edit and revise that document as we went along, and ultimately, those provisions that we discussed were incorporated into the LOA.

Q. And ultimately became the LOA?

A. And became the LOA.

Q. Okay. In any of those meetings, those negotiation meetings, was there any discussion of the use of TCNs?

A. Yes.

Q. And was that an item that to your recollection was discussed once or many times?

A. It was discussed a number of times.

Q. Okay. And what do you recall with respect to the discussions of TCNs in these negotiation meetings?

A. We discussed -- basically the idea that we would be permitted to use TCN labor. Our understanding was that that was a common practice in Israel and wanted to preserve the right in the LOA for our contractors to have the ability to use TCN labor.

Q. For the contractors to be allowed to use TCN labor; is that right?

A. Yes.

Q. Okay. When you use the term "we," obviously that refers to subsequent contractors actually performing the work.

Correct?

A. Right.

The LOA -- I believe the note says

the U.S. government and its contractors.

Q. Okay. Was the -- you refer to a common practice in Israel.

What do you recall specifically about what you heard in these meetings about that practice?

A. I don't recall a lot of specific discussion other than that it was a common practice, and, you know, a common practice not only in Israel but in a lot of large international construction projects.

Q. Okay. Was there any -- was it ultimately agreed that the LOA would reflect the fact that the Corps and its contractors would be allowed to use TCN labor in performing the work?

A. Yes.

I believe the language that ended up in the LOA is that they may use --

Q. Okay. I'm going to hand out as exhibit 1 -- you probably will need to take a minute or 2 or maybe more than a minute or 2. It's up to you.

MR. COHEN: Excuse me for a minute.

I mean, read it. I don't want to hold things up.

(Recess.)

MR. COHEN: This will be exhibit 1, I assume.

(Jones Exhibit No. 1 was marked for identification.)

BY MR. COHEN:

Q. Are you still looking, or are you ready to --

A. I guess I'm ready.

MR. BRILLIANT: It hasn't been memorized yet, but --

MR. COHEN: Not memorized: surprise.

BY MR. COHEN:

Q. Okay. All right.

Just in the interest of time, can you point out the provision or provisions in the LOA that reflect the aspect of the LOA that

allows the United States -- the government and its contractors to bring TCNs in for performing the work. And you pick what you want.

I would suggest that again just in the interest of time, you may among other things want to look at page 6 of 19, but you're answering, not me.

A. Yes.

I'd say it's note 5 N on page 6.

Q. Okay. What page is note 5 on?

A. Note 5 begins on page 4 and has a number of subparagraphs extending to the top of page 7.

Q. Okay. Let's see, what's the date?

Let's get the date.

December -- the first page of exhibit 1, there's a date of December 21, 1999.

Is that your understanding of the ultimate conclusion of those negotiations and the finalization of the LOA, or am I missing a date here?

A. This copy had -- doesn't have the

other signatures on it, but it appears to -- regarding this note, it appears to be the same language that was in the final LOA as I recall.

Q. M-hm. So is it correct that at the time the contracts were entered into -- and of course we're concerned here with Nachshonim -- the U.S. government anticipated that the joint venture would be utilizing TCN labor in performing the work?

A. I would say that the U.S. government and our customer, ministry of defense customer, our general understanding is that we expected that contractors would probably choose to use TCN labor.

Q. And is it also true that there were other contracts other than the Nachshonim contract that -- let me strike that.

Was there a contract -- were contract provisions included in the Nachshonim contract reflecting this anticipation that TCN labor would be utilized?

A. I never reviewed the contract, so I

Q. Because of the TCN issue.
Right?
A. Yes.
Q. Okay. In the next -- back on page 1 of exhibit 5 -- the next sentence and I'm going to leave out the parentheses states: Under the terms of the LOAs, we, US and our contractors, are allowed to bring TCN workers into Israel on projects being executed under the LOA.
Correct?
A. Yes.
Q. All right. And we've already covered this, but that -- isn't -- that is in fact your view as well, is it not, that under the LOA, your contractors were allowed to bring TCN workers into Israel on projects being executed under the LOA; is that right?
A. Yes.
The LOA provides for U.S. and its contractors to bring TCN labor.
Q. To perform work on the Wye River projects.

A. Yes.

Q. And in particular, you told her what you've said a few times here in the next paragraph, that under the LOAs, your contractors -- and I'm skipping words here in the interest of time -- are allowed to bring TCN workers into Israel to work on these projects.

Correct?

A. Yes.

I've related the same information that has -- was provided to us by our district and through the program office.

Q. Right.

And you've already said that that was your opinion as well, that under the LOAs, the contractors were going to be allowed to bring TCNs in.

Correct?

A. Yes.

Q. Okay. And then in the next sentence, you're advising Ms. Moretti that contrary to them being allowed to bring in the

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Dated
September 4, 2007

CHERYL A. LORD
Notary Public in and for the
District of Columbia

My Commission expires April 30, 2011

Loren Data Corp.

[redacted]

**COMMERCE BUSINESS DAILY ISSUE OF OCTOBER 30, 2000 PSA #2716**
**SOLICITATIONS**

# Y -- FIRM FIXED PRICE CONTRACT FOR DESIGN/CONSTRUCTION SERVICES FOR NACHSHONIM STORAGE BASE, ELAD, ISRAEL

**Notice Date**
October 26, 2000

**Contracting Office**
Department of The Army, US Army Engineer District, Europe, Attn: CENAU-CT, Cmr 410, Box 7 APO AE 09096

**ZIP Code**
09096

**Solicitation Number**
DACA90-01-R-0001

**Response Due**
January 22, 2001

**Point of Contact**
PM-Robert Saari, phone 011-49-611-816-2820 or C S- Ann Gunzel, phone 011-49-611-2624.

**Description**
Firm Fixed Price (FFP) Contract for Design/Construction of military facilities, Nachshonim Storage Base, located approximately 20km east of Tel Aviv, Israel. The proposed facilities construction will be administered under Foreign Military Sales (FMS), and United States procurement laws and regulations. Contract will be awarded and paid in U.S. dollars. Under the Wye River Accords, this procurement is restricted to United States firms, Israeli firms OR United States/Israeli Joint Ventures. In addition, construction materials must be manufactured in Israel, to the extent such materials satisfy contract requirements. Contractors may bring into Israel nationals of the U.S and third countries having diplomatic relations with Israel for the purpose of accomplishing the work. Principal features of this project are as follows: The Nachshonim Storage Base shall be designed and constructed for the long-term storage and maintenance of a large number of vehicles and equipment. The work includes the follow-on design and construction of storage buildings, office buildings, residential storage and services buildings and the construction of all related infrastructure. The Base occupies an area of approximately 1,600,000 square meters. The total building area is approximately 227,000 square meters for 204 different buildings. Infrastructure and Site Development is currently fully 100% designed. The contractor will be responsible for follow-on detailed design of the external utilities connections, all buildings, and communications and control systems. The buildings, external utility connections, and communications and control systems have been designed through approximately 35%. Responses are desired from firms who can demonstrate



EXHIBIT
3

recent experience and excellent past performance in design/construction of similar facilities. If the offeror does not have in-house design and construction capabilities, joint ventures will be acceptable. The qualifications of both the design and construction firm will be evaluated. The offeror will also have to demonstrate scheduling capability, proposed schedule for this procurement, and submit a management plan. Solicitation will be issued on or about 20 November 2000. Proposals will be received on or about 22 January 2001. Estimated cost of proposed procurement is more than $100,000,000. Estimated time of completion: 1095 Calendar Days: SIC code 1541. Plans and specifications will be issued on CD ROM only and limited to one (1) set per contractor. A site visit has been scheduled for 20 December 2000, 10:00 at the site. Questions of a technical nature may be addressed to Mr. Robert Saari at telephone number 011 49 611 816-2820 or electronic mail Rob.B.Saari@nau02.usace.army.mil. Questions of a contractual nature may be addressed to Ann Gunzel at 011-49 611 816-2624 or electronic mail Ann.L.Gunzel@nau02.usace.army.mil or faxed to 011 49 611 816-2618.

**Web Link**

Ann.L.Gunzel@NAU02.usace.army.mil (Rob.B.Saari@NAU02.usace.army.mil or Ann.L.Gunzel@NAU02.usace.army.mil)

**Record**

Loren Data Corp. 20001030/YSOL005.HTM (W-300 SN505248)

| Y - Construction of Structures and Facilities Index | Issue Index |

---

*Created on October 26, 2000 by Loren Data Corp. -- info@ld.com*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x

A.A.B. JOINT VENTURE, :
Plaintiff, :
v. : No. 04-1719C, No. 05-114C,
THE UNITED STATES, : No. 05-1172C, and
Defendant. : No. 06-49C (Consolidated)

- - - - - - - - - - - - - - x

Tel Aviv, Israel
Thursday, November 30, 2006

Videotaped deposition of YEHUDA SEGEV, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Sixth Floor, Tel Aviv, Israel, at 7:10 p.m., Thursday, November 30, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.

ORIGINAL



EXHIBIT
4

APPEARANCES:

On behalf of the Plaintiff:

PHILIP C. JONES, ESQ.
Bell, Boyd & Lloyd, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
202.955.7050
pjones@bellboyd.com

On behalf of the Defendant:

SHALOM BRILLIANT, ESQ.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
202.305.7561
shalom.brilliant@usdoj.gov

Also present:

YANIV SOMEKH, Videographer
MOSHE TOPROVSKY, Advocate
STEPHEN DENISON KEENEY

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| YEHUDA SEGEV | PLAINTIFF | DEFENDANT |
| By Mr. Jones | 5 | |
| By Mr. Brilliant | | 30 |


E X H I B I T S


| EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 14 | Hebrew Document, Dated December 24, 2001 | 12 |

P R O C E E D I N G S

THE VIDEOGRAPHER: We're on record. Cassette No. 4.

MR. JONES: Good evening. I'm Phil Jones. We're here in the case of A.A.B. Joint Venture versus the United States, in the United States Court of Federal Claims, Case No. 1719C (Consolidated), under Chief Judge Damich.

We are here for the deposition of Yehudou -- Yehuda Segev, who is the former director general of the Association of Contractors & Builders in Israel. And with him is the deputy director general of the association, Advocate Moshe Toprovsky.

Could we swear the witness.

Whereupon,

YEHUDA SEGEV,

was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

MR. BRILLIANT: Before we proceed, I want to state for the record: I'm Shalom Brilliant with

the Department of Justice, representing the defendant in this case and that I'm here, but I object to this entire deposition on the grounds that I was first given notice of this deposition yesterday evening.

I have had absolutely no time within which to prepare for this deposition. If there's any need for cross-examination, since I'm here, I may try to just do the best I can. But I -- I don't waive anything in that regard. And I believe that it's procedurally inappropriate to conduct a deposition on one day's notice. And I reserve all my rights to object to the use of this deposition or any part of it.

MR. JONES: Very well.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. JONES:

Q. Sir, could you please --

MR. BRILLIANT: And also -- excuse me -- the unreasonableness of having a deposition at -- after 7:00 o'clock in the evening.

MR. JONES: Very well.

Q. Sir, could you please state your full name and spell your last name.

A. Segev, Yehuda. Today I am director general of the Industry Association. But I was, between 2000 until 2006, the director general of the Contractors & Entrepreneurs Association in Israel.

Q. In addition to that position, are you also engaged in military service in Israel?

A. Until 2000, I was in the Israel Military, in the Army. The last job was the human res -- in charge of the human research. And my rank is major general.

Q. Prior to -- let me just start again.

During the time that you were director general of the Contractors Association, what, if any, involvement did you have in the issue of the admittance of third country nationals for use in the construction industry, for employment in the construction industry?

A. In my job in the Contractors Association, I was in charge of the policy and carry out the policy of our association with the Government, or maybe against the Government, about all the employees of our branch.

Q. Uh-huh. And who were members of the association?

A. The members. The members is about 2,400 contractors who deal with building, with infrastructures, and all the world of build -- of contractors.

Q. In the course of your work, did you become familiar with the history of the use of third country national skilled workers in Israel?

A. Yes, of course. I know -- I know the -- the problem of the manpower and workers in our branch, specifically in contractors branch, and all other branch. Because this is not just my hobby. It was my job to know it.

Q. Okay. Could you give us a history of the use of third country nationals as skilled workers in the construction trade in Israel?

A. Until from -- from what -- what year?

Q. Whenever --

A. Okay.

Q. -- it became --

A. Okay.

Q. Just how it came about --

A. Okay.

Q. -- that the importation of skilled workers became common.

MR. BRILLIANT: Are you confining the

question to the period of the witness' experience in this area?

MR. JONES: No. No.

THE WITNESS: Okay.

MR. JONES: He did testify that he'd become familiar with the history in the course of his work. And I'm asking him about that history.

THE WITNESS: Okay. And we're talking about -- I -- I want to start from 1967. From 1967, after the six war -- Six Day War, the -- the border between the Jordan, Egypt -- no -- between Jordan, it's open Aza -- Gaza Strip. And Palestinian workers start to became to Israel with license and with the permission of the Government to come and work in a lot of area, not just in the contractors.

We're talking about two thousand and fifty -- two -- two thousand fifty thousand (sic) Palestinian workers who came to work in Israel.

Usually, most of them come every day from the villages, come to work from 5:00 o'clock, 6:00 o'clock until the evening. And they go back to the village.

BY MR. JONES:

Q. And I'm sorry to interrupt.

A. In our -- in our branch, in the contractor branch, until 1996, we -- the number of the Pales -- Palestinian workers who work in our branch was about 90,000 -- "nine-oh" thousand -- Palestinian workers who work in our branch.

Q. In what trades would these workers tend to concentrate?

A. What --

Q. What -- what trades, skills?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. The skills was -- let's say, we call it wet jobs. It -- it mean people who work with iron. People who work with cement. People who work with --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Concrete, floors.

THE WITNESS: -- concrete, floors.

If we -- if you -- we split the workers in our industry, third of the people work with the hard works. Third of the people work with the professional work, like electricity, wood, and et cetera, et cetera. And third it's, let's say, another skills. Okay?

The -- the problem was in the -- what we called hard work -- hard workers. This was the problem. Until 1996, everything it was okay. But when the Intifada will start, in one day, all the 90,000 Palestinians disappear in one days.

BY MR. JONES:

Q. Approximately when did this Intifada start? This was in -- during 1996?

A. Yes. '96. Yes.

Q. Okay.

A. This was the first time that they disappear in one day because the Government -- huh?

MR. MOSHE TOPROVSKY: Borders.

THE WITNESS: -- the borders -- the border was blocked. The Government decided, because the security problem, not allow them to come to work in Israel.

And for us, in one day, all the areas that you start to build in and you're building, we have a big problem. And it was a big mess because the contractors couldn't continue and to build and to fulfill their contracts -- contracts and to stand in their schedule.

Because, you know, every -- every contracts, you have schedule that you have to

finish it. And if you don't finish it, there is a fee plus.

MR. MOSHE TOPROVSKY: Fine.

THE WITNESS: Fine. A fine. Okay?

BY MR. JONES:

Q. Uh-huh.

A. You have to pay money. It's a lot of money.

So we go to the Government, and we -- we ask him to -- to bring to Israel foreign workers. Foreign workers, it's mean workers who come from other countries, from Romania, from China, from Ukraine, from Turkish (sic). And the Government allowed us -- allowed to bring foreign workers.

The number was -- we start in 1996, 1997. And the peak of the number of foreign workers was in 2000 -- about 2000, it was about sixty, 65,000 foreign worker who walk -- who work in our branch.

In those times, what happened is start a new phenomena in Israel. What happened? And the Government allowed to bring agriculture foreign workers, our industry, contractors foreign workers --

MR. MOSHE TOPROVSKY: Industrial.

THE WITNESS: -- industrial foreign

workers --

MR. MOSHE TOPROVSKY: Restaurants.

THE WITNESS: -- restaurant foreign workers. And the numbers grow and grow up until we found ourselves in about 350,000 foreign workers in Israel. And the unemployment start to increase, and the Government decided to do something with this phenomena.

MR. JONES: Mr. Segev, I wanted to hand you a document that I'll have marked as Plaintiff's Supplemental Exhibit No. 14. This is in Hebrew. And I've also got an unofficial translation of the document.

(Plaintiff's Exhibit No. 14 marked for identification.)

BY MR. JONES:

Q. First of all, what is the date on that document?

A. The date of the decision, of the document, is our Government -- the Israeli Government decision. The number is 1141 from 24 of December, 2001.

Q. In --

MR. BRILLIANT: Before we proceed, just in terms of the document, can you identify who made

the translation.

MR. JONES: Actually, we just had someone in -- in our office make it. We didn't -- there was not time to get it done by Word Power.

MR. BRILLIANT: Because we have a stipulation in the Court order, providing that translations made for purposes of deposition exhibits and trial exhibits will be made by Word Power.

MR. JONES: Right. And we will have Word Power make this translation. And when we have the official translation, we'll add it into the record.

MR. BRILLIANT: All right. But in that event, the testimony shouldn't be about this translation because that's not going to be the one in the record.

MR. JONES: No, we -- he will be discussing it from the Hebrew.

MR. BRILLIANT: Okay.

BY MR. JONES:

Q. Do you -- could you explain what the significance is of this decis -- governmental decision that you just identified.

A. (Examining.) Okay. From this period of

time in December 2001, the number of the foreign workers who work in our industry was about, let's say, fifty, 55,000 foreign workers. And the Government decide to do three things.

First of all, to close the sky. And there is a big influence in our branch, and I will explain you later -- later.

The second was to -- to put a quota of number of foreign workers who can work in our -- all the country. And the decision was that in two branches, in agricultures and our industry, it will be 45,000 foreign workers.

Q. Was that 45,000 each or total?

A. No. Together in our branch and the agriculture. And in point No. 1. And it's -- this was the second vector.

And the third vector was to arrange the system how to split --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: To split.

THE WITNESS: Huh?

MR. MOSHE TOPROVSKY: To split.

THE WITNESS: -- how to split the foreign workers between the contractors.

I can tell you that it was a big mess between 2001 until 2003, end of 2003, because they don't carry out this decision like they wrote it.

And the contractors who need foreign workers couldn't -- couldn't find foreign workers because it was a problem with the license. It was a problem with the number of the foreign workers.

Each contractors have a -- have a right to -- to hire. And it was a lot of strike -- Government strike that they stop to -- to treat to the contractors.

Okay? I -- you understand?

BY MR. JONES:

Q. Yes.

A. What I can tell you: That until 2004, we -- it was a big debate between our association and the Government.

And just in the end of 2004, we start to make an order in this field, in this problem. And we signed an agreement with the Government, our association and the treasure minister and the labor minister. We signed an agreement to arrange and fix all the big mess with the foreign workers in our industry. But it was just in December 2 -- December 2004.

The lead time between December 2001 until in December 2004, for the contractor, it was -- I cannot describe the problem. But it was a -- a big, big problem.

Why? Every two months, three months, the Government carry out another regulation, another order, a strike. The labor minister, who -- who have to deal with this and supply the services to contractors doesn't do it because a lot of mean -- reasons. And what happened it's --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Uncertainty.

THE WITNESS: -- uncertainty for the contractor, uncertainty time to know how many workers he can work with them tomorrow morning. I don't only talk about one month, two months, one year. Tomorrow morning, they don't know. They don't know how many foreign workers came to work in -- "shetach habneya" -- in the field area of the contractors.

The reason was: First of all, you cannot know what is the number that you have the permission to work. After that, the police start to --

MR. MOSHE TOPROVSKY: Hunt.

THE WITNESS: -- hunt the foreign worker -- unlegal foreign workers who work. And if you come to the area that you -- building area, the police doesn't know that you are legal foreign worker and you are not legal or unlegal foreign worker.

So they came to the area, to the field, contractor area, stopped the building, stopped the build, called to foreign workers, and they took them four hour, six hour, to check if you are legal or illegal. And it's make a lot of damages to the contractors.

The foreign workers start to fraid. So they leave the site. And I can tell you it was a very -- a very big problem. And there is no alternative to take another for -- workers. Why? Because we don't have Israeli workers with the professional skills. Okay?

BY MR. JONES:

Q. Skills?

A. Skills. Prof -- professional skills. Sorry about my language. I didn't say it.

This was the first -- there is no Israelis who can come to work. The border was

blocked. So the Palestinians doesn't come. So it was a very big problem.

I can tell you that we -- a lot of contractors lose a lot of money. In my period of time between 2002 until 2004, 74 firms, contract -- contractor's firms go to bre -- bankrupt and close the business. And the main reason was workers. Workers, workers, and workers. Okay?

Q. Uh-huh. There was one other area that I was curious about. There has been testimony in the record already of a certain lack of cooperation on the part of the ministries that were responsible for allocation of visas.

Was -- was this -- to what extent was this a problem during the 2002 to 2004 period?

MR. BRILLIANT: Objection. Leading.

THE WITNESS: I will describe you the system, what was the system, to understand what was the results.

If I'm contractors and I need the workers, first of all, I have to prove that I have a site and building, how much square meter I build, and if it's building -- it's industrial building, it's infrastructure building. It was --

//

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: The keys. You -- in order to get the quota, the numbers of skilled --

MR. BRILLIANT: Objection. We should only have testimony by the witness.

MR. JONES: Yeah. We can only have testimony by one person.

THE WITNESS: Okay. But he can help me to translate?

BY MR. JONES:

Q. Yes.

A. Okay. Thank you.

As I say, you have to prove the demands, how you do it. I'm go -- I have permission to build, et cetera, et cetera, number of square meter. Okay? I build a site with infrastructure or building or industrial -- industrial site. You have a key. And they give you the permission after you prove your demands. Okay? This was the first step.

The second step, the Government send people, clerks, who come to check if the contractor give the -- all the data, all the right data.

Okay?

The second -- the third step was that to give you a permission to bring foreign workers. Now, after tell the minister of labor give you a permission, you have to go to interior minister -- "nachon"? -- interior minister to ask them the permission to go to overseas and bring foreign workers.

After you go to Romania -- let's take the example in Romania. You take from Romania foreign workers. You have to test them and to check if they have a skill and they know how to build the building.

They bring -- they -- they bring it -- they bring -- they -- they get the name. They get the permission from the Romanian country that they can come to work in Israel. And after that, you have to ta -- to check them with --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Health.

THE WITNESS: -- health checks and other checks. And it's take time. After you have a list, you come back to Israel. And they have to -- to -- to give you the permission to bring them.

Okay. Let's say -- I give you a real example. Let's say that the contractors have a list with 100 foreign workers and he can bring it and everyone passed all the checks and everything it's okay.

But I told you that there are a lot of changes of regulations. Okay. We are going to cut the quota from one number to another wonder -- number. So it stopped to bring the foreign workers.

Now we are going to split the quota for all the contractors. And it's take another month and another month and another month. And now you have to go to do all the process again.

And I can tell you: This mess take six months, eight months, even one year. So even you have the license to bring foreign workers, it's took three months, six months, nine months. You cannot know. You cannot know. In those time, we cannot know nothing. Uncertainty of -- you cannot know. This is the word.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. Another issue was foreign worker. Okay. I am a contractor. I

brought 100 foreign workers, and I start to work.

I told you that it was a gap between the demands and the number of the foreign workers. The demand was here and the -- and the foreign workers was here. (Indicating.) And it was a gap.

So how the contractors know -- can continue to work? What they do? Or -- what they do? And I will explain you two seconds.

Or foreign worker who come with visas or license to work in our branch, but they go to work in food industry. Why? They get more money there. So they leave the site and go to work in the agriculture or food or mechanic or you name it.

Why? Because if the contractor paid them, let's say, $5, $6 per hour, another people -- another people pay them half dollar more, they leave the site. They go to work in another work. So this was the system of -- to create unlegal foreign workers.

If I come back, an -- a lot of foreign workers, about 30, 35 percent, doesn't work through the license. They work in another contractor, another branch, another area, but not in the site.

BY MR. JONES:

Q. Was there also a policy developed during

this 2002 to 2004 period with respect to the obligation of a contractor to retrieve, for lack of a better term, if you can understand that, or find the people who have deserted them?

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

THE WITNESS: Just a minute. Let me make sure that I understand the question.

MR. MOSHE TOPROVSKY: Ask again, please, the question.

BY MR. JONES:

Q. Right. Basically what I'm asking about is the deserters policy.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: The policy was very funny because the Government account the number of the illegal foreign workers --

MR. MOSHE TOPROVSKY: Deserters.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Deserters?

MR. MOSHE TOPROVSKY: Uh-huh.

THE WITNESS: Okay. Deserters. They account them like they in the site, they belong to

the contractor. It's the contractor problem, not the Government problem, not the police problem, not the law problem. Contract -- the contractor's. He in charge of these people, and he has to -- to find them. No tools. No law to do it.

Let's say if I found you in the restaurant and you have a visa in my site, I can enforce you to come to work in my site? What is the authority to force you to come to work in my site? I can hit you? I can arrest you? What I can do? Nothing. But the policy of the Government it's was: You in charge. We don't care.

BY MR. JONES:

Q. Now, did there come a time during this 2002 to 2004 period that enforcement of the law and a method of enforcing the law was created, the -- the establishment of the immigration police?

A. Okay. In -- there is a lot of Government decision about set up immigration police. But they carry out the decision just, let's say, in -- in the end of 2003. I don't remember the month.

And in 2003, the Government decided to give 400 policemen and to build -- set up a -- a new department, immigration police. And all the job was to catch the -- the people who live here

unlegally.

I can tell you that the influence of -- of this start in 2004. And they really success. They cut the number between 350,000 to 250,000. That's all. One hundred -- about 100,000 foreign worker, they enforce them to leave to their country.

Q. What, if any, impact did the establishment of the immigration police have on contractors?

A. I told you before it was a disaster. Because they come every day to the site. And they check the people. And -- and they check the foreign workers and they --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

THE WITNESS: -- they --

MR. MOSHE TOPROVSKY: Stop.

THE WITNESS: -- they -- they don't give them --

(Discussion in Hebrew between Mr. Brilliant, Mr. Moshe Toprovsky, and the witness.)

MR. BRILLIANT: "Interfere."

THE WITNESS: Interfere. Okay.

-- interfere them, and they stopped the worker. It was influence --

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Outcome.

THE WITNESS: Outcome?

-- the outcome of the -- the -- the project. Because, let's say -- I will give you the example. Let's say, to build 100 square meter, you need eight foreign workers. Okay. And we know that the eight foreign workers can do it with -- with 30 day. Okay? But we take -- we -- when we make the count, we assume that these people work from 6:00 o'clock until 4:00 o'clock afternoon.

So what happened? They don't work for 6:00 o'clock until 4:00 o'clock. Four hour, six hour. The -- the immigration police come, and they don't let them to work. They check them. They make their research. They took them to the police.

(Court reporter interruption.)

(Comment in Hebrew by the witness to Mr. Moshe Toprovsky.)

MR. MOSHE TOPROVSKY: Research.

THE WITNESS: Research.

MR. MOSHE TOPROVSKY: Investigation.

THE WITNESS: Investigation. They take them to the police station.

How the contractor can work? He need ten people. The police take five. And when they come, they don't want to work, et cetera, et cetera.

BY MR. JONES:

Q. The last area I wanted to ask you about was this.

I understand that even -- even before 2001, it was illegal for foreign workers to work on Government projects; is that correct?

A. We have an -- an example. It's published in the newspapers, so I can spoke about it.

Our Parliament were built with foreign workers. You understand the joke? This is a joke.

Q. Uh-huh.

A. The Government didn't give us permission or give us -- didn't give us foreign workers to build private projects. But for them, no problem. They give a license to bring foreign workers.

Q. Is this despite the fact that it was actually technically illegal for them to -- to be on the job?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: No. The police -- the -- the immigration police come to check them. They found legal foreign workers and illegal foreign workers. No problem.

BY MR. JONES:

Q. But -- but there was a -- there was a period of time, was there not, where on Government jobs, there weren't supposed to be any foreign workers? Is that true?

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Okay. Listen, it was my -- my big fight against the Government. They carry out decision that they don't give visas and license to foreign workers for infrastructures or national projects.

BY MR. JONES:

Q. None?

A. Infrastru -- no. No. You cannot take foreign workers to work in the site that belong to the Government. Okay? This was the decision.

But they understand they cannot carry out this decision. So the decision was a paper. But in the fields, foreign worker works. And the police -- police immigration -- immigration police

not enforce this decision.
It was agreement -- "ech omrim"? -- nonofficial agreement between me and the Government that they close their eyes. There is a decision, but you can -- you can take foreign workers, and you can continue for -- for work for the Government projects. Okay?
Q. Last question. I -- I wanted to get a little bit of clarification as to what you meant by "closing the skies."
Let's say, for example, the minis -- which ministry gave the visas?
A. Okay.
Q. Was it the Labor?
A. The Labor --
Q. Okay.
A. -- give the visas. But the permission to bring the foreign worker to Israel is Interior --
Q. Okay.
A. -- Ministry.
Q. Let -- let's say, for example, the -- the -- the Labor Ministry issues approval to a company for 100 foreign workers.
A. Foreign workers. Okay.
Q. What, if any, effect did the advent, the

start of the Closed Sky policy have on contractors who had visas as of that date?

A. Very, very simple. You can get from one Government, from the Labor, the department, the Labor Ministry permission to bring 100 foreign workers. And the Interior Ministry don't allow to bring it. Why? Because the sky is closed. Two policies --

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

MR. JONES: Okay. I have nothing further. Thank you.

MR. BRILLIANT: I -- just one quick question.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. BRILLIANT:

Q. Without -- without waiving my prior objection, since there hasn't been any ruling on it, with regard to the exhibit that's been shown -- what's that exhibit? -- Plaintiff's Supplemental Exhibit No. --

MR. JONES: Thirteen.

BY MR. BRILLIANT:

Q. -- 13 --

MR. MOSHE TOPROVSKY: Fourteen, I think.
MR. JONES: Oh, I'm sorry. Fourteen.
THE WITNESS: Fourteen.
BY MR. JONES: Fourteen. Yeah, we've already used 13.
BY MR. BRILLIANT:
Q. I think you testified before, in connection with this, that this arose as a result of a concern about rising unemployment?
(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)
THE WITNESS: No. Two reasons. Unemployment is increase, and the number of the foreign workers was also increased.
BY MR. BRILLIANT:
Q. This concern -- did that -- did that concern happen suddenly, like in December 2001, or was it a period of time that the Government became concerned about these -- these two problems?
A. This was the first time that they carry out a decision to decline the numbers, to cut the numbers of the foreign workers.
Q. No, I'm -- I understand that this is the first -- this is when the decision came out.
A. Yes.

Q. But was this something where they just suddenly woke up on December 24th and --

A. Aah. No, no, no, no. As you know, the Government, before they make a decision, they have to set up a committee. So they set up a committee, and the committee recommend them to take these decisions.

Q. Do you know around, like, when -- when that committee was set up, when it made its recommendation and so on?

A. It was three, four, six months before the decision, something like that. I cannot mention the number -- the date, the exact date.

Q. And was there any -- during this period of time, was there any what we call a lobbying, like, let's say, trade associations like your association making recommendations to the Government or urging them to do this or not to do this or --

A. I can tell you that I spend a lot of money, a lot, a lot of money for lobbying, for media, for research, from the expert research, to convince the Government to give us a permission for foreign workers because there was no alternative. No alternative.

Q. Was this after this committee was formed or before the committee was formed?
A. Before and after. We -- we -- I can tell you, according to our association's history, we start the fight in 1999. In 19 -- from 1999 until December 2004, until we signed an agreement between the Government, it was a big fight, a big debate and a big fight. Because we go to the Government. We go to the Parliament. We go to the ministers. We go to the Prime Minister. There is no -- there is no field area that we don't push.
Q. But -- but this -- you say, in 1999, we started the fight, the debate, and so on.
A. Yes.
Q. What was the fight about that made that time -- they did not have this restriction on foreign labor; right?
A. The number was -- no. I -- I -- the number of the permission to bring foreign labor was 40,000, something like that. And our demand was 65,000. So this was the -- the -- our -- our request from the Government in those time.
Until this time, the bargaining between the association and the Government was about the quota. And we enforce them to -- to raise the

number of the foreign work -- workers.

Q. No, what I'm asking about is in connection with -- you mentioned before about that this -- this December --

A. 2001.

Q. -- 2001 restriction was a result of -- of follow -- after the formation of a committee to look into this problem about the increase in foreign workers and the rising unemployment --

A. Yes.

Q. -- and that that committee was formed several months, maybe six -- four or six months, whatever --

A. Something like that.

Q. -- before December and you were involved in -- what I was concerned with is: When did you start getting involved in -- not in the issue of increasing foreign workers specifically, but in the issue about the plan to decrease foreign workers in accordance with -- with this -- what ultimately came out to be this -- this law.

(Discussion in Hebrew between Mr. Moshe Toprovsky and the witness.)

THE WITNESS: Something around 2001, something like that. I cannot tell you exactly the

date.

BY MR. BRILLIANT:

Q. I mean, but late? Middle of the year? Early in the year?

A. I don't know. Something -- during the year of 2001, we start to do. But they -- I -- I described what happened. It was the decision, but it was a big gap between the decision and what happened in the field area.

MR. BRILLIANT: I have no other questions.

MR. JONES: I have nothing further. Thank you.

THE WITNESS: Thank you very much.

THE VIDEOGRAPHER: Going off the record.

MR. JONES: Just as a -- if you want to read the transcript to make sure it's accurate, you have that right to do so.

THE WITNESS: No problem. You have my email.

MR. JONES: Okay.

MR. MOSHE TOPROVSKY: Please send him.

MR. JONES: We'll send you a copy.

THE WITNESS: Okay. And we will check it.

MR. JONES: Thank you.
THE WITNESS: Thank you very much.
(The deposition concluded at 7:55 p.m.)

CERTIFICATE OF WITNESS

I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read the same; and that I have made the corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this ______ day of ____________________ 2006.

____________________
Yehuda Segev

REPORTER'S CERTIFICATE

I, BRENDA MATZOV, CA CSR No. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

IN WITNESS WHEREOF, I have subscribed my name this 14th day of December, 2006.

Brenda Matzov

Brenda Matzov, CA CSR No. 9243

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-114C |
| | ) | (Consolidated with Case Nos. |
| THE UNITED STATES OF AMERICA | ) | 05-1172C, and 06-49C |
| | ) | (Chief Judge Damich) |
| Defendants. | ) | |

**AFFIDAVIT OF AVRUM JOEL ARENSON**

AVRUM JOEL ARENSON, first being duly sworn on oath, subject to the penalties for perjury and based on his personal knowledge, states as follows:

1. I am the founder and President of A. Arenson, Ltd. ("the Arenson Company"), an Israeli construction company which is one of the three members of the A.A.B. Joint Venture.

2. The Arenson Company was among the first Israeli construction companies to bring foreign workers into Israel. The first occasion on which we used a substantial number of foreign workers was for a project for the Israeli Electric Corporation, which had instituted a policy in 1988 of not permitted Israeli Arabs to work on their projects, in light of a violent incident involving Arab workers. For that project the foreign workers came from Portugal. Later on we obtained most of our skilled labor in the "wet" trades – concrete, masonry, tile, painting, etc., from Turkey and Romania.

3. After the 1967 Six Day War, in which Israel gained control of the West Bank, an ever growing number of construction workers in Israel were Palestinians, who would travel from their villages into Israel to work, and then return in the evening.



**EXHIBIT 5**

4. As a result of the uprising in the West Bank in the late 1980s and early 1990s, which became known as the first Intifada, for security reasons many contractors began shifting their work force from Palestinians to foreign workers. In 1996, the border between Israel and the West Bank was closed, and at that time there was almost a complete shift to the use of foreign workers in the construction trades.

5. By the year 2000, it had became standard practice on large Israeli construction projects to use predominantly foreign labor. At that time a substantial majority of our company's labor force was third country nationals. For example, on the Open University project, a $17,000,000 job, 94% of our labor force was provided by TCNs. Similarly, on the Main Office Building for the Israeli Electric Corporation, a $20,000,000 job, 86% of our labor was TCNs.

6. The Notice to Proceed for the Nachshonim Project was issued by the Corps of Engineers on June 19, 2001. On December 24, 2001, the Government of Israel announced a major shift in policy with respect to importation of foreign labor. In what became known as the "Closed Sky Policy," Government Decision No. 1141, a translation of which is appended to this affidavit as Attachment A, decreed a number of initiatives that were designed to reduce the number of foreign workers in Israel.

7. As part of the implementation of the Closed Sky Policy, the Economical Administration issued Temporary Order 2001/44, effective January 1, 2002, which provided that no Foreign Workers were permitted to be employed on Israeli Government projects.. See Attachment B.

8. In the Fall of 2002, Prime Minister Sharon declared an immediate moratorium on the admission into Israel of foreign workers, until the end of 2003. A press report which fixes the date of that announcement as being released on October 2, 2002, is appended hereto as Attachment C.

9. When the Joint Venture approached the Corps of Engineers for guidance as to how to proceed to obtain foreign workers, the Corps directed the Joint Venture to consult the Arenson Company, since we had had considerable prior experience in employing third country nationals ("TCNs"). See Attachment D.

10. Had the Corps of Engineers not provided assurance to prospective bidders that foreign labor could be used on the Nachshonim Project, the Arenson Company would not have participated in the Project.

11. The first step in obtaining visas to bring foreign workers into Israel is an annual determination, made by the Ministry of Labor, as to what the need is for such labor for the coming year for each segment of the economy. Construction companies apply for "block visas" based on the volume of construction of the work-in-hand at time of application for the coming year. Once the Ministry of Labor issues its decision as to how many workers will be permitted with respect to the construction segment, the Ministry of Labor (which was later incorporated into the Ministry of Trade and Commerce) divides those visas among construction company applicants. The next step is to obtain approval of individual visas from the Ministry of Interior.

12. After the contract was awarded, the Joint Venture inquired of the Corps of Engineers concerning the procedure that would be used to obtain third county national

worker visas, and the Corps suggested that since the Arenson Company was already familiar with the process that the Joint Venture rely on the Arenson Company to obtain the needed foreign workers.

13. In the fall of 2001 and during early 2002 there were lengthy delays in the issuance of the Ministry of Labor's visa allocations due to a strike by the employees of the Ministry. The Arenson Company on behalf of the Joint Venture applied for a 2001 supplemental visa allotment for Nachshonimon September 24, 2001. The employees of the Ministry of Labor went on strike from October 16 through November 29, 2001. The application had still not been considered when there was another strike on February 14, 2002. Finally on July 3, 2002, the Ministry of Labor released its block visas for 2002, which included 784 visas for the Arenson Company, 539 of which were specific for use in the Nachshonim Project.

14. The Ministry of Labor block visa allocation turned out to be worthless, since the Ministry of Interior refused to issue any visas for new third county nationals to either the Arenson Company or to the Joint Venture. The bureaucratic excuse given by the Ministry of Interior for not issuing the visas in question was that their records showed that there were a number of foreign workers previously brought into Israel by the Arenson Company, over a period dating back to the beginning of the licensing period, and for which the Ministry had no documentation that the workers had returned to their home county.

15. Our company obtained a list of the purported "deserters" ( 306 in number) and assembled documentation, including airline tickets, showing that 102 of the claimed deserters had returned to their home country. We were able to convince the clerks at the

Ministry of Interior that the workers in question had in fact returned, but it made no difference as far as the Ministry of Interior was concerned. After that the Ministry of Labor just stopped referring to the "deserter" issue, but nonetheless, no visas were forthcoming.

16. The Joint Venture and the Arenson Company developed various strategies for dealing with the TCN issue, including increasing the rates we were paying for labor in the hope of attracting Israeli workers, advertising for workers in Romanian language newspapers, approaching the local labor office to hold a Job Fair for the purpose of recruiting Israelis, and engaging in our own direct recruitment efforts.

17. There were no visas issued by the Ministry of Interior for new TCNs to be brought into Israel for use either by the Arenson Company or the Joint Venture during the entire duration of the Nachshonim Project.

18. The effect of labor shortage in Israel in the construction trades in the 2002-2005 period was by no means limited to the Joint Venture or Arenson Company. There was a shortage of labor throughout the construction industry, which led the Israeli Contractors Association to file suit against the Ministries in question, seeking relief from the Closed Sky Policy.

19. I have been shown documentation by the Joint Venture counsel that the decision by the Corps of Engineers to deny the Joint Venture any relief in connection with the labor shortage issue was based on advice from the Israel Ministry of Defense, which believed that the Arenson Company was using TCNs on its other projects that should have been used on the Nachshonim Project. Not only is that not true, in fact the exact opposite is true. The Arenson Company permitted TCNs which we had brought into

Israel for other projects before the advent of the Closed Sky Policy to be used on the Nachshonim Project. The first I learned of such an allegation by the MOD was during this litigation. No one at either the MOD or the Corps had ever made an inquiry of me or to my knowledge anyone at our company to confirm their erroneous belief.

The foregoing is true and correct based on my personal knowledge.

________________________________

Avrum Joel (Avie) Arenson

litigation. No one at either the MOD or the Corps had ever made in inquiry of me or to my knowledge anyone at our company to confirm their erroneous belief.

The foregoing is true and correct based on my personal knowledge.

AVRUM Joel (Avie) Arenson

103362/F/1