**No. 05-114C**
**(Consolidated with Case Nos.**
**04-1719C, 05-1172C, and 06-49C)**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**A.A.B JOINT VENTURE**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# APPENDIX PART 4

---

REF: F:/US-Dept_Of-Justice/GovernmentDecision1141/BSR/25.3.07
[TRANSLATED FROM THE HEBREW]

# GOVERNMENT DECISION NO. 1141 OF 24TH DECEMBER 2001

## Reduction in the Employment of Foreign Workers

**Decided:**

With a view to increasing the employment options of Israeli workers by substantially reducing the number of foreign workers employed in Israel, with and without a permit, so that, as a long-term target, it does not exceed the number of foreign workers who were employed as aforesaid at the beginning of the 1990s -

1. To determine that in 2002, the maximum number of annual permits for the employment of foreign workers in all industries will be 48,000, of which 45,000 at the most will be in the building and agricultural industries; the aforegoing will not apply to foreign workers in the nursing industry.

2. To require the interministerial committee on consolidating governmental powers and responsibility with regard to the treatment of foreign workers, which the Minister of Labour and Social Affairs set up in accordance with paragraph 13 of decision no. 642 of 2nd September 2001 (hereinafter referred to as "decision 642"), to submit to the ministerial committee on foreign workers by no later than 15th March 2002 a plan for the establishment of a central agency that will consolidate the responsibility and powers of all the government entities currently charged with implementing policy on foreign workers under a single roof. Such plan shall include timetables and performance milestones.

3. To require the Minister of the Interior immediately to submit the regulations subjecting the employer of a foreign worker to an application fee and permit fee on under section 1J of the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991 (hereinafter referred to as "the Foreign Workers Law") in the maximum amounts prescribed in the said Law, to the Labour, Welfare and Health Committee of the Knesset and to act for the said regulations to be approved as soon as possible. Should such regulations not be submitted by 1st January 2002, the Prime Minister shall assume the power to make the said regulations in accordance with the provisions of section 39(b) of the Basic Law: The Government, and he shall make the said regulations forthwith.

4. To require the Foreign Workers Directorate to conduct a targeted information campaign to increase the awareness of employers and foreign workers of the provisions of law and the regulations of the Directorate with regard to the employment of foreign workers and the implications involved in the unlawful

**ATTACHMENT**

**A**

employment of foreign workers. In the scope of the said campaign it shall be stressed to the public that a report may be made to the appropriate authority by voice mail of specific cases of the unlawful employment of foreign workers; to allocate to the Foreign Workers Directorate in the 2002 budget for the implementation of this paragraph the sum of NIS 3 million.

5. To require the Minister of Labour and Social Affairs to give a report to the government at every government meeting that is held on and after 1st January 2002 on the progress of the combined activity to deport foreign workers who are staying in Israel unlawfully in accordance with government decision no. 642, on the number of foreign workers employed in Israel with and without a permit, on the number of foreign workers who have been deported from Israel due to staying here unlawfully and on the number of persons refused entry into Israel, all from the beginning of 2002 and since the date of the last report.

6. To require the Minister of Internal Security to prepare, in coordination with the Minister of Finance and by no later than 1st February 2002, an operative plan for increasing the number of places of custody intended for keeping persons who are staying in Israel unlawfully and intended for deportation from Israel; such increase shall not include places of custody in prisons and remand centres.

7. To add to the basic budget of the Ministry of the Interior for 2002 a sum of NIS 2 million and 10 public employee positions for implementing the provisions of the Entry to Israel (Amendment No. 9) Law, 5761-2001 with regard to bringing those who are staying in custody before the Commissioner of Border Control and the Custody Tribunal.

8. To require the Minister of Finance to appoint a team with the participation of representatives of the Employment Service and the Ministries of Labour & Social Affairs, Justice and Finance for the preparation of a tender for the award of concessions for bringing to Israel and temporarily employing foreign workers to a limited number of corporations in consideration for the payment of concession fees and in compliance with the obligations required by law, including with regard to the payment of wages and the provision of reasonable conditions for the foreign workers, and such other obligations as imposed upon them as conditions for the award of the concession; such tender shall be prepared subject to legal examination in consultation with independent experts and be published by no later than 1st March 2002, and the concessions pursuant thereto shall be allocated by no later than 1st June 2002; in accordance with the aforegoing, the Employment Service shall limit the validity of permits for the employment of foreign workers to employers who are not such concessionaires as aforesaid until 1st June 2002 at the latest.

# ECONOMY & FINANCE REGULATIONS (EFR)
# ECONOMICAL ADMINISTRATION BOOK

| Publication Date | Chapter 3<br>Clause 3<br>Sub-clause 3 | Purchases<br>Public Tender<br>Specifications | Valid from day |
|---|---|---|---|
| | | | 01 January 2002 |

Temporary Order 2001/44

To: Government Offices Accountants
Physical resources Managers in Governmental Offices
Government Offices' legal Advisers

Re: Enhancing Employment Possibilities of Israeli Workers by Decreasing the Extent of Foreign Workers Employment.
Ref. Government Decision No. 642 of September 2nd 2001

EFR: 2-03.03.03.01 2-13.02.05

According to the referenced government decision, the officers-in-charge in the goverment offices are to act according to the following:

Definitions in this Temporary Order:

"Foreign Workers" – excluding foreign workers, which chapter 6 to the Law for implementation of the agreement regarding Gaza strip & Jericho Area (Financial settlements and other orders) (Legislation amendments) 1994, applies to.

[Meaning residents of the autonomy in Judea, Samaria and Gaza Strip, which have valid working permission from the Employment Services to work in Israel].

"Foreign Expert" - As defined in regulation 1 in the Income Tax Regulations (Deducting stay expenses for foreign residents), 1979 – foreign resident that fulfills the following:

(1.) He was invited from abroad to Israel by an Israeli citizen who is not a manpower contractor or manpower mediator, to provide services to that Israeli citizen in a field where the foreign resident holds unique expertise;
(2.) He legally stays in Israel;
(3.) During his stay in Israel he has worked only in the field on his unique expertise;
(4.) For his work in the field of his expertise he was paid a sum exceeding 10,000 NIS, multiplied by the number of months he stayed in Israel and from which income tax was legally deducted; had he stayed in Israel less than a month – the above sum will be calculated when it is divided by 30 and multiplied by the number of days he stayed in Israel; the aforesaid sum will be coordinated according to clause 120b to the order as if it was a social benefit and rounded to the closest 100 NIS.

**ATTACHMENT**
**B**

1. In a connection to perform works in the construction and infrastructure field it is obligatory to include in the tender's documents, within the preconditions, in addition to the preconditions specified in paragraph 3.3.3.1 and in sub-clause 13.2.5 in the administrative EFR, additional condition, according to which the winning supplier will oblige in the agreement, that for the performance of the works that are specified in the agreement, he will not employ "foreign workers" excluding "foreign experts" as defined above.
   Such order will be included also in any connection other than tender.
2. The state's agreement will include, in addition to the above obligation, a special clause regarding the remedies for breaching the contract according to which: a violation of the aforementioned obligation substitutes for a fundamental Infringement and it will enable the office, according to its best judgment, to Rescind the contract or confiscate the guarantee they posses, or both, without detracting from the office' rights by law, including the Contracts Law (Remedies for breach of contract) 1971.
3. The above orders will be included also in other contractual agreements for the performance of works in the construction and infrastructure field performed by governments financing. Therefore, every finance transfer will be conditioned by the aforesaid obligation and by an obligation that additional contractual agreements for the performance of such works with third parties will be made with those who will pre-obligate -- as aforesaid. The contractual agreements will include a clause regarding the remedies due to breach of contract as aforesaid.
4. These orders must be applied to tenders that will be published starting January 1st 2002, and on works in the field on construction and infrastructure that are performed with government financing given starting January 1st 2002.
5. Please transfer the content of this order to all the relevant position holders and prepare accordingly.

Regards,

Nir Gil'ad
Accountant General

*Turning good science into hard cash*

**Ora Koren, Page 9**

HA'A[...] English

[Hebrew logo] Israel's Leading Daily Newspaper, Established 1919 Thursday, C[...]

03OCT02

# PM: No entry of foreign workers till end of 2003

## *Illegals in Israel will be offered jobs in place of imported workers, in de facto amnesty program*

*By Ruth Sinai*
*Ha'aretz Correspondent*

In an unprecedented decision, Prime Minister Ariel Sharon last night declared an immediate moratorium on all imports of foreign workers until the end of 2003.

Employers with authorization to import foreign workers who have yet to arrive will be able to employ illegal workers already in the country.

Sharon made the decision at a meeting with Public Security Minister Uzi Landau, Police Commissioner Shlomo Aharonishki, the head of the Deportation Authority, Police Commander Yaakov Ganot, and representatives from the Labor, Finance, and Interior Ministries.

"The entry of foreign workers to Israel is prohibited," according to an announcement issued by the Prime Minister's Office after the meeting. "The Interior Ministry and the Deportation Authority promised that employers will be able to get appropriately skilled laborers from the pool of workers in Israel."

The decision means that the state will grant a de facto amnesty to foreign workers who quit their legal jobs – due to poor conditions or because they were tempted by better conditions elsewhere – and went to work for employers not authorized to employ them. Some of those workers still have work visas.

The decision is expected to be vehemently opposed by manpower companies that bring tens of thousands of workers to Israel, earning hundreds of millions of dollars in brokerage fees. There are 350 such companies listed with the government. The agriculture and construction sectors are also expected to protest the decision, as they had objected to previous attempts to "launder" illegal workers in Israel.

### *Benizri welcomes 'courageous' decision*

"I welcome the prime minister's brave decision," said Labor Minister Shlomo Benizri. "Closing the skies will prevent the disgrace of all the middlemen making money off this phenomenon. I hope there won't be pressure from various interest groups on the prime minister as has happened in the past."

Benizri was referring to the farmer's lobby, represented in the government by Agriculture Minister Shalom Simhon, which pressured the government to allow the import of an additional 6,000 foreign workers beyond the 22,000 previously authorized. Benizri was opposed to the additional quota, and, with his Shas colleague Interior Minister Eli Yishai, tried to block the decision, infuriating the prime minister. Ultimately, the Shas ministers lost the battle.

The idea to prevent new foreign workers into the country came from the treasury, which has witnessed a bizarre paradox in recent weeks: while the state began a mass deportation program of foreign workers ordered by the prime minister, convoys of airplanes loaded with foreign workers arrived daily, bringing new construction and agriculture workers.

In August, airplanes filled with workers brought by a new manpower company, Speed, owned by Ephraim Mimoni, a close associate of Simhon, arrived here.

However, 150 of the Thai workers brought in by Speed complained to the Thai Embassy that there was no work for them, even though each of them had paid $5,000 for the right to work here. Mimoni denied that there was no work for the Thais, while Simhon denied any connection to Mimoni's businesses.

### *Caregivers may be exempt*

It is not clear if last night's decision will affect foreign workers providing care for the elderly and chronically ill.

Such workers have enjoyed a special status due to the humanitarian nature of their work, and they have not been subject to the quotas limiting the number of people who can be employed as caregivers. There are some 40,000 Israelis with authorization to employ caregivers, a number which grows by about 500 a month.

The treasury says that yesterday's decision should include caregivers, since tens of thousands of them have left their employers and are working as house cleaners or as caregivers to those without authorization. Benizri said the decision regarding caregivers should be more flexible, and he plans to emphasize that point to the prime minister.

According to the plan worked out last night, the Interior Ministry and the Deportation Authority, established to expel 50,000 foreign workers without visas, will find workers with visas who left their original employers or whose visas have recently expired and offer them work with employers who would otherwise import workers.

Until now, the employers have objected to such an arrangement, saying they did not want to employ "escapees," since it would reward law-breakers. But human rights groups that work with foreign workers said the employers prefer new workers unfamiliar with their rights over veterans aware of such rights.

ATTACHMENT C

MFR Subject: Tax Issues on DACA90-01-C-0043 26 October 2001

WHAT THE JV WANTS WITH RESPECT TO SR 14, 28, 29, AND 30

1. SR 14: JV is assuming that, because the Contract sets no limit on the number of TCNs, it will be given approval by GOI to import as many TCNs as it deems necessary to complete the project on time. JV wants the details of the process and procedures which must be followed in order to get approval of the visas for TCNs. I have told Deni that Arenson because they have had previous experience is his best source of information for getting TCNs approved and into the country. Deni has asked both me and Uria for copies of the Hebrew version of the letter from Meir Ran to the Ministry of Labor and Wages requesting that the Ministry of Labor and Wages provide whatever assistance necessary to the JV in order to get the necessary manpower in country. The English translation is not much help when the JV approaches the GOI.

2. SR 28: JV wants a letter from the Ministry of Finance agreeing that ABB SUSA is exempt from Corporate Tax. This letter will be made part of the JV's tax file for future use. JV's cash from our payments is currently being held in the U.S. JV wants to bring that cash into Israel to fund the execution of the project. At some point in the future, the JV will make payments to the partners. ABB SUSA and the JV want to be certain that the tax collection authorities will not require income tax to be collected and paid on SUSA's share when SUSA wants to transfer cash out of Israel.

3. Car dealers have told U.S. National employees of the JV that in order to purchase a car tax free, a bond must be posted for the tax. If the car is not exported or sold to another qualifying individual within one year the bond is forfeited and the money is used to pay the tax that normally would have been paid at purchase. JV employees want to purchase cars tax free without posting a bond.

4. The JV currently has 3 U.S. National employees who are paying U.S. income taxes and of course do not want to pay income tax to GOI. The number may increase in the future. The JV wants a Ministry of Finance letter to document their tax file agreeing that U.S. Nationals receiving income from the JV are not required to pay any tax to GOI on that income.

JWB

**ATTACHMENT D**

Courts

In the Jerusalem District Court
Sitting as a Court for Administrative Affairs
Before: His Honour Zvi Segal

A.P. 582/03

Date: 07/08/02

In the matter of: A. Arenson Ltd

Petitioner

- versus -

1. Minister of Industry, Commerce and Labor
2. Minister of Interior

Respondents

Present: For the Petitioner: Advocate Krispin, Advocate Blecher, Advocate Halperin
For the Respondent: Advocate S. Edry
The Deputy General Manager of the Labor Authority: Mr. Nizri
Advocate A. Bar-On
Mrs. R. Confareti
Advocate N. Elba

Advocate Blecher, for the Petitioner:

After more than three hours of discussions and negotiations both in court and out of court, the sole application that I am seeking subject to which I would be prepared to withdraw the Petition without any order as to costs is the following:

1. That the Honorable Court recommend to the Registrar of Contractors to contemplate the application that will be submitted to her by ABB SUSA, which is the Petitioner's partner in the Nachshonim Project, to receive an exemption from registration in the Register of Contractors since it is not an Israeli company. We would request that the recommendation specify a reasonable period, that we assess to be 14 days, to receive the Registrar's decision. We undertake to file the request with the Registrar of Contractors within 7 days of today.

2. As the last date for filing new applications with the Labor Authority, namely 28 July, 2002, has passed, in light of what has occurred during the negotiations and the hearing, I seek the Court's recommendation to extend the date for filing the application on behalf of ABB SUSA to convert the allocation of 523 workers that was issued to the Petitioner for the Nachshonim Project, by an allocation to ABB SUSA, with the concurrent waiver by the Petitioner of the allocation that was issued to it. I hereby elucidate that the partnership between the Petitioner and ABB SUSA and Baran Group is a duly registered partnership, and the implication of filing the new application would be to vary the conduit of the allocation from the Petitioner to ABB SUSA.

Advocate Edry, for the Respondent:

There is no objection to the approval of the Petitioner's request to extend the requested date within a specified period and an undertaking on our part to deal with the foregoing application within 21 days of the date it will be submitted to us.

ATTACHMENT
E

\\BGB-PPC\SYS\SYSOLD\DOC\Office\14064-27\Trans\Rulling A.P 582-02 I.doc

With respect to my colleague's first request, I would like to mention that the Registrar of Contractors is not a party to the hearing of the Petition, and therefore, from our standpoint I can not to accede to his request, since my colleague ought to have initiated another proceeding or to join her to the hearing of this petition. Thus I believe that it would be going too far to issue an order in that respect, but if the court finds it appropriate to recommend, I have no position on the subject.

I am not familiar with the load and constraints of the Registrar of Contractors but I have no doubt that 14 days is a totally unreasonable period of time.

Counsel for the parties:

Everything that has been agreed above is on the basis that all the rights and claims of each party are reserved and without any of them being waived.

## Judgment

1. As agreed above.
2. As the Registrar of Contractors is not a party to the hearing, I can not direct an order to hold a discussion on ABB SUSA's application (which is also not a party to the hearing of the Petition), to obtain an exemption from registration in the Register of Contractors. Nevertheless, due to the essential nature of this procedure for the purpose of the additional application mentioned, which has been agreed upon by the parties' counsels and which, without such a discussion with the Registrar of Contractors, would be impractical, I sincerely recommend to the Registrar of Contractors to do her outmost from her standpoint and to deal with the application that will be so submitted, within 30 days of the date of its being submitted.
3. Subject to the foregoing, the Petition is dismissed without any order as to costs.

Granted this day, 29 Av, 5762 (August 7, 2002) in the presence of the parties.

Zvi Segal, Judge

\\BGB-PPC\SYS\SYSOLD\DOC\Office1\14064-27\Trans\Rulling A.P 582-02 1.doc

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - x
A.A.B. JOINT VENTURE, :
Plaintiff, :
v. : No. 04-1719C, No. 05-114C,
THE UNITED STATES, : No. 05-1172C, and
Defendant. : No. 06-49C (Consolidated)
- - - - - - - - - - - - - x

Tel Aviv, Israel

Wednesday, November 29, 2006

Deposition of AVIE ARENSON, a witness herein, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Seventh Floor, Tel Aviv, Israel, at 9:20 a.m., Wednesday, November 29, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.

Certified Copy

EXHIBIT 6

APPEARANCES:

On behalf of the Plaintiff:

PHILIP C. JONES, ESQ.
Bell, Boyd & Lloyd, PLLC
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
202.955.7050
pjones@bellboyd.com

On behalf of the Defendant:

SHALOM BRILLIANT, ESQ.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20005
202.305.7561
shalom.brilliant@usdoj.gov

Also present:

STEPHEN DENISON KEENEY
AMNON BARKAI
AVI RAVIV

P R O C E E D I N G S

Whereupon,

AVIE ARENSON,

was called as a witness by counsel for Defendant, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MR. BRILLIANT:

Q. Good morning, Mr. Arenson. Let me ask you first if you could state your full name and address for the record.

A. My name is Avrum Joel Arenson. My home address is 9 Hatamar Street, Cluster 2, Caesarea.

Q. Now, I understand that you have been designated as a witness or one of the witnesses to testify in response to a Notice of Deposition that we served pursuant to Rule 30(b)(6) of the rules of the U.S. Court of Federal Claims.

In that regard, I want to show you, first of all, a Notice of Deposition, which I'll ask to have marked as Defendant's Deposition Exhibit 21. I believe that's where we left off at the last defendant's deposition.

//

partner in a construction company or the owner of a construction company.

Q. What companies were those?

A. Pardon me?

Q. What companies were they?

A. That I worked for?

Q. Yes.

A. In North America, I worked for a company named McNamara Construction, which is a company very similar to what I have now, a company involved in civil engineering work. And I worked in West Africa for a local company, which was controlled by Solel Boneh. This was in the early '60s.

And when I came back, I worked for two or three privately owned companies that don't exist anymore. And I set up my own company in '69.

Q. That's the company that you're with now?

A. Yes.

Q. And the name of that company is?

A. A. Arenson Ltd.

Q. And that's one of the joint venturers in the plaintiff, A.A.B. Joint Venture?

A. Exactly.

Q. How would you characterize your position in A. Arenson?

facts alleged in this Complaint; is that correct?
A. Yes.
Q. Let me direct your attention to the allegation in paragraph 13 of the Complaint.
The paragraph 13 states -- this is following up on some more general allegations leading up to it. In 13, the allegation is, quote:
"Specifically, through the 1990s and up to the execution of the Nachshonim contract, the well-established practice in Israel was that substantial numbers of third country nationals ('TCNs') were utilized to perform construction work in Israel." End of quote.
Firstly, I note that this follows on from paragraph 12 that makes reference to familiarity with practices by virtue of the experience described -- the experience of A. Arenson Ltd. and Baran Group described in the preceding paragraphs.
My first question to you is: Did Arenson and Baran, prior to the Nachshonim project, have prior experience in hiring third country nationals?
A. I can't answer for Baran.
Q. And for Arenson?
A. Yes.
Q. And can you describe that experience

generally.
A. The history of our hiring?
Q. Yes.
A. In 1988, actually, the first -- we hired Portuguese labor for one of the power stations we were building. This was actually as a result of a personal tragedy. The general manager of the Israel Electric Corporation's son was killed by Arabs, actually by Israeli Arabs, brutally murdered and put in a well near Haifa.
He then decided that he would have an overall order disallowing any Arabs on any of the corporation's projects. And we were and are a major contractor for the things.
So we were given special permission to bring in a group of Portuguese workers. At that time, Eastern Europe was still not an open place to bring labor from. We were actually the first contractors to bring them in.
Later on, we brought in more workers. We were building the Schneider's Children's Hospital in Petach Tikva. And we got permission to bring in workers. At that point, they were Turkish workers.
At that point, there was a great deal of practical pressure as to why third country

nationals -- by the way, third country nationals is the term in the contract. If you were to ask an Israeli contractor, he would call them "strange workers" or "foreign workers."

MR. BRILLIANT: Off the record.

(Discussion held off the record.)

MR. BRILLIANT: Back on the record.

THE WITNESS: It went through a series of changes, that whole TCN scene in the country. But very quickly, because of the Intifada, the first Intifada that started at the end of the '80s, I think, or 1990, more or less stopped the West Bank people from coming in. And they were our source of labor.

In particular for wet works, we had more and more third country people until, ultimately, we were using in our major jobs -- in the jobs that we built, which were major jobs, we had 100 percent foreign labor. By the time we were bidding this job, it was more or less standard practice.

BY MR. BRILLIANT:

Q. Was it generally the practice during that period for the employer to make arrangements to obtain work visas?

A. Yes.

Q. And was there any particular practice with respect to the employer's responsibility with regard to workers whose employment was terminated?
A. Yes.
Q. What was that?
A. Well, it was developed throughout the time. It wasn't the same kind of a -- the same kind of responsibility at any one time.
But we were supposed to have made sure that our workers would leave the country. In fact, we had no way of doing it other than asking the police to come and get them.
In fact, a subcontractor/labor supplier of mine, who was involved in servicing and serving the contractors, was put in jail because he forcibly took one of his workers from Haifa to Tel Aviv to the airport. At the airport, the worker was let go, and he was arrested.
So we had a problem with getting workers out of the country. After that, subsequently, we had notified police where these foreign workers were, but nothing happened because of that. These were the ones that didn't leave.
The ones that did leave -- and they were the vast majority -- we escorted them with their

cooperation, obviously, to the airport. We bought tickets for them, and they went off.

Nothing very much was done with this fact that they left or that they didn't leave until, I think, in the early '90s when they started talking about all this huge number of foreign workers in the country. And they meant, in general, foreign workers.

We have four or five different fields where foreign workers are active in the country, including industry, including agriculture. And there was a big problem of the public perception that there was a high rate of unemployment and a huge number of foreign workers in the country, some of which -- or many of whom were illegally in the country.

At which point they started looking at things that could be cut back. And the Government decided that they would cut back on the foreign labor in the construction field.

Q. Well, this concern that you described about the large number of foreign workers in the country, around when was that coming to a head, let's say?

A. Well, I think that it was the beginning

of 2000, and from then on, it started getting more and more. Politicians started making an issue of it, et cetera.

Q. Was it not an issue prior or just not as intense?

A. It depends. I think you probably could consider it an issue. There was always an issue about their physical arrangements, how they were housed and how they were treated, et cetera.

But I don't think there was a question that there was an actual popular or a political movement to cut down the number of foreign workers.

Q. Was there a concern about foreign workers being, essentially, competition for domestic workers in terms of unemployment?

A. Theoretically, yes. Theoretically. Because there were no and hadn't been Israeli workers in the construction business since 1968, since we took over the West Bank and we had Palestinian workers. There were basically no Israeli workers in what we call the wet works, in the concrete, the steel, the paint, floor laying, and so on.

So there was no competition. There was no group of people saying: We have no work. I

don't even think that their fathers remembered when they had this work.

Q. Did this change at all in the early '90s when there was a substantial influx of immigrants from the former Soviet Union?

A. No. No. They moved into the -- the foreign immigrants, the Russians in particular, actually solved another problem.

Because up until the middle '90s, we still had foremen and team leaders from the Arabs -- from the Israeli Arabs of the middle '60s. But by that time, they were getting old and retiring. And the Russian immigrants came in, and they took their place.

The backbone of our company, the middle management is Russians, people that we took in the '90s. And they replaced a lot of the Arabs that were just too old to keep on working.

Q. But they didn't go into the --

A. They weren't laborers.

Q. Looking down to paragraph 15 of the Complaint -- strike that.

Turning to page 8, paragraph 35 -- now, this is after a number of allegations describing the -- well, actually, let me ask you this way.

You make reference in paragraph 35 to -- well, let me focus on the first sentence, and I have a few questions about that. Now, the first sentence of that paragraph reads:

"On information and belief, critical activities, in particular, concrete construction, steel frame erection, and insulated panel installation were adversely impacted by the Government's breach of warranty pertaining to TCN labor." End of quote.

First of all, since I obviously skipped over a whole list of allegations leading up to this, just to put this in context, when you refer -- without repeating in detail all the allegations, when the Complaint refers to "the Government's breach of warranty pertaining to TCN labor," can you basically summarize what you're referring to there.

A. It's my belief and understanding that our bid was put in and the work was commenced on the assumption that we were going to be allowed to use this labor. And, in fact, the Government -- the Governments together had expected us to use the labor and had warrantied the use of the labor.

Q. You say the "Governments" plural. And

putting aside what those Governments expected, you said they warrantied.
Now, which Government warrantied what?
A. Well, our contract was with the American Government. Obviously, they were the ones who were doing the warranting.
Q. So what do you say that the American Government warrantied with respect to foreign labor?
A. That we would have access to foreign labor from certain countries listed in the documents, and we had to bring these people in from these countries, and that we would be entitled to tax rebates based on the taxes paid for these TCNs.
Q. But, I mean, you are not contending that the U.S. Government did anything to preclude the Joint Venture from bringing in foreign laborers, are you?
A. The U.S. Government?
Q. Yeah.
A. I'd have to think about that.
Well, in a sense, I think that they didn't do what they should have done to make sure we got the laborers.
Q. And what was that?

A. Well, I have seen, for instance -- I don't know if you want to get into this. I have seen the Wye agreements where the U.S. Government has requested and required the Israeli Government to supply liaison people who are supposed to solve these kinds of problems.

And as far as I know, there was no such liaison officer. As far as I know. We certainly didn't see any results of this work. So in this sense, I think they neglected to do what they should have done.

Q. Was it your understanding or the Joint Venture's understanding going into this progress that the --

A. Going into what?

Q. Going into the -- when preparing and submitting its bid --

A. Yes.

Q. -- that the U.S. Government ultimately had control over the Israeli Government with respect to the immigration policies and visas and the like?

A. I didn't have an opinion on that. I don't know.

Q. Moving to the specific allegation that I

which lawyer represented us.

Do you remember, Deni? I'm sorry.

In any case, I think that this June 10th stuff was our own company problems, not the Joint Venture problems. Although later on, the Joint Venture, it was advised -- it's mentioned here that, if ABB SUSA is registered as a foreign company, then the Joint Venture would be entitled to bring in its own labor.

This was in answer to the Ministry of Labor and the Ministry of the Interior's allegation that the people that we had, the deserters -- if you like, I'll explain what deserters are -- that we had collected over the 14 or 15 years of activity numbered several hundred, almost 400, I think, and effectively stopped us from bringing in workers even if A. Arenson Ltd. was entitled to a visa.

Because we were only allowed to bring in net numbers of workers, so we tried to separate A. Arenson Ltd. from the Joint Venture because A. Arenson Ltd.'s problems were of a different kind and from different -- had nothing to do with the Joint Venture.

In fact, ultimately, the Joint Venture

was -- there was an agreement made that the Joint Venture would be allowed to get the visas in its own name, which was never initiated. It was never done by the company.

I'd like to explain also that throughout this period of time of 2001 and on, there was various changes in the identification of the Government units which handled the foreign labor. This was never very easy in any case. It always involved the Ministry of the Interior in the country and the Ministry of Labor, which decided whether the jobs -- whether there was a requirement for foreign workers or not, the initial visas.

And there had to be cooperation at all stages. There had to be cooperation with the Ministry of Foreign Affairs because the visas were actually administered in the various embassies of Israel in these foreign countries.

During the period of time that we were involved, the Ministry of Labor disappeared and became part of the Ministry of Trade and Commerce. And this involved a complete change of personnel. Not only did it change the ministry, it changed the political party who had power over these ministries.

Without going into great detail, the Shas was the one that was involved in the -- they had the control over the ministry which issued the requirement for visas, the Ministry of Labor, and the Ministry of the Interior to allow the actual bringing in of the workers.

Shas lost part of its power. Shas had a lot of scandals, a lot of financial scandals. There's still criminal cases going on against Ben Izri, one of the ministers who was being accused of corruption involving foreign labor and their visas. And it became very, very difficult to get any visas.

Arenson's problem -- if you would like me to elaborate on what Arenson's problem involved, I would be happy to do so.

Q. Sure.

A. Like I said, we started in 1988 to bring in foreign workers. And as a rule, we got them out. We certainly had no complaints from anybody until early 2000, 2001 maybe, where suddenly they said that you have 400 or so deserters.

We, in the middle '80s, had thousands of foreign workers with visas. We may have had three or 4,000 workers. We were doing very large jobs

with very large numbers of foreign workers. We had, I think, a thousand on the southern power station at one time.

And these workers, they didn't come in 1988 and leave in 2001. They came for two years, one year, five years. And I would guess that of the -- in those years, we may have had something like 20,000 workers that came in and went out in the 12 or 14 years we were involved. Maybe less, but thousands and thousands and thousands of workers.

Of those thousands and thousands, there was no record in the Ministry of the Interior. In the border police's records of people leaving, they had missed 400 people, and they called them deserters. They said they're still in the country.

One of the subjects of our court cases was that we went back in time and we found actually that we had definite proof or fairly definite proof -- we had stamped ticket stubs with names of people that were supposed to be deserters that we knew had left the country. And we had their ticket stubs that they had left the country. We thought it was a computer mix-up, which could be easily solved by showing that these people had had tickets

purchased for them and they had used the tickets, involved identification, et cetera.

Like I said earlier -- mentioned earlier, we had actually found -- I think we believed at one time that we had possibly up to 50 workers who actually were in the country of these tens of thousands that we had brought into the country.

And of the hundreds that was alleged that they were deserters, we thought we knew of about 50 of whom we actually gave to the border police. At this time, the police set up a special unit to take care of foreign workers. And we actually gave them a list, addresses and names of these people, and they were not taken out of the country.

On the basis of that, we went to court, Arenson did, to cut down the number of deserters that we had because the deserters themselves became a very heavy burden because we were only allowed to bring in the net number of workers. This had nothing to do with the Joint Venture, and we never claimed it did.

The reason, by the way, that we went from a company that had thousands of workers to a company that had just a few hundred workers, if you notice, our net -- our contribution to the six or

700 workers that we were allowed, there was only about 200, and the rest were Nachshonim.

The reason was that the Israeli Cabinet made a decision to not allow public jobs to have foreign workers on them. In practice, what this meant was that there were no visas issued on the basis of contracts for public works. So since most of our jobs were public works, we couldn't get the visas. It wasn't that we didn't have the same amount of work, but we couldn't get the visas.

And for us, it was terrible. Because if we had a shortage of workers -- if we have no foreign workers at all, it didn't really matter whether we had -- say we were allowed to bring in 200 workers, but we had 500 deserters, or we weren't allowed to bring in any at all. It was exactly the same difference. We weren't allowed to bring in people with or without visas.

The simplest way for us to approach the problem was to separate the Joint Venture from A. Arenson Ltd. while we continued fighting A. Arenson's particular issues. And we did.

Q. In this effort that you mentioned to -- I don't know if that was a judicial -- a suit in court or an administrative proceeding or both.

But you said you wanted to reduce the number of deserters.

I assume that you mean, in other words, reduce the number --

A. The roll call of the deserters.

Q. -- in a sense, in the Government's records, so to speak?

A. Yes. Yes.

Q. And you attempted to prove that many of these ostensible deserters, in fact, did leave the country, I think is what you described?

A. Yes.

Q. Did the court or whatever administrative body was involved make any findings on that subject?

A. I believe that we had our deserters substantially reduced at one point.

I would like to mention some of the efforts that we made. For instance, when we realized that we had a problem with deserters, we put up a campaign to recall our deserters. And we actually had -- we put ads in the Romanian newspapers. Because most of our employees through the '90s were Romanians and most the deserters were Romanians.

And we put ads in the Romanian-language papers in the country: Come back. Everything is forgiven. We won't punish you. We'll give you a bonus. We'll buy you a ticket out if you want to go out or reapply for a visa if you want to come in.

We actually got a few people that came back on that basis. And they told us about the others who didn't. That was the basis for our believing that there were about 50 deserters in the country.

Q. I mean, now, this effort that you made, was that specifically in the court or before one of the ministries, or what body was that?

A. All bodies. Because any one of these bodies could say no. And when the special foreign labor police came in, a lot of it was involved with the foreign workers police.

Q. So did the Israeli Government ultimately reach a conclusion that the number of deserters was something less than they originally said? And, if so, approximately what number is that?

A. They may have. But what, in fact, happened was that they quit referring to the deserters. It became a nonissue. Why they decided

to make it a nonissue, I don't know. I guess it was because they realized that these were just incorrect numbers. I wouldn't like to say fictitious, but incorrect.

Q. Now, if we look back at Exhibit 24, the next line item after the reference to lawsuits --

A. Yes.

Q. -- is an item with reference to July 3rd, 2002. And it says here:

"Contractor" --

And I assume that means the Joint Venture; right?

A. Yes.

Q. (Reading.)

"Contractor received list of block visas issued by MOL to various companies for 26,827 slots."

What does "slots" mean here? Does this mean allocations?

A. It means visas.

Q. Okay.

A. Or allocations. Yes.

Q. Of visas?

A. Yes.

Q. (Reading.)

hundreds of dunams -- hundreds of square meters of -- thousands of square meters that we started with. And we finished -- we didn't wait until everything was done to start the site development.

If I could just tell you an anecdote. We're just across the road from the project called Canarit. Canarit is the Israel Air Force headquarters. I am building it. The project was being bid in the midst of -- towards the end of all of these problems with the TCNs.

We were invited to bid. Three or four contractors were invited to bid. And we said we wouldn't take part in the bid. They said: Why? And we said: Because we can't build a building like this without TCNs. And we're not going to bid. We learned from experience you can't do it and they won't let us do it.

It turned out that my colleagues, the competitors, also had the same sense, or at least some of them did. The Ministry of Defense was very concerned about this. And they called a meeting with the bidding contractors -- with the Ministry of Labor and with the contractors.

Ranon Denur, who is now the manager -- the director of the Prime Minister's office, was

then the director of the Ministry of Trade, Commerce, and Labor, which was the same -- Ehud Olmert was then the minister. And he sat together with Amos Yaron, who was the head of the -- and with all of their people, dozens and dozens of people, and also some of the contractors or maybe even all of the contractors.

We said: We are not going to obligate ourselves to places or timetables unless we're guaranteed TCNs. And the outcome was -- and it's in the minutes -- that the Ministry of Labor notes that the contractors will use TCNs on this project without official permission.

This was in the Ministry of Defense in the presence of most of the people who were involved in enforcing the law. It was specifically designated as a job that everybody would just pretend didn't exist. And, in fact, we're building it with TCNs, only with TCNs, which is strictly against all the rules.

Q. Going back to the Nachshonim project and this issue about deserters, you mentioned earlier in your testimony about some efforts to convince the relevant ministries that the number of actual deserters among TCNs that Arenson had hired was a

lot smaller than what the ministries thought it was.

You might have answered this, but -- well, approximately what was the number again that the ministry was saying -- the number of deserters that the ministry was saying Arenson had and what was the number that Arenson was contending was the correct one?

A. Well, as I said earlier, we were advised we had 500. We found tens and hundreds of paper proof that the people had actually left. And we knew from our own sources that there were about 50 left in the country for various reasons. So if these are the numbers that you're asking, that's what I said earlier.

Q. Now, as to those 50 who were left in the country, what, if anything, did Arenson do with respect to them?

A. I told you two things that we did. We did several things. But two particular things was: Early on in this problem, we had some people escort, physically escort a group of laborers -- there may have been only one, but somehow I think there was a group -- from Haifa to the airport. And in the airport -- the workers had notified

whoever they had notified. And at the airport, the workers were set free and went back into the country, and our escorts were arrested.

Q. You did mention that.
When did this happen?

A. This happened, I think, in 2002.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. 2002.

Another time, we advised -- we located a group of 20-odd people who had deserted us, and we knew exactly where they were, their addresses and the names.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. We put into the Holon police station the names and the addresses of the people, and nothing immediately happened. I think a few months later, Amnon was held for questioning overnight so they wouldn't bother them anymore.

MR. JONES: I'm sorry. Who was?

THE WITNESS: Amnon.

MR. JONES: Could you --

THE WITNESS: Amnon Barkai.

MR. BRILLIANT: Let me ask the questions.

MR. JONES: The record wasn't clear who he was referring to.

MR. BRILLIANT: He said Amnon. Amnon, I think, was previously identified somewhere along the line as being in the room here.

THE WITNESS: Yes.

MR. BRILLIANT: And if not, he is now.

Q. Okay. So if I understand, there were these efforts that you described with respect to about 50 workers?

A. We guessed at about 50.

Q. I mean, approximately --

A. Approximately.

Q. -- about 50 who were in the country.

And that would leave roughly 450 that, I guess, the Ministry of Interior were saying were in the country and Arenson were saying were not in the country?

A. They didn't even say that. They said: We have no record of them leaving. That was their position. They didn't have any proof that they were here, but they didn't have any record that they had left.

Q. Normally, if they had left, if they had

left through than airport or something like that, through passport control, there would be a record?

A. You would think so. Yes.

Q. And it would be quite difficult, wouldn't it be, for them to leave the country just by walking across the border?

A. There would be no point to it. Why would they do that? They wouldn't do it. If they left, they would probably leave of their own volition.

In Romania at least -- a Romanian worker going back to Romania who couldn't show a legal exit was not allowed to leave Romania to work outside of the country again. Because the Romanians themselves had control of their own.

Q. So now, if there was no record of these people leaving the country, are you saying -- I'm trying to understand what you're saying.

Are you contending that they, in fact, did leave the country?

A. I'd like to just state slightly differently what you just said.

The Ministry of the Interior claimed there was no record. But, in fact, these are foreign names. It wasn't only Romanians. It was also Turks. And it was very difficult for them to

control it. They sometimes gave -- the numbers, the identification numbers or the passport numbers were changed when and if they had a new passport issued to them.

In terms of the tens of thousands of workers that we had or the hundreds of thousands of workers that had gone in and out of the country, there was an insignificant number of people that the Ministry of the Interior couldn't see the record for them.

In some cases, we showed them the canceled ticket stubs, I mentioned earlier, the airport ticket stubs. We showed them airport lists of passengers. We showed them all kinds of stuff. And at least at the level of the clerks, we convinced them that, in fact, they had left the country.

It didn't help us with our deserter thing because that wasn't -- the purpose of the exercise was not to find the deserters. The purpose of the exercise was to disallow us any visas whatsoever or any workers whatsoever.

Q. Isn't that speculation on your part?

A. I am willing to speculate that. Yes.

Q. But the number of deserters or so-called

deserters, depending on your point of view, as to whom you presented evidence such as canceled tickets and that sort of thing, roughly how many are we talking about?

A. I didn't understand the question.

Q. Roughly how many workers are we talking about?

A. Who deserted?

Q. No, no. Those who you submitted evidence such as canceled tickets, indicating that they did leave the country.

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: 102.

BY MR. BRILLIANT:

Q. Okay. So that would still leave about 350 or so unaccounted for by --

A. By the Ministry of the Interior. Yes.

Q. And as to which Arenson could not specifically prove that they did leave the country?

A. Yes. At least not in a paper way.

Q. Well, was there other proof?

A. People said they had gone back, their families. We probably could have gone to Romania and found them as well if we wanted to.

Q. But you didn't have any correspondence from them or that sort of thing?

(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

THE WITNESS: Yeah. I'm just recalling, 102 was after a great deal of effort. We put in all this paper proof, and they refused to check them. And they weren't interested in receiving them, at which point we realized it was just a waste of effort.

It was a lot of effort to find them and to find the proof. We were going through everywhere. The first 102 was more or less ironclad, and they just ignored them. So we decided we weren't going to beat our heads against the wall.

MR. BRILLIANT: I have no further questions for Mr. Arenson.

MR. JONES: Could we take a two-minute break?

MR. BRILLIANT: Sure.

(Recess.)

//

//

//

A. For the TCNs who were onsite.

Q. Okay. But these were not TCNs who were specifically brought into the country?

A. No.

Q. Okay. The next thing I'd like to ask you about is a document that appears at Tab 51 of our exhibits, page 138. Again, we're continuing in Volume VIII-A.

This is a memorandum, for the record, internal to, apparently, the Corps of Engineers, dated 1 July, 2003. And the specific statement that I'd like to direct your attention to starts at the bottom of the page and then goes over to the next page. And what it says is this:

"According to Eran and Uriah, the MOI is not allowing Arenson to bring in additional TCNs until an accounting is made for those TCNs already within the country under Arenson's visas."

And then this is the specific part I want to ask you about:

"The MOI and MOD suspect that Arenson is using its TCNs on other projects within the country."

Was that true?

A. We used TCNs on the airport job, where

we had a specific allocation of TCNs, where the Airport Authority had, in fact, managed to convince the ministry to allow us to have TCNs onsite. But whatever TCNs we had available, we brought to this site.

Q. Okay. Was there ever an occasion where TCNs who were allocated by the Ministry of Labor, or anyone else for that matter, to the Nachshonim project were used on any of the other Arenson projects?

A. We never actually brought any laborers because of the Nachshonim allocation. All of the laborers we had were from other jobs. Or were from previous jobs, not other jobs.

Q. So if I'm understanding you correctly, what you're saying is just the opposite is true, that you took laborers from other jobs and sent them to Nachshonim, not the reverse?

A. Yeah. Because on most of our other jobs, we were able to use Palestinians. On this job, we weren't. So the other jobs, we had some kind of alternative.

Q. We are now switching to Volume VIII-B of plaintiff's exhibits. And I would like to direct your attention to Tab 2, which starts at page 16,

MR. BRILLIANT: Well, in terms of --

THE WITNESS: I can answer that. I'd like to answer, if I could.

MR. JONES: Okay.

THE WITNESS: I have no objection to the Israeli Government deciding that there should be no more foreign workers. There's good reasons for it, and I agree with the reasons.

My objection was to the complete arbitrariness and lack of preparation and the amount of distortions that resulted from their implementation of the policy.

It's not only my position. It's my position and the Contractors Association's position. What we objected to was them telling us to put in these applications, run around like chickens without heads, become illegal whatever you do. We're changing the law every three days so that you're always breaking the law. This is what drove us crazy.

BY MR. BRILLIANT:

Q. Well, okay. Apart from these aspects of implementation and administration of the policy that you're referring to, though, then it's true, though, that the overall decision of disallowing

further foreign workers, in itself, did not come as a big surprise? I mean, it's something that one might expect?

A. It definitely came as a surprise.

I'll tell you something else. If we had known before the bid, we would have put in a higher bid or not a bid at all, like in the Ministry of the Air Force/Defense things.

There is nothing technically difficult about training Israeli Arabs to work on a project. We're doing it now. Today, there is no difference in my company between jobs -- no difference in my company in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs. And I have hundreds of them.

They more or less have the same salary now. They more or less have the same skills. The Arabs, because they're close to home, they tend to take more holidays and they're slightly less efficient. But they're better workers.

And the Romanians and the Turks are willing to work longer hours, but they're a little less -- they're a little dumber than the Arabs. They're a little less competent. Our Israeli Arabs

are fine, upstanding people. And when there was a place for them to work and proper payment, it turned out that they are very good workers like I remember them in 1961 and '62 when I first started.

Q. So, I mean, the kind of suddenness, perhaps, or the abruptness of the decision --

A. That's what killed us. Yeah.

Q. -- that took you by surprise, if I understand you?

A. Yes.

Q. But with hindsight, the fact of this problem of foreign workers coming in and no way to enforce the need to make them leave when they're done, sooner or later the Government was going to put a stop to that. I mean, that one might expect even though you might not expect it to kind of come suddenly.

A. I think it came because of -- I think it came because, ultimately, in 2000, plus minus, the Israeli Government realized that they would never be able to use Palestinians within the country. And at that time, they decided that, if they weren't going to have Palestinians, they didn't want foreigners.

This was a period of years, three or four