No. 04-1719C, No. 05-114C, No. 05-1172C, and No. 06-49C (CONSOLIDATED)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE,

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

APPENDIX TO DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AS TO THE M-20 BOLTS CLAIM IN NO. 05-1172C, AND FOR SUMMARY JUDGMENT AS TO THE L/600 DEFLECTION CLAIM IN NO. 05-1172C

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

**Filed electronically**

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

September 11, 2007

# INDEX TO APPENDIX

| | PAGE |
|---|---|
| Letter from AAB to Contracting Officer, October 10, 2001 | 1 |
| Modification No. P00009 | 3 |
| Certified Claim, February 11, 2005 | 12 |
| Contracting Officer's Final Decision, September 22, 2005 | 44 |

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

א. א. ב. – עסקה משותפת
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD

פרוייקט בסיס אחסון נחשונים, אלעד

Via Fax: 0049-611-816-2618

10 October 2001

Ref. USACE/01-0032

Contracting Officer
United States Army Corps of Engineers
Europe District
Konrad-Adenauer Ring 37
65167 Wiesbaden, Germany

RE: DACA90-01-C-0043, NACHSHONIM STORAGE BASE

**SUBJECT: Current Progress**

Dear Sir,

In response to your letter dated 26 September 01, the AAB JV offers the following.

The AAB JV shares your concern regarding the need to maintain progress on the project, and to ensure that the scheduled completion dates are met. We do agree that currently we have an "apparent lack of progress" on the Nachshonim project. However, we also must point out that the project is still well within the Proposal Schedule, which reflects early start and early finish dates. This, by definition, is the most conservative schedule which contains adequate float, as follows:

- Activity #1610:

  Control Rock Blasting: Area 1: Early Start 10 Sep 01 - Early Finish 11 Dec 01

- Activity #1615:

  Clear Site & Rock Removal: Area 1: Early Start 10 Sep 01 – Early Finish 27 Jan 02

  Area 1 includes half of the Main Drainage Culvert, the Pilot DSB and Segments #67 & #56, which are on the critical path. The early start has slipped to 11 October 01, with one month of the 2-month built-in float absorbed. The 1st Earthworks subcontractor shall start on Segment #67 on 11 October 01. The 2nd Earthworks subcontractor shall start on Segment #56 on 28 October 01 to ensure we complete the required 300 meters distance from blasting and concrete works for Culvert and Pilot DSB. The JV is confident that completion of the Control Rock Blasting and Removal for both segments will meet the proposed early finish of 11 December 01 and 27 January 02, respectively. To allow start of the 2nd half of the Main Drainage Culvert, the 2nd Earthworks subcontractor shall start work in Segment #12, simultaneously with Segment #56, on 28 October 01.

- Activity #3000-

  Construct First (Pilot) Dry Storage Building – Early Start 28 Jan 02 – Early Finish 27 Jun 02

  The required 300 meter distance from blasting the Pilot DSB area in Segment #67 shall be completed 27 January 01, on schedule. This will allow the start of Pilot DSB construction on schedule.

The above commitment will reinstate the one month absorbed float, and bring us back on the conservative Proposal Schedule.

משרד העסקה: השיטה 5, פארק התעשייה קיסריה טל. 04-6231111 פקס 04-6230230
V.office: 5-HASHITA ST. CEASAREA INDUSTRIAL PARK (ISRAEL) 38900 P.O.B 3566, TEL 972-4-6231111 FAX 972-4-6230230

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

א. א. ב. – עסקה משותפת
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD
פרוייקט בסיס אחסון נחשונים, אלעד

Additionally, the JV has requested (USACE-01-028 dated 03 October 01) a deviation to the Contract to allow notice to proceed with concrete work for "other DSBs" before completion and approval of the Pilot DSB envelope test. Aside from a few openings and penetrations, which shall wait for envelope test approval, the substantial concrete work is not the discerning factor for ensuring the specified environmental conditions within the DSBs and is all work which can effectively and safely be performed without the need to wait for the envelope test. Should the JV receive a favorable review of this request, our concrete work on those DSBs other than the Pilot DSB can proceed immediately after completing concrete work on the Pilot DSB and provide continuity for the concrete teams as well as significant schedule recovery. This will allow a 4 to 6 month advance start (from the Proposal Schedule) on the majority of the project structures and allow more time for the more critical activities of space frame and insulated panel installation.

The 60% Design Segment 1 for the Pilot DSB was submitted ahead of the Proposal Schedule. Due to the number of review comments, the JV shall submit an 80% Design Segment 1 by 18 October 01, which is nearly 2 weeks ahead of the Proposal Schedule for 60% design. Our intention is to complete the 100% Design Segment 1 as much as 3 months ahead of the Proposal Schedule, to allow an early start of 28 January 02 for construction of the Pilot DSB.

The reason why we are making reference to the Proposal Schedule is that we believe this to be an effective and conceptually valid document and because we are cognizant of the fact that to-date, only the 90-Day Mobilization Schedule has been submitted. On 04 October, after several meetings with the USACE on site, a definition of the format and required detail of the Initial Base Line Schedule for the entire project was agreed to. We will continue to coordinate closely with the USACE staff in order to submit the Base Line Schedule in the shortest possible time frame. We are very appreciative of the USACE's continued co-operation since these weekly coordination meetings with the USACE should preclude a large number of review comments and allow this schedule to be adopted upon first submittal. At the same time we have increased our scheduling staff and are proceeding on an accelerated basis to submit this most important project control document.

Lastly the JV site project management team is now fully mobilized and fully committed to working cohesively as a team with the USACE to ensure a timely completion of this important project, which continues to receive the closest attention and support from all our respective Head Offices.

Sincerely,

S. D. Keeney
Project Director

CC: Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

A.P.Salvato, ABB SUSA, New Jersey.

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

CONTRACT ID CODE | PAGE 1 OF PAGES 2

| | | | |
|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO.<br>P00009 | 3. EFFECTIVE DATE<br>SEE Blk 16C | 4. REQUISITION/PURCHASE REQ. NO.<br>Nachshonim Storage Base | 5. PROJECT NO. *(If applicable)* |
| 6. ISSUED BY CODE<br>Resident Engineer, Central Resident Office, Israel<br>Europe District, Army Corps of Engineers,<br>Unit 7228, Box 42<br>APO, AE 09830 | | 7. ADMINISTERED BY *(If other than Item 6)* CODE | |

8. NAME AND ADDRESS OF CONTRACTOR *(No., street, county, State and ZIP Code)*

ABB Susa / A. Arenson / Baran Group
PO Box 37
Rosh Haayin
68100 Israel

CODE V FACILITY CODE

(√) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED *(SEE ITEM 11)*

X 10A. MODIFICATION OF CONTRACTS/ORDER NO.
DACA90-01-C-0043

10B. DATED *(SEE ITEM 13)*
05-Jun-2001

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*
N/A

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| (√) | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR52.243-4 "Changes" |
| | D. OTHER *(Specify type of modification and authority)* |

**E. IMPORTANT:** Contractor ☐ is not, ☒ is required to sign this document and return 2 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

See Enclosed Scope of Work "M-1014, USACE/AAB Design Issues Meeting, 13 December 2001"

This contract change is the final resolution of the issues and discussions included in the minutes referenced by the scope of work described above.

It is understood and agreed; pursuant to the above, that the contract amount remains unchanged; the contract time for performance remains unchanged; and the contract adjustement in this modification includes all costs for the change and all claims incidental therto have been satisfied.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | | | |
|---|---|---|---|
| 15A. NAME AND TITLE OF SIGNER *(Type or print)*<br>S.D. KEENEY<br>Project Director | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*<br>J.W. BLACKBURN, JR, P.E.<br>Administrative Contracting Officer | |
| 15B. CONTRACTOR/OFFEROR<br>[signature]<br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>03Jun02 | 16B. UNITED STATES OF AMERICA<br>BY [signature]<br>(Signature of Contracting Officer) | 16C. DATE SIGNED<br>5-31-02 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

USAPPC V1.00

# NACHSHONIM STORAGE BASE
ELAD, ISRAEL
CONTRACT NO. DACA90-01-C-0043

## SCOPE OF WORK
M-1014

**USACE/AAB Design Issues Meeting**
**13 December 2001**

1. Reference USACE/AAB Design Issues Meeting of 13 December, 2001. (Enclosure 1)

2. The agreements reached in the referenced meeting are hereby incorporated into the contract, along with the clarification to the minutes as listed below. (Items a through c)

a) The minimum acceptable space frame bolt size for all types of the dry storage buildings is M-16.

b) The maximum deflection of L/600 shall apply to all individual elements of the roof structure for each of the DSBs (Dry Storage Buildings), including the panels. Note, the maximum permissible vertical deformation in the center of the roof as listed in the contract specifications, 02.003 Chaper B, 1.2 Table is not changed.

c) Foundation and concrete work on the DSBs can begin prior to the completion of the initial DSB, provided that the relevant structural designs have been accepted and released for construction.

d) The equipment ~~shelf~~ platform (galvanized metal) shall be constructed to perform the purpose of the ground bus bar for the items stored within all of the DSBs. This shelf shall be properly bonded to each of its elements and the buildings grounding system. Lugs shall be provided as part of this system, in a number appropriate for the equipment stored within the buildings, properly spaced along the length of the shelf.

SC
B
6/3/02

e) The dehumidification system for all of the DSBs shall be as specified in the contract. The sizing of these units (number of units and capacity) shall be based on the calculation procedures included in the Dry Storage Building Type A Construction Set Design Analysis. This analysis is based in part on a 7% air infiltration rate.

13.12.01

**Subject: Nachshonim – USACE/AAB DESIGN ISSUES MEETING**

Attendees:

COE: Gordon Simmons
Jody Blackburn
Michael Roach

AAB JV: Deni Keeney
Ram Noham
Gerry Ray
Richard Stump

ITEM I AND II. Goal and Comments.

Michael Roach
- We are approaching this meeting in the spirit of partnering—we all have the same goal—completion of the project.
- The contract is the guide we use to reach the goal.
- We have a challenge to meet in coordinating the goals of three separate engineering groups—Baran and its designers, the IDF, and the Wiesbaden COE.
- It is important for all parties to this project to maintain a good relationship without animosity.

Deni Keeney
- The key with successful design-build is to allow construction to proceed concurrently with design—without a compromise in quality.

Ram Noham
- We want to provide a good engineering product and to do the best work possible. The designers may defend their positions, but it should not cause a bad atmosphere in the project.

Gordy Simmons
- The COE is in the middle between the customer and the JV. We have to let the customer talk and express his desires, but we also must enforce the contract.

ITEM III. Design, General

Michael Roach
- Issues remained unresolved for the 100% design—this creates critical issues that should be resolved earlier in the design process.
- Respect for the requirements of the contract is important.
- Separation of designers, construction managers and COE creates fewer opportunities for "face time" and prevents smooth relationships.

| | |
|---|---|
| Gordy Simmons | • The COE must receive advance notice from the JV when changes in design or construction may occur. This started to happen on the 60% Segment 2 submittal, but we need to work harder to ensure earlier notification of changes.<br>• We have limited resources for scheduling project reviews, and we need to be aware of your design schedule. |
| Gordy Simmons | • The COE is in the middle between the customer and the JV. We have to let the customer talk and expresses his desires, but we also must enforce the contract. |

ITEM III c. Submission of Segment 2, 60%

| | |
|---|---|
| Michael Roach | • The submittals must have a list of transmitted documents (4025). We did not receive one, and neither the COE nor IDF knew when everything had been received. |
| Ram Noham | • The IDF specifically asked us for separate submittals of drawings and other documents. |

I. III d. DQC Program

| | |
|---|---|
| Jody Blackburn | • The DQC program should have prevented an incomplete submittal for Segment 2. Please make certain you follow your plan and that the program functions as promised. |

ITEM III e. Design Review Costs

| | |
|---|---|
| Jody Blackburn | • The COE and IDF are incurring additional review costs because of interim and incomplete submittals. This causes problems with management, and it costs everyone time. |

Challenges to Submittals

| | |
|---|---|
| Deni Keeney | • Major supply and installation contracts are with subcontractors in other countries. The different design disciplines are also not always working on the same timeline. Ram's challenge is to get the design out, correct and complete, on time.<br>• The LV contractor package was difficult and complicated to evaluate. It was not the highest priority contract at the beginning of the construction and design. Additionally, there were many disagreements about contract translations between the lawyers on both sides.<br>• Contracts signings in Israel also take longer. The LV contractor, like the mechanical/electrical/plumbing contractor, is a Joint Venture. Everyone must be satisfied to sign the contract. |
| Gerry Ray | |

ITEM IV. Design – Specific

| | | |
|---|---|---|
| Michael Roach | • | The COE feels probed by some of the designers, and we aren't certain they are trying to adhere to the contract. This has lasted longer than necessary. |
| Jody Blackburn | • | We need to be comfortable with the design before you can build. When changes to the design are made very late in the process, we feel taken advantage of. |
| | • | We have different understandings of what is written in the contract. The designers made some mistakes in not pointing out design changes. |
| Ram Noham | | |

ITEM IV a. Battery Chargers

| | | |
|---|---|---|
| Mike Roach | • | The resolution on the battery chargers made the COE feel that the JV was not being honest with the product. |
| Gordy Simmons | • | This issue should have been addressed earlier—at the 35% or 60% stage. We are at 100%, and now we are receiving letters on the system design. |
| Deni Keeney | • | The sole source manufacturer has created problems. He has asked us to submit our proposal to the COE, and then he will tell us the cost. This isn't the correct way to do business. |
| RESOLUTION | • | The battery chargers should be written into the specification as described in the RFP. Include requirements for shop drawings and product submittals so this item can be fully resolved before construction begins. |

ITEM IV b. Dehumidifiers

| | | |
|---|---|---|
| Gordy Simmons | • | We are skeptical about this new machine that meets the requirements at a lower kW rating. We can't understand how this is possible without a test of the unit. |
| | • | It will take 2-3 months to verify all of the construction submittals for this unit. There are some very specific requirements for the unit to meet, but we want to move forward on this item as well. |
| ,\am Noham | • | I have been talking to the manufacturer—he is looking into an independent company to verify his unit's capability. The IDF is welcome to witness the tests. |
| Leo Price | • | Do we know if the unit requirements describe a dehumidifier that currently exists on the market, or were parts of the requirements taken from different units? Do they describe a "real item"? |
| RESOLUTION | • | The specification for the dehumidifiers should include a minimum performance requirement. Two or three acceptable manufacturers should be listed in the specification. |

ITEM IV c. Space Frame Bolt Size

| | |
|---|---|
| Deni Keeney | • The JV wishes to offer a minimum bolt size of M16 for all space frames. |
| Gordy Simmons | • The M20 requirement was written into the specification because manufacturer's flaws in smaller bolts occur more often. I have no objection to M16 bolts if they meet the technical requirements for the contract as well as accepted safety factors for design. |
| | • |

| | |
|---|---|
| RESOLUTION | • ACO to determine acceptibilty of changing the contract to accept M16 bolts. |

ITEM IV d. L/600 deflection .

Gordy Simmons
- The client wants L/600 for all structural members, including the roof system, to prevent the building seals from opening up as much as possible.

Deni Keeney
- The JV must provide a solution that meets COE requirements. We see three options:
  - Increase the number of purlins
  - Increase the thickness of the panel skin
  - Increase the thickness of the polyurethane foam insulation

Ram Noham
- Zvi Hemly is going to Turkey next week to make tests on the panels so they will meet the L/600 requirement.
- BP Projects in Ashdod is constructing a 4m x 4m mock-up.

Deni Keeney
- I can't provide a proposal to resolve this issue until we know the commercial costs and benefits of each option.

Michael ›ach
- We need to collectively resolve this issue. The COE sees the requirement for L/600 and the dehumidifier performance as part of the contract.
- If you reduce the deflection requirement and fail the pressure test, we will be much harder on the JV than if you follow the contract and the pressure test comes out at 1.5% or 2% infiltration.

RESOLUTION
- JV to conduct tests and provide results to COE. Compliance with L/600 is required for all roof structure elements, including panels.

ITEM IV e. Emergency Generators

Ram Noham
- Our safety consultant raised this issue. It is actually an alternate power supply, and not an emergency generator, requirement.

Gerry Ray
- The building controls can ensure that the fans are turned on in an emergency, while power will be shut off to the remainder of the facility.

RESOLUTION
- This issue will be resolved in the safety guidelines and electrical design.

-EM IV f. Bus Bar

Gordy Simmons
- The COE feels the designer understood this item at the 80% design, and removed it from the 100% drawings.

Richard Stump
- The specifications and drawings are completely unclear as to the size, location and intention of this busbar.
- There are three solutions to this item:
  - Provide a busbar along the front of each platform as shown in the 80% drawings.
  - Provide a sectional busbar, 40cm long, between each pair of vehicles and connect the bars with a conductor.
  - Provide a busbar and connect it back to the grounding system at the center of each wall.

| RESOLUTION | • COE to consider item as open for negotiation. |
|---|---|

ITEM V. Deviations

ITEM V a. Start on Micropiles

| RESOLUTION | • COE needs an approved concrete and waterproofing design. Once these documents have been received, piling and foundation work can begin.<br>• Successful presentation and approval of the DSB A concrete design will allow this item to move forward. See V a. |
|---|---|

ITEM V b. Proposal to begin concrete work on other DSBs prior to prototype completion.

| RESOLUTION | • This item was not discussed in detail. COE to consider once concrete design for DSB Type A has been accepted. This will require attention in a future meeting. |
|---|---|

ΞM V c. Precast vs. cast-in-place concrete walls.

| | |
|---|---|
| Gordy Simmons | • We will want to review the concrete design and waterproofing systems. The IDF reviewers and the COE reviewers will need to see the drawings and specifications.<br>• The Enkadrain solution should take the revised lean concrete design into account.<br>• Will there be a grade beam in the cast-in-place design? |
| Ram Noham | • We have a proposal for your consideration. The lean concrete will be thickened under the walls; this will protect the waterproofing during casting of the walls.<br>• Zvi Hemly can have the full concrete building design completed by Wednesday. |
| Gerry Ray | • There will be no production problems with cast in place building. The time schedule will be the same as for precast buildings, 6 per month. |

| RESOLUTION | • The revised design for protection of waterproofing under the cast in place walls is approved in principle.<br>• Gordy Simmons will bring the IDF/COE reviewers to Baran offices at 1pm, Wednesday, December 19. Structural and waterproofing drawings will be reviewed for completeness. All other disciplines should complete as many items for 100% corrected final review as possible. |
|---|---|

ITEM VI. Resolution.
All resolutions are identified in items I-V above.

ITEM VII. Resolution of Segment 2, 60% design

Gordy Simmons

- The following items should be revised and included in the resubmittal: Low-voltage system design, mechanical calculations, lateral load resistance systems, and the architectural relationship of building M1 to R type buildings.
- Follow the DQC plan and ensure all contract requirements are met.

Michael Roach

Minutes submitted by Richard Stump
AAB Joint Venture

cc:
Shai Vaxman
Amnon Glick
I ᵔo Price

BELL BOYD & LLOYD PLLC
1615 L STREET N.W., SUITE 1200
WASHINGTON, D.C. 20036-5610
202.466.6300 FAX 202.463.0678

OFFICES IN WASHINGTON, D.C.
AND CHICAGO

BRIAN COHEN
202.955.6836
bcohen@bellboyd.com

February 11, 2005

VIA PRIORITY MAIL

Resident Engineer
United States Army Corps of Engineers
Nachshonim Resident Office
Unit 7228, Box 42
APO AE 09830

Contracting Officer
Department of the Army
Engineer District Europe, Corps of Engineers
PO Box 1, Konrad Adenauer Ring 39
65187 Wiesbaden Germany
Attention: William D. Mills

Re: Contract No. DACA90-01-C-0043
Nachshonim Storage Base
Certified Claim and Request for Contracting Officer's Decision
DSB Claim

Dear Sir:

Please be advised that the undersigned represents the A.A.B Joint Venture in connection with the above-referenced contract.

Pursuant to FAR 52.233-1 Disputes and the Contract Disputes Act of 1978 as amended (41 U.S.C. 601-613) A.A.B Joint Venture hereby submits this claim in the amount of $11,239,552 and a 299 calendar day compensable time extension. A.A.B Joint Venture specifically requests a Contracting Officer's decision in accordance with the contract and the Contract Disputes Act. A.A.B Joint Venture also claims simple interest as provided by law. You will also find enclosed an executed Claim Certification.

Very truly yours,

Brian Cohen

Brian Cohen

BC:meb
Enclosures

36174/F/2

In reference to DSB Claim:

## CERTIFICATION

I, S. Denison Keeney, do hereby certify that this claim is made in good faith; the supporting data are accurate and complete to the best of my knowledge and belief; the amount requested accurately reflects the contract adjustment for which A.A.B Joint Venture believes the Government is liable; and I am duly authorized to certify this claim on behalf of the contractor, A.A.B Joint Venture.

A.A.B JOINT VENTURE

By: [signature]
S. Denison Keeney
Project Director

Date: 10 February 2005

## I. INTRODUCTION

AAB JV ("J/V" or "JV") requests an equitable adjustment to compensate it for the delay and direct costs it has experienced because of the U.S. Government's issuance of defective specifications and breach of its implied warranty of specification adequacy with respect to the pressure testing requirements for the dry storage buildings ("DSBs"). As a result of the issuance of the defective specifications/breach of the implied warranty of specification adequacy the JV is entitled to an equitable adjustment in the amount of $ 11,239,552 and a 299 calendar day compensable time extension.

This claim arises under Contract No. DACA90-01-C-0043 ("the Contract") between the United States Army Corps of Engineers ("USACE," "COE" or "the Government") and AAB JV[1], to design and build a dry storage and logistics base complex for the use of the Israeli Defense Forces ("IDF") near Elad, Israel.

The $125M firm-fixed price design-build construction contract, awarded on June 5, 2001, was enabled through U.S. Foreign Military Financing as part of the Wye Plantation Peace Accords. Notice to Proceed ("NTP") was issued on June 19, 2001, with a stipulated 3 year performance period (1095 calendar days), making the baseline completion date June 18, 2004.

The Contract required the construction of approximately 200 buildings on a circular area of approximately 400 acres. One hundred and twenty seven of these buildings are Dry Storage Buildings ("DSBs"), specifically designed to maintain a controlled climate minimizing environmental impacts from temperature (by utilizing insulated panel cladding) and humidity (by

[1] An Israeli Joint Venture, comprised of ABB SUSA, Inc., A. Arenson, Ltd., and the Baran Group.

combining a completely sealed building envelope with dehumidifiers) for heavy military equipment, such as tanks and armored personnel carriers.

In accordance with the design criteria provided by USACE, the DSBs consist of a concrete foundation and partial concrete walls upon either drilled/cast piles or spread footings, a structural steel roof (conventional or space frame type), with external insulated "sandwich" panel cladding on both the roof and walls, with a total of approximately 2 miles of seams that had to be hermetically sealed in each DSB.

Of particular importance was the requirement in the Request for Proposal ("RFP") drawings, that the insulated panel cladding be placed on the exterior of the structural steel, thus precluding the possibility of sealing the seams from the inside of the building. At the same time, the contract required the building to be almost hermetically sealed. The rationale behind this extremely tight sealing requirement was to reduce to a minimum the electrical consumption of the dehumidifiers. The combination between this specified placement of the panel cladding on the exterior of the structural steel design and the specified requirement that the building be almost hermetically sealed was defective *per se*.

The contract required the upper part of the building envelope to be a steel-structure cladded by insulated "sandwich" panels and completely sealed joints "as specified," although this sealing detail was never defined in the RFP specification. All connections on site between steel parts were to be made with bolts only. The minimum bolt size of M20 (20mm diameter) was deleted by RFP specification amendment before contract execution, however, because the Government omitted this change in all specifications, it disagreed that this change was made.

The Government first "considered" reducing bolt size at the December 13, 2001 meeting; but did not finally issue Change Order (P00009) to reduce bolt size until 31 May 2002. The

Government also erroneously insisted that the specifications required the panels, which cladded the structure, to be a structural element themselves, thereby mandating compliance with the L/600 deflection requirement.

The contract required the construction and successful testing of a first DSB building (hereinafter the "Pilot DSB"), before the mass production of DSB buildings could commence. The contract also mandated that the Pilot DSB pass two pressure tests to ascertain the near hermetic sealing of the building, with a required one month interval between the first and second tests.

The air tightness requirements as stipulated by the pressure test (25mm $H_20$ to 12mm $H_20$ in 30 minutes) were unusually stringent and far exceeded the air tightness and vapor proofing standards for chemical warfare shelters by over 180 fold (20mm $H_2O$ to 10mm $H_20$ in 10 seconds). The contractually mandated exterior panel cladding, resulted in a configuration that simply could not meet the required tightness. This pressure test was particularly significant to the project schedule because, as mentioned above, the contract prohibited the JV from proceeding with construction of any of the other DSB envelopes until the Pilot DSB passed both tests.

By way of illustration, a typical DSB Type A building contained approximately two linear miles of seams resulting from panels tightly fitted together at the edges. The contract pressure test noted above could not be met if the building contained holes or spaces (in the aggregate for the entire structure), greater than the size of a pea (8mm diameter)!

After 19 months of unnecessary delay caused by USACE's unwillingness to change the impossible/defective air tightness/pressure test standards, USACE relaxed the air tightness/ testing requirement, making it 30 times less stringent. Even this greatly relaxed testing

requirement was extremely tight, allowing for holes or spaces between the panels in this enormous structure, in the aggregate of no more than a silver dollar (50mm diameter).

The Government was put on notice during the Question & Answer pre-bid phase of the contract that passing the required level of air tightness/pressure test would be exceedingly difficult, if not unprecedented (see Q/A #1029, #2021 and #2024 below). Notwithstanding these warnings, USACE gave direction to all bidders to perform as directed, contending that the specifications could be accomplished and stating that USACE would be liable should there be additional costs due to Government furnished information.

In reliance on these statements, the JV attempted to comply with the impossible specification with disastrous results, including the following: (1) a significant unanticipated research and development ("R&D") effort; (2) concession of other meritorious claims such as, (a) minimum air infiltration rate, (b) the L/600 panel deflection issue, and (c) the minimum bolt size for the spatial frames; and (3) significant delay to the project schedule and associated extended performance costs, and other resulting damages, before USACE belatedly relaxed the testing requirements so that the Pilot DSB could meet the test, and construction of the other DSB buildings could commence.

Nearly two years after contract award, on 14 May 2003 the USACE finally gave approval for a relaxed testing method, ASTM E 779, including testing values agreed by the parties, thus reducing the air tightness by 30 fold. The Pilot DSB was finally approved on 03 June 2003, and the JV was released to mass produce the remaining DSBs.

For the reasons discussed herein, the Government is liable to the JV for all of the costs, project delays and the monetary consequences of the delays associated with the JV's attempts to comply with the defective/impossible specifications. In total, the compensable delay to the

project's critical path was 299 calendar days (See Section VI below), and the damages to the JV, both direct and indirect, total $11,239,552.

## II. RELEVANT CONTRACT PROVISIONS

At the heart of this claim is the "Tests" Section found in Specification - - Division 2- Section 003 Dry Storage Buildings, Chapter J, Paragraph 3: (02-003-J-3).

> Tests
>
> **The permeability of the joints and the complete structure will be pressure tested twice with positive pressure of 25 mm. of water gauge. This should not drop more than 12 mm. over 30 minutes.** The pressure in the building (for the test) will be created by blowing air into the building by a fan to 25-mm. water gauge and measuring the time and the pressure drop after stopping the fan. The pressure test shall be conducted in the presence of the COR. The contractor shall record the pressure in the building and the barometric pressure outside every five minutes for 45 minutes. (Emphasis added).

That section further states:

> The contractor cannot proceed with the erection of any other building envelopes until both test results of the first building has been approved . . . to prove his design the Contractor must complete one structure and successfully test it prior to construction of subsequent structures . . . The contractor cannot proceed with the erection of the second building until completion of the two tests and acceptance of the first building.

Thus, the test required that the building be sealed such that it would lose pressure from 25mm to 12mm over one half hour, when most buildings that can meet this test are all concrete construction or cold storage constructed with panels attached interior of the structural steel. During a 12 August 2002 inspection of structures in Israel, that the USACE / IDF designer declared to be precedent for this test, the structures observed were all concrete construction or cold storage constructed with panels attached interior of the structural steel. One of these fruit storage buildings, designed by this IDF designer, Asa Aharoni, used the exact same air infiltration pressure test as specified for this project and the steel was exterior of the panel cladding.

L/600 deflection specification references:

Specification Division 2 - Section 003 Dry Storage Buildings, documents that there is no contractual reference to panels as "structural elements."

Minimum bolt size specification references:

Specification Division 2 - Section 003 Dry Storage Buildings and Special Specification Division 3 - Chapter 19, (See Exhibit 1, 22 November 01 JV Letter USACE/01-054, documenting specification inconsistencies in Amendment #6, which are the responsibility of the Government and Exhibit 2, 27 November 01 USACE response Letter COE-01-053).[2]

## III. RELEVANT PRE-BID QUESTIONS AND ANSWERS.

### A. Pressure Test Questions & Answers

From the outset, the JV and other prospective bidders had concerns with respect to the ability of the Government-supplied design criteria to pass the testing requirements. These concerns were incorporated into the contract during the pre-bid question and answer period when USACE was notified that the specification was problematic, if not impossible. USACE responded to all of these questions (detailed below) that it believed the specification was achievable and that if "failure is due to any information the government provides, the government will be liable."

During the pre-bid period, several questions were presented with respect to the required pressure tests:

1. Question #1029:

Q: The RFP requires the Contractor build a prototype dry storage building to undergo qualification tests of the design and construction adequacy. However, the Government is providing the actual design concept. If the

[2] Exhibits 10, 25, 28, 30 and 32 will be supplied under separate cover.

building fails the test and it is shown not to be fabrication/construction flaws, who has the financial responsibility for fixing the problem?

A.____The government is providing design criteria, some conceptual ideas of how this design criteria can be implemented, and <u>some boundary conditions that must be applied to this criteria. If failure is due to any information the government provides; the government will be liable.</u> (emphasis added).

2. Question #2021:

Q.____According to our PU Insulated panels manufacturers the DSB buildings cannot be made to withstand the 25 mm water gage pressure in testing. Please check once more and clarify.

A.____The government has verified that panels are available that will meet this requirement.

3. Question #2024

Q.____The pressure tests (02-003 J.3) that is required as part of the acceptance tests is not applicable in DSB and cannot be achieved due to the following facts:

a. The jamb seals of the vehicle door to the DSB are designed to prevent an outside pressure (wind) from entering the buildings. The seals will not hold internal pressure.

b.The dehumidifiers are equipped with gravity water drainage pipes, which are open to the atmosphere; therefore an internal pressure is not applicable.

Can the acceptance test be changed to ultimate operational test, which should prove the performance of the DSB to keep the humidity level of less than 45% for a period to be defined (7-10 days?)

A. Reference paragraph 02-003-M1-1.5 with respect to the requirements for the jamb seals. With respect to the second part of this question, note that there is no requirement in the solicitation that the drainage pipes be open to atmosphere, only that the building must function to the requirements of the solicitation package. The contractor is responsible for designing to these solicitation requirements.

B. <u>L/600 Deflection Requirement Questions & Answers</u>

With respect to the L/600 issue, the following questions were presented at the pre-bid conference:

Question #172: Reference 02-003-B.1.2. In the general description it is written "Deformation maximum vertical deformation in the roof of L/600." Does it mean that the above limitation is relating only to the total structure of the roof at the center of the roof, which mean (sic) only to the spatial frame, steel frame or main truss or relating also to the roof structural elements such as purlins on secondary beam?

Answer #172: The maximum vertical deformation (sic) the roof of L/600 applies to every element of the roof structure.

Question #2035: Can the deflection criteria requirement of L/600 be reduced to L/240 if it can be shown that this change has no impact on the air-tightness of the facility?

Answer #2035: No.

## IV. CHRONOLOGY OF RELEVANT EVENTS

### A. THE DESIGN PHASE OCTOBER 2001-JANUARY 2002

Many issues concerning the inaccurate and/or incomplete specification prolonged and complicated the design process. For example, USACE failed to provide a working value for the air infiltration rate.[3] This parameter was omitted from the RFP specification and was necessary, among other things, to determine the design, procurement and mandatory testing of the dehumidifiers and the paneling for the outer cladding of the buildings. Although this parameter was necessary, USACE stated:

> Bottom line is that yes, this is your design and you should be able to pick the design parameters for this issue since a value was not specifically stated in the solicitation documents. However, your design must be reasonable and based on industry practice/industry standard AND your design must meet the functional requirements of the solicitation in all cases (emphasis added). Obviously, decisions made at this time will affect overall performance, and hence, potentially

3 The outdoor air infiltration rate of the DSB was critical to the design of the building dehumidification system. The amount of infiltration sets the size of the dehumidifiers which affects the energy consumption of the buildings. The building infiltration rate also affects the results of the required building pressure test. If the infiltration rate was too large the building would not pass the pressure test and the overall contract schedule would be affected. (Exhibit 3, 21 November 01 Stanley Consultants, Inc. Report by Stewart Primrose).

the overall schedule. . . (Exhibit 4, 12 October 01 Gordon L. Simmons, P.E. e-mail).

As early as October 2001, the JV requested a contract modification to allow concrete work to begin for all the DSBs before completion and approval of the Pilot DSB envelope test, (Exhibit 5, 10 October 01 JV letter USACE/01-0032) in order to expedite those elements of the work that would not affect the JV's attempts to comply with the pressure test specification.

During the design phase of the project, from October 2001 to January 2002, it became clear that due to the USACE mandated construction design concept requiring the insulated panels to be attached to the outside of the steel roof frame, the JV was forced to design a state of the art pressure building that had not been done before and which required a significant unanticipated R & D effort.

In early October 2001, USACE was aware that the "theoretical" lowest leakage rate for the specified type of building, not including doors, was 2.4% versus the calculated specified maximum allowable leakage rate of 0.25%. (Exhibit 6, 9 October 01 e-mail from Ragan Glandon to Gordon Simmons "Industry criteria and actual measured test data for controlled atmosphere warehouses is very thin. . . . I consider this "(2.4% air leakage rate)" to be the theoretical lowest leakage rate for our type of buildings").

In spite of USACE having knowledge that the theoretical lowest leakage rate for this type of building was 10 times higher than that required by the specified pressure test, in the 27 October 01 80% Design Review, USACE stated, "The COE will invoke the latent defects clause and request damages from the JV if the buildings do not perform as specified." (Exhibit 7, Annex C - Mechanical 27 October 01 Design Review Comments, "General Introduction").

These threats made clear that the JV had no choice but to make every effort to try to achieve this impossible performance requirement.

At the same 27 October 2001 meeting, the JV again alerted USACE to the criticality of the pressure test, "This test must be passed before any more DSBs can be constructed." (Exhibit 7, "Annex C - Mechanical, Design Review Comments, Mechanical Discipline Discussion" Section).

B. THE MOCK-UP AND OTHER R&D EFFORTS

On 21 November 2001, in the wake of continual USACE threats regarding the consequences of failure to achieve the specified DSB pressure test, the JV decided to build a mock-up in Ashdod and conduct R&D to determine the optimum sealing elements[1] and procedures necessary to achieve what both parties knew was theoretically an unachievable and unprecedented specification requirement before entering into a fruitless attempt to build the building on a large scale. Thus, the JV realized at an early date that a failure of the DSB pressure test would be catastrophic. From this point on, the J/V's fruitless and futile efforts to demonstrate that the specified DSB pressure test could be achieved became the critical path for the project.

The J/V informed USACE that it was constructing the Ashdod Mockup at the 13 December 01 critical Design Issues Meeting. Many decisions were also made at this critical meeting that changed the course of the contract, causing major delay to the contract schedule. First, USACE insisted that the contract specifications required a deflection of L/600 "for all structural members," and included the panel cladding within this definition, despite numerous contractual indications to the contrary and the fact that there is no contractual reference to panels as "structural elements."

At the December 13th meeting, USACE stated, "If you reduce the deflection requirement and fail the pressure test, we will be much harder on the JV than if you follow the contract and the pressure test comes out at 1.5% or 2% infiltration." (Exhibit 8, 13 December 01 Meeting

Minutes Item IV d). This statement was made in spite of USACE having knowledge in October 2001 that even a 2% maximum air infiltration rate was theoretically unachievable

Driven by the need to pass the impossible pressure test (and thus advance the project), the JV was unconscionably pressured by USACE into waiving its right to claim on the L/600 panel deflection issue. The JV was led to believe that USACE would release it from full compliance with the impossible testing specification. In return for this alleged promise, the JV was forced to construct a more costly and structurally stable building than required by the contract.

On February 6, 2002, USACE gave design approval and clearance for the construction of the Pilot DSB. This approval was based on specification requirements in the RFP and before the results of the Ashdod mock-up were known. Thus, USACE bore full responsibility for the defects in its design package. (Exhibit 9, 06 February 2002, USACE letter COE-02-006).

On February 7, 2002, the JV informed USACE again in USACE/JV Weekly Meeting No. 19 (Item 7.4) that it was building a mock-up (Exhibit 10). However, on 24 March 2002, the mock-up test in Ashdod failed. (Exhibit 11, DSB Mock-up in Ashdod Report #1, transmitted via J/V letter USACE/02-0161 dated 22 July 2002).

In late April, 2002, the second Ashdod mock-up pressure test failed, holding for a mere 7 seconds as opposed to the 30 minutes required.

The JV continued to make mock-up and panel sealing changes in an effort to look for an optimal sealing method to meet the specified pressure test standards. Additional panel deflection tests also had to be conducted before the JV could release the spatial frames for fabrication for the Pilot DSB.

On May 14, 2002, the JV's Project Director, Deni Keeney, discussed the pressure test with USACE and made it clear that a lot of time was being lost on the R&D efforts in Ashdod.

Mr. Keeney also stated that since all parties knew the system would not pass the test, the Government should reduce the criteria to that similar to shelters.

Despite the fact that the USACE was aware as early as October 2001 that the pressure test (air tightness) requirements could not be met given the external cladding, the USACE persisted in requiring the JV to continue R&D work, with resultant delay to the project. It would take another full year before USACE would finally informally approve an alternate testing procedure with a target result that was achievable with the Government design criteria of internal structural steel, cladded externally with insulated panels.

On 13 & 22 June 2002, the JV conducted further pressure tests on the Mockup at Ashdod; each time unsuccessfully.

In short, throughout the spring of 2002, the JV attempted to meet the impossible specification on the mockup in Ashdod and in doing so expended much time and expense in a fruitless R&D effort. (Exhibit 11). In fact the best results for the required pressure drop from 25 mm to 12mm was 1 minute and 10 seconds, as compared with the 30 minute contract requirement. In other words the best results achieved only 4% of the required result. Despite being so far off the mark for the pressure test, other test parameters related to dehumidification and energy consumption, for example, showed that the envelope exceeded what was needed. This led the JV to conclude that the only possible solution was to ask, yet again, for the "COE to lower the requirements." (Exhibit 11).

In fact, the schedule demands and technical research associated with the DSB pressure test issue became so extreme that a full-time engineer was hired for a sub-project management position, dealing exclusively with the issues raised by the impossible specifications.

The J/V submitted the Izopoli panels on April 18, 2002, (Exhibit 12, Transmittal 0080, AAB-19-18.1). However, it could not submit the Izopoli panel sealing materials for approval until 21 July 2002, after a prolonged period of ascertaining that these panels were not the cause of the pressure test failure. (Exhibit 13, Transmittal 0080A, AAB-19-18.1.).

The next day, July 22, 2002, the JV sent USACE a letter, noting "As you have been made aware, the Contractor has been conducting pressure tests on a miniature mockup DSB at BP facilities in Ashdod over the last 3 months." (Exhibit 14). Those tests showed that even with all of its R&D efforts, the results were nowhere near meeting the contractually dictated requirement. Thus the Government was well aware at this point that further R&D was pointless.

## C. THE EXPERTS AND THE SEARCH FOR BUILDINGS THAT MET THE CONTRACT SPECIFICATIONS

When, by the end of July 2002, it became clear to the JV that the pressure test was unachievable, and USACE showed no willingness to relax the specification, the JV began a series of consultations with the leading experts in building "air-tightness," in order to solve what by this time, had become an insolvable problem.

On August 6, 2002, the JV received a response from HRS, a U.K. specialist in air-tightness, regarding the pressure test requirements in the DSB context. Ed Westgate, an expert in the field, advised the JV that the specification would be impossible to attain, particularly with the form of construction.

At the same time, the JV again requested the USACE and IDF conceptual (RFP) designer to show the precedent for the specification. JV management was sent by Asa Aharoni, the IDF's design consultant and USACE, to see buildings that supposedly had met the contract's pressure testing requirements.

On August 12, 2002, the USACE sent the JV management to see three cold storage facilities in Northern Israel. Apparently, even USACE was misled by the IDF designer, as they stated. "I understand that the following sites have achieved good results with their panels." During these site visits it was found that one of the 3 buildings was all concrete construction and the other 2 buildings had interior panel construction. Therefore, all three were completely irrelevant to the JV's pressure testing requirements. Thus it became even clearer that the specification pressure test had no precedent.

While inspecting one of the buildings with internal panel cladding and external structural steel, the IDF designer, Yehoshafat Aharoni, stated that the JV should now change the design to be similar to this building. USACE responded immediately that the design of the building would not change.[4]

Concurrently, the JV began to consider testing the panel system in accordance with a different methodology. The JV proposed ASTM E 283, which was mentioned in USACE Mechanical Designer, Ragan Glandon's 09 Oct 01 e-mail to Gordon Simmons which measures the air leakage rate through elements of the building envelope when a specified constant pressure is applied. (Exhibit 6). Although ASTM E 283 does not dictate any specific values, the Government reduced the required level for passing the test on a rough order of magnitude by more than 30 fold in comparison with the original test method.

By this time, the JV was convinced that it could not pass the air infiltration test as specified, so it released the Pilot DSB panels for fabrication, in the hope that USACE would

---

4 Significantly, the original RFP specified panels to be attached internally to the structural steel. This requirement was deleted in Amendment No. 3 to the RFP in order to match the RFP drawings which depicted external panel cladding.

ultimately relax the testing requirement, enabling the Pilot Building to pass the pressure tests so that the mass production of the DSBs could commence.

Despite its knowledge, at this point, that there were no buildings conforming to the contract design that had attained the impossible performance specifications set forth in the contract, USACE rejected the JV's panel submittal. (Exhibit 15, 5 September 02 USACE letter COE-02-038). Mike Roach, USACE's Contracting Officer's Representative, wrote, "I am disappointed with your submission of this very important element of the project where your subcontractor states that the specified 'Pressure criteria can't be achieved.' This statement calls into question the contract requirements regarding the building envelope of the Dry Storage Buildings and essentially restarts the design process regarding this critical element of work."

On 12 & 17 September 2002, the JV met with USACE and the IDF building designers. When the JV requested precedent for the specified design criteria and air infiltration test, the IDF designer, Asa Aharoni, stated on 12 September 02 that, "There are some basic rules that must be applied very carefully in order to achieve the sealing of the building: a) Work space - All the joints and connections must be exposed to properly seal and inspection all joints and penetrations." However, the joints are not and can not be exposed with structural steel inside of the panels and obstructing inside joints. When pressed to provide precedent for the specification, Mr. Aharoni responded that there was not enough time at this meeting to explain the basis in the specification for the pressure test and results. It is apparent that there was "not enough time" because Mr. Aharoni knew, based on the August 12 inspection, that there was no "precedent" for cladding external to the steel.

The JV then informed USACE that the "pressure test results required in the RFP cannot be achieved with this type of building. To achieve the RFP requirements the interior walls must

be clean of purlins and other structural elements, exposing all joints and penetrations for proper sealing. That means that the structural steel must be outside the building, as all parties witnessed at both of the two locations identified by Asa Aharoni (Rosh Pina and Kiriat Shemone) as typical air tight panel-cladded structures in Israel." (Exhibit 16, 12 September 02 Summary of meeting held at Asa Aharoni Haifa Offices and Exhibit 17, 17 September 02 Summary of meeting held at Asa Aharoni Haifa Offices).

In spite of Asa Aharoni's inability to provide an example of a building that met the contract specifications, and the extraordinary efforts undertaken by the J/V to meet the impossible specifications, USACE continued to insist that, [the] "Building configuration will not change. The buildings shall remain with internal structure steel covered with external cladding panels. Izopoli panels meet the performance required in the RFP. The remaining issues are the details of joints and penetrations to obtain the best possible sealing." (Exhibits 16 and 17).

The 19 September 02 Meeting minutes re: DSB construction, reflect that, in Eric Schneider's[5] experience, ". . . a building made of internal structure and external insulated panels cladding, cannot be asked to sustain internal pressures; The buildings we were shown in Rosh Pina and Kiriat Shemone are made of an external structural skeleton so it can be possible to achieve a smooth interior surface that can be sealed almost completely. In his experience, the major leaks are from the bolts .." (Exhibit 18, 22 September 02 Nachshonim 93, Meeting Minutes).

On September 20, 2002, the J/V responded to the USACE's rejection of its panel submission, pointing out (1) Stanley Consultant's dry storage experience and their role in the JV design; (2) The IDF designer, Asa Aharoni's statement that Eric Schneider is the world's

5 Eric Schneider was BP Panel Insulation CEO and a world renowned expert in the field of panel insulation, according the IDF consultant, Asa Aharoni.

foremost expert for construction and sealing building envelopes and that the JV had utilized this expertise from the project's inception, as Eric Schneider is the former CEO of the JV's panel erection subcontractor, BP Insulation Projects, Ltd.; (3) The Government's liability as stated in Pre-Contract Question and Answer #1029; (4) The JV Ashdod mock-up was erected to develop optimal sealing methods and materials through experiments, as the JV was unaware of existing technology to meet the specified testing criteria. These R&D results precipitated the JV/BP statement in the submittal that the specified pressure test may not be achievable utilizing the RFP design criteria; and (5)the IDF designer had been unable to point out a single building that had an exterior panel design that had met the specification pressure test. (Exhibit 19, 20 September 02 JV letter USACE/02-0194).

On 10 October 2002, the JV resubmitted its panel submittal, stating that the test procedure had been presented to Asa Aharoni and were awaiting his comments, and proposing an infiltration test at the "top end of the market for air infiltration." (Exhibit 20, 10 October 02 JV letter USACE/02-0207). Thus, the JV spent a great deal of time attempting to improve the quality of the panels in order to somehow meet the specification which simply could not be met.

Informal discussion on 30 October 2002 with Mr. Roach indicated that the COE will approve erection of Pilot DSB, as submitted.

However, on 05 November 2002, after all that had transpired with respect to the DSB pressure test issue, USACE wrote the JV that it was in receipt of the JV's DSB envelope submittal, but it was still not satisfied with the "non-visibility of the joints and penetrations of the bolts." (Exhibit 21, 05 November 02 JV letter USACE/02-045).

The JV responded immediately, detailing all of the additional research and development invested in this project because of the impossible DSB pressure testing requirement. The JV

noted that it had well exceeded its estimated costs and time of performance to meet the RFP requirements, and had succeeded in every regard, other than passing the specified envelope pressure test. (Exhibit 22, 05 November 02 JV letter USACE/02-0219).

D. PERFORMANCE OF PRESSURE TESTS AND RELAXATION OF PRESSURE TEST REQUIREMENT

On 07 November 2002, USACE wrote to the JV, ". . . please complete the construction of the initial DSB and perform the various tests necessary to prove your design in accordance with Division 02, Section 003, Chapter J of the contract. Your alternative testing procedures shall be evaluated in conjunction with this phase of construction." (Exhibit 23, 07 November 02 USACE letter COE 02-046). Thus, even at this late date, the JV did not have any formal relaxation of the testing requirements specified in Chapter J of the contract.

On 14 January 2003, Preliminary Pilot DSB pressure tests were conducted. The ASTM E-283 infiltration test reached half the allowable amount, but the test resulted in 1 minute 25 seconds versus the specified 30 minute minimum to lose pressure from 25mm to 12mm $H_2O$ pressure.

On 21 January 2003, Ron McPeters of USACE informed the JV that a formal pressure test in accordance with ASTM E-283 was scheduled for 23 January 03. (Exhibit 24, 21 January 2003 McPeters e-mail).

The first formal pressure test was conducted on 23 January 2003, (Exhibit 25, USACE/J/V Weekly Meeting No. 60), and on 31 January 2003, (Exhibit 26, Transmittal No. 00158, AAB-19-23). The JV submitted those test results using both the original test, showing that the building withstood the pressure for 1 minute 40 seconds and according to the ASTM-283 standard, achieved a flow rate of 262 cubic meters per hour at 7.83 mm water pressure, passing the new standard.

Finally, on 19 February 2003, the USACE wrote to the JV regarding the DSB pressure test report and procedures, indicating that perhaps the ASTM E283 test was inappropriate and that "An acceptable alternative to this test is ASTM E 779. . . It is a field test performed on an entire building envelope," (Exhibit 27, 19 February 03 USACE letter COE 03-004). Thus, while USACE never made a formal change to the contract requirements, its suggestion that ASTM E-779 was an acceptable alternate was a tacit admission that the original specification could not be achieved.

On 04 March 2003, the JV submitted an alternative testing procedure based on ASTM E-779 for the entire building envelope. (Exhibit 28, 4 March 03 JV Submittal 19-37).

On 12 March 2003, USACE approved the JV's air leakage test based on the relaxed requirement. (Exhibit 29, 12 March 03 USACE letter COE-03-023).

Near the end of March, 2003 Izopoli/BP initiated a contractual dispute over the delays in starting the panel installation which ultimately resulted in an "amicable" termination of BP on 23 June 03, while retaining Izopoli as the panel supplier. (Exhibit 30, USACE/J/V 26 June 03 Weekly Meeting No. 79, - Item 2.7).

On 01 April 2003, the second Pilot DSB pressure test was performed. (Exhibit 31 Submittal AAB JV 19-59 dated 19 May 03) and (Exhibit 32, 3 April 03 USACE/JV Weekly Meeting No. 69).

Finally, on 03 June 2003, USACE approved the pressure test results of the initial Dry Storage Building and stated, ". . . your work on subsequent DSB envelopes may continue." (Exhibit 33, 03 June 03 USACE letter COE-03-064). Thus, the JV's efforts to comply with the impossible specification was finally resolved, 18 months after it began.

V. <u>ENTITLEMENT</u>

The Government is liable to the JV under several theories of recovery: (a) breach of the implied warranty of adequate design and/or impossibility/commercial impracticability, (b) constructive change to the contract, (c) breach of the duty of good faith and fair dealing, and (d) economic duress and unconscionability. In total The Government is liable to the Joint Venture for an equitable price adjustment in the amount of $11,239,552 and a 299 calendar day compensable time extension. Each theory is discussed below.

(A) <u>The combination of the requirement to place the panels exterior to the structural steel and the Chapter J pressure test requirement breached the implied warranty of specification adequacy and/or constitutes an impossible/commercially impracticable specification.</u>

The Government's detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be obtained. It is well established that where the design specifications the Government furnishes are not suitable for their intended purpose, the risk of non-performance and delay falls on the Government. Where this warranty of adequacy is breached, the Government is liable for a contractor's additional costs, including extended performance costs resulting therefrom, incurred in attempting to comply with the faulty specifications.

Here, the Government is responsible for the JV's additional costs and delays since it was the Government which specified that the paneling on the DSBs had to be installed exterior to the structural steel roof frame. However, the use of <u>exterior</u> paneling is fundamentally incompatible with the infiltration pressure test for the building envelope prescribed by Chapter J.

The facts demonstrate, that during the many months the JV attempted to achieve the level of sealing required under the contract specifications, the Government behaved as if the pressure

test standard was achievable, and that there were examples of such construction, even in Israel. The Government's direction to visit various buildings in Northern Israel, illustrates this point well. Even when it became completely clear that no such buildings existed, the Government, instead of relaxing the specification, rejected the JV's panel submittal. Instead of issuing a contract modification relaxing the specification, the Government erroneously insisted that the JV continue to achieve what the Government knew or should have known by that time, was impossible.

The J/V had no latitude or discretion to change the Government's design requirement to place the paneling exterior to the structural steel. Indeed, it is obvious that in spite of all the problems, the Government persisted in requiring that the paneling be placed exterior to the steel. Under such circumstances the Government is liable since compliance with the Government's design requirement prevented the J/V from meeting the pressure test performance requirement, thereby entitling the J/V to an equitable adjustment for its direct costs and delays and disruptions resulting therefrom.

Even if incorrectly viewed as a performance specification, the JV is still entitled to an equitable price adjustment for its additional costs, since the pressure test when considered with the other pertinent specifications, was impossible or commercially impracticable to achieve. Accordingly, for the reasons discussed below, the Government is liable for the additional costs and delays incurred in attempting to comply with the pressure test requirement.

First, it is clear that no other contractor has achieved the specified requirements. The visit to other sites in Israel yielded no relevant projects. USACE was also unable to identify any other place in the world where the contract requirements had been achieved with paneling installed exterior to a structural steel frame.

Further, the JV exceeded the state of the art, by achieving a sealing standard twice as high as had been achieved previously. The Corps appears to have recognized this fact when it mentioned the Nachshonim project on its website, stating specifically that the building passed the twice relaxed ASTM E-779 test, achieving "results three times better than the target," In fact, USACE boasted that an independent observer stated that the pilot DSB was "the tightest building he had ever seen." (Exhibit 34 nau.usace.army.mil/news/images/Summer03_cover.jpg).

The clear and inescapable implication of this language is that the JV achieved a new standard in building technology when it succeeded in "pushing the envelope" for air infiltration pressure in a dry storage building using extèrior paneling.

Next, the JV cannot be considered, at any point, to have "assumed the risk" of the defective specification. The Government was put on notice even at the pre-bid stage that its specifications were problematic, if not impossible, and the JV was given direction to proceed. At each and every possible juncture, the JV gave the Government notice of the difficulties in achieving the specified performance results and the Government continued to insist on performance.

In addition, several other factors are present which have been held to support a finding of either impossibility or commercial impracticability. First, unanticipated research and development indicates impossibility. Thus, where as here, the contract does not contemplate research, but significant research and testing beyond the state of the art must be undertaken, which was not contemplated by the contract, impossibility or impracticability has been found. Second, the Government ultimately agreed to the use of a testing standard that had the effect of relaxing the performance standard by a factor of 30. Third, independent expert analyses by