world renowned experts confirmed that the pressure test requirement was impossible to meet given the design requirements.

Finally, the J/V has demonstrated beyond cavil that it diligently attempted to perform the contract. It is indisputable that the JV explored many alternatives, conducted endless research and exhausted all alternatives before concluding that the pressure test results, as dictated by the contract, could not be achieved.

In sum, the contract was a straightforward fixed price construction contract. It did not contemplate any research or development effort, particularly with respect to the air tightness for the DSB building envelope. Nor was extensive testing of panels, sealants, and construction technology to be carried out. In fact, no work beyond the state of the art under the contract was contemplated or even imagined. Yet from November 2001 to June 2003, the JV was compelled to conduct a battery of leading edge engineering studies resulting in substantial delay, that led to the inevitable conclusion that achieving the Chapter J infiltration pressure standard was impossible, or at an absolute minimum, commercially impracticable.

The Government cannot have it both ways. Having pushed the JV into advancing the state of the art by insisting on compliance with impossible performance requirements until very late in the game, the Government, which was notified from the outset of the problems, cannot avoid responsibility for the increased costs and delays caused by its actions.

In addition, the Government breached its duty of good faith and fair dealing and its companion duties of cooperation and noninterference by its unreasonable contract administration in not issuing a change order in a timely fashion and by insisting the JV enter into an R&D contract, when the JV had not signed an R&D contract. Instead of issuing a change order relaxing the specifications, or changing the paneling to the interior of the structure as soon as the

impossibility of performance became clear, the Government allowed the JV to flounder for months, critically delaying performance, which caused extraordinary additional costs. In this case, if the Government had issued a timely relaxation of the testing requirements, months of wasted time, effort expense and delay would have been avoided.

(B) <u>The Government is also liable for the additional costs incurred by the JV resulting from the Government's constructive change requiring that the panels meet the L/600 deflection requirements.</u>

The Government administered the contract in an unconscionable manner, the effect of which was to coerce or induce the JV into relinquishing other meritorious equitable adjustment claims at great loss to the JV.

In parallel with the DSB pressure test chronology described above, there was another dispute between USACE and the JV with respect to contract interpretation. This disagreement revolved around the issue of the level of deflection of the panel cladding. The Government erroneously viewed the panel cladding as a structural element, while the JV understood, based upon the specifications and accepted industry practice, that the panels were not "structural" for purposes of the deflection requirements.

As a result of the unconscionable pressure and economic duress imposed on the JV by USACE in the process of trying to achieve the impossible pressure test described above, the JV was compelled to waive its right to claim for the additional costs and time associated with the changed work in conforming to USACE's erroneous interpretation of the contract.

The relevant facts are as follows:

During the pre-bid conference, the following questions were presented:

> Q# 172: Reference 02-003-B.1.2. In the general description it is written "Deformation maximum vertical deformation in the roof of L/600." Does it mean that the above limitation is relating only to the total structure of the roof at the center of the roof, which mean (sic) only to the spatial frame, steel frame or main truss or it is relating also to the roof structural elements such as purlins on secondary beam?

A: The maximum vertical deformation (sic) the roof structure.

Q. # 2035: Can the deflection criteria requirement of L/600 be reduced to L/240 if it can be shown that this change has no impact on the air-tightness of the facility?

A. No.

The JV reasonably interpreted this answer to mean that the L/600 maximum deflection requirement did not apply to the panels since panels could not be considered structural elements. With the specified panel dimensions and without intermediate structural elements (purlins) to greatly reduce the span of the panels, the panel cladding could not be designed to be within a maximum vertical deformation of L/600. (See Q&A #172 and #2035 and Exhibit 27 January 01 e-mail from Gordon Simmons to Ram Noham).

However, at the 13 December 01 meeting, USACE applied unconscionable pressure to the JV to agree to USACE's interpretation of the contract requirements, in return for the Government's lenience on the pressure test.

Thus, between the months of January – May 2002, the JV was forced into another R&D project to make the panel configuration comply with the L/600 requirement, before the panels could be fabricated for the Pilot DSB.

The JV, as a result, began conducting tests on the Izopoli[6] insulated panels to ensure that the panels would meet the Government directed L/600 deflection requirement. In late December 2001, testing was performed on five panel thicknesses in Turkey using the Segment I design configuration for purlin spacing (368 cm). These tests indicated that, in order to meet this additional requirement, the JV would have to almost double the panel thickness to 75 mm. As this was an unanticipated cost, the JV attempted to devise a solution using thinner 40 mm panels

6 The JV's Turkish panel supplier.

and a smaller purlin spacing using a panel junction design that would stiffen the panels and meet the USACE directed L/600 maximum deflection requirement.

It was not until 29 May 2002 that this additional requirement was met, through a series of R&D efforts which added additional costs and further delayed the project. USACE issued Change Order P0009 only on 31 May 2002, once the JV had created a new panel / purlin configuration that could meet the L/600 deflection.

The waiver exacted by the Government from the JV of its L/600 panel deflection claim is both substantively and procedurally unconscionable and therefore the modification is invalid. The Government knew or should have known that its insistence on the defective and impossible specifications was improper and unreasonable. Yet it cavalierly chose to ignore the engineering problems and allowed the J/V to proceed with its research and development effort. To add insult to injury, the Government actually exacted a price from the J/V to "allow" the J/V to continue its wild goose chase in search of an engineering solution to an impossible problem. That price was the waiver of the L/600 panel deflection claim. The insistence by the Government on the J/V's waiver of a bona fide claim as a condition to having the privilege of pursuing an out-of-scope research and development effort to comply with an impossible and defective specifications is unconscionable, amounting to overreaching. Under these circumstances, the waiver of the L/600 claim is void, ineffective and unenforceable on the grounds of unconscionability and overreaching, thereby permitting the J/V to pursue the claim.

In addition and/or in the alternative, the terms of the agreement entered into on December 13, 2001 and made part of the contract, on 31 May 02 as P0009, were entered into under duress and the JV's waiver of any further claims for time or money are therefore null and void. In order to render a release unenforceable for duress, a contractor must establish that (1) it involuntarily

accepted the government's terms, (2) under circumstances permitting no other alternative, and (3) such circumstances were the result of the government's coercive acts.

The JV has established that it felt it "had no choice" but to try to conform with the government's interpretation of the L/600 requirement given that it had no alternative if it wished "lenience" with respect to the impossible requirements of the original pressure test. These circumstances can only be attributed to the Government's unreasonable insistence upon the JV's conformance with the original defective contract specifications.

Coercion which renders a modification voidable has been found where the government violates an express provision of the contract without a good faith belief that the action was permissible under the contract, or breaches the implied covenant of good faith and fair dealing.

Here, the government extracted a waiver of otherwise meritorious claims in return for the government's lenience on the impossible pressure test requirement. By May 2002 the government could not have had a good faith belief that it was entitled to strict compliance with the impossible requirement. Exchanging this non-existent right (strict enforcement of the impossible test requirement) for valid claims is also a breach of the duty of good faith and fair dealing. For similar reasons the modification is unenforceable as not being supported by legal consideration. The government's conduct also amounts to actionable overreaching.

Accordingly, the J/V is not bound by the unenforceable waiver, and is entitled to an equitable adjustment under the Changes clause for the extra costs and time resulting from the Government's constructive change requiring the J/V to comply with the L/600 deflection requirement for the panels.

VI. QUANTUM

The Joint Venture is entitled to an equitable adjustment for the costs of extended performance due to government-caused delay. Here, the government's issuance of defective/impossible/commercially impracticable specifications pertaining to the pressure test requirements proximately caused a 299 calendar day compensable critical path delay to the project.

The Joint Venture and certain of its subcontractors incurred unanticipated extended performance costs as a direct and proximate result of the government-caused delay. Specifically, the delay caused the JV and its subcontractors to incur extended site indirect (general conditions) costs, acceleration costs and loss due to learning curve. The extended general conditions/acceleration costs are claimed for the period from March 8, 2002 to November 10, 2002. The loss due to learning curve and long duration of envelope sealing costs are claimed for the period from April 2003 through November 2003. The JV also incurred additional direct costs for testing and mock-up costs and the additional direct costs incurred to replace the original panel installer BP, caused by the impossible pressure test specification. Extended site indirect costs are also claimed for the J/V and its subcontractors for the time required to replace BP with other panel installers (June 9 through July 26, 2003). Finally, the JV claims for its additional costs incurred to comply with the government ordered change requiring the panels to meet the L/600 deflection requirement.

The specific amounts claimed including applicable mark up are set forth below:

| Item | Description | Unit | Marked Up Amount Per Count |
|---|---|---|---|
| 1 | Testing and Mockup Costs | LS | $62,964 |
| 2 | JV Site Indirect Costs – Delay of the project due to R&D from 08 Mar 02 to 23 Jan 03, total of 196 days (6.44 months). | Mo. | $2,798,240 |

| Item | Description | Unit | Marked Up Amount Per Count |
|---|---|---|---|
| 3 | Subcontractor (EK) Extended Management & Acceleration Costs – Delay of the project due to R&D from 08 Mar 02 to 23 Jan 03, total of 196 days (6.44 months). | Mo. | $1,555,993 |
| 4 | Subcontractor (Motorola) Extended Management & Acceleration Costs – Delay of the project due to R&D from 08 Mar 02 to 23 Jan 03, total of 196 days (6.44 months). | Mo. | $1,242,004 |
| 5 | Additional JV Site Indirect Costs – Delay of 55 days on the critical path of the project from April 03 through November 03, due to long learning curve and long duration of the envelope sealing – 1.81 months. | Mo. | $875,161 |
| 6 | Additional Subcontractor (EK) Extended Management & Acceleration Costs – Delay of 55 days on the critical path of the project from April 03 through November 03, due to long learning curve and long duration of the envelope sealing – 1.81 months. | Mo. | $436,631 |
| 7 | Additional Subcontractor (Motorola) Extended Management & Acceleration Costs – Delay of 55 days on the critical path of the project from April 03 through November 03, due to long learning curve and long duration of the envelope sealing – 1.81 months. | Mo. | $348,522 |
| 8 | Additional Direct Costs – Replace Original Panel Installer. | LS | $2,003,934 |
| 9 | Additional JV Site Indirect Costs – Delay of 48 days on the critical path of the project from 09 June 03 through 26 July 03, to replace original panel installer BP, due to non-performance caused by the unachievable DSB Pressure Test. | Mo. | $763,777 |
| 10 | Additional Subcontractor (EK) Extended Management & Acceleration Costs – Delay of 48 days on the critical path of the project from 09 June 03 through 26 July 03, to replace original panel installer BP, due to non-performance caused by the unachievable DSB Pressure Test | Mo. | $381,060 |
| 11. | Additional Subcontractor (Motorola) Extended Management & Acceleration Costs – Delay of 48 days on the critical path of the project from 09 June 03 through 26 July 03, to replace original panel installer BP, due to non-performance caused by the unachievable DSB Pressure Test. | Mo. | $304,164 |
| 12 | Change for Panels to Meet L/600 Deflection. | LS | $467,103 |
| | | | |
| | | | $11,239,552 |

## VII. CONCLUSION

The Joint Venture is entitled to a 299 calendar day compensable time extension, and extended performance costs and direct costs under FAR 52.243-4, Changes, in the amount of $11,239,552.

**DEPARTMENT OF THE ARMY**
US ARMY CORPS OF ENGINEERS
EUROPE DISTRICT
KONRAD ADENAUER RING 39
65187 WIESBADEN, GERMANY

REPLY TO
ATTENTION OF

Office of Counsel

22 September 2005

ABB SUSA/A. Arenson/BaranGroup Joint Venture
P. O. Box 37
Rosh Ha'ayin, Israel 68100

Subject: Contract DACA90-01-C-0043, Nachshonim Storage Base, Elad, Israel, Request for Contracting Officer's Decision, Dry Storage Building (DSB) Pressure Test

Dear Mr. Keeney,

Reference is made to your request for a Contracting Officer's Decision (COD or claim) for "Dry Storage Building (DSB) Pressure Test" (Ex. 1), dated 11 February 2005, in the amount of $11,239,552 and 299 calendar day time extension.

Although not specifically mentioned in your claim, your previous Request for Equitable Adjustment submitted on 08 July 2004 (Ex. 2) for "DSB Pressure Test Research and Development Effort" requested a 205 calendar day time extension from "the Notice to Proceed through 10 November 2002." This REA covers an overlapping, but different, time period and most of the same basic arguments as this claim, and is considered to be rescinded and superseded by this claim.

Your claims requests reimbursement for "delay and direct costs it (the Joint Venture – hereinafter "JV") has (allegedly) experienced because of the US Government's issuance of defective specifications and (alleged) breach of its implied warranty of specification adequacy with respect to the pressure testing requirements for the dry storage buildings ("DSB's"). The claim consists of twelve items, grouped into four parts, arising from the same operative facts:

1. Research and Development – hereafter R&D
    a. Testing and Mockup Costs (item 1)
    b. Extended Overhead Costs for the JV and two subcontractors, EK and Motorola for the period 08 March 2002 to 23 January 2003 (items 2 through 4)
2. Extended Overhead Costs arising from Long Learning Curve and Long Duration of Envelope Sealing for the period April 2003 through November 2003 for the JV and two subcontractors; EK and Motorola (items 5 through 7)
3. Replacement of the Original Panel Installer
    a. Direct Costs (item 8)
    b. Extended Overhead Costs for the JV and two subcontractors, EK and Motorola (items 9 through 11)
4. Change for Panels to Meet L/600 Deflection (item 12)

The following constitutes my findings of fact, analysis, and decision.

**TABLE OF CONTENTS**

**FINDINGS OF FACT** .......... **3**

A. Contract .......... 3

B. Contract Documents .......... 3

1. General Scope of the Contract .......... 3
2. Section 00100 Instructions, Conditions, and Notices to Bidders .......... 4
3. Bidding Requirements: Section 00700 Contract Clauses .......... 5
4. Specifications .......... 8
5. Attachment to the Special Contract Requirements .......... 11
6. Questions/Answers provided in Amendments .......... 11

C. JV's Technical/Bid Proposal .......... 16

D. General Timeline (Items Associated with Claim) .......... 17

**ANALYSIS** .......... **27**

A. Research and Development Efforts .......... 27

1. Testing and Mockup Direct Cost .......... 28
2. Delays to the Critical Path (Completion) .......... 28
3. Subcontractor Delays .......... 34

B. Delays due to Long Learning Curve & Long Duration of Envelope Sealing .......... 35

1. Progress Payment Narratives .......... 35
2. General Schedule Analysis from Primavera Schedules Submitted with Payments .......... 43
3. Validity of Durations .......... 45

C. Replacement of Original Panel Installer .......... 46

1. Quality and Safety Issues with DSB Construction .......... 46
2. Termination of Subcontractor .......... 47
3. General Schedule Review .......... 47

D. Change for Panels to Meet L/600 Deflection .......... 48

E. Simultaneous Events .......... 49

1. Change of DSB Infiltration/Pressure Test Requirements .......... 49
2. Replacement of Space Frame Manufacturer .......... 51
3. Quality Problems with Structural Steel DSB's .......... 52
4. Discovery of Defective Insulated Panels; December 2003 .......... 53

**SUMMARY** .......... **53**

**DECISION** .......... **55**

# FINDINGS OF FACT

## A. Contract

1. The Government issued a Request for Proposals (RFP) (Ex. 3) on 18 December 2000 for a firm, fixed price contract for the design and construction of a division storage facility (Nachshonim Storage Base) for the Israeli Defense Forces. The RFP was for a design build contract in which the successful bidder would have responsibility to design and construct the facilities in accordance with a limited partial design and specifications provided by the Government.

2. A pre-proposal conference was conducted on 17 and 18 January 2001 and the offerors, including Amar Sanwani, Amnon Glick, and Dan Senyk (members of the ABB SUSA/A. Arenson/BaranGroup Joint Venture (hereafter "the JV" or "JV")), visited the site (Ex. 4). Subsequent to the site visit, the bidders and attendees were given an opportunity to present questions. These questions and the governments answers were later incorporated into Amendment 3 (Ex. 5), Amendment 4 (Ex. 6), and Amendment 6 (Ex. 7), which the JV acknowledged.

3. Contract DACA90-01-C-0043 was awarded by the Europe District, U. S. Army Corps of Engineers ("the Government") to the JV on 5 June 2001 in the amount of $124,089,175.50. A copy of the contract may be found at (Ex. 8).

4. Notice to Proceed for Design and the Notice to Proceed for Construction were issued jointly on 19-Jun-2001 (Ex. 9). The original duration of the contract was 1,095 calendar days, with a required completion date of 18 June 2004.

5. As of 4 August 2005, 73 modifications have been issued for a net increase to the contract amount of $2,150,473.00 and 184 calendar day time extension. The resulting modified contract value is $126,239,649.00 and the required completion date was 19 December 2004.

## B. Contract Documents

The clauses and referenced excerpts from the contract listed below are only a partial list of the most relevant clauses applicable to this claim.

### 1. General Scope of the Contract

The contract calls for the design and construction of 205 buildings with over 227,000 square meters of floor space and 27 kilometers of paved roads. The project is located on approximately 380 acres adjacent to the town of Elad, Israel. Of the 205 buildings, 121 are either Dry Storage Buildings or Auxiliary Buildings. Included in this are 16 different types of buildings, each requiring a different design and/or structural method (39 Type A, 15 Type B, 12 Type C, 2 Type D3, 3 Type D4, 3 Type L, 8 Type F4, 9 Type E4, 5 Type E3, 7 Type E5, 13 Type H, and 1 each Type E2, F2, G, M1, M2). The structure of these buildings consists of a concrete foundation and floor, with the walls up to a height of 2.9 meters constructed of concrete. Above this elevation, including the roof load bearing elements, either space frame (hollow steel tubing with purlins) or conventional steel (I-beams and purlins) framing is utilized, depending on the structure. Each building is covered with insulated panels requiring sealing and pressure testing. The contract required the JV to provide a complete design for the entire structure based on the criteria in the

RFP which consisted of the floor dimensions, type of wall/roof structure, and performance criteria including the maximum deflection of the roof structure and the testing requirements to ensure the buildings were properly sealed.

**2. Section 00100 Instructions, Conditions, and Notices to Bidders**

The project was solicited using best value criteria. Prospective bidders were required to submit a two volume proposal consisting of a Technical Management Proposal (Volume I) and a Price Proposal (Volume II). The Technical Management Proposal consisted of 4 factors; experience, past performance, management, and technical. The Criteria were laid out in Section 00100 of the RFP, under Bidding Requirements and specific attention is made to the following sections:

**a. Technical and Management Proposal Factor 1 Experience, Paragraph B Similar Specialized Construction Experience: – Dry Storage Facilities**

The offeror shall provide information on projects performed within the last ten years that show experience constructing dry storage facilities of a similar complexity and function, utilizing techniques relevant to those required by this solicitation. If the offeror does not posses this specialized experience, either in-house or through a joint venture partner, and intends instead to utilize a subcontractor, this key subcontractor's experience will be given full consideration if a letter of commitment is provided to demonstrate the subcontractor's intent to enter into a contract with the offeror. Substitutions of this firm subsequent to award will not be permitted without written permission from the Contracting Officer. Projects that demonstrate similar "building envelope" performance requirements to this solicitation are considered most relevant. Similar performance requirements consist of the water tightness of the building envelope, pressurized door seal requirements, and dehumidification and control requirements. Dry storage construction for applications such as lumber drying, fruits and vegetables storage, etc., will be considered but are less relevant. An English speaking Point of Contact, including name, phone number, fax number and email address (if possible) should be provided for each project submitted to demonstrate construction experience.

**b. Technical and Management Proposal Factor 1 Experience, Paragraph D Similar Specialized Design Experience – Dry Storage Facilities**

The offeror shall provide information on projects performed within the last ten years that demonstrate dry storage facilities design of a similar complexity and function, utilizing techniques relevant to those required by this solicitation. If the offeror does not posses this specialized design experience either in-house or through a joint venture partner, and instead intends to utilize a subcontractor, this key subcontractor's experience will be given full consideration if a letter of commitment is provided to demonstrate the subcontractor's intent to enter into a contract with the offeror. Projects that demonstrate similar "building envelope" performance requirements to this solicitation are considered most relevant. Particular emphasis shall be devoted to experience in design and testing to ensure building envelope performance. Related design experience to include building sealing, insulation, waterproofing, and weather stripping performance. Dry storage construction for applications such as lumber drying, fruits and vegetables storage, etc., will be considered but are less relevant. An English speaking Point of Contact, including name, phone number, fax number

and email address (if possible) should be provided for each project submitted to demonstrate construction experience.

**c. Basis for Award, Evaluation Factors, Factor 1 Experience Paragraph B Similar Construction Experience – Dry Storage Facilities**

Experience will be evaluated by assessing the relevancy and depth of the Offeror's project experience performed in the past ten (10) years. Depth is defined as the number of relevant similar projects. The offeror shall provide information on projects performed within the last ten years that show experience constructing dry storage facilities of a similar physical size, complexity and function, utilizing techniques relevant to those required by this solicitation. Projects that demonstrate similar "building envelope" performance requirements to this solicitation are considered most relevant. Similar performance requirements consist of the water tightness of the building envelope, pressurized door seal requirements, and dehumidification and control requirements. Dry storage construction for applications such as lumber drying, fruits and vegetables storage, etc., will be considered but are less relevant. A Point of Contact, including name, phone number, fax number and email address (if possible) should be provided for each project submitted to demonstrate construction experience.

**d. Basis for Award, Evaluation Factors, Factor 1 Experience Paragraph D Design Experience - Dry Storage Facilities**

Experience will be evaluated by assessing the relevancy and depth of the Offeror's project experience performed in the past ten (10) years. Depth is defined as the number of relevant similar projects. The offeror shall provide information on projects performed within the last ten years that demonstrate dry storage facilities design of a similar complexity and function, utilizing techniques relevant to those required by this solicitation. Projects that demonstrate similar "building envelope" performance requirements to this solicitation are considered most relevant. Particular emphasis shall be devoted to experience in design and testing to ensure building envelope performance. Related design experience to include building sealing, insulation, waterproofing, and weather stripping performance. Dry storage construction for applications such as lumber drying, fruits and vegetables storage, etc., will be considered but are less relevant. A Point of Contact, including name, phone number, fax number and email address (if possible) should be provided for each project submitted to demonstrate construction experience.

**e. 52.216-1 Type of Contract (Apr 1984)**

The Government contemplates award of a Firm Fixed Price contract resulting from this solicitation.

**3. Bidding Requirements: Section 00700 Contract Clauses**

**a. Clause 11. Audits and Records – Negotiation (52.215-2)**

(a) As used in this clause, records includes books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form.

(b) Examination of costs. If this is a cost-reimbursement, incentive, time-and-materials, labor-hour, or price redeterminable contract, or any combination of these, the Contractor shall maintain and the Contracting Officer, or an authorized representative of the Contracting Officer, shall have the right to examine and audit all records and other evidence sufficient to reflect properly all costs claimed to have been incurred or anticipated to be incurred directly or indirectly in performance of this contract. This right of examination shall include inspection at all reasonable times of the Contractor's plants, or parts of them, engaged in performing the contract.

(c) Cost or pricing data. If the Contractor has been required to submit cost or pricing data in connection with any pricing action relating to this contract, the Contracting Officer, or an authorized representative of the Contracting Officer, in order to evaluate the accuracy, completeness, and currency of the cost or pricing data, shall have the right to examine and audit all of the Contractor's records, including computations and projections, related to--

(1) The proposal for the contract, subcontract, or modification;

(2) The discussions conducted on the proposal(s), including those related to negotiating;

(3) Pricing of the contract, subcontract, or modification; or

(4) Performance of the contract, subcontract or modification.

**b. Clause 14 Subcontractor Cost or Pricing Data (52.215-12)**

(a) Before awarding any subcontract expected to exceed the threshold for submission of cost or pricing data at FAR 15.403-4, on the date of agreement on price or the date of award, whichever is later; or before pricing any subcontract modification involving a pricing adjustment expected to exceed the threshold for submission of cost or pricing data at FAR 15.403-4, the Contractor shall require the subcontractor to submit cost or pricing data (actually or by specific identification in writing), unless an exception under FAR 15.403-1 applies.

**c. Clause 30 Disputes (52.233-1)**

(a) This contract is subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613).

(b) Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c) "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $100,000 is not a claim under the Act until certified as required by subparagraph (d)(2) of this clause. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

(d)(1) A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision. A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

(2)(i) The Contractor shall provide the certification specified in paragraph (d)(2)(iii) of this clause when submitting any claim exceeding $100,000.

(ii) The certification requirement does not apply to issues in controversy that have not been submitted as all or part of a claim.

(iii) The certification shall state as follows: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duty authorized to certify the claim on behalf of the Contractor."

(3) The certification may be executed by any person duly authorized to bind the Contractor with respect to the claim.

(e) For Contractor claims of $100,000 or less, the Contracting Officer must, if requested in writing by the Contractor, render a decision within 60 days of the request. For Contractor-certified claims over $100,000, the Contracting Officer must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

(f) The Contracting Officer's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

(g) If the claim by the Contractor is submitted to the Contracting Officer or a claim by the Government is presented to the Contractor, the parties, by mutual consent, may agree to use alternative dispute resolution (ADR). If the Contractor refuses an offer for ADR, the Contractor shall inform the Contracting Officer, in writing, of the Contractor's specific reasons for rejecting the offer.

(h) The Government shall pay interest on the amount found due and unpaid from (1) the date that the Contracting Officer receives the claim (certified, if required); or (2) the date that payment otherwise would be due, if that date is later, until the date of payment. With regard to claims having defective certifications, as defined in (FAR) 48 CFR 33.201, interest shall be paid from the date that the Contracting Officer initially receives the claim. Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Contracting Officer receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

(i) The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

**d. Clause 61 Pricing of Contract Modifications (252.243-7001**

When costs are a factor in any price adjustment under this contract, the contract cost principles and procedures in FAR Part 31 and DFARS Part 231, in effect on the date of this contract, apply.

**4. Specifications**

**a. Division 002, Section 003, Description of Dry Storage Buildings Chapter A. General Description (as amended by Amendments 0003 and 0006**

1. The various Dry Storage Buildings (hereinafter "DSB") are detailed according to the building types specified in the drawings.

2. The DSB are to be erected according to the complete design prepared by the Contractor. The design shall comply with informative drawings issued to him, the performance criteria, specifications as well as the various laws, regulations and standards as specified. The design of these buildings should be integrated to match the design provided for the site infrastructure, Section 001.

Features shown or specified for one area should be applied to the other buildings unless stated otherwise to provide even aesthetics, system integration, and functional integration. Where sizes or strengths are shown, these should be considered the minimum requirement unless noted otherwise.

4. The DSB are rectangular, and sealed on all sides to the highest sealing level, as specified hereinafter.

There shall be no open joints in the buildings and all protrusions shall be sealed to the same level.

5. The lower part of the building shall be rigid, its floor made of reinforced concrete and walls of reinforced and prestressed concrete as it is intended to serve as a retaining wall for a peripheral earth embankment. The envelope shall be insulated by a protective weatherproofing and waterproofing system. The upper part shall be a steel structure clad with "sandwich" panels and completely sealed joints, as specified. The junction between the upper clad and lower insulated structure shall be completely sealed.

6. The DSB shall have an overhead sectional vehicle door within a concrete frame, as well as a service entrance door and an emergency exit (buildings G, H and L shall have two gates, two entrances and two exits). All the above shall be completely sealed. All utility inlets, such as electric and phone cables, etc., shall be sealed using MCT type weather stripping (as detailed in drawing 003/01/017). Each building shall be equipped with two electromechanical systems, one for the air drying system and the other, system for the exhaust of gases and smoke, with outlets and inlets weather stripped. The buildings shall be equipped with lighting and online control systems.

7. The inside of the building, along the walls as indicated in the drawings (only the walls perpendicular to the entrance wall), shall have horizontal ramps and shelves for equipment.

**b. Division 002, Section 003, Description of Dry Storage Buildings Chapter B. Construction Works**

**1. General Requirements:** The planning requirements for the DSB include all the Israeli standards, in addition to mentioned (sic) below, including SI. 466 and SI 1225.

**1.1 External Loads** :The structural solution of the building shall be subject the following design directives, while taking into consideration the dead load of the roof structure, including purlins and panels, and the following loads:

- Characteristic loads according to SI 412.
- Variations in temperature - according to SI 1225.
- Wind loads: a wind of 41 m/sec according to SI 414 + additional load according to the maximum internal pressure possible inside the building before the pressure relief valve opens.
- Minimum hanging elements load: 15 kg/m$^2$ or higher as requested by the hanging systems elements designed by the Contractor.
- Seismic load: according to SI 413.
- Minimum live load: 50 kg/m 2 (see SI 412).
- Panels (purlins and bolts): additional concentrated loads of 100 kg in accordance with SI 412.
- Panels shall be design (sic) for all external loads as listed above. Additionally, panels shall be designed for the positive internal pressure as identified in paragraph 02-003-J-3. For this condition only, the internal pressure load shall be in combination with a wind loading from a wind of 15 m/sec according to SI414 and NO live load and NO additional concentrated loads. Testing in accordance with paragraph 02-003-J-3 may not take place if the wind speed is expected to exceed 15 m/sec during the testing period.

The loads do not include safety factors. Combinations of loads must be calculated according to Israeli Standards, including SI 466 and SI 1225.

**1.2 Deformations**: The acceptable deformations of the structure shall fit the lowest of the values according to the following:

- SI 1225.
- Permissible deformation shown in the table below.
- Maximum vertical deformation in the roof: l/600.

| Building | Internal Columns | Minimum Thickness of Walls and Supporting Columns | Thickness of Floor (min.) | Type of Light Roof | Maximum Permissible Vertical Deformation in Center of Roof* | Clear Height (min.) | Max. Weight Distribution on Floor | Concentrated Weight of Wheel on Floor ** |
|---|---|---|---|---|---|---|---|---|
| | | | (cm') | | (cm') | (m') | (ton/m') | (ton/m) |
| A | No | 25 | 30 | Spatial Frame | 6 | 5 | 2.5 | 10 |
| B | No | 25 | 30 | Spatial Frame | 5.5 | 5 | 2.5 | 10 |
| C | No | 25 | 30 | Spatial Frame | 4.5 | 5 | 2.5 | 10 |
| $D_3$ | Optional | 25 | 15 | Regular | 3 | 5.5 | 1.6 | 8 |
| $D_2$ | Optional | 25 | 15 | Regular | 3 | 5.5 | 1.6 | 8 |
| $E_2$ | Optional | 25 | 15 | Regular | 3.5 | 5.5 | 1.6 | 8 |
| $E_3$ | Optional | 25 | 15 | Regular | 4 | 5.5 | 1.6 | 8 |
| $E_4$ | Optional | 25 | 15 | Regular | 5 | 5.5 | 1.6 | 8 |
| $E_5$ | Optional | 25 | 15 | Regular | 5 | 5.5 | 1.6 | 8 |
| $F_2$ | Optional | 25 | 15 | Regular | 3.5 | 5.5 | 1.6 | 8 |
| $F_4$ | Optional | 25 | 15 | Regular | 4 | 5.5 | 1.6 | 8 |
| G | Optional | 25 | 15 | Regular | 4 | 5.5 | 1.6 | 8 |
| H | Optional | 25 | 30 | Spatial Frame | 7 | 5.5 | 2.5 | 10 |
| L | Optional | 25 | 15 | Regular | 4 | 5.5 | 1.6 | 8 |

* Vertical deformation calculated after permanent loads in the buildings.
** Width of wheel according to SI 412, Table 12 – 60 ton truck.

**c. Division 002, Section 003, Description of Dry Storage Buildings Chapter J. Building Envelope**

**1. General:** The building envelope shall provide sealed environment in order to maintain the desired environment conditions. The structure composed of concrete and metal works will support insulated panels as shown in the drawings.

**2. Insulated Panels:** All areas as indicated on the drawings shall be insulated with panels. The panels shall be produced to form a rigid insulation core strongly bonded to the metal skins. In order to maintain the airtight requirements of this facility, joints shall be provided so that there is a minimum volumn (sic) of connections between the panels. Therefore the panels shall have a minimum length of 10 meters (walls and roofs). The core insulation shall be rigid polyurethane certified Pu-of B1-DIN4102, 100% environmentally friendly, and approved by the ministry of environment. The metal surface shall be treated by Korona procedure or equal procedure and the production line will be heated for best adhesion between skin and polyurethane, K value 0/0188 W/mk and having density of 40 Kg. Per cubic meter. Thickness of the panels shall be not less than 40 mm. insulation at lowest part with minimum rib height of not less than 42 mm. The walls and roofs exterior facing shall not be less than 0.55 mm. galvanized trapezoidal steel SAE 1020, painted with ppvdf (primer paravinil de fluor 10+40 micron) coating (50 microns). The interior facing, shall be 0.55 mm galvanized steel painted with polyester coating. Both steel faces shall be galvanized in accordance with Euronorm 10142- 79 as 200-275 g\m2. The suppliers shall warranty the metal skin as good for 20 years. The panel's producer will make quality standard tests to each batch of 5000 sq. meters, which will include the following: Compression test, tensile test, and 4-point flexure test to SAE 1020. The results will be submitted to the approval of the COR. Panel construction and configuration shall be water and vapor proof. Panels shall be designed to the loads specified in the Israeli standards and those mentioned below in para. 3 Tests. Computed stresses may not exceed the maximum allowable stress, according to the Israeli standard reference is made to S.I. - 412,414, 1508, 1556.

The round bent panels for corners (radius to be about 50 cm), roof to wall and the panels connected to the concrete walls. – shall include all the flashing, claddings and accessories. The panels shall be completely sealed, and will include sealed expansion joints. All passes (of wiring, pipes etc.) and other holes will be sealed with appropriate materials. The panels will be shipped to site with marine packs and UV protection layers."

**3. Tests** The permeability of the joints and the complete structure will be pressure tested twice with positive pressure of 25 mm. of water gauge. This should not drop more than 12 mm. over 30 minutes. The pressure in the building (for the test) will be created by blowing air into the building by a fan to 25- mm. water gauge and measuring the time and the pressure drop after stopping the fan. The pressure test shall be conducted in the presence of the COR. The contractor shall record the pressure in the building and the barometric pressure outside every five minutes for 45 minutes. The contractor shall graph this data (pressure vs time) and submit it as part of the test results. The test should be made at a stable barometric condition and the cooling and ventilation equipment should be switched off. The building shall be in an operable condition at the time of the test, with the single exception that the pressure relief valve shall be sealed. The first test will be done immediately after completion of the complete building, including the doors, the cooling and dehumidification systems, the

ventilation systems, electricity controls etc. The second test will be done after 30 days of operation. The contractor cannot proceed with the erection of any other building envelopes until both test results of the first building has been approved.

Each building will be required to pass these two pressure tests. However, to prove his design the Contractor must complete one structure and successfully test it prior to construction of subsequent structures. The contractor cannot proceed with the erection of the second building until completion of the two tests and acceptance of the first building. The first DSB to be implemented will be determined by the COR. In the event of a failed test, the contractor shall investigate the envelope for all sources of leakage. The contractor shall submit a plan for his repair procedures. After these procedures have been accepted, he can proceed with the repairs and submit a schedule for a new test.

The Contractor will be responsible to supply to each tested DSB all the necessary utilities (as electricity) on his own expense.

**5. Attachment to the Special Contract Requirements**

**a. SR-32 Responsibility of the contractor for Design**

(a) The Contractor shall be responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and any other nonconstruction services furnished by the Contractor under this contract. The contractor shall, without additional compensation, correct or revise any errors or deficiency in its designs, drawings, specifications, and other nonconstruction services.

(b) Neither the Government's review, approval or acceptance of nor payment for, the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of the performance of this contract, and the Contractor shall be and remain liable to the Government in accordance with applicable law for all damages to the government caused by the Contractor's negligent performance of any of the services described in paragraph (a) furnished under this contract.

**6. Questions/Answers provided in Amendments**

**a. Amendment #3**

**#172.** Reference 02-003-B.1.2. In the general description, it is written "Deformation maximum vertical deformation in the roof of L/600". Does it mean that the above limitation is relating only to the total structure of the roof at the center of the roof, which means only to the spatial frame, steel frame or main truss or is it relating also to the roof structure elements such as purlins on secondary beam?

*The maximum vertical deformation the roof of L/600 applies to every element of the roof structure.*

**#187.** The description for the overhead sectional doors for the DSBs call for panels that use two metal skins with 1 mm minimum thickness. Does this mean that each skin has to be 1 mm minimum thickness or the combined thickness should be 1 mm? When discussing this with several manufacturers, they said 1 mm metal is very hard to process

and that will raise the price of the doors substantially. According to the manufacturers, a combined thickness of 1 mm is the more common practice.

*Answer: The thickness of each metal skin must be a minimum of .06 mm instead of the 1 mm thickness listed. The total thickness shall be 1.2 mm minimum. There will be no further change to the drawings or specifications to reflect this change to the criteria.*

**b. Amendment #4**

**#1002.** Will the COE approve other than spatial steel roof structure in Type A, B, C and H DSBs for heavy vehicles?

*No variations to the solicitation documents will be considered at this time. Contractor always has the option of submitting a proposal through the VECP clause; however, Government has no obligation to accept any Value Engineering proposals.*

**#1003.** Will the COE approve in spatial roof structures use of steel hollow pipes with longitudinal welding (LW) that are more cost effective than the pipes without LW? The relevant Israeli standards allow the use of steel hollow pipes with LW for spatial roof structures.

*No.*

**#1004.** The tender specifications require, in heavy vehicle Type A, B, C and H DSBs only, the spatial roof structure to withstand a collapse of one column (as a result of an impact by a heavy vehicle). Is this an internal column only?

*This requirement is for any column, internal or perimeter.*

**#1005.** Will the COE allow use of PU insulating roof panels manufactured by a not continuous method that is used in Israel?

*No.*

**#1006.** This contractor did not succeed to find a suitable manufacturer or supplier of PU insulating panels with a warranty of metal skin good for 20 years in the whole world. Could the COE help by supplying the names and addresses of suitable PU panel manufacturers who give 20 year warranties for Israel?

*The COE has confirmed that there are several firms available that meet this requirement.*

**#1007.** It is stated in Section 003 - Description of DSB, Chapter J - Building Envelope on Page 28, Paragraph 2 - Insulated Panels that the panels shall be attached to the structure from inside, while in the drawing the panels seem to be attached from outside. Please clarify.

*The specification requirement has been changed in Amendment 3.*

**#1008.** In the same section, the use of special round corner PU panel details are required while in the structural drawings, ordinary corner details can be seen. Will the COE approve the standard, not round corner details, that are more cost effective?

*No, the corners shall be as specified.*

**#1009.** In the same section, the use of 200 micron PVDF coating is required for exterior PU panel coating. According to the manufacturer's specifications, the maximum PVDF thickness will be 40-45 microns comprising 3-4 layers of coating. Please clarify.

*The specification requirement has been changed in Amendment 3.*

**#1012.** If the project is truly fast track, will all of the submissions described in Section 01012 (such as design analysis, calculations, manufacturer's literature and submittal register) be required for each building type?

*Complete design analysis calculations and manufacturer's literature will not be reviewed for each building, but representative calculations showing compliance with the solicitation documents and the required design codes will be randomly checked.*

**#1013.** Per Paragraph 3.3 of Section 01330, the submittal review time for DSB envelope components and mechanical HVAC systems will require 60 days review. Is this the intent?

*Yes, this is the intended time for the submittal review of the construction data. It is not the review time for the design.*

**#1026.** Specification Section 003 - Dry Storage Buildings, Chapter A – General Description, Page 3, Paragraph 9 - Question: Is the double slope roof with a slope of 5% a mandatory requirement?

*The 5% figure is a minimum slope. The maximum height of the buildings and the clear heights inside the buildings are mandatory as stated in the solicitation documents. The slopes can change within these parameters.*

**#1027.** Can we submit a different solution that utilizes a regular steel structure (which is lower than the spatial) for Type A, B, C & H DSB's and a different insulation system (also for the other DSB types) which will meet the level of energy requirements and will be much cheaper to the customer? Such solution was successfully implemented in DSB.

*The contractor always has the option under the VECP clauses to submit other options. Government is not obligated to accept these submitted Value Engineering proposals.*

**#1028.** Our experience with DSB's indicate that any concrete surface (floor and/or wall) which is in touch with the internal air volume, should be treated (sealed) from the inside of the building in order to prevent infiltration of water vapors into the internal air volume. The external waterproofing is actually unnecessary. Can we use the internal concrete treatment while reducing the external waterproofing system from two layers of bitumen sheets (01-003 D 3.1) to one layer?

*The contractor always has the option under the VECP clauses to submit other options. Government is not obligated to accept these submitted Value Engineering proposals.*

**#1029.** The RFP requires contractor build a prototype DSB to undergo qualification tests of the design and construction adequacy. However, Government is providing the actual design concept. If the building fails the test and it is shown not to be fabrication/construction flaws, who has the financial responsibility for fixing the problem?

*Government is providing design criteria, some conceptual ideas of how this design criteria can be implemented and some boundary conditions that must be applied to this criteria. If failure is due to any information Government provides, Government will be liable.*

**#1031.** On drawing project 08745/003/01/002 dated 02/10/01 Page 5 - Buildings Type A have a minimum specified clear height of 4 m with an additional 1 m for electro-mechanical equipment for a total clearance of 5 m. With our space frame truss design, we wish to recommend using the more than 2 m of free space created by the space frame design to accommodate easily and economically the 1 m clearance required for the electro-mechanical equipment. Do you agree in principle with our recommendation?

*No alternates to the solicitation documents will be considered prior to contract award.*

**#1051.** In different parts of the General Description (Section 003) and the drawings, it is written special truss, space frame and special structure. Please confirm that those are different names for the same roof structure.

*Only on building types A, B, C and H is there a requirement that the roof structure be a space frame. On any other structure, any roof system that meets the requirements of the solicitation will be acceptable.*

**c. Amendment #6**

**#2017.** Will the COE approve supply of build materials and finished products from Turkey as they are the most cost effective?

*Refer to Contract Clause SR-20, Local Construction Materials. Building materials, including finished products or components consisting of off-site assemblies of construction materials, must be manufactured in Israel if items manufactured in Israel meeting the contract requirements are available. If materials manufactured in Israel are not available, contractor must certify non-availability, submit a product submittal for the non-Israeli materials and obtain Contracting Officer approval in advance, as specified in that clause. Cost differentials between materials manufactured in Israel and materials from other sources will not be considered as a factor. The only basis for approval to purchase materials manufactured outside Israel will be non-availability of Israeli manufactured materials meeting contract requirements. If the Contacting Officer approval is obtained to use non-Israeli materials, materials may be purchased anywhere except in those countries specified in the contract as prohibited sources. See clause 52.225-13, Restrictions on Certain Foreign Purchases and SR-18.*

**#2019.** Most of PU roof insulated panels in the world market are made with the rib height of 40 mm only instead of 42 mm). Will the COE allow use of these roof panels?

*The offerers should bid the project as the solicitation documents require. Any variation of VECP proposals will not be considered at this time.*

**#2020.** It could be understood from the description of DSB's that COE thought to use one kind of PU insulated panel namely the roof insulated panels with 42 mm ribs, for roofs and for wall as well. Usually the walls are made of flat (without ribs) 40 mm PU

insulated panels and the roofs are made of PU roof insulated panels with the 40 mm ribs. Please clarify.

*The offorers should bid the project as the solicitation documents require. Any variation of VECP proposals will not be considered at this time.*

**#2021.** According to our PU insulated panel manufacturers, the DSB's cannot be made to withstand the 25 mm water gauge pressure in testing. Please check once more and clarify.

*Government has verified that panels are available that will meet the requirement.*

**#2023.** In regard to DSB's, the requirement for building types A, B C and H asks for a spatial frame solution for the roof structure (02-003 A.3.1). In addition, the requirement for all the DSB's is to utilize insulating panels for the walls and roofs (02-003 J.2). Based on our knowledge, the combination of a spatial frame and insulated panels was never implemented in the construction of DSB's anywhere in the world. The spatial frame contributes to the buildings an unnecessary additional air volume, which needs to be dried. The insulated panels are blocking the sun radiation and are preventing the entrance of the sun's energy. That energy is required to heat the internal air volume, assisting in reducing the humidity. In Israel. the sun's energy is a very important factor in the design of DSB's. The sun's energy radiation in Israel is about 1kwh/m2. The combination of additional unnecessary air volume and the blockage of the sun's energy will definitely require more dehumidifiers and use much more energy than is required in the specifications. It will therefore also require an expansion of the electricity infrastructure in the site. Assuming that contractor utilizes the spatial frame structure and the insulated panels, but the results are that the DSB needs much more energy than is required by the specification. Who will bear the additional expense regarding additional dehumidifiers and electricity infrastructure expansion?

*The requirements of the solicitation documents are obtainable.*

**#2024.** The pressure tests (02-003 J.3.) that is required as part of the acceptance tests is not applicable in DSB's and cannot be achieved due to the following facts:

a. The jamb seals of the vehicle door to the DSB's are designed to prevent outside pressure (wind) from entering the buildings. The seals will not hold internal pressure.

b. The dehumidifiers are equipped with gravity water drainage pipes, which are open to the atmosphere; therefore an internal pressure is not applicable. Can the acceptance test be changed to ultimate operational test, which should prove the performance of the DSB's to keep the humidity level of less than 45% for a period to be defined (7-10 days)?

*Reference Paragraph 02-003-M1-1.5 with respect to the requirements for the jamb seals. With respect to the second part of this questions, note that there is no requirement in the solicitation that the drainage pipes be open to atmosphere, only that the building must function to the requirements of the solicitation package. Contractor is responsible for designing to these solicitation requirements.*

**#2025.** The pressure relief valves (02-003-J.4) usually used in refrigeration rooms where there is a large temperature gradient and are not necessary for DSB's due to the following: The main feature of the DSB design is to maintain a low temperature gradient between day and night. As mentioned above, the DSB is virtually not isolated from the

atmosphere due to the design of the dehumidifier's drainage and the vehicle door. Can the pressure relief valves be omitted due to a lack of necessity?

*No variation or VECP proposals will be evaluated at this time.*

**#2026.** We will have to make uplift calculations for the membrane which constitutes the roof. In addition to the uplift created by the wind forces, there is an uplift force created by the internal pressure in the buildings. Please provide the value or the criteria, which will determine what is the internal pressure in the building.

*The specification requirement are being changed by amendment.*

**#2032.** Is it the intention of certain specific provisions of Sections 02-003-8 and 03-2.19 of the specifications to restrict the possible space frame suppliers to a single source?

*No. Government has reviewed this specification and has been in contact with several suppliers of this type of system. While some of the material requirements of this space frame structure may not be the "standard" manufactured product generated by some companies, each of the materials required are readily available on the market. It is the purpose of these specifications to require very high level of quality to ensure absolutely no corrosion points within the structure, no failures from manufacturing defects in the execution process. Additionally, the ability of the using agency to be able to maintain and make repairs to any system used was a consideration in the type of system specified. These materials and execution requirements can be met by several companies contacted and have been used on similar projects in the past that utilized difference manufacturers. In order to clarify some points in these specifications and in order to open this specification to equal options, these specification sections have been changed slightly by amendment. Note: Question number 1003 on Amendment #4 is no longer applicable. The offerers shall comply with the amended version of this specification.*

**#2034.** Will an aluminum space frame structure be acceptable for the DSB's where an all steel construction is currently specified?

*Reference the answer to questions 2020 and 2032 above.*

**#2035.** Can the deflection criteria requirement of L/600 be reduced to L/240 if it can be shown that this change has no impact on the air tightness of the facility?

*No.*

## C. JV's Technical/Bid Proposal

Reference is made to the JV's Technical and Management Proposal (Volume 1A) (Ex. 10). In this proposal, under Factor 3, Technical Approach, Subfactor A Scheduling Capability, the JV includes a "Proposed Summary Execution Plan", providing a timeline of the planned design and construction works. This schedule includes the following activities for Dry Storage Buildings:

| Activity | Description | Duration | Early Start | Early Finish |
|---|---|---|---|---|
| 3000 | Construct First (Pilot) Dry Storage | 130 | 28 Jan 02 | 27 Jun 02 |
| 3010 | Joint Envelop Test/Design | 60 | 05 Jun 02 | 13 Aug 02 |
| 3020 | Compl Punch List/Constr (Pilot) Dry | 20 | 14 Aug 02 | 05 Sep 02 |