(March 2002) indicates they would not start work until 9 July 2002 (the Foundation Drains are shown as the responsibility of the JV in this schedule), and could be on site through 28 June 2004 (the late finish of their last activity, Street Lighting Works Road #12, Activity 12DEV8016). In schedule RV14 (January 2003), the subcontractor could still complete their work by 30 June 2004 (the early finish of their last activity, now Street Lighting Works Road #17, Activity RD1701730). The late finish of their last activity was 16 July 2004 (several activities finished on this date). In either case, there is no substantiation of a 55 day delay.

## B. Delays due to Long Learning Curve & Long Duration of Envelope Sealing

In this portion of the claim, the JV indicates 55 days delay on the critical path occurred between April 2003 through November 2003 "due to long learning curve and long duration of the envelope sealing – 1.81 months." The costs indicated are "JV Site Indirect Costs" and "Extended Management and Acceleration Costs" for the subcontractors EK and Motorola, for a combined total of $1,660,314.

No explanation is provided defining the "long learning curve" and "long duration." As noted in the claim, "a typical DSB Type A building contained approximately two linear miles of seams resulting from panels fitted together at the edges." The contract clearly states, "The panels shall be completely sealed, and will include sealed expansion joints. All passes (of wiring, pipes etc.) and other holes will be sealed with appropriate materials." No changes in sealing methodology or requirements were ever requested by the JV or approved by the government. There was no change in the amount of sealing required, or in the sealing requirements which would account for any delays to the completion date. In fact, by changing the pressure test, the JV was able to provide less thorough and less tight sealing than originally anticipated in the contract.

### 1. Progress Payment Narratives

A review of the narrative reports submitted with progress payments during this time period (April to November 2003) indicates the JV lost 97 days on the critical path (going from 18 days 115 days beyond the required completion date).

Narratives identify problems with overall management of the job and severe problems with the quality and safety of the works, especially in regards to the construction of the DSB's, which resulted in a stop work order in May and the replacement of the subcontractor responsible for installing the insulated panels. Problems were also identified with properly staffing the project; at no time during the period does the JV have the number of employees on site required by their schedule.

| [illegible] | [illegible] | [illegible] | Days Behind Schedule |
|---|---|---|---|
| April 2003 | 24 | 18 | |

- The delays in April could be attributed to the following factors;
  - Four (4) days due to weather
  - Delay in steel structure erection
  - Delay in insulated panel installation
- Above all of these factors is the manpower availability, which the JV is still struggling to obtain, in order to reach the required labor force.
- Due to the late construction of MC, 67TR25 and 56TR25 Buildings, the site infrastructures

| | | |
|---|---|---|
| that were defined critical, the completion date is pushed back 18 more days.<br>• With no change in the logic connection and relationships between activities, the updated schedule shows the most critical activities on the following paths.<br>o Infrastructure Critical Path – Due to the delay and late construction of the MC, 67TR25 and 56TR25, high voltage direct burial cable and the succeeding electrical and communication works becomes the most critical. Laying of high voltage cables requires that at least the buildings mentioned above should be completed with doors and louvers. 67TR25 and 56TR25 building is yet to start with concrete slab. Site infrastructure requires 13 to 14 months to complete.<br>o Erection of conventional steel structure and its production<br>o Start of spatial frame erection and its progress.<br>o Progress on installation of insulated panels<br>• The experienced manpower required to perform the work on these critical activities is the essential resource. Erection of the spatial frame requires 6 teams and installation of panels for all types of DSB's requires 12 teams. A delay in the erection will absolutely jeopardize the completion of the project.<br>• For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and BP (insulated panels installation) there is an inability to import labor and lack of Israeli labor with adequate craft skills, which will severely impact the work in cost and time of completion. | | |
| May | 25 | 48 |
| • The site construction is in delay. The delay can be attributed to the following;<br>o Unavailability of manpower – Added to the already acute shortage of manpower was the Mid-May 2003 immigration raids, which reduced the work force to about half of what it was at 30 April. As of 31 May 2003 the total workforce is 143 against the required 350 for the month of June 2003.<br>o No installation of insulated panels – Installation was put on hold due to safety and QC issues.<br>o Government general strike – At least 9 days of delay on spatial frame erection.<br>• The concrete is now again one of the major critical activities due to the manpower crisis. If not for the shortage of workers, the concrete production should be peaking in this period. Due to the continuing problem of manpower, constructions of concrete structures are now progressing according to priority structures.<br>• Bolt tightening, alignment and checking of verticality of the structures is in progress and it appears that some of the work is outside of the standard tolerance. There was no installation of insulated panels for the month due to safety and QC issues.<br>• This slippage of (48) calendar days can be minimized, if and only if the manpower issues are resolved.<br>• With no change in the logic connection and relationships between activities, the updated schedule shows the most critical activities on the following paths.<br>o Construction of structural concrete - Concrete works is in critical stage right now, due to the manpower crisis. Erection of the conventional steel structures is affected by slow progress of the concrete structures. Concrete works for Offices and Public buildings, Logistics Complex and Auxiliary buildings have to be delayed or durations extended.<br>o Erection of conventional steel structure and its production | | |

- Production of spatial frame assembly and erection
- Resumption of insulated panels installation
- Infrastructure Critical Path – Due to the delay and late construction of the MC, 67TR25 and 56TR25, high voltage direct burial cable and the succeeding electrical and communication works becomes the most critical. Laying of high voltage cables requires that at least the buildings mentioned above should be completed with doors and louvers. 67TR25 and 56TR25 building is yet to start with concrete slab. Site infrastructure requires 13 to 14 months to complete.

- For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and BP (insulated panels installation) there is an inability to import labor and lack of Israeli labor with adequate craft skills, which will severely impact the work in cost and time of completion.

| | | |
|---|---|---|
| June | 25 | 68 |

- The delay for this month is attributed to the following factors:
  - Continuing unavailability of manpower – The total average manpower present at site during the month was 333 workers, which is 438 less than the required manpower of 771 for this month. For concrete alone, the average workforce for the month was 188, or 162 workers short of the required 350 workers.
  - No installation of insulated panels – Due to non-performance, safety and quality issues, the installation was put on hold. In effect, the Joint Venture was compelled to terminate the contract of BP/IZOPOLI effective 23 June 2003. However, the insulated panels will still be supplied by IZOPOLI. New contractors (Koor Metals and Gal Asbest) will perform the installation, starting early July 2003.
- The termination of the BP/Izopoli contract made the installation of insulated panels to be the most critical activity, having the longest path on the network. The production and the numbers of qualified workers will be the main key in recovery of delays.
- The resumption of the insulated panels installation is considered to be one of the critical milestone dates and for this update, the installation is estimated to resume on 6 July 2003.
- Structural concrete – The critical element of the construction of concrete structure is the unavailability of workers. Production is being slowed down due to lack of manpower. On the previous and latest revised schedules, the 350 required workers for concrete alone should have been present at site since the end of May 2003.
- Erection of conventional steel structure (48 days negative float) – The negative float of the steel structure erection is due to slow concrete progress. No further delay in the completion of the steel structure should transpire.
- The correction of misalignment steel structure will also have an impact in re-starting insulated panels.
- Spatial Frame erection (56 days negative float) – The first 3 ~ 4 months of the erection is the most critical period. Production of the spatial frame will determine if the negative float will be recovered.
- For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and Gal Asbest & Koor (insulated panels installation) there is an inability to import labor and lack of Israeli labor with adequate craft skills, which will severely impact the work in cost and time of completion.

| | | |
|---|---|---|
| July | 27 | 94 |

- The delay for this month is attributed to the following factors:
  - Limited unavailability of experienced manpower - With almost all the disciplines progressing in parallel, the required manpower becomes the most critical resource of the project. The JV has hired new workers for concrete works; however, the number of workers on site-230 (July average) is still 120 short of the 350 required. Workforce for steel structures and insulated panels must increase in the coming months.
  - Concrete placement for DSB walls was put on hold on 04 July due to cracks in the walls. The cracks were inspected, analyzed by independent structural and concrete specialists and a release order to proceed with wall casting was issued in the third week of July. This temporary hold decreased the concrete production by 750 m³.
  - Following the termination of the subcontract with BP/IZOPOLI, new installation subcontractors started panel installation 27 July. Once the installation procedures are successfully implemented on the first structures, it is expected that the insulated panel installation will catch up to the progress of the steel structure erection in the near future.
- The primary critical path of the project is the insulated panel installation. To date there are two panel installation subcontractors, GAL ASBEST and KOOR Metals Ltd. GAL ASBEST will install one half (1/2) of the total DSB spatial frames, while KOOR will install all convention steel structures and the remaining one half (1/2) of the DSB spatial frames. This shall make Koor responsible for both steel and panel line for all conventional steel structures.
- The criticality of the installation will be dependent on the following:
  - Number of crews – the updated schedule still maintains the assumption that the maximum number of installation crews that can be mobilized is 10 crews. This is 7 for KOOR (3 spatial frames and 4 conventional frames) and 3 for GAL ASBEST.
  - Installation production – with the assumed 10 crews, panel installation should be completed in July 2004. This means that each crew should complete one building a month equivalent or 10 buildings a month.
- In addition, concrete work is considered the preceding critical activity. As observed, the production of steel structures could recover the delay incurred previously. Moreover, if the insulated panels can recover also with the steel erection, the concrete works should be accelerated.
- Verification and analysis is being formulated on how to accelerate the concrete production especially on the DSB buildings.
- For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and Gal Asbest & Koor (insulated panels installation) there is a shortage of TCN labor and lack of Israeli labor with adequate craft skills, which will impact the work in cost and time of completion.

| | | |
|---|---|---|
| August | 28 | 103 |

- The delay for this month is attributed to the following factors:
  - Unavailability of manpower – The problematic hiring of adequate / planned manpower continues to delay progress of construction. The workforce for this month averaged 254; there was an increase of only 24 from the average 230 recorded in July 2003. At the end of August the workforce stands at 200. The peak manpower required for concrete works is 350, without regard to the planned recovery schedule.

- Only two conventional steel buildings, 34L3 and 34L5, received structural steel, due to subcontractor waiting for concrete completion of enough buildings to warrant continuous work by the subcontractor.
- Low progress of Insulated Panels – Initial safety and quality concerns have been addressed and this work should accelerate with multiple fronts next period. The installation of the panels is the prime activity on the critical path.

- After amicably terminating BP/Izopoli for supply and installation of insulated panels, the JV is negotiating a supply agreement with Izopoli and has completed agreements with Gal Asbest and Koor Metals for panel installation.
- Caesarea Polymers (CP) was subcontracted to supply and install approximately 10% of the insulated panels. CP has now requested to be released from this agreement and the JV is negotiating an amicable separation. Izopoli shall supply these panels.
- This update reflects the same critical path of the project, which is the installation of insulated panels for DSB's. In effect, the installation of insulated panels delays the project to 20 January 2004
- The criticality of the installation will also be affected by rate of production. As of this update there are only 6 DSB's in progress. This initial production will only increase depending on the mobilization of required manpower. Later production will be constrained by completion of concrete works.
- Concrete work and erection of conventional steel structure are the second most critical preceding activities. For concrete works the manpower requirement is the most critical resource. Concrete work has been analyzed and additional formworks have been ordered.
- Infrastructure could also be considered critical. Electrical and communications infrastructure should accelerate production in advance of winter rains.
- For concrete work, Biri Barashi (stonework), Rolider (stonework), spatial frame erection and Gal Asbest & Koor (insulated panels installation) there is a shortage of TCN labor and lack of Israeli labor with adequate craft skills, which will impact the work in cost and time of completion.

| | | |
|---|---|---|
| September | 29 | 117 |

- The delay for this month is attributed to the following factors:
  - Unavailability of manpower – The average labor present on site increased to 308 from 254 the previous month. The increase of 54 still does not cover the required direct labor. With a limited duration on the construction, the manpower requirement should be in the range of 400 for concrete works alone.
  - Slow progress on conventional steel structures erection. Erection resumed on 04 September with 6 buildings turned over to steel erection. Unavailability of labor is again one of the main reasons that impede the progress of work. Quality of erection is a priority issue to be resolved immediately.
  - HV infrastructure works delayed due to EK having difficulty in achieving required backfill compaction. Work methodology and testing are being formulated so that work will resume immediately and to close open trenches before opening more and causing access problems.
  - Slow progress on Insulated Panels – Koor Metals had minimal production due to lack of labor and quality issues due to lack of experienced labor. One crew was dismissed from site for quality errors. QC problem with verticality and alignment of steel

columns also a factor for slow progress.

- Insulated Panels: 4 buildings completed this month and 6 in progress for spatial frame DSB's, while 1 building was completed and 4 in progress for the conventional steel DSB's. Due to the manpower constraints of the subcontractors, the Joint Venture mobilized a self-perform crew to expedite the installation of insulated panels and recover delays previously incurred
- After terminating BP/Izopoli for supply and installation of insulated panels, mainly due to more costly labor from their proposal, the JV is negotiating a supply agreement with Izopoli. Due to the lack of experienced and qualified labor to meet the contract rigid quality, safety and sealing requirements for panel installation, Gal Asbest and Koor Metals have demanded payment of additional costs for panel installation. JV is again establishing availability of qualified Turkish labor to submit to the USACE for assistance to import as experts in panel erection.
- Caesarea Polymers (CP) was subcontracted to supply and install approximately 10% of the insulated panels. CP has now requested to be released from this agreement, purportedly due to the drastic increase in the cost of installation labor and the JV is negotiating an amicable separation. Izopoli or another Turkish panel manufacturer shall supply these panels.
- The primary critical path of the project remains installation of insulated panels. Due to unavailability of adequate experienced labor, training time for compliance with stringent safety procedures and demands for a highly sealed structural envelop have lengthened the learning curve to ramp up production in this activity.
- The JV has mobilized a self-perform crew for panel installation and shall increase this capability to address any shortfall in subcontractor production.
- Final flashing work and sealing for the first buildings of each type is critical to performing air infiltration tests and establishing a baseline for acceptable sealing of the DSB envelops.
- There is a risk of delayed receipt of 3rd shipment of panels in the 3rd week of October, due to present port workers strike.
- Concrete work, especially on conventional steel structure DSB's is also very critical. Manpower for concrete work is the critical resource for production as scheduled. Additional DSB wall forms were mobilized in anticipation of having the ability to mobilize and maintain competent labor to attain quality production. The required workforce of an average 400 workers was not reached in September. As the available Israeli Arabs work fewer hours, produce less and at a lesser quality than the TCN's, we must recruit 20% more labor to attain required production.
- In addition, the concrete work in Logistics Complex is becoming critical.
- Erection of conventional steel structures is considered a secondary critical activity. Low progress in erection this month was to get a sufficient backlog of structures handed over from the concrete work, in order to work multiple crews efficiently. This work is expected to accelerate in October.
- HV and LV cable laying for electrical works is becoming critical due to delays resulting from the QC issue for backfilling requirements. Coordination with construction for project access during trench work is of paramount importance.

| | | |
|---|---|---|
| October | 30 | 114 |

- The delay for this month is attributed to the following factors:

- Non-performance of electrical infrastructure – HV voltage infrastructure and LV infrastructure were delayed due to backfilling issue. Methods and soil test have already passed the QC requirements and works are expected to start. Infrastructure activities are now approaching the critical stage.
- Slow progress on conventional steel structures erection – It was forecasted that the erection should complete 4 buildings this month. However, the building that should complete first achieved only 90%. The slow production is due to the lack of experienced labor and on-the-job training.
- Lack of Insulated Panel Production – the Joint Venture is still looking for additional experienced labor to work or to be trained in order to increase the monthly production. Consequently, the succeeding activities such as installation of permanent equipment are being delayed by the completion of the insulated panels.
- Delay in the final issuance of construction drawings for building 10/8 and 10/11. It should be noted that the said two buildings are utility buildings and must to be completed as soon as possible.

- Insulated Panels: 4 buildings completed this month and 13 in progress for spatial frame DSB's, while 2 buildings were completed and 2 in progress for the conventional steel DSB's. The Joint Venture is still looking for additional manpower to be mobilized as self-perform crew. This is to expedite the installation of insulated panels and to complement the lack of experienced manpower of the subcontractors.
- The above progress and critical delay on insulated panel resulted in an additional delay of 6 days, however the additional time extension of 9 days covers the said delay.

**Insulated Panels**

- Insulated panel installation is still the primary critical activity. The unavailability of experienced manpower is the main cause of the slow progress. The JV is exerting all means to increase the self-perform crew in order to cover the required manpower, which the subcontractors are having difficulty to supply.
- In any case, installation production is improving, with lesser durations to complete envelopes.
- Final flashing work and sealing for testing is also critical.

**Concrete Work**

- Concrete work, especially on conventional steel structure DSB's is also very critical. Due to high turnover and inexperienced labor, JV is still looking to increase manpower to maintain an adequate number of trained and productive workforces until concrete works is substantially complete.
- Concrete work in Logistics Complex is becoming critical.

**Conventional Steel Erection**

- Erection of conventional steel structures is considered a secondary critical activity. Low progress in erection this month added to the backlog that was incurred when erection was put on hold, due to an inadequate volume of structures handed over from the concrete work.

**Infrastructure**

- HV and LV cable laying for electrical works is now critical. HV direct burial should start next month for Segments 67 and 56. Further delay for this work will result in additional delay to the project completion. Succeeding activities such as LV electrical/communication and water supply system are affected by the delay in the HV cable works.
- Coordination with construction for project access during trench work is of paramount importance.

| | | |
|---|---|---|
| November | 31 | 115 |

- The progress is being affected by the following factors:
  - Late start of HV and LV infrastructure – Trenching works for the HV and LV started 12 November 2003 from 89/4 going to 67TR25. The late start of this activity was the result of the backfilling quality requirement. Previous test results indicated that the backfilling for HV trenches failed. Backfilling methodology had been optimized to obtain the requirements.
  - Low progress of steel structure erection – The progress is continuously affected by the lack of skilled manpower for steel structures erection.
  - Low progress of Electro-Mechanical works – The main cause of the low progress is the consequence of the slow progress is sealing the envelope of the DSB buildings.
- Insulated Panels: There were 14 buildings completed this month and 10 in progress for spatial frame DSB's, while 1 building was completed and 3 in progress for the conventional steel DSB's.
- Production of panel installation increased by 5% from previous month's production. Time of installation decreased by about 20%, now averaging only 27 days installation as opposed to 42 days the previous month. Although the production of panel installation is improving with the increased level of experience and skill of the available manpower, the sealing of the envelope is the critical activity. JV is presently optimizing an installation procedure for each type of building to ensure the testing criteria is achieved.
- At end of the month, a significant detection of paint peeling from panels resulted in an elaborate testing program and inquiries to panel steel coil suppliers to determine the cause of the problem.

**Insulated Panels**

- With the unanticipated current problem of panel paint peeling, the criticality of installation is more aggravated. Any delay in the installation will have a consequential delay to the electro-mechanical works and to the final completion of the project. It is probable that the panel installation will be totally or partially put on hold.
- JV is exerting all efforts to determine the source and cause of the paint-peeling problem.

**Concrete works in Logistics Building**

- Concrete works have been affected by the low turnout of manpower for concrete. Completion of the Logistics Complex now shows a negative float.

**Conventional Steel Erection**

- Steel structure erection for conventional steel structures has been slowed down by the unavailability of experienced and skilled manpower. As of this report, this activity is the secondary critical path.

| | | |
|---|---|---|
| **Infrastructure**<br>• The late start of trenching works for HV cable further delays the site infrastructure works. In addition, trenching works started during the wintertime making it more difficult, due to rains.<br>• Coordination with construction for project access during trench work is of paramount importance. | | |
| December | 16 | N/A* |
| Stoppage of insulated panel installation– On December 9, 2003, JV management issued a stop work order for insulated panel installation.<br>*Days behind schedule is not applicable to this schedule, as work on the critical path had stopped and it was not known when it would resume. | | |

**2. General Schedule Analysis from Primavera Schedules Submitted with Payments**

The schedule updates provided with the partial payments provide a basis for evaluating the activities ongoing during the period between April 2003 and November 2003. During this time, the JV replaced the subcontractor responsible for installing insulated panels (for which the JV has claimed additional costs; refer to paragraph C for the analysis of this portion of the claim). Also, the JV was subject to numerous stop work orders both for panel installation and steel framing erection due to poor quality and inadequate safety during this time. As the specific "55 days" of delay are never identified (the time period identified in the claim is 243 days), only a general overview of the schedule during this time period may be conducted. It must be noted that during this time period, the JV revised schedule logic and/or durations of activities in virtually every update; thus "critical" activities in one month become non-critical in the next month

**April 2003 (RV17).** In this schedule, with the JV running 12 days late, 185 activities are identified as relating to the installation of insulated panels (roof, wall, or roof and wall). None of these activities are on the critical path. In December 2002 (RV14), 202 activities met this criteria; indicating a decrease of 17 activities. No explanation is offered for this change. Nonetheless, only one insulated roof or wall panel installation (aside from the initial) has started, 56E303 on 28 April. The next two are not scheduled to start until 1 May (56E504 and 67E303).

**May 2003 (RV18).** As noted elsewhere, the installation of panels was stopped in early May due to problems with quality and safety. As a result, this schedule update shows no panel activities had started, and the "actual start" date for 56E303 had been removed.

**August 2003 (RV21).** This schedule, with the JV now 89 days behind schedule, is the next to show Insulated Panel installation restarting. 167 activities are identified, a decrease of 18 from the April schedule (the "SH" Type buildings in Sector 12 and Ammunition storage sheds).

**December 2003 (RV26).** In this schedule, with the JV now 201 days late, there are now 175 activities related to Insulated Panels. As noted in the Progress Payment narratives, panel installation had stopped after paint began peeling off panels already installed.

Based on this, any "delay" due to "long learning curve" would have to have been incurred on buildings already completed. Schedule RV26 indicates 29 Panel activities as being completed; 24 Type A DSB's, 2 Type E3, 2 Type E5, and 1 Type L. Six of these DSB's were completed

after the Late Finish date in schedule RV21, as indicated in the table below. However, only three DSB's were completed later than the "Late Finish" where the Actual Duration exceeded the Scheduled Duration (highlighted). The other three impacted the completion date only because they started late.

| Late Completion DSB's | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Activity ID | Area | Building | | Actual Start | Actual Duration | Actual Finish | Late Start | Original Duration | Late Finish |
| | | Type | Number | | | | | | |
| E504561921 | 56 | E5 | 4 | 8/25/2003 | 46 | 10/19/2003 | 8/25/2003 | 27 | 9/25/2003 |
| E504451921 | 45 | E5 | 4 | 8/28/2003 | 40 | 10/15/2003 | 8/26/2003 | 27 | 9/25/2003 |
| A08671921 | 67 | A | 8 | 10/12/2003 | 17 | 10/30/2003 | 9/26/2003 | 21 | 10/23/2003 |
| E303451921 | 45 | E3 | 3 | 10/22/2003 | 10 | 11/2/2003 | 9/26/2003 | 18 | 10/20/2003 |
| A12671921 | 67 | A | 12 | 10/23/2003 | 39 | 12/7/2003 | 10/24/2003 | 21 | 11/17/2003 |
| L05341922 | 34 | L | 5 | 11/5/2003 | 25 | 12/3/2003 | 10/21/2003 | 30 | 11/24/2003 |

Ignoring other critical activities and other critical paths, the theoretical impact of 56E504 on the critical path was to have extended it 24 calendar days. However, the overall impact of the "learning curve" must be reviewed over every activity associated with the installation of insulated panels. The schedule links the completion of the paneling on 56E504 to 45E303. While no further installation of paneling was linked to 45E303, it was completed on 2 November. Schedule RV21 indicates a late finish of 20 October; thus, the theoretical maximum delay would be 13 days (21 October to 2 November). Had the installation of the panels not stopped due to peeling paint, it is likely any delay would have been recovered if there was a "learning curve" on the first set of panels erected by a "team."

However, with this evaluation, it is critical to know which crews erected which structures in what order; each crew would have a unique learning curve. The schedule, if properly resourced, would provide an accounting of the DSB's erected by each crew. However, of the 29 completed structures, the schedule does not provide a "Team" number for 5; the remaining 24 were completed by no less than 12 crews; an average of 2 per crew. In general, the first DSB completed by each team did take longer than subsequent DSB's completed by that crew, but this was not absolute, nor was there a consistent duration. As an example, of the 19 Type A DSB's completed where the crew was identified in the schedule, the duration of the initial DSB completed by 10 different crews ranged from 17 to 39 days.

Of the three completed DSB's which theoretically could have impacted the critical path, an apparent error in the schedule arises as the schedule indicates 56E504 was paneled by Team 1 of Koor Metals, while 45E303 is assigned to Team 2. There is no reason for this link, as "Team 2" should be operating independently of "Team 1." Additionally, the schedule indicates "Team 1" worked simultaneously on 67E303 and 56E504 between 25 August (start date of 56E504) and 04 September (completion of 67E303), but they did nothing between 19 October (completion of 56E504) and 5 November (start of 34L05).

| Completed Panel Installation: Koor Metals "Team 1" | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Activity ID | Area | Building | | Actual Start | Actual Duration | Original Duration | Actual Finish | Late Start | Late Finish |
| | | Type | Number | | | | | | |
| E303671921 | 67 | E3 | 3 | 7/27/2003 | 35 | 18 | 9/4/2003 | 7/27/2003 | 9/17/2003 |
| E504561921 | 56 | E5 | 4 | 8/25/2003 | 46 | 27 | 10/19/2003 | 8/25/2003 | 9/25/2003 |
| L05341922 | 34 | L | 5 | 11/5/2003 | 25 | 30 | 12/3/2003 | 10/21/2003 | 11/24/2003 |
| Completed Panel Installation: Koor Metals "Team 2" | | | | | | | | | |
| E504451921 | 45 | E5 | 4 | 8/28/2003 | 40 | 27 | 10/15/2003 | 8/26/2003 | 9/25/2003 |
| E303451921 | 45 | E3 | 3 | 10/22/2003 | 10 | 18 | 11/2/2003 | 9/26/2003 | 10/20/2003 |

As noted in the claim, separate flashing and sealing details were required for each type of DSB, requiring a learning curve for each type of DSB. Team 1 worked on 3 different types of DSB's of successively larger size, from 1147 to 2625 square meters. The "actual duration" increased from 35 to 46 days before dropping to 25 on the third. Team 2 only completed two structures. Team 2 was able to complete their first DSB – Type E5, in LESS time than Team 1 was able to complete their second DSB. Team 2 shows a substantially shorter "learning curve" than Team 1. If Team 2 could make such a remarkable reduction in installation time between the first and second DSB's, one should expect Team 1 to make similar improvements if the problem was a "learning curve" and not the ability of the crew or the validity of the scheduled duration.

Finally, 67A12 has no insulated panel predecessors; it is the first set of panels to be installed by "AAB Team 2". No analysis of a "learning curve" could be made, as there was only one set of panels erected by this team before the installation of panels was stopped due to the peeling paint issue. Additionally, it is not certain if the installation of these panels was stopped and then resumed.

**3. Validity of Durations**

When conducting a schedule analysis, it became apparent that a more detailed review of the validity of the durations associated with the insulated panel installation was necessary.

In schedule RV21 of April 2003, 167 activities on 160 structures were identified where the description contained "Insulated Wall" "Insulated Roof" or "Insulated Pan"; this should capture all relevant activities related to the installation of the panels. The total duration indicated by these activities was 3079 days. In Schedule RV45 of June 2005, 285 activities on 163 structures were identified meeting this criteria (including additional activities for "Sealing" which had been included in the original activities for "Installation of Insulated Panels") with a total "original" duration of 3831 days.

Filtering the comparison to match the 160 structures identified in both schedules, the 3079 days in RV21 compare against an "original duration" in RV45 of 3819 days and an actual duration of 5139 days. Additionally, in RV45, of the 285 activities, 95 (33%) were completed in less than the scheduled duration, 16 (6%) in the duration scheduled, and 174 (61%) took longer to complete than scheduled. This was not limited to simply the panels; of the 9918 activities completed in this schedule, 3238, or 33%, took longer to complete than scheduled. The cumulative duration of these activities was 125,199 days versus a scheduled 68,475.

The project schedule did not contemplate a "learning curve" in their original schedules, as all durations for a specific type of DSB were identical. The basis for determining the duration in the schedule has not been supported, however based on actual construction, the JV either did not adequately resource the project to allow the activities to complete in the time identified in their schedule, or the durations were simply too optimistic and were not achievable. As the JV noted in their narratives, the inexperience of the crews was a primary factor for the increased durations. Since the contractual requirements for sealing had not changed from the initial solicitation to the actual construction period, there is no evidence to support a conclusion that a "learning curve" was responsible for the delay to the contract occurring during this period.

## C. Replacement of Original Panel Installer

In this portion of the claim, The JV seeks reimbursement of 1) $2,003,934 in "additional direct costs incurred to replace the original panel installer BP"; 2) $763,777 in "Additional JV site indirect costs"; and 3) "Extended Management & Acceleration Costs" for EK and Motorola in the amount of $381,060 and $304,164. The claim alleges this impact occurred between 9 June and 26 July 2003. The JV must prove the government was responsible for the removal of the initial panel installer. No claim certifications from subcontractors have been provided, nor any detail or supporting information behind the alleged increase in direct costs.

### 1. Quality and Safety Issues with DSB Construction

An accident during the installation of panels on the 6th of May caused the JV to stop work on 8 May (Ex. 96). Subsequent site visits by government personnel indicated serious problems with panel installation, resulting in a stop work order being issued for panels on the 14th of May because of "safety, quality, and designs (sp) issues" (Ex. 97). The JV, in a response dated 22 May 2003 (Ex. 99), identified several corrective measures and changes in their quality control and safety programs, including direction to Izopoli/BP to replace certain defective and unacceptable panels. Additional concerns were noted with the underlying structural steel (Ex. 108, 109, 110, 111, 113, and 114), and there were no space frames on site, as the JV had previously terminated that subcontractor. In this same time frame, the JV requested a change regarding the galvanization of purlins.

On 11 June 2003, the government issued letter 03-070, "Regarding specific quality issues, the installation of panels on DSB's is not allowed until your quality control program is amended as requested by correspondence COE 03-055. Your revision must also include a plan for effectively controlling the installation of the base plates, columns, purlins, etc. which support the panels. A complete survey of the existing steel structures must be performed .... These structures, along with all of the subsequent structures, must be inspected by your designer and certified that it is in accordance with the contract before the installation of panels. These controls are required because your current level of oversight is not working" (Ex. 110).

On 19 June, the JV issued a letter to a subcontractor (Koor Metals, the "replacement" panel installer) rejecting the "entire shipment" of structural steel elements for M type buildings. On 23 June, the JV issued a stop work order for DSB Columns. (Ex. 115)

On 2 July, government letter COE 03-393 discussed a meeting between the JV and the government concerning required changes to the DSB Quality Control Plan,

**2. Termination of Subcontractor**

The JV claims states, "Near the end of March 2003 Izopoli/BP initiated a contractual dispute over the delays in starting panel installation which ultimately resulted in an "amicable" termination of BP while retaining Izopoli as the panel supplier." The Progress Payment Narratives for May states, "No installation of insulated panels – due to non-performance, safety and quality issues, the installation was put on hold. In effect, the Joint Venture was compelled to terminate the contract of BP/IZOPOLI. New contractors (Koor Metals and Gal Asbest) will perform the installation, starting early July 2003."

This correspondence history highlights the problems with quality and safety ongoing on site when the panel installation began. The lack of a safe, quality product in compliance with the contract requirements resulted in the issuance of numerous stop work orders and corrective actions to structural steel and/or space frame DSB's. All of these items required correction before panel installation could begin or recommence.

The preponderance of evidence indicates the real reason was for other lack of quality, unsafe work practices, lack of sufficient materials on site, and failure of the subcontractor to perform. The government never directed the JV to terminate the subcontractor; the means and methods of construction were the JV's responsibility.

Once again, there were no changes to the contract terms regarding the sealing requirements, and in fact, the same sealing procedures were used throughout the project life. The reasons for the termination of a subcontractor are the discretion of the JV and were in no way related to any government action.

**3. General Schedule Review**

The delay was alleged to have occurred between 9 June and 26 July, however due to the status of the work being stopped in May, it was not possible for the JV to begin work on panels until this stop work order was lifted. If the government was responsible for the termination of the subcontractor, the JV must still show the stop work order could have or would have been lifted on 9 June (or prior to 26 July) and there were no other factors preventing installation of panels.

The schedule updates for this period (RV17 in April through RV21 in August) show the critical path changes every month; in part due to undocumented changes in the logic and scheduling of activities. Consequently, activities on the critical path in one month are not on the critical path in subsequent months. During this period, the JV lost 77 days on critical activities, falling from 12 to 89 days behind the contractual completion date.

As an example of the continued flux in the schedule, RV17 indicates panel installation had started on 56E303 on 28 April, with work scheduled to start on 56E504 and 67E303 on 1 May. The next structure scheduled to start was 45E504 on 21 May. However, by RV21, 56E303 was now scheduled to start between 26 September and 14 October; and 56E504 on August 25. Panel installation had started on 67E303 and 67A18 on 27 July, 67A19 on 11 August, and 56E504 on 25 August. Panel installation for 67A18 and 67A19 could not have started before 7 July, as the space frame structure had not been completed before then.

## D. Change for Panels to Meet L/600 Deflection

The JV requests compensation in the amount of $467,103 for an alleged change to the contract requiring panels to meet the L/600 panel deflection requirements. This argument is based on the allegation that a) the contract documents did not require panels to meet L/600 deflection requirements; and b) modification P00009 was signed after the government placed "unconscionable pressure and economic duress" on the JV. Thus "compelling" the JV to "waive its right to claim for the additional costs and time associated with the changed work in conforming to USACE's erroneous interpretation of the contract."

The claim attempts to link the L/600 panel deflection requirements to the panel sealing requirements by alleging the JV waived a "claim" for a contractual change to the panel deflection requirements so they could "pursue an out-of-scope research and development effort to comply with an impossible and defective specification." The argument is based on a mischaracterization of the statements of the government, as at the 13 December 2001 design meeting, the minutes of which were incorporated into modification P00009 (Ex. 30).

As already noted, the contract documents state, "The structural solution of the building shall be subject the following design directives, while taking into consideration the dead load of the roof structure, including purlins and panels.." Amendment #3 clearly emphasized that the L/600 requirement applied to "Every element of the roof structure."

At the meeting, and again in the modification, the government clearly indicated the L/600 requirement applied to the panels. They are an integral part of the roof structure as identified in the RFP specifications. At no time did the government ever suggest they were not. The JV design presented panels with a higher deflection, effectively proposing a lesser product than that required by the contract. The government rejected this change, reiterating the panel deflection requirements were one of the minimum performance criteria established by the contract. While the JV could have pursued this as a Value Engineering Change, the JV was aware that the government did not consider this an acceptable alternative.

The JV's minutes clearly state, "Compliance with L/600 is required for all roof structure elements, including panels" (Ex. 21). Consequently, when modification P00009 was signed bilaterally, it served as a means whereby both the JV and the government agreed the issue was resolved.

Finally, it must be noted that modification P00009 did not deal exclusively with the L/600 requirements, yet this appears to be the only portion of the modification which the JV was placed "under duress" to sign. The modification also allowed the JV to begin construction of foundations and other portions of the DSB "envelope" prior to the completion of the initial DSB, effectively saving the JV "two to four months" from their construction schedule. This is discussed in paragraph E.1.a below.

## E. Simultaneous Events

The JV's claim omits or ignores several concurrent or subsequent events occurring between the commencement of construction of the first DSB and December 2003. When reviewed in conjunction with the events described in the claim, a substantially different perspective concerning the reasons for the slippage in the completion date of the project become evident. All have a direct bearing on the merit of any "delays" and in the underlying merit of the claim itself.

### 1. Change of DSB Infiltration/Pressure Test Requirements

#### a. Completion of Entire Building before Conducting Test

The JV conducted an initial pressure test on the initial DSB on 14 January 2003, it failed. This was to be anticipated, as the structure could not be considered a "complete envelope" as required by Specification 02.003.J.3. The DSB was missing basic items such as flashing and caulking. Systems were not functional in the first DSB building until 17 February 03 and a punch list (Ex. 83) developed by the government on 26 March 03 listed 177 remaining deficiencies with the structure.

Rather than making the necessary corrections and properly sealing the building, the JV continued with preparations for another test, which it conducted on 1 April 2003 (Ex. 97). The results of the second test of the initial DSB were not accepted by the government until 3 June 2003 (Ex. 104). Even then, the JV had not prepared a "complete" building. The following table shows the activities which were completed after the first test (based on schedule RV26, previously cited).

| Activity | Description | Start | Finish |
|---|---|---|---|
| A08569011 | DSB 1st Test | 22-Jan-03 | 23-Jan-03 |
| A08560831 | Electrical Cable Pulling | 29-Jan-03 | 3-Feb-03 |
| A08563421 | Installation Of Communication & Control System | 29-Jan-03 | 13-Feb-03 |
| A08561532 | Installation Of Dehumidification Drain | 30-Jan-03 | 31-Jan-03 |
| A08561531 | Dehumidification System Installation | 2-Feb-03 | 3-Feb-03 |
| A08560841 | Installation Of Switch Boards And Panel | 4-Feb-03 | 5-Feb-03 |
| A08560861 | Installation Of J.B./Receptacles/Switches | 4-Feb-03 | 7-Feb-03 |
| A08560832 | Cable Termination, Joints And Check | 6-Feb-03 | 12-Feb-03 |
| A08560881 | Installation Of Lighting Fixtures | 9-Feb-03 | 12-Feb-03 |
| A08560243 | Floor Slab Saw Cutting | 10-Feb-03 | 23-Feb-03 |
| A08560151 | Stabilized Cement Fill | 12-Feb-03 | 3-Mar-03 |
| A08560252 | Construction Of Retaining Wall | 17-Feb-03 | 27-Feb-03 |
| A08560244 | Floor Slab Joints Sealing | 24-Feb-03 | 28-Feb-03 |
| A08561931 | Erection Of Steel Access Ramps & Platform | 2-Mar-03 | 5-Mar-03 |
| A08560152 | Concrete Apron Along The Walls | 4-Mar-03 | 17-Mar-03 |
| A08561932 | Handrail For Emergency Stairs | 6-Mar-03 | 6-Mar-03 |
| A08560542 | Waterproofing For Wall | 10-Mar-03 | 14-Mar-03 |
| A08560605 | Doors For Electrical Cabinets | 16-Mar-03 | 16-Mar-03 |
| A08562271 | Vehicle Gate Blocks | 17-Mar-03 | 20-Mar-03 |
| A08560422 | CMU Protection Wall On Exposed Concrete (Back) | 18-Mar-03 | 20-Mar-03 |
| A08561922 | External Flushing | 24-Mar-03 | 26-Mar-03 |

| | | | |
|---|---|---|---|
| A08569012 | DSB 2nd Test & Acceptance | 31-Mar-03 | 1-Apr-03 |
| A08561410 | Rail On Top Of The Retaining Wall | 4-Apr-03 | 6-Apr-03 |
| A08560882 | Emergency Lighting Fixtures | 22-Apr-03 | 22-Apr-03 |
| A08560883 | Front And Back Outside Lighting Fixtures | 4-May-03 | 5-May-03 |
| A08560710 | Installation Of Sanitary Works | 22-Jun-04 | 22-Jun-04 |
| A08560851 | Battery Chargers Installation | 10-Oct-04 | 11-Oct-04 |
| A08562231 | Pair Of Shelves Factory Painted Galvanized Steel | 21-Feb-05 | 22-Feb-05 |
| A08569030 | Building Completion | | 22-Feb-05 |

Contractually, the first test should have been conducted no sooner than April 2003, and the second at least 30 days later, and only after the tests were received should the work on other envelopes begin. Thus, placement of concrete foundations, erection of space frames and steel structures, as well as installation of insulated panels, would have started at least six months later than contractually required.

**b. Change of Test**

Between 14 and 23 January 2003, several additional tests were performed, including alternative test methodologies. On 31 January 2003, the JV submitted the results of these tests to the government and proposed an alternate test method, which was ultimately rejected.

A different method, however, was ultimately proposed by the JV in Transmittal AAB 19-37 (Ex. 78). The government accepted the JV's proposal based on their assurance the dehumidification systems would maintain the desired environmental conditions inside the buildings while consuming energy under the maximum permitted levels.

This change relaxed the contractual requirements in regards to the air infiltration requirements, "by a factor of 30," enabling the JV to produce a less costly building with less stringent sealing requirements.

**c. Reduced Sealing Requirements**

By increasing the allowable air leakage/infiltration, the JV was able to lower the performance requirements of the specifications by more than 30 times. In effect, the government constructively waived the requirements for "complete sealing" of panels; for example, no "sealing" of the seams between panels in the same manner as between concrete and panels was ever attempted. The JV obtained substantial savings in time, labor, and materials by not providing the level of sealing envisioned by the specifications.

**d. Waiver of Requirement to Complete First DSB before Continuing Work**

The contract clearly defined the requirements for construction, "to prove his design the contractor must complete one structure and successfully test it prior to construction of subsequent structures." Construction could not begin on any other DSB structures until a "complete" structure successfully passes the two required pressure tests.

Furthermore, in response to the JV's letter of 10 October 2001 (Ex. 12), indicating "4 to 6 months" could be saved by amending the contract, Modification P00009, signed bilaterally on 31 May 2002, allowed the JV to begin foundation and concrete work on other DSB's prior to the first DSB passing both tests. The government accepted this proposal by the JV because of its previously expressed concerns about the lack of progress on the project and its

strong concerns about the JV being able to complete the project on time. Numerous documents, including weekly reports, JV and Government Daily Reports, Progress Payment Narratives, and the schedule updates, clearly show that the JV proceeded with this work. Further waivers were enacted by the government when it allowed erection of conventional structural steel DSB structures beginning on 28 February 03 and installation of panels on 28 April 2003 in advanced of approval of the initial DSB. When the first DSB was accepted on 3 June 2003, the JV had completed the erection of structural steel on six DSB's, shortening the duration of the project substantially.

A substantial risk was borne by the government in allowing this work to begin, as a failure in the testing regimen might have required substantial rework by the JV to remove non-performing items, causing delays to the project. By allowing the work to begin, the government was essentially coerced and forced into accepting a design which did not meet the contract requirements, allowing the JV to test using a lower standard rather than completing a structure which met the original testing requirements.

**2. Replacement of Space Frame Manufacturer**

Concurrent with the "R&D effort" for insulated panels, the JV followed a similar course of action relating to the underlying space frames, yet they do not call this "R&D" or recognize the impact of this effort on their ability to complete the first DSB. Prior to installing panels on DSB's, the underlying support structure must be erected. While the insulated panels are the same throughout the project, the support structures are divided into two types: steel space frames and conventional steel structures. There are 79 DSB's with space frames and 40 DSB's with conventional steel structures. The JV identified space frame structures as the most critical due to their number; the first DSB - 56A08 - is a space frame structure.

Initially, the JV proposed an aluminum type of space frame from Geometrica (Ex.15, 16, 17). When substantial issues arose with this proposed variance, the JV changed to an Uskon space frame system. However, the JV's transmittals contained problems with the composition of the steel, quality standards, and manufacturing testing requirements and were disapproved repeatedly by the Government (Ex. 24, 27, and 28). However, the JV continued with this "R&D effort", requesting deviations to the material specifications as noted in RFI's DC-038, DC-039 and DC-040 (Ex. 138). An acceptable submittal was not approved until Transmittal AAB 19-6 62R1 on 09 April 2002 (Ex. 139).

When the materials arrived on 29 August 2002 (Ex. 41) they were found to contain flaws, such as cracks in the nodes. Replacements were provided (Ex. 55) and the initial frame for the first DSB was not completed until 26 November 2002 (Ex. 58). In schedule REV9 (August 02), the initial space frame had a late completion date of 29 September 2002. Thus, the impact on the projects critical path was 58 calendar days between 29 September 2002 and 26 November 2002. However the schedule update for November (RV12) indicated the JV only 36 days late; changes in the critical path and sequencing of activities had mitigated this delay, along with any other delays.

In December 2002, the JV decided to switch space frame manufacturers again, proposing a new supplier in Transmittal AAB 19-36 (Ex. 77) on 28 February 2003. This change, according to JV Letter 03-314 (Ex. 107) cost the project an additional two months of delay. However, schedule

RV16 of March 2003, the last one where the JV indicated they would complete the project by the contractual completion date, indicates space frames would have to be on site only by 18 May 2003. Erection actually began on 21 May. Reviewing schedule RV26 of December 2003, the JV indicated erection of space frames had started on 59 structures (plus the initial DSB) and was completed on 55. Of these 55, 46 had taken longer than scheduled; the cumulative delay was 636 days. All four DSB's where work had started but was not complete should have been finished; they were taking longer to complete than scheduled. During the same period, the JV claims to have lost 55 days due to a "long learning curve" of panel installation.

Finally, it should be noted that, according to the contract, the government could have insisted a new initial DSB be completed before the erection of any other DSB's once the JV changed the space frame manufacturer. This would have impacted the completion date of the contract substantially, as the first test of the first DSB completed with the new space frames was not scheduled until January 2004. However, the government did not require a new initial DSB, allowing the JV to continue with space frame erection.

### 3. Quality Problems with Structural Steel DSB's

As noted previously, the government allowed the JV to begin erection of structural steel DSB's prior to acceptance of the first DSB. The JV adjusted their schedule and began erection of these structures in February 2003. However, the purlins did not meet the contract requirements for galvanization. The JV in RFI DC-054 R1 (Ex. 75) proposed using purlins of a minimum thickness made of pre-galvanized sheet metal, as galvanization would cause severe warping on the thin profile. Until this RFI was approved on 20 March 2003, the JV was unable to erect structural steel DSB's, concurrently with other delays to critical activities.

Even with this change, fabrication errors with the steel in Type D, E & F DSB's were noted by RFI DC-071 (Ex. 71), resulting in more delays while the JV developed a proposal for field alterations to the steel members already onsite. The poor quality associated with these repairs was noted by Government in COE Letter 03-068 (Ex. 109) dated 10 Jun 03. Field welding was subsequently halted onsite by Government. Once again, the JV was responsible for delaying the completion of the project due to inadequate quality control.

According to QC Report No. 678 for 28-Apr-03 (Ex. 94), the JV began to install insulated panels on the structural steel building 56E03. As noted previously, one of the workers fell from the building due to unsafe work practices on 6 May 2003 and work was halted by the Government until safety was properly addressed (Ex. 96). When the government conducted an investigation of the scene, it became apparent the structural steel had been improperly erected. As a result of the breakdown in the JV's quality control system, the Government stopped further work on these structures on 14 May 2003 in COE Letter 03-055 (Ex. 97). The JV lost additional time while they devised corrective procedures and revised their quality control system to prevent recurrences of the problem. Work on the DSB envelopes did not resume until 27 July 2003 as noted in QC Report No. 768 (Ex. 123). Once again, the JV's own mismanagement of the job had caused delay to the completion date.

**4. Discovery of Defective Insulated Panels; December 2003**

Notwithstanding all of the previous factors and events, the JV was erecting space frames and structural steel, installing insulated panels, and attempting to recover their delays through the hiring of additional crews by November 2003, as noted in their progress payment narratives. Whether the JV would have been able to continue this progress and eliminate the delays became irrelevant in late November 2003, when it was discovered paint was peeling from the insulated panels.

The defect was ultimately determined not to be isolated, but occurring in panels from different shipments, in panels stored on site and on panels already erected. The JV conducted an internal investigation and stopped all panel installation in December 2003 (Ex. 131). After several months, the JV determined to remove all installed panels from all structures and replace them with panels from a different manufacturer.

The JV has thus provided a claim which includes alleged delays to the contract occurring from the erection of defective panels that were ultimately removed and taken off site. If the JV had encountered none of these alleged delays, they would have had to remove more panels from more structures. The problems with the panels would not have been discovered sooner, nor would a solution (the selection and delivery of a replacement panel) been implemented any sooner. Thus, any delay occurring before December 2003 is ultimately overcome by the discovery of the defective panels.

## SUMMARY

In analyzing the JV's claim, the government was hampered by the JV's repeated refusal to provide certified cost and pricing data, as well as fragnets or other schedule analysis as required by the contract. Lacking any cost proposal or supporting documents for either direct or indirect/overhead costs (which are different for each period of delay identified in the claim), the government was ultimately unable to conduct an audit of alleged costs. Therefore, our analysis resulted in classification of all proposed costs as "subjective" and unsubstantiated. The alleged periods of delay were abstract and arbitrary; it was not possible to determine with any degree of certainty what event triggered either the start or end of the alleged delay. The number of days identified as delay does not match the calendar days in the period identified in the claim, preventing any direct analysis of the specific days where delay was alleged to occur.

The JV's claim contains numerous factual errors and attempts to distort the actual contract requirements. The JV's attempt to link the dehumidifier performance requirements for infiltration to the performance requirements for pressure testing of the Dry Storage Buildings are one of the most egregious of these errors. The requirements for dehumidifier sizing, based on a 7% infiltration rate, do not contradict the requirements for a tightly sealed building envelope. Dehumidifiers will function during the entire lifespan of the structures; while the structures are utilized and equipment moved in and out. This creates a situation where the majority of air in a structure will turn over in a short period of time. A pressure test occurs once, when the structure is first completed, with all external openings closed off. While this condition will likely not occur during actual operations, it is necessary to ensure the buildings are constructed and sealed to a high, but not impossible, standard which can be repeatedly measured on all buildings. Additionally, the seals will degrade over time, increasing the amount of infiltration. This was

noted several times during the design review process and documented, including the 80% design review conference (Ex. 20). Dehumidifiers must be designed on a higher infiltration rate than would appear to be necessary when comparing to the pressure test "infiltration rate." If the dehumidifiers were designed solely on the results of the pressure test, they would be grossly under designed and incapable of properly maintaining the environment once the facility has been completed. Thus, any attempt to "compare" the performance requirements for the performance test to those of the dehumidifiers is erroneous and misleading.

Removing consideration of the validity of any costs or periods of delay, the government conducted an objective analysis of the underlying arguments to determine if there was any merit in the JV's allegations. The entire claim is ultimately based upon the JV's assertion that the government provided a defective specification in regards to the pressure test that could not be met. The JV has the burden of proof to show that the specification was inherently defective and could not ever be met, whereas they have only shown that, after one trial which was not fully in compliance with the specifications, their selected design methodology would probably not have achieved this rating. By itself, this does not constitute a defective specification. Throughout the contract, the JV has continually proposed using materials or products not in compliance with the contract requirements. The government has accepted some of these changes and has not received any offsetting credit, although it should have. Ultimately, the specification would have been achievable had the JV pursued other options, such as completely sealing the internal envelope of the structure or conducting a more thorough review of their sealing methods to determine where the leaks were.

Alleged "research and development" was a result of the JV's continual efforts to find cheaper and more easily obtained materials in an attempt to either Value Engineer cost savings or increase the JV's profit. The government was under no obligation to accept any VECP proposal, nor is it under any obligation to compensate the JV when their proposal was either rejected outright or ultimately failed to produce the results desired. These costs are a result solely of the JV's management decisions and were neither contractual requirements nor the result of any direction given by the government. The JV's "scale mock-up" building was never requested by the government, nor was it completed in a manner which would allow for any direct comparison with actual DSB's. The JV's choice to pursue this unnecessary effort ultimately delayed the project, as the JV expended resources on this rather than on constructing the contractually required first DSB building. Consequently, the JV bears the burden for the resulting costs.

When the JV moved to construction and showed an inability to meet the required testing requirements, the government was faced with two options; either reject the design in its entirety or work with the JV to reduce or lower the contract requirements in an effort to obtain a functional facility in the contractually specified time. In the spirit of partnering, the government worked with the JV to achieve the latter. Unfortunately, the JV's poor selection of suppliers and subcontractors who could not deliver the required materials or labor was exasperated by their mismanagement of the job. Continued "tinkering" with the project schedule gave a misleading impression that the JV was not as far behind as they actually were.

In March 2003, the JV produced a schedule indicating the contract was on time for the required completion date. This schedule indicated installation of DSB panels would not commence any earlier than 20 April and possibly as late as 27 April without impacting project completion. To

that extent, there is no merit in the alleged "delay" for either "research and development" or the JV's termination of the subcontractor responsible for installing insulated panels.

The JV's failure to properly design and execute the work in accordance with the contractual requirements, including failure to staff and resource the project as required by the JV's schedule and replacement of non-performing subcontractors, is the primary cause for delays prior to December of 2003. These delays are the real reasons the JV fell behind schedule after March 2003, and are in no manner related to any alleged "R&D Effort" and "Long Learning Curve," neither of which have been substantiated. Neither was the replacement of the original panel installer was a result of these unsubstantiated allegations, it was an internal contractual matter between the JV and a subcontractor.

Although the JV has failed to substantiate the merit in any alleged government caused delays, the ultimate failure of the original insulated panels mitigated and effectively eliminated any delay occurring before this date, regardless of whether it was the government or the JV's responsibility. The JV essentially was back to the state of having no panels installed on site when 2003 ended.

## DECISION

Based on the foregoing, your claim is found without merit and denied in its entirety.

This notice constitutes a final decision of the Contracting Officer in accordance with the Disputes Clause of your Contract. This decision may be appealed to the Armed Services Board of Contract Appeals, Skyline Six, 5109 Leesburg Pike, Falls Church, Virginia 22041-3201. If you decide to make such an appeal, you must mail or otherwise furnish written notice thereof to the Armed Services Board of Contract Appeals within 90 days from the date you receive this decision. A copy thereof shall be furnished to the Contracting Officer from whose decision the appeal is taken. The notice shall indicate that an appeal is intended, shall reference this decision, and shall identify the contract number. For appeals under the Disputes Clause, you may solely at your election, proceed under the Armed Services Board of Contract Appeals small claims procedure for claims of $50,000.00 or less. In lieu of appealing to the Board of Contract Appeals, you may bring an action in the Unites States Claims Court within 12 months of the date you receive this notice. (Note: The U.S. Court of Appeals for the Federal Circuit has issued a decision you should consider in evaluating your choice of a potential forum for any appeal from this final decision. See Overall Roofing & Const. Inc. v. United States, 929 F.2d 687 (Fed. Cir. 1991).

Sincerely,

William Mills
Contracting Officer