**No. 04-1719C**
**(Consolidated with Case Nos.**
**05-114C, 05-1172C, and 06-49C)**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**A.A.B JOINT VENTURE**
**Plaintiff,**
**v.**
**THE UNITED STATES,**
**Defendant.**

---

# APPENDIX TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AS TO THE M-20 BOLTS CLAIM IN NO. 05-1172C, AND FOR SUMMARY JUDGMENT AS TO THE L/600 DEFLECTION CLAIM IN NO. 05-1172C

---

**Respectfully submitted,**

**Filed electronically:**

**BRIAN COHEN, ESQ.**
**Bell, Boyd & Lloyd, LLP**
**1615 L Street, N.W.**
**Suite 1200**
**Washington, D.C. 20036**
**(202) 466-6300**
**Attorney for Plaintiff**

**October 12, 2007**

# INDEX TO APPENDIX

PAGE

October 12, 2007 Signed Declaration of Dennison S. Keeney ....................................................1

Exhibit 1 –Modification P00091..................................................................................6

Exhibit 2 – April 5, 2000 Memorandum from Ragan Glandon ...................................................9

Exhibit 3 – October 9, 2001 email from Ragan Glandon ..........................................................10

Exhibit 4 – May 17, 2002 email from Gordon Simmons with attached
Memorandum for Record dated April 16, 2000......................................................11

Exhibit 5 – May 14, 2002 email from Deni Keeney..................................................................20

Exhibit 6 – May 21, 2002 email from Gordon Simmons ..........................................................22

s/ Brian Cohen
Brian Cohen
BELL BOYD & LLOYD, LLP
1615 L Street, N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

*Of Counsel:*
Philip Clark Jones
Michael J. Schrier
BELL BOYD & LLOYD, LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **A.A.B JOINT VENTURE,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **Case Nos. 04-1719C, 05-114C, 05-1172C and 06-49C (CONSOLIDATED)**<br>**(Chief Judge Damich)** |

## DECLARATION OF STEPHEN DENISON KEENEY

Stephen Denison Keeney deposes and states, to his personal knowledge, the following:

1. I am employed by A.A.B Susa, Inc., a New Jersey based construction company.

2. A.A.B Susa, Inc. is one of the three partners in the A.A.B Joint Venture ("JV"), the plaintiff in the above captioned consolidated cases.

3. During all times pertinent hereto, I was the project director for the JV and, in that capacity, personally participated in the events and circumstances discussed herein.

4. The JV contracted with the United States Army Corps of Engineers ("USACE") to design and construct the Nachshonim Military Storage Base Project (the "Project"). The Project involved the design and construction of a storage and logistics complex for use by the Israeli Defense Force. The Project, which involved the construction of roughly 200 buildings and supporting infrastructure and site development, is located approximately 20 km. east of Tel Aviv, Israel.

5. The contract for the design and construction of the Project was signed by the USACE on June 5, 2001, and by the JV on June 11, 2001.

6. I personally participated, on behalf of the JV in the design issues meeting held on December 13, 2001.

7. During the December 13, 2001 meeting, the issue of minimum bolt hole size was discussed. At the meeting, I indicated that the JV wanted to utilize a minimum bolt size of M-16 for all space frames. At the time, it was my and the JV's belief that the use of M-16 bolts was allowed by the contract based upon Amendment 6 which deleted a reference to M-20 bolts. The bolt size issue was not resolved at the December 13, 2001 meeting. At the conclusion of the December 13, 2001 meeting, the USACE stated only that it would subsequently determine the acceptability of the M-16 bolts.

8. I had additional discussions with the USACE at the December 13, 2001 meeting concerning the applicability of the L/600 requirement to the panels and noted that there were three options possible to providing a solution all of which would involve additional cost to the JV. Additionally, I did not agree to provide maximum L/600 deflection in panels until I reviewed the cost impacts for each option. In response, Mr. Michael Roach, the contracting officer's representative, stated that if the JV complied with the L/600 requirement for the panels, the Government would show "leniency" if the pressure test came out at 1.5% or 2% infiltration, rather than the 1.1% which would have been required based upon the specified pressure test.

9. The resolution of this issue was that the JV would comply with the L/600 requirement for the panels. However, the JV was only willing to make this concession, of what it considered to be an otherwise valid claim, if the Government would give the stated leniency with respect to the pressure test.

10. Though the leniency of nearly 100% was significant, as it turned out this would have fallen far short of allowing compliance with the specified pressure test (*see e.g.* Specification-Division 2, Section 003, Dry Storage Buildings, Chapter J, Paragraph 3), a fact that was not known to the JV at the time of the meeting.

11. There was never any discussion, or agreement between the JV and the USACE, either at the December 13, 2001 meeting or at any time thereafter that: 1) The issuance of Modification P00009 would be delayed for five and one half months until May 31, 2002; or 2) that the USACE would not make a determination with respect to the bolt hole size until after the JV demonstrated compliance with the L/600 requirement for the panels.

12. During the period from December 13, 2001 through May 31, 2002 the USACE withheld its approval of the proposed M-16 minimum bolt size pending resolution of the L/600 panel issue. However, as noted above, the parties never agreed that the USACE would delay approval of the bolt size until the JV demonstrated compliance with the L/600 requirement for the panels.

13. Consistent with this, I sent an email on May 14, 2002 to the USACE which stated the following: "I asked him to issue a change order for maximum [sic] M-16 bolts for all DSB's and to consider requesting value engineering, thereby separating the bolt and L/600 panel issues. I stated that the JV was exposed for design and time by not having an official change to the contract. . . . He still wants to lump the bolt issue with the L/600 panel issue."

14. During discussions with Jody Blackburn, USACE ACO, a day or so before signing Modification No. P00009, Mr. Blackburn encouraged me to sign the modification by stating there was no need to worry about waiving my claims, as even after signing I would not be giving up all my rights to claim, as the courts are often convinced there was no accord and satisfaction for many reasons and allow the contractor to make the claim.

15. The USACE's response indicated that the bolt size issue remained unresolved and would not be resolved until all issues tied to the bolt size had been resolved.

16. The untimely issuance of Modification P00009 and the imposition by the USACE of a requirement that the bolt size issue would not be determined until the JV demonstrated compliance with the L/600 requirement for the panels delayed the release of space frames for fabrication until May 31, 2002.

17. Rather than grant any leniency, the USACE continued to insist on strict compliance with the specified pressure test from December 13, 2001 through at least January 2003, contrary to Mr. Roach's statement in the December 13, 2001 meeting.

18. I also participated on behalf of the JV in the negotiation of the terms of Modification P000091 during the last week of November 2005, leading up to execution of the modification on December 9, 2005.

19. Those negotiations were conducted directly with Michael Roach, Administrative Contracting Officer, who executed the modification for the USACE.

20. The purpose of the modification was to bilaterally resolve several issues including the establishment of a substantial completion date, a start date for the two year warranty period, and conversion of three unilateral modifications to bilateral settlements including a time extension.

21. Both parties also understood that the JV had to reserve its rights for and/or exclude from this modification the JV's certified claims. In order to accommodate the JV's concerns regarding its certified claims and complaints, language was inserted stating that issues directly or indirectly related to the stated certified claims, including the DSB pressure test claim, were excepted from the language stating that the change resolved all outstanding time of performance related issues.

concerns regarding its certified claims and complaints, language was inserted stating that issues directly or indirectly related to the stated certified claims, including the DSB pressure test claim, were excepted from the language stating that the change resolved all outstanding time of performance related issues.

22. Mr. Roach and I also agreed that the JV would come up with draft language for the modification.

23. A day or so before the modification was executed I provided Mr. Roach with the above referenced language and the additional language which states: "Contractor reserves its rights to any costs, impacts, markups, delays, extended overhead costs and the like for any of the certified claims and those directly or indirectly related to certified claims listed above."

24. Mr. Roach indicated his agreement with this language and on December 9, 2005, the modification was executed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oct 12, 2007

Stephen Denison Keeney

## AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: Construction
PAGE OF PAGES: 1 | 3

2. AMENDMENT/MODIFICATION NO.: P00091
3. EFFECTIVE DATE: SEE BLOCK 16C
4. REQUISITION/PURCHASE REQ. NO.: W2SD0611560876
5. PROJECT NO. (If Applicable):

6. ISSUED BY — CODE: IP-C
Central Resident Office
Unit 7228, Box 42
APO AE 09830

7. ADMINISTERED BY (If other than item 6) — CODE: IP-C
Central Resident Office
Unit 7228, Box 42
APO AE 09830

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
ABB SUSA/A. Arenson/BaranGroup
P. O. Box 37
Rosh Ha'ayin
Israel 68100

CODE | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (SEE ITEM 11)
X 10A. MODIFICATION OF CONTRACT/ORDER: DACA90-01-C-0043 NA
10B. DATED (SEE ITEM 13): 05 Jun 2001

### 11. THIS ITEM APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning ______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitations and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA
97-11-X-8242-ISO1 2K73K6
Contract Amount Increased $87,496.00.

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify Authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (Such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(B).

X C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:
52.0243-0004- CHANGES

D. OTHER (Specify type of modification and authority)

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return original and 3 copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Contract for Nachshonim Storage Base at El'ad, Israel.

Reference No. R00130

M1137 Sign/Pad/Mesh/Camera/Ramp/Locks

See Page 2.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print): S. Denison Keeney, Project Director
16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): Michael A. Roach, P.E. Administrative Contracting Officer

15B. CONTRACTOR/OFFEROR: [signature] (Signature of person authorized to sign)
15C. DATE SIGNED: 09 Dec 05
16B. UNITED STATES OF AMERICA BY [signature] (Signature of Contracting Officer)
16C. DATE SIGNED: 9 Dec 05



Exhibit 1

| MODIFICATION OF CONTRACT | DATE SIGNED<br>See Block 16C | PAGE OF PAGES<br>2 \| 3 |
|---|---|---|

Contract No: DACA90-01-C-0043 NA Reference No. R00130
Modification No: P00091
Contractor: ABB SUSA/A. Arenson/BaranGroup
Contract Title: Nachshonim Storage Base
Location: El'ad, Israel

14. DESCRIPTION OF MODIFICATION (Continued)

## A. SCOPE OF WORK

**M1137** **Sign/Pad/Mesh/Camera/Ramp/Locks**

Provide all labor, materials and equipment to accomplish the following work:

1. Work at entrance to base:
   a. Install T-10A sign 50cm from curb stone.
   b. Install concrete pad and lighting for the tank display.
   c. Install electronic mesh on existing culvert.
   d. Install camera including optical transmitter and RG-59 receiver cable.
2. Install loading ramp at Road 3.
3. Install locks on gate at Road 12.
4. Install additional oil/water separator in the refresh area of the fuel farm in the Logistics Complex.

The following unilateral modifications were settled bilaterally:
1. P00067 for expansion of sewer line issued on 06 June 2005.
2. P00069 for drainage culverts and sensors issued on 20 June 2005
3. P00071 for fuel farm double wall piping issued on 27 July 2005.

Completion and Warranty:
1. Substantial completion date of the project is 10 October 2005.
2. Warranty period begins on 20 November 2005.
3. Contractor is responsible for all costs associated with utilities, operations, etc. of the project until 20 November 2005.

## B. CHANGE IN CONTRACT PRICE

Total contract price is increased by $87,496.00.

Lump Sum Changes

| CLIN No. | DESCRIPTION | CHANGE AMOUNT |
|---|---|---|
| 0004 | Site Infrastructure (Section 02-001) | $87,496.00 |

Total Change Amount $87,496.00

## C. CHANGE IN CONTRACT TIME

The contract completion date shall be extended by 40 calendar days by reason of this modification.

It is understood and agreed that this change resolves all outstanding time of performance related issues.

EXCEPTION: Issues directly or indirectly related to the following certified claims:

1) TCN Labor Shortage
2) Erroneous Rejection of Alternate Paint System
3) DSB Pressure Test
4) Liquidated Damages.

Contractor reserves its rights to any costs, impacts, markups, delays, extended overhead costs and the like for any of the certified claims and those directly or indirectly related to certified claims listed above.

| MODIFICATION OF CONTRACT | DATE SIGNED See Block 16C | PAGE OF PAGES 3 \| 3 |
|---|---|---|

Contract No: DACA90-01-C-0043 NA — Reference No. R00130
Modification No: P00091
Contractor: ABB SUSA/A. Arenson/BaranGroup
Contract Title: Nachshonim Storage Base
Location: El'ad, Israel

## D. CLOSING STATEMENT

Prices contained in this modification are exclusive of all taxes and duties from which the U.S. Government is exempted by virtue of any tax agreements between the U.S. Government and the State of Israel.

It is understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and any subcontractors or suppliers including but not limited to, all costs and markups directly or indirectly attributable to the change ordered, all delays related thereto, all extended overhead costs, any impact whether cost or time on this work or other work under this contract, whether changed or unchanged, and for performance of the contract work within the time stated except as provided in Section C.

All other terms and conditions of the contract, as heretofore changed, remain unchanged and in full force and effect.

CENAU-ED 5 April, 2000

Memorandum for Record

Subject: Envelope Sealing Criteria and Testing for the Dry Storage Warehouses.

The current building envelope-sealing criteria seems to be too stringent to be met by the specified elements for the envelope. The current testing protocol requires the building to be pressurized to 25 mm WG. The building can then only lose 5mm of air pressure after thirty minutes. This corresponds to a loss rate of 3 to 7 liters/sec (depending on building size) over the entire envelope of the building.

All stationary (ie with permanent joints) elements have been well thought out and thoroughly analyzed. These systems will contribute some leakage to the envelope but all substandard sealing in these joints will most likely be from poor workmanship and can be corrected during the testing regime. The primary area of concern is the seals around and in the sectional overhead doors, the seals around the personnel doors the personnel doors themselves (as currently specified), and the dehumidifing units.

For the sectional overhead doors, it is recommended that the designer obtain more detailed data from the manufacturer. This data should included all edge seal details, all section seal details, details at seal intersections and corners. The manufacturer should also supply any test data available in order evaluate the sealing effectiveness of the doors.

For the personnel doors, it is recommended that the designer evaluate the specified door types and obtain detailed pressure testing data from the manufacturer.

For the dehumidifying units, it is recommended that the designer obtain more detailed data from the manufacturer. This data should include working drawings of the units, and catalog data. The designer should meet with the manufacturer of these units and explain the pressure testing procedure. The manufacturer should then provide an analyis of his units expected performance under these test conditions.

The designer can then evaluate the combined effect of the expected leakage rates of these items on the performance of the total building envelope and determine the most cost effective solutions to correct any ineffective building envelope elements.

Ragan Glandon, P.E.
Mechanical Engineer

**Exhibit**
**2**

Chief, Technical Coordination Branch

Israel Program Office, USACE

+972-9-957-7950 ext. 210

+972-9-957-7941 fax

+972-56-305-907 cell

-----Original Message-----

**From:** Glandon, Ragan L SPA

**Sent:** Tuesday, October 09, 2001 8:02 PM

**To:** Simmons, Gordon L NAU

**Subject:** RE: DSB Air Infiltration Rates

I do have to agree with statement #2.

Industry criteria and actual measured test data for controlled atmosphere warehouses is very thin. The British criteria (CIBSE T23) is the best (simplest, most clear-cut) I could find. I would agree to go to the 7% (0.055cfm/sf) cited in this criteria. This is still a reasonable number, ***if the construction quality is up to standard***.

Another way to approach the problem is to look at the laboratory test results of the building elements to be used. I pulled some data for metal wall panels from the Internet. The maximum laboratory leakage rate for a metal panel system could be as high as 0.06 cfm/sf, but most of the better systems will give you 0.02 cfm/sf. Using .02cfm/sf gives a 2.4% leakage rate. Since this does not include doors and is based on a laboratory test (ASTM E283), I consider this to be the theoritical lowest leakage rate for our type of buildings. Adding in the door leakage and inevitable construction inefficiencies would put us back up to around the 7% given in CIBSE.

So first I would ask them what rate they want to use. Then I would ask them to support it based on manufacturer's test data of the building elements they intend to use, preferrably tested in accordance with ASTM E283.

Hope this gives you a place to start, call me if you need anything.

Ragan

-----Original Message-----

**From:** Simmons, Gordon L NAU

**Sent:** Monday, October 08, 2001 3:57 AM

**To:** Glandon, Ragan L SPA

**Cc:** NOBLE, JAMES F NAU

Exhibit 3

From: Simmons, Gordon L NAU
To: Blackburn JR, Joseph W NAU, Roach, Michael A NAU
Cc: Abraham, Ezra E NAU, Iarosis, Mike NAU, MCCALLISTER, LARRY D NAU
Bcc:
Date: Fri May 17 00:48:24 CDT 2002
Subject: Historical Files
Attachments: MFR on Israel Trip of 1 April.doc
Drysto~1.doc

Mike/Jody,

Attached are the first records of our review of the Nachshonim project whereby we addressed the attainability of the testing criteria of the DSB envelope. I'll continue searching the history and send you the other documents as I find them. Other items of interest in these reports as well : -)

G

Gordon L. Simmons, P.E.
Chief, Technical Coordination Office
USACE, Israel Program Office
Office: +972-9-957-7950 X210
FAX: +972-9-957-7941
Cell: +972-56-305-907
gordon.l.simmons@usace.army.mil

Exhibit
4

CENAU-ED 6 April 2000

MEMORANDUM FOR RECORD

SUBJECT: Technical Review of the Design of the Nachshonim Storage and Logistics Base, Israel

1. The subject project is a new division reserves base located in the central portion of Israel near the kibbutz of Nachshonim. The project is currently being designed by 22 Israeli A/E consultants under contract to the Israeli Ministry of Defense (MOD). This design effort is to be awarded as a Design-Build (DB) contract. The project design is divided into two packages, infrastructure and vertical construction. The infrastructure portion of this project is to be 100% completely designed, and the remaining vertical structures are DB. Design requirements for the vertical components are being identified with performance requirements.

2. During the week of 2 April 2000, members of Europe District (CENAU) Engineering Division, along with representation from CENAU Project Management, Contracting, Construction and Executive Offices, Headquarters, US Army Corps of Engineers (HQUSACE), and US Army Corps of Engineers, North Atlantic Division (CENAD) performed a review the subject project. The review was not focused on technical or functional competence or requirements, but rather on the contract package itself and how well the design package will comply with U.S. contracting laws and how biddable the package will be. The technical review team from CENAU consisted of:

   - Gordon L. Simmons — Structural Engineer — 0049-611-816-2338
   - Ragan E. Glandon — Mechanical Engineer — 0049-611-816-2594
   - James F. Noble — Architect — 0049-611-816-2346
   - Louie P. Brackett — Electrical Engineer — 0049-611-816-2305
   - (first.mi.last@usace.army.mil – example: gordon.l.simmons@usace.army.mil)

3. Other personnel reviewing this project include:

   - Aly Samahy, Chief, Defense Agencies and Support for Others Branch, HQUSACE
   - John Jones, Program Manager, Defense Agencies and Support for Others Branch, HQUSACE
   - John Sassi, Chief, Environmental and International Programs, CENAD
   - John Carpenter, Chief, Contracting, CENAU, 0049-611-816-2600
   - COL Michael R. Pelkey, District Engineer, CENAU, 0049-611-816-2700

- Rob Saari, Project Manager, Wye River Projects, CENAU, 0049-611-816-2820
- Armando Solis, Deputy Chief, Construction Division, CENAU, 0049-611-816-2741

4. Items discussed are detailed in the following paragraphs. The meetings opened with a general description of the project from LTC Offer Groisman, MOD, and Zvi Kimelman, the lead architect on this project. This is the construction of a new base covering over 1,600,000 square meters. There will be 119 dry storage facilities of different sizes for different vehicles. Other facilities include logistics buildings, administration buildings, community buildings, utility and other support buildings, dormitories, a helicopter pad, 24 kilometers of roads, 5 kilometers of fencing, and electronic security. Altogether, the buildings have been divided into 14 different types for the purpose of the design package.

5. During this review, there were two significant concerns noted with the current status of this design. The first concern is the apparent lack of adequate coordination between the work being done by the 22 consultants. The second concern is the level of work and detail currently shown in the developed design documents far surpasses the requirements normally associated with a DB contract. This increased level of developed design conflicts with the general intent of DB contracting and has the possibility of potentially negating any cost or liability benefits. Additionally, with the level of detail shown, there is a high potential for conflict between what the A/E has shown and what the DB contractor must provide to meet a finished contract.

6. There were several examples indicating the lack of coordination between the consultants. One of the more significant was that two different electrical consultants designed the same components of the intrusion detection system, neither knowing that the other was designing the same component. Another example was the civil and landscaping designer making a requirement to salvage topsoil from the site while one geotechnical consultant strongly states that there is no topsoil available and another stating it is available. Queries of one consultant of how the work of another impacts their design brought more questions than answers. In all, it is not felt that adequate attention is being put on design coordination.

7. The second concern deals with the amount of detail shown on the contract documents. The designers had/have some confusion as to how a design build contract functions and the legal aspects of who "owns" the design given different levels of detail which can be shown in this contracting process. The package appears to be written more as an incomplete prescriptive design package rather than a performance criteria package. Complete engineering

systems were shown and details which tie the contractor's hands on other options. Enough data is shown such that no risk for acceptable performance of the design is transferred to the DB contractor.

8. These issues were discussed in detail with the A/E and MOD representatives. A copy of TI 800-03,Technical Requirements for Design Build, was given to MOD. This is a document that had not been available to MOD or the A/E prior to this meeting. Additionally, a sample of an existing DB package for a flight simulator was provided to MOD in the form of an electronic bid set (EBS) disk. Mr. Carpenter gave a presentation and tutorial on this method of contracting. The problems and difficulties appear to be well understood by MOD and the A/E. As such, MOD has decided to scale back the level of detail shown in these drawings and prepare more of a performance specification. This revision will have a positive impact on the final product, but a negative impact on the schedule. It is now estimated that the final package will not be prepared until the end of June 2000. Additional coordination meetings between the COE, MOD and the A/E firms will be scheduled as required.

9. Breakout discipline review sessions were held between the individual consultants and the USACE reviewers. A review of the infrastructure package yielded the following comments:

- There are known archeological sites within the boundaries of this project. These areas will be identified on the contract drawings and the restrictions of the contractor disturbing these areas will be stated.
- An additional archeological investigation is ongoing. There may be further sites found, but it is felt that these will be minor sites can be sufficiently documented, after which the site will be released for construction. This survey is expected to be completed within two months.
- The requirement for site access for the archeologist during construction should be stated in the contract.
- The main water pipe adjacent to the site has a tap in place for access by the contractor for this project. The contractor will have contract with the water company to bring this water into the base and will also have to get licenses to tie into this tap and pay for usage. A negotiated maximum fee contract with the water company to bring this line in will be provide by MOD.
- A sewage line is to be constructed from the site to the town of Elad. This line partially follows the line of a high power electric line. The contractor will be responsible for renewing the right-of-way agreements with the electrical company and the agreements with Elad. Licenses and permits will be at the cost of the contractor.

- The contractor will need to arrange with the national electric company to bring a line in from the substation in Elad up to the substation at the gate of the facility. A pre-negotiated contract with the electric company will be included that the contractor must renew/renegotiate. Until this line is brought in, no electricity will be available on site.
- The north area of the site slopes quickly away. This area is environmentally sensitive and it will be written into the DB package that the contractor must not damage this area.
- The limits of the site will be identified on the drawings.
- Autocad version 14 or 2000 is being used by all the design consultants.
- Available area for the contractor laydown and spoil collection will be suggested on the site drawings. This will be stated clearly as only a suggestion and the contractor is responsible for final planning and siting of all laydown areas he requires.
- Currently, the specifications are written that no blasting is allowed. After visiting the site and talking with the geotechnical engineer, it was discussed that blasting must be allowed. LTC Groisman agreed that this would happen. It may be that the amount of blasting performed close to the archeological sites will be limited. The contractor will be responsible for obtaining permits to blast.
- Topsoil was specified to be salvaged from the site prior to the bulk of the excavation. The area and depth of topsoil was not defined on the drawings. After discussing with personnel who visited the site and with one of the geotechnical engineers, it is unclear whether the soil is available or not. This requirement must be clarified and properly identified in the contract when the correct answer is known. If rock removal is required from salvaged topsoil, this requirement must be written into the contract.
- It was discussed whether an estimated quantity of soil removal could be provided in the contract or whether a grid system, better defining the amount of cut and fill, should be provided. After discussing this with Mr. Carpenter, it was decided that a statement similar to the following may be added to the drawings:

  > *Our calculations indicate that there will be approximately XXX cubic meters of soil excavation (cut) required and YYY cubic meters of fill required. The contractor is responsible for calculating his own quantities.*

- The soil boring locations and logs will be added to the drawings.
- Seeds for the landscaping must be collected locally around this site for final landscaping usage. The plants specified have no commercially available source.
- Road signs and markings will be completed in the infrastructure package. Signage for the buildings will be included in the design build portion.

- Removal of trees was discussed. Special permission must be obtained prior to removal of trees which may necessitate replanting. This was initially included as the contractor responsibility, but after discussion it was clear that this would be an unknown level of work that the contractor could not bid. This requirement will be taken care of by MOD prior to the contract.
- The locations of the buildings will be added to the site drawings and it will be stated that these locations are to be maintained.
- Where buildings have more than one story or a basement, is should be clearly indicated for which slab the elevation of the building is being shown.
- The specifications were reviewed and found to be generally complete and accurately written. Some issues such as the authorities of the COR and descriptive quantification of specified items were discussed and revisions will be made to correct these errors.

10. The Dry Storage buildings were discussed. The following comments and observations are made:

- The need for a prototype was discussed. All agreed that it would be very good to have a model to test prior to completion of construction all the other buildings. Mr. Carpenter stated that if you call the model a prototype and "approve" this model, then the responsibility for acceptable performance of all buildings for all time now belongs to the government. Instead, it was decided to write the phasing of the construction such that a few buildings must be completed early (before all others) and these buildings would be tested and "accepted", leaving the responsibility on the contractor.
- Many of the drawings and specifications were written around specific engineering systems. A lot of time went into reviewing the specifications written in this manner with emphasis placed on descriptions or where directions were written which are incorrect for US contracting procedures. Given the decision to change the package as discussed above, these items have been overcome and further review and coordination of the new performance specification will be required. It was agreed that architectural floor plans, without detailed dimensions or materials, will still be provided to ensure the approved functional layout of all facilities as necessary.
- The testing requirement being written for proofing of the envelope around these buildings was discussed. The COE has a concern that the requirements as currently written cannot be achieved with the building configurations on this project. Areas where leakage could occur were discussed. The fact that the test pressure in which a building "passes" a functional acceptance test is considerably higher than the normal operating pressure in the building was discussed. This may mean that the

building passes the required functional test, but may not work under operating conditions. The A/E will study this issue further. Mr. Glandon has a separate memo outlining this concern which is attached to this document.

- The need for a clear line of delineation between what is required to be design build and what is to be included in the completed infrastructure design was discussed.

11. All the other facilities on this base were reviewed similar to the dry storage buildings. Similar items were discussed like the lessons learned on the infrastructure specification and the dry storage package. A couple facilities are a bit out of the norm of the rest of the package. One of these is the dining and kitchen facility. This facility is being designed by an A/E under separate contract and is to be a model used on all future army facilities. Approvals from Rabbis, medical corps, logistics etc. have been obtained for this building and these approvals cannot easily be waivered. This building will be included in the DB package; however, the level of detail on the functional layout, finishes and other requirements which have been approved by the appropriate authorities will be included in the package. This level of detail for this building will be written as a mandated requirement for the contractor to follow. It is possible that the antennae on this site will be written in the same manner.

12. MOD has stated that the current working estimate of this central base is approximately $155 million without the value added tax.

13. During a briefing by Mr. Carpenter, it was discussed how to ensure the appropriate Israeli laws are referenced and/or included. A listing of all such documents (Law of Concrete, Law of Electricity, Law of Building and Planning, Communications, Safety, etc.) will be provided by the A/E such that Mr. Carpenter can judge how to present this issue. He stated that the contractor will normally have a 60 day window for preparing his bid, and there is concern that these laws may not be well enough known or available to US bidders to consider adequately during the bid time. Options such as inclusion of copies of these documents into the contract, summaries of these documents, extending the bid time, etc. were discussed. No conclusion on which option will be finally considered acceptable has been made yet.

14. The format of the contract was discussed. Currently the completed 100% infrastructure design is separate from the DB portion. However, the DB portion is divided further by building type and not by construction disciplines. Mr. Carpenter agreed that the division of the buildings may remain, but a cross-reference table will be prepared indicating where the contractor can find all sections related to each discipline.

15. There was some discussion about the need to have the transformer buildings included within the completed infrastructure design. After discussing the pros and cons of this issue, it was agreed to leave these buildings in the DB package.

16. In addition to reviewing this central base, the COE team also discussed some issues on the Southern Infantry Base with Major Orly Stern. Major Stern was given a letter (31 March memo) and a sample detailing the COE requirements for an electronic bid set package (EBS) for the solicitation. This letter provided two different options on how to provide the design package in a format which could be incorporated into an EBS. One method – the preferred method by the COE – is to save the CADD drawings in a "CAL" format using a special software driver available from the CADD vendor. The other method requires that all drawings be submitted in their original CADD format, along with all font tables, pen tables, plotting scales and the like. After discussing this issue with Major Stern and the project manager on this project, it was determined that they would submit in the CAL format if at all possible.

17. Additionally, the need for a signature on the drawings and the contract number on the drawings was discussed. Mr. Carpenter stated that he will need a signature from the lead engineer or architect, or a principle of the responsible company. This signature should be provided on the first or second page of the drawings. It is not necessary to have this signature reflected in the EBS package, but it should be on the final submission hard copy. The contract number is not important at this time and this space may be left blank for now.

18. The requirements for transmittal of contract documents between the GOI and the COE were discussed. It was stated that when the complete final design package (including the translated General Specifications) is ready for review, a hard copy will be transmitted to the COE. A review of these documents will take place for approximately three weeks after receiving the total package. Comments generated by the COE will be faxed to the GOI at least weekly, and these will be distributed to the responsible designer. If the comments are agreed to, the changes will be incorporated in the contract document. If the comments are not agreed to, telephonic conferences will be held to come to a mutual agreement. After all review comments are submitted and incorporated as necessary, the A/E will prepare the final technical bid document package. This will be in the form of design files in CAL format and specifications in the original Microsoft Word format. The few files which require color to transmit the design data will be submitted in both a CAL format and in the original CADD format with the font tables, pen tables and the like. A table listing CADD file names and the corresponding drawing title will be submitted.

Additionally, a final hard copy will be submitted with the signed cover sheet. These should be bound in such a way as to allow easy reproduction. This process was discussed for both the southern site and the central site.

19. Any questions on this report may be directed to the undersigned 0049-611-186-2338.

Gordon L. Simmons, P.E.
Senior Structural Engineer
U.S. Army Engineer District, Europe

Attch: Glandon Report

**Keeney**

**From:** keeney [keeney@aab.co.il]
**Sent:** Tuesday, May 14, 2002 1:37 PM
**To:** Leo Price (E-mail)
**Subject:** Fw: Bolts/L600/Pressure Test

----- Original Message -----
**From:** keeney
**To:** Shai Vaxman
**Cc:** Ram Noham ; Paul Salvato
**Sent:** Tuesday, May 14, 2002 12:22 PM
**Subject:** Bolts/L600/Pressure Test

Shai,

Just had a long discussion with Mike Roach (COE) concerning the bolts/L600/Pressure Test. I stated that things had changed since our 13 Dec 01 meeting, as the design is further along since that meeting.

1. I asked him to issue a change order for maximum M-16 bolts for all DSBs and to consider requesting value engineering, thereby separating the bolt and L/600 panels issue. I stated that the JV was exposed for design and time by not having an official change to the contract, even though we still believe we have a case for claim. I stressed that this was a "structural" issue as opposed to a long term stability L/600 issue. He believes the bolts a "material substitution" issue versus a Value Engineering issue. I disagreed, as VE is reducing a specification requirement while retaining the same intended function and a difference in cost to be split between the parties. He still wants to lump the bolt issue with the L/600 panel issue

I explained that the L/600 panels was thought to be a S160K issue in the 13 Dec meeting and I told them that at that time. Now the issue is closer to S1,000K, as we had firm quotes and more into the design and testing to achieve this criteria. He was very disappointed that we could no longer agree to package all the issues tabled at the 13 Dec meeting, which was a precursor for them to allow us to proceed on all structural work before completing the Pilot pressure test. I told him, that with the present labor problem, we were unable to take advantage of this relief. I also stated that even though we had no official contract change to allow this work before test, COE approval of our revised baseline, March schedule was tantamount to an approval, but issuing a change order would make things more clear. I told him that the JV were very confident of winning a claim, as a line-by-line examination of all the specifications showed that there was at least 7 places in the contract that proved the panels were never intended to be a structural element and that no panel cladding was never manufactured to be either structural and/or an air-tight sealed envelope. Roach thought the COE had a good case the prove the contractual "intent" for the panels to be structural. I told him we were proceeding with L/600 panels, but that R&D time is being lost. Looks like a contested claim here.

3. We discussed all the R&D going on in Ashdod for the pressure test and that time is being lost here, also. He brought up a good point that their first argument would be - did we try testing another panel from another supplier in Israel. I said Caesarea Polymer cannot meet our production schedule with the facilities they had and that was the precedent to COE approval of our waiver for procurement from a non-designated country, Turkey. We should probably get two panels and standard seam (gasket) from Caesarea Polymer and test in Ashdod, just to say we looked at that angle as well.

I asked the question of why, since all parties know the system will not pass the test, why not reduce the criteria to that similar to shelters. He made a good point be stated they had no data, nor seen any tests that would allow them to consider this. I told him we would clean up the test procedures, pictures and results, submit for information and then invite them to Ashdod to witness the next test. I told him of sealing off the roof/panel and concrete wall/panel connection and were concentrating on the bolt penetrations and the panel connections. Roach stated that these details in design would be the criteria for any relief for the pressure test. He wanted to know if we had not only a gasket between bolt head and outer panel, but one between the inner panel surface and the purlins. Could remember this from my visit, but please ensure this gasket is being considered and tested.

I told Roach we were doing preliminary calculations to possibly change the criteria to a continuous over-pressure, similar to "white rooms" and calculating the required additional dehumidification and added energy costs to attain this result. He thought this would be very expensive and too much additional energy costs.

Please ensure Ashdod is gasketing inner panel surface and purlin and send two Caesarea Polymer panels to Ashdod for testing. Roach agreed that bolts and gasket/washers were similar to both panels and need not be tested on both type

panels.

**Keeney**

---

**From:** keeney [keeney@aab.co.il]
**Sent:** Wednesday. May 22. 2002 1:31 PM
**To:** Michael Roach: Blackburn JR, Joseph W NAU
**Subject:** Fw: Comments by Luis Labaton

Joey. Mike.

Per my recent discussions with Mike concerning spatial frame bolts. L/600 panels and Pilot Pressure Test. I have the following comments:

The JV cannot be held in the air on the bolt issue and complete the design. manufacture the spatial frame and construct the Pilot. The COE should advise what is technically acceptable from an engineering point of view and let the commercial consequences fall out where they may afterwards Otherwise we cannot go any further. Aside from what is specified. If either or both of the bolt size and the deflection is an IDF technical requirement, we need this in writing now to complete the design and start fabrication. If one or the other is not technically required. we must proceed with the project and let the commercial aspects be negotiated later

We have had several tentative approvals of a max bolt M-16. but the record needs to reflect this or we have no direction as how to proceed

Deni
----- Original Message -----
**From:** Simmons. Gordon L NAU
**To:** Ram Noham (E-mail) : Richard Stump (E-mail) : Deni Keeney (E-mail)
**Cc:** Roach, Michael A NAU : Blackburn JR, Joseph W NAU : Iarosis, Mike NAU : Rami Kerekesh (E-mail) : Abraham, Ezra E NAU
**Sent:** Tuesday. May 21. 2002 12.06 PM
**Subject:** Comments by Luis Labaton

Ram/Rich

I have reviewed the comments submitted by Luis Labaton for the Segment II/III 100% design. As previously discussed. these comments are divided into two sections - the first for general discussion points as "designer to designer" help and/or suggestions. and the second being actual review comments requiring an annotated response. Although not used properly as "helpful advice" from one designer to another. the first portion of Luis' comments are only the Discussion Points (reference the top line of the header in this section). Many of these discussion points have previously been discussed *ad nauseam* and will not be discussed further at the upcoming meetings. We will control what is and isn't discussed at the upcoming meetings. allowing only what is necessary to be helpful to the overall design and completion of the project. General discussions may be held on the concept of horizontal loads to the foundations. finite element analysis requirements. and the completeness of the calculations with respect to contract requirements.

Note however. that the section of comments provided by Luis entitled "Design Review Comments" have several valid and significant points dealing with the actual design calculations provided. conflicts between the calculations and the drawings. conflicts between the calculations and the contract. etc. These will have to be gone over in the meeting to come to resolution. Note that the issue of the M20 bolts apparently remains unsolved based on some discussions of revisions to previous agreements dealing with this issue. I don't know the full details of these discussions. but until there is a resolution to all issues originally tied to this bolt size. the contract requirement of M20 bolts will remain valid.

Thanks.

Gordy

*Gordon L. Simmons, P.E.*

Chief, Technical Coordination Office

USACE. Israel Program Office

Office. +972-9-957-7950 X210

FAX: +972-9-957-7941

Cell +972-56-305-907

gordon.l.simmons@usace.army.mil