No. 04-1719C, No. 05-114C, No. 05-1172C, and No. 06-49C (CONSOLIDATED)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE,

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

# DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

**Filed electronically**

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

November 2, 2007

# TABLE OF CONTENTS

DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE . . . .. . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. The Contract Did Not Contain A Warranty By The Government Immunizing AAB From GOI Laws And Policies Regarding The Admission Of Foreign Workers Into Israel . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. A Contract Provision Stating That A Contractor "May" Take A Certain Action Does Not Constitute A Warranty That Such Action Will Be Feasible Or Produce Desired Results . . . . . 13

B. A Government Warranty Concerning The Conduct Of A Foreign Government Must Be Made In Unmistakable Terms . . . . . . . . 16

C. The Contract Language upon Which AAB Relies Does Not Support The Alleged Warranty . . . . . . . . . . . . . . . . . . . . . . . 17

II. AAB Was Not Prevented From Arranging, Through The Appropriate GOI Office, To Bring TCNs Into Israel For Employment On The Nachshonim Project . . . . . . . . . . . . . . . . . . . . . . . . 24

III. AAB Is Not Entitled To An Excusable Time Extension Under The Default Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## CASES

Amino Brothers Co. v. United States,
178 Ct. Cl. 515, 372 F.2d 485 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Associated Engineers & Contractors, Inc.
ASBCA Nos. 9992-94, 65-2 BCA 5177(1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Banco Nacional de Cuba v. Sabbatino,
376 U.S. 398 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Chris Berg, Inc. v. United States,
182 Ct. Cl. 23, 389 F.2d 401 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Kolar, Inc. v. United States,
227 Ct. Cl. 445, 650 F.2d 256 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Oman-Fischbach Int'l (JV) v. Pirie,
276 F.3d 1380 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16, 17

Oman-Fischbach International,
ASBCA No. 44195, 00-2, B.C.A. ¶ 31,022 (July 12, 2000) . . . . . . . . . . . . . . . . . . . . . 17

W.G. Yates & Sons Const. Co. v. United States,
53 Fed. Cl. 83 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 16

## RULES

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# INDEX TO APPENDIX

PAGE

Solicitation DACA90-01-R-0001 (December 18, 2000), SF-1442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Solicitation DACA90-01-R-0001, Amendment 0003 (February 5, 2001) – excerpts . . . . . . . . . . . . . . . . . . 3

Government Decision No. 2213 (August 16, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Government Decision No. 2215 (July 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Government Decision No. 554 (August 5, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Government Decision No. 2328 (July 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Government Decision No. 208 – excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Press Notice, Prime Minister's Bureau (October 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Closed Skies Procedure, Ministry of the Interior (January 7, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

AAB Minutes of Meeting Held January 2, 2001- excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Project Status Sheet (October 19, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

AAB Minutes of Meeting Held November 28, 2001- excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Deposition of Avie Arenson – excerpts excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1719C, No. 05-114C, No. 05-1172C, |
| | ) | and No. 06-49C |
| THE UNITED STATES, | ) | (CONSOLIDATED) |
| | ) | (Chief Judge Damich) |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF’S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE “THIRD COUNTRY NATIONALS” ISSUE

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant respectfully requests the Court to grant summary judgment dismissing the claims asserted in Count I of plaintiff’s complaint in No. 05-114C, alleging breach of a warranty concerning the employment of of third country nationals (“TCNs”) on the project in question, upon the grounds that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. In support of our motion, we rely upon the pleadings, the following brief, The appendix to this motion, the separately filed proposed findings of uncontroverted fact, and portions of the appendix to plaintiff’s motion for partial summary judgment regarding the TCN issue.[1]

[1] “Def. App.” refers to the appendix to this motion. “Pl. App.” refers to the appendix to plaintiff’s' motion for partial summary judgment regarding the TCN issue. “Pl. Br.” refers to the brief in support of plaintiff’s motion.

DEFENDANT'S BRIEF

Issue Presented

Whether the contract in question contained a warranty that plaintiff, A.A.B Joint Venture ("AAB"), would be able bring into Israel, as necessary, TCNs from countries having diplomatic relations with Israel, and, if so, whether the Government breached the warranty.

Statement Of The Case

These consolidated cases concern a contract between AAB and the United States Army Corps of Engineers ("the Corps"), for the design and construction of a storage and logistics base complex for the Israel Defense Forces ("IDF"). Count I of the complaint in No. 05-114C alleges that the contract contained "a U.S. government warranty that the Joint Venture would be able to utilize, as necessary, third country nationals from countries having diplomatic relations with Israel," and that "[t]his warranty was breached by the decrees, special orders and policies of the Government of Israel which prevented the Joint Venture from utilizing third country nationals . . . .Complaint ¶ 40. The complaint bases the alleged warranty upon the statement in Special Contract Requirement SR-22, that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work." Complaint ¶ 20. AAB Does not allege any act or omission upon the Government's part that prevented AAB from employing TCNs or from bringing TCNs into Israel for the purpose of employment; rather, the conduct alleged to have given rise to a breach of warranty consists entirely of conduct attributed to the Government of Israel ("GOI").

However, the contract made clear – and it would have been obvious in any event – that permission to enter or remain in Israel for employment was under the control of the GOI, not the United States. That the clause permitting the contractor to “arrange, through the appropriate Government of Israel office, to bring into Israel [TCNs] . . . for purposes of employment in carrying out this contract work,” cannot reasonably be construes as a promise by the United States as to the future conduct of the appropriate GOI office. Nothing in the contract stated or implied that the United States Government would or could dictate to the GOI policies and practices concerning entry of foreigners into Israel. The United States cannot be held liable for increased costs resulting from acts by a third-party government, unless the parties contract in unmistakable terms to shift the risk of such costs to the Government. Nothing in the contract at issue here even suggests that the Government agreed to assume the risk concerning difficulties the contractor might encounter in obtaining foreign labor as a result of GOI policies. Indeed, to the extent that the contract addressed the risk associated with meeting labor requirements, it expressly allocated this risk to the contractor.

Further, the GOI had begun to limit the importation of foreign labor even before the solicitation at issue in this case was issued. Therefore, AAB could not reasonably have construed SR-22 as conferring an unfettered right to bring TCNs into Israel. And, despite AAB’s conclusory characterizations of the alleged GOI policies as having the effect of an absolute bar to bringing TCNs into Israel, AAB has offered no competent evidence that such a bar was imposed.

Finally, the primary obstacle to AAB’s ability to import TCN labor for the project in question was not the GOI policy change of which AAB complains, but an obstacle that existed

and of which AAB was aware when it bid on the contract. Through one of its component joint venturers – A. Arenson, Ltd. ("Arenson ") – AAB received visa allocations for the number of workers it claimed to need, but it was not able to utilize these visa allotments because of the failure of that joint venturer to account for TCNs it had previously brought into Israel for other projects. In this and other respects, AAB failed to take all of the steps necessary in order to successfully "arrange, through the appropriate Government of Israel office," to bring TCNs into Israel for employment on this project.

STATEMENT OF FACTS

On December 18, 2000, the Corps, Europe District, issued Solicitation DACA90-01-R-0001, for a "Firm Fixed Price Contract for Design/Build Services required for Construction of the Nachshonim Storage Base, Elad, Israel" ("the Solicitation"). Def. App. 1-2. AAB submitted its proposal and bid for the project on April 9, 2001. Complaint ¶ 5. On June 5, 2001, AAB was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. Complaint ¶ 6.

As AAB correctly asserts, the Solicitation included Special Contract Requirement SR-22, stating that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work." Complaint ¶ 20. SR-22 also set forth various types of information required of the contractor concerning TCNs, and stated that "Contractors shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses or permits." Pl. App. 47. SR-22 also stated:

> The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency. Offerors are advised that the Government of Israel reserves the right to limit access to designated security areas and refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice.

Id.

The contractors rights and obligations with respect to hiring TCNs was also addressed in SR-13 (Compliance with Host Country Rules and Customs),which stated:

* * *

> b. The following items are the sole responsibility of the Contractor to investigate, estimate as to cost, and assume the risk, as normally encountered by Contractors. The Contractor shall be responsible for determining the effect of the following on his own cost performance of the contract and for including sufficient amount in the contract price:
>
> * * *
>
> – Entry and exit visas, residence permits, and residence laws applicable to aliens. This includes any special requirements of the Host Government, including those required by local labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.
>
> * * *
>
> – Arranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor, to receive payments and to remove such funds from the country.
>
> – Operating under local laws, practices, customs and control, and with local unions, in connection with hiring and firing, mandatory wage scales, vacation pay, severance pay, overtime, holiday pay, 7th day of rest, legal notice or pay in lieu thereof for dismissal of employees, slowdown and curtailed schedules during religious holidays, and ratio of local labor employed in comparison to others.

* * *

Pl. App. 40-41.

Solicitation Amendments 3 and 6 contained the Government's answers to various questions posed by offerors. Amendment 3 included the following question and answer:

> 32) Will the COE facilitate obtaining VISAS during the construction program?
>
> No.

Def. App. 5.

The importation of foreign labor into Israel had long been limited by quotas, and, prior to the issuance of the Solicitation, the GOI had begun to tighten these quotas. According to the certified claim that AAB submitted to the contracting officer concerning this matter,

> as a result of Government Resolution Number 188 dated August 22, 1999 the overall quota of foreign labor was reduced to 50,000 from 83,000, effective January 1, 2001. The Ministry of Labor and Welfare ("MOL") implemented Resolution 188 by determining that the maximum annual amount of permits that would be allocated to the construction industry for 2001 would be 26,000 as opposed to 34,000 in 2000. . . .

Pl. App. 229.

Further, prior to the issuance of the Solicitation, the GOI adopted a policy of intensifying enforcement of laws prohibiting foreign workers from remaining in Israel illegally. See, e.g., Government Decision No. 2213 of 16th August 2000, entitled "Economic policy for 2001 - renewal and intensification of action to enforce the law in the foreign workers' sphere." Def. App. 6.

On December 24, 2001, in what AAB characterizes as the "Closed Sky Policy," Pl. Br. 11; Pl. App. 136, the GOI announced in Government Decision No. 1141 that "in 2002, the

maximum number of annual permits for the employment of foreign workers in all industries will be 48,000, of which 45,000 at the most will be in the building and agricultural industries . . . ." Pl. App. 142. Thus, whereas in 1999 the GOI announced drastic decreases in the total foreign worker quota and the quota for the construction industry from 2000 to 2001, the total quota announced in December 2001 for 2002 was only 4 percent less than the 2001 quota announced in 1999, and the construction industry quota announced in December 2001 for 2002 was not explicitly decreased at all from the quota announced in 1999 for 2001.

In Government Decision No. 2215, dated July 11, 2002, the construction industry quota for 2002 was set at was set at 30,000. Def. App. 7. The decision described this as a decrease from 45,000. The latter number had been announced as the construction industry quota for 2002 in Government Decision No. 554, dated August 5, 2001. Def. App. 8. Nevertheless, the quota of 30,000 for 2002 was substantially greater than the construction industry quota of 26,000 that had been announced for 2001 prior to the issuance of the Solicitation, under Government Decision No. 188. Pl. App. 229.

In Government Decision No. 2328, dated July 30, 2002, the Minister of Interior was directed not to grant visas to persons seeking to enter Israel for the purpose of employment, other than foreign experts as defined by Israeli tax regulations. By its terms, however, the decision was not applicable to all non-expert foreign workers. Rather, it was applicable to a person not in Israel on July 31, 2002, unless that person's entry was required in order to replace another foreign worker who had worked in Israel legally and left Israel upon the expiration of his visa. (The same decision also established annual fees and application fees to be paid by employers in connection with obtaining foreign worker visas. ) Def. App. 10. Pursuant to this decision,

therefore, employers could still obtain permits to bring foreign workers into Israel, as long as these workers were brought in to replace departing foreign workers. In subsequent government decisions, the term "closed skies policy" was described as being the policy set forth in Government Decision No. 2328. See, e.g., Def. App. 12.

On October 2, 2002, the Prime Minister's office issued a press release announcing a decision "not to allow the entry of additional foreign workers into Israel." Def. App. 13. This was not, however, an absolute bar to the entry of additional foreign workers into Israel. The press release did not provide any further details concerning the restriction, other than to state: "Those employers with permits to employ foreign workers will not be affected. The Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel." Id. Pursuant to this decision, the Ministry of Interior ("MOI"), issued a "Closed Skies Procedure," effective January 9, 2003, in order "to find a solution for employers who are experiencing a shortage of workers." Def. App. 14, ¶ 2. This issuance outlined procedures for employers to fill their foreign worker allocations with foreign workers already in Israel, and further stated:

> If the Ministry of the Interior is unable to offer an employer foreign workers from Israel, in accordance with his unfilled quota, within 30 days of the day on which his unfilled quota is determined by the Foreign Workers' Unit at Ben Gurion Airport, the Ministry shall consider the possibility of approving the bringing of foreign workers from overseas for such employer, provided that he has fully cooperated with the Ministry in each of the stages.

Def. App. 15-16, ¶ 13.

Meanwhile, in Temporary Order 2001/44, effective January 1, 2002, the GOI required that future contracts for construction and infrastructure work financed by the GOI contain a

clause prohibiting the employment of foreign workers, other than foreign "experts." Pl. App. 145. Although the stated purpose of this order was to enhance employment opportunities for Israeli workers by decreasing the number of foreign workers, id., it also mitigated the effect of the construction industry foreign worker quota upon projects not covered by the order – such as the Nachshonim project – since these projects would not have to compete with GOI-financed projects in seeking permits for foreign workers within the industry-wide quota. Further, in the case of contractors involved in both GOI-financed projects and other projects, foreign workers employed by the contractor for GOI-financed projects reaching completion constituted a pool of potential workers for the contractor's other projects, since these workers could not be employed for the contractor's new GOI-financed projects.

Among such contractors was Arenson. Most of Arenson's work involved public contracts. Pl. App. 169. After the prohibition against the employment of foreign workers on public contracts became effective, Arenson brought foreign workers from some of its public contracts to work on the Nachshonim project. Pl. App. 182-83.

When AAB learned, in or around January 2002, that GOI was going to further limit the importation of foreign workers, it viewed this not as a major threat to its ability to obtain necessary construction workers, but as an opportunity to obtain, in connection with TCN employees already in Israel, the benefit of tax refunds otherwise available only for TCNs brought into Israel specifically for the Nachshonim project. Thus, in the discussion of anticipated TCN restrictions contained in the minutes of a meeting held by AAB on January 6, 2002, no mention was made of any anticipated shortage of workers. Rather, it was observed that "ARENSON has up to 200 TCN workers available for Nachshonim on short notice," and that "[i]f restrictions on TCN labor are implemented, we could use such ruling as leverage to obtain a

waiver from COE/MOD for reimbursement of income tax for TCN's already in the country." Def. App. 19.[2]

During this period, AAB's principal reason for importing TCN's was not because of a dearth of available TCNs in the country, but because, at that time, this was a prerequisite to obtaining desired tax refunds. The discussion of TCN labor contained in the minutes of a meeting held by AAB on November 28, 2001, states:

> Block Visa and Tax Reimbursement for TCN Labor discussed in detail. Highlights of discussion:
>
> JV will use Arenson allotment and will not pursue separate Block Visa in the name of the JV to import Labor.
>
> Agreed to use the few skilled/trained TCN's and forego reimbursement of taxes, but to bring in majority of TCN's to get taxes reimbursed.
>
> * * *

Def. App. 23.

In or around February 2002, the MOD authorized temporary relief of the TCN tax reimbursement issue for the Nachshonim project. Pl. App. 201; Def. App. 29-30.

In September 2001, Arenson applied for a TCN visa allotment for the Nachshonim project. Pl. App. 138. Although AAB complains that action on this application was delayed by strikes at the Ministry of Labor, ("MOL"), it acknowledges that by July 2002, the MOL "released its block visas for 2002, which included 784 visas for the Arenson Company, 539 of

---

[2] Even before the restrictions of which AAB complains were announced, AAB began employing for the Nachshonim project TCNs who were already in Israel for other Arenson projects, and AAB was focusing upon obtaining income tax reimbursement for these TCNs. Thus, a Project Status Sheet dated October 19, 2001, notes that "[t]he contractor has TCNs that were transferred from other projects within Israel and is requesting tax exempt status." Def. App. 21.

which were specific for use in the Nachshonim Project." Pl. App. 138.[3] This was more than the number AAB stated in its proposal that would be needed at peak production. Pl. Br. 9; Pl. App. 37. For 2003, Arenson was allocated at least 523 visas to be utilized for the Nachshonim project. Pl. App. 250. (AAB does not allege any inability to obtain foreign workers for the project after 2003. See Complaint ¶¶ 34-35.)

The MOI, however, found that several hundred foreign workers that Arenson previously had brought into Israel for employment on other projects had left their employment but remained in the country. As summarized by AAB, the "deserter policy" followed by the MOI and MOL was "to prevent an employer whose FWs [foreign workers] 'deserted' him but did not leave Israel, from employing another FW in his stead." Pl. App. 242. Under this policy, the MOI would not issue visas for Arenson to bring new foreign workers into Israel without an adequate accounting for these deserters. Pl. App. 75, 244.

Arenson had begun receiving complaints from the GOI about deserters at least as early as the beginning of 2001. Pl. App. 166. And, according to a March 25, 2003 letter submitted by AAB's attorneys to various GOI ministries, Arenson's records indicated that, as of January 1, 2002, "Arenson had approximately 498 employees registered in its name, working on other projects, who had deserted between April 1, 1999 and January 1, 2002." Pl. App. 75, ¶ 23 (emphasis added). According to the same letter, in 2002, when Arenson received its visa

---

[3] The latter figure is the one given by Avie Arenson in his unsigned and undated declaration in support of AAB's motion. (Because it is unsigned and undated, the declaration should not be considered by the Court except to the extent that statements therein may constitute admissions on AAB's part.) This figure is also given in a November 11, 2002 letter from AAB to the Government. Pl. App. 54. Elsewhere, however, AAB has stated the 2002 allocation for Nachshonim to have been 523. Pl. App. 75, 244.

allocation for Nachshonim, it had 485 foreign workers actually employed at its construction sites, while, according to MOI records, Arenson had 506 registered deserters. Id., ¶ 24.[4] Thus, the total number of foreign workers who were employed by Arenson and had not left Israel as of July 2002 was 991 – well in excess of Arenson's total visa allocation for 2002. For this reason, Arenson could not bring in new foreign workers in 2002 under the 539-visa allocation it had received specifically for the Nachshonim Project. Pl. App. 76, ¶ 26.[5] And, after 2002, Arenson's deserter problem remained an obstacle to AAB's ability to bring new TCNs into the country. Pl. App. 250. Even according to Arenson, if Arenson had proved that it had exhausted all efforts to hire foreign workers already in Israel, and had resolved the problem of deserters, it probably would have been able to utilize its allocation of 539 visas for the Nachshonim project. Def. App. 26-28.

None of these restrictions, ho excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

wever, affected AAB's ability to hire Israeli construction workers. AAB was paying its TCNs a monthly salary higher than the average not only for TCNs, but also for Israeli construction workers. Pl. App. 245. And, according to Avie Arenson, there is "no difference in my company

---

[4] At various times, AAB has offered different figures concerning the number of its on-site employees and deserters. Thus, in an attachment to a July 24, 2003 letter to the Government requesting a time extension and equitable adjustment, AAB stated that it had 511 foreign workers actually employed at its construction sites, and that, according to MOI records, Arenson had 399 deserters. Pl. App. 245.

[5] It should be noted that, since 539 of the 784 visas allocated to Arenson for 2002 were specifically for the Nachshonim Project, only the balance of 245 should have been utilized for Arenson's other projects. If, as AAB has conceded, Arenson "had 485 foreign workers actually employed at its construction sites," Pl. App. 75, then at least 240 of these foreign workers should have employed at the Nachshonim site.

in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs." Def. App. 31.

## ARGUMENT

### I. The Contract Did Not Contain A Warranty By The Government Immunizing AAB From GOI Laws And Policies Regarding The Admission Of Foreign Workers Into Israel

#### A. A Contract Provision Stating That A Contractor "May" Take A Certain Action Does Not Constitute A Warranty That Such Action Will Be Feasible Or Produce Desired Results

A plaintiff asserting that the Government is liable for damages resulting from the actions of a third party must "establish that the [Government] provided a warranty either explicitly or implicitly by showing that: (1) the Government assured the plaintiff of the existence of a fact; (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact itself; and (3) the Government's assurance of the fact proved untrue." Oman-Fischbach Int'l (JV) v. Pirie, 276 F.3d 1380, 1384 (Fed. Cir. 2002) (citing Kolar, Inc. v. United States, 227 Ct. Cl. 445, 650 F.2d 256 (1981) (internal quotation marks omitted). An essential element of a warranty is the assurance by one party to another of the existence of a fact on which the other party may reasonably rely. Oman-Fischbach, 276 F.3d at 1383.

A contract provision stating that the contractor "may" take a certain action does not, without more, constitute an assurance that if the contractor attempts to take the action in question it will in fact succeed or obtain the desired results. See, e.g., Kolar, 650 F.2d at 259; Chris Berg, Inc. v. United States, 182 Ct. Cl. 23, 28-30, 389 F.2d 401, 404-06 (1968); Amino Brothers Co. v. United States, 178 Ct. Cl. 515, 372 F.2d 485, 491 (1967); W.G. Yates & Sons Const. Co. v. United States, 53 Fed. Cl. 83, 85 (2002).

In Kolar, the plaintiff asserted that the Government had warranted that it would be safe to use cutting torches to prepare the material sold under the contract. 650 F.2d 256, 258 (Ct. Cl. 1981). Plaintiff sued the Government alleging a breach of that warranty after one of its employees was killed when a bomb casing exploded while he was using a torch to cut it. Id. The plaintiff based its assertion of the existence of a warranty on a clause in the contract stating that "Purchaser may also bring to work site equipment to prepare the material for ease of loading and transporting such as cutting torches and a metal baler." Id. at 259. The court rejecting the claim, observing explaining that the provision on which plaintiff relied "[did] not guarantee or assure plaintiff that cutting torches [could] be safely used on practice bombs or on any of the other scrap metal involved herein." Id. Instead, the court read that provision as giving the plaintiff "permission to use cutting torches to prepare material for ease of loading." Id. At most, the court stated, the provision could be read as stating that "[t]he purchaser may use cutting torches." Id. Thus, the court determined that "this permissive use put the risk of determining when the use of cutting torches would be appropriate on the plaintiff." Id. Ultimately, the court concluded that, particularly in light of other provisions of the contract requiring the plaintiff to "ascertain all facts as to the potential dangers," the provision of the contract permitting the plaintiff to utilize cutting torches could not be considered a warranty.

In Chris Berg, the court held that, in te absence of a Government Furnished Property clause, a contract provision stating that"[t]he existing towers and tramway may be used in erecting the new towers and tramway" did not give rise to a warranty as to the suitability of the existing tramway for use, and that "[t]he use of the word 'may' has been held not to be a representation by the Government of the nature or quality of the property furnished." 389 F.2d

at 405, citing Associated Engineers & Contractors, Inc., ASBCA Nos. 9992-94, 65-2 BCA 5177 (1965).

In Amino Brothers, the court held that there was no breach of warranty where the Government released water from a dam destroying a low water crossing that the plaintiff used to transfer excavated materials across a river, explaining:

> Plaintiff argues that the provision in the contract stating that the plaintiff 'may construct for his own use * * * low water crossings * * *' in accordance with certain specifications amounted to an implied promise or guarantee on the part of the defendant that the low-water crossing if constructed would always be there for the use of the plaintiff, and that if destroyed, the defendant would pay the consequent damages for such destruction. We do not so interpret the contract. The contractor had a choice of building a low-water crossing or a high-water crossing, or of devising some means of transferring the excavated material across the river other than by the use of a low-water crossing. We find nothing in the contract that could be said to be an express or implied promise, on the part of the defendant that it would not perform any sovereign act, such as the release of the water from the Kanopolis Dam, which would preclude use by the plaintiff of the low-water crossing or hinder it otherwise in the performance of its contract.

372 F.2d at 49.

In Yates, the solicitation issued by the Government suggested three manufacturers from whom the contractor could purchase motorized cable reels necessary for the construction project in question. The contractor made plans to purchase motorized cable reels from one of these manufacturers, and based its bid upon the price quoted by that manufacturer. However, well into the performance of the contract, the contractor learned that the manufacturer no longer produced the kind of cable reel necessary to complete the project, and the contractor was forced to purchase the reels elsewhere and at substantially greater cost. The Court rejected the argument that the solicitation's identification of that manufacturer as a source of the necessary

reels constituted a warranty: "Defendant suggested a manufacturer that made a reel it believed would fit the specifications. It would have accepted a substitute product, an 'approved equal.'" 53 Fed. Cl. at 85. Thus, the Court stated, "[t]he Government is not responsible for any representations that [the manufacturer's distributor might have made to [plaintiff] about the suitability of a particular reel or its availability or price." Id. The mere fact that the contract expressly permitted the use of a particular manufacturer's reels was thus insufficient to imply a warranty that the specified manufacturer's reels would be available.

B. A Government Warranty Concerning The Conduct Of A Foreign Government Must Be Made In Unmistakable Terms

The Federal Circuit has shown particular reluctance to read a warranty into a contract where the warranty would make the Government responsible for the acts of a third party, especially where the third party is a foreign government. Thus, in Oman-Fischbach, the Federal Circuit affirmed an Armed Services Board of Contract Appeals decision holding held that the Government was not liable for damages to the contractor resulting from actions taken by the Portuguese Armed Forces blocking the most convenient access route to a disposal site. Having failed to demonstrate an express warranty of access to the disposal site, the plaintiff asserted that "the [Government] breached the implied warranty of access to the disposal site at runway 29 when [plaintiff] was denied access through the Lajes Base by the Portuguese Armed Forces." 276 F.3d at 1385. The Federal Circuit, however, noted that "[i]t is, of course, settled that absent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties." Id. Thus, the court reasoned, "[u]nless the parties in unmistakable terms agreed to shift the risk of increased costs due to acts by the Portuguese military, no liability on the part of the [Government] attaches from such acts."

Id. In the same case, the board stated the rule even more categorically: "Unless the parties contract in unmistakable terms to shift the risk of increased costs due to acts by a third-party government, no liability on the part of the Government attaches from such acts." Oman-Fischbach International, ASBCA No. 44195, 00-2 B.C.A. ¶ 31,022 (July 12, 2000) (emphasis added).

C. The Contract Language upon Which AAB Relies Does Not Support The Alleged Warranty

The contract language upon which AAB relies does not support the alleged warranty, and the surrounding circumstances cited by AAB, to the extent that they are relevant, confirm that no warranty was intended. The cases cited by AAB in support of the claimed warranty – some of which are discussed in Oman-Fischbach – are inapplicable, for the reasons stated in Oman-Fischbach. In those cases, the courts or boards involved found a warranty based upon the specific language of the contracts involved and the specific facts of those cases. None of these cases justifies reading a warranty into the precatory language upon which AAB relies, especially a warranty which would make the Government liable for the consequences of another country's policies regarding the admission of foreign workers into that country.

The provision upon which AAB relies as the source of the alleged warranty is Special Contract Requirement SR-22, which states: "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work." Pl. App. 46-47; see Complaint ¶ 20; Pl. Br. 30. In an apparent effort to address the Federal Circuit's holding in Oman-Fischbach without actually citing it, AAB asserts that "[t]his is exactly the sort of 'unmistakable language' that the courts and boards have required in order to

find the existence of a contractual warranty." Pl. Br. 30. Yet, on its face, this language does nothing more than permit the contractor to request authorization from the GOI to bring foreign workers into Israel to work on the Nachshonim project.[6] This language cannot be construed as a promise or representation as to the decisions the GOI would make in response to such requests, or as to the policies that the GOI might adopt in the future with respect to the admission of foreign workers into Israel. As AAB was fully aware, this was a matter plainly within the sovereign authority of the GOI, and not a matter within the control of the United States or about which the United States could make promises.

AAB argues that its interpretation of SR-22 "is bolstered by an implied representation contained in the Tax Clause, SR-14 . . . ." Pl. Br. 31. The Tax Clause, however, adds nothing to AAB's interpretation. The clause reflects the fact that, under the Letter of Acceptance ("LOA") signed by the GOI and the United States Government in February 2000 pursuant to the Wye River Accords, foreign workers brought into Israel for projects covered by the LOA (such as the Nachshonim project) were exempt from income and employment taxes. Pl. App. 19. The Contract's Tax Clause describes this tax exemption, and contains reporting and other provisions related to the implementation of the exemption where applicable – i.e., in connection with TCNs who might be brought into Israel for the purpose of employment on the Nachshonim project. Pl. Br. 42-45. The need for such provisions would have been the same whether the employment of such TCNs was viewed as a certainty or as a mere possibility. The Tax Clause, therefore, demonstrates nothing more than the fact that the possibility of hiring such TCNs was within the

[6] The same provision also states: "The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency." Pl. App. 47.

contemplation of the parties. The clause adds no weight, however, to the notion that the Government guaranteed AAB's ability to bring TCNs into Israel.

AAB also seeks to buttress its interpretation of SR-22 by pointing to corresponding language contained in the LOA. AAB notes that the LOA "specifically stated 'The USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA' . . . ." Pl. Br. 31. The difference between this language and the language in the Contract, however, proves AAB's interpretation wrong. The LOA stated that "[t]he USG and its contractors may bring into Israel nationals of the United States and third countries . . . ." (Emphasis added.) The Contract stated that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries . . . ." (Emphasis added.)[7] This difference in wording reflects the difference between the promises each government was in a position to make. The GOI was a party to the LOA, and could make promises to the United States in the LOA concerning the admission of foreign workers into Israel.[8] The United States Government, however, could not make such promises in its Solicitation. The Government thus made clear in the Solicitation that authorization to bring

---

[7] AAB also cites the notice of the Solicitation published in the Commerce Business Daily, which utilizes the term "may bring into Israel." However, the brief synopsis of the Solicitation contained in the notice does not trump the terms of the Solicitation themselves.

[8] For this reason, AAB's extensive reliance upon the deposition testimony of John Jones – a Government official who participated in the negotiation of the LOA – is misplaced. This testimony is offered to prove the intent of the parties to the LOA with respect to the referenced provision in the LOA. The question here is not what assurance the United States obtained from Israel in the LOA, but what assurance the United States gave AAB in the Contract. The cited testimony did not pertain to the Contract; Mr. Jones had never even reviewed the contact. Pl. App. 91.

foreign workers into Israel would ultimately be up to "the appropriate Government of Israel office." The Government made no promises or representations canceling any conditions, restrictions, or limitations that the appropriate Government of Israel office might impose.

AAB further argues that "based on these surrounding circumstances, it is obvious that the Corps of Engineers had actual knowledge of the Joint Venture's reasonable interpretation, and indeed had the same interpretation, prior to the execution of the contract." Pl. Br. 32. This conclusion, however, is not obvious at all; it is supported by no evidence and is wrong. Likewise, there is no basis for AAB's assertion that "consistent interpretation by the government and the Joint Venture prior to when the dispute arose, demonstrates that both parties contemporaneously interpreted the Contract as promising the Joint Venture freedom to use nationals of third countries having diplomatic relations with Israel." Id. AAB points to no circumstances indicating that the Government interpreted the Solicitation or he contract as containing a Government promise, representation, or warranty concerning future GOI actions or policies affecting the admission of foreign workers into Israel. Nor does AAB point to circumstances indicating that the Government knew, prior to award, that AAB interpreted the Contract in this manner. At most, AAB has demonstrated the Government's awareness that AAB was likely to seek GOI permission to bring a substantial number of TCNs into Israel to work on the Nachshonim project, and that AAB's proposal was based upon an optimistic view of how the GOI would respond.

Finally, the Contract expressly stated, in Special Contract Requirement SR-13, that it was "the sole responsibility of the Contractor to investigate, estimate as to cost, and assume the risk" concerning matters such as

> Entry and exit visas, residence permits, and residence laws applicable to aliens . . . includ[ing] any special requirements of the Host Government . . . which the Contractor may have to fulfill before an application for a regular block of visas will be accepted . . . , [a]rranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor . . . , [o]perating under local laws, practice, customs and controls . . . , in connection with . . . ratio of local labor employed in comparison to others.

Pl. App. 40-41. And, the Government further disclaimed responsibility for effectuating the entry of TCNs into Israel by expressly advising bidders, in Amendment 3 to the Solicitation, that the Government would not facilitate obtaining visas. Def. App. 5.

AAB states that "[t]he scope of the risks allocated to the Contractor in SR-13 is modified and limited by the phrase 'as normally encountered by Contractors.'" Pl. Br. 33. This modifying phrase does appear in SR-13, but AAB reads far too much into it. Based upon this phrase, AAB arbitrarily construes SR-13 to be extremely narrow. AAB would limit the contractor's risk under this provision to cases such as where the contractor "sent recruiters to, say, Turkey or Romania to find skilled concrete workers and none had been found who were willing to go to Israel," or matters such as "the ability of prospective workers to pass medical exams, required as part of the documentation for visas by the Ministry of Interior, as well as the costs thereof . . . ." Pl. Br. 33.[9] On the other hand, AAB concedes that "[a]ny costs or legal obstacles of the type listed in SR-13 which could have reasonably been foreseen and addressed by the Contractor, based on Israeli

[9] In a similar vein, AAB argues that "Contractual risks are normally vested in the party best able to control them." Pl. Br. 33. We need not quarrel with this observation as a general proposition, because it has no application here. The Government was not "best able to control" GOI policy concerning the entry of foreign workers into Israel. Indeed, meeting the prerequisites for obtaining GOI permission to bring such workers into Israel – such as accounting for deserters or demonstrating an inability to hire sufficient foreign workers from within Israel – were within AAB's control, not the Government's.

law and policy as they existed on the date on which the contract was entered into, should properly be vested in the Contractor." Pl. Br. 34.

AAB's argument is flawed, but, even if it is taken to be correct, it falls short of accomplishing its purpose. Risks "normally encountered by Contractors" include the risk of events of the kind that are normally encountered by contractors, including events that are not themselves specifically foreseeable. Government regulation of the entry of foreign workers, including the tightening of restrictions and the imposition of preconditions to avoid circumvention of restrictions by foreign workers or their employers, have long been common in Israel, the United States, and other countries. The risks created by such regulation are normally encountered by contractors, even if contractors cannot always foresee te specific restrictions that might be imposed. And, the kinds of obstacles that AAB in fact confronted in its effort to bring TCNs into Israel could have reasonably been foreseen and addressed by AAB based on Israeli law and policy as they existed on the date on which the Contract was entered into, even if some of these obstacles involved changes in Israeli law and policy.

First, the importation of foreign labor into Israel had long been limited by quotas, and, prior to the issuance of the Solicitation, the GOI had begun to tighten these quotas severely. Pl. App. 229 ("as a result of Government Resolution Number 188 dated August 22, 1999 the overall quota of foreign labor was reduced to 50,000 from 83,000, effective January 1, 2001"). AAB should have foreseen, when it submitted its proposal, that the GOI might tighten these quotas even further. [10] Second, prior to the submission of AAB's proposal, the GOI adopted a policy of

[10] The construction industry in Israel considered the foreign worker quotas overly restrictive and a source of difficulty for contractors at least as early as 1999, according to the deposition testimony of Yehuda Segev, the former Director General of the Israel Contractors Association.
(continued...)

intensifying enforcement of laws prohibiting foreign workers from remaining in Israel illegally. See, e.g., Government Decision No. 2213, Def. App. 6. Also prior to the submission of AAB's proposal, foreign workers who had been brought into Israel by Arenson (the joint venturer authorized to import foreign workers) had deserted their employment, and were – at least according to the MOI – remaining in Israel illegally. Pl. App. 75, 166. AAB should have foreseen, when it submitted its proposal, that the MOI might not permit Arenson to bring new TCNs into Israel for the Nachshonim project without a satisfactory accounting for the foreign workers it had already brought into Israel for earlier projects. Third, given the various measures taken by the GOI to reduce the number of foreign workers in Israel as well as the number of foreign nationals who had deserted their previous employment and were remaining in Israel illegally, AAB should have foreseen, when it submitted its proposal, that the GOI might require employers to hire foreign nationals from within Israel before allowing them to bring in new foreign workers from abroad.

Under these circumstances, the obstacles that AAB confronted in its effort to bring TCNs into Israel were foreseeable, and fall well within the zone of risks allocated to the contractor

---

[10](...continued)
Pl. App. 129-130. This deposition was taken by plaintiff's counsel over our objection, and is relied upon by AAB in support of its motion. We renew our objection here, for the reasons we stated on the record at the commencement of the deposition. See Pl. App. 100-101. We also note that the testimony of Mr. Segev upon which AAB relies consists almost entirely of generalities far too vague to support any specific findings. Further, AAB provides no evidence as to the source of the information to which Mr. Segev testified, and as to which portions of his testimony, if any, are based upon personal knowledge. From the face of the cited testimony, it is apparent that he testified as the former head of a contractors' trade association and as a lobbying, and that he was largely relying upon what the association's members or others told him at various times. The testimony is thus inadmissible hearsay. However, if the Court considers any of the portions of the Segev deposition cited by AAB, it should also consider the portion of that deposition that we cite here.

under SR-13. Thus, the terms of SR-13 leave no room to argue that SR-22 provided the contractor a warranty against such risks.

II. AAB Was Not Prevented From Arranging, Through The Appropriate GOI Office, To Bring TCNs Into Israel For Employment On The Nachshonim Project

AAB argument is flawed not only with respect to the existence of the alleged warranty, but also with respect to the events portrayed as constituting a breach of the alleged warranty. According to AAB, these events were "principally the 'closed sky policy' combined with the deserters policy and the implementation of these policies by the Ministry of Interior . . . ." Pl. Br. 35. The referenced "closed sky policy," is vaguely and inconsistently described by AAB, and AAB fails to provide competent evidence establishing what that policy actually was. And, the referenced deserters policy, even as described by AAB, is simply not inconsistent with the right stated in the contract language that allegedly contains the asserted warranty – a right to "arrange, through the appropriate [GOI] office, to bring into Israel . . . . nationals of third countries . . . ." Pl. App. 46-47; see Complaint ¶ 20; Pl. Br. 30.

AAB cites various government resolutions and other official documents issued by the GOI concerning the referenced "closed sky policy," but none of these documents mention or describe any such policy. AAB also cites testimony of its own principals or employees and other persons concerning their understanding of this policy, but they cite no testimony from GOI officials. And, AAB's various characterizations of this policy, coupled with the evidence cited in connection with this description, paint a vague, inconsistent, and unreliable picture of the alleged policy.

Thus, the first reference to a "closed sky policy" in AAB's brief states that the policy is described in a letter that "the Corps of Engineers' Israel Program Office drafted in July 2002 for

the U.S. Embassy to send to the Government of Israel." Pl. Br. 2. The language that AAB quotes from this unsigned, anonymous draft letter makes reference to industry-wide quotas on TCNs. The cited draft plainly does not constitute competent evidence of what GOI policies were, but AAB's reference to the draft letter suggests that the "closed sky policy" to which they refer was, essentially, the quotas governing the entry of foreign construction workers into Israel.

In a more detailed discussion of the alleged policy, AAB states:

> On December 24, 2001, six months after the June 19, 2001 Notice to Proceed on the Nachshonim Project, the GOI issued Decision No. 1141 (Att-A to Ex. 5, Arenson Affidavit), which came to be known as the "Closed Sky Policy." Although the Decision itself does not by its terms ban all new TCNs, on October 3, 2002, the then Prime Minister of Israel, Ariel Sharon, announced that the Government was implementing a complete ban on the admission of foreign workers. (Keeney Affidavit, Ex. 1 at ¶ 14, See also Att-C to Ex. 5, Arenson Affidavit).

Pl. Br. 11. This statement confirms that what AAB means by the term "closed sky policy" is the quota reduction and related provisions contained in Decision No. 1141, and not a ban on all new TCNs. AAB also suggests that there was a de facto ban of some sort in the interim, but offers no evidence indicating that any such ban was imposed prior to the referenced October 3, 2002.[11]

AAB fails, however, to offer competent evidence even as to the referenced October 3, 2002 Prime Minister's announcement. AAB does not provide the text of the announcement, relying, instead, upon a newspaper article discussing item paraphrasing the announcement. Pl.

[11] There was, in fact, a partial ban imposed pursuant to Government Decision No. 2328, dated July 30, 2002, but this ban did not apply to foreign workers required in order to replace other foreign workers who had left Israel upon the expiration of their visas. Def. App. 10. Thus, to the extent that foreign workers previously brought into Israel by Arenson properly left Israel upon the expiration of their visas, this decision allowed Arenson to bring the same number of other foreign workers into Israel for the Nachshonim project, within the visa allocation Arenson had received for this project.

App. 146. In fact, the press release issued by the Prime Minister's office to announce the decision in question did state that it "was decided not to allow the entry of additional foreign workers into Israel," but also stated that "[t]hose employers with permits to employ foreign workers will not be affected. The Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel." Def. App. 13. The latter statement is the only comment or explanation that the press release provides concerning the scope and effect of the decision "not to allow the entry of additional foreign workers into Israel." However, pursuant to this decision, the MOI issued a "Closed Skies Procedure," effective January 9, 2003, in order "to find a solution for employers who are experiencing a shortage of workers." Def. App. 14, ¶ 2. This issuance outlined procedures for employers to fill their foreign worker allocations with foreign workers already in Israel, and further stated:

> If the Ministry of the Interior is unable to offer an employer foreign workers from Israel, in accordance with his unfilled quota, within 30 days of the day on which his unfilled quota is determined by the Foreign Workers' Unit at Ben Gurion Airport, the Ministry shall consider the possibility of approving the bringing of foreign workers from overseas for such employer, provided that he has fully cooperated with the Ministry in each of the stages.

Def. App. 15-16, ¶ 13.

Thus, assuming that the "closed sky policy" of which AAB complains is the policy announced by the Prime Minister's office in October 2002, this policy was not an absolute bar to the entry of additional foreign workers into Israel. Pursuant to implementing procedures issued by MOI, contractors such as AAB were required to meet their needs for foreign workers first by hiring foreign workers already in Israel, who were to be made available by the MOI. If the MOI

could not meet the contractor's need in that manner, the possibility of bringing foreign workers from abroad remained open.

AAB has not demonstrated that it has been foreclosed from arranging to bring TCNs into Israel pursuant to these procedures. Nor has AAB demonstrated that it has been foreclosed from accounting for the deserters attributed by the MOI to Arenson, and thus eliminating this obstacle to utilizing the full number of TCN visas allocated to Arenson for the Nachshonim project. Nor does AAB contend that the number of visas allocated to Arenson for this project was less than what AAB required. In fact, this number was more than the number AAB stated in its proposal that would be needed at peak production. Pl. Br. 9; Pl. App. 37, 138, 250.[12] Thus, AAB has failed to demonstrate that it was denied the opportunity to "arrange, through the appropriate [GOI] office, to bring into Israel . . . nationals of third countries . . . ." Pl. App. 46-47. At most, it has demonstrated that, in its efforts to make such arrangements, it failed to meet the GOI's prerequisites, including, in particular, accounting for the foreign workers who were previously

[12] AAB describes various communications from AAB to the Corps, describing difficulties in obtaining foreign workers, and argues that "[t]he foregoing unchallenged JV reports demonstrate, conclusively, that the Corps of Engineers was aware throughout the duration of the Project that the Contractor was being impacted by a lack of foreign workers." Pl. Br. 19. However, the fact that the Government accepted AAB's assertions in this regard and did not contemporaneously challenge them does not prove that the assertions were true. Likewise, the fact that upon occasion Corps officials conveyed AAB's version of the problem to other officials within the governments of Israel and the United States does not constitute an admission that this version of the problem was accurate. The content and context of the communications cited by AAB in this regard indicate that Corps officials were simply attempting to ameliorate the problem as it was described by AAB, in the interest of progress on the project. AAB points to no evidence that Corps officials possessed independent knowledge confirming the truth of the contractor's assertions concerning this matter.

brought into Israel by Arenson but who, according to MOI records, deserted Arenson's employment and remained in Israel illegally.[13]

III. AAB Is Not Entitled To An Excusable Time Extension Under The Default Clause

AAB argues, in the alternative, it "is entitled to an excusable non-compensable time extension, pursuant to the Default clause. Under FAR 52.249-10 the Joint Venture is entitled to an excusable time extension for events that caused delay which was unforeseeable and beyond the contractor's control and without its fault or negligence." Pl. Br. 36. As we have demonstrated, however, the obstacles that AAB confronted in its effort to bring TCNs into Israel were foreseeable, and were within the zone of risks allocated to the contractor under SR-13. For the same reason, AAB cannot characterize the delay as an excusable delay under the Default clause upon the theory that the delay was caused by "acts of the Government in either its sovereign or contractual capacity . . . ." Pl. Br. 36, quoting FAR 52.249-10. To characterize the

[13] AAB describes various administrative and legal proceedings that AAB and/or Arenson commenced in various Israeli tribunals, to challenge the policies of which it complains or to circumvent them. For example, AAB describes efforts to have Arenson's foreign worker visa allocation transferred to AAB itself, so that Arenson's deserters would not be an obstacle to the utilization of the allocation. (As AAB acknowledges, the request for such a transfer was denied upon the ground that "the transfer request amounted to an attempt to circumvent the Ministry of Interior's rules." Pl. Br. 16.) AAB contends that Israeli agency responses to the various requests and petitions challenging these policies, as well as administrative findings such as the MOI's calculation of the number of deserters chargeable to Arenson, were wrong. We do not concede that these decisions and findings were wrong, but whether or not they were wrong is irrelevant. The merits of these administrative decisions and findings are not before this Court. This case is not a suit for judicial review of administrative actions on the part of Israeli agencies or for review of the decisions of Israeli tribunals, and it is plainly not the role of this Court to conduct such review. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401(1964) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory").

GOI's actions in response to AAB's efforts to bring TCN workers into Israel as the kind of "acts of the Government " within the meaning of this clause would eviscerate the allocation of risks set forth in SR-13. After all, any action on a request for an entry visa could be termed an act of the government of the country whose visa is requested.

Nor were these obstacles in question beyond AAB's control. The prerequisites for being permitted to bring foreign workers into Israel under the MOI's January 2003 "Closed Skies Procedure" and consistent with the deserter policy involved actions the employer was required to take. AAB failed to satisfy these prerequisites.

Finally, none of the actions and events of which AAB complains in themselves prevented AAB from performing on schedule. Even if AAB's account of all of these actions and events are taken as true, they prevented AAB only from bringing foreign workers into Israel to perform the work. They did not affected AAB's ability to hire foreign workers already in Israel, or to hire Israeli construction workers. Especially when one considers the fact that AAB was paying its TCNs a monthly salary higher than the average for Israeli construction workers, Pl. App. 245, and the lack of any difference in terms of quality or speed or cost between the work of Israeli construction workers and foreign workers, Def. App. 31, the delay that AAB wishes to have excused based upon TCN restrictions cannot be deemed to have resulted from events beyond AAB's control.

## CONCLUSION

For the foregoing reasons, AAB's motion for summary judgment as to liability should be denied, and summary judgment should be entered in favor of the Government, dismissing AAB's claims concerning TCN labor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

**s/Jeanne E. Davidson**
JEANNE E. DAVIDSON
Director

**Filed electronically**

**s/Shalom Brilliant**
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

November 2, 2007