No. 04-1719C, No. 05-114C, No. 05-1172C, and No. 06-49C (CONSOLIDATED)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE,

Plaintiff,

v.

THE UNITED STATES,

Defendant

---

# APPENDIX TO DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE

---

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

**Filed electronically**

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

November 2, 2007

# INDEX TO APPENDIX

PAGE

Solicitation DACA90-01-R-0001 (December 18, 2000), SF-1442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Solicitation DACA90-01-R-0001, Amendment 0003 (February 5, 2001) – excerpts . . . . . . . . . . . . . . . . . . 3

Government Decision No. 2213 (August 16, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Government Decision No. 2215 (July 11, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Government Decision No. 554 (August 5, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Government Decision No. 2328 (July 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Government Decision No. 208 – excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Press Notice, Prime Minister's Bureau (October 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Closed Skies Procedure, Ministry of the Interior (January 7, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

AAB Minutes of Meeting Held January 2, 2001- excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Project Status Sheet (October 19, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

AAB Minutes of Meeting Held November 28, 2001- excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Deposition of Avie Arenson – excerpts excerpt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

| SOLICITATION, OFFER, AND AWARD (Construction, Alteration, or Repair) | 1. SOLICITATION NO. DACA90-01-R-0001 | 2. TYPE OF SOLICITATION ☐ SEALED BID (IFB) ☒ NEGOTIATED (RFP) | 3. DATE ISSUED DEC 18 00 | PAGE OF PA |
|---|---|---|---|---|

IMPORTANT – The "offer" section on the reverse must be fully completed by offeror.

| 4. CONTRACT NO. | 5. REQUISITION/PURCHASE REQUEST NO. W2SD06-0002-0001 | 6. PROJECT NO. |
|---|---|---|

| 7. ISSUED BY CODE CT | 8. ADDRESS OFFER TO CT |
|---|---|
| US ARMY ENGINEER DISTRICT - EUROPE<br>CONTRACTING DIVISION (CENAU-CT)<br>KONRAD ADENAUER RING 39<br>65187 WIESBADEN GERMANY | US ARMY ENGINEER DISTRICT - EUROPE<br>CONTRACTING DIVISION (CENAU-CT)<br>KONRAD ADENAUER RING 39<br>65187 WIESBADEN GERMANY |

| 9. FOR INFORMATION CALL: | A. NAME Ann Gunzel C53 | B. TELEPHONE NO. (Include area code) (NO COLLECT CALLS) 0611-816-2624 |
|---|---|---|

**SOLICITATION**

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder".

10. THE GOVERNMENT REQUIRES PERFORMANCE OF THE WORK DESCRIBED IN THESE DOCUMENTS (Title, identifying no., date):

Firm Fixed Price Contract for Design/Build Services required for Construction of the Nachshonim Storage Base, Elad, Israel. Solicitation is limited to U.S. firms, Israeli firms or U.S./Israeli Joint Ventures.

Package Includes: DD FORM 1707
SF 1442
Section 00010 (Bid Schedule)
Section 00100 through Section 00800
Special Contract Requirements

Attachments: Section 00100: Offeror Questionnaires (Attachment A)
Section 00600: Security Approval Forms (Attachment A)
Sample Bank Letter of Guaranty (Attachment B)

11. The Contractor shall begin performance within 1 calendar days and complete it within 1 calendar days after receivi
☐ award, ☒ notice to proceed. This performance period is ☒ mandatory, ☐ negotiable. (See ________.)

| 12A. THE CONTRACTOR MUST FURNISH ANY REQUIRED PERFORMANCE AND PAYMENT BONDS? (If "YES," indicate within how many calendar days after award in Item 12B.) ☒ YES ☐ NO | 12B. CALENDAR DAYS 015 |
|---|---|

13. ADDITIONAL SOLICITATION REQUIREMENTS:

A. Sealed offers in original and 3 copies to perform the work required are due at the place specified in Item 8 by 1400 (hour) local time FEB 16 01 (date). If this is a sealed bid solicitation, offers must be publicly opened at that time. Sealed envelopes containing offers shall be marked to show the offeror's name and address, the solicitation number, and the date and time offers are due.

B. An offer guarantee ☒ is, ☐ is not required.

C. All offers are subject to the (1) work requirements, and (2) other provisions and clauses incorporated in the solicitation in full text or by reference.

D. Offers providing less than 120 calendar days for Government acceptance after the date offers are due will not be considered and will be rejected.

14. NAME AND ADDRESS OF OFFEROR (Include ZIP Code)

15. TELEPHONE NO. (Include area code)

16. REMITTANCE ADDRESS (Include only if different than Item 14)

CODE FACILITY CODE

17. The offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation, if this offer is accepi by the Government in writing within ____ calendar days after the date offers are due. (Insert any number equal to or greater than the minimum require stated in Item 13D. Failure to insert any number means the offeror accepts the minimum in Item 13D.)

AMOUNTS ▶

18. The offeror agrees to furnish any required performance and payment bonds.

19. ACKNOWLEDGMENT OF AMENDMENTS
(The offeror acknowledges receipt of amendments to the solicitation – give number and date of each)

| AMENDMENT NO. | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE | | | | | | | | | | |

20A. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print)

20B. SIGNATURE

20C. OFFER DATE

**AWARD (To be completed by Government)**

21. ITEMS ACCEPTED:

22. AMOUNT

23. ACCOUNTING AND APPROPRIATION DATA

24. SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) ▶ ITEM

25. OTHER THAN FULL AND OPEN COMPETITION PURSUANT TO

☐ 10 U.S.C. 2304(c)( ) ☐ 41 U.S.C. 253(c)( )

26. ADMINISTERED BY CODE

27. PAYMENT WILL BE MADE BY

**CONTRACTING OFFICER WILL COMPLETE ITEM 28 OR 29 AS APPLICABLE**

☐ 28. NEGOTIATED AGREEMENT (Contractor is required to sign this document and return __________ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all work, requisitions identified on this form and any continuation sheets for the consideration stated in this contract. The rights and obligations of the parties to this contract shall be governed by (a) this contract award, (b) the solicitation, and (c) the clauses, representations, certifications, and specifications incorporated by reference in or attached to this contract.

☐ 29. AWARD (Contractor is not required to sign this document.) Your offer on this solicitation, is hereby accepted as to the items listed. This award consummates the contract, which consists of (a) the Government solicitation and your offer, and (b) this contract award. No further contractual document is necessary.

30A. NAME AND TITLE OF CONTRACTOR OR PERSON AUTHORIZED TO SIGN (Type or print)

31A. NAME OF CONTRACTING OFFICER (Type or print)

30B. SIGNATURE

30C. DATE

31B. UNITED STATES OF AMERICA

BY

31C. AWARD DATE

**STANDARD FORM 1442 BACK** (REV. 4-85)

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE

PAGE OF PAGES: 1 | 1

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0003 | FEB 05 01 | W2SD06-0002-0001 | |

6. ISSUED BY CODE CT

US ARMY ENGINEER DISTRICT - EUROPE
CONTRACTING DIVISION (CENAU-CT)
KONRAD ADENAUER RING 39
65187 WIESBADEN GERMANY
Ann Gunzel C530611-816-2624

7. ADMINISTERED BY (If other than Item 6) CODE

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code) Vendor ID: 00000000

(X) X 9A. AMENDMENT OF SOLICITATION NO. DACA90-01-R-0001

9B. DATED (SEE ITEM 11) DEC 18 00

10A. MODIFICATION OF CONTRACT/ORDER NO.

10B. DATED (SEE ITEM 13)

CODE | FACILITY CODE

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☒ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☒ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning 1 copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(X)
A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103 (b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

D. OTHER (Specify type of modification and authority)

**E. IMPORTANT:** Contractor ☐ is not, ☐ is required to sign this document and return ______ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

Solicitation DACA90-01-R-0001, Firm Fixed Price Contract for Design-Build Services Required for Construction of the Nachshonim Storage Base, Elad, Israel is hereby amended in accordance with the attached changes:

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br>BY ______<br>(Signature of Contracting Officer) | 16C. DATE SIGNED |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

30-105

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

**Wye River Accords Program**
**Nachshonim Storage Base**
**Offerors Questions and Answers**
**Solicitation No. DACA90-01-R-0001**
**Amendment #3**

1) **This Contractor feels very strongly that the period of time given for the preparation of the tender (till 16th February 2001) is very insufficient, especially in the light of so many different buildings that are not designed. We feel that it will be very advantageous for the COE (in order to get the very best bid) to extend this period at least till the end of March 2001.**

*Amendment #2 extended the proposal submission due date to 19 MAR 01.*

2) **The Special Specification, Chapter 01 Excavation, in CD Volume 1 contains page No.1 only, the rest of the pages are missing.**

*This will be reviewed and an amendment will be issued if necessary. All earthwork and site work is shown in Division 02, Section 001, Chapter 51. Chapter 01 of the Special Specifications deals only with the earthwork related to the buildings as specified paragraph 01.01.*

3) **Will the COE approve prefabricated concrete walls (connected with in situ concrete columns and pre-stressed horizontally) for the retaining walls of DSB?**

*Proposals must be prepared in accordance with the plans and specifications and design criteria. Subsequent to award, contractors are responsible for completing the design. At that time, reasonable suggested substitutions proposing alternates to the design criteria or completed design portions will be reviewed. Reference SR-31, and section 800, clause FAR 52.236-21I. In the event that a substitution is accepted, and it is less expensive, an equitable adjustment in the contract price will be required. Reference, "Value Engineering After Award" added by Amendment #3, and "Value Engineering – Construction", 52.248-3, in Section 00700. The Value Engineering clause applies to the 100% design provided as well any partial design and additional design criteria. It is in the Government's discretion to consider and accept or reject such suggestions.*

4) **Why do we need the secondary roof beams for the steel roof structures (in most of the steel roof buildings and sheds) in the direction of purlins? These beams do not take any vertical loads from the roof. We believe that the whole roof system namely, the main roof beams (or trusses) and the purlins, may be designed for transfer of all horizontal forces in both directions.**

*Drawings are representative of only one acceptable design solution. Other solutions that comply with the requirements of the contract documents may be submitted.*

30) **Will security during construction be provided by the client?**

*No.*

31) **Will there be retention against invoiced work. What%?**

*Reference clause 52.232-5: "Payments Under Fixed-Price Construction Contracts".*

32) **Will COE facilitate obtaining VISAS during the construction program?**

*No.*

33) **Is there a limit on L.D. due to delay?**

*No.*

34) **Is there a bonus for early completion of the work?**

*No.*

35) **What is the maximum liability of the contractor?**

*It is the offeror's responsibility to determine corporate liability for this contract.*

36) **SR-14 refers to reimbursement of value added taxes. What is the period for reimbursement from date of invoice?**

*Offeror shall work directly with GOI authorities for VAT reimbursement.*

37) **In order to assist in take off of materials, please provide the contoured layout plans in digital format.**

*If the plans are to made available, they will be issued via amendment.*

38) **Please provide us with the exact number of each of the types of building from A through L.**

*Reference the solicitation package.*

REF: F:/US_Justice/GovernmentDecision2213/SM/16/10/2007
[TRANSLATED FROM THE HEBREW]

## GOVERNMENT SECRETARIAT

## GOVERNMENT DECISION NO. 2213 OF 16TH AUGUST 2000

"2213. Economic policy for 2001 – renewal and intensification of action to enforce the law in the foreign workers' sphere

Decided:

With a view to limiting, insofar as possible, the number of foreign workers staying in Israel illegally, including preventing the entry of immigrants who intend to work in Israel illegally and creating a maximum deterrent vis-à-vis illegal workers and their employers:

1. The Ministry of Internal Security shall immediately renew its action to enforce the Entry into Israel Law, 5712-1952, including action to locate foreign workers without a suitable permit, to hold them in custody, to escort them with a view to their deportation and to deport them from Israel. The effort shall be focused on work sites, places of residence and the places of entry into Israel.

2. The Ministry of Labour and Social Affairs and the Ministry of the Interior shall assist the Ministry of Internal Security in its action to enforce the law, which shall be coordinated and simultaneous, each ministry in accordance with its statutory powers and in accordance with the joint procedure approved by the Foreign Workers' Administration on 31st July 2000.

3. The Ministry of Labour and Social Affairs shall focus its efforts on enforcing the law vis-à-vis employers of foreign workers who are unlawfully employed, including the employment of a foreign worker with a license and the assurance of the foreign workers' rights (wage and ancillary rights) in accordance with the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991, the Employment Service Law, 5719-1959 and the other employment laws.

4. All the relevant ministries shall make a maximum effort and exploit all the existing resources designated for the subject of foreign workers, so that the location of the employers and foreign workers who are operating contrary to the law will be on a monthly scale exceeding the average monthly scale in 1999."

REF: F:/US_Justice/GovernmentDecision2215/SM/16/10/2007
[TRANSLATED FROM THE HEBREW]

11th July 2002

Decision of Foreign Workers' Ministerial Committee of 14th Tamuz 5762 (24th June 2002), which took effect on 2nd Av 5762 (11th July 2002)

2215. (AZ/5) Employment of foreign workers

Decided:

Further to Government decisions no. 1141 of 24th December 2001 and no. 1458 of 17th February 2002, to determine that in 2002 the maximum number of annual permits for the employment of foreign workers in all the industries, save for the nursing care industry, will be 61,000, of which 28,00 will be foreign workers in the agricultural industry and 30,000 instead of 45,000 in the construction industry.



WORD POWER LTD, THE PROFESSIONAL LEGAL TRANSLATORS, TEL. 09-7444041; FAX. 09-7455327

REF: F:/US_Justice/GovernmentDecision554/SM/16/10/2007
[TRANSLATED FROM THE HEBREW]

## GOVERNMENT SECRETARIAT

## GOVERNMENT DECISION NO. 554 OF 5TH AUGUST 2001

"554. Employment of foreign workers in Israel – objections

Decided, in relation to objections filed by the Ministers of Finance, Construction and Housing, Agriculture and Rural Development, against decision no. AZ/4 of 22nd July 2001 of the Foreign Workers' Ministerial Committee, concerning the employment of foreign workers in Israel and determination of the quota of foreign workers in Israel on a permit in the construction and agricultural industries:

A. to dismiss the said objections;

B. (1) paragraph (a) of the aforesaid decision shall be altered such that in the agricultural industry in 2002, the quota of foreign workers on a permit will be 22,000 instead of 20,650;

(2) if it subsequently transpires that the agricultural industry is still in distress because of the lack of an adequate number of employees who engage in agriculture – the Minister of Labour and Social Affairs will again discuss applications to increase the quota of foreign workers on a permit.

C. In accordance with the aforesaid, the amended version of decision no. AZ/4 of 22nd July 2001 shall be as follows:

(a) To determine a quota of foreign workers on a permit as follows:

Construction industry

In 2001 - 45,000 foreign workers on a permit.
In 2002 - 40,000 foreign workers on a permit.

Agricultural industry

(1) In 2001 - 22,000 foreign workers on a permit
In 2002 - 22,000 foreign workers on a permit

(2) If it subsequently transpires that the agricultural industry is still in distress because of the lack of an adequate number of employees who engage in agriculture – the Minister of Labour and Social Affairs will

again discuss applications to increase the quota of foreign workers on a permit.

(b) A team including representatives of the Prime Minister's Office, the Ministry of Finance and the committee to examine the scope of the employment of foreign workers in the Israeli economy, headed by Yaakov Boukhris, which was appointed by the Minister of Labour and Social Affairs, will examine the committee's conclusions and recommendations that were submitted to the Minister of Labour and Social Affairs.

The representatives of the relevant government ministries – Agriculture and Rural Development, Construction and Housing, Tourism, Industry and Trade, Internal Security, National Infrastructure and the Ministry of the Interior will be invited to participate in the committee's discussions as the case may be and to present their positions to it.

The team shall formulate, within two weeks, a draft resolution regarding policy guidelines and a detailed plan on the employment of foreign workers in Israel that will be brought for the discussion and approval of the Foreign Workers' Ministerial Committee."

REF: F:/US_Justice/GovernmentDecision2328/SM/30/10/2007
[TRANSLATED FROM THE HEBREW]

## GOVERNMENT SECRETARIAT

## GOVERNMENT DECISION NO. 2328 OF 30.07.2002

"2328. Integration of Israelis on the job market instead of foreign workers

**Decided**:

1. To instruct the Minister of the Interior not to grant entry into Israel visas to anyone seeking to enter Israel for work purposes who are not "foreign experts", as such expression is defined in the Income Tax (Deduction of Living Expenses for Foreign Residents) (Amendment) Regulations, 5761-2001.

   This decision shall apply to anyone not living in Israel on 31st July 2002, unless his entry into Israel is necessary for the purpose of replacing a foreign worker who worked in Israel lawfully and left it on the expiry of the entry into Israel visa granted to him.

2. To amend section 1J of the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991, such that it shall include an employer's duties to pay an annual fee of NIS 4,000, which shall be paid for each foreign worker's visa granted pursuant to the Entry into Israel Law, and an application fee of NIS 500, which shall be paid for each visa application and license for a visit for the purpose of work in Israel according to the Entry into Israel Law, and such that the enactment of the regulations pursuant to the said section shall not require the approval of the Knesset or any of its committees.

3. To amend the Income Tax Ordinance, such that the Minister of Finance shall be authorised to determine that a foreign worker shall not be entitled to credit points, within the meaning thereof in Chapter Three of the said Ordinance, even if he is considered an Israeli resident pursuant to the said Ordinance; in such regard, "foreign worker" bears the meaning attributed to it in the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991.

4. The goals of the foreign worker enforcement activity shall be the implementation of the two following actions each year:

   - with the aim of bringing about the departure from Israel of at least 50,000 foreign workers living in Israel without a valid work visa, including the deportation of at least 30,000 foreign workers as aforesaid;

- the imposition of administrative fines on employers for offences under the Foreign Workers (Prohibition of Unlawful Employment and Assurance of Fair Conditions) Law, 5751-1991 or, alternatively, the filing of indictments against such employers for such offences, such that the overall number of administrative fines imposed and indictments filed shall not be less than 5,000.

5. The Israel Police and all the relevant Government ministries shall act by arrangement and in coordination to realise the goals detailed in paragraph 4 above. The Government is making note of the notice of the Inspector-General of the Israel Police concerning the ways of implementing the Government's decision.

...

208. The employment of foreign workers

The Prime Minister opens the discussion.

The Minister of Industry, Trade and Employment presents the subject.

Participating in the discussion: Ministers Avraham Poraz, Zvulun Orlav, Meir Shitreet, Binyamin Netanyahu, Gidon Ezra, Yisrael Katz and the Director-General of the Prime Minister's Office.

Decided (unanimously):

1. Further to Government decisions nos. 642 of 2nd September 2001 and 2327 of 30th July 2002 –

   (a) to allow the maximum number of permits for the employment of foreign workers in all the industries (save for nursing care) in 2003 at the level that existed in 2002, that is to say – 61,000, of which 30,000 in the construction industry, 28,000 in the agricultural industry and 3,000 in general industry;

   (b) to determine, in accordance with the long-term goal of limiting the number of foreign workers in the Israeli workforce, that in 2004 the quota of permits in all the industries (save for nursing care) shall be reduced by 13,000 permits compared with the quota in 2003 and shall stand at 48,000 in total.

2. This decision amends paragraph 1 of Government decision no. 642 only, and leaves unchanged all the Government decisions regarding the employment of foreign workers relating to 2003 and thereafter, including decision no. 2328 of 30th July 2002 regarding the integration of Israelis in the Israeli workforce instead of foreign workers (known as the "closed skies policy").

3. To appoint a team headed by the Minister of Finance and including the Minister of Industry, Trade and Employment, the Minister of the Interior and the Director-General of the Prime Minister's Office to discuss the determination of a foreign worker policy, when dealing with reciprocal contracts with foreign countries.

REF: F:/US_Justice/GovernmentDecision_PressNotice/SM/16/10/2007
[TRANSLATED FROM THE HEBREW]

**THE PRIME MINISTER'S BUREAU**

**Adviser for Media Affairs**

Jerusalem, 26th Tishrei 5763
2nd October 2002

**PRESS NOTICE**

In a discussion that took place this evening at the Prime Minister's Bureau, which was attended by the Prime Minister, Ariel Sharon, the Minister of Internal Security, Uzi Landau, the Inspector-General of Police, Shlomo Aharonisky, the Head of the Foreign Workers' Administration, Superintendent Yaakov Ganot and representatives of the Ministry of Labour, Ministry of the Interior and Ministry of Finance, it was decided not to allow the entry of additional foreign workers into Israel.

Those employers with permits to employ foreign workers will not be affected. The Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel.

The Prime Minister praised the rapid preparations of the Police to handle the matter of the foreign workers, which he described as essential to handling the problems of the Israeli economy and society.

**Prime Minister's Media**

Circulation: Economy, Labour and Social Affairs



WORD POWER LTD, THE PROFESSIONAL LEGAL TRANSLATORS, TEL. 09-7444041; FAX. 09-7455327

REF: F:/US_Justice/MOI_ClosedSkiesProcedure/SM/28/10/2007
[TRANSLATED FROM THE HEBREW]

**STATE OF ISRAEL**

**MINISTRY OF THE INTERIOR**

**LEGAL BUREAU** **POPULATION ADMINISTRATION**

7th January 2003

**Closed Skies Procedure**

General

1. In consequence of the Prime Minister's closed skies decision of 3rd October 2002 (the refusal to allow the entry of foreign workers from overseas and the filling of quotas with the assistance of foreign workers already in Israel), the following procedure has been decided upon.

2. The aim of the procedure is to find a solution for employers who are experiencing a shortage of workers. In view of the new policy, the aim of the procedure is not to find an employment solution for foreign workers wishing to continue their employment in Israel.

Employers who wish to receive workers

3. An employer with a valid permit to employ foreign workers whose quota is not full shall go to the Foreign Workers' Unit of the Ministry of the Interior at Ben Gurion Airport and submit an application for foreign workers, as he has done to date.

4. The Foreign Workers' Unit shall examine the application in accordance with the Ministry of the Interior's procedures, determine the number of foreign workers that may be approved for the employer and give notice thereof to the employer and the Enforcement Unit.

5. The aforesaid number of workers shall be offered in writing to the employer, from amongst the workers in Israel, in accordance with the industry for which they entered, whether they are in custody for illegal work and/or stay, or not. The approach in such regard shall be made by the Enforcement Unit, which shall also be responsible for arranging the times at which the employers shall arrive at the custodial facility.

6. The employer will have to complete the process of absorbing the workers within three working days, either directly or after interviewing the workers at the custodial facility.

7. An employer who for any reason does not wish to employ any of the workers offered to him will have to explain the reason for the refusal in detail and in writing. The reason will be examined and the Ministry of the Interior shall act accordingly. The employer will only be given one more chance to receive workers and if he refuses again, he shall be placed at the end of the line of employers who are supposed to receive foreign workers and the information shall be passed to the Employment Service, which shall consider whether the refusal warrants a reduction in his quota.

8. Failure to comply with the aforesaid times, for reasons dependent on the employer, shall be deemed refusal, unless the delay is approved in advance by the Ministry of the Interior, for reasons that are noted.

9. For the purpose of receiving the workers, the employer will have to sign the standard forms at Ben Gurion Airport, as will the workers themselves, and on receipt of the workers suitable records will be drawn up at the Foreign Workers' Unit at Ben Gurion Airport.

10. After the employer and the workers have agreed to the employment and all the necessary forms have been arranged, the deportation order will be revoked and the Enforcement Unit will arrange for the passports of the workers who have been approved to be transferred to the Foreign Workers' Unit at Ben Gurion Airport, which is charged with attending to the regulation of the employment, the drawing up of the required records, the stamping of the passports and the furnishing thereof to the employer.

11. On receiving the passports from Ben Gurion Airport, the employer shall arrive at the custodial facility, by arrangement with the Enforcement Unit, for the purpose of releasing the workers.

12. An employer whose quota has been reduced and/or who is employing workers in excess of the quota that has been approved for him must report thereon immediately to the Ministry of the Interior and go to the Foreign Workers' Unit at Ben Gurion Airport and submit an application for the transfer of the workers from him to another employer and/or for their removal from Israel, as has been done to date and in accordance with the Ministry of the Interior's procedures.

13. If the Ministry of the Interior is unable to offer an employer foreign workers from within Israel, in accordance with his unfilled quota, within 30 days of the determination of his unfilled quota by the Foreign Workers' Unit at Ben Gurion

Airport, the Ministry shall consider the possibility of approving the bringing of foreign workers from overseas for such employer, provided that he has fully cooperated with the Ministry in each of the stages.

The foreign workers

14. Foreigners who are in Israel illegally will be taken into custody and deported in accordance with the Entry into Israel Law. The foreigners themselves, whether they were foreign workers or not, have no right to demand placement with any employer pursuant to this procedure and/or to demand that their deportation be stayed until any employer is found for them.

15. Only if an offer is made to workers to be released in Israel to work for a specific employer and they agree thereto, might they be released and receive a license to stay and work in Israel, subject to the provisions of this procedure and the other procedures of the Ministry of the Interior.

16. The workers who might be made offers pursuant to this procedure are only those who have been in Israel since 1st January 2001, save for workers who left their employers without giving prior notice thereof and/or without receiving approval from the Ministry of the Interior (hereinafter referred to as "deserters"). It is emphasised that this procedure shall not apply to foreigners entering Israel as tourists who are caught working illegally. It is also emphasised that the possibility of offering work to foreign workers shall be in accordance with the requirements of the entitled employers at such time and no worker has a right to demand that the procedure be applied to him.

17. Workers who are made an offer pursuant to this procedure shall have a right to refuse the offer. If they do so, they shall be returned to the circle of deportees. A worker who wishes to argue that he has a specific reason for his refusal, which according to him warrants considering whether to offer him another employer or not, may do so in writing and the matter will be considered. It is emphasised that such an argument will not prevent and/or stay his deportation from Israel.

The nature of the handling

18. Foreign workers caught whilst staying in Israel illegally shall be taken into custody with a view to their deportation from Israel and *inter alia*: workers found with an employer who is not their registered employer, workers who do not have a valid license, workers who entered as tourists and were caught working, workers caught at an employer who does not have a permit or who has exceeded his quota and the like.

19. The Enforcement Unit shall maintain records of the workers in custody and decide to which of them the procedure may be applied and shall divide them in accordance with the industries for which they first entered the country.

20. The Enforcement Unit shall offer the workers to the employers in accordance with the chronological order of the employers who have filed an application for workers and shall make an effort to fill the employer's application within one month of its submission by him, provided that the employer fully cooperates with the Enforcement Unit in each of the stages.

Employers with whom workers are found who are employed illegally

21. The name of any employer who is found to have employed workers illegally or to have transferred workers illegally or to have otherwise acted contrary to any statute and procedures shall be passed on to the Ministry of Labour and Social Affairs for its handling in accordance with the relevant procedures and statutes, *inter alia* for the examination of his future entitlement to employ foreign workers.

Applicability

22. The above procedure shall apply from 9th January 2003.

23. It is emphasised that the deportation of the illegal workers from Israel shall not howsoever stay any part of the operation of this procedure. From the moment the illegal worker is taken into custody, he shall be placed on a list of those being flown to his country, including the finding of his passport, arrangement of a light and the like. A situation in which the arrangement of the flight is delayed in light of the possibility that an employer might be found for him is unacceptable. We will tell any employer that this person will be deported from Israel on a flight on day X at hour Y and that he must regulate his status prior thereto. If he manages to do so, the person in custody will be released and he will not be put on the flight arranged for him. If he does not manage to do so, the person in custody will be deported from Israel on the flight arranged for him and the possibility will be examined of offering another person in custody to the employer.

24. The aforesaid does not derogate from the provisions of any other procedure or statute of any of the relevant ministries, including the procedure concerning the transfer of workers from employer to employer.

- THE END -

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

**א. א. ב. - עסקה משותפת**
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD

פרוייקט בסיס אחסון נחשונים, אלעד

06 January 2002

**PROJECT PROGRESS MEETING No. 26**

**MINUTES OF MEETING HELD ON WEDNESDAY 2 JANUARY 2001**

**ATTENDANTS:** **ABB-SUSA:** **Peter Foy, Leo Price**
**ARENSON:** **Gerry Ray, Amnon Glick, Amnon Barkai**
**BARAN:** **Isaac Friedman**

**CC: Itzhak Itzhaki, Ram Noham, Shai Vaxman, Conrado Fagarillo**

| No | Subject | Action Required By | Date Required By |
|---|---|---|---|
| **1.** | **Earthworks** | | |
| 1.1 | **Rate of Production:**<br>To date 400,000 M3 have been excavated out of 3 million M3, which is only about 1/8 of the total quantity. Much more should have been done as we are way behind the project schedule.<br>Blasting remains a critical issue. The question is how far can we blast without damaging the piles? Section 67 will take much longer because of control blasting. Rolider blasted in 56, close to pilot; will also have to revert to control blasting.<br>Rolider's equipment has been reduced to half of the drilling equipment due to present financial problems.<br>Issac Freidman inquired as to the possibility to rent drilling equipment.<br>Gerry Ray replied that discussions are ongoing with Yael Baratz, Shilo Vardizer, and Avie Arenson in regard to Rolider's present financial difficulties.<br>Amnon Glick requested a list of equipment that Rolider would need to continue operations.<br>Due to the rains (7 rain days) and the holidays during December there were only 16 working days. Therefore, when taking into account the relatively small number of workdays, the production level was not so bad<br>Can explain to the COE that there was low production in December due to circumstances beyond our control. | Gerry Ray | Ongoing |
| 1.2 | Subcontractors still did not provide costs for insurance claim (rain damage). We must report the approximate amount of the claim to Insurance Company by 7 January. | Gerry Ray | Ongoing |



R.Noham1 00900 -002

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP

א. א. ב. – עסקה משותפת
אבב – סוסה/ א. ארנסון/ קבוצת ברן

NACHSHONIM STORAGE BASE, ELAD

פרוייקט בסיס אחסון נחשונים, אלעד

| | | | |
|---|---|---|---|
| | COE response to RFI stated that the JV design team had related the material to be Sub-Base "A" in the Specifications. Review of Specifications and Drawings do not indicate this. The JV has rebutted COE decision. Cost impact of subbase type "A" in lieu of crushed aggregate selected fill is significant.<br>Want to use Host Nation Technical Requirement Specifications for select crushed material. Cost impact is very significant. | | |
| | | | |
| **3.** | **Schedules** | | |
| 3.1 | **Concrete Schedule:** Revised concrete/budget correlation to be completed. | Gerry Ray | ASAP |
| 3.2 | **Baseline Schedule:** Resource loaded schedule to be submitted by end of next week. | Conrado | Ongoing |

| | | | |
|---|---|---|---|
| **4.** | **TCN Labor** | | |
| 4.1 | No approval received for TCN Block Visa for 2001 nor for 2002.<br>Radio announcement and Newspaper articles indicate that there will be no new Block Visa allocations for TCN labor for the whole year 2002.<br>Amnon Barkai informed that ARENSON has up to 200 TCN workers available for Nachsonim on short notice.<br>TCN tax reimbursement is a separate issue.<br>If restrictions on TCN labor are implemented, we could use such ruling as leverage to obtain a waiver from COE/MOD for reimbursement of income tax for TCN's already in country. | Amnon Barkai<br><br>Peter Foy | Ongoing. |
| 4.2 | Civil Engineer to help Gerry Ray has arrived. | Amnon Barkai | |
| | | | |
| **5.** | **Contracts** | | |
| 5.1 | **Rolling Doors:** Eltron/Campisa to be closed by next week. | Amnon Glick | 09 January |
| 5.2 | **Waterproofing:** Quotations will be ready on Monday; will transfer to Amnon for negotiations. | Amnon Glick | Ongoing |
| 5.3 | **Readymix Concrete Suppliers:** The 7-day strength test results for concrete supplied by READYMIX have been lower than desired. READYMIX was informed of the situation and increased the quantity of cement in their mix for B15 and B30 concrete. | Leo Price | Ongoing |
| 5.4 | **Structural Steel:** Ongoing | Amnon Glick | Ongoing |

# PROJECT STATUS SHEET
# U.S. ARMY CORPS OF ENGINEERS
# EUROPE DISTRICT, ISRAEL PROGRAM OFFICE
# CENTRAL RESIDENT OFFICE

**19 Oct 01**

1. PROJECT TITLE: Nachshonim Storage Base
2. PROJECT LOCATION: Elad, Israel

3. FMS CASE/PROJECT NUMBER/PROGRAM YEAR: IS-B-HAC/165640/ FY 00
4. CURRENT WORKING ESTIMATE: $138,413,723.00
5. CONTRACT NUMBER: DACA90-01-C-0043
6. CONTRACTOR NAME: ABB SUSA/A. Arenson/Baran Group (Joint Venture)

7. DATE OF AWARD: 5 Jun 01 ADMIN NTP DATE: 19 Jun 01
   CONSTRUCTION NTP DATE: 19 Jun 01 START DATE: 31 Jul 01

8. CONTRACT STATUS:
   a. AWARD AMOUNT: $124,089,176
   b. LAST MOD NUMBER: none
   c. CURRENT CONTRACT AMOUNT: $124,089,176
   d. CONTR. COMPLETION DATE (Orig/Curr): 18 Jun 04/18 Jun 04
   e. OCCUPANCY DATE (Orig/Curr): 19 Jun 04/19 Jun 04
   f. SCHEDULED (SCHED/ACT): 5/4 %
   g. UPCOMING CHANGES: 1

9. SCOPE OF WORK: The Nachshonim Storage Base is designed for long-term storage and maintenance of IDF combat equipment and vehicles ready to deploy on short notification. The base is designed in a circular pie shaped pattern with two main ring roads and 10 "wedges". The complex is to be built on approximately 320 acres east of Tel Aviv. It consists of approximately 205 buildings with over 227,000 square meters of floor space. The buildings include 119 climate-controlled warehouses, 14 office complexes, and over 70 logistical, residential, and general service buildings. Because the site is very rugged and hilly, over 2.6 million cubic meters of cut and 1.8 million cubic meters of fill will be required. Additionally, over 27 kilometers of paved and unpaved roads will be constructed.

10. CURRENT ACTIVITIES:

Design

- Contractor working on 80% design for DSB. Anticipate submission on 25 Oct 01.
- **Responding to RFI's and IDF coordination.**
- **Contractor notified that the 100% design of initial DSB must be complete prior to considering his request to begin concrete operation ahead of prototype testing.**

Construction

- **Security improvements 90% complete. Badges to be issued on 25 Oct 01.**

- Earthwork subcontractors continue to mobilize more equipment, build haul roads and strip topsoil. **Filling operations are now underway.**

- Rock blasting commenced on 11 Oct 01. **Blasting was halted on 14 Oct 01 due to lack of static charge detection device. (lightning detector) Expect this device NLT 26 Oct 01.**

- Contractor is building his schedule. **Weekly meeting with scheduler indicated that much progress has been made. Format contains correct amount of detail and appears to be logical. Anticipate full submission on 15 Nov 01.**

- **Negotiating quantities and unit prices with contractor concerning the box culvert change.**

11. FUTURE ACTIVITIES:

- 100% design submission for DSB Type A scheduled for 8 Nov 01.

12. ISSUES:

- Contactor is requesting additional compensation for site security. The amount is approximately $300K. Discussions underway with contractor. Contractor agrees tentatively to remove costs associated with static security items, but continues to request additional compensation for armed security guards. Additional documentation has been requested from the contractor to substantiate these costs.

- A possible modification or contractor claim has arisen concerning the eligibility of TCN's (third country nationals) for tax exempt status even if they were not brought into the country specifically for this project. The contractor has TCN's that were transferred from other projects within Israel and is requesting tax exempt status.

13. PROJECT ENGINEER'S ASSESSMENT:

**Site work is now progressing in several sectors. Stripping and backfilling operations are underway. The pace of work continues to increase and the JV has become more responsive.**

**(Items in bold represent changes to last report)*

RESIDENT ENGINEER: Jody Blackburn, 056-461-974 (mobile)
PROJECT ENGINEER: Mike Roach, 056-462-071 (mobile)
OFFICE ENGINEER: Ron McPeters, 056-435-042 (mobile)

**A.A.B JOINT VENTURE**
ABB SUSA\ A. ARENSON\ BARAN GROUP
NACHSHONIM STORAGE BASE, ELAD

א.א.ב. - עסקה משותפת
אבב – סוסה/ א. ארנסון/ קבוצת ברן
פרוייקט בסיס אחסון נחשונים, אלעד

20

02 December 2001

## PROJECT PROGRESS MEETING No. 22

### MINUTES OF MEETING HELD ON WEDNESDAY 28 NOVEMBER 2001

ATTENDANTS:
ABB-SUSA: Deni Keeney, Leo Price, Peter Foy
ARENSON: Itzhak Itzhaki, Gerry Ray, Amnon Glick, Amnon Barkai, Motti Shriki, Diana Oren
BARAN: Isaac Friedman, Ram Noham

| No | Subject | Action Required By | Date Required By |
|---|---|---|---|
| **1.** | **Earthworks** | | |
| 1.1 | **Rate of Production:** Barashi (2nd month) – 2,500 $M^3$/Day; Rolider (1st month) – 2,850 $M^3$/Day<br>At end November Rolider producing over 7,000 $M^3$/Day. Barashi production is hampered by lack of open area to fill and needs a place to dispose of material off site. Also, trucks are lined up at backhoe. Must organize to alternate trucks to go long (off site) and short (to fill) simultaneously. | Gerry Ray | Ongoing |
| 1.2 | Rolider planning to start night shift 03 December. To arrange First Aid course for night shift foreman. | Gerry Ray | 03 December |
| 1.3 | **Isotop Laboratory:** Permanent Lab set up on site at Barashi's laydown area. | | |
| 1.4 | **Crushing Operations:** Options for setting up crushing operations and/or dispose off site was discussed at length. Revised draft of contract terms sent to Pioneer. Pioneer wants to control criteria to pay for good material. JV proposed for Pioneer to pay 1.5 Shekels for all material. Amnon Glick trying to arrange final negotiations meeting with Pioneer at 14.00 Sunday 02 December in Herzelyia. | Amnon Glick<br>Itzhak Itzhaki | 02 December |
| | | | |
| **2.** | **Concrete** | | |
| 2.1 | **Culvert:** Geotech Engineer will come today to confirm slopes for excavation.<br>In-situ concrete works postponed to 09 December.<br>Setting up to start work on Section 17C, west side of site, next week if TCN labor available. | Leo Price<br>Gerry Ray<br>Gerry Ray | 28 November<br>09 December<br>05 December |

| | | | |
|---|---|---|---|
| | Review in Wiesbaden of 100% DSB design confirmed for 3 and 4 December. Ram Noham handed out the list of participants.<br>Following the review meeting in Wiesbaden, Ram Noham, Rich Stump and Shlomo Gilboa will travel to Milano to visit the Rolling Door Manufacturers. | Ram Noham | 03-06 Dec. |
| 3.4 | Must start excavation work for External Power Feed to have IEC commence work. | Gerry Ray | 15 December |
| | | | |
| **4.** | **TCN Labor** | | |
| 4.1 | Block Visa and Tax Reimbursement for TCN Labor discussed in detail. **Highlights of discussion:**<br>JV will use Arenson allotment and will not pursue separate Block Visa in the name of JV to import Labor.<br>Agreed to use the few skilled/trained TCN's and forego reimbursement of taxes, but to bring in majority of TCN's to get taxes reimbursed.<br>In support of possible claim, need dates that Ministry of Labor was on strike, date of application for Block Visa.<br>Discuss TCN problems with MOD after weekly meeting on Thursday. | Amnon Barkai<br>Amnon Barkai<br>Amnon Barkai<br>Peter Foy | Ongoing<br>Ongoing<br>02 December<br>06 December |
| | | | |
| **5.** | **Contracts** | | |
| 5.1 | **Concrete walls:** Received two offers and a third one coming on Friday for formwork (walls and pile caps). | Amnon Glick | Ongoing |
| 5.2 | **Post-Tensioning:** Contract signed. PTT<br>Zvi Hemly advised that there is no need for pipe sleeves for the cable placed inside the walls. | Amnon Glick | |
| 5.3 | **Communications and Control:** Finalized contract documents; to be signed within one week. | Amnon Glick | 04 December |
| 5.4 | **Rolling Doors:** Eltron/Campisa entering final stage of contract terms negotiations; will sign in 2-3 weeks | Amnon Glick | 19 December |
| 5.5 | Itumit, Helpevin, Maaman Fawzi<br>**Waterproofing:** Ongoing. Must be finalized by end of December. Will submit all 3 specified suppliers for Pilot DSB. | Amnon Glick | 12 December |
| 5.6 | **Electrical/Communications Infrastructure:** Negotiations finalized with small overrun. | Amnon Glick | 07 December |
| 5.7 | **Micropiles:** Contract signed. Preparatory meeting scheduled for 29 November and postponed by COE until approval of Pilot DSB | | |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - x

A.A.B. JOINT VENTURE, :

Plaintiff, :

v. : No. 04-1719C, No. 05-114C,

THE UNITED STATES, : No. 05-1172C, and

Defendant. : No. 06-49C (Consolidated)

- - - - - - - - - - - - x

Tel Aviv, Israel

Wednesday, November 29, 2006

Deposition of AVIE ARENSON, a witness herein, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Seventh Floor, Tel Aviv, Israel, at 9:20 a.m., Wednesday, November 29, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.


5b913e4a-b091-4ab2-a9c2-7e646f1fea86

were found to have deserted?

A. No, no. The deserters were at this time -- again, this was a short period of time. It was about two years when the whole concept of deserters existed, maybe two or three years.

But what they did was they went back in history, the first known foreign workers, and checked our -- who were always brought in by construction companies, and they checked all of our work.

In fact, the majority of the foreign workers that we brought in was in the middle '90s where we had thousands and thousands onsite. And those hundreds of deserters were not from Nachshonim.

As far as I know -- I may be wrong -- but, essentially, there were no deserters from Nachshonim. They were too valuable a commodity at that time. We just did whatever we had to do to make sure they stayed onsite up to physical restraint.

Q. Now, this is talking about an allocation on July 3rd, 2002.

So were there foreign workers on Nachshonim prior to that?

A. Oh, yes. There were all the time. We supplied foreign workers, whoever was available.
Q. Okay. Prior to July 3rd, 2002, can you estimate roughly how many foreign workers were on the Nachshonim project at any time?
A. I don't remember. I wouldn't like to guess. But substantial numbers. Several tens. Maybe a hundred. I wouldn't like to guess, though.
Q. Would you say the maximum was roughly a hundred?
A. I wouldn't like to say.
Q. The next paragraph in Exhibit 24, also under the heading of July 3rd, 2002, it says:
"The problem remains that MOI will not allow import of new TCNs until 'proof' that every effort has been exhausted to employ TCNs presently in country."
Can you explain what that is about?
A. This was as a result of what they called the Closed Sky policy, the idea being that there is a number of illegal workers in the country -- the Government's idea was that there is a number of illegal workers in the country and the contractors, the people who have been issued visas entitling them to hire foreign workers, should find these

people and hire them.

And the incentive was that there were no new foreign workers allowed in. So we had a situation where, even if we had workers with free visas, visas that were not discounted by deserters, and we didn't have a worker working using the visa, we couldn't bring in a new worker. We had to find somebody locally or prove, which is an impossible thing, to say that we have exhausted all efforts. We were exhausted. That's true. But we certainly weren't able to prove it.

Q. Now, it's not clear to me, I think -- when I read this sentence, "The problem remains that MOI will not allow import of new TCNs until 'proof' that every effort has been exhausted to employ TCNs presently in country," it sounds like that statement is saying that the problem -- it says "the problem."

This seems to be saying that the problem is not that Arenson had a certain number of deserters being held against it, but rather that there were other TCNs in the country that might possibly be employed.

I mean, the sense -- and correct me if I'm wrong. The sense I get from the way this reads


5b913e4a-b091-4ab2-a9c2-7e646f1fea86

is that, despite the problem with the deserters, Arenson would have been able to -- would have been allowed to hire foreign workers if they were already in the country.

In other words, was it workers who came in, let's say, under some other company's visas, and that job finished, and they were still in the country? Those people would have been allowed to be hired; is that correct?

A. I think the language is a little unclear. I think what they meant to say is there still remained the problem. In other words, even if everything else had been solved, we still couldn't bring in new foreign workers. I think that's all that this means to say. At least that would be my understanding of it.

Q. So you understand that to mean that, even if Arenson had somehow resolved the problem of deserters, that they still would not have been able to use the 539 visa allocations?

A. No, no. We probably could have. We certainly would have made an effort. We would have added a lot of money. There was a good chance we would have found the workers.

It's funny because the Government is

telling us to go find illegally present workers and hire them. Those are the ones that you can use. But the fact was they gave us kind of a guideline. They said that if they had been in the country less than five years and if they were originally brought in under a work permit, et cetera, et cetera, then we could hire them and get them kind of -- get their act cleaned up. And we did this to a certain extent.

But I think this referred, I think, to another question. The fact is that, at least in one place in the contract, the contract instructs us to bring in new TCNs. It doesn't allow us to use existing TCNs. It says bring in new TCNs.

We actually had an argument, which I believe was solved favorably, about whether we were entitled to tax rebates for workers, kosher foreign workers whom we didn't bring in. I think this may refer to that.

Q. You are saying you understand that the contract said that you had to bring in foreign workers?

A. Had to bring in new foreign workers, which we never did. We never could. And I know that at one point, the Corps was reluctant to pay

the tax rebates, but they finally did for workers who were present in the country when we hired them.

Q. Well, let me make this clear, because you talk about tax rebates.

Was it a question of the contract requiring you to bring in new foreign workers, or was it a matter that the tax rebates would be applicable only to new foreign workers?

A. I think the tax rebates were the proof of the pudding. The contract said bring in new foreign workers.

I don't think anybody particularly cared, except when we came to get the tax rebates, whether they were new or not. But I may be wrong.

Q. In the next paragraph in Exhibit 24, referencing August 28th, 2002, the document says:

"Contractor received indication from unofficial source that the block visa for 539 slots, specific to Nachshonim, could be transferred from Arenson to ABB SUSA."

Do you know who that unofficial source is?

A. If I could just ask Amnon in Hebrew, he would refresh my memory. Because I don't think Deni knows. And I should know, but I just don't

further foreign workers, in itself, did not come as a big surprise? I mean, it's something that one might expect?

A. It definitely came as a surprise.

I'll tell you something else. If we had known before the bid, we would have put in a higher bid or not a bid at all, like in the Ministry of the Air Force/Defense things.

There is nothing technically difficult about training Israeli Arabs to work on a project. We're doing it now. Today, there is no difference in my company between jobs -- no difference in my company in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs. And I have hundreds of them.

They more or less have the same salary now. They more or less have the same skills. The Arabs, because they're close to home, they tend to take more holidays and they're slightly less efficient. But they're better workers.

And the Romanians and the Turks are willing to work longer hours, but they're a little less -- they're a little dumber than the Arabs. They're a little less competent. Our Israeli Arabs