# INDEX TO APPENDIX



| PLAINTIFF'S SUPPLEMENTAL EXHIBIT | TITLE | PAGE |
|---|---|---|
| 1 | Deposition of Joseph W. Blackburn | 1 |
| 2 | Declaration of Roy Blecher, Adv. | 5 |
| 3 | Deposition of Avie Arenson | 14 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B. JOINT VENTURE,

Plaintiff,

v.

Case Nos. 04-1719C, 05-114C, 05-1172C, and 06-49C (CONSOLIDATED)

THE UNITED STATES OF AMERICA

Defendants

DEPONENT: JOSEPH WILLIAM BLACKBURN, JR.

DATE: AUGUST 29, 2007

TIME: 1:04 P.M.

LOCATION: LYNCHBURG, VIRGINIA

REPORTED BY: KIMBERLY A. HENDERSON, RPR

nationals into Israel to perform work on the Nachshonim project?

MR. BRILLIANT: I think we may get into some confusion about the contract if the witness is asked questions about what the contract provided without being able to see what the contract provided.

MR. COHEN: I have something here, but I want ask if he has any recollection of that.

BY MR. COHEN:

Q. On that issue, do you recall whether or not the contract permitted the joint venture to bring TCNs in to perform work on the contract?

A. I don't remember the exact language. I just remember that there was provisions for reimbursement related to taxes associated with the use of TCNs.

Q. Do you remember there being an issue during the job in your dealings with the contractor concerning not being able to or allowed to bring TCNs in?

A. I do.

Q. Did you discuss that with anyone?
A. I'm sure that I discussed it with Denny.
Q. Denny Keeney?
A. Denny Keeney. And I'm sure I discussed it with Larry McCallister, and I'm sure I discussed it with John Rovero and Mike Roach.
Q. Is it your recollection that Mr. Keeney, did Mr. Keeney tell you that it was the joint venture's position that they were allowed under the contract to bring TCNs in?
A. I believe he did, yes.
Q. Did you research that or discuss that with any of the people you just mentioned?
A. I'm sure I did.
Q. Did anyone indicate to you that they agreed that the contractor did have that right under the contract?
A. Yes.
Q. Who did; who told you that they were of that opinion?
A. I think everybody I talked to.
Q. Just for the record, would you name those

people again? "Those" being the people who told you that they agreed that under the contract the joint venture had the right to bring TCNs into the country?

A. Well, Mike Roach, Larry McCallister and John Rovero.

Q. Okay. As I said, I'm skipping -- well, do you recall anything else about your discussions with Gordon Simmons on the TCN issue or is that pretty much it?

A. That's pretty much it.

Q. I will skip the archaeological stuff.

You also talked to, I assume Mr. Simmons again about the DSB design criteria; is that what you said?

A. Yes.

Q. Besides Mr. Simmons or in addition to Mr. Simmons, did you talk to anyone else on the design side about the DSB design criteria, that you recall?

A. Anybody else on the design side?

Q. Yes.

IRENE KENIGSBERG-DARZI
אירן קניגסברג - דרזי
NOTARY נוטריון

AMOT MISHPAT BUILDING · 8 SHAUL HAMELECH BLVD. 64733 TEL-AVIV, ISRAEL
TEL. 03.6952590 .טל FAX. 03.6950416.פקס 64733 תל אביב · 8 שד' שאול המלך · בית אמות משפט
E-mail : ikdlaw@netvision.net.il

No 7309/07/68 מס'

| | |
|---|---|
| **AUTHENTICATION OF SIGNATURE** | **אימות חתימה** |
| I, the undersigned,<br>**Irène KENIGSBERG-DARZI**<br>Notary,<br>at Tel-Aviv (64733), ISRAEL,<br>Bait Amot Mishpat<br>8 Blvd. Shaul Hamelech<br>hereby certify that on the **03/12/2007**<br>there appeared before me at my office : | אני החי"מ,<br>**קניגסברג-דרזי אירן**<br>נוטריון<br>בתל-אביב (64733), ישראל<br>בית אמות משפט<br>שדי שאול המלך מסי 8<br>מאשרת כי ביום **03/12/2007**<br>ניצב לפני במשרדי : |
| **Mr. Roy BLECHER, Advocate** | **מר רועי בלכר, עו"ד** |
| Whose identity was proved to me<br>by his Israeli identity card<br>Number **0 2803533 5**<br>Issued by the Ministry of Interior<br>in **TEL AVIV-CENTER**, on the **30.12.2001** | שזהותו הוכחה לי על פי<br>ת.ז. הישראלית<br>מסי **0 2803533 5**<br>שניתנה מאת משרד הפנים<br>**בתל אביב-מרכז**, ביום **30.12.2001** |
| And signed of his own free will<br>the attached document<br>marked with the letter **"A"(1)-(7)** | וחתם מרצונו החופשי<br>על המסמך המצורף<br>והמסומן באות "א",(1)-(7) |
| **IN WITNESS THEREOF,** I hereby<br>authenticate the signature of the said signee<br>by my own signature and seal,<br>This **03/12/2007** | **ולראיה,** הנני מאמתת<br>את חתימתו של החותם הנ"ל<br>בחתימת ידי ובחותמי,<br>היום **03/12/2007** |
| Fees paid _________NIS + VAT | שכר שולם 138. ש"ח + מע"מ 15,5% |
| Signature and Notary's Seal | חתימה וחותם הנוטריון |

נוטריון * א. קניגסברג דרזי I. KENIGSBERG DARZI NOTAIRE * NOTARY

Roy BLECHER 03.12.07

Plaintiff's Supplemental
Exhibit 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE )
Plaintiff, )
)
v. ) Case No. 05-114C
) Judge Damich
THE UNITED STATES OF AMERICA )
Defendants. )

**DECLARATION OF ROY BLECHER, ADV.**

ROY BLECHER, first being duly sworn on oath, states as follows:

1. I am an adult citizen of Israel, and have practiced law in Israel for 13 years. I am a partner at the Law Firm of M. Seligman & Co., and specialize in Civil and Administrative Litigation. I have specific expertise in the field of Foreign Workers' Employment in Israel.

2. I have personally represented the following clients within the framework of the following proceedings:

   a. A. Arenson Ltd.; Administrative Petition no 582/02 before the District Court of Jerusalem;

   b. The Association of Contractors and Builders In Israel; Petition no. 8722/00 before the High Court of Justice;

   c. Danya Cebus; Petition no. 6755/03 before the High Court of Justice.

3. I make this declaration based on my personal review of the Brief filed in this case on behalf of the United States (hereinafter: "**the Defendant**"), entitled "Defendant's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment Regarding the 'Third Country Nationals' Issue" as well as my personal review and analysis of the relevant documents concerning such issue.

א. קניגסברג דרזי
I. KENIGSBERG DARZI
NOTARY NOTAIRE

4. According to the Defendant, "the referenced "closed sky policy", is vaguely and inconsistently described by AAB and **AAB fails to provide competent evidence establishing what that policy actually was...** AAB cites various government resolutions and other official documents issued by the GOI concerning the referenced "closed sky policy", but none of these documents mention or describe any such policy. AAB also cites testimony of its own principals or employees and other persons concerning their understanding of this policy, but they cite no testimony from GOI officials" (Defendant's Cross-Motion, page 24).

5. The Defendant also presents a citation from an affidavit submitted by A.A.B. in the framework of the lawsuit, in terms of which:

> On December 24, 2001, six months after the June 19, 2001 Notice to Proceed on the Nachshonim Project, the GOI issued Decision No. 1141 (Att-A to Ex. 5, Arenson Affidavit), which came to be known as the "Closed Sky Policy". Although the Decision itself does not by its terms ban all new TCN's, on October 3, 2002, the then Prime Minister of Israel, Ariel Sharon, announced that the Government was implementing a complete ban on the admission of foreign workers. (Keeney affidavit, Ex. 1 at 14, see also Att-C to Ex. 5, Arenson Affidavit)..

6. According to the Defendant, "this statement confirms that what AAB means by the term "closed sky policy" is the quota reduction and related provisions contained in Decision No. 1141, and not a ban on all new TCN's. AAB also suggests that there was <u>de facto</u> ban of some sort in the interim, but offers no evidence indicating that any such ban was imposed prior to the referenced October 3, 2002" (Defendant's Cross-Motion, page 25).

7. The Defendant further claims that if and insofar as a ban had existed on the bringing of foreign workers during the interim period (commencing from government decision no. 1141 of 24.12.2001 and until the Prime Minister's announcement of 3.10.2002), this ban applies by virtue of government decision no. 2328 of 30.7.02, which prohibited the bringing of foreign workers to Israel, but allowed the bringing of foreign workers to Israel to replace other foreign workers who had left Israel at the end of their visa period and had returned to their own country.

8. The Defendant further claims also that the Prime Minister's announcement of 3.10.2002, does not express the hermetic closed skies policy described by A.A.B., since it was noted in the announcement itself, that "those employers with permits to employ foreign workers will not be affected" and that "[t]he Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel" (Defendant's Cross-Motion, page 26).

9. In addition, according to the Defendant, it was stipulated in section 13 of the "closed skies procedure" which the Ministry of the Interior published on 9.1.03, effective as of that date, that the Ministry of the Interior would consider allowing an employer to bring foreign workers from overseas if such employer was unable to find workers from amongst the foreign workers who were already in Israel, within 30 days of the date of a quota having been set for such employer for employing foreign workers.

10. In summary of this matter, the Defendant asserts:

> Thus, assuming that the "closed sky policy" of which AAB complains is the policy announced by the Prime Minister's office in October 2002, **this policy was not an absolute bar to the entry of additional foreign workers into Israel.** Pursuant to implementing procedures issued by MOI, contractors such as AAB were required to meet their needs for foreign workers first by hiring foreign workers already in Israel, who were to be made available by the MOI. If the MOI could not meet the contractor's need in that manner, **the possibility of bringing foreign workers from abroad remained open** (Defendant's Cross-Motion, pp. 26-27)

11. The Defendant's allegation, that the closed skies policy was vague and that also after it was consolidated, the employers had the possibility of bringing foreign workers from abroad, is not in keeping with reality.

**<u>When did the closed skies policy commence?</u>**

12. Contrary to the Defendant's claim, **the closed skies policy did not begin with the decision of Prime Minister Ariel Sharon, of 3.10.02, but on 1.1.02, soon after government decision no. 1141, of 24.12.01.**

13. Thus, on 1.1.02, one week after government decision no. 1141, the then Minister of Labor and Welfare, Mr. Shlomo Benizri, published an announcement to the press, with the following heading:

> **"The Minister of Labor and Welfare, Shlomo Benizri, in reliance on the government's decision, decided that <u>from today, 1.1.02, the country's borders will be closed to the entry of new foreign workers into the State of Israel</u>".**

נוטריון
א. קניגסברג
עו"ד
I. KENIGSBERG
NOTARY

14. It was written in the body of the decision, in this regard, as follows:

> "The Minister of Labor and Welfare, Shlomo Benizri, in reliance on the government's decision which stipulates that the maximum number of annual permits for the employment of foreign workers in the field of construction, agriculture and industry, will be only 48,000 (in all sectors), 45,000 of which, at the most, in the construction and agriculture sectors, has decided that from today, 1/1/2002, the skies will be closed to the entry of new foreign workers to the State of Israel".

A copy of the press announcement of the spokesperson of the Ministry of Labor and Welfare dated 1.1.02 is attached hereto as **Appendix 'A'**.

15. In addition, in a response filed by the District Attorney's Office in Jerusalem to the petition lodged by A. Arenson Ltd. on the issue of the "deserters" (Administrative Petition 582/02 (District - Jerusalem) **A. Arenson Ltd. v. the Minister of Labor and Welfare**), the Attorney's Office confirms that the decision of the Minister of Labor and Welfare of 1.1.02, is the policy of "closed skies".

> "**The Minister** [the Minister of Labor and Welfare - R.B.] **also announced, in reliance on the above-mentioned decision no. 1141, that from 1.1.2002, "the state's borders will be closed to the entry of new foreign workers to the State of Israel"**, all as stated in Appendix A/5 of the Petition [the press announcement by the spokesperson of the Ministry of Labor of 1.1.02 - R.B.]. **This policy was termed, in public, as the "closed skies" policy** (section 6(c) of the Response)."

A copy of the Response of the District Attorney's Office in Administrative Petition 582/02, is attached hereto as **Appendix 'B'**.

16. It thus transpires that contrary to the Defendant's argument, the press announcement published by the spokesperson of the Ministry of Labor and Welfare and the Response filed by the District Attorney's Office to the Court for Administrative Matters in Jerusalem, most certainly constitute official documents of a governmental office, which describe in a clear and decisive manner, the nature of the "closed skies" policy.

**<u>Did the closed skies policy totally preclude the bringing of foreign workers to Israel?</u>**

17. As mentioned, according to the Defendant, in reliance on government decision no. 2328 of 30.7.02, the closed skies policy was not expressed by a total negation of the possibility of bringing foreign workers to Israel, since also following its formulation, the employers in the construction industry could have replaced foreign workers who left Israel with new foreign workers from abroad.

NOTARY
א. קניגסברג
I. KENIGSBERG

18. Contrary to the Defendant's claim, the decision of Mr. Shlomo Benizri, the Minister of Labor and Welfare, of 1.1.02, was implemented, word for word, and totally prohibited the bringing of new workers to Israel, also if these workers were designated to replace foreign workers who had worked in Israel and returned to their country.

19. To the best of my understanding, government decision no. 2328 of July 2002, remained in the sense of "lawful but inadvisable" and also thereafter, employers in the construction industry were not allowed to bring new foreign workers into Israel, even if this involved new foreign workers who were supposed to have replaced foreign workers who had completed their work and returned home.

20. The above clearly emerges from the Response of the District Attorney's Office in Jerusalem to a petition which A. Arenson Ltd. filed in Administrative Petition 582/02 (District - Jerusalem) **A. Arenson Ltd. v. the Minister of Labor and Welfare** (Appendix 'B' above).

21. In the Response of the Attorney's Office, it was alleged that the Company was not entitled to bring foreign workers from abroad, for the reason that the number of workers employed thereby, together with the workers who had "abandoned" it and for whom the Company had not been credited, exceeded the number of workers in the permit to employ foreign workers received by the Company. In addition, the Attorney's Office added that:

> "...**Even if the Appellant had a right to employ additional foreign workers**, something which, as mentioned, is refuted, **there was no justification to bring them from abroad, but rather to move them from other contractors who employ an excess number of workers** (from the difference between 45,000 workers whose employment had been approved in 2001 and 30,000 workers who had been agreed between the parties [The State of Israel and the Federation of Contractors and Builders - R.B.], with regard to 2002)" (section 8(a) of the Response).

22. The District Attorney's Office further added, in reference to the compromise settlement reached in the framework of High Court of Justice Petition no. 8722/00 - **The Association of Contractors and Builders v. The Minister of Labor and Welfare**, which the parties arrived at following government decision no. 1141, in terms of which they would not deport foreign workers who had been legally employed in the construction industry in 2001, that:

> "**There is a very big difference between agreement not to deport excess workers and agreement to bring in new workers (contrary to the State's declared policy).** This is not what was meant by the Respondents [the State authorities, which are the Respondents in High Court of Justice 8722/00 - R.B.] and this is not a reasonable interpretation of their words" (section 9(c) of the Response).

I. KENIGSBERG NOTARY

23. In other words, the State's undertaking in the framework of the compromise settlement in High Court of Justice Petition no. 8722/00, not to expel foreign workers from Israel, does not mean a cancellation of the closed skies policy declared by the Minister of Labor and Welfare on 1.1.02, which prohibits the bringing of new foreign workers to Israel.

<u>**The closed skies policy since the "closed skies procedure" of January 2003**</u>

24. Moreover, it is clear that from the moment the "closed skies procedure" was formulated by the Ministry of Interior in January 2003, the employers were unable to bring foreign workers from abroad, even if this involved workers who were meant to replace foreign workers who had left the employer and returned to their country of domicile.

25. The foregoing clearly emerges from the judgment in High Court of Justice Petition no. 6755/03, **Danya Cebus Ltd. v. The Government of Israel** that deals with the petition of a construction company, which requested the Ministry of Interior to act in accordance with section 13 of the "closed skies procedure" and allow it to bring foreign workers from abroad, in order to realize its remaining quota of permits.

26. The State's position on section 13 of the Procedure is presented in the judgment, as follows:

> **"The State further claimed that section 13 of the Procedure contradicts the government's decision and that it is therefore void, and in any event, that the section was annulled by the government's recent decision, which was rendered after the issuance thereof"** (page 4 of the judgment).

A copy of the judgment in High Court of Justice 6755/03 is attached hereto as **Appendix 'C'**.

27. It is thus evident that **contrary to the Defendant's claim, the State never acted in accordance with section 13 of the "Closed Skies Procedure" and did not give an employer who had not managed to supplement the quota of foreign workers who it was allowed to engage from amongst the foreign workers already in Israel, the opportunity of bringing new workers from abroad.**

28. I wish to note, in closing, that within the framework of a judgment that was recently rendered in High Court of Justice Petition no. 10843/04 **Hotline for Migrant Workers v. The Government of Israel**, the Court discussed an agreement that was signed between Israel Military Industry Ltd., a government company, and the government of Turkey, according to which, as part of IMI's undertakings of "reciprocal procurement" from Turkey, an agreement was signed between the IMI

and the Turkish Defense Ministry, in terms of which part of the undertakings of "reciprocal procurement" would be realized by means of employing Turkish workers in Israel. The agreement was anchored in government decision no. 2222 of 11.7.04.

29. It seems that the facts described in this judgment illustrate that a sovereign country which so wishes, can act vis-à-vis the State of Israel in order to facilitate the employment of foreign workers in Israel, also where such transaction is not consistent with the general policy of the government in this regard.

A copy of the judgment in High Court of Justice 10843/04 is attached hereto as **Appendix 'D'**.

The foregoing is true and accurate to my personal knowledge.

Roy Blecher, Adv.

א. קניגסברג
דרזי
I. KENIGSBERG
DARZI
NOTAIRE * NOTARY

Attachments A, B, C and D

In Hebrew language translation will be provided

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - x

A.A.B. JOINT VENTURE, :

Plaintiff, :

v. : No. 04-1719C, No. 05-114C,

THE UNITED STATES, : No. 05-1172C, and

Defendant. : No. 06-49C (Consolidated)

- - - - - - - - - - - - x

Tel Aviv, Israel

Wednesday, November 29, 2006

Deposition of AVIE ARENSON, a witness herein, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Seventh Floor, Tel Aviv, Israel, at 9:20 a.m., Wednesday, November 29, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.

MR. BRILLIANT: I'm not sure that there is any foundation for that last piece of testimony.
THE WITNESS: I'm sorry.
BY MR. JONES:
Q. Okay. The question is: What were the -- here's a good way to ask it.
What was the value of the visas once the Closed Sky policy was put into effect?
MR. BRILLIANT: Hasn't this been answered and beaten to death?
MR. JONES: Not really.
THE WITNESS: Basically, there was no value.
BY MR. JONES:
Q. Okay. Now, with respect to the ability of an employer to enforce the legal obligation of a worker to leave, what, if any, enforcement mechanism was in effect prior to the creation in Israel of the immigration police?
A. There must have been something.
Can I ask Amnon? I don't remember.
Q. Well, do you know approximately when the immigration police in Israel was formed?
(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)



THE WITNESS: We were asked this before. The second half of 2003.
BY MR. JONES:
Q. Okay. Prior to the second half of 2003, if you wanted a worker to leave and he wouldn't leave, what, if any, enforcement mechanism did a company have?
A. Nothing really, except that it very seldom happened.
MR. JONES: Nothing further.

FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. BRILLIANT:
Q. Well, if the employer had -- if there was no enforcement mechanism, the employer had no way to ensure that the employee left after his work was done, doesn't that create a kind of -- that situation create a kind of obvious incentive for a Government to say let's cut back on how many foreign employees we're bringing in because there's no way to make sure that --
MR. JONES: I am going to have to object to that. That's really speculation in terms of Government policy.



MR. BRILLIANT: Well, in terms of --
THE WITNESS: I can answer that. I'd like to answer, if I could.
MR. JONES: Okay.
THE WITNESS: I have no objection to the Israeli Government deciding that there should be no more foreign workers. There's good reasons for it, and I agree with the reasons.
My objection was to the complete arbitrariness and lack of preparation and the amount of distortions that resulted from their implementation of the policy.
It's not only my position. It's my position and the Contractors Association's position. What we objected to was them telling us to put in these applications, run around like chickens without heads, become illegal whatever you do. We're changing the law every three days so that you're always breaking the law. This is what drove us crazy.
BY MR. BRILLIANT:
Q. Well, okay. Apart from these aspects of implementation and administration of the policy that you're referring to, though, then it's true, though, that the overall decision of disallowing



further foreign workers, in itself, did not come as a big surprise? I mean, it's something that one might expect?
A. It definitely came as a surprise.
I'll tell you something else. If we had known before the bid, we would have put in a higher bid or not a bid at all, like in the Ministry of the Air Force/Defense things.
There is nothing technically difficult about training Israeli Arabs to work on a project. We're doing it now. Today, there is no difference in my company between jobs -- no difference in my company in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs. And I have hundreds of them.
They more or less have the same salary now. They more or less have the same skills. The Arabs, because they're close to home, they tend to take more holidays and they're slightly less efficient. But they're better workers.
And the Romanians and the Turks are willing to work longer hours, but they're a little less -- they're a little dumber than the Arabs. They're a little less competent. Our Israeli Arabs

Page 130

are fine, upstanding people. And when there was a place for them to work and proper payment, it turned out that they are very good workers like I remember them in 1961 and '62 when I first started.

Q. So, I mean, the kind of suddenness, perhaps, or the abruptness of the decision --

A. That's what killed us. Yeah.

Q. -- that took you by surprise, if I understand you?

A. Yes.

Q. But with hindsight, the fact of this problem of foreign workers coming in and no way to enforce the need to make them leave when they're done, sooner or later the Government was going to put a stop to that. I mean, that one might expect even though you might not expect it to kind of come suddenly.

A. I think it came because of -- I think it came because, ultimately, in 2000, plus minus, the Israeli Government realized that they would never be able to use Palestinians within the country. And at that time, they decided that, if they weren't going to have Palestinians, they didn't want foreigners.

This was a period of years, three or four

Page 131

years, until the implications of -- everybody's understanding that we would no longer be using Palestinians worked out.

There are still many foreign laborers in the country. In some cases -- in 2001, I think there were sixty or 70,000 visas for the building industry. There was 5,000 visas for the health care industry, for home aid and so on.

Today I think we have 11,000 in the whole building industry. And the health care is over 35,000. So it isn't as if they've decided that there are no more foreign labor. They just said no more foreign labor in the construction business.

I mean, personally, I don't think there's anything wrong with Israelis being home care people too. I don't know why we have to have Philippines. The Israelis are very compassionate people. Why not hire them?

MR. BRILLIANT: I have no further questions.

MR. JONES: I have no further questions. Thank you, Mr. Arenson.

MR. BRILLIANT: Thank you.

THE WITNESS: Thank you.

(The deposition concluded at 11:45 a.m.)

Page 132

CERTIFICATE OF WITNESS

I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read the same; and that I have made the corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this ______ day of ____________________ 2006.

______________________________
Avie Arenson

Page 133

REPORTER'S CERTIFICATE

I, BRENDA MATZOV, CA CSR No. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

IN WITNESS WHEREOF, I have subscribed my name this 13th day of December, 2006.

______________________________
Brenda Matzov, CA CSR No. 9243