**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **A.A.B JOINT VENTURE,** | ) | |
| | ) | |
| ` **Plaintiff,** | ) | |
| | ) | **Case Nos. 04-1719C, 05-114C, 05-1172C** |
| **v.** | ) | **and 06-49C (CONSOLIDATED)** |
| | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ______________________________ | ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANT'S**
**<u>PROPOSED FINDINGS OF UNCONTROVERTED FACT</u>**

Plaintiff A.A.B. Joint Venture, in response to the Defendant's Proposed Findings of Uncontroverted Fact, states and represents as follows:

1. On December 18, 2000, the Corps, Europe District, issued Solicitation DACA90-01-R-0001, for a "Firm Fixed Price Contract for Design/Build Services required for Construction of the Nachshonim Storage Base, Elad, Israel" ("the Solicitation"). Def. App. 1-2. AAB submitted its proposal and bid for the project on April 9, 2001. Complaint [1]115. On June 5, 2001, AAB was awarded Contract No. DACA90-01-C-0043 (the "Contract") for $124,089,176. Complaint 6.

<u>Response</u>:

Agreed.

2. The Solicitation included Special Contract Requirement SR-22, stating that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work." Complaint ¶ 20. SR-22 also set forth various types of information required of the contractor concerning

nationals of third countries ("TCNs"), and stated that "Contractors shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI [Government of Israel] agency for the required customs clearances, passports, visas, licenses or permits SR-22 also stated:

> The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency. Offerors are advised that the Government of Israel reserves the right to limit access to designated security areas and refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice.

Pl. App. 46-47.

<u>Response</u>:

Agreed to the extent the full text of the references supports this finding.

3. The contractors rights and obligations with respect to hiring TCNs was also addressed in SR-13 (Compliance with Host Country Rules and Customs), which stated:

* * *

> b. The following items are the sole responsibility of the Contractor to investigate, estimate as to cost, and assume the risk, as normally encountered by Contractors. The Contractor shall be responsible for determining the effect of the following on his own cost performance of the contract and for including sufficient amount in the contract price:

* * *

> – Entry and exit visas, residence permits, and residence laws applicable to aliens. This includes any special requirements of the Host Government, including those required by local labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.

* * *

> – Arranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor, to receive payments and to remove such funds from the country.
>
> – Operating under local laws, practices, customs and control, and with local unions, in connection with hiring and firing, mandatory wage scales, vacation pay, severance pay, overtime, holiday pay, 7th day of rest, legal notice or pay in lieu thereof for dismissal of employees, slowdown and curtailed schedules during religious holidays, and ratio of local labor employed in comparison to others.

* * *

Pl. App. 40-41.

<u>Response</u>:

Agreed to the extent the full text of the references supports this finding.

4. Solicitation Amendments 3 and 6 contained the Government's answers to various questions posed by offerors. Amendment 3 included the following question and answer:

> 32) Will the COE facilitate obtaining VISAS during the construction program?
>
> No.

Def. App. 5.

<u>Response</u>:

Agreed.

5. The importation of foreign labor into Israel had long been limited by quotas, and, prior to the issuance of the Solicitation, the GOI had begun to tighten these quotas. According to the certified claim that AAB submitted to the contracting officer concerning this matter,

> as a result of Government Resolution Number 188 dated August 22, 1999 the overall quota of foreign labor was reduced to 50,000 from 83,000, effective January 1, 2001. The Ministry of Labor and Welfare ("MOL") implemented Resolution 188 by determining that the maximum annual amount of permits that would be

> allocated to the construction industry for 2001 would be 26,000 as opposed to 34,000 in 2000. . . .

Pl. App. 229.

Response:

Plaintiff contests the assertion that importation of labor into Israel had "long been" limited by quotas, due to the ambiguity as to what constitutes a "long" time. Plaintiff agrees that the quoted portion of its claim is accurate to the extent of the portion quoted, but notes that the text of the certified claim contains additional representations which must be added to the quotation to give it its full and complete meaning

6. Prior to the issuance of the Solicitation, the GOI adopted a policy of intensifying enforcement of laws prohibiting foreign workers from remaining in Israel illegally. See, e.g., Government Decision No. 2213 of 16th August 2000, entitled "Economic policy for 2001 - renewal and intensification of action to enforce the law in the foreign workers' sphere." Def. App. 6.

Response:

Agreed to the extent the full text of the references supports this finding.

7. On December 24, 2001, the GOI announced in Government Decision No. 1141 that "in 2002, the maximum number of annual permits for the employment of foreign workers in all industries will be 48,000, of which 45,000 at the most will be in the building and agricultural industries . . . ." Pl. App. 142.

Response:

Agreed to the extent the full text of the references supports this finding.

8. Whereas in 1999 the GOI announced drastic decreases in the total foreign worker quota and the quota for the construction industry from 2000 to 2001, the total quota announced in December 2001 for 2002 was only 4 percent less than the 2001 quota announced in 1999,

and the construction industry quota announced in December 2001 for 2002 was not explicitly decreased at all from the quota announced in 1999 for 2001. Pl. App. 142, 229.

Response:

Plaintiff contests this finding in numerous respects, both as to inaccuracies in the statements made and the failure to include information which is necessary in order for the statements made to be not misleading.

9. In Government Decision No. 2215, dated July 11, 2002, the construction industry quota for 2002 was set at 30,000. Def. App. 7.

Response:

Agreed to the extent the full text of the references supports this finding.

10. The construction industry quota for 2003 was also set at 30,000. Def. App. 12.

Response:

Agreed to the extent the full text of the references supports this finding.

11. In Government Decision No. 2328, dated July 30, 2002, a partial ban was imposed upon bringing new foreign workers into Israel, but this ban did not apply to foreign workers required in order to replace other foreign workers who had left Israel upon the expiration of their visas. Def. App. 10. Government Decision No. 2328 contains what the GOI later referred to as the "closed skies policy." Def. App. 12.

Response:

Agreed as to the first sentence. The reference in the second sentence to Decision No. 2328 appears to be erroneous, and the decision that established the closed skies policy was No. 208.

12. On October 2, 2002, the Prime Minister's office issued a press release

announcing a decision "not to allow the entry of additional foreign workers into Israel." Def. App. 13. This was not, however, an absolute bar to the entry of additional foreign workers into Israel. The press release did not provide any further details concerning the restriction, other than to state: "Those employers with permits to employ foreign workers will not be affected. The Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel." Id.

Response:

Agreed to the extent the full text of the references supports this finding.

13. Pursuant to this decision, the Ministry of Interior ("MOI"), issued a "Closed Skies Procedure," effective January 9, 2003, in order "to find a solution for employers who are experiencing a shortage of workers." Def. App. 14, ¶ 2. This issuance outlined procedures for employers to fill their foreign worker allocations with foreign workers already in Israel, and further stated:

> If the Ministry of the Interior is unable to offer an employer foreign workers from Israel, in accordance with his unfilled quota, within 30 days of the day on which his unfilled quota is determined by the Foreign Workers' Unit at Ben Gurion Airport, the Ministry shall consider the possibility of approving the bringing of foreign workers from overseas for such employer, provided that he has fully cooperated with the Ministry in each of the stages.

Def. App. 15-16, 1113.

Response:

Agreed to the extent the full text of the references supports this finding.

14. In Temporary Order 2001/44, effective January 1, 2002, the GOI required that future contracts for construction and infrastructure work financed by the GOI contain a clause prohibiting the employment of foreign workers, other than foreign "experts." Pl. App. 145.

Although the stated purpose of this order was to enhance employment opportunities for Israeli workers by decreasing the number of foreign workers, one of its effects was that for projects not covered by the order – such as the Nachshonim project – would not have to compete with GOI-financed projects in seeking permits for foreign workers within the industry-wide quota. Further, in the case of contractors involved in both GOI-financed projects and other projects, foreign workers employed by the contractor for GOI-financed projects reaching completion constituted a pool of potential workers for the contractor's other projects, since these workers could not be employed for the contractor's new GOI-financed projects.

Response:

As to the first sentence, agreed to the extent the full text of the references supports this finding. The balance of the statement is contested, as unsupported speculation. First, the rules, which were frequently changing in 2001-2004, were unclear as to whether a foreign worker on a completed project was required to return to his home country. Further, the method of calculation of the annual quotas – which was based on anticipated square foot of new construction – would not change for non-GOI construction.

15. Most of the work of one of AAB's component joint venturers – A. Arenson, Ltd. ("Arenson ") – involved public contracts. Pl. App. 169. After the prohibition against the employment of foreign workers on public contracts became effective, Arenson brought foreign workers from some of its public contracts to work on the Nachshonim project. Pl. App. 182-83.

Response:

Agreed as to the first sentence. The second sentence is contested. There was no connection between a ban on foreign workers on public contracts and the Arenson company’s transfer of foreign workers for the use of the Joint Venture.

16. When AAB learned, in or around January 2002, that GOI was going to further limit the importation of foreign workers, it viewed this not as a major threat to its ability to obtain necessary construction workers, but as an opportunity to obtain, in connection with TCN employees already in Israel, the benefit of tax refunds otherwise available only for TCNs brought into Israel specifically for the Nachshonim project. Thus, in the discussion of anticipated TCN restrictions contained in the minutes of a meeting held by AAB on January 6, 2002, no mention was made of any anticipated shortage of workers. Rather, it was observed that "ARENSON has up to 200 TCN workers available for Nachshonim on short notice," and that "[i]f restrictions on TCN labor are implemented, we could use such ruling as leverage to obtain a waiver from COE/MOD for reimbursement of income tax for TCN's already in the country." Def. App. 19.

Response:

Objection to this entire proposed finding, as unsupported speculation. First, the quoted reference does not support the assertion made. Second, as of the date of the meeting at issue, the Joint Venture had not yet learned that there was any problem with the Joint Venture obtaining TCNs based on the Arenson company's 2001 and 2002 applications.

17. During this period, AAB's principal reason for importing TCN's was not because of a dearth of available TCNs in the country, but because, at that time, this was a prerequisite to obtaining desired tax refunds. Def. App. 23.

Response:

Contested - unsupported speculation.

18. In or around February 2002, the MOD authorized temporary relief of the TCN tax reimbursement issue for the Nachshonim project. Pl. App. 201; Def. App. 29-30.

Response:

Agreed (the actual date was during the first week of February 2002).

19. In September 2001, Arenson applied for a TCN visa allotment for the Nachshonim project. Pl. App. 138. By July 2002, the MOL released its block visas for 2002, which included 784 visas for the Arenson, more than 520 of which were specific for use in the Nachshonim Project." Pl. App. 54, 75, 138, 244. This was more than the number AAB stated in its proposal that would be needed at peak production. Pl. Br. 9; P1. App. 37. For 2003, Arenson was allocated at least 523 visas to be utilized for the Nachshonim project. Pl. App. 250.

Response:

Plaintiff contests the accuracy of the first sentence. The Arenson company's September 24, 2001 application was a supplemental request for an additional block visa allocation for 2001. Agree with the balance of this proposed finding.

20. The MOI found that several hundred foreign workers that Arenson previously had brought into Israel for employment on other projects had left their employment but remained in the country. Under what was referred to as the "deserters policy," MOI sought to prevent an employer whose foreign workers "deserted" him but did not leave Israel, from bringing other foreign workers into Israel their stead. Pl. App. 242. Under this policy, the MOI would not issue visas for Arenson to bring new foreign workers into Israel without an adequate accounting for these deserters. Pl. App. 75, 244.

Response:

With respect to the first sentence, plaintiff agrees that the MOI *contended* that the Arenson company had foreign workers who lefts its employment but remained in Israel, but denies the truth of that allegation. The second sentence is an accurate description of both MOI and Ministry of Labor policy during a period of time in 2002/2003. Plaintiff contests the

accuracy of the third sentence, for the reasons stated in Avie Arenson's deposition, specifically that the presentation of evidence to MOI that former Arenson workers had in fact departed Israel was of no assistance in obtaining visas.

21. Arenson had begun receiving complaints from the GOI about deserters at least as early as the beginning of 2001. P1. App. 166. Arenson's records indicated that, as of January 1, 2002, Arenson had approximately 498 employees registered in its name, working on other projects, who had deserted between April 1, 1999 and January 1, 2002. Pl. App. 75.

Response:

Agreed.

22. When Arenson received its visa allocation for Nachshonim, it had 485 foreign workers actually employed at its construction sites, while, according to MOI records, Arenson had 506 registered deserters. Id. Thus, the total number of foreign workers who were employed by Arenson and had not left Israel as of July 2002 was 991 – well in excess of Arenson's total visa allocation for 2002. For this reason, Arenson could not bring in new foreign workers in 2002 under the 539-visa allocation it had received specifically for the Nachshonim Project. Pl. App. 76.

Response:

On line 4 of the foregoing, the "991" figure represents those foreign workers employed by Arenson and those who had left. Although the figures presented are as represented by MOI, Arenson never agreed with MOI that the so-called "deserters" were in fact still in Israel, and Arenson had documentation that many had returned to their home country.

23. If Arenson had proved that it had exhausted all efforts to hire foreign workers already in Israel, and had resolved the problem of deserters, it probably would have been able to

utilize its allocation of 539 visas for the Nachshonim project. Def. App. 26-28.

Response:

This conclusion is obviously speculation and thus is not established as a material fact.

24. The restrictions imposed by the GOI concerning foreign workers did not prevent AAB from hiring foreign construction workers who were already in Israel, or Israeli construction workers. AAB was paying its TCNs a monthly salary higher than the average not only for TCNs, but also for Israeli construction workers. Pl. App. 245. And, there is no difference in terms of quality or speed or cost between the work of Israeli workers and that of foreign workers.

Def. App. 31.

Response:

Plaintiff disputes the first and last sentence and agrees that the second sentence is accurate. The restrictions in question so severely limited the availability of TCNs that there were very few available for hire during the relevant period. Moreover, the MOI refused to recognize proof that former TCNs had returned to their home country. Lastly, with respect to the alleged lack of difference between Israeli and foreign workers, the testimony relied upon by the

Government for such assertion was a reference to the situation in 2006 – after numerous Israeli Arabs had been trained in construction trades – and not the 2002-2004 period, during which there were very few Israeli's trained in the construction work.

Date: December 3, 2007

Respectfully submitted,

s/ Brian Cohen

Brian Cohen
BELL BOYD & LLOYD LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Attorneys for Plaintiff

Of Counsel:
Philip Clark Jones

**CERTIFICATE OF SERVICE**

I, Brian Cohen, hereby certify under penalty of perjury that the foregoing pleading was served automatically via "shalom.brilliant.usdoj.gov" upon ECF filing this 3rd day of December, 2007 upon:

Shalom Brilliant, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

s/ Brian Cohen
Brian Cohen