# INDEX TO APPENDIX


| PLAINTIFF'S SUPPLEMENTAL EXHIBIT | TITLE | PAGE |
|---|---|---|
| 1 | Deposition of Joseph W. Blackburn | 1 |
| 2 | Declaration of Roy Blecher, Adv. | 5 |
| 3 | Deposition of Avie Arenson | 84 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B. JOINT VENTURE,

Plaintiff,

v.

Case Nos. 04-1719C, 05-114C, 05-1172C, and 06-49C (CONSOLIDATED)

THE UNITED STATES OF AMERICA

Defendants

DEPONENT: JOSEPH WILLIAM BLACKBURN, JR.

DATE: AUGUST 29, 2007

TIME: 1:04 P.M.

LOCATION: LYNCHBURG, VIRGINIA

REPORTED BY: KIMBERLY A. HENDERSON, RPR

nationals into Israel to perform work on the Nachshonim project?

MR. BRILLIANT: I think we may get into some confusion about the contract if the witness is asked questions about what the contract provided without being able to see what the contract provided.

MR. COHEN: I have something here, but I want ask if he has any recollection of that.

BY MR. COHEN:

Q. On that issue, do you recall whether or not the contract permitted the joint venture to bring TCNs in to perform work on the contract?

A. I don't remember the exact language. I just remember that there was provisions for reimbursement related to taxes associated with the use of TCNs.

Q. Do you remember there being an issue during the job in your dealings with the contractor concerning not being able to or allowed to bring TCNs in?

A. I do.

Q. Did you discuss that with anyone?
A. I'm sure that I discussed it with Denny.
Q. Denny Keeney?
A. Denny Keeney. And I'm sure I discussed it with Larry McCallister, and I'm sure I discussed it with John Rovero and Mike Roach.
Q. Is it your recollection that Mr. Keeney, did Mr. Keeney tell you that it was the joint venture's position that they were allowed under the contract to bring TCNs in?
A. I believe he did, yes.
Q. Did you research that or discuss that with any of the people you just mentioned?
A. I'm sure I did.
Q. Did anyone indicate to you that they agreed that the contractor did have that right under the contract?
A. Yes.
Q. Who did; who told you that they were of that opinion?
A. I think everybody I talked to.
Q. Just for the record, would you name those

people again? "Those" being the people who told you that they agreed that under the contract the joint venture had the right to bring TCNs into the country?

A. Well, Mike Roach, Larry McCallister and John Rovero.

Q. Okay. As I said, I'm skipping -- well, do you recall anything else about your discussions with Gordon Simmons on the TCN issue or is that pretty much it?

A. That's pretty much it.

Q. I will skip the archaeological stuff.

You also talked to, I assume Mr. Simmons again about the DSB design criteria; is that what you said?

A. Yes.

Q. Besides Mr. Simmons or in addition to Mr. Simmons, did you talk to anyone else on the design side about the DSB design criteria, that you recall?

A. Anybody else on the design side?

Q. Yes.

IRENE KENIGSBERG-DARZI
אירן קניגסברג - דרזי
NOTARY נוטריון

AMOT MISHPAT BUILDING · 8 SHAUL HAMELECH BLVD. 64733 TEL-AVIV, ISRAEL
TEL. 03.6952590 .טל FAX. 03.6950416.פקס 64733 תל אביב · 8 שד' שאול המלך · בית אמות משפט
E-mail : ikdlaw@netvision.net.il

No 7309/07/68 מס'

| | |
|---|---|
| **AUTHENTICATION OF SIGNATURE** | **אימות חתימה** |
| I, the undersigned,<br>**Irène KENIGSBERG-DARZI**<br>Notary,<br>at Tel-Aviv (64733), ISRAEL,<br>Bait Amot Mishpat<br>8 Blvd. Shaul Hamelech<br>hereby certify that on the **03/12/2007**<br>there appeared before me at my office : | אני החי"מ,<br>**קניגסברג-דרזי אירן**<br>נוטריון<br>בתל-אביב (64733), ישראל<br>בית אמות משפט<br>שדי שאול המלך מסי 8<br>מאשרת כי ביום **03/12/2007**<br>ניצב לפני במשרדי : |
| **Mr. Roy BLECHER, Advocate** | **מר רועי בלכר, עו"ד** |
| Whose identity was proved to me<br>by his Israeli identity card<br>Number **0 2803533 5**<br>Issued by the Ministry of Interior<br>in **TEL AVIV-CENTER**, on the **30.12.2001** | שזהותו הוכחה לי על פי<br>ת.ז. הישראלית<br>מסי **0 2803533 5**<br>שניתנה מאת משרד הפנים<br>**בתל אביב-מרכז**, ביום **30.12.2001** |
| And signed of his own free will<br>the attached document<br>marked with the letter **"A"(1)-(7)** | וחתם מרצונו החופשי<br>על המסמך המצורף<br>והמסומן באות "א",(1)-(7) |
| **IN WITNESS THEREOF,** I hereby<br>authenticate the signature of the said signee<br>by my own signature and seal,<br>This **03/12/2007** | **ולראיה,** הנני מאמתת<br>את חתימתו של החותם הנ"ל<br>בחתימת ידי ובחותמי,<br>היום **03/12/2007** |
| Fees paid ________NIS + VAT | שכר שולם 133 ש"ח + מע"מ 15,5% |
| Signature and Notary's Seal | חתימה וחותם הנוטריון |

א. קניגסברג דרזי
I. KENIGSBERG DARZI
נוטריון NOTAIRE * NOTARY

Roy BLECHER 03.12.07

Plaintiff's Supplemental
Exhibit 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 05-114C<br>Judge Damich |

**DECLARATION OF ROY BLECHER, ADV.**

ROY BLECHER, first being duly sworn on oath, states as follows:

1. I am an adult citizen of Israel, and have practiced law in Israel for 13 years. I am a partner at the Law Firm of M. Seligman & Co., and specialize in Civil and Administrative Litigation. I have specific expertise in the field of Foreign Workers' Employment in Israel.

2. I have personally represented the following clients within the framework of the following proceedings:

   a. A. Arenson Ltd.; Administrative Petition no 582/02 before the District Court of Jerusalem;

   b. The Association of Contractors and Builders In Israel; Petition no. 8722/00 before the High Court of Justice;

   c. Danya Cebus; Petition no. 6755/03 before the High Court of Justice.

3. I make this declaration based on my personal review of the Brief filed in this case on behalf of the United States (hereinafter: "**the Defendant**"), entitled "Defendant's Cross-Motion for Partial Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment Regarding the 'Third Country Nationals' Issue" as well as my personal review and analysis of the relevant documents concerning such issue.

NOTARY I. KENIGSBERG DARZI NOTAIRE

4. According to the Defendant, "the referenced "closed sky policy", is vaguely and inconsistently described by AAB and **AAB fails to provide competent evidence establishing what that policy actually was...** AAB cites various government resolutions and other official documents issued by the GOI concerning the referenced "closed sky policy", but none of these documents mention or describe any such policy. AAB also cites testimony of its own principals or employees and other persons concerning their understanding of this policy, but they cite no testimony from GOI officials" (Defendant's Cross-Motion, page 24).

5. The Defendant also presents a citation from an affidavit submitted by A.A.B. in the framework of the lawsuit, in terms of which:

> On December 24, 2001, six months after the June 19, 2001 Notice to Proceed on the Nachshonim Project, the GOI issued Decision No. 1141 (Att-A to Ex. 5, Arenson Affidavit), which came to be known as the "Closed Sky Policy". Although the Decision itself does not by its terms ban all new TCN's, on October 3, 2002, the then Prime Minister of Israel, Ariel Sharon, announced that the Government was implementing a complete ban on the admission of foreign workers. (Keeney affidavit, Ex. 1 at 14, see also Att-C to Ex. 5, Arenson Affidavit).

6. According to the Defendant, "this statement confirms that what AAB means by the term "closed sky policy" is the quota reduction and related provisions contained in Decision No. 1141, and not a ban on all new TCN's. AAB also suggests that there was <u>de facto</u> ban of some sort in the interim, but offers no evidence indicating that any such ban was imposed prior to the referenced October 3, 2002" (Defendant's Cross-Motion, page 25).

7. The Defendant further claims that if and insofar as a ban had existed on the bringing of foreign workers during the interim period (commencing from government decision no. 1141 of 24.12.2001 and until the Prime Minister's announcement of 3.10.2002), this ban applies by virtue of government decision no. 2328 of 30.7.02, which prohibited the bringing of foreign workers to Israel, but allowed the bringing of foreign workers to Israel to replace other foreign workers who had left Israel at the end of their visa period and had returned to their own country.

8. The Defendant further claims also that the Prime Minister's announcement of 3.10.2002, does not express the hermetic closed skies policy described by A.A.B., since it was noted in the announcement itself, that "those employers with permits to employ foreign workers will not be affected" and that "[t]he Ministry of the Interior and the Administration's personnel have undertaken that these employers will receive foreign workers with suitable qualifications from the database of foreign workers in Israel" (Defendant's Cross-Motion, page 26).

I. KENIGSBERG

9. In addition, according to the Defendant, it was stipulated in section 13 of the "closed skies procedure" which the Ministry of the Interior published on 9.1.03, effective as of that date, that the Ministry of the Interior would consider allowing an employer to bring foreign workers from overseas if such employer was unable to find workers from amongst the foreign workers who were already in Israel, within 30 days of the date of a quota having been set for such employer for employing foreign workers.

10. In summary of this matter, the Defendant asserts:

> Thus, assuming that the "closed sky policy" of which AAB complains is the policy announced by the Prime Minister's office in October 2002, **this policy was not an absolute bar to the entry of additional foreign workers into Israel.** Pursuant to implementing procedures issued by MOI, contractors such as AAB were required to meet their needs for foreign workers first by hiring foreign workers already in Israel, who were to be made available by the MOI. If the MOI could not meet the contractor's need in that manner, **the possibility of bringing foreign workers from abroad remained open** (Defendant's Cross-Motion, pp. 26-27)

11. The Defendant's allegation, that the closed skies policy was vague and that also after it was consolidated, the employers had the possibility of bringing foreign workers from abroad, is not in keeping with reality.

**<u>When did the closed skies policy commence?</u>**

12. Contrary to the Defendant's claim, **the closed skies policy did not begin with the decision of Prime Minister Ariel Sharon, of 3.10.02, but on 1.1.02, soon after government decision no. 1141, of 24.12.01.**

13. Thus, on 1.1.02, one week after government decision no. 1141, the then Minister of Labor and Welfare, Mr. Shlomo Benizri, published an announcement to the press, with the following heading:

> **"The Minister of Labor and Welfare, Shlomo Benizri, in reliance on the government's decision, decided that <u>from today, 1.1.02, the country's borders will be closed to the entry of new foreign workers into the State of Israel</u>".**

NOTARY * נוטריון * א. קניגסברג * I. KENIGSBERG

14. It was written in the body of the decision, in this regard, as follows:

> "The Minister of Labor and Welfare, Shlomo Benizri, in reliance on the government's decision which stipulates that the maximum number of annual permits for the employment of foreign workers in the field of construction, agriculture and industry, will be only 48,000 (in all sectors), 45,000 of which, at the most, in the construction and agriculture sectors, has decided that from today, 1/1/2002, the skies will be closed to the entry of new foreign workers to the State of Israel".

A copy of the press announcement of the spokesperson of the Ministry of Labor and Welfare dated 1.1.02 is attached hereto as **Appendix 'A'**.

15. In addition, in a response filed by the District Attorney's Office in Jerusalem to the petition lodged by A. Arenson Ltd. on the issue of the "deserters" (Administrative Petition 582/02 (District - Jerusalem) **A. Arenson Ltd. v. the Minister of Labor and Welfare**), the Attorney's Office confirms that the decision of the Minister of Labor and Welfare of 1.1.02, is the policy of "closed skies".

> "**The Minister** [the Minister of Labor and Welfare - R.B.] **also announced, in reliance on the above-mentioned decision no. 1141, that from 1.1.2002, "the state's borders will be closed to the entry of new foreign workers to the State of Israel"**, all as stated in Appendix A/5 of the Petition [the press announcement by the spokesperson of the Ministry of Labor of 1.1.02 - R.B.]. **This policy was termed, in public, as the "closed skies" policy** (section 6(c) of the Response)."

A copy of the Response of the District Attorney's Office in Administrative Petition 582/02, is attached hereto as **Appendix 'B'**.

16. It thus transpires that contrary to the Defendant's argument, the press announcement published by the spokesperson of the Ministry of Labor and Welfare and the Response filed by the District Attorney's Office to the Court for Administrative Matters in Jerusalem, most certainly constitute official documents of a governmental office, which describe in a clear and decisive manner, the nature of the "closed skies" policy.

**<u>Did the closed skies policy totally preclude the bringing of foreign workers to Israel?</u>**

17. As mentioned, according to the Defendant, in reliance on government decision no. 2328 of 30.7.02, the closed skies policy was not expressed by a total negation of the possibility of bringing foreign workers to Israel, since also following its formulation, the employers in the construction industry could have replaced foreign workers who left Israel with new foreign workers from abroad.

א. קניגסברג
I. KENIGSBERG
NOTARY

18. Contrary to the Defendant's claim, the decision of Mr. Shlomo Benizri, the Minister of Labor and Welfare, of 1.1.02, was implemented, word for word, and totally prohibited the bringing of new workers to Israel, also if these workers were designated to replace foreign workers who had worked in Israel and returned to their country.

19. To the best of my understanding, government decision no. 2328 of July 2002, remained in the sense of "lawful but inadvisable" and also thereafter, employers in the construction industry were not allowed to bring new foreign workers into Israel, even if this involved new foreign workers who were supposed to have replaced foreign workers who had completed their work and returned home.

20. The above clearly emerges from the Response of the District Attorney's Office in Jerusalem to a petition which A. Arenson Ltd. filed in Administrative Petition 582/02 (District - Jerusalem) **A. Arenson Ltd. v. the Minister of Labor and Welfare** (Appendix 'B' above).

21. In the Response of the Attorney's Office, it was alleged that the Company was not entitled to bring foreign workers from abroad, for the reason that the number of workers employed thereby, together with the workers who had "abandoned" it and for whom the Company had not been credited, exceeded the number of workers in the permit to employ foreign workers received by the Company. In addition, the Attorney's Office added that:

> "...**Even if the Appellant had a right to employ additional foreign workers**, something which, as mentioned, is refuted, **there was no justification to bring them from abroad, but rather to move them from other contractors who employ an excess number of workers** (from the difference between 45,000 workers whose employment had been approved in 2001 and 30,000 workers who had been agreed between the parties [The State of Israel and the Federation of Contractors and Builders - R.B.], with regard to 2002)" (section 8(a) of the Response).

22. The District Attorney's Office further added, in reference to the compromise settlement reached in the framework of High Court of Justice Petition no. 8722/00 - **The Association of Contractors and Builders v. The Minister of Labor and Welfare**, which the parties arrived at following government decision no. 1141, in terms of which they would not deport foreign workers who had been legally employed in the construction industry in 2001, that:

> "**There is a very big difference between agreement not to deport excess workers and agreement to bring in new workers (contrary to the State's declared policy).** This is not what was meant by the Respondents [the State authorities, which are the Respondents in High Court of Justice 8722/00 - R.B.] and this is not a reasonable interpretation of their words" (section 9(c) of the Response).

I. KENIGSBERG NOTARY

23. In other words, the State's undertaking in the framework of the compromise settlement in High Court of Justice Petition no. 8722/00, not to expel foreign workers from Israel, does not mean a cancellation of the closed skies policy declared by the Minister of Labor and Welfare on 1.1.02, which prohibits the bringing of new foreign workers to Israel.

**The closed skies policy since the "closed skies procedure" of January 2003**

24. Moreover, it is clear that from the moment the "closed skies procedure" was formulated by the Ministry of Interior in January 2003, the employers were unable to bring foreign workers from abroad, even if this involved workers who were meant to replace foreign workers who had left the employer and returned to their country of domicile.

25. The foregoing clearly emerges from the judgment in High Court of Justice Petition no. 6755/03, **Danya Cebus Ltd. v. The Government of Israel** that deals with the petition of a construction company, which requested the Ministry of Interior to act in accordance with section 13 of the "closed skies procedure" and allow it to bring foreign workers from abroad, in order to realize its remaining quota of permits.

26. The State's position on section 13 of the Procedure is presented in the judgment, as follows:

> **"The State further claimed that section 13 of the Procedure contradicts the government's decision and that it is therefore void, and in any event, that the section was annulled by the government's recent decision, which was rendered after the issuance thereof"** (page 4 of the judgment).

A copy of the judgment in High Court of Justice 6755/03 is attached hereto as **Appendix 'C'**.

27. It is thus evident that **contrary to the Defendant's claim, the State never acted in accordance with section 13 of the "Closed Skies Procedure" and did not give an employer who had not managed to supplement the quota of foreign workers who it was allowed to engage from amongst the foreign workers already in Israel, the opportunity of bringing new workers from abroad.**

28. I wish to note, in closing, that within the framework of a judgment that was recently rendered in High Court of Justice Petition no. 10843/04 **Hotline for Migrant Workers v. The Government of Israel**, the Court discussed an agreement that was signed between Israel Military Industry Ltd., a government company, and the government of Turkey, according to which, as part of IMI's undertakings of "reciprocal procurement" from Turkey, an agreement was signed between the IMI

and the Turkish Defense Ministry, in terms of which part of the undertakings of "reciprocal procurement" would be realized by means of employing Turkish workers in Israel. The agreement was anchored in government decision no. 2222 of 11.7.04.

29. It seems that the facts described in this judgment illustrate that a sovereign country which so wishes, can act vis-à-vis the State of Israel in order to facilitate the employment of foreign workers in Israel, also where such transaction is not consistent with the general policy of the government in this regard.

A copy of the judgment in High Court of Justice 10843/04 is attached hereto as **Appendix 'D'.**

The foregoing is true and accurate to my personal knowledge.

Roy Blecher, Adv.

I. KENIGSBERG DARZI
NOTAIRE * NOTARY

State of Israel
Ministry of Labour and Social Affairs
Spokesperson's Office

17 Tevet 5762
1 January 2002
8-0004-2002

**Statement to the Media**

**The Minister of Labour and Social Affairs, Shlomo Benizri, on the basis of the government's decision, decided that from today, 1 January 2002, the borders of the state shall be closed to the entry of new foreign workers into the State of Israel**

The Ministry of Labour and Social Affairs, Shlomo Benizri, on the basis of the government decision that determined that the maximum number of annual permits for the employment of foreign workers in the construction, agriculture and manufacturing industries would be 48,000 only (for all of the industries combined), of whom at most 45,000 would be in the construction and agriculture industries, decided that from today, 1 January 2002, the skies would be closed to the entry of new foreign workers into the State of Israel.

Minister Benizri ordered that the permits that were given in 2001 should be extended for sixty days for the purpose of continuing projects. The number of these approvals shall be no more than 18,000. During the first two months of 2002, intensive administrative work shall be carried out, and this shall include an assessment of needs, a revision of the allocation formulae including ongoing projects and new projects in accordance with the total quota and the guarantee and allocation of new permits within the framework of the 23,000 for the building industry.

With regard to the rest of the permits that were given, the contractors shall ensure that the foreign workers return to their countries in a supervised manner and with immediate effect.

In the near future notice will be given to employment contractors, which shall call upon the contractors to submit an application to receive permits for 2002 which shall be considered as soon as possible. At the same time, the question of the Chinese workers who are in Israel with permits and without work is still being examined; some of these have come to the employment offices to receive work and we are waiting for approximately 3,000 additional Chinese workers who claim that they cannot find work. The Ministry of Labour and Social Affairs undertakes to find a place of work for all the Chinese workers who have permits to stay in Israel.

For agricultural work there shall be no entry into Israel for new foreign workers; the local market shall be utilized.

Sincerely,
( - )
Yoram Malca
Spokesperson, Ministry of Labour and Social Affairs
and Adviser to the Minister on Media Matters

In the Jerusalem District Court
Sitting as the Administrative Affairs Court
Before the honourable Justice Tz. Segal

Administrative Petition 582/02
Set down for 2 July 2002

A. Arenson Ltd
By its counsel Advocates Eli Zohar,
Orna Lin, Amit Krispin and others
Of 23 Petah Tikva Road, 66184 Tel-Aviv

The petitioner

v.

1. Minister of Labour and Social Affairs

2. Minister of the Interior

By their counsel, the Jerusalem District Attorney's Office
Of 4 Uzi Hasson Street, Jerusalem
Tel. 02-6208177/8, 6208114; fax. 02-6222385

The respondents

**Preliminary Response to the Petition**

Pursuant to the decision of the honourable court of 10 June 2002, the respondents hereby respectfully submit their preliminary response to the petition.

1. The issue in the petition is the petitioner's application to bring foreign workers into Israel, in addition to those currently employed by it, for the purpose of employing them in the construction industry. To this end, the petitioner applies for two reliefs: first, that the honourable court should declare that the policy of the first respondent, which is known as the 'closed skies' policy, is void; secondly, that the petitioner should be permitted to bring additional foreign workers into Israel, in accordance with the permits that it claims it has received.

2. From the outset it should be said that with regard to the first relief, there is no basis or need to consider this matter in this case (and it is questionable whether the honourable court is the proper forum for this purpose, in view of the principled nature of the matter as presented in the petition) beyond what is required in order to consider the second relief. With regard to the second relief, the respondents argue that the petitioner has already brought into Israel more foreign workers that the number that it is currently lawfully permitted to do, and therefore there is no basis for bringing in any additional workers.

3. The respondents' position, on which we shall say more and upon which we shall expand below, is that the petitioner, like every other Israeli employer, has

no inherent right to employ foreign workers. The decision with regard to the scope of employment of foreign workers in Israel is made by the government from time to time in accordance with the needs of the economy and the supply of Israeli job seekers. The trend, throughout the years, has been to reduce the scope of employment of foreign workers to the smallest number possible, because of the problematic nature of the residency and work of foreign workers on large scales in Israel, as shall be described below.

4. For these reasons, the honourable court will be requested to deny the petition. For the purpose of clarifying the issue, we shall give details below of the factual background, the legal framework within which the respondents operate and the decisions concerning the employment of workers in the construction industry; thereafter we shall address the petitioner's claims.

## I. **The factual background: the employment of foreign workers in Israel**

1. In recent years, the use of foreign workers has become widespread in various industries, especially the construction and agriculture industries.

2. a. In addition to the foreign workers whose entry and work in Israel has been permitted by the organs of state that are responsible for this matter, the number of foreign workers who reside and work in the various industries, including the construction industry, without a permit has continually increased.

   b. It should be emphasized that a significant number of the foreign workers who are working in Israel without a permit originally entered Israel with residency and work permits, but when the period of the permit came to an end they did not leave Israel, as they and their employers undertook would happen when the application for the permit was approved. See in this regard the findings of the State Comptroller, which were published in his Annual Report no. 49 for 1998 and the Accounts for the 1997 Fiscal Year, on pages 273-275.

   c. As a result of this, the total population of foreign workers in Israel, according to the figures of the Central Statistics Bureau, reached a total of approximately 100,000 foreign workers with a permit and approximately 150,000 foreign workers without a permit.

3. The employment of foreign workers creates immediate economic advantages for employers, since the cost of employing them is, as a rule, less than the cost of employing a corresponding Israeli worker, both with regard to their wages and with regard to their social benefits.

4. a. In contrast to the benefit that the employer obtains from employing foreign workers, the consequences for the economy and society as a whole are very serious, both in the long term and in the short term.

b. Thus, for example, the employment of the foreign workers harms Israeli workers who are competing with the foreign workers for jobs; it increases unemployment and reduces the incentive for Israelis to go into the industries in which foreign workers are employed in significant numbers, including in the construction industry (since the existence of an available supply of foreign workers in a certain industry, because they are prepared to work for relatively lower wages than the wages of the corresponding Israeli worker, significantly reduces the average wage in that industry and a consequence of this is that Israeli workers abandon it).

c. Forcing Israeli residents out of the job market and their joining the ranks of the unemployed places a heavy financial burden on the state because of the payment of unemployment benefits and it brings with it negative social ramifications.

d. As unemployment increases, it is no longer possible to acquiesce in a reality where foreign workers seize control, *inter alia* because of unequal competition, of an increasingly larger part of the Israeli job market.

5. The large number of foreign workers in the economy also extracts an economic price from the Israeli economy, in various ways.

6. Thus, the permanent residency of hundreds of thousands of foreign workers in Israel involves costs that are estimated in hundreds of millions of sheqels for investments in infrastructures (roads, sewage systems, schools, the health system, etc.) and ongoing expenses in the field of internal security, municipal services, etc..

7. Similarly a very considerable bureaucratic system is required in order to deal with permitting the residency and work of the foreign workers, protecting their rights as workers while they are in Israel and finally compelling them to leave the country at the end of the period of the permit, and this requires considerable pecuniary expenses.

8. An additional problematic phenomenon that results from the employment of foreign workers is the prevailing serious violations of the basic human rights of the foreign workers as a result of disgraceful living conditions, and their exploitation and oppression by some of the employers. The existence of these phenomena is inconsistent with the basic values of the state and it seriously harms the image of the State of Israel around the world.

9. a. Moreover, the large number of foreign workers living in Israel has long term social consequences, *inter alia* on the image and character of society and the state.

b. In this regard, the prophetic warning of the State Comptroller in her Annual Report no. 40 for 1989 and Accounts for 1988, at page 491,

was perspicacious, and regrettably a large part has already been realized. She said the following:

> 'In several countries in Western Europe, the problem of foreign workers has gone beyond the narrow field of the structure of the work market and has become a social problem: it is reflected in the forming of a community of foreigners whose cultural differences create hostility, social tension and focal points of conflict between foreigners and locals. In Israel the foreigners are [at the time the report was written] approximately one per cent of the Israeli workforce, which is far less than the amount of foreign workers in the workforce in countries such as West Germany, France or England. But the upward trend in the number of these workers may create, within a few years, the forming of relatively large communities of foreign workers, who are mostly in Israel illegally, are characterized by a low socio-economic status, have difficult work conditions and lack equal political and social rights, a situation that is likely to create hostility and become a source of social tension.'

10. Because of the negative long-term consequences of employing foreign workers in Israel as described above, there arose a need to find different mechanisms whose purpose is to regulate the entry of foreign workers into Israel, and also to ensure the departure of the workers from Israel at the end of the period of their permit. In addition to this, there arose a need to make the costs of employing the foreign workers equal to those imposed on an employer who employs Israeli or Palestinian workers, in order to protect the local job market.

11. a. Naturally, the most important mechanism in this regard is determining the number of permits to employ foreign workers in the various sectors of the economy.

b. Even in this context, the State Comptroller made some insightful remarks, this time in his Annual Report no. 46 for 1995 and the Accounts for the 1994 Fiscal Year, at page 481, where he says the following:

> 'The advantages and disadvantages of employing foreign workers indicate the existence of a disparity between the cost to the employer of employing the foreign worker and the total cost to the economy and society. For the employer, the employment of the foreign worker is a short term solution, at a low cost, to the problem of a shortage in manpower. *But what is worthwhile for the employer in the short term may turn*

> *out not to be worthwhile for the public as a whole in the long term* (emphasis supplied).'

c. A survey of the phenomenon of foreign workers in Israel over the years, various questions relating to it and how to deal with this phenomenon can be found in the following annual reports of the State Comptroller: Annual Report no. 40, at pp. 485 *et seq.*; Annual Report no. 46, at pp. 475 *et seq.*; Annual Report no. 49, at pp. 272 *et seq.*; and Annual Report no. 50, at pp. 470 *et seq.*.

## II. <u>The laws applicable to the employment of foreign workers</u>

1. The residency in Israel of foreign workers for work purposes is regulated in two systems of laws that are interconnected: one system relates to permitting foreigners to work in Israel and the other to permitting them to live in Israel during the period of the work.

2. The laws relating to the employment and work of foreign workers in Israel are stated in the Employment Service Law, 5719-1959 (hereafter: **'the Employment Service Law'**), which provides in section 32 a prohibition against the employment of workers who are not Israeli citizens or Israeli residents except through the Employment Service.

3. The residency of foreign workers in Israel is regulated by the Entry into Israel Law, 5712-1952 (hereafter: **'the Entry into Israel Law'**) and the Entry into Israel Regulations, 5732-1972, which were enacted thereunder.

4. These laws make the residency of a foreign worker in Israel conditional upon receiving a B/1 type visa. This visa, like all visas of foreigners to visit Israel, is granted in accordance with the broad discretion given to the Minister of the Interior.

5. As is well known, the power of the Minister of the Interior to give residency licences and entry visas, under the Entry into Israel Law, has been interpreted by the Supreme Court as a power where there is very broad discretion. The following was said in HCJ 431/89 *Kendal v. Minister of Interior* [1992] IsrSC 46(4) 505, at p. 520:

> 'Under section 1(b) of the Entry into Israel Law, "Someone who is not an Israeli citizens or who does not have an immigration visa or an immigration certificate shall reside in Israel in accordance with a residency licence under this law." The power to give such a licence and the discretion to exercise it are given to the Minister of the Interior, the respondent. The law, the regulations that were enacted thereunder… do not define the criteria for granting such a licence. The respondent has broad discretion in this matter and he is not obliged to give reasons for his decision.'

6. With regard to imposing restrictions on the entry of foreigners into Israel, the following was said in HCJ 1031/93 *Pesaro (Goldstein) v. Minister of Interior* [1995] IsrSC 49(4) 661, at pp. 677-678:

> 'Every state imposes restrictions on the entry of foreigners into it and additional restrictions on someone who wants to become a resident or a citizen. These restrictions were intended to protect the special culture of the residents of the state, the identity, the common denominator that unites then and makes them special, their economic interests and public order and morals. These restrictions are of two kinds: restrictions on entry into the country and restrictions upon obtaining citizenship and becoming a resident of the state.'

With regard to the restrictions on entry into Israel, every state reserves the absolute right to control the flow of persons entering it.

7. In addition to these laws, the legislator determined in the Foreign Workers (Prohibition of Illegal Employment and Guaranteeing Decent Conditions) Law, 5751-1991, that the employment of foreign workers other than in accordance with the provisions of the Employment Service Law or the Entry into Israel Law shall be a criminal offence.

## III. **Government policy**

1. From time to time the Israeli government determines a policy with regard to permitting the entry into Israel and the employment of foreign workers. This policy is determined, *inter alia*, on the basis of an examination of the needs of the economy and the availability of Israeli workers to perform the various jobs, while recognizing the ramifications that the phenomenon of an increase in the number of foreign workers has on society and on the state. According to the policy, the government determines maximum quotas of foreign workers that can be brought into the country.

2. The premise is that in the first place it is necessary to employ Israeli residents and only if there is no alternative will a permit be given for the limited and conditional employment of foreign residents, as a rule, when they are skilled workers or there is a special need. Even in such a case, the Israeli government regards the employment of foreigners as a temporary event only, whose purpose is to provide time and tools to the employers in that industry to train skilled workers in the foreign workers' fields of expertise.

3. The employment service examines on a regular basis the criteria according to which the employment of foreign workers is approved in the various sectors of the Israeli economy and it takes action to reduce the number of foreign workers in Israel on a gradual basis in accordance with the government's

policy, the needs of the economy and the experience that has been accumulated.

4. The policy of reducing the number of foreign workers is reflected also in government decisions. This policy is determined on the basis of an examination of the needs of the economy and the availability of Israeli workers to carry out the various jobs, with the goal of reducing in so far as possible the number of foreign workers in Israel. Thus, for example, in decision 2199 of 27 May 1997, it was stated that:

> 'The number of foreign workers employed in Israel shall be reduced within the framework of a multi-year plan, with a strategic approach that regards the large number of foreign workers as an undesirable phenomenon from social, economic and security perspectives.'

5. a. During the last year, the government adopted several decisions, whose purpose is to reduce the scale of the employment of foreign workers in the Israeli economy by a significant amount.

b. *Inter alia*, on 5 August 2001 the government decided that in 2002 40,000 permits would be given to foreign workers in the construction industry.

c. Within the framework of an emergency plan to encourage employment, against the background of the revised economic figures for 2002 with regard to the amount of growth expected, the deficit in the state budget, the amount of unemployment and the poverty figures, the government decided on 24 December 2001 in decision 1141, among the other proposals that were adopted, to carry out a whole range of measures in the job market, whose purpose was to create the conditions for increasing the number of persons employed in the business sector. Accordingly, it was decided to reduce the number of foreign workers to a total quota of 45,000 permits to employ foreign workers in the construction and agriculture industries together (see appendix P/4).

6. a. Later, the first respondent (in a statement attached as appendix P/5 of the petition; hereafter: 'the first respondent's statement) announced that of the total quota of 45,000 permits for employing foreign workers, he intended to allocate 23,000 permits to the construction industry. The first respondent also announced that the permits that were given for 2001 (which all expired on 31 December 2001), in so far as they related to ongoing projects, would be extended for sixty days (for a total amount of a maximum of 18,000 permits).

b. With regard to the other permits, the minister announced that the contractors who employ foreign workers by virtue of these should ensure the return of the workers to their countries of origin in a

controlled manner and with immediate effect. The minister further announced that during the first two months of 2002 intensive administrative work would be carried out to assess needs, revise allocation formulae, and assess and allocate new permits for the construction industry.

c. The minister also announced, relying on the aforesaid decision no. 1141, that from 1 January 2002 the 'borders of the state would be closed to the entry of foreign workers into the State of Israel,' all of which as stated in appendix P/5 of the petition. This policy was called by the public the 'closed skies' policy.

7. a. When these decisions were made, the petition in HCJ 8722/00 *Association of Contractors and Builders in Israel v. Minister of Labour and Social Affairs* (see appendix P/6 of the petition) was pending before the High Court of Justice. The original issue in that petition was the petitioner's application that the respondents would allocate additional foreign workers to the construction industry to replace the residents of the territories whose employment was prevented by the closure that was imposed in October 2000.

b. In January 2002, an application for an interim order was filed, in which the court was requested, *inter alia*, to cancel decision no. 1141 and the first respondent's statement mentioned above. The petition pleadings were amended to include these applications. A copy of the amended petition pleading is attached as appendix P/6 of the petition.

c. The understandings and agreements that were reached in HCJ 8722/00 and the activity of the competent authorities since the amended petition was filed constitute a basis for the present petition, and therefore we should say more on this subject.

d. The respondents filed responses to the application for the interim order, and also to the amended petition, in which they said that foreign workers who were employed legally in the building industry in 2001 would not be deported from Israel during the months of January and February 2002, on certain conditions. This statement was extended from time to time.

e. On 25 April 2002, the parties filed in the court an application with consent to postpone the date of the hearing of the petition by several weeks, in order to allow the Employment Service to continue the administrative work required in order to determine the allocations for 2002 (see appendix P/5 of the petition). Within the framework of the aforesaid agreed application (appendix P/7 of the petition), the respondents declared that according to the results of the aforesaid administrative work, 'the question of whether the need in the economy to employ foreign workers corresponded with the amount of the quota as determined by the government in December 2001 and the proper

manner of dividing it between the construction and agriculture industries would be considered once again.'

f. The respondents also stated in the aforesaid agreed application that by the postponed date of the hearing '*they would not act to take foreign workers away from their employers in the construction industry*' (emphasis supplied), if they satisfied certain conditions:

1. The permits for their employment were given for projects that were defined by the contractors in their application for a permit that was filed by them in 2001 as 'a project continuing into 2002,' provided that the project has not yet ended.

2. The permits for their employment were given to contractors who employed foreign workers with a permit in 2001, and who began a new project for which they filed an application for a permit to employ foreign workers in 2002.

g. In paragraph 6 of the application, the respondents emphasized that when the consideration of the matter ended and the allocations were determined, they intended to act without delay to implement the government's policy with regard to reducing the scale of the employment of foreign workers, *inter alia* by deporting from the State of Israel foreign workers for whom no permits were received.

h. Following the aforesaid application, the hearing was postponed to 24 June 2002. During that period, the Employment Service finished considering the applications that were submitted to it by employers in the construction industry for the employment of foreign workers in 2002. The respondents also held meetings with representatives of the contractors for the purpose of reconsidering the total quota.

i. On 24 June 2002, a meeting of the ministerial committee for foreign workers took place; a copy of the minutes of that meeting is attached as appendix R/1 of this response. In these the chairman of the committee proposed that the number of permits for employing foreign workers in the construction industry should be 30,000 (less than the quota of 45,000 in 2001, but more than the quota of 22,000 that was determined in the aforesaid decision 1141). This proposal was the result of an agreement with the contractors' representatives, all of which as documented in the minutes.

j. As paragraph FW/5 of the minutes states, *a quota of 30,000 permits 'was agreed with the contractors' representatives in view of the reduction in the scale of building in Israel in 2002 as compared with 2001, by an amount of approximately 35% on average in the different types of construction*' (emphasis supplied).

k. Paragraph FW/5 of the minutes also states that 'the contractors' representatives told us that they were prepared to help the enforcement authorities in the placement of foreign workers for whom they did not have a permit when the approvals for employment were received according to the quota that was approved.' In other words, the contractors agreed that when the new permits were received, they would help to transfer foreign workers between one contractor and another, so that a contractor who employed more foreign workers than were approved for him would help in transferring the surplus workers to another contractor who employed less workers that were approved for him.

l. The proposal to determine the quota in an amount of 30,000 workers was adopted by the ministerial committee (see the aforesaid appendix R/1). If no challenge is filed against it, the decision shall become a government decision within two weeks of the date on which it was made (24 June 2002).

m. As a result of the aforesaid agreement, the parties filed in HCJ 8722/00 an application with consent for a short postponement of the hearing by three weeks, a copy of which is attached as R/2, in which the parties addressed the understanding that had been reached between them, according to which the quota of permits in the construction industry would be 30,000. The High Court of Justice granted the application and postponed the date of the hearing as requested.

n. In the aforesaid application, the parties gave notice that in order to complete the process of increasing the quota as aforesaid, a period of approximately three weeks was needed (since as aforesaid the decision of the ministerial committee becomes a decision of the government two weeks after it is made, if no challenge is filed against it). Therefore the parties applied to postpone the hearing '*in view of the possibility that the petition will become redundant if a government decision is made in accordance with the agreement that was reached between the petitioner and the ministers*' (emphasis supplied).

o. In the aforesaid application with consent, the respondents reiterated their declaration that until the postponed date of the hearing, they would not act to deport the foreign workers who complied with the conditions set out in sub-paragraph f above.

8. The aforesaid is a survey of the factual and legal background; let us now turn to address the specific arguments of the petitioner in this file.

## IV. Response to the petitioner's arguments

1. In 2001, the Employment Service allowed the petitioner to employ a total amount of 1,262 foreign workers in the construction industry. According to

what is stated in the relevant permits, '*The validity of the permit is until 31 December 2001 inclusive*' (see appendices P/1, P/2 and P/3 of the petition; emphasis in the original).

2. On 8 January 2002, the Employment Service gave the petitioner approval for a quota of 265 foreign workers for ongoing projects for 2002, and this was valid until 28 February 2002. A copy of the permit is attached as appendix R/3 of this response.

3. In paragraph d of the permit, it was expressly written that 'this permit revokes any previous permit.'

4. In view of what is stated in these documents, the last permit that was given to the petitioner was to employ 265 workers only. But, as the respondents declared from time to time in HCJ 8722/00, until the hearing in the High Court of Justice they would not act to remove the additional workers, whose employment was approved in 2001, on condition that they complied with certain conditions (see paragraph III.8.f above).

5. As stated in chapter III above, the Employment Service recently completed the task of determining the allocations. As a result of its decisions, and on the assumption that the decision of the committee that the total quota of foreign workers in the construction industry will be 30,000 will be given the force of a government decision, the petitioner will be permitted to employ 780 foreign workers (including the aforesaid 265 workers), immediately after the decision of the ministerial committee is given the validity of a government decision. At that time, the petitioner will be responsible to ensure that the other workers leave Israel or are transferred to other contractors as stated in the decision of the committee.

6. a. According to the petitioner in paragraphs 33-34 of the petition, out of the 1,262 foreign workers that it employed legally in 2001, it today employs *de facto* only 573. It says that 306 of these workers left the country lawfully, and the departure of most of them was confirmed by the Ministry of the Interior, as opposed to the remaining 383 who have left the petitioner's employment, but there is no confirmation that they have left Israel, and apparently they have applied to work for other employers illegally.

b. In an up-to-date investigation, the second respondent clarified that it has confirmed the departure from Israel of 252 out of the aforesaid workers.

c. As the petitioner states in paragraph 35 of the petition, the respondents' policy is that if an employer employed a foreign worker with a lawful permit, and that worker left his job without leaving Israel, the employer will not be 'credited' for the worker who left. This issue is the subject of another administrative petition, Administrative Petition 531/02, which is pending before the honourable court. A copy of the

preliminary response of the respondents in the aforesaid AP 531/02, in which the position of the respondents on this matter is clarified, is attached as appendix R/4 of this response.

7. a. Therefore, of the 1,262 foreign workers whom the petitioner employed legally in 2001, 1,010 remain today in Israel.

b. As stated above, the last permit that the petitioner held was to employ 265 foreign workers only.

c. As stated above, the permit that the petitioner is expected to receive, on the aforesaid assumption that the decision of the committee will be given the force of a government decision, is to employ 780 foreign workers. According to the petitioner, it currently has only 573 workers who are actually employed by it. But in view of the presence in Israel of more than 400 additional foreign workers who entered Israel for the purpose of being employed by the petitioner but have not departed, it does not have a right to bring in additional foreign workers.

d. As we said above, the respondents' policy with regard to foreign workers who left their employer illegally is set out in appendix R/4. This policy was not attacked in this petition, and therefore we will not discuss it at length. We will only point out that were the respondents to approve the replacement of a worker who left his employer illegally with a new foreign worker who will be brought to Israel in his stead, a vicious cycle would be created and this would lead to a never-ending increase in the number of foreign workers who reside illegally in Israel.

8. a. Although not essential, it should be noted that even if the petitioner had a right to employ additional foreign workers, something which as aforesaid is denied, there would be no grounds for bringing them from abroad; they should rather be transferred from other contractors who employ a surplus of workers (from the difference between the 45,000 workers whose employment was approved in 2001 and the 30,000 workers that were agreed between the parties for 2002).

b. In view of this, there is no basis or need for the honourable court to consider the first relief requested in this petition, i.e., the revocation of the respondents' policy that additional workers should not be brought to Israel. Moreover, with regard to the second relief there is no basis for the honourable court to consider the petitioner's application to bring additional foreign workers to Israel, but only an alternative application (which was not made by the petitioner) for the transfer of workers from other contractors.

9. a. In the petition, the petitioner rests its case on the respondents' declaration in HCJ 8722/00 that 'it will not act to deport foreign

workers' from Israel, on certain conditions (see paragraphs 29-30 of the petition, and also appendix P/7).

b. On the basis of these remarks, the petitioner claims that 'the respondents agreed to freeze the existing position' (paragraph 30 of the petition), in the sense that in practice they agreed to extend the validity of all the permits that were given in 2001 and were not renewed.

c. This contention of the petitioner should be rejected. The respondents' declaration should be given its simple meaning: the respondents *will not deport from Israel* foreign workers whose entry into Israel was originally lawfully approved, until a final settlement is reached in the High Court of Justice. The difference between consenting not to deport surplus workers and consenting to bring new workers to Israel (in violation of the declared policy of the state) is very great. The respondents did not intend this, nor is it a reasonable interpretation of their remarks.

d. In addition it should be noted that when the respondents declared, within the framework of the petition to the High Court of Justice, that they would not deport workers who originally came to Israel legally (and as it will be remembered, on certain conditions), the petitioner did not have a permit to employ 1,262 workers (since, as we have said, these permits expired on 31 December 2002 (*sic*), but only 265 workers, in accordance with the new permit of 8 January 2002.

10. In view of all of the aforesaid, the respondents argue that the petition should be denied.

## V. The timing of the petition

1. In view of the sequence of events as described above, it is clear that the matter that is the subject of this petition is not ready to be considered by the courts.

2. As we have said, in the near future (possibly within the next two weeks), if the committee decision receives the force of a government decision, the respondents are supposed to give the petitioner a revised allocation of 780 foreign workers. This allocation is based, *inter alia*, on the agreement between the respondents and the Association of Contractors (of which it can be assumed the petitioner is a member) with regard to a total quota of 30,000 foreign workers in the construction industry in 2002 — a drastic reduction from the quota approved in 2001, because of the decline in the amount of building, among other reasons. In view of this agreement, the Association of Contractors agreed to postpone the hearing in HCJ 8722/00 in the hope that this agreement will be given the force of a government decision, which may make its petition redundant.

3. The petitioner claims that the 1,262 permits that were given to it in 2001 were 'frozen' by the respondents in HCJ 8722/00. But even according to the petitioner, the validity of these permits will expire in the coming weeks, when it is given a new allocation of 780 permits only.

4. Is it conceivable that the petitioner is applying to the honourable court to be allowed to bring additional foreign workers to Israel, on the basis of the clearly unreasonable interpretation that it is giving to the agreement, when everyone agrees that it will become obsolete in the coming weeks? This application is clearly unreasonable, and it departs from the position of the Association of Contractors (of which, as aforesaid, the petitioner is presumably a member) in the High Court of Justice, when the agreements in that court constitute the basis for this petition.

5. In practice, the petitioner wants to have the best of both worlds. On the one hand, it wants to benefit from the interpretation that it gives to the agreements reached in HCJ 8722/00; on the other, it wants to ignore the consequences of those agreements, in so far as they do not suit it.

6. Therefore, the respondents request that the honourable court postpones the hearing of this petition, including the preliminary hearing, by one month.

* * * * *

For these reasons, the honourable court is requested to deny the petition and to find the petitioner liable for the court costs, including legal fees.

( - )
Sharon Edri
Senior Deputy A to the Jerusalem District Attorney and Director

HCJ 3541/03

**A. Dori Engineering Works Co. Ltd**

**v.**

**1. Government of Israel**
**2. Minister of Labour**
**3. Director-General of Employment Service**
**4. Minister of Interior**
**5. Director of Population Administration at Ministry of Interior**
**6. Hotline for Migrant Workers**

HCJ 6755/03

**Danya Cebus Ltd**

**v.**

**1. Government of Israel**
**2. Minister of Industry and Trade**
**3. Director of Foreign Workers Department**
**4. Minister of Interior**
**5. Director of Population Administration at Ministry of Interior**
**6. Hotline for Migrant Workers**

The Supreme Court sitting as the High Court of Justice
[17 May 2004]
*Before Justice Emeritus D. Dorner and Justices Y. Türkel, E.E. Levy*

Petition to the Supreme Court sitting as the High Court of Justice.

Petition in HCJ 3541/03 denied. Petition in HCJ 6755/03 granted.

For the petitioners in both petitions — E. Zohar, R. Blecher, A. Krispin.
For respondents 1-5 in both petitions — A. Helman.
For the sixth respondent in both petitions — N. Levenkron.

JUDGMENT

**Justice Emeritus D. Dorner**

1. For more than two decades foreign workers have been employed in Israel for low wages, especially in the agricultural, construction and nursing industries. According to the prevailing arrangement, these workers are brought to Israel by manpower companies on the basis of permits that are issued each year to employers in the various industries. Over the years, the number of the foreign workers has grown and has reached hundreds of thousands. Many of them remained in Israel even after the permits for their employment expired. In view of the negative ramifications of this phenomenon on the work market and Israeli society, the government decided to limit the number of foreign workers drastically, both by deporting the illegal workers and by reducing the number of permits issued. In addition, the government decided upon a 'closed skies' policy, according to which, as a rule, it would not allow the entry of any foreign workers into Israel in addition to those that are already in Israel, many of whom are, as aforesaid, present in Israel illegally. The employers were required to fill the quota of foreign workers stipulated in the permits given to them — a quota that was also reduced — by employing workers who are already in Israel.

The decision in this regard was adopted on 30 July 2002, and it was ratified by the current government on 13 April 2003. Later it was decided not to apply the 'closed skies' policy to the agricultural industry, because of the special needs of this industry.

On the basis of this policy, on 7 January 2003 the Ministry of the Interior issued a 'closed skies' protocol (hereafter: the protocol). Paragraph 13 of the protocol allows the possibility, in certain circumstances, of bringing workers from abroad. The paragraph states as follows:

> 'If the Ministry of the Interior does not succeed in offering an employer foreign workers who are in Israel, in accordance with the unfilled quota that he has, within 30 days of the date on which the foreign workers unit at Ben-Gurion airport determines his unfilled quota, the ministry shall consider allowing the possibility of an approval for that employer to bring workers from abroad, provided that the employer cooperated fully with the ministry in each of the stages.'

2. The petitioners in the two petitions before us are construction companies that employ foreign workers. The petitioner in HCJ 3541/03 (hereafter: Dori) applied, in a petition that was filed on 14 April 2003, to compel the state to allow it to realize permits to employ 131 workers that were issued to it in 2002 and which it was unable to realize as a result of the 'closed skies' policy. The petitioner in HCJ 6755/03 (hereafter: Cebus) applied, in a petition that was field on 24 July 2003, to allow the entry of 1,075 foreign workers, on the basis of permits that were issued to it in April 2003, for the year 2003.

At the request of the petitioners, we decided to hear the petitions together, and we issued orders *nisi* in them.

2. The petitioners argued that they made a serious effort to recruit foreign workers who are present in Israel, but they did not succeed in finding the workers whom they need. In view of this, the petitioners applied, pursuant to paragraph 13 of the protocol, to be allowed to bring foreign workers from abroad, in order to realize the permits that had already been given to them, which constitute, in their opinion, a binding administrative promise. The petitioners added that there was no basis for distinguishing between them and farmers, and that the construction industry in Israel is also dependent on the work of foreign workers.

In its reply to the petition, the state argued that Dori is not entitled to realize the permits that were given to it for the year 2002, whereas Cebus, when it received the permits for the year 2003 knew of the 'closed skies' policy. It was also argued that the petitioners did not take advantage of the pool of foreign workers who are present in Israel — who were arrested after they were found to be in Israel illegally and who are being held in custody facilities — and the number of workers present in Israel whom the two companies are prepared to employ is minimal. The state also argued that paragraph 13 of the protocol conflicts with the government decision and is therefore void, and in any case the paragraph was revoked by the most recent decision of the government, which was made after the protocol was issued. In such circumstances, the state is of the opinion that it is not possible to regard the permits as a binding administrative promise, and alternatively that even if these permits do constitute an administrative promise, the state was entitled not to honour it. This is because the state was confronted by the national need to carry out a reform in the work market that conflicts with the harm to the

petitioners, and this national need will be seriously prejudiced if foreign workers continue to be brought to Israel.

The state further argued that the distinction between the agricultural industry and the construction industry, whose needs differ from one another, is based upon objective considerations and is therefore a permitted one.

The Hotline for Migrant Workers (hereafter: the Hotline), which at its request was joined as an additional respondent, agreed with the state's position. The Hotline discussed the evils of bringing additional foreign workers to Israel and the efforts that it is making to find work for foreign workers who are in Israel illegally. An affidavit that was filed on behalf of the Hotline states that the Hotline organizes employment fairs for these workers at the imprisonment facilities, and many workers were brought to each of the fairs in numbers that exceed the number of the workers that the employers were prepared to absorb. The affidavit also states that the employers prefer 'new' foreign workers, who are unaware of their social rights, as opposed to the workers who are already in Israel, many of whom are aware of their rights. The Hotline is also of the opinion that even if the permits constitute a valid administrative promise, the government was entitled to be released from it.

3. No-one denies that the petitioners do not have a right to operate their companies by means of foreign workers, and that permits that were given in the past according to the policy that prevailed at that time do not give rise to a legitimate expectation that this policy will continue. See HCJ 298/70 *Pollak v. Minister of Trade and Industry* [1971] IsrSC 25(2) 3, at page 8. The reason for this is that, as a rule, an administrative authority may change its policy when it is of the opinion that this is required. See HCJ 198/82 *Munitz v. Bank of Israel* [1982] IsrSC 36(3) 466, at page 470.

As stated, workers are allocated on an annual basis. Each year an individual check is made with regard to the needs of each of the employers who wish to employ foreign workers in accordance with criteria that reflect the policies in force at that time. Permits that were not realized in a certain year are not credited to an employer for subsequent years. See and cf. HCJ 8155/03 *Aronson v. Director of Foreign Workers Department* (not yet reported, given on 10 November 2003), at paragraph 2(c). In any case, Dori has no right to be issued 131 additional permits to those that were issued to it in 2003, and therefore its petition should be denied.

4. Cebus's case is different. It has in its possession permits for the year 2003, and the question is whether it is entitled to realize them.

In my opinion, the permits to employ foreign workers — which in themselves are not conditional — should not be regarded as an administrative promise that relates to a norm that the authority undertakes to adopt in the future or an act that it undertakes to carry out in the future. These permits are *de facto* norms. It follows that the policy that prevents the realization of the permits amounts to the revocation of an administrative norm that has already been adopted.

Admittedly, an administrative authority is competent to revoke norms that it adopts — including permits — and to change them. But the proper considerations that should be taken into account in the case of a revocation of a norm, and especially the cancellation of a permit, are different from the considerations that should be taken into account when adopting the original norm. The balancing point between the conflicting interests is different from the one that justifies a release from an executive promise. This is because the latter creates an expectation interest only, and at most a reliance interest, whereas the revocation of a permit takes away 'something' that has already been given. In the balance that depends on the relative weight of the conflicting interests, very great weight should therefore be given to the harm to the individual as a result of the revocation, while taking into account the reason for the revocation. As a rule, very important reasons are required to cancel a permit that has already been given. See HCJ 799/80 *Shalalam v. Licensing Clerk under the Firearms Law, 5709-1949* [1982] IsrSC 36(1) 317, at pages 328-331; HCJ 4492/92 *Schenkrenko v. Director of Health Ministry* [1993] IsrSC 47(4) 861, at page 864.

5. In the case before us, the permits were issued after the decision concerning the 'closed skies' policy was made in 2002, and this was reflected in the protocol which also included a possibility — when this is essential — of bringing foreign workers from abroad.

The state's arguments that paragraph 13 of the procedure is void cannot be accepted. *Prima facie*, the paragraph does not contradict the policy that was determined, but merely gives validity to permits that were issued, so that they do not become worthless. The later government decision, which reiterated the decision that led to the issue of the protocol, should certainly not be regarded as an implied revocation of the protocol. The 'closed skies' policy — which leaves an opening for discretion, when needed, to bring foreign workers to

Israel in order to realize the permits — cannot, in itself, lead to the *de facto* revocation of permits that were already given.

In our case, the question whether Cebus, with a proper effort, could have recruited the workers that it needed in Israel is in dispute. In any case, Cebus will need, in the proceeding that will take place at the Ministry of the Interior, to prove its claim in this regard, as stated in paragraph 13 of the protocol. If it is found that Cebus is indeed unable, with a reasonable effort, to recruit the workers that it needs from among the foreign workers who are already present in Israel, the authorities will be required to allow it to bring workers from abroad, unless they find an important reason that is capable of revoking permits that have already been given.

For these reasons, I propose that we deny Dori's petition and grant Cebus's petition, as set out above.

I also propose that we order the state to pay Cebus's legal fees in a sum of NIS 10,000 and court costs. Dori shall pay the state court costs in a sum of NIS 10,000.

**Justice J. Türkel**

I agree.

**Justice E.E. Levy**

I agree.

Petition in HCJ 3541/03 denied. Petition in HCJ 6755/03 granted.

26 Iyyar 5764.

17 May 2004.

HCJ 10843/04

**1. Hotline for Migrant Workers**
**2. Kav LaOved Worker's Hotline**
**v.**
**1. Government of Israel**
**2. Minister of Interior**
**3. Minister of Industry, Trade and Employment**
**4. Yilmazlar International Construction, Tourism & Textile Co. Ltd**
**5. Israel Military Industries Ltd**

The Supreme Court sitting as the High Court of Justice
[19 September 2007]
*Before Vice-President E. Rivlin and Justices E.E. Levy, E. Hayut*

Petition to the Supreme Court sitting as the High Court of Justice.

Petition denied, by majority opinion (Vice-President Rivlin and Justice Hayut), Justice Levy dissenting.

For the first petitioner — N. Levenkron, Y. Berman.
For the second petitioner — Y. Livnat.
For respondents 1-3 — A. Helman.
For the fourth respondent — T. Benenson.
For the fifth respondent — R. Wolf.

JUDGMENT

**Vice-President E. Rivlin**

*The background to the petition and the arguments of the parties*

1. In 2002, an agreement was signed between Israel Military Industries Ltd (IMI) and the Turkish Ministry of Defence to upgrade 170 Turkish Army

tanks, for a sum of approximately 700 million dollars. The agreement included an undertaking of the State of Israel to make reciprocal purchases in an amount of approximately 200 million dollars over a period of ten years, i.e., approximately 20 million dollars per annum. An undertaking of this kind for a reciprocal purchase, which is called an 'offset arrangement,' is intended, as a rule, to compensate local industry for sending sources of income and employment out of the country, as well as to create an economic balance so that together with the purchase from a party outside the country, foreign currency will also travel in the opposite direction, which in our case is from Israel to Turkey. There is therefore no dispute that, without the undertaking to make a reciprocal purchase, the Turkish Ministry of Defence would not have approved the transaction as a whole.

In 2003 it was agreed between IMI and the Turkish Ministry of Defence that a part of the offset undertaking to which IMI committed itself would be realized by means of granting a permit to the fourth respondent, Yilmazlar International Construction Tourism & Textile Co. Ltd (hereafter: **the Yilmazlar company**), a company registered in Israel with Turkish owners, to employ workers from Turkey in the construction industry. Within the framework of the agreement it was stipulated that the wages of the Yilmazlar company's workers, less the amounts of money that the employees would keep for themselves for the purpose of their living expenses in Israel, would be sent directly to Turkey, and would be deducted from the offset debt. In order to ensure that most of the amounts that the Yilmazlar company's workers would receive would indeed be sent to Turkey and be deducted from the offset liability, it was stipulated that at least 90 per cent of the Turkish workers who would be employed by the Yilmazlar company within the framework of the agreement would have families to support.

The aforesaid agreement was enshrined in government decision no. 2222 of 11 July 2004 (hereafter: **the government decision**). It was stipulated in the decision that the Yilmazlar company would receive a special permit to employ 800 foreign workers from Turkey in the construction industry for the years 2004-2007, without this leading to an increase in the total maximum amount of foreign workers in the construction industry. The petition before us was filed against this decision.

2. The petitioners before us — the Hotline for Migrant Workers and the non-profit organization Kav LaOved Worker's Hotline — attack the aforesaid decision of the government. In their petition, they explain that the workers of the Yilmazlar company are not subject to the procedures that apply to the

other foreign workers in the construction industry in Israel with regard to the possibility of changing employers, but they are subject to the arrangement that existed before the procedures were formulated. According to this arrangement, a worker may work solely and exclusively for the employer for whom he came to Israel, and when the contract between the worker and that employer ends, the validity of the worker's entry visa and his licence to live in Israel expires. As a result of this, the workers of the Yilmazlar company are 'bound' to their employers. In view of the aforesaid, the petitioners demand that respondents 1-3 (hereafter: **the respondents**) apply to the workers of the Yilmazlar company the arrangements that apply to the other foreign workers in the Israeli construction industry. In particular the petitioners demand that the 'change of employer' procedure and the 'closed skies' procedure should be applied to the workers of the Yilmazlar company. The 'change of employer' procedure, it should be clarified, was intended to allow a worker to submit an application to change employers before he leaves his lawful employer or immediately after leaving him, if he proves that he was unable to submit the aforesaid application before he left. The procedure stipulates conditions that allow a worker to leave the employer whose name is stated in his licence and change over to a different employer, subject to the conditions and requirements stipulated therein. The 'closed skies' procedure allows, in certain circumstances, a worker who has been arrested for living in Israel illegally to be released from custody and to receive work with another employer. This is intended to find a solution for employers who have a shortage of workers, in view of the closed skies policy. The petitioners argue therefore that the government decision, which provides that the Yilmazlar company's workers shall not be subject to the aforesaid procedures, is an unreasonable decision, which violates the basic constitutional rights of the workers.

3. The petitioners give details in their petition of several incidents in which the Yilmazlar company's workers applied, because of allegedly harsh and illegal conditions of work and wages, to change over to another employer, within the framework of the 'closed skies' procedure. The applications of these workers were refused — so it is alleged — as the state relied on the government decision that is the subject of the petition. The petitioners argue that the Yilmazlar company's workers suffer from harsh conditions of work and meagre wages that are illegal. They explain that the Yilmazlar company's workers are recruited for the work in Turkey and are

immediately required to sign a several-page agreement, without being given the possibility of reading the agreement and without being given a copy of it. It is alleged that the workers' wages, without overtime, are less than the minimum wage provided by law. The workers are required to sign a blank promissory note, which remains in the possession of the Yilmazlar company and allows it to attach the worker's money and property unconditionally and for whatever amount that it sees fit to write in the promissory note. The petitioners further argue that when the workers come to Israel, their passports are taken from them; that in the first few months of their work, the Yilmazlar company does not pay their wages; that they work many hours each day and in rare cases they are even required to work almost a whole day consecutively; that the workers are not paid for overtime; that in some cases the workers are forbidden to leave the site after the workday ends without the approval of the work manager or they are required to return home no later than 10:00 p.m.; that at some sites the workers are forbidden to have cellular telephones; that if workers make a complaint, they are fined by the company and threatened that they will be dismissed and sent to Turkey; and that the company has the habit of holding 'threat meetings' from time to time. The petitioners claim that the respondents' policy, according to which they do not allow the Yilmazlar company's workers to change over to another employer, gives Yilmazlar absolute power over its workers, who are compelled to suffer any condition and any stricture that is imposed on them. They also say that the petition is filed as a public petition and that the petitioners do not include any worker of the Yilmazlar company who has been personally harmed by the company's policy. The reason for this, according to the petitioners, is that Yilmazlar has succeeded in exploiting its absolute power over the workers in order to suppress any possibility of a 'revolt' against its conditions of work, as well as against the restriction upon changing over to another employer.

The petitioners raise a host of arguments against the government decision. *Inter alia* they argue that the government decision with regard to the restrictive arrangement was made *ultra vires* and is contrary to the provisions of the Employment Service Law, 5719-1959, and contrary to the decision of a previous government; that it is a restrictive arrangement that violates the dignity and liberty of Yilmazlar's workers, the freedom of occupation, the freedom of contracts and their freedom to enter into contracts; that the decision is contrary to public policy, contrary to the principle of equality and unreasonable. Finally they are of the opinion that we ought to decide that the

offset transaction that was signed between the Government of Israel and the Government of Turkey is nothing more than trafficking in human beings.

4. The state argues at the beginning of its reply that no foreigner has an inherent right to work in Israel, and a foreigner certainly does not have an inherent right to work in any place of work where he wishes to work, for any employer whom he chooses. It argues that every state may make its willingness to allow a foreign national to enter and work in it conditional upon him working only for a specific employer in whose favour a visa was issued to the worker. On the merits, the state is of the opinion that the government decision does not violate any inherent rights of the company's workers and that there are objective and reasonable grounds that justify not applying the 'closed skies' procedure and the 'change of employer' procedure to the Yilmazlar company's workers. The state argues that there are significant differences between the Yilmazlar company's workers and other foreign workers. *First*, the state says that the Yilmazlar company's workers do not pay, when they enter into a contract with the company, large sums of money for their actual employment in Israel. This is different from other foreign workers, who pay huge sums to manpower companies or other agents in return for their actual employment in Israel, and they are therefore subject to the possibility of exploitation by the employer. In view of the aforesaid, the state argues that a worker who is not satisfied with the terms of his employment with the Yilmazlar company and wishes to terminate his employment with it can return to Turkey without suffering serious economic loss as a result, and there is no ground or reason that justifies allowing him to remain in Israel and to work here. *Second*, the state claims that the Yilmazlar company's workers are different from other foreign workers in Israel in that they are employed in Israel within the framework of an agreement that was made with the approval of the Turkish government and they are entitled to the protection of the Turkish government with regard to their rights as workers. *Third*, the state further argues that the State of Israel has a clear special interest in protecting the rights of the Turkish workers to earn proper wages and to receive their wages on time. It is emphasized that the State of Israel attributes great importance to carrying out the offset undertaking within the framework of the agreement with Turkey, both because of the serious economic consequences that could result from a breach of the undertaking and because of the negative consequences that could result from a breach of the undertaking in the sphere of Israel's foreign relations with Turkey. The

respondents say in this regard that the Turkish Ministry of Defence and the Israeli government check the conditions of employment of the Yilmazlar company's workers. Thus a delegation from the Turkish Ministry of Defence visited Israel in order to check the conditions of employment of Yilmazlar's workers. In addition, the Director of the Foreign Workers Department at the Ministry of Industry, Trade and Employment (hereafter: **the Ministry of Industry**) ordered a comprehensive investigation to be made of the conditions of employment of Yilmazlar's workers at the company's various sites throughout Israel. It is claimed that the findings of this investigation showed that, as a rule, the company's workers are employed on fair conditions, their wages are not less than the minimum wage provided by law and that their housing conditions at the company's sites are reasonable. The state clarifies that where problems were found, a further check was made and this showed that most of the problems had been corrected, and it declares that in any case the department will continue to examine whether to take action pursuant to its powers under the law to prevent additional problems in the future. *Finally*, the state claims that the petitioners did not succeed in establishing their claim with regard to a systematic violation of the rights of the Yilmazlar company's workers, and that in any case even if there is a basis to their claims, nothing prevents the workers who are dissatisfied with their terms of employment from leaving their work and returning to Turkey.

5. The Yilmazlar company, the fourth respondent, requests in its reply that we deny the petition against it entirely. Yilmazlar claims that the petitioners, in their innocence, have fallen victim to parties with economic interests — employers and manpower contractors — who wish to create a method of bringing foreign workers into the State of Israel, which will operate without supervision and in circumvention of the 'closed skies' policy of the Israeli government. Yilmazlar regrets the fact that the petitioners did not contact it at all with a request to receive the relevant details and to clarify the truth of the claims raised against it. The company claims that the documents in its possession — salary slips, confirmations of the payment of wages by bank transfer, confirmations of direct payments to workers and work agreements — show that it is fully in compliance with the labour laws, and that investigations that were made, both by Turkish government authorities and by Israeli authorities, show this to be the case. Yilmazlar requests that we do not accept the affidavits of the three foreign workers, on which the petition is based. It claims that a comparison of these affidavits with other affidavits, which were filed by workers in administrative petitions