**No. 05-114C**
**(Consolidated with Case Nos.**
**04-1719C, 05-1172C, and 06-49C)**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**A.A.B JOINT VENTURE**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

# AND

# MEMORANDUM IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

**Filed electronically:**

**BRIAN COHEN, ESQ.**
**Bell, Boyd & Lloyd LLP**
**1615 L Street, N.W.**
**Suite 1200**
**Washington, D.C. 20036**
**(202) 466-6300**

**December 21, 2007**

**Attorneys for Plaintiff**

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. OVERVIEW AND SUMMARY ........ 1

II. THE UNITED STATES MISCHARACTERIZES SR-22 ........ 2

III. SR-14 REINFORCES SR-22 AS AN AFFIRMATIVE WARRANTY ........ 4

IV. DEFENDANT'S BRIEF WHOLLY IGNORES THE CORPS' REQUIREMENT THAT BIDDERS SUBMIT A TCN PLAN ........ 5

V. THE INSTRUCTIONS TO BIDDERS REQUIRED A CREDIT TO THE GOVERNMENT FOR THE ANTICIPATED AMOUNT OF TAX REIMBURSEMENT ........ 6

VI. THE GOVERNMENT'S ANALYSIS OF GOVERNMENT OF ISRAEL ORDERS CONCERNING IMPORTATION OF TCNs IS ERRONEOUS, AND IN ANY EVENT DOES NOT ALTER THE STARK FACT THAT THE JOINT VENTURE WAS UNABLE TO BRING A SINGLE TCN INTO ISRAEL FOR THE PROJECT ........ 7

VII. THE CASE AUTHORITIES CITED BY THE GOVERNMENT ARE NEITHER CONTROLLING NOR PERSUASIVE ........ 11

VIII. CONCLUSION ........ 21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Ainger v. Michigan General Corp.*, 476 F. Supp 1209 (S.D.N.Y. 1979) .......... 18

*Amino Bros. Co., Inc. v. United States,* 372 F.2d 485, 178 Ct. Cl. 515 (1967), cert denied, 389 U.S. 846 (1967) .......... 13, 14

*Carl W. Linder Co.,* ENG BCA No. 3526, 78-1 BCA ¶ 13,114 .......... 17

*Chris Berg, Inc. v. United States,* 389 F.2d 401, 182 Ct. Cl. 23 (1968) .......... 13

*D & L Const. Co. v. United States,* 402 F.2d 990 (Ct. Cl. 1968) .......... 17

*Dale Const. Co. v. United States,* 168 Ct. Cl. 692 (1964) .......... 16

*Dravo Corp.,* ENG BCANo. 3800, 79-1 BCA ¶ 13,575 .......... 17

*Fort Sill Assoc. v. United States,* 183 Ct. Cl. 301 (1968) .......... 18

*Gerhardt F. Meyne Co. v. United States,* 76 F. Supp. 811 (Ct. Cl. 1948) .......... 17

*Hollerbach v. United States,* 233 U.S. 165 (1914) .......... 5

*J.W. Bateson Co., Inc.,* GSBCA No. 4687, 80-2 BCA ¶ 14,608 .......... 17

*Kolar, Inc. v. United States,* 227 Ct. Cl. 445, 650 F.2d 256 (1981), .......... 11, 12

*Lenry Inc. v. United States*, 156 Ct. Cl. 46, 297 F.2d 550 (1962) .......... 18

*Metropolitan Coal Company v. Howard*, 155 F.2d 780 (2nd Cir. 1946) .......... 18, 19

*Oman-Fischbach Int'l (JV) v. Pirie,* 276 F.3d 1380 (Fed. Cir. 2002) .......... 2, 15

*S.S. Mullen, Inc. v. United States,* 389 F.2d 390, 182 Ct.Cl.1 (1968) .......... 13

*Swinerton & Belvoir,* ASBCA No. 24022, 81-1 BCA ¶ 15,156 .......... 19

*W.G. Yates & Sons Const Co. v. United States,* 53 Fed. Cl. 83 (2002) .......... 14

## TREATISES

*Administration of Government Contracts* (4th Ed.) at 483 .......... 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **A.A.B JOINT VENTURE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05-114C** |
| | ) | **(Consolidated with Case Nos.** |
| **THE UNITED STATES OF AMERICA** | ) | **04-1719C, 05-1172C, and 06-49C** |
| | ) | **(Chief Judge Damich)** |
| **Defendant.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiff A.A.B. Joint Venture, for its Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, and for its Opposition to Defendant's Motion for Summary Judgment, states and represents as follows:

## I. OVERVIEW AND SUMMARY

The Brief filed by counsel for defendant presents as the single outcome-determinative issue in this matter the proper interpretation of SR-22,[1] while studiously ignoring four equally if not more important provisions: (1) the prior contractual commitment which the Government of the United States obtained from the Government of Israel to permit use of Third Country National (TCN) labor, which provided the underlying authority of the United States to make the representation to the Contractor that is contained in SR-22; (2) the contractual commitment obtained by the Government of the United States from the Government of Israel to reimburse the

[1] "Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel, for purposes of employment in carrying out this contract work."

United States for employment and income taxes paid by the Contractor for TCNs, which provided the basis for the "tax clause," SR-14, in the Corps of Engineers' contract with the A.A.B Joint Venture, in which the Corps agreed in turn to reimburse the Contractor for such taxes; (3) the Corps of Engineer's requirement in its Invitation to Bid that each bidder submit *with its bid* a plan setting forth the extent of the bidder's anticipated usage of Third Country National labor, which demonstrates beyond question both the reliance of the Contractor on SR-22 and SR-14 and the expectation on the part of the Corps that there would be such reliance; and (4) the requirement that bidders not include in its bid price the value of TCN taxes for which the Contractor is entitled to reimbursement pursuant to SR-14, which further establishes AAB's bid reliance.

When the foregoing additional provisions are taken into consideration, it becomes evident that the facts presented meet the requirements for a breach of warranty: (1) the Government assured the Contractor of the existence of a fact (specifically, that the Contractor would be able to import TCN labor to work on the Project); (2) the Government intended that the Contractor be relieved of the duty to ascertain the existence of the fact for itself (the United States Government having obtained a written commitment from the Government of Israel upon which its commitment to the Contractor was based); and (3) the Government's assurance of the fact proved untrue (the Government of Israel's Closed Sky Policy). *See Oman-Fischbach Int'l (JV) v. Pirie,* 276 F.3d 1380, 1384 (Fed. Cir. 2002), and other cases cited herein.

## II. THE UNITED STATES MISCHARACTERIZES SR-22

Defendant characterizes SR-22 as dealing with an issue that the United States had no influence or control over. The crux of defendant's argument is that SR-22, in its essence, communicated to the Contractor in advance that while the Corps of Engineers had no objection if

the Contractor were to request the Government of Israel to permit it to bring in TCNs as its work force, nonetheless the Corps was making no commitment as to how the Government of Israel might respond to such a request. This characterization is simply wrong.

To the contrary, SR-22 is reflective of a written commitment obtained in advance by the United States from Israel -- prior to issuing any of the contracts for the Wye River Accords projects -- that "[t]he USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA."[2] See paragraphs "n" and "o" of Note 5 of the Wye River Accords LOA, which is set forth in Plaintiff's Memorandum in support of its Motion for Summary Judgment at 5 (hereafter, "Plaintiff's Memorandum"). The LOA further contained an affirmative obligation on the part of the Government of Israel to "expedite the required materiel and personnel clearances associated with the execution and performance efforts authorized under this LOA." LOA Note 8, paragraph b. Id at 6.

SR-22 goes far beyond a mere grant of approval of the Contractor to seek Government of Israel permission to bring in TCNs, as counsel for the United States attempts to characterize it. Rather, SR-22 makes an affirmative representation that the Contractor "may arrange" to bring TCNs into Israel. This was not merely an empty promise, but rather one based on a pre-existing contractual commitment from the Government of Israel to permit importation of TCNs. When SR-22 is read in its proper context, it is evident that the United States first obtained from the Government of Israel the authority to represent to bidders on the projects the

---

2 In Plaintiff's Memorandum at 6-7, there is a citation to the testimony by deposition of John M. Jones, an official from the Corps of Engineers' Washington headquarters who participated in the negotiation of the LOA, to the effect that it was the Corps' understanding that use of TCNs in Israel was "common practice," and that the Corps wanted to preserve the right of "our contractors to have the ability to use TCN labor."

United States was funding that the winning Contractors could use TCNs as its labor force. Then secure in the knowledge that it had the authority to make such a representation, the contracts issued by the Corps of Engineers included affirmative representations to the Contractors to that effect. That the Corps of Engineers so intended was confirmed by the COE Resident Engineer, Joseph W. Blackburn, Jr., who testified by deposition that he and everyone within the Corps of Engineers he spoke with, including COR Michael Roach, and senior Corps officials Larry McAllister and Col. John Rovero, all agreed that the contract gave AAB the right to bring TCNs into Israel to perform the work. Blackburn Dep. at 21-23, Plaintiff's Supplemental Exhibit 1. Moreover, when it turned out that the Israeli Government changed its policy, one of the COE negotiators expressed his opinion that the Government of Israel was "clearly in violation of the LOA." Pl. App. Ex. 30.

## III. SR-14 REINFORCES SR-22 AS AN AFFIRMATIVE WARRANTY

The status of SR-22 as an affirmative warranty that the Contractor could use TCNs for construction labor is reinforced by SR-14, the clause in the contract that established a financial incentive for the Contractor to use as its labor force TCNs brought into Israel for the sole purpose of working on the Nachshonim Project. As is true with respect to SR-22, the contractual obligations of the Corps to the Contractor in SR-14 was reflective of contractual obligations taken on by the Government of Israel to the United States in the LOA. Among the conditions negotiated by the USG with the GOI as part of the Wye River Accords was an exemption from Israeli income and employment taxes for the contractor's third country national work force. See LOA Note 10, Plaintiff's Memorandum at 6.

The tax clause in the contract between the parties, SR-14, was based specifically on Note 10 of the LOA. (*See* Att.-F to Ex. 1.) That clause required the Contractor to provide to the

Corps, for submission to the GOI, information that would establish that the person was qualified for the tax exemption. The qualification was set forth at SR-14, paragraph 4(b), as follows:

> *b. The tax exemption for TCN personal income and employment taxes on earnings is limited to those third country nationals who enter Israel as employees of the contractor or subcontractors to work exclusively on this contract or other contracts under LOA # IS-B-HAC.*

As is discussed in detail in Plaintiff's Memorandum at 10-11, the tax exemption negotiated by the Corps of Engineers on behalf of its contractors on the Wye River Accords construction projects was an integral part of the Government of Israel's commitment to the Corps to permit the use of TCNs.

## IV. DEFENDANT'S BRIEF WHOLLY IGNORES THE CORPS' REQUIREMENT THAT BIDDERS SUBMIT A TCN PLAN

The fundamental principle underlying the use in the Federal procurement system of equitable adjustments to construction contracts which are awarded pursuant to competitive bidding is that the Government can save money in the long run by discouraging contractors from including contingency money in their bids through the assurance of an award of additional funds and time extensions when certain types of unanticipated events occur. See, e.g., Nash, Cibinic and Nagle, *Administration of Government Contracts* (4th Ed.) at 483. It has long been recognized that a contractor is entitled to rely on positive statements made in contract documents, despite general cautionary language to the contrary. *Hollerbach v. United States,* 233 U.S. 165 (1914). The basic question in "warranty" cases is whether the Government makes a positive representation upon which the contractor relies. Evidence that the Government anticipated such reliance by the Contractor in pricing its bid, combined with actual proof of such reliance (see Moav Affidavit, Pl. App. Ex. 7), constitutes strong support for a breach of warranty claim.

Here, the Instructions to Bidders required the submission of data confirming the extent to which each bidder anticipated using TCNs. *See* Plaintiff's Memorandum at 8. The A.A.B Joint Venture submitted to the Corps as part of its bid package such information, consisting of a chart (Att.-C to Ex. 1) showing anticipated TCN usage. Such submission demonstrates beyond question that the JV relied upon its contractual right to use TCNs in formulating its bid price.

## V. THE INSTRUCTIONS TO BIDDERS REQUIRED A CREDIT TO THE GOVERNMENT FOR THE ANTICIPATED AMOUNT OF TAX REIMBURSEMENT

The applicable contract Special Requirement dealing with the tax issue, SR-14, directed, "Bid prices shall not include the value of taxes for which the contractor will be reimbursed." (Att.-F to Ex. 1). Thus not only did the Government have actual knowledge of the degree to which each bidder anticipated using TCNs, the Government further required that the bidders adjust their bid price to account for the tax savings involved in using TCNs brought into Israel for the sole purpose of working on the Nachshonim Project. To require a contractor to adjust its bid in anticipation of obtaining a benefit offered in a Government representation (i.e., SR-22), and then to later deny the contractor an equitable adjustment when the benefit becomes unavailable to the Contractor, is directly contrary to the most fundamental principles underlying the concept of equitable adjustments.

## VI. THE GOVERNMENT'S ANALYSIS OF GOVERNMENT OF ISRAEL ORDERS CONCERNING IMPORTATION OF TCNs IS ERRONEOUS, AND IN ANY EVENT DOES NOT ALTER THE STARK FACT THAT THE JOINT VENTURE WAS UNABLE TO BRING A SINGLE TCN INTO ISRAEL FOR THE PROJECT

In Section III of plaintiff's Memorandum, A.A.B. Joint Venture identifies the specific Government of Israel orders and policy declarations which resulted in a virtual ban on the importation of new TCNs into Israel starting in January 2002. The Orders in question are

supplemented by the deposition testimony of the Director General of the Israeli Contractors Association, an affidavit of the JV's Project Manager, S. Denison Keeney, an affidavit of Avie Arenson, the President of the Joint Venture partner that performed much of the construction on the Nachshonim project, as well as numerous admissions[3] on the part of the Corps of Engineers which confirmed the drastic impact that lack of TCN labor was having not only on the Nachshonim project but all of the Wye River Accords projects.

In response to this overwhelming evidence of a drastic change in Government of Israel policy with respect to foreign workers, the Government offers no affidavits or deposition testimony contesting such evidence. Rather, the Government's approach is limited to a presentation of the relevant Government of Israel orders and policy declarations, from which counsel, and counsel alone, posits that a careful reading of such orders establishes that the Joint Venture *should not have had a problem* obtaining TCN labor. In rebuttal to counsel's unsupported argument, the Joint Venture has obtained a declaration of Israeli counsel Roy Blecher, Adv. Mr. Blecher was counsel to the Joint Venture in litigation in the Israel courts challenging the Israeli Government's restrictions on TCNs. He affirms the analysis contained in Plaintiff's Memorandum that the "Closed Sky Policy" restrictions on importation of TCNs began shortly after Government Decision No. 1141 of December 24, 2001, and that there was in fact a total ban on importation of new TCNs. See Plaintiff's Supplemental Exhibit 2.

Government counsel – apparently acting as his own expert witness – uses the Government of Israel orders in question as a platform from which to engage in unsupported

---

3 At page 8 the Government's Brief attempts to discount the significance of the admissions contained in the draft letter that the Corps submitted to the U.S. Embassy for the Embassy's use in dealing with the Government of Israel (Pl. App. 27B) as "unsigned and anonymous" In fact, as is revealed in Pl. App. 27A, paragraph 1.d, the letter was prepared by the Israel Program Office of the Corps "to document the scope of the problem for Embassy use in correspondence with the GOI."

assertions and rank speculation. Ironically, the Government's arguments as to why the Joint Venture should not have had the problems that it in fact had were largely the same arguments made by both the Arenson company and the Joint Venture in their futile lawsuits filed in the Israel courts against the Ministries of Labor and Interior, and were moreover essentially the same the contentions made by Israeli counsel for the Joint Venture in numerous entreaties to various Government Ministers and senior officials: that the Joint Venture *should have been able* to bring in TCNs for the Nachshonim project.

Whether the orders and policy declarations in question should have provided a basis for the contractor's importation of TCNs really begs the question. The true basis for the Joint Venture's claim – which the Government makes no effort at all to dispute – is the fact that despite Herculean efforts to overcome the obstacles placed in its way, the Joint Venture was unable to bring a single TCN into Israel to work on the Nachshonim Project after the December 2001 announcement of the Closed Sky Policy.

One of the most serious defects in the Government's argument is that it confuses the *allocation* of block visas by the Ministry of Labor with the actual *issuance* of employee-specific visas by the Ministry of Interior. As is established by the evidence presented by the Joint Venture in Section III, pp. 11-17 of Plaintiff's Memorandum, an allocation of block visas by the Ministry of Labor provided a contractor with nothing more than a right to apply to the Ministry of Interior for visas for specific individuals. The amount of annual visas permitted by the Ministry of Labor, which provides the foundation of much of the Government's argument, is wholly irrelevant to the true issues in this case. Throughout the duration of the Nachshonim project, the Ministry of Interior refused to issue *any* visas either to the Arenson Company or to the Joint Venture. As Avie Arenson declared in his affidavit – which the Government made no effort to dispute – the

so-called "Deserter's Policy" turned out to be ephemeral when Mr. Arenson confronted the Ministry of Interior with actual proof of repatriation of the Arenson company's former TCNs. Pl. App. Ex, 6, at 167-172; Ex. 5 at ¶ 15.

The Government speculates that since visas for TCNs were regulated prior to the date of the Nachshonim contract, that the contractor knew or should have known of a potential problem. In fact, admissions in the record establish beyond doubt that the Corps of Engineers was well aware prior to the Solicitation that that it was "common practice" for construction contractors in Israel to rely on TCN labor. See Plaintiff's Memorandum at 2, 6-7. To the contrary, any doubt that the Joint Venture may have had concerning its ability to bring in TCNs made its reliance on the assurances provided by the Corps of Engineers in SR-22 all that more critical and justified.

Next, the Government contends that the relevant GOI orders did not result in an *absolute* ban on TCNs. While that may be true in theory, in actual practice, the stark fact remains that the Joint Venture was unable to overcome the ban to bring in even one TCN. Further, even if the Government were correct on this point (which it is not), that issue goes to mitigation of damages, not liability.

Counsel for the United States contends that the Israeli Government's ban on TCNs working on GOI projects should have freed up TCNs to move to non-GOI jobs, such as the Nachshonim project. There are a number of defects in this argument in addition to the fact that it is nothing more than counsel's speculation. As revealed in Avie's Arenson's deposition, Pl. App. Ex. 6, at 64-65, the major Israeli contractors refused to bid on certain large GOI projects without permission to use TCNs, and an agreement to disregard the law was reached. Moreover, the Joint Venture has never asserted that it was unable to obtain *any* TCNs already in-country on other

projects. The JV's claim is rather based on the fact that it was unable to obtain *enough* TCNs to man the project adequately, due to the restrictions on bringing in any new TCNs.

At page 10 of the Government's Brief, Government counsel takes speculation and innuendo to a new height – asserting that a cryptic reference to a discussion of the tax reimbursement issue at an internal JV meeting constitutes proof that "A.A.B. principal reason for importing TCN's was not because of a dearth of TCNs in the country" but rather a "desire to obtain tax refunds." Not only is there nothing in the quoted excerpt which supports such an outlandish conclusion, the actual statement includes a reference to a decision of the JV to *"forgo reimbursement of taxes"* in order to use the "few skilled/trained TCNs" that were available.[4]

In his closing remarks at page 29, Government counsel asserts as an additional reason why the Joint Venture should not have had a problem with adequacy of manpower a purported concession in Avie Arenson's deposition that there was no difference "in terms of quality or speed or cost between the work of Israeli construction workers and foreign workers." This is a deliberate and calculated distortion of the record. Throughout this entire dispute not a single witness has challenged nor has any document refuted the accuracy of the proposition that in the 1996-2002 time frame, the majority of construction work in Israel was performed by foreign labor, and that there were very few Israelis trained in the construction trades. What Mr. Arenson was referring to by his several references to "now" was the fact that in 2002 / 2003 Israeli contractors started training Israelis – particularly Israeli Arabs – in the construction field and that

---

[4] It should also be noted that as of the date of the meeting in question, November 28, 2001, the Ministry of Labor was in the middle of a strike that had commenced on October 16, 2001, and that the JV did not become aware that it was going to have a problem with Arenson's applications for TCN visas with the Ministry of Interior until its 2002 block visas had been issued on July 3, 2002. See Avie Arenson deposition, Pl. App. Ex 5, at ¶¶ 13-14 (page 138).

*by the time the deposition was taken in 2006,* there were numerous trained Israeli construction workers. Deposition of Avie Arenson at 129, Plaintiff's Supplemental Exhibit 2.

Under Rule 56, a summary judgment motion or opposition must be supported by admissible evidence. The factual contentions presented by the Government contain mere unsupported speculation by counsel, and are wholly inadequate to support the Government's legal arguments.

## VII. THE CASE AUTHORITIES CITED BY THE GOVERNMENT ARE NEITHER CONTROLLING NOR PERSUASIVE

The primary legal argument made by the Government is that the Corps of Engineers only advised the Contractor in SR-22 that it "may" arrange to bring TCNs into Israel, and that it was up to the Government of Israel, over whom the United States had no control, or concerning which the United States could make no promises to grant or deny such permission. Def. Br. At 18. The Government cites four cases for the proposition that use of the word "may" in a representation cannot be the basis for a warranty. The four cases cited by the Government are distinguishable, and are not persuasive when the factual context of the contract clauses at issue are taken into consideration. At most, the cited cases demonstrate that a representation by the Government that a contractor "may" take a particular action might or might not constitute a warranty, depending on a reading of the relevant contract as a whole and giving due consideration to the surrounding circumstances.

*Kolar, Inc. v. United States,* 227 Ct. Cl. 445, 650 F.2d 256 (1981), involved a contract for sale by the U.S. Air Force to a scrap metal dealer of scrap metal, including practice bombs, which had been collected from land used by the Air Force for target practice. The contract specifically warned the contractor that the scrap may contain substances of an explosive nature, that the contractor was responsible for safety, and that the Government assumed no liability for

injury to or death of the contractor's employees arising out of the disposition of the material. The specific contract language that the contractor claimed constituted a warranty stated:

> *[p]urchaser may also bring to work site equipment to prepare the material for ease of loading and transporting such as cutting torches and a metal bailer.*

Id. at 449.

In conformance with the above-quoted contract language, the contractor was in fact permitted to bring to the work site and to use cutting torches. The contractor in *Kolar* asserted that the foregoing language constituted a warranty by the Air Force that the purchaser was not only permitted to bring to the site and *use* cutting torches, but also that such use would in all circumstances be *safe*. The purchaser asserted a breach of the asserted warranty when one of its employees attempted to use a cutting torch on a practice bomb and it blew up.

First, there was nothing in the quoted language making a representation that the use of cutting torches on all of the scrap metal purchased by the dealer was safe. Secondly, the contract was replete with language to the contrary – specifically warning the purchaser that the property may be hazardous, and expressly shifting to the contractor responsibility for safe handling and the risk of injury or death to the contractor

The *Kolar* case did not turn on the Government's use of the term "may." Had the Air Force changed its mind and decided to deny the purchaser the right to bring cutting torches to the work site, the express representation that the contractor "may" bring cutting torches to the work site would properly have been the basis for a breach of warranty claim. Contrary to the Government's contention in this case, the *Kolar* decision did not turn on whether the word "may" constituted a representation upon which there could have been bidder reliance. Rather, reading the contract as a whole, the court concluded that there was no warranty extended *as to matters of safety.*

The importance of viewing both the contract as a whole and the surrounding circumstances in making a determination as to the existence of a warranty is evident in a comparison of *S.S. Mullen, Inc. v. United States,* 389 F.2d 390, 182 Ct.Cl.1 (1968) and *Chris Berg, Inc. v. United States,* 389 F.2d 401, 182 Ct. Cl. 23 (1968). Both cases involved contracts for replacement of aerial tramways in remote locations in Alaska. Each contract contained the same representation: that the existing tramway "may be used" in erecting the new tramway. When the tramways on both contracts could not be so used, both contractors sued for breach of warranty. In *Mullen* the Court found the existence of a warranty, while in *Chris Berg,* no warranty was found. There were two critical differences in the cases. First, in the *Mullen* contract there was a Government Furnished Property clause, while in the *Chris Berg* contract there was not. Second, while neither contractor performed a pre-bid inspection, the Court found that in the *Mullen* project the evidence supported the conclusion that as of the date of the contract the old tramway had been suitable for use in construction of the new one, while in the *Chris Berg* project a pre-bid inspection would have revealed that the old tramway was not suitable for use for the purpose intended by the contractor.

Thus contrary to the argument made by the Government in this case, the *Chris Berg* decision does not stand for the proposition that use of the term "may" in a representation by the Government perforce defeats a claim for breach of warranty. Instead, Mullen and Chris Berg, read together, establish the proposition that a representation to a contractor that it "may" perform its work in reliance on a fact can constitute a warranty if there is actual reasonable reliance on a Government representation.

The third case cited by the Government, *Amino Bros. Co., Inc. v. United States,* 372 F.2d 485, 178 Ct. Cl. 515 (1967), cert denied, 389 U.S. 846 (1967), presented a question of contract

interpretation. The project involved the construction of a flood control levee using excavated materials that had to be transported across a river that was located below a Army Corps of Engineers flood control dam. The contract stated that the contractor "may construct for its own use" a low water crossing across the river for purposes of transporting such material. Heavy rains resulted in the water in the upstream reservoir reaching a level at which the Corps was required to release water from the dam, both in order to protect the dam itself and the lives of people and their property located downstream from the dam. The increased flow of water destroyed the contractor's low water crossing.

The contractor in *Amino Brothers* argued that the contractual right to construct a low water crossing implicitly included an obligation not to release water from the upstream dam in a quantity that would destroy the crossing. The Court recognized that the Government can agree in a contract to pay a contractor the amount of its increased costs resulting from a sovereign act, but held that the Corps did not make such a contractual promise with respect to the matter at issue.

Certainly had the Corps of Engineers changed its mind and prohibited the contractor in *Amino Brothers* from building a low water dam, the representation that the contractor "may" build such a dam would have properly been viewed as a warranty. The issue presented was not whether the contractor could build a low water crossing, but rather whether a representation which permitted the construction of such a crossing extended so far as to require the Corps to pay to rebuild the crossing if heavy rains required water to be released from the dam. It was the absence of any contractual language to support the Contractor's claim that led to a decision in favor of the Government.

The final case relied upon by the Government is *W.G. Yates & Sons Const Co. v. United States,* 53 Fed. Cl. 83 (2002). In *Yates,* the specifications listed three potential sources of cable

reels to be used in the construction of an aircraft repair facility, but permitted an "approved equal" as well. The contractor's electrical subcontractor contacted the distributor of one of the three identified sources and obtained a price quote, which later turned out to be erroneous, since (apparently unknown to the distributor) the actual cable reel the subcontractor ordered was no longer made by the manufacturer whose products that distributor offered for sale. The Court in *Yates* concluded that the representations as to the potential sources of supply were only "suggestions or examples" and not a warranty, and on that basis denied the contractor's claim.

On the basis of the foregoing, it is evident that a contractual representation by the Government that a contractor "may" perform its contract in a particular way can constitute, under appropriate circumstances, a warranty upon which a contractor may comfortably base its bid price.

The Government cites in further support of its argument *Oman-Fischbach Int'l (JV) v. Pirie,* 276 F.3d 1380 (Fed. Cir. 2002), a case where there was no contractual support for the contractor's claim of warranty. In its Brief he Government attempts to use dicta in *Oman-Fischbach* to suggest – contrary to all existing precedent -- that a finding of a Government warranty and a breach thereof is not sufficient upon which to base an equitable adjustment, and that the contract must actually go one step further, and affirmatively promise *payment* in the event the fact represented by the Government turns out not to be true. There is no reported decision that goes that far, and the context in which the dicta appears does not support such a conclusion.

*Oman-Fischbach* involved a claim for extra costs for transporting waste material on a construction contract performed on a military base which was under the control of the Portuguese Armed Forces. The contractor claimed additional hauling costs, having been required

to haul waste around the military base instead of through it due to the actions of the Portuguese Armed Forces in locking a gate. There was no contract language the contractor could point to as the basis for its claim of warranty. In fact, the contract specifically granted to the contracting officer the option to select among three identified alternative dump sites, and was silent with respect to the haul route to be used. The only support for the claim was an implied representation as to the route to be used which was claimed to have been made at the pre-bid conference.

The primary case cited by the Court in *Oman-Fischbach* is *Dale Const. Co. v. United States,* 168 Ct. Cl. 692 (1964). *Dale* involved a contract for replacement of a deteriorated water main on an Army base. During one point in the construction the post engineer requested the City of Boston Water Department to shut off a particular water valve, and then the post engineer represented to the contractor that the valve had been shut. It was later discovered, after water started gushing from the pipe, that the City employee had turned off the wrong valve. The Army denied the Contractor's claim for resulting damages on the grounds that the fault was the City's, not the Army's. In language that is very close to that adopted in the opinion of the Federal Circuit in *Oman-Fischbach,* the Court of Claims stated (168 Ct. Cl. at 699):

> *It is in this context that the record clearly establishes that the post engineer was not at fault in this incident; hence the Government may be held liable in damages only if the circumstances show that it extended a warranty to the contractor which was breached. In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promissee for any loss if the fact warranted proves untrue.* ***

The Court of Claims opinion in *Dale* then concluded that since the Army had given the contractor an "unqualified assurance" that the contractor relied upon, the contractor was entitled to damages when the assurance turned out not to be accurate. In *Dale* and the other cases where a

warranty has been found [5] the existence of an unqualified warranty has been deemed sufficient upon which to base an award for breach.

In *Oman*, there is ambiguous dicta that the Government seizes upon, which in fact goes beyond the court's holding, and that is not supported by the cases cited in support of that proposition. In its statement that "[u]nless the parties in unmistakable terms agreed to shift the risk of increased cost due to acts by the Portuguese military, no liability on the part of the Navy attaches from such acts," there is some ambiguity whether it is the warranty itself which must be clearly expressed, or the obligation implied in a warranty to make compensation. As discussed below, to interpret this language as requiring anything more than a clear and explicit *warranty* would be inconsistent with established case law, including decisions of this court. Moreover, such a conclusion finds no support in *Lenry Inc. v. United States*, 156 Ct. Cl. 46, 297 F.2d 550,

5 *See, e.g., D & L Const. Co. v. United States,* 402 F.2d 990, 999 (Ct. Cl. 1968) (contract clause providing that existing off-site improvements, such as existing streets, would be available to the contractor extended a warranty the breach of which was compensable); Everett Plywood and Door Corp. v. United States, 190 Ct. Cl. 80, 419 F.2d 425 (1969) (timber contract – estimate of quantity constituted warranty, supporting damage award); *Gerhardt F. Meyne Co. v. United States,* 76 F. Supp. 811 (Ct. Cl. 1948) (contract specifications which provided a specific route to be used by the contractor constituted a warranty the breach of which entitled the contractor to compensation); *Henderson, Inc.*, DOT BCA Nos. 2423, 2500, 94-2 BCA ¶ 26,728 (contract clause that prohibited dredging during a certain portion of the year implied a warranty that contractor could dredge the remainder of the year – breach of the warranty caused by action of third party entitled contractor to equitable adjustment); *J.W. Bateson Co., Inc.,* GSBCA No. 4687, 80-2 BCA ¶ 14,608 (Site access case – combination of contract drawing, contract clause, and pre-bid inquiry constituted a warranty, and Government liability for breach); *Dravo Corp.*, ENG BCANo. 3800, 79-1 BCA ¶ 13,575 (designation of work areas constituted warranty as to the availability of such areas for contractor's use, and denial of access constituted compensable breach); and *Carl W. Linder Co.*, ENG BCA No. 3526, 78-1 BCA ¶ 13,114 (Contractual representation as to anticipated site access constituted promise which implied that Government would stand the increased cost upon denial of such access).

553 (1962), and *Fort Sill Assoc. v. United States,* 183 Ct. Cl. 301, 309 (1968) -- the cases cited as support for this proposition by the Federal Circuit.[6]

It is generally recognized that the most lucid statement of the law of breach of warranty was written by Judge Learned Hand. In *Metropolitan Coal Company v. Howard*, 155 F.2d 780, 784 (2nd Cir. 1946) Judge Hand stated:

> A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promissee of any duty to ascertain the fact for himself; it amounts to a promise to indemnify the promissee for any loss if the fact warranted proves untrue, for obviously the promissor cannot control what is already in the past. (emphasis added)

The Southern District for New York noted in *Ainger v. Michigan General Corp.*, 476 F. Supp 1209, 1221 (S.D.N.Y. 1979) that Judge Hand's "analysis of a warranty as an implied promise to indemnify is supported by the leading authorities on contract law, citing Restatement of Contracts § 2(2) (1932) wherein it is observed that words which in terms promise the happening or failure to happen of something not within human control or the existence or nonexistence of a present or past state of facts are to be interpreted as a promise or undertaking to be answerable for such proximate damage as may be caused by the failure to happen or the happening of a specified event, or by the existence or nonexistence of the asserted state of facts."

---

[6] A careful reading of *Lenry* demonstrates that there is nothing inconsistent in the court's analysis in that case with the authorities cited by plaintiff. However, at page 553 of that opinion the court stated "Had defendant ever intended to make such a unique and all-encompassing guarantee, and had plaintiffs expected it, we believe they would have so specified in clear and unmistakable language." It is obvious that the court in *Lenry* was using the term "unmistakable" not in relation to the implied agreement to indemnify, but rather to the language that it believed was required to constitute a warranty.

*Everett Plywood*, *Metropolitan Coal Company, Mullen, Dale, and* all the Board cases cited in our original motion as well as other authorities, including the Restatement of Contracts, make it clear that inherent in a warranty is an implied promise to indemnify. There is no requirement to prove an express promise to indemnify.

Moreover, such a rule of law is also contrary to logic, sound policy and reason. To adopt such a rule would allow the government to routinely escape financial responsibility where it assured the contractor of any existing fact in such a manner that the contractor was entitled to rely upon it but such statement proved untrue. There appear to be no reported cases where the government expressly agreed to be responsible for the damages caused by its breach. The adoption of such a rule would eviscerate the current law of warranty, and would be contrary to the most basic notions of contract law and innumerable cases decided by this court, its predecessor, and the boards of contract appeal.

There is likewise no decisional law supporting the view that a warranty is any less effective applicable to the conduct of third parties, rather than conduct of the Government itself.[7]

7 In *Carl W. Linder Co., supra,* the Board noted that within the framework of government standard clauses sovereign government acts, acts of natural forces and acts of third parties "are treated in the same fashion" and given a warranty, "there are no logical grounds for distinguishing among them." The Board then summarized the applicable law (78-1 at 64,098):

> *When the government has given a warranty in its contractual capacity, and the subject matter of the warranty is frustrated by any intervening cause, the contractor should be entitled to relief.*

*See also, Swinerton & Belvoir,* ASBCA No. 24022, 81-1 BCA ¶ 15,156 (delay caused by Government of Guam in importing alien workers).

## VIII. CONCLUSION

All of the elements of a breach of warranty claim are present in this matter. First, SR-22 contains an explicit, unqualified representation that the contractor may arrange for the importation of TCNs as its work force, which was backed up by a prior written commitment to that effect by the Government of Israel to the Government of the United States. The fact that the Government anticipated and specifically intended that the contractor rely on its ability to bring in TCN workers is evidenced by both the tax clause, SR-23, and the requirements that bidders submit their plan for TCN usage, and deduct from their bid price the anticipated amount of tax reimbursement. It is also beyond dispute that in January 2002 – after the contract had been entered into – that the Government of Israel made a drastic change in policy with respect to use of foreign labor, which prevented the A.A.B. Joint Venture from importing a single new TCN into Israel. There are no material disputes of fact concerning this issue. The Motion for Summary Judgment filed by the United States should be denied. A.A.B. Joint Venture is entitled to judgment in its favor as a matter of law.

Date: December 21, 2007

Respectfully submitted,

s/ Brian Cohen
Brian Cohen
BELL BOYD & LLOYD LLP
1615 L Street N.W., Suite 1200
Washington, D.C. 20036
(202) 466-6300

Attorneys for Plaintiff

Of Counsel:
Philip Clark Jones
Bell, Boyd & Lloyd, LLP

**CERTIFICATE OF SERVICE**

I, Brian Cohen, hereby certify under penalty of perjury that the foregoing pleading and exhibits were served automatically via "shalom.brilliant.usdoj.gov" upon ECF filing this 21st day of December, 2007 upon:

Shalom Brilliant, Esq.
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530

s/ Brian Cohen
Brian Cohen