relating to them, show many contradictions and that many of the facts included in them are incorrect. *Inter alia*, Yilmazlar says that the workers keep their Turkish passports, which they claim was proved by the investigation made by the Ministry of Industry; that the workers, including the deponents, come to Israel after signing work agreements with Yilmazlar that are supervised and approved by the Turkish Ministry of Labour; that the terms of the agreements with them, including increases in wages, are punctiliously observed by Yilmazlar; that the Turkish Ministry of Employment controls the travelling of Turkish workers to Israel and supervises the procedure carefully; and that the fact that many of the workers who return to Turkey, including one of the petitioners' deponents, wish to return to Israel and to be reemployed precisely by Yilmazlar shows that the employment is fair and the wages are proper and lawful. Yilmazlar claims that the offset agreement constitutes a golden economic opportunity for the Turkish workers, and that granting the petition and setting aside the agreement will inflict a mortal blow upon hundreds of Turkish workers who are employed by the company.

6. IMI, which was joined at a later stage as a party to the petition, is also of the opinion that it should be denied. It argues that the petition should be denied *in limine* because of delay in filing it, both because it was filed more than four months after the date on which the government decision was made, and because IMI was joined as a party to the proceedings another four months thereafter. IMI explains that the realization of the undertaking to make a reciprocal purchase — in an amount of tens of millions of dollars, and in accordance with predetermined timetables — involves prolonged and complex planning. It argues that setting the government decision aside will case IMI real and serious damage, since it will have difficulty, and maybe will not succeed at all, in complying with its undertakings to make a reciprocal purchase within the timetable that applies in this matter. IMI points out that Turkey is one of its important strategic targets. It argues that a failure to comply with the undertakings that IMI took upon itself is likely to result in fines in a sum of millions of dollars; damage to its chances of winning a further order for the project; the inclusion of IMI on the 'blacklist' of the Turkish defence establishment; exclusion from participation in additional tenders in Turkey in the military-security sphere; damage to IMI's additional projects in Turkey; and damage to other joint projects of Israel and Turkey and the strategic relationship between the countries.

*Decision no. FW/3 of the ministerial committee and government decision no. 4024*

7. Before we turn to consider the merits of the petition, we should discuss several developments that have occurred since the petition began to be heard before this court. *First*, on 7 September 2005, the state filed an update statement, in which it gave notice that on 7 June 2005 the ministerial committee for the employment of foreign workers adopted a decision concerning the workers of the Yilmazlar company (hereafter: **ministerial committee decision no. FW/3**), which states the following:

> '1. a. Further to government decision no. 2446 of 15 August 2004 and government decision no. 222 of 11 July 2004 [the decision that is the subject of this petition], it shall be determined that the permits that were given to Yilmazlar... to employ 800 foreign workers until the end of 2007 shall not be subject to the procedures concerning the employment of foreign workers through licensed corporations, and the Minister of Industry, Trade and Employment shall be directed to grant an exemption to the Yilmazlar company from paying the permit fees for employing those workers. In addition, the Ministry of the Interior shall be directed not to apply the transfer procedure and the change of employer procedure to the Yilmazlar company's workers, subject to the decision of the Supreme Court in petition HCJ 10843/04, and at the same time the Director of the Foreign Workers Department at the Ministry of Industry, Trade and Employment shall be directed to carry out special periodic checks of the conditions of employment of the company's workers, in order to ensure the payment of wages and ancillary benefits to the workers according to law.
>
> b. It is clarified that only the government has the power to approve, in very exceptional cases, an additional arrangement for the bringing or the employment of foreign workers as a part of reciprocal purchase transactions.'

The update statement clarifies that the Minister of Finance submitted an objection to the aforesaid ministerial committee decision no. FW/3, and on 31 July 2005 the government adopted decision no. 4024 (hereafter: **decision no. 4024**), in which it was decided, *inter alia*, to approve the aforementioned paragraph 1, which lies at the heart of this petition and which concerns the arrangement whereby the foreign workers are employed by Yilmazlar. The

state emphasizes, therefore, that both the ministerial committee and the government directly considered the matter lying at the heart of the petition, and they decided, in the circumstances of the case, that the transfer procedure and the change of employer procedure should not apply to the 800 foreign workers who are employed by Yilmazlar. It is argued that the margin of discretion given to the government, as the executive branch of the state, with regard to the policy of employing foreign workers in Israel is very broad. In view of the aforesaid, the state argues that government decision no. 4024 falls within the margin of reasonableness and that there are no legal grounds for the intervention of the court.

8. For their part, the petitioners filed a response to the update statement, in which they clarified that they stand behind everything stated in their petition and insist upon the reliefs sought therein. The petitioners claim that the decision of the ministerial committee and government decision no. 4024 do not change the position of Yilmazlar's workers. Moreover, the petitioners emphasize that other foreign workers who work in the construction industry are no longer employed by construction companies, but through licensed corporations who supply manpower to the construction companies. As we said above, these workers are subject to the 'closed skies' procedure and the 'change of employer' procedure, which allow workers to transfer from one manpower company to another once every three months. The petitioners argue that by contrast Yilmazlar remains the only construction company in Israel which has permits to employ non-Israeli construction workers directly, and whose workers suffer from being bound absolutely to their employer and from a continued violation of their rights.

9. On 8 February 2006, the petitioners filed an application to attach documents, which they claim are capable of shedding light on the harsh consequences of the arrangement under discussion in the petition, and of the violation of the rights of the Yilmazlar company's workers. The documents that the petitioners wish to attach are decisions of three instances of the courts in an action filed by the village of Yagel against the Yilmazlar company. In the action, the Yilmazlar company was requested to vacate a building in the village in which it had housed its workers. It was alleged that the company housed in a building designed as a home for one family approximately one hundred of its workers, thereby violating their rights. The petitioners claim that the Magistrates Court, the District Court and finally this court accepted the factual contentions of the village of Yagel in this regard.

In response, Yilmazlar argues that the housing conditions of its workers are not a part of the petition, and the facts of this matter should be clarified, if at all, in other proceedings. It argues that the citations from the judgments that the petitioners wish to attach are *obiter* remarks that were made within the framework of the hearing for a temporary order, before the actual claim was tried. Finally, Yilmazlar argues that supervisors from the Department for Enforcing the Labour Laws of the Ministry of Labour and Social Affairs made an inspection of the housing of the workers who were housed in the village of Yagel. They claim that it can be seen from the report that was compiled that the housing conditions of the workers were satisfactory and that Yilmazlar passed the inspection after correcting minor defects. Yilmazlar therefore wishes to attach to its submissions the report from the inspection of the foreign workers' housing by the Department for Enforcing the Labour Laws of the Ministry of Labour and Social Affairs of 8 November 2005, and the report from the inspection after correcting the defects, in order to prove that there is no basis to the petitioners' claims.

*The judgment in HCJ 4542/02*

10. On 40 March 2006, judgment was given by this court in HCJ 4542/02 *Kav LaOved Worker's Hotline v. Government of Israel* (hereafter: **HCJ 4542/02**). The petition in HCJ 4542/02 was filed by the petitioners before us and others. In that petition it was claimed that the arrangement that bound foreign workers in Israel to one employer seriously violated the rights of those workers. The Supreme Court granted the petition. In a comprehensive judgment (written by Justice E. Levy, with the agreement of President A. Barak and Vice-President M. Cheshin), the court first considered the reality of the employment of foreign workers in Israel. The condition of the workers was described (in paragraph 27 of the judgment) as follows:

> 'A consideration of the reality of employing foreign workers in Israel during these years reveals a problematic and troublesome picture. It transpires that workers from foreign countries are able to come to Israel *ab initio* only after paying large amounts of money — sometimes involving the mortgaging of their property and taking out loans — to manpower providers and agencies. These amounts of money are shared between the manpower company in the country of origin and the manpower providers in Israel (State Comptroller, *Annual Report no. 53b for 2002*, at pp. 655-656; LabC (Hf) 1565/05 *Rosner v. Ministry of Industry, Trade and Employment*). In this manner:

Vice-President E. Rivlin

> "The profit involved in actually bringing the foreign workers from abroad (which arises from payments that the foreign workers are prepared to pay in their country of origin in return for the right to work in Israel) induces various manpower providers to bring foreign workers to Israel in as large a number as possible, whether there is work for them in Israel... or not" (Recommendations of the Inter-ministerial Committee, at p. 11).

The wages paid to foreign workers are in most cases low, and frequently even lower than the minimum wage. The State Comptroller's Annual Report for 1999 found that:

> "The main economic incentive for employing foreign workers is that they cost less than the Israeli worker, and that they are prepared to work without social benefits and on terms that are unacceptable to the Israeli worker... Foreign workers are the most vulnerable sector, from the viewpoint of breaching the Minimum Wage Law. Exploitation of foreign workers by employers can also be seen from a survey conducted by the Manpower Planning Authority in 1998 with regard to foreign workers in Israel without a permit. Approximately 70% of those interviewed earned less than the minimum hourly wage..." (State Comptroller's Annual Report for 1999, at pp. 278-279).

Even the work and subsistence conditions offered to foreign workers are poor, and many of them find themselves living in crowded accommodation and unpleasant living conditions (see State Comptroller's Annual Report for 1995, at pp. 476, 493; CrimC (Jer) 106/03 *State of Israel v. Mordechai Aviv Construction Enterprises Ltd*). They do not benefit from the effective protection of protective legislation (see O. Yadlin, "Foreign Work in Israel," *Menachem Goldberg Book* (A. Barak et al. eds., 2001), at p. 350 and the references cited there; LabC (BS) 1347/03 *Atzova v. Sansara Health Club Management Ltd*); they are exposed to abuse, exploitation and oppression (see

> LCrimA 10255/05 *Hanana v. State of Israel*; see also the Report of the Ministry of Justice, Ministry of Labour and Social Affairs and the Ministry of Foreign Affairs, *Implementation of the International Covenant on Economic, Social and Cultural Rights* (1997), at p. 27), and they find it difficult, *inter alia* because of a lack of the knowledge and the funds that are required in order to pursue a legal recourse, and because of their great dependence on their employers, in bringing their cases to the courts (see LabA 1064/00 *Kinianjoi v. Olitziki Earth Works*, at p. 638).'

Against the background of this harsh reality, the court reached the conclusion that the arrangement that restricts a worker to one employer violates the basic rights of the foreign workers to dignity and liberty. The court explained that in view of the large sums that the worker invests in acquiring the possibility of working in Israel, the connection between the residency permit in Israel and working for one employer seriously violated the foreign worker's autonomy of will, which constitutes a central part of the human right to dignity. It was held that the restrictive employment arrangement linked the act of resignation, which is a legitimate act and a basic right of every worker, with a serious sanction, the loss of the licence to live in Israel that was given to the person who wishes to terminate the employment relationship. This involves a violation of the worker's right to operate in the work market as a free agent. The judgment explains that:

> 'Associating the act of resignation with a serious resulting harm is equivalent to denying the individual of the possibility of choosing with whom to enter into a contract of employment, and compelling a person to work in the service of another against his will. This not only violates the right to liberty, but it creates a unique legal arrangement that is by its very nature foreign to the basic principle of employment law, the moral value of the employment contract and the basic purpose of the employment contract in guaranteeing the economic survival, dignity and liberty of the worker. It gives the employer of the foreign worker an enforcement tool that is unrecognized in our legal system, which has freed itself of the idea of enforcing employment contracts (see s. 3(2) of the Contracts (Remedies for Breach of Contract) Law, 5731-1970). It deprives the worker of the basic ability to negotiate for the remuneration that he will receive for

> his work potential, and for the terms of his employment and his social benefits' (*Kav LaOved Worker's Hotline v. Government of Israel*, at paragraph 32).

The court went on to hold that the arrangement that binds a worker to one employer does not satisfy the proportionality test. In view of the aforesaid, the court ordered the respondents:

> '...to formulate a new employment arrangement, which is balanced and proportionate, with regard to foreign workers in these industries. This should not be based on the restriction of the worker who comes to Israel to a single employer, and it should refrain from linking the act of resigning with any sanction, including the loss of the status in Israel.'

11. Following the judgement in HCJ 4542/02, the parties were asked to notify the court of their position with regard to the ramifications of the aforesaid judgment on the petition before us. From the statements of the parties it can be seen that both the petitioners and the respondents adhere to their positions. According to the petitioners, the judgment in HCJ 4542/02 strengthens their petition and what is stated therein is true *a fortiori* in so far as the specific restrictive arrangement of Yilmazlar's workers is concerned. The petitioners are of the opinion that the arrangement that is the subject of this petition should also be set aside, since it is a unique and even more drastic arrangement that the arrangement that applied to all the foreign workers in Israel. For their part, the respondents are of the opinion that HCJ 4542/02 does not have any effect upon their response. According to them, there is a material and relevant difference between the workers of the Yilmazlar company and the other foreign workers, who are required to pay large sums of money in order to come to Israel. The respondents are of the opinion that in view of the special employment arrangements of the Yilmazlar workers, the additional supervision of their employment, the fact that that this is an exceptional and special arrangement and the fact that the arrangement is supposed to continue only until the end of 2007, a distinction should be made between the specific case in this petition and the general question considered in HCJ 4542/02.

*Consideration of the arrangement that applies to the Yilmazlar workers*

12. No one disputes that the offset arrangement between the Turkish government and IMI, which is the background to this petition, involves important public interests of the State of Israel. Granting the petition, by

ordering the state to apply to the workers of the Yilmazlar company the arrangements that apply to all the foreign workers in the construction industry, in so far as this concerns changing employers, is likely to result in serious damage to essential interests of the state, since it can lead to one of two possibilities. The first possibility is that the Yilmazlar company will be given an opportunity to employ new workers from Turkey, instead of workers who leave it and change over to other employers. This course of action will open the floodgates to bringing in new foreign workers in Israel without any limit, which is completely contrary to the 'closed skies' policy that the government adopted in order to limit the number of foreign workers and to encourage Israelis to reintegrate into the work market. The respondents clarify that this policy has led in the last two years to the entry into the construction industry of thousands of new Israeli workers. It has also been approved in a number of decisions of this court, which has held that it contains no flaw and there are no grounds for court intervention (HCJ 8155/03 *A. Arenson Ltd v. Director of the Foreign Workers Department* (not yet reported); HCJ 3541/03, HCJ 6755/03 *A. Dori Engineering Works Ltd v. Government of Israel* (not yet reported); HCJ 1963/04 *Resido Fi. Bi. Ltd v. Ministry of Industry, Trade and Employment* (not yet reported); HCJ 10692/03 *Plassim Development and Construction Co. Ltd v. Prime Minister* (not yet reported)). The second possibility available to the state that it should not allow Yilmazlar to bring new workers from Turkey to replace workers who have changed over to other employers. It should be noted that the employment of a worker who changes over to any employer other than the Yilmazlar company, which as we said above has Turkish owners, will not be considered a realization of the reciprocal purchase undertaking, without the approval of the Turkish Ministry of Defence with regard to the identity of the employer. Consequently, this course of action will lead to a breach of the offset agreement with Turkey, and the respondents declare that it is likely to result in serious damage to IMI in particular and the foreign and security relations of Israel in general. In this regard, the state emphasized the great importance of the strategic relationship between the State of Israel and Turkey and the fact that Turkey is one of Israel's most important allies.

13. Indeed, the concern of harm to important interests of the state has great weight. But in the case before us I have reached the conclusion that the petition should be denied not because of this concern but because I am persuaded that the petition on its merits is unjustified and that the rights of

the foreign workers, whom the petitioners wish to protect, are not being violated to a degree that justifies our intervention.

The position of the Yilmazlar company's workers is incomparably different from the position of the foreign workers whose case was considered in HCJ 4542/02, because of a combination of several factors that are all present in our case. *First*, there is no dispute that the workers of the Yilmazlar company are not required to pay large sums of money in order to come to Israel for the purpose of working for Yilmazlar. In the judgment in HCJ 4542/02, the court emphasized that:

> '*The question whether the restrictive employment arrangement violates the rights of the employee to dignity and liberty cannot be considered in a vacuum. It should be considered in view of the reality of the employment of foreign workers in Israel.* It should be sensitive to the complex circumstances that led to the possibility of foreign workers coming to Israel in the first place. It should take into account the special status of the group of foreign workers in the Israeli work market — a group that is composed of weak, "temporary," poor and unorganized workers. It should take into account the huge disparity in forces between the foreign worker and the state that is allowing them to enter its work market on its terms , and the manpower agencies and companies that operate in this work market' (*Kav LaOved Worker's Hotline v. Government of Israel*, at paragraph 28; emphasis supplied).

Indeed, the court went on to discuss this reality. It clarified that:

> '... foreign workers that come to Israel to work here do so against a background of economic distress and their desire to provide for their families. *In the process of coming here, they are charged, not infrequently, large sums of money, which in terms of what is customary in their countries of origin are sometimes enormous, in return for arranging their coming and staying in Israel. For these reasons*, deporting them from Israel before the worker has the opportunity of earning an amount of money that is at least sufficient to "cover" his debt is an action that deals a mortal economic blow to the worker and his dependents' (*Kav LaOved Worker's Hotline v. Government of Israel*, at paragraph 28; emphasis supplied).

Later the court said:

> '...according to the restrictive employment arrangement the residence permit given to the foreign worker who comes to Israel is conditional upon him working for a specific employer whose name is stipulated in the residence permit. A termination of the work for this employer, whatever the reason for it may be, means that the permit to reside in Israel expires. *In view of the money and the effort that the foreign worker invests in 'acquiring' the possibility of working in Israel for a fixed period*, it is clear that this connection between the validity of the residence permit and the work for a single employer seriously violates the autonomy of his will...' (*Kav LaOved Worker's Hotline v. Government of Israel*, at paragraph 31; emphasis supplied).

The conclusion of the court in the aforesaid HCJ 4542/02 was therefore derived to a large degree from the factual background. In the case before us, as we have said, the position is different: the Turkish workers are not required to pay huge amounts to middlemen or to manpower companies in order to come to Israel to work for Yilmazlar. The opposite is true: Yilmazlar pays the cost of bringing the workers to Israel, including the costs of medical checks, flights to Israel and medical insurance. In view of the aforesaid and as the respondents justly point out in their replies, an employee of the Yilmazlar company who is not satisfied with his conditions of employment may terminate his work relationship with the company, return to his country of origin, and this too is at Yilmazlar's expense (except in exceptional cases where the worker is dismissed because of damage and loss that he deliberately and wilfully caused to the company), without the worker being encumbered by any significant debt. Indeed, a foreign worker who enters Israel within the framework of the offset arrangement does not have any inherent right to work in Israel; certainly he does not have an inherent right to work at any place of work that he wishes and for any employer that he chooses. Notwithstanding, a worker who has returned to Turkey can, if he so wishes, take the necessary steps in order to be employed by an Israeli employer instead, like any foreign national who wishes to be employed in Israel.

14. Moreover, I have been persuaded that there is a significant difference between the Yilmazlar workers and other foreign workers, which is expressed in a host of other parameters. Thus the procedure of making a contract with

Yilmazlar's workers is carried out under the auspices and with the supervision of the Turkish government; the employment agreement with the workers is drafted and prepared by the Turkish Ministry of Labour together with the Turkish Ministry of Defence; the agreement is written in Turkish, the mother-tongue of the workers, and a copy of it is kept in the file retained by the central management of the Turkish employment office; the work agreement is signed in Turkey as a three-party agreement by the worker, the Yilmazlar company and also a representative of the Turkish Ministry of Labour; the agreement grants the Yilmazlar workers a right to sue Yilmazlar even in Turkey. In this respect also their situation is different from other foreign workers, since the deportation of the latter from Israel to their country of origin is likely to make it impossible for them to pursue their rights against their Israeli employer. With regard to the work conditions of the Yilmazlar company's workers, the employment of these workers requires compliance with very strict conditions that were determined by the Turkish authorities. The respondents declare that the workers benefit from good work conditions, which includes being given three meals a day, housing and medical insurance that are paid by Yilmazlar. The activity of the Yilmazlar company, in so far as it concerns the protection of the rights of the Turkish workers employed by it in Israel, is subject to the institutionalized supervision and strict review of several bodies, both from the Turkish side and from the Israeli side: the Turkish Ministry of Labour recruits the workers, prepares the work agreement with them and signs it, as aforesaid, as a third party, together with the worker and the Yilmazlar company. In this way, it is possible for the Turkish authorities to monitor the conditions in which the workers are employed. It was also stated that a delegation from the Turkish Ministry of Defence actually visited Israel in order to check the employment conditions of the Yilmazlar workers; the Turkish authority that supervises the offset arrangement supervises the transfers of the money and payments to the workers. The money (at least 75% of the workers' salaries) is transferred to a central account that is managed in a bank in Turkey and from that account the money is transferred to the private accounts of the workers. From the Israeli side there is an equal degree of supervision: IMI sends the Turkish authorities copies of all the transfers of money to the workers' accounts and in return it benefits from a credit for the reciprocal purchase in the total amount of those transfers; the Israeli Ministry of Industry, which is responsible for the performance of the offset agreement, conducts inspections of the Yilmazlar

company. As the state explained in its reply, the Foreign Workers Department at the Ministry of Industry carries out checks at the various sites of the company throughout Israel. In the most recent check that was made, it was found that all of the company's workers are employed in decent conditions, that their wages are not less than the minimum wage provided by law and that their housing conditions at the company's sites are reasonable. The state also declared that in places where problems were found a further inspection was made, and this showed that most of the problems had been corrected. The state further declared that the Foreign Workers Department will continue to check that measures are taken in accordance with its powers under the law in order to prevent additional problems in the future. It will be remembered that in decision no. FW/3 of the ministerial committee, which was approved in government decision no. 4024, it was stated that 'the Director of the Foreign Workers Department at the Ministry of Industry, Trade and Employment shall be directed to carry out special periodic supervision of the conditions of employment of the company's workers, in order to ensure the payment of wages and ancillary benefits to the workers according to law'; in addition, the Israeli Ministry of Labour and Social Affairs is also carrying out checks, on a regular basis, of the manner in which Yilmazlar treats its workers.

15. From all of the aforesaid and after reviewing all the additional documents in the application to attach documents, it transpires that the position of the Yilmazlar company's workers is materially different from the position of the foreign workers whose case was considered in the aforesaid HCJ 4542/02. In the circumstances described, I am satisfied that the rights of Yilmazlar's workers are being protected, thanks to the strict supervision that is imposed both from the Turkish side and from the Israeli side. Indeed, the arrangement under review in this petition is an unusual and special arrangement. Counsel for the state emphasized before us that according to government decision no. 4024 it will not be possible in the future to make an additional arrangement to bring foreign workers to Israel or to employ them as a part of reciprocal purchase agreements, without the approval of the government. In these circumstances, in view of the state's foreign affairs and security interests that are in the balance, as well as the fact that the arrangement under discussion is supposed to come to continue only until the end of this year, and since the terms of employment of the workers were dictated by the Turkish government, which has a sincere concern for the conditions in which its citizens are employed, there are no grounds for

granting relief to the workers, when it is questionable whether they want such relief. I would propose to my colleagues that the petition is denied.

16. I have carefully read the comprehensive opinion of my colleague Justice E.E. Levy and the opinion of my colleague Justice E. Hayut. I agree in principle with everything stated in them. Indeed, no one could dispute that the restrictive employment arrangement is highly undesirable, and that its causes very great harm to the foreign workers.

In the course of his wide-ranging opinion, my colleague devoted approximately two pages to an examination of the 'actual harm' to the Yilmazlar workers. In his consideration of the concrete expression of the harm to the workers, my colleague reaches the conclusion that 'the factual picture is not entirely clear,' but he determines that, from his point of view, it is sufficient that there is 'a real concern that arises from the case that the rights of the Yilmazlar workers may be violated in various respects.' The heart of the matter, in his opinion, is therefore 'the *normative* situation created by the government decision' (paragraphs 19 and 20 of his opinion; emphasis in the original). It should be noted that this is the point of dispute between us: I agree with the rule held in HCJ 4542/02 as well as with the vast majority of the legal analysis made by my colleague in the course of his present opinion; but I am of the opinion that this court cannot consider the legal position without reference to the actual factual position. In our case, we are dealing with a special group of workers, and in the *special circumstances that have been brought before us* — as I have emphasized and I emphasize once again — there is no basis for granting the petition.

17. In the case before us, it is not possible to examine the specific work relationship between the parties — the foreign worker on the one hand and the employer on the other — without reference to all of the factors that are involved in the transaction between them. In the case before us, the contract between the foreign workers and Yilmazlar is based on the agreement between the Israeli and Turkish governments, with the reciprocal supervision mechanisms contained therein, which constitute a kind of 'collective protection' for Yilmazlar's workers. The main agreement between the governments strengthens the position of Yilmazlar's workers; these workers benefit *ab initio* from a different status of other foreign workers, since the Turkish government represents them, conducted the negotiations concerning their terms of employment and is responsible for ensuring that the terms that were agreed are upheld. In the present case, the protection of the rights of

Yilmazlar's workers does not rely solely on the goodwill of the employer, but involves international political interests, which arise from the relationship between the two countries. Thus the Yilmazlar workers are employed within the framework of a government arrangement, by virtue of a political agreement, which imposed on the private subcontractor (Yilmazlar) duties that do not apply as a rule to private manpower contractors. We cannot ignore the clear purpose of the offset agreement between the two countries, which is the background to the employment of the workers. Whereas as a rule the assumption is that the employer, who is motivated by economic interests, is likely to minimize his workers' rights, in the present case it is the interest of the Turkish government that foreign currency, the workers' wages, will flow into it. In these circumstances, the Turkish government can be presumed to ensure that the economic value that was agreed will actually be transferred, since this is the main declared and agreed purpose of the agreement.

18. Finally I should point out that a consideration of the operative consequences of my colleague's opinion raises the question whether, if the outcome proposed by him is adopted, the condition of Yilmazlar's workers will actually be improved. Since a cancellation of the open skies policy is no longer a possibility, adopting the position of my colleague means cancelling the offset agreement, and as a consequence thereof, completely denying the Yilmazlar workers the possibility given to them to earn their livelihoods in Israel. I think, in view of the serious state of the Turkish job market, which my colleague also discusses in his opinion, that the actual harm that such a decision will cause the Yilmazlar workers is more serious, and is far greater than the theoretical concerns that my colleague raises in his opinion. The interests and concerns of the foreign workers are the main focus of my decision. I agree also with the remarks of my colleague Justice E. Hayut that we are dealing with an agreement that is limited in time and subject to special supervision, and that any change will justify a reconsideration of the matter by this court.

**Justice E.E. Levy**

1. On 30 March 2006, this court held that a procedure that made the entitlement of a foreign worker to a residency and work licence in Israel conditional upon his remaining with the employer whose named was stipulated in the licence was void because it disproportionately violated basic rights (HCJ 4542/02 *Kav LaOved Worker's Hotline v. Government of Israel*

(not yet reported)). It was held that the procedure blatantly conflicted with a major principle in labour law — the right of a person to stop working for an employer with whom he no longer wants to be associated, without this involving so serious a sanction that it makes the termination of the employment relations unfeasible. If you take this right away from someone — and with it the fundamental principle of competition between employers — there is a significantly greater risk that his rights as an employee will be violated. This violation, as we know, not infrequently results in serious cases of exploitation. It deprives the worker of the one real protection that he has — his market value. Thus, in the absence of any sense of moral responsibility, which it would appear many people have long forgotten, it is as if we have removed the last barrier preventing the adoption of the outlook that seeks to blur the image of the worker as a human being and to reduce his existence to being no more than a pair of working hands, a machine to be used by the employer; in the works of Aristotle:

> κα□ □ δο□λος κτ□μ□ τι □μψυχον, κα□ □σπερ □ργανον πρ□ □ργ□νων π□ς □πηρ□της.
>
> 'And the slave is a living possession, and every slave is like a tool that is preferable to all others' (Aristotle, *Politics* 1, 21).

The fundamental case law ruling that the 'restrictive arrangement' is void remains valid, even if it has not been implemented in full (see the decisions of October-December 2006 in the aforesaid HCJ 4542/02; see also Hotline for Migrant Workers and Kav LaOved Worker's Hotline, *Binding Migrant Workers to Corporations*, 11 (March 2007), and *Freedom Inc. — Binding Migrant Workers to Manpower Corporations in Israel*, 14, 38 (August 2007)). It created a new legal position, in which the law is no longer prepared to acquiesce in the determination of arrangements of a similar kind. It plays a major role in the normative framework in which migrant workers are employed in Israel. It looks equally to the present and the future. It binds all the organs of government, and in particular the government. As long as it is valid, it is also the concern of the court, whether it is this court, the administrative courts, the labour courts or the detention courts.

2. The ink has not yet dried on that ruling, and the question of employment restrictions is once again before us. This time, it is alleged, it takes a different form, which should be distinguished from the case that we decided. It presents us with a specific and special arrangement that is based on important security, economic and political interests. This arrangement is

limited in scope and *prima facie* concerns at most several hundred workers. Its severity is reduced — so it is alleged — because of the low level of the violation of rights that is actually inflicted. In all of this my colleague Vice-President E. Rivlin found a basis for departing from the case law ruling that was made. My position is different. Adopting my colleague's approach means nothing more than turning the normative clock back and returning to a previous legal position that was found to be undesirable. Were my opinion heard, we would made an absolute order that determines that the restrictive element in the government decision cannot stand, because it is inconsistent with the provisions of the prevailing law.

*Restrictive arrangements come in many forms but have the same result*

3. In *Kav LaOved Worker's Hotline v. Government of Israel* my colleagues and I discussed in brief the negative effects of restricting foreign workers to one employer, throughout the world in general and in Israel in particular (see, *inter alia*, paragraphs 24 and 38 of that decision and the citations there). I personally am surprised that the normative position that was set out in that case was not enough. I will not speak of what I wrote there, but can there be anyone who reads the judgment and is not disturbed by the profound question of Vice-President Cheshin who asked:

> 'What has happened to us that we are treating the foreign workers, those human beings who leave their homes and their families in order to provide for themselves and their families, in this way? We are overcome with shame when we see all this, and how can we remain silent?' (*ibid.*, at paragraph 4 of his opinion).

We therefore need, and this time with even greater force, to reemphasize how bad is the damage caused by restrictive employment mechanisms, and how great is the wrong caused by acquiescing in them. By considering these, we will also find an answer to the claims that are unique to the case before us.

4. Throughout the world there are arrangements that apply to migrant workers, which despite their many forms of expression, the different methods that they adopt and the various sectors of industry to which they apply all have a similar purpose — to restrict an employee to one employer. By taking from the employee the natural protection inherent in the idea of the free market, the restrictive arrangement exposes him to violations of his rights concerning wages, including the payment of lower wages than the minimum

wage provided by law and prohibited setoffs against the wages actually paid, to the determination of hours of work that are far longer than those permitted, to the seizing of travel papers by employers as a means of guaranteeing the continued existence of the work relationship, to poor quality housing, to the denial of proper medical case, to forced movement from one work site to another, and not infrequently also to sexual abuse and real imprisonment. There is a considerable, surprising and regrettable similarity between countries that are far distant from one another and between peoples who are completely foreign to one another, when we are dealing with the treatment of migrant workers.

5. An expression of some of these phenomena *in Israel* was given by the *State Comptroller* in reports that he issued (State Comptroller, *Annual report no. 49* (1998), at page 279; State Comptroller, *Annual Report no. 55b* (2005), at p. 379). Scholars have also written about them (see, *inter alia*, Amiram Gill and Yossi Dahan, 'Between Neo-Liberalism and Ethno-Nationalism: Theory, Policy, and Law in the Deportation of Migrant Workers in Israel,' 10 *Mishpat uMimshal (Law and Government)* 347 (2006), at p. 361; Adrianna Kemp and Rivka Reichman, '"Foreign Workers" in Israel,' 13 *Information on Equality and Social Justice in Israel* 1 (2003), at p. 13). They were well described in the annual journal of the Israeli Society for Labour Law and Social Security for 2004:

> 'The "restrictive arrangement" has led to widespread and serious phenomena of abuse and violations of the human rights of foreign workers. Many employers have exploited foreign workers in various ways. Workers are "charged" for fees and taxes that they [the employers] are liable to pay to the state, huge sums are deducted from the salaries of foreign workers on various pretexts and the workers are housed in wretched conditions. A large number of employers do not pay the foreign workers for all the hours during which they work, they pay less than the minimum wage and they do not pay overtime. Many employers do not pay medical insurance for their workers, and they shirk responsibility for them when they are hurt in work accidents and need medical treatment' (Sharon Asiskovitch, 'The Political Economy of Migrant Workers in Israel and the Immigration Policy vis-à-vis Foreign Workers in the 1990s,' 10 *Labour, Society and Law* 79 (2004), at p. 90).

6. But the negative consequences of restricting workers to their employers are not found in Israel alone. In Britain the recognition of the serious harm caused by it to foreign domestic workers led to the amendment of the law in 1998 and the cancellation of the restriction (recently human rights organizations are warning of its return, *de facto*, because of government policy: Kevin Bales, *Disposable People: New Slavery in the Global Economy* (2000), at page 28; Kate Roberts, 'An important progressive response to globalisation is about to be reversed,' *Compass* (May 22nd, 2007)). In Italy foreign workers are forced to suffer harsh treatment by their employers, since an attempt to change employers leads to immediate deportation from the country and being forbidden to return to work there for three years (John Wrench, *Migrants and ethnic minorities at the workplace — The interaction of legal and racial discrimination in the European Union* (Danish Centre for Migration and Ethnic Studies, Papers, Migration No. 19, 1997), at p. 29). In the United States the restriction of a whole sector — seasonal migrant workers whose main occupation is in agriculture — is a key factor in their serious exploitation by their employers. A comprehensive report, which was published this year by an American human rights organization, discussed this relationship between the restrictive arrangement and the violation of the rights of temporary migrant workers, who are sometimes treated like commodities:

> 'Unlike U.S. citizens, guestworkers do not enjoy the most fundamental protection of a competitive labor market – the ability to change jobs if they are mistreated. Instead, they are bound to the employers who "import" them. If guestworkers complain about abuses, they face deportation, blacklisting or other retaliation... They are the foreseeable outcomes of a system that treats foreign workers as commodities' (Southern Poverty Law Center, *Close to Slavery — Guestworker Programs in the United States* (2007) 1, 2, 33-40).

70. Some people regard restrictive arrangements as a means used by the host countries to keep the migrant workers apart and estranged from society, and to make them a cheap and available work force that can only enter the workforce in difficult and unattractive jobs. The direct link between being bound to one employer on the one hand and a reduction in the wages paid and the foreign worker being forced to the bottom of the work ladder was well illustrated by what is happening in the labour markets in East and South

Asia (Stuart Rosewarne, 'The Globalisation and Liberalisation of Asian Labour Markets,' 21 *World Economy* 963 (1998), at page 973) as well as in Canada (Nandita Sharma, 'On Being Not Canadian: The Social Organization of "Migrant Workers" in Canada,' 38 *Canadian Review of Sociology and Anthropology* 415 (2001), at pages 425, 433). This was also discussed in a work describing the territory of Macao in China, which attracts each year a significant number of migrant workers:

> '[Scholars] have gone a long way to expose the role of the state in keeping the migrant workers "cheap" and "flexible." The state has constructed a regulatory system in managing this category of foreigners. Many of these mechanisms are legislated into laws. Typically, migrant workers are denied the right to change employers. Since the ability of foreign workers to switch employer is severely curtailed, they are forced into a status of bonded labour and thus allow their employers to pay them a rate below that of the local workers' (Alex H. Choi, *Migrant Workers in Macao: Labour and Globalisation* (2004), at page 6).

In the United Arab Emirates, foreigners, who are mainly used in the work force, are forbidden to change employers during their first two years and thereafter can only do so with the employer's consent. An especially serious consequence of this is in the construction industry, where dozens of migrant workers *die* every year as a result of poor safety conditions. Dozens of others, in their distress, take their own lives. Others do not receive wages on time, live in poor conditions and are compelled to work long hours. All of this is because the employers regard themselves as not needing to compete for the market value of the worker (Hassan M. Fattah, 'In Dubai, an Outcry from Asians for Workplace Rights,' *The New York Times* (March 26th, 2006)). This was discussed by the international human rights organization, Human Rights Watch, in a comprehensive report published last year:

> 'In most other places, a worker faced with hazardous working conditions and unpaid wages, in a free market economy that has an extreme shortage of labor, would move to a different job. But this is not an option for the migrant construction workers of the UAE, who like all other migrant workers in the country are contracted to work only for a specific employer' (Human Rights Watch, *Building Towers, Cheating Workers – Exploitation of Migrant Workers in the United Arab Emirates* (2006), at p. 13).

8. But what happens around the world does not only direct restrictive arrangements. Sometimes the arrangements in the law take on an indirect guise, so that it appears that they originate in the *free will* of workers. But this is not the case. The United States also provides an example of this. Not many years ago, in 2000, the American legislator addressed the impropriety in the law that bound foreign skilled workers and repealed it (S. 2045 American Competitiveness in the Twenty-first Century Act of 2000, Pub. L. 106–313, title I, § 105, Oct. 17, 2000 (8 USCS §1184(n))). These workers are therefore allowed to change employers, but few of them take advantage of this, since their loyalty to a single employer is almost always an essential condition for recognition of their entitlement to a permanent residency visa ('green card'). The strong desire to obtain this visa results in most workers binding themselves to an employer for many years. The direct and obvious result of this constraint — which as we have said appears to be a voluntary act deriving from freedom of choice — is the lack of competition for the workers, and consequently a significant worsening of their terms of employment. The figures show that even though these are skilled workers, including engineers, software and hi-tech personnel (who include, incidentally, no small number of Israelis), the wages paid to them are significantly lower than their American counterparts, they are compelled to work far more than the customary number of hours and they are harmed in other ways (Mark Krikorian, 'Slave Trade: Permitting guest workers sounds like the perfect solution to the immigration imbroglio: Look again,' *National Review* (September 14th, 1998); Norman Matloff, 'On the Need for Reform of the H-1B Non-Immigrant Work Visa in Computer-Related Occupations,' 36(4) *University of Michigan Journal of Law Reform* 50 (2003), at page 64).

9. Additional aspects of an indirect restrictive arrangement, which results in workers refraining from changing employers and suffering unfair treatment and the loss of basic rights, may also be found in the following two measures. The *first* of these is to require workers to sign promissory notes for large amounts or for unstipulated amounts, which allows the employer to sue the workers for large amounts of money at will and for any reason that he chooses. According to the petitioners, Yilmazlar's workers were signed on such promissory notes. The *second* is to have 'blacklists' in which employers cooperate to blacklist workers who dare to complain of their conditions of employment. Being blacklisted has serious consequences, since not only does the complaint result in many cases in an immediate termination of the work

and deportation, but in the future also, even if those workers have a right in principle to ask for another work permit, they will have difficulty in finding someone who will be willing to employ them.

*The restrictive arrangement and the claim of consent*

10. Only a consideration of the complexity of the issue of restrictive arrangements, with the variety of situations that it manifests, allows us to understand the real difficulty faced by migrant workers, whose being restricted to one employer — whether overt or concealed, whether official or *de facto*, whether clearly coerced or seemingly the result of the worker's free choice — is a main source of the violation of their rights. It is clear to everyone that were migrant workers not prepared to suffer the restrictive arrangement, because they have no choice, the restrictive arrangement would never come into existence. Were the workers to make their arrival in the host country conditional upon their ability to change employer, were they to apply on a constant basis to the courts and to enforcement agencies in government ministries for help and receive a positive response, and were they to refrain from working under the restrictive arrangement system, then it is doubtful whether it would survive for long. Similarly, were they to refuse poor employment conditions, the employers would be compelled to improve them.

Does this lead us to the conclusion that the responsibility for the restrictive arrangement should be imputed to those who suffer from it? Do migrant workers bring upon themselves the wrongs that they suffer, by continuing to look for employment despite what they know of it? Should they complain to no one other than themselves for choosing to look for work abroad? *This is exactly how we should understand the argument of the respondents before us.* This can also be seen from an approach that, regrettably, has obtained a status in the public debate concerning migrant work in Israel. It was written in one research paper that the treatment of foreign workers 'is based today on a contractual-commercial approach, according to which the consent of the migrant workers to accept the "rules of the game" makes the rules acceptable' (Ofer Sitbon, 'The Role of Courts in Israel and France in Designing the Policy towards Migrant Workers,' 10 *Mishpat uMimshal (Law and Government)* 273 (2006), at page 278). This was well described by Professor Guy Mundlak:

> 'One of the arguments raised in the public debate is that the discussion of the rights of the foreign worker is not important, since the state does not have a duty to take in foreign workers…

> The foreigner can decide if he wishes to accept the status that Israel offers and to work accordingly, or he can choose a competing status offered by another country or stay in his own country. [According to this argument], the willingness of a foreigner to enter a country with the status offered in itself indicates his consent to the conditions accompanying it that are presented before him. When this consent is given, it constitutes the moral basis for the whole set of rights that the state offers... If the number of foreigners who are interested in adopting this status, with its accompanying conditions, fills the quota, it means that these conditions are fair. The mere consent of the foreigners to accept them is the stamp of approval for their fairness' (Guy Mundlak, 'Workers or Foreigners in Israel? "The Basic Contract" and the Democratic Deficit,' 27 *Tel-Aviv University Law Review (Iyyunei Mishpat)* 423 (2003), at page 428).

11. According to the respondents, the violation of rights inherent in the restricting arrangement of the Yilmazlar workers is not a violation, since it can be remedied at any time by means of a simple act — the return of the worker to his country of origin. If he does not choose to do this, on the basis of a profit and loss reckoning that finally leads him to the conclusion that work in Israel is worthwhile, what right does he have to complain about a work system that he chooses to join? A similar approach is also implied in the position of my colleague, the Vice-President, when he says: '... an employee of the Yilmazlar company who is not satisfied with his conditions of employment may terminate his work relationship with the company [and] return to his country of origin...' (paragraph 13 of his opinion). Moreover, according to my colleague's approach, the employee has the right to apply once again, when he returns to Turkey, for a work permit in Israel, as if there were no 'closed skies' policy, as if the number of positions were not limited, and as if the workers could be certain and assured that they would not be prejudiced because they left in the first place.

In my opinion, this position cannot be allowed, primarily for reasons of principle. It is inconsistent with the basic principles of our legal system. I am referring primarily to a core principle in the law, which is the principle of public policy. It was my colleague, the Vice-President, who regarded this principle as 'one of the legal tools that were designed to protect the

fundamental core values of the legal system and to steer the operation of the rules of law in a direction that is consistent with those basic values' (CA 11152/04 *Pardo v. Migdal Ltd* (16 October 2006) not yet reported). Indeed, the whole of public policy is based on the recognition of the superiority of social values, which are even capable of prevailing over a contractual consent made freely and willingly. It allows the court to invalidate a contract whose content is immoral (section 30 of the Contracts (General Part) Law, 5733-1973); it denies the right of a person to incorporate in a company whose purpose is not a proper purpose (section 2 of the Companies Law, 5759-1999); a mediator may terminate a mediation proceeding where he is of the opinion that the settlement reached by the parties is an improper one (regulation 4A of the Courts (Mediation) Regulations, 5753-1993), and so on.

12. Thus we see that the outlook that regards consent as the entirety of the matter is an idea that is foreign to our legal system. A prominent expression of this was provided in the past by the rulings that deal with the serious issue of trafficking in human beings, which despite the clear differences has more than one point of similarity with the issue that we are currently considering. In several cases that came before it, this court emphasized the limited value of the argument of consent in that context. In CrimA 11196/02 *Frudenthal v. State of Israel* [2003] IsrSC 57(3) 40, at p. 46, Justice D. Beinisch emphasized that the consent of the victim of the trafficking to what is done to him is of no relevance. In CrimA 7757/04 *Borstein v. State of Israel* [2005] IsrSC 59(5) 218, at p. 233, Vice-President Cheshin also determined that 'there is no significance to the issue of the consent or lack of consent of a person to work in prostitution; consent does not reduce the severity of the offence nor can it serve as a defence for the trafficker.' Within the narrow limits of the case before us, we are not dealing with criminal liability. But the criminal prohibition is one of several tools for expressing our unwillingness to acquiesce in moral wrongs, which harm the ethical basis on which our society is founded. Where someone wishes to put forward the argument of consent in order to indicate *prima facie* acquiescence in a situation that is regarded as ethically wrong, we have the power — perhaps I should say that we are required by the law — not to satisfy ourselves with that argument but to investigate further the moral basis underlying the matter, and where necessary to set matters right.

This is the position in the law in general, and it is also the position in labour law, which for some time has not regarded a contract as the final word

with regard to the relationship between a worker and his employer. An approach that consent is sufficient to make a contract for providing a service valid, whatever its contents, is inconsistent with our understanding of the labour laws and their purpose — to encompass, within the well-established limits of decency and morality, interactions between an employer and an employee. It is also clearly contrary to the rationale underlying protective legislation, and regrettably we so often find ourselves acquiescing in the blatant breach of such legislation (see Gill and Dahan, *supra*, at p. 363). A 'foreign worker,' before he is a foreigner, is a worker. The spirit of labour law, which extends its protection to him, does not allow us to regard his relationship with his employer, as well as with the state, merely from the narrow viewpoint of informed consent.

Basic values of law, as well as basic principles of morality, cannot be left out of the normative framework that encompasses migrant workers. Mundlak answers the questions that we cited above so correctly that it is fitting that I should cite his remarks:

> 'Even if we accept the premise that the arrival of the foreigner to work in Israel is based on consent, there are limits to the extent of the consent that can be attributed to the contract that was agreed by the foreigner when he came to work in Israel. First, there are universal rights that do not depend upon prior association with the national community; contracting out of these in a contract of a foreign worker has no effect. ... The mere presence of foreign workers in Israel cannot be the answer to the question of what is the extent of the rights to which they are entitled. In essence, the argument of consent grants a legitimacy that does not depend on content but only on procedure (a kind of offer and acceptance). But offer and acceptance are not the proper procedure... There is a basis for making the *prima facie* consent in the basic contract subservient to norms of public policy, including the protection of human rights and democratic norms' (Mundlak, *supra*, at pages 430, 432, 480).

Although we spoke extensively above of 'market value,' we should always remember that this is a starting point, but not the end of the matter, and to this important element we ought to add other factors that are also

capable of protecting workers — whether foreign or local — when their market value is limited.

13. The position adopted by my colleague also does not sufficiently take into account factors that are inherent to migrant workers. The first and foremost of these is the question of motivation. Almost always the foreign worker is looking for employment opportunities outside his country of origin because of a desire to improve his economic condition. Sometimes poverty, which is clearly recognizable to western eyes, and a difficulty to provide for his family are what compel him to look for work abroad. The same economic distress is also what leads temporary workers to return time after time to countries in which they were exploited in the past, in the hope — usually a false one — that this time they will receive better treatment. Indeed —

> 'Propelled by desperate economic circumstances in their home countries, and perhaps misplaced naive optimism, they return a second or third time with hopes of better conditions, only to experience salary reductions again' (Human Rights Watch, *Bad Dreams: Exploitation and Abuse of Migrant Workers in Saudi Arabia* (2004), ch. 2).

In other cases, and it is possible that this is also what happened in the case before us, the background from which the migrant worker comes is better. But we should not treat lightly the economic constraints which the migrant worker faced and which led him to seek an alternative source of livelihood. Not infrequently the opportunity of employment in the host country is the alternative to a high level of unemployment in the country of origin, which reduces a person's chances of finding work in his homeland. The wages paid in the host country, which are often considerably higher than those in the country of origin, also have considerable power to encourage migration for the sake of work. The economic enticement is great, and its effects are considerable. It is not difficult to imagine what motivates a person who earns a relatively small wage in his country of origin, sometimes merely a few dollars a day, to uproot himself from his home and his family and look abroad to the promise of wages that are hundreds of times greater. This promise, whether it is realized or not, is very powerful and has great effect. Not infrequently it overcomes concerns of difficulties, and even specific knowledge concerning the danger of exploitation and the loss of rights. This too was considered by the American report, which asked:

'This raises the question: Why do workers choose to come to the United States under these terms? The simple fact is that workers from Mexico, Guatemala and many other countries often have very few economic opportunities... Where jobs exist [in those countries], the pay is extremely low; unskilled laborers can earn 10 times as much, or more, in the United States as they can at home. So even though they risk being cheated, many workers are willing to take that chance. Most perceive the guestworker program as their best chance to provide a better life for their families. These desperate workers are easily deceived' (Southern Poverty Law Center report, *supra*, at p. 12).

14. Turkey is a developed country in comparison with many of the countries from which workers come to find employment in Israel. The Turkish economy has undergone considerable changes in recent years, and the economy of that country is experiencing growth and making efforts to increase employment opportunities. Notwithstanding, the report of the World Bank, which was written in 2006, indicates that the increase in jobs available there still lags considerably behind the natural growth of the population. Whereas the number of residents of working age has increased considerably — between 1980 and 2004 approximately 23 million potential employees entered the market — only six million additional jobs have been created (World Bank, *Turkey Labour Market Study*, report no. 33254-TR 12 (April 2006)). For this reason, the World Bank states that the employment rate in Turkey is *one of the lowest in the world* (*ibid.*). The report goes on to reveal that as a result of economic crises that Turkey underwent in 1994 and 2001, there was a significant reduction in the amount of the average wage paid in Turkey, and only recently has there been some degree of improvement in this index (*ibid.*, at p. 21). To illustrate this, in 2004 — the year in which the arrangement that is the subject of the petition before us began to be implemented — the average monthly salary of a worker in Turkey was the equivalent of approximately 3,600 sheqels. In Israel the amount of the average wage at that time was *double* — approximately 7,000 sheqels.[1]

Moreover, precisely because of extensive protective legislation that is included in the Turkish code of laws and that makes the dismissal of a worker there very expensive for his employer, not only is the incentive for Turkish

[1] http://www.databasece.com/international.htm.

employers to take upon themselves the risk of creating new jobs small, but there is a flourishing market of informal workers who do not benefit at all from the protection of the labour laws (World Bank report, *supra*, at pp. iii, 21). The vast majority of formal workers do not benefit from proper protection because they are not parties to collective arrangements that are the result of collective bargaining (*ibid.*, at p. 26). Turkey has, of course, a long tradition as an 'exporter' of migrants to foreign countries, and the migration consciousness in Turkey, including for the purposes of work, is well developed. According to official figures of the Turkish Ministry of Labour, in June 2005 more than three and a half million persons with Turkish nationality lived in countries around the world (approx five per cent of the country's population at that time), and of these almost a million and a half persons took part in the foreign work market.[1]

15. From reading all this it becomes very clear what motivates the persons employed as workers for Yilmazlar to look for a livelihood outside their country of origin, notwithstanding the difficulties that may accompany their work in Israel, including the absence of any possibility of choosing their employer here. Even more important is the understanding that it is not their informed choice — a preferred choice between several good options — that is the basis for their acquiescing in the restrictive element. Difficulty and distress are the essence of the matter. Their fear of a harsh economic fate, their natural desire to improve the living conditions of their families, their ambition to take advantage of an opportunity that the global village of the beginning of the twenty-first century has opened up to them — these are the motives of these workers to agree to a well-institutionalized denial of their market value. Can anyone fault them for this?

*The argument concerning enforcement*

16. It may be argued, and this reasoning is also used by my colleague the Vice-President in his opinion, that concern with regard to the evil consequences of restricting the workers is assuaged by the protection given to them in labour law, and especially the declared policy of the Israeli and Turkish governments that the employment of the workers shall be subject to 'institutionalized supervision and strict review,' in the words of my colleague. I will say from the outset that I can only doubt somewhat how strict the supervision measures adopted can be, and of this I will say more below. But

1 http://www.csgb.gov.tr/birimler/yih/bulten/ingilizce/ing2005_2.pdf.

before this I will emphasize that experience in most countries around the world, as well as in Israel, proves that in the main the enforcement authorities cannot provide a solution to the concern that we have described.

Not infrequently there is an inherent conflict of interests, even if it is an unspoken one, between the system of laws that is the basis for the policy whose main purpose is to provide a cheap and effective workforce for various industries in the economy and the part of the legal system that concerns workers' rights.

> 'If supplying this labor force is a primary goal of immigration policy, then legal protections for guest workers cannot be guaranteed, since they contradict its essential purpose' (David Bacon, *Be Our Guests*, The Nation (September 27th, 2004)).

Second, the protection of the rights of foreigners, who are found on the margin of society, is usually a low-level priority for governments, and only limited resources are devoted to it. As a direct result, in many countries that host foreign workers the enforcement system has difficulty in protecting a violation of their rights. It should be emphasized that I am not referring to rights of a vague or external nature that rely on the overburdened foundations of universal morality or general principles, which may well not be given any expression in the law of the host country. Even those principles that are expressly enshrined in the laws of the state and whose solid foundations are unchallenged, both in their application to local employees and also to temporary guests in the work force, are not sufficiently enforced. Often, even if on paper these rules are quite developed, when put to the test they are an empty shell and devoid of any real effect (Sitbon, *supra*, at page 278). This is the case throughout the world, including in the United States (Southern Poverty Law Center report, *supra*, at pages 1, 7), in East Asia (Rosewarne, *supra*, at page 22), in Africa (Nasseem Ackbarally, *Foreign workers in Mauritius face torrid time*, Mail & Guardian Online (28 November 2006)), and in the countries of the United Arab Emirates (Human Rights Watch report regarding UAE, *supra*, at pages 9, 13, 48).

Even the countries of origin of migrant workers do not always have the same interests as their citizens abroad. Even if in some cases an effort is made to further the rights of the workers, usually in agreements with host countries, this effort is often confronted by, and sometime in direct conflict with, the interest of the country of origin to develop its economy by means of income from a foreign source and the importation of knowledge and work

methods. When this interest prevails, the first to be harmed are the workers (S. Rosewarne, *Globalisation and the Valorisation of Migrant Labour: Recasting the Migration-Development Nexus* (Paper presented to the Regional Conference on Institutions, Globalisation and their Impacts on Labour Markets in Pacific Island Countries, October, 2006), at page 4).

17. The case of the Yilmazlar workers, which according to the state's argument before us — an argument that my colleague the Vice-President sees fit to accept — benefits also from the protection of representatives of the Turkish authorities, is very similar to the case of temporary workers in Canada, who are employed in the agricultural industries and are bound to a single employer during all the months when they are in that country (Sharma (2001), *supra*, at page 423). The unique aspect of work migration to Canada is that almost all of it is based on bilateral agreements, in which the federal government is one party and the authorities of the country of origin the other. These agreements contain mechanisms that allow the two countries to supervise the enforcement of proper conditions of employment. If a foreign worker has any complaint with regard to any aspect of his work, he may bring it before the representatives of his country, and they, in turn, are supposed to raise the matter with the Canadian authorities. In practice, those representatives of the countries of origin are faced with a conflict: on the one hand, they owe a duty of faith to the worker, but on the other hand, they have a similar duty to the interests of their country, including to its good diplomatic relations with Canada. It is not surprising to discover that in this competition of interests, the workers find themselves at a disadvantage. They are employed in very harsh conditions and with small salaries, and there is no real address for their complaints. Because they fear being deported, they are compelled to suffer conditions that would be unacceptable to local workers (Nandita Sharma, *Mexican Standoff – Canadian 'Guest Workers,'* The Globe and Mail (March 29th, 2006)). The Supreme Court of Canada discussed this in a judgment in 2001, in which it set aside a provision of legislation that forbade foreign workers to form unions (*Dunmore v. Ontario (Attorney General)* [2001] 3 S.C.R. 1016, at paragraphs 41, 102). This harmful reality is also described in an article that was published last year and reviewed the Canadian experience, which is so bad that some have called it 'Canada's shameful little secret.' The article states:

> '...the consular liaison officers [of the sending nation] appointed to look out for the workers suffer from a conflict of interest:

> maintaining good relations with Canada and the smooth operation of the scheme versus taking up the fight on behalf of individual workers.
>
> As one former contract worker from Mexico puts it, a complaint to a consular official "enters in one ear and goes out the other." It is simpler for consular officials to replace workers who raise concerns in the workplace than to address the root cause of their complaints' (Peter Mares, *Workers for all seasons*, The Diplomat (July-August, 2006). See also World Bank, *Pacific Islands At Home & Away - Expanding Job Opportunities for Pacific Islanders Through Labor Mobility*, Report No. 37715-EAP 117 (September, 2006)).

Moreover, initiating contact with the enforcement authorities, which is often the most effective way in which workers who have been harmed may bring the harm to the attention of the authorities, is not applicable in view of the concern, which is well established in the experience of migrant workers, that it will lead to the loss of their livelihood. An additional report of Human Rights Watch, which deals with the American work market, found that migrant workers in that country generally refuse to sue for legal remedies to which they are entitled under the law, in case it leads to their being blacklisted for work. In the words of the report:

> '... found widespread fear and evidence of blacklisting against workers who speak up about conditions, who seek assistance from Legal Services attorneys, or who become active in [labor organizations]' (Human Rights Watch, *Unfair Advantage: Workers' Freedom of Association in the United States under International Human Rights Standards* (2002), at pages 42, 202, 206).

18. To all of this we should add the recognition that despite the developed labour law in the country of origin of Yilmazlar's workers, the legal protection that workers in Turkey enjoy *de facto* is flawed. This was determined by the World Bank, which said: 'Compliance with labor law is weak in Turkey. Many workers are not receiving the protection that is the intent of the laws' (World Bank report, *supra*, at page xi). In view of the aforesaid, one can only look sceptically upon the promise of enforcement measures by the authorities, both in Israel and in Turkey. In the absence of a real channel for taking legal measures, there is additional support for the

conclusion that a worker who refuses to acquiesce in his being bound to one employer faces real difficulty in protecting his rights.

To complete the picture I will add that this difficulty only increases in view of an additional characteristic inherent in work migration, and this is the limited ability of foreign workers to form unions and to achieve collective protection. In many places the local workers' organizations are not prepared to admit foreigners into their ranks, and there are places where the law prevents this and even forbids the creation of alternative frameworks. It is also natural that temporary workers who come from different countries, speak different languages and sometimes have conflicting interests (for example, because of the competition over a limited number of positions or a desire to improve their work conditions at the expense of other workers) have difficulty in forming unions. To all of this we should add the well-known difficulty, which is inherent in work migration, of being distanced from a familiar environment, the normative system to which the workers are accustomed and the family unit, which is capable of weakening their power and prevent them from becoming organized in an effective manner.

*Theoretical harm and actual harm*

19. What is the concrete expression of all this in the case of the Yilmazlar workers? The parties disagree on this question. On the one hand, workers of the company have testified, in affidavits that were attached to the petition before us, with regard to difficult conditions in which they were employed, harsh treatment that they received, having to sign contracts whose content, which is sometime draconic, was unclear to them, prolonged delays in receiving wages, the confiscation of passports, the payment of wages that are lower than the minimum wage provided in Israel, non-compliance with the provisions of the Hours of Work and Rest Law, 5711-1951, and an absolute dependence on their employer, which prevents any possibility of improving the situation. On the other hand, Yilmazlar insists upon its position that everything stated in those affidavits is false and unfounded. As proof, the company presented affidavits from other workers, in far greater numbers, that testify to fair employment conditions and the payment of wages on time. Unfortunately, these affidavits are all drafted in identical language, as if they were an exact copy of one another. All that I can hope is that it is merely a false concern that someone wished to have workers sign a declaration that does not reflect the true position. In any case, these affidavits do not address at all the amount of the wages paid to the workers, the content of the work

contract, the claim of having been forced to sign blank promissory notes, the question of the workers' dependence on the company including the claim that passports were confiscated, the proper housing conditions that are provided and the question of vacations and rest days.

In the field, checks that were conducted by the Ministry of Employment on the work sites where Yilmazlar operates, on 8 November 2005 and 23 November 2005, found nothing detrimental to the company. This was also the case when a visit was made by representatives of the Department of Security Industries in the Turkish Ministry of Defence (SSM). On the other hand, in a legal proceeding that took place not long ago against Yilmazlar in the Ramla Magistrates Court, a case was considered in which dozens of its workers were housed with considerable overcrowding in a residential house in a village in the centre of the country. At the request of the village, the Magistrates Court ordered the company to remedy the matter immediately (CC 2992/05 (Ramla Magistrates Court) *Yagel v. Nomdar and Yilmazlar* (unreported, 4 September 2005)). In its decision to deny an application for leave to appeal filed by Yilmazlar, the Tel-Aviv District Court (the honourable Justice S. Dotan) held that: 'If we are dealing with the rights of the workers, there is no greater violation of their rights than housing them with inhuman overcrowding as described above' (LCA (Tel-Aviv District Court) 2782/05 *Yilmazlar International v. Yagel* (unreported, 4 January 2006)). The same conclusion was reached by this court, which approved the decision and added (*per* the honourable Justice E. Arbel): 'I agree with the remarks of the District Court with regard to the serious conditions in which the workers were placed — a hundred people in one overcrowded house' (LCA 267/06 *Yilmazlar International v. Yagel* (unreported, 9 January 2006)).

20. Even though the factual picture is not entirely clear, it is sufficient that there is a real concern, which arises in this case, that the rights of the Yilmazlar workers may be violated in various respects. In any case, this court is not the appropriate framework for clarifying questions of fact (HCJ 4999/03 *Movement for Quality Government in Israel v. Prime Minister*, in the second paragraph of the opinion of President A. Barak (not yet reported, 10 May 2006)). The focus of the matter, therefore, is upon the *normative* situation created by the government decision. This has created an opening, which is very wide, for the abuse of Yilmazlar's workers, as well as other foreign workers in the future. Experience teaches us that where there is an

opening, there will always be someone who tries to pass through it. I cannot acquiesce in this.

*The argument concerning the imminent expiry of the arrangement*

21. I should further emphasize that the respondents should not rely on the argument that in any case the whole arrangement is soon to expire, at the end of 2007. I should say, first, that I will not be surprised if someone tries to extend it. Second, even though the decision of the ministerial committee for foreign workers no. FW/3 of 7 June 2005 states that 'only the government has the power to approve, in very exceptional cases, an additional arrangement for the bringing or the employment of foreign workers as a part of reciprocal purchase transactions,' I think that I will not err in my assessment that giving legal sanction to the government decision in this case will result in similar decisions in the future. Indeed, the normative impropriety of the decision is the heart of the matter, and this is undesirable, not matter how long it is valid.

22. My colleague the vice-president bases his position mainly on the absence of debt bondage in the case of the Yilmazlar workers. This is almost the entire basis for the distinction that he wishes to make between the case before us and the ruling made in the aforementioned *Kav LaOved Worker's Hotline v. Government of Israel*.

Indeed, the question of debt bondage is of critical importance in the context of migrant workers, and a major part of the cruel fate — no less — that awaits them in host countries. In brief, the meaning of this is that a worker who wishes to obtain a visa to work in a foreign country is often required to pay huge sums to various agencies and middlemen, who are responsible for obtaining it. To illustrate the point, the average agency fee that a foreign worker is required to pay, when he earns in Israel an average wage of 500-1,000 dollars a month, is 10,000 dollars and even more (*Binding Migrant Workers to Corporations*, *supra*, at page 23; *Freedom Inc. — Binding Migrant Workers to Manpower Corporations in Israel*, *supra*, at pages 12, 26). Most of the workers borrow money for this purpose in their countries of origin, and they thereby become debtors who pay high rates of interest. Often they are given a promise that they can work in Israel for several years, even though their residency permit in Israel is valid only for that year and there is no certainty that it will be renewed. Even a very small delay in receiving the wages — for example because of not turning up to work because of illness or another reason, may result in a situation in which

this debt increases significantly to a point that it can no longer be repaid. This harsh reality, which threatens to bring serious economic disaster upon them, is the lot of foreign workers throughout the world. It is possible that it is the main problem in work migration in modern times. There are three petitions addressing this issue that are pending in this court (HCJ 2405/06, HCJ 1193/07, HCJ 2768/07).

It also cannot be denied that when the two evils — debt bondage and being restricted to one employer — befall a worker simultaneously, the extent of the harm to him is greatly increased. In the absence of any market force, not only does he have difficulty in earning the true value of his work (which is usually greater than what he is paid) and repaying his debt, but the worker will hesitate two or three times before he dares to complain about his conditions of employment, because of the fear that he will be dismissed, which means — in the absence of an alternative possibility of employment — that he will have no ability to repay the debt. Indeed, a worker who is not burdened with a debt, but is bound to one employer, is in a better position that his fellow worker who both has a debt and is also bound to one employer.

23. But all of this is not capable of combining the two — the debt and the restrictive arrangement — into one entity that cannot be separated. It should be emphasized that we are dealing here with two different elements that are independent of one another, even though each one of them may have a bad effect in relation to the other. *A restrictive arrangement without a debt is still a restrictive arrangement*, and the harm that it causes, as I have described at length above, is great.

It is therefore clear that there is no basis to the state's claim that the special position of the Yilmazlar workers, who have left no debt to be repaid behind them when they come to Israel, lies in the fact that the restrictive arrangement does not cause them any real harm. This harm, the essence of which is the worker's loss of his power, does not depend — it should be emphasized once again — on the existence of a debt and does not derive from it. It is independent. Can it seriously be argued that the removal of the element of debt will be sufficient to make employers willing to pay their workers wages that reflect the value of their work, adhere strictly to the hours of employment, stop taking passports or provide fitting housing conditions? Is the absence of a debt capable of repairing the moral flaw inherent in the

restrictive arrangement mechanism? I think that the answer to these questions is self-evident.

24. Another aspect of the argument, if I have understood it fully, is that in the absence of a debt there is nothing to prevent an employee, who is not satisfied with the conditions offered to him, from leaving Israel. Once again the same error has arisen, since, as I clarified above, often the option of leaving Israel and giving up the job is a bad one, both because of the alternative in the country of origin and because of the reliance that has already occurred. If there are workers — and there are very many of these — who are prepared to work under a regime of both debt and a restrictive arrangement, with its double evils, then *a fortiori* there will certainly be those will be prepared to work subject to the restrictive arrangement only, while suffering the harm that it causes them. I have already discussed the weakness of the argument of consent, and I see no reason to say any more.

My colleague, the vice-president, bases his position on remarks that were written in *Kav LaOved Worker's Hotline v. Government of Israel*. Even in this regard I think I should make matters clear. Debt bondage was mentioned there as *one* of the factors that made the restrictive arrangement so evil, but not the only one, and not necessarily the dominant one. The violation of 'the foreign worker's autonomy of will' — in the words of my colleague in paragraph 10 of his opinion above — does not arise solely from the debt bondage. The following is what I wrote in *Kav LaOved Worker's Hotline v. Government of Israel*:

> 'The restrictive employment arrangement violates the basic rights of the foreign workers. It violates the inherent right to liberty. It violates human freedom of action. It denies the autonomy of the free will. It tramples the basic right to be released from a work contract. It takes away a basic economic bargaining power from a party to employment relations who is already weak. By doing all this, the restrictive employment arrangement violates his human dignity and liberty in the most basic sense' (paragraph 29 of my opinion).

These violations, regrettably, are unaffected by the absence of debt bondage.

All of the above shows that the special characteristics of the Turkish deal cannot undermine the basis of the claim that the restrictive arrangement

seriously harms the rights of the workers. I shall now consider how this harm is consistent with the public interest.

*The public interest and the purpose of the administrative act*

25. The contract with the Turkish Ministry of Defence is important to the respondents. It is important to the State of Israel. Their counsel emphasized the interests that it serves, in both the economic and the political spheres. First and foremost it would appear, and I am prepared to accept this as a fact, that without the offset aspect, the agreement would not have been made. The Israeli economy, and especially the fifth respondent, Israel Military Industries Ltd, would then have lost substantial income in foreign currency. IMI's ability to enter into future transactions with the Turkish authorities would have been harmed. It would have to bear the consequences of a breach of contract. The effects on workers in the security industries would have been considerable, and possibly employment in the economy as a whole would have been affected. It is possible that in the long term this would have even harmed the security of Israel. Moreover, it cannot be denied that the agreement plays a part in the relationship with Turkey, a main ally without parallel, and it is difficult to exaggerate the importance of maintaining good relations with it. In so far as the agreement, with its various elements, can benefit the interests of that country, this too is indirectly desirable for Israel, its ally. Indeed, 'the phenomenon of work migration is an inseparable part of international relations' and of 'the reciprocal interest of governments to develop relations' (Kemp and Reichman, *supra*, at page 10).

The realization of this interest by means of implementing the Turkish transaction imposes a duty on Israel, which is not at all a light one. It is obliged to carry out its share in the offset mechanism, and for this purpose it was required to take upon itself an undertaking with a significant financial value. A particularly creative mind gave rise to the idea that it would be possible to make use of *human beings* in order to cover a part of this liability. As the state explained in its response to the petition (in paragraph 9 of the preliminary response), of the two hundred million dollars that Israel is required to return to Turkey, approximately 28 million dollars are supposed to be derived from the employment of the Turkish workers (which is only approximately fourteen per cent of the total amount). The restriction of the workers to their employer very much facilitates the ability to reach this target. It ensures that the majority of the wages will be transferred in an orderly manner to Turkey. It is especially essential in the situation where the

Turkish Ministry of Defence has taken upon itself the work of supervising the implementation of the agreement and it refuses to hold discussions with several different employers but is prepared, for its own reasons, to work only with Yilmazlar.

26. When we are enquiring into the dominant purpose of an administrative act such as the one undertaken by the government of Israel in the case of the Yilmazlar workers, we should of course consider those aspects that indicate, in so far as possible, the essence of the act and properly reflect the reality and the context in which it arose (see and cf. HCJ 1030/99 *MK Oron v. Knesset Speaker* [2002] IsrSC 56(3) 640, at page 665; CA 10078/03 *Shatil v. State of Israel* (not yet reported, 19 March 2007), at paragraph 26 of my opinion)). In view of the aforesaid, it is possible to determine without any difficulty that a main purpose of the government decision is to create an effective mechanism of discharging a part of the offset debt, by means of ensuring that Yilmazlar has foreign manpower available at all times.

But this is not the only purpose of the restrictive arrangement mechanism. It serves another purpose. The concern of the authorities that the floodgates will be opened, after they have been erected with considerable effort in recent years and prevented Israel from being inundated by legal and illegal migrant workers, is what led them to act so that the number of Yilmazlar's workers would be measured and limited at all times, and that no use would be made of the narrow route that was provided for individual cases, in order to bring hundreds and thousands of others into the Israeli economy.

These, then, are the two dominant purposes of the decision that is the subject of this petition. They seek to realize important interests, and to this end the government of Israel took the liberty of restricting the rights of Yilmazlar's workers. In order to determine whether the government did this lawfully, we are required to consider the matter — just as we did in *Kav LaOved Worker's Hotline v. Government of Israel* — from the perspective of the formulae that we have borrowed from the limitations clauses in the Basic Laws.

*Judicial scrutiny*

27. The first stage in the process of scrutiny seeks to ascertain whether the purposes are proper ones. With regard to the first purpose of which I spoke above, I think that it can be determined with the utmost clarity that it is *not a proper purpose*. Whoever looks at the facts of the case before us cannot, in my opinion, fail to be outraged at the use that has been made of these workers

as an instrument and a means of furthering the interests of the Israeli government and commercial companies. After all, of what concern to the Turkish worker are international relations? What does he care for the success of the security industries in Israel? What interest is it to him that tanks are improved for his country's army? What is the source of the obligation, for which that worker is required to pay with his liberty, his dignity, his ability to earn a livelihood and his hopes for a better future for his family, in order to further these interests? What is it that justifies that he should be subjected to the binding force of the restrictive arrangement (cf. HCJ 6427/02 *Movement for Quality Government in Israel v. Knesset* (not yet reported, 11 May 2006), at paragraph six of my opinion)? What justification is there that in addition to the consideration that he is required, in the usual manner, to provide within the framework of a free and fair contract with an employer, he should be required to pay an additional price, from which he does not benefit and with regard to whose nature and character he was never consulted?

28. This purpose is inherently inconsistent with the ethical foundations on which the State of Israel is founded. The basic principles of liberal morality have taught us that a human being is always an end and not merely a means to an end. Kant wrote:

> '… der Mensch und überhaupt jedes vernünftige Wesen existiert als Zweck an sich selbst, nicht bloß als Mittel zum beliebigen Gebrauche für diesen oder jenen Willen… dagegen vernünftige Wesen... das nicht bloß als Mittel gebraucht werden darf... mithin sofern alle Willkür einschränkt (und ein Gegenstand der Achtung ist).'
>
> '… man and generally any rational being exists as an end in himself, not merely as a means to be used arbitrarily by this or that will…; but rational beings… are… something that should not be used merely as a means, and consequently all arbitrariness is thereby eliminated (and he is an object of respect)' (Immanuel Kant, *Groundwork of the Metaphysic of Morals*).

To this I would add that, *prima facie*, even if a person is required to take part in achieving any purpose, it should be one in which he is directly the goal of that purpose. Any other approach is tantamount to treating a human being as an object, and in our case, as the property of the employer. Justice M. Cheshin said: 'An inanimate object and likewise an animal may be taken

by its owner from place to place, transferred from one person to another, and no one will object. But man is different; nothing should be done to him against his will' (HCJ 8111/96 *New Federation of Workers v. Israel Aerospace Industries Ltd* [2004] IsrSC 58(6) 481, at p. 575). And Justice D. Beinisch emphasized: 'The dark ages in which a person could be regarded as the property of another person have passed' (CrimA 11196/02 *Frudenthal v. State of Israel*, at p. 47). Particularly appropriate here are remarks written by my colleague the vice-president in *New Federation of Workers v. Israel Aerospace Industries Ltd*:

> '... We should not include within the scope [of the employer's property rights] also the power to hold onto the worker, even only as a premise. I said as a premise, because no one disputes that the worker always has the power to leave his new employer, just as he had the power to leave his previous employer. But a right to leave an employer that is based on the premise of the liberty of the worker is not the same as a right to leave an employer that is based on the premise of the employer's prerogative. There can only be one premise, the former one, if we agree that the employer's property rights will never also include control of the worker's liberty... The liberty of the worker to choose his employer is derived from the right to liberty, which is enshrined in the Basic Law: Human Dignity and Liberty, and from the value of human dignity, which is the foundation of the aforesaid Basic Law... This liberty of the worker is derived directly from the outlook that the human being is an end and not a means' (*ibid.*, at page 595).

These remarks were admittedly written with regard to Israeli workers, but I do not know what moral basis there is for distinguishing between them and their foreign counterparts. The principle is simply that the idea that Yilmazlar's workers can be used as a tool for performing the obligation in a commercial transaction between third parties is immoral and cannot stand. The restrictive arrangement mechanism, which turns the foreign worker into an object, cannot be accepted in a normative environment that seeks to emphasize — in the course of implementing processes of globalization and openness — the value of man, every man, as a subject (Stuart Rosewarne, 'Globalization and the Recovery of the Migrant as Subject: "Transnationalism from Below",' 15(3) *Capitalism, Nature, Socialism* 37

(2004); Ivan G. Alvarado & Hilda Sánchez, 'Migration in Latin America and the Caribbean: A view from the ICFTU/ORIT,' 129 *Labour Education* 101 (2002), at page 104). Such an environment, which carries on its banner the autonomy of will and dignity of the human being, cannot stand idly by when it sees, in the words of the poet Yehuda Amihai: 'How people who went out whole return in the evening to their homes like small change' (Yehuda Amihai, 'Out of three or four in a room,' *Poems 1948-1962* (2002), at page 97).

29. I might have ended here, since the impropriety of the dominant purpose of an administrative act is sufficient in order to set aside the act itself. But since a similar conclusion — that the act should be set aside — arises also from a consideration of the *second purpose* of which I spoke, I ought also to add this: admittedly, preventing a rupture in the framework of employment in Israel is likely, as a rule, to be regarded as a proper purpose, and therefore it will pass the first part of the test of judicial scrutiny. But my opinion is that the measures that were adopted to realize it do not satisfy the second part of the test of judicial scrutiny, by which I mean the principle of proportionality.

30. I have difficulty in imagining what motive a foreign worker who enjoys fair conditions of employment that are compatible with his market value will have to stop working for his employer. If the picture is so rosy, and reflects — in the words of counsel for Yilmazlar — the 'huge advantage given to the Turkish workers in the offset agreement' without which 'they would not be able to come and work in Israel at all' (pages 708 of the statement of reply), why is there any need for a restrictive arrangement? One is compelled to wonder why this 'huge advantage' is not capable of ensuring loyalty to the employer. Is it perhaps because the main advantage belongs precisely to Yilmazlar, which, because of the power of control given to it by the restrictive arrangement mechanism, can only be an object of envy to other employers?

It is precisely the restrictive arrangement that threatens to deprive the worker of fair conditions that is likely — and this is the heart of this case — to provide an incentive for workers to leave their employers, and to result in an increase in the market of unlicensed workers and the breakdown of control of what happens in this sphere. As I said in *Kav LaOved Worker's Hotline v. Government of Israel*, figures that were compiled by the Ministry of Industry, Trade and Employment indicate this connection between a restrictive

arrangement and illegal work, since the latter is 'a rational act necessitated by reality' in the efforts of the foreign worker to improve his conditions (Yoram Ida, *Factors Influencing Foreign Workers to Revert to Illegal Employment* (Research Department of the Ministry of Industry, Trade and Employment, 2004), at page 57). That research found that the phenomenon of foreign workers in Israel resorting to illegal employment was not usually a result of the worker receiving a better financial offer, nor of the expiry of his residency permit. It mainly derived from the desire of the worker to extricate himself from the difficulties that were brought upon him by unfair employment conditions enforced by the employer (*ibid.*, at pages 64, 74; see also Malsiri Dias & Ramani Jayasundere, 'Sri Lanka: Good Practices to Prevent Women Migrant Workers From Going Into Exploitative Forms of Labour,' 9 *GENPROM Working Paper* 26 (ILO, Geneva, 2000). From this we can see the absence of a rational connection between the purpose and the means adopted to achieve it, since the restrictive arrangement not only does not reduce the illegal employment market *but it is one of the factors creating it.* An additional conclusion is that the restrictive arrangement is a more harmful measure that other measures that could be adopted in order to realize the purpose under discussion, especially the measure of ensuring that workers are given their rights.

31. Even the proportionality test in the 'narrow' sense is not satisfied, since in my opinion, as I described above, the impropriety in the restrictive arrangement is greater than the benefit that it provides. In this respect, I should add the following: it is hard to dispute the contribution of work migration to economic success in the host country and to ensuring the existence of industries in which it would otherwise be difficult to recruit workers, by which I particularly mean the construction and agriculture industries. This can be clearly proved by Germany after the Second World War, the markets of the United States and Canada and what is happening in additional countries (see, for example, Michael J. Piore, 'Illegal Immigration to the U.S.: Some Observations and Policy Suggestions', in *Illegal Aliens: An Assessment of the Issues* 26 (1976). But the foreign work market does not only make a positive contribution. The public interest is not monolithic, and some of its aspects may be harmed — even from a narrow economic viewpoint of the interests of the economy — as a result of acquiescing in a reality where foreign workers are deprived of their rights. Thus, *inter alia*, there is a concern that unemployment may be increased among local workers

and the amount of their wages may be harmed by being 'dragged' down by a whole sector of foreign workers whose salary is inconsistent with what is provided by law. The willingness to ignore the value of having fair employment relations in the economy is a two-edged sword, which ultimately will harm local workers. Cheap work also takes away the incentive to develop new technologies and hi-tech industries, and it leads instead to an excessive focus on manual labour industries that restrict the development of the economy. There are other negative aspects as well (see and cf. O. Yadlin, 'Foreign Work in Israel,' *Menachem Goldberg Book* 337 (2001), at page 342). All of these, which are strengthened when the restrictive employment mechanism operates, should not be ignored. We should also consider the possible risk of harm to the international standing of the State of Israel as well as its image in the eyes of the exploited community of workers, who ultimately return to their country of origin and share their impressions with others.

*On membership of the community of civilized nations*

32. In this last context, I would add another significant aspect that may have remained, unjustifiably, in the shadow of the discussion of the technical aspects of the restrictive arrangement. I am referring to the responsibility that the State of Israel is obliged to take upon itself as a member of the community of civilized nations and on the basis of its commitment to universal values of justice and morality (CA 105/92 *Re'em Contracting Engineers Ltd v. Upper Nazareth Municipality* [1993] IsrSC 47(5) 189, at p. 206). In my opinion, these do not allow the continued implementation of the restrictive arrangement. Even if the foreign worker does not have an inherent right to work in Israel, the state has a duty not to harm him once he comes within its borders, especially after the state itself has invited him to do so. The spirit of the twenty-first century, a spirit of openness and transnational cooperation cannot allow this. A problematic and strange combination of globalization on the one hand, and adhering to old laws of serfdom and bondage on the other, is unacceptable. Indeed, in the first part of my remarks I gave many disturbing examples of the harm that restrictive employment arrangements inflict on foreign workers all around the globe, including in progressive and enlightened western democracies. I do not think that the conclusion that follows from this is that we should regard restrictive arrangements as a necessary evil or — worse still — a desirable and acceptable phenomenon. We can learn from the bad experience of others, and

we should not hasten to adopt into our legal system anything other than what should be adopted. In the words of Justice A. Witkon: 'It is possible that in this question or that the [Israeli] public will have an outlook of its own that is different from the outlook of other peoples, and it need not be said that in such a case we will be guided solely by the outlook of our public' (CA 337/62 *Riezenfeld v. Jacobson* [1963] IsrSC 17(2) 1009, at page 1026; IsrSJ 5 96). The rights of the weak are naturally not carried away on waves of popularity and support, but they are rooted in a solid and well-founded ethical outlook. This is the direction in which our social conscience leads us, and we can only hope that its light will also shine on others.

With regard to work migration in Europe in the 1970s, the Swiss novelist and playwright coined a phrase that many people quote. 'Wir riefen Arbeitskräfte, und es kamen Menschen' ('We called for workers, and human beings came'). Indeed, the Yilmazlar workers, before they are workers, are human beings. We should recognize this. This should be reflected in our legal arrangements. This is how we should treat the foreign worker who comes into our gates.

**Justice E. Hayut**

My colleague Justice E. Levy has once again set out in his comprehensive opinion the basic principles that this court addressed not long ago in HCJ 4542/02 *Kav LaOved Worker's Hotline v. Government of Israel* (not yet reported, 30 March 2006). By virtue of these principles, the decision in *Kav LaOved Worker's Hotline v. Government of Israel* set aside a procedure that was practised in the agriculture, nursing and manufacturing industries, according to which the residency and work licence of foreign workers was conditional upon being bound to a specific employer. With regard to this procedure, my colleague Justice E. Levy said in that case (in para. 29 of his opinion):

> 'The restrictive employment arrangement violates the basic rights of the foreign workers. It violates the inherent right to liberty. It violates human freedom of action. It denies the autonomy of the free will. It tramples the basic right to be released from a work contract. It takes away a basic economic bargaining power from a party to employment relations who is already weak. By doing all this, the restrictive employment

> arrangement violates his human dignity and liberty in the most basic sense.'

These appropriate remarks were adopted by President A. Barak and Vice-President Emeritus M. Cheshin who added some remarks of his own in that case, and as a result the arrangements that bound foreign workers to their employers were set aside. I think that there is and can be no dispute between my colleagues with regard to the basic principles underlying the ruling made in *Kav LaOved Worker's Hotline v. Government of Israel*, but my colleagues are in disagreement with regard to the implementation of this ruling in the special circumstances of the case before us. In this dispute, I agree with the opinion of my colleague Vice-President E. Rivlin, and like him I too am of the opinion that the offset arrangement is an exceptional arrangement with special characteristics that justifies the exclusion from the government decision under consideration in this petition from the rule that invalidates restrictive arrangements. Notwithstanding, I would like to emphasize that in my opinion it is possible to allow this arrangement as an exception *inter alia* because it is limited in time. But if the concern that my colleague Justice E. Levy raises is realized, and the denial of the current petition 'will result in similar decisions in the future,' then it will be necessary to re-examine the legality of those decisions and it is not improbable that a different conclusion will be required in their case. I would also like to emphasize that in view of the restriction imposed on the Yilmazlar workers when they are in Israel, that they cannot change over to another employer, there is in my opinion an extra and special duty to protect the rights of these workers, and it is to be expected that the respondents will take care to do so and will continue to carry out regular and strict supervision of their conditions of employment.

Petition denied, by majority opinion (Vice-President Rivlin and Justice Hayut), Justice Levy dissenting.

7 Tishrei 5768.
19 September 2007.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - x

A.A.B. JOINT VENTURE, :

Plaintiff, :

v. : No. 04-1719C, No. 05-114C,

THE UNITED STATES, : No. 05-1172C, and

Defendant. : No. 06-49C (Consolidated)

- - - - - - - - - - - - x

Tel Aviv, Israel

Wednesday, November 29, 2006

Deposition of AVIE ARENSON, a witness herein, called for examination by counsel for the Defendant in the above-entitled matter, pursuant to notice, the witness being duly sworn by BRENDA MATZOV, taken at 3 Daniel Frish Street, Seventh Floor, Tel Aviv, Israel, at 9:20 a.m., Wednesday, November 29, 2006, and the proceedings being taken down by stenotype by BRENDA MATZOV and transcribed by her.



Plaintiff's Supplemental
Exhibit 3

Page 126

MR. BRILLIANT: I'm not sure that there is any foundation for that last piece of testimony.
THE WITNESS: I'm sorry.
BY MR. JONES:
Q. Okay. The question is: What were the -- here's a good way to ask it.
What was the value of the visas once the Closed Sky policy was put into effect?
MR. BRILLIANT: Hasn't this been answered and beaten to death?
MR. JONES: Not really.
THE WITNESS: Basically, there was no value.
BY MR. JONES:
Q. Okay. Now, with respect to the ability of an employer to enforce the legal obligation of a worker to leave, what, if any, enforcement mechanism was in effect prior to the creation in Israel of the immigration police?
A. There must have been something.
Can I ask Amnon? I don't remember.
Q. Well, do you know approximately when the immigration police in Israel was formed?
(Discussion in Hebrew between the witness and Mr. Amnon Barkai.)

Page 127

THE WITNESS: We were asked this before. The second half of 2003.
BY MR. JONES:
Q. Okay. Prior to the second half of 2003, if you wanted a worker to leave and he wouldn't leave, what, if any, enforcement mechanism did a company have?
A. Nothing really, except that it very seldom happened.
MR. JONES: Nothing further.

FURTHER EXAMINATION BY COUNSEL
FOR DEFENDANT
BY MR. BRILLIANT:
Q. Well, if the employer had -- if there was no enforcement mechanism, the employer had no way to ensure that the employee left after his work was done, doesn't that create a kind of -- that situation create a kind of obvious incentive for a Government to say let's cut back on how many foreign employees we're bringing in because there's no way to make sure that --
MR. JONES: I am going to have to object to that. That's really speculation in terms of Government policy.

Page 128

MR. BRILLIANT: Well, in terms of --
THE WITNESS: I can answer that. I'd like to answer, if I could.
MR. JONES: Okay.
THE WITNESS: I have no objection to the Israeli Government deciding that there should be no more foreign workers. There's good reasons for it, and I agree with the reasons.
My objection was to the complete arbitrariness and lack of preparation and the amount of distortions that resulted from their implementation of the policy.
It's not only my position. It's my position and the Contractors Association's position. What we objected to was them telling us to put in these applications, run around like chickens without heads, become illegal whatever you do. We're changing the law every three days so that you're always breaking the law. This is what drove us crazy.
BY MR. BRILLIANT:
Q. Well, okay. Apart from these aspects of implementation and administration of the policy that you're referring to, though, then it's true, though, that the overall decision of disallowing

Page 129

further foreign workers, in itself, did not come as a big surprise? I mean, it's something that one might expect?
A. It definitely came as a surprise.
I'll tell you something else. If we had known before the bid, we would have put in a higher bid or not a bid at all, like in the Ministry of the Air Force/Defense things.
There is nothing technically difficult about training Israeli Arabs to work on a project. We're doing it now. Today, there is no difference in my company between jobs -- no difference in my company in terms of quality or speed or cost between jobs where I'm doing the work with Israeli Arabs and jobs where I'm still using my TCNs. And I have hundreds of them.
They more or less have the same salary now. They more or less have the same skills. The Arabs, because they're close to home, they tend to take more holidays and they're slightly less efficient. But they're better workers.
And the Romanians and the Turks are willing to work longer hours, but they're a little less -- they're a little dumber than the Arabs. They're a little less competent. Our Israeli Arabs

Page 130

are fine, upstanding people. And when there was a place for them to work and proper payment, it turned out that they are very good workers like I remember them in 1961 and '62 when I first started.

Q. So, I mean, the kind of suddenness, perhaps, or the abruptness of the decision --

A. That's what killed us. Yeah.

Q. -- that took you by surprise, if I understand you?

A. Yes.

Q. But with hindsight, the fact of this problem of foreign workers coming in and no way to enforce the need to make them leave when they're done, sooner or later the Government was going to put a stop to that. I mean, that one might expect even though you might not expect it to kind of come suddenly.

A. I think it came because of -- I think it came because, ultimately, in 2000, plus minus, the Israeli Government realized that they would never be able to use Palestinians within the country. And at that time, they decided that, if they weren't going to have Palestinians, they didn't want foreigners.

This was a period of years, three or four

Page 131

years, until the implications of -- everybody's understanding that we would no longer be using Palestinians worked out.

There are still many foreign laborers in the country. In some cases -- in 2001, I think there were sixty or 70,000 visas for the building industry. There was 5,000 visas for the health care industry, for home aid and so on.

Today I think we have 11,000 in the whole building industry. And the health care is over 35,000. So it isn't as if they've decided that there are no more foreign labor. They just said no more foreign labor in the construction business.

I mean, personally, I don't think there's anything wrong with Israelis being home care people too. I don't know why we have to have Philippines. The Israelis are very compassionate people. Why not hire them?

MR. BRILLIANT: I have no further questions.

MR. JONES: I have no further questions.

Thank you, Mr. Arenson.

MR. BRILLIANT: Thank you.

THE WITNESS: Thank you.

(The deposition concluded at 11:45 a.m.)

Page 132

CERTIFICATE OF WITNESS

I hereby declare under penalty of perjury that the foregoing is my deposition under oath; that I have read the same; and that I have made the corrections, additions, or changes to my answers that I deem necessary.

In witness thereof, I hereby subscribe my name this ______ day of ________________________ 2006.

________________________
Avie Arenson

Page 133

REPORTER'S CERTIFICATE

I, BRENDA MATZOV, CA CSR No. 9243, do hereby certify:

That, prior to being examined, the witness named in the foregoing deposition, was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That the foregoing deposition was taken before me at the time and place herein set forth, at which time the aforesaid proceedings were stenographically recorded by me and thereafter transcribed by me;

That the foregoing transcript, as typed, is a true record of the said proceedings;

And I further certify that I am not interested in the action.

IN WITNESS WHEREOF, I have subscribed my name this 13th day of December, 2006.

________________________
Brenda Matzov, CA CSR No. 9243