No. 04-1719C, No. 05-114C, No. 05-1172C, and No. 06-49C (CONSOLIDATED)
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

A.A.B JOINT VENTURE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE

---

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

**Filed electronically**

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

January 7, 2008

**TABLE OF CONTENTS**

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. SR-22 Permitted The Contractor To Arrange, Through The GOI, To Bring TCNs Into Israel To Work On The Nachshonim Project, But Gave No Assurance As To The Conditions Under Which The GOI Would Permit Such Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. SR-14 Does Not Convert SR-22 Into A Warranty . . . . . . . . . . . . . . . . . . . . . . . 5

III. AAB Misconstrues The Provisions Of SR-14 Concerning Bidding And Tax Reimbursement, And The Related Provisions Concerning Submission Of A Tax Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV. Under Applicable Case Law, The Contract Should Not Be Construed To Contain The Alleged Warranty . . . . . . . . . . . . . . . . . . . . . . 8

V. The GOI Did Not Impose An Absolute Bar To The Importation Of Foreign Workers, And AAB Has Failed To Demonstrate That Its Inability To Bring TCNs Into Israel Was Not Due To Its Own Failure To Satisfy The Prerequisites For Doing So . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

Amino Brothers Co. v. United States,
178 Ct. Cl. 515, 372 F.2d 485 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Chris Berg, Inc. v. United States,
182 Ct. Cl. 23, 389 F.2d 401 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Kolar, Inc. v. United States,
227 Ct. Cl. 445, 650 F.2d 256 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Oman-Fischbach Int'l (JV) v. Pirie,
276 F.3d 1380 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

W.G. Yates & Sons Const. Co. v. United States,
53 Fed. Cl. 83 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATUTES

28 U.S.C. §1746 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## RULES

Fed. R. Evid. 1002-1005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| A.A.B JOINT VENTURE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1719C, No. 05-114C, No. 05-1172C, |
| | ) | and No. 06-49C |
| THE UNITED STATES, | ) | (CONSOLIDATED) |
| | ) | (Chief Judge Damich) |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING THE "THIRD COUNTRY NATIONALS" ISSUE

Defendant, the United States, respectfully submits this reply in support of our cross-motion for summary judgment regarding the "third country nationals" issue.

## INTRODUCTION

In our moving brief, we established that the contract in question did not contain a warranty that plaintiff, A.A.B Joint Venture ("AAB"), would be able bring into Israel third country nationals ("TCNs") for employment on the Nachshonim Storage Base project, and that, even if the contract could be construed to contain a warranty concerning this matter, the Government did not breach it. We demonstrated that the contractual language upon which AAB relied did not support the alleged warranty, and that the contract placed the risks associated with importing foreign labor upon the contractor. The contract expressly permitted the contractor to arrange, through the appropriate Government of Israel ("GOI") office, to bring TCNs into Israel for employment on the Nachshonim project, but gave no assurance concerning what preconditions the GOI might require the contractor to meet in connection with such arrangements. Additionally, we established that, despite AAB's conclusory characterizations of the alleged GOI policies as having the effect of an absolute bar to bringing TCNs into Israel, no

such bar was imposed. Rather, AAB failed to take all of the steps necessary in order to successfully arrange, through the GOI, to bring TCNs into Israel for employment on the project.

In its response, AAB disputes our reading of the pertinent contract provisions, but here, as in its moving brief, AAB stretches these provisions in order to convert the contractor's contractual right to request GOI permission to import TCNs into Israel for employment on the project into a warranty that the GOI would grant such requests with no preconditions. The language of the contract does not support this interpretation. And, under the applicable case law, a contract should not be construed to contain a warranty that would make the United States liable for the actions of a foreign government unless the contract expresses such a warranty in unmistakable terms.

AAB also has not effectively refuted the factual basis of our cross-motion. For the most part, AAB dispute the facts underlying our motion. Even in the instances where AAB purports, in its response to our proposed findings of uncontroverted fact, to dispute certain proposed findings, AAB's cites no evidence contradicting those proposed findings. AAB does attempt, in its response brief and appendix, to counter some of the facts that we presented concerning the nature and scope of the GOI's "closed skies policy" and related GOI actions to which AAB attributes its alleged inability to bring TCNs into Israel. The evidence AAB offers in this regard, however, supports our position, not AAB's.

## ARGUMENT

### I. SR-22 Permitted The Contractor To Arrange, Through The GOI, To Bring TCNs Into Israel To Work On The Nachshonim Project, But Gave No Assurance As To The Conditions Under Which The GOI Would Permit Such Arrangements

The complaint bases the alleged warranty upon the statement in Special Contract Requirement SR-22, that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work." Complaint ¶ 20. As we demonstrated in our moving brief, this language did not promise that AAB's efforts to make such arrangements would be successful. This language contains no assurance as to what conditions the GOI might require contractors to meet as a prerequisite to such arrangements, or that AAB would be found to satisfy these conditions. We also noted that no such assurance could reasonably be read into the language of SR-22, because the policies that the GOI might adopt with respect to the admission of foreign workers into Israel and the decisions the GOI might make in response to requests to bring such workers into Israel were matters plainly within the sovereign authority of the GOI, and were not matters within the control of the United States or about which the United States could make promises.

In response to the latter point, AAB argues that "SR-22 is reflective of a written commitment obtained in advance by the United States from Israel . . . "that '[t]he USG and its contractors may bring into Israel for employment in carrying out the work implementing this LOA.'" Pl. Resp. 3.[1] However, the commitments made by the GOI to the United States in this

---

[1] "Pl. Resp." refers to plaintiff's brief in response to our cross-motion for summary judgment. Pl. Supp. App." refers to the supplemental appendix attached to plaintiff's response

(continued...)

matter did not extend so far as to give the United States control over the entry of foreign workers into Israel. Moreover, if the intent of SR-22 were to make the same promise to the contractor that the GOI made to the United States in the referenced Letter of Acceptance ("LOA"), the promise would have been made in the same words. It was not. As we demonstrated in our moving brief, the LOA states that "[t]he USG and its contractors may bring into Israel nationals of the United States and third countries . . . ." (Emphasis added.) Pl. App. 14. SR-22 states that "Contractor may arrange, through the appropriate Government of Israel office, to bring into Israel US nationals and nationals of third countries . . . ." (Emphasis added.) Pl. App. 46-47. Thus, even if the United States could have included in the contract the exact same assurance as the one contained in the LOA, the fact is that it did not do so.[2]

AAB attempts to buttress its interpretation of SR-22 by pointing to the deposition testimony of Resident Engineer Joseph W. Blackburn, Jr., which, according to AAB, indicates that "he and everyone within the Corps of Engineers he spoke with . . . all agreed that the contract gave AAB the right to bring TCNs into Israel to perform the work." Pl. Resp. 4. The question here, however, is not whether AAB had such a right under the contract, but whether the

[1](...continued)
brief. "PFUF Response" refers to plaintiff's response to our proposed findings of uncontroverted fact. "Pl. App." refers to the appendix to plaintiff's motion for partial summary judgment regarding the TCN issue. "Pl. Br." refers to plaintiff's brief in support of that motion. "Def. App." refers to the appendix to our cross-motion. Def. Br." refers to our moving brief.

[2] We agree with AAB that SR-22's provision that the contractor "may arrange" to bring foreign workers into Israel "was not merely an empty promise . . . ." Pl. Resp. 3. It was not, however, the promise that AAB claims it to have been. It was a promise to allow AAB to make whatever arrangements it could with the GOI to bring foreign workers into Israel. Based upon this promise, AAB could expect the Government not to hinder AAB's efforts to make such arrangements, and not to prevent or prohibit AAB from employing TCNs on the Nachshonim project. AAB does not claim that the Government did any of these things.

contract contained a warranty that efforts to exercise that right would be successful and would not face hurdles stemming from GOI policies concerning the importation of foreign labor. Nothing in the cited deposition testimony indicates that anyone within the Corps of Engineers believed that the contract contained such a warranty.

## II. SR-14 Does Not Convert SR-22 Into A Warranty

AAB argues that SR-14 "established a financial incentive for the Contractor to use as its labor force TCNs brought into Israel for the sole purpose of working on the Nachshonim Project," Pl. Resp. 4, and that "the tax exemption negotiated by the Corps of Engineers on behalf of its contractors on the Wye River Accords construction projects was an integral part of the Government of Israel's commitment to the Corps to permit the use of TCNs." Pl. Resp. 5. Here again, AAB begs the question at issue by assuming that the promises and assurances obtained by the United States from the GOI, and those given by the United States to AAB, were the same. This assumption is unfounded.

Further, AAB's characterization of the referenced tax exemption as an "incentive" to utilize TCNs and as having been negotiated "on behalf of its contractors" adds nothing to the analysis, and is misleading. The tax exemption in question was an exemption for TCNs, not contractors, and it concerned the tax liabilities of employees, not employers. See LOA Note 10, stating that TCNs "imported into Israel . . . to work exclusively on efforts covered by the provisions of this LOA shall be exempted by the GOI from liability for or payment of Israeli personal income tax on earnings resulting from such employment . . ." Pl. App. 19. To the extent that the gross wages of such TCNs and of other workers were the same, the benefit of this tax exemption flowed to the TCNs. If the tax exempt status of such TCNs enabled the contractor

to attract TCN labor at less expense than other labor,[3] the tax exemption might have indirectly benefitted the contractor, and – other things being equal – might have served as an incentive to import TCN labor. This does not mean, however, that it was inherently an incentive or was intended as an incentive to import TCNs. The most that can be said about SR-22 and the tax exemption referenced in SR-14 is that SR-22 allowed the contractor the option of arranging with the GOI to import TCN labor for the Nachshonim project, and that the tax exemption might have made that option less expensive than it would otherwise have been and thus – possibly – less expensive than employing workers who were already in Israel. The fact that one alternative permitted by a contract may be less expensive than other permitted alternatives does not justify reading into the contract a warranty that the less expensive alternative will be feasible. And, even if the contract can be viewed as creating an incentive to choose that alternative, it does not follow that there is a warranty as to the feasibility of that alternative. There is no reason why the Government cannot encourage a contractor to choose a particular alternative <u>if</u> feasible, without guaranteeing that it <u>is</u> feasible.

---

[3] The tax exemption would not necessarily enable contractors to attract TCN labor at less expense than other labor, because foreign workers would incur substantial expenses in coming to Israel to work, which could far exceed the savings provided by the tax exemption. <u>See</u>, <u>e.g.</u>, Pl. Supp. App. 43 (Israeli Supreme Court decision quoting finding of State Comptroller that foreign workers "are able to come to Israel <u>ab initio</u> only after paying large amounts of money . . . to manpower providers and agencies"). In view of these expenses, foreign workers possessing the requisite skills would not necessarily be willing to come to Israel for lower gross wages than other workers. And, it is undisputed that AAB in fact paid its TCNs a monthly salary higher than the average for Israeli construction workers. PFUF Response ¶ 24.

III. AAB Misconstrues The Provisions Of SR-14 Concerning Bidding And Tax Reimbursement, And The Related Provisions Concerning Submission Of A Tax Plan

AAB attempts to buttress its warranty claim by pointing to the clause in SR-14 stating that "bid prices shall not include the value of taxes for which the contractor will be reimbursed." Pl. Resp. 6, quoting Pl. App. 43. AAB interprets this clause to "require a contractor to adjust its bid in anticipation of obtaining a benefit offered in a Government representation (i.e., SR-22) . . . ." Pl. Resp. 6. This argument takes the quoted clause out of context, and is based upon the faulty premise that the contract's provisions regarding tax exemptions for TCNs was a benefit to the contractor. As we have demonstrated, the tax exemption in question was an exemption for TCNs, not contractors. The reimbursement provision was merely a part of the manner in which the contract required the exemption to be implemented. Instead of simply eliminating withholding of the taxes by the employer as well as transmittal of the withheld taxes to the taxing authority, the contract required the contractor to pay taxes for qualified TCNs without withholding them from the TCNs' wages, and then obtain reimbursement for these payments from the GOI though the Corps of Engineers, by means of regular periodic payments pursuant to invoices reflecting the taxes paid. Pl. App. 44 (SR-14, ¶ 4.d-f); see also Pl. App. 19 (LOA Note 12). Thus, the instruction that bidders "not include the value of taxes for which the contractor will be reimbursed" was not a requirement to credit the Government with the amount of an anticipated benefit. It was merely an instruction to disregard tax layouts for which the contractor was going to be reimbursed.

For similar reasons, neither the contract's requirement that the contractor submit a TCN tax plan, nor the TCN tax plan that AAB submitted, demonstrates that AAB "relied upon its contractual right to use TCNs in formulating its bid price." Pl. Resp. 6. The requisite TCN tax

plan contains projections concerning the anticipated usage of TCNs and anticipated amounts of TCN tax reimbursements, but, as we have demonstrated, these projections would not necessarily affect AAB's bid or its cost of performance. If AAB contemplated paying a particular category of laborers $1,000 per month, the cost to AAB would remain $1,000 per month whether these workers were TCNs for whom AAB would pay employment taxes which would subsequently be reimbursed, or whether they were non-TCNs from whom such taxes would be withheld prior to transmittal to the tax authorities. Projections of the kind described in the TCN tax plan requirement, as set forth in both the instructions to bidders and the special contract requirements (see Pl. App. 30, 45) were necessary to enable the GOI to budget funds for reimbursement. Such budgeting was necessary because the LOA required the GOI to "ensure that the necessary funds in US dollars are made available to the USG in advance (to support forecasted requirements) in an amount that makes the contractor(s) whole." Pl. App. 19-20 (LOA Note 12).

Finally, the paragraph of the contract concerning the TCN tax plan states: "Submission of the plan and acceptance of the contractor's proposal by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor." Pl. App. 30, 45. Implicit in this provision is the assumption that the hiring of TCNs who qualified for the tax exemption would not necessarily occur as planned by the contractor. Thus, to the extent that the contract's TCN tax plan provision suggests anything about the warranty issue, it suggests that the alleged warranty did not exist.

## IV. Under Applicable Case Law, The Contract Should Not Be Construed To Contain The Alleged Warranty

In our moving brief, we established that, under applicable case law, a contract provision stating that the contractor "may" take a certain action does not, without more, constitute an

assurance that if the contractor attempts to take the action in question it will in fact succeed or obtain the desired results. Def. Br. 13-14, citing Kolar, Inc. v. United States, 227 Ct. Cl. 445, 650 F.2d 256, 259 (1981); Chris Berg, Inc. v. United States, 182 Ct. Cl. 23, 28-30, 389 F.2d 401, 404-06 (1968); Amino Brothers Co. v. United States, 178 Ct. Cl. 515, 372 F.2d 485, 491 (1967); W.G. Yates & Sons Const. Co. v. United States, 53 Fed. Cl. 83, 85 (2002). In response, AAB argues that these cases do not support "the proposition that the use of the word 'may' in a representation cannot be the basis for a warranty," Pl. Resp. 11 – a more far-reaching proposition than the one we actually asserted – and that, under these cases, "a representation by the Government that a contractor 'may' take a particular action might or might not constitute a warranty, depending on a reading of the relevant contract as a whole and giving due consideration to the surrounding circumstances," id. – a proposition that does not appear to be substantially different from the assertion we did make. AAB has not refuted that, under these cases, the term "may" is ordinarily permissive, and that a contract provision stating that a contractor "may" take a particular action does constitute a warranty absent other contract language or circumstances justify construing the provision as a warranty. In these cases, the Court did not find sufficient other language or circumstances to justify finding a warranty, and construed the term "may" to be permissive.

AAB attempts to distinguish these cases, but the distinctions drawn are not significant. For example, AAB states:

> The Kolar case did not turn on the Government's use of the term "may." Had the Air Force changed its mind and decided to deny the purchaser the right to bring cutting torches to the work site, the express representation that the contractor 'may' bring cutting torches to the work site would properly have been the basis for a breach of warranty claim. . . . .

Pl. Resp. 12. However, the second of the above-quoted two sentences does not support the first. Rather, it supports no more than the unremarkable proposition that even a permissive clause can be the subject of a breach giving rise to a valid claim. The same is true of AAB's assertion that "had the Corps of Engineers changed its mind and prohibited the contractor in Amino Brothers from building a low water dam, the representation that the contractor 'may' build such a dam would have properly been viewed as a warranty." Pl. Resp. 14. All that these purported distinctions signify with regard to this case is that, if the Government had prevented or prohibited AAB from arranging with the GOI to bring TCNs into Israel to work on the Nachshonim project, there would have been a breach of the clause permitting AAB to make such arrangements. No such prevention or prohibition, however, is claimed here.

Finally, we demonstrated in our moving brief that the Court should be particularly reluctant to read a warranty into a contract where the warranty would make the United States responsible for the acts of a foreign government. In support of this proposition, we cited Oman-Fischbach Int'l (JV) v. Pirie, 276 F.3d 1380, 1385 (Fed. Cir. 2002) ("[u]nless the parties in unmistakable terms agreed to shift the risk of increased costs due to acts by the Portuguese military, no liability on the part of the [Government] attaches from such acts"). In its response, AAB misconstrues our argument and the proposition for which we cited Oman-Fischbach, unnecessarily reads an ambiguity into the above-quoted statement in Oman-Fischbach, assumes that we cite this statement for the more far-reaching of the two meanings AAB attributes to it, and proceeds to argue at length that the statement should not be so construed, and that, if it is so construed, it constitutes erroneous dicta. Thus, AAB argues that in the quoted statement, "there is some ambiguity whether it is the warranty itself which much be clearly expressed, or the

obligation implied in a warranty to make compensation," Pl. Resp. 17, proceeds to argue that "to interpret this language as requiring anything more than a clear and explicit warranty would be inconsistent with established case law, including decisions of this court," id., and asserts that the pertinent authorities "make it clear that inherent in a warranty is an implied promise to indemnify. There is no requirement to prove an express promise to indemnify." Pl. Resp. 19 (emphasis in original).

The short answer to this is that it addresses an argument we did not make. We agree that if the Government provides in unmistakable terms a warranty that a foreign government will act in a particular manner, then the Government can be held liable to compensate the contractor for increased costs resulting from acts of the foreign government that breach that warranty. However, because Oman-Fischbach counsels that such liability should not be imposed absent an unmistakable agreement to shift the risk of such acts to the Government, and because a warranty concerning the acts of a foreign government carries an implied promise to indemnify and thus shifts the risk of such acts to the Government, a contract should not be construed to contain such a warranty unless the contract expresses such a warranty in unmistakable terms.

Even assuming that the various contract provisions and circumstances relied upon by AAB provide some plausibility to the theory that the alleged warranty was intended by the parties, these provisions and circumstances fall far short of establishing that this warranty was expressed in unmistakable terms.

V. The GOI Did Not Impose An Absolute Bar To The Importation Of Foreign Workers, And AAB Has Failed To Demonstrate That Its Inability To Bring TCNs Into Israel Was Not Due To Its Own Failure To Satisfy The Prerequisites For Doing So

In our moving brief, we demonstrated that the trend of the GOI to tighten restrictions upon the entry of foreign workers into Israel began before AAB bid on the contract, and AAB was well aware of this trend at the time of its bid. Additionally, we established that, despite AAB's conclusory characterizations of the alleged GOI policies as having the effect of an absolute bar to bringing TCNs into Israel, no such bar was imposed. Rather, AAB failed to take all of the steps necessary in order to successfully arrange, through the GOI, to bring TCNs into Israel for employment on the project.

In its response, AAB asserts that its moving brief "identifies the specific Government of Israel orders and policy declarations which resulted in a virtual ban on the importation of new TCNs into Israel starting in January 2002." Pl. Resp. 6. AAB tacitly concedes, however, that it merely identified the orders and policy declarations that it characterizes as having resulted in the referenced "virtual ban," but failed to support its motion with copies of the referenced orders and policy declarations, or English translations thereof. English translations of the principal GOI orders and policy declarations concerning the importation of foreign workers into Israel were first provided to the Court in the appendix in support of our cross-motion and opposition to AAB's motion, and the text of these documents contradicts AAB's characterization.

The only GOI issuances that AAB provided to support its allegation of a "virtual ban" were Government Decision No. 1141, Pl. App. 142-43, and Temporary Order 2001/44, Pl. App. 144-45. Neither of these issuances, however, imposed anything resembling a ban on the importation of new TCNs into Israel. In Government Decision No. 1141, the GOI merely

announced in that "in 2002, the maximum number of annual permits for the employment of foreign workers in all industries will be 48,000, of which 45,000 at the most will be in the building and agricultural industries . . . ." Pl. App. 142. As we demonstrated in our moving brief, although this represented a decrease in the foreign worker quota, it was a less drastic one than the decrease from 2000 to 2001 that the GOI has announced in 1999. Def. Br. 6-7; see PFUF Response ¶ 5. In Temporary Order 2001/44, the GOI required that future contracts for construction and infrastructure work financed by the GOI contain a clause prohibiting the employment of foreign workers, other than foreign "experts." Pl. App. 145. This order was simply inapplicable to the contract in this case. And, as we demonstrated in our moving brief, Def. Br. 9, if this order had any indirect effect upon the Nachshonim project, it was to remove GOI-financed construction projects from competition for permits for foreign workers within the industry-wide quota.

AAB also asserts in its reply that "[t]he Orders in question are supplemented by" the affidavits or deposition testimony of certain individuals, "as well as numerous admissions on the part of the Corps of Engineers . . . ." Pl. Resp. 6-7 (footnote omitted). For the most part, however, the referenced deposition testimony and affidavits did not supplement the referenced orders, but were a substitute for them; rather than provide the text of these orders, AAB offered deposition testimony and affidavits in which the identified individuals described their understanding, beliefs, and opinions concerning the policies allegedly expressed in these orders. The referenced testimony may constitute evidence of certain efforts made by AAB and others to bring TCNs into Israel and the failure of these efforts, but they do not constitute admissible evidence of the actual GOI policies concerning this matter, as embodied in the referenced orders

and policy declarations. See Fed. R. Evid. 1002-1005. Still less can the cited deposition and affidavits be considered evidence of these policies where the text of the referenced orders and policy declarations, now before the Court, indicate that these policies were not as described in the deposition and affidavits. Similarly, the purported "admissions on the part of the Corps of Engineers" are not evidence of the GOI policies in question. Indeed, as we noted in our moving brief, Def. Br. 27, n.12, the content and context of the communications cited by AAB as containing these "admissions" indicate that Corps officials were simply attempting to ameliorate the problem as it was described by AAB, in the interest of progress on the project, and AAB offers no evidence that Corps officials possessed independent knowledge confirming the truth of AAB's assertions concerning this matter.

AAB further argues that we offered "no affidavits or deposition testimony contesting" what AAB mischaracterizes as "overwhelming evidence of a drastic change in the Government of Israel policy with respect to foreign workers," and that "the Government's approach is limited to a presentation of the relevant Government of Israel orders and policy declarations, from which counsel, and counsel alone, posits that a careful reading of such orders establishes that the Joint Venture should not have had a problem obtaining TCN labor." Pl. Resp. 7 (emphasis in original). AAB does not explain what better evidence of the policies in question there could be than the relevant orders and policy declarations establishing those policies. Indeed, under the best evidence rule, as embodied in Fed. R. Evid. 1002-1005, these documents are the only proper evidence of the policies in question. Further, we did not argue that AAB "should not have had a problem obtaining TCN labor." We demonstrated, rather, that the policies in question left AAB with an opportunity to arrange, through the GOI, to bring TCNs into Israel for the Nachshonim

project if necessary, and that AAB, in its efforts to make such arrangements, failed to meet the GOI's prerequisites, including accounting for the foreign workers who were previously brought into Israel by one of its component joint venturers, A. Arenson, Ltd. ("Arenson ").[4]

In what AAB describes as a "rebuttal to counsel's unsupported argument," Pl. Resp. 7, AAB offers "a declaration of Israeli counsel Roy Blecher, Adv., [who] was counsel for the Joint Venture in litigation in the Israeli courts challenging the Israeli government's restrictions on TCNs." Pl. Resp. 7. To the extent that Mr. Blecher's declaration and its exhibits are relevant, however, they lend more support to our position than to AAB's.[5]

---

[4] We demonstrated in our moving brief that the AAB's inability to obtain permission from the Ministry of Interior ("MOI") to import foreign workers stemmed, at least in part, from the MOI's conclusion that Arenson had failed to account for its "deserters" – foreign workers previously brought into Israel by Arenson and who remained in Israel illegally after leaving their employment with Arenson. Def. Br. 11-12. AAB responds that, according to the affidavit of Arenson's president, Avie Arenson, "the so-called 'Deserter's Policy' turned out to be ephemeral when Mr. Arenson confronted the Ministry of Interior with actual proof of repatriation of the Arenson company's former TCNs." Pl. Resp. 8-9. What the cited affidavit establishes, however, is nothing more than that Mr. Arenson submitted what he considered to be adequate proof of repatriation, and that he construed the MOI's response (which is not itself in evidence) as conceding the adequacy if this evidence. Whether or not MOI found or should have found this evidence adequate, and whether or not the MOI's actions concerning AAB's requests were otherwise valid, are matters for Israeli tribunals to decide, and are not properly before this Court.

[5] It should be noted that the notarization accompanying Mr. Blecher's declaration appears to authenticate the declaration, but it contains no indication of the administration of an oath, nor does the declaration meet the requirements of an unsworn declaration set forth in 28 U.S.C. § 1746. Additionally, it is apparent that the assertions Mr. Blecher's makes in the declaration are not based upon personal knowledge, but upon the exhibits referenced in and attached to the declaration. Thus, in paragraph 3 of the declaration, Mr. Blecher states that the declaration is based upon his personal review of the Government's brief concerning the TCN issue and his "personal review and analysis of the relevant documents concerning such issue." Pl. Supp. App. 6. And, most of the assertions contained in the declaration consist of quotations or paraphrases from the referenced documents, or opinions as to what the documents signify. The documents, however, speak for themselves. The interpretation of the documents offered by Mr. Blecher constitute legal argument, not evidence. The declaration itself cannot be taken as proof of

(continued...)

First, AAB asserts that Mr. Blecher "affirms the analysis contained in Plaintiff's Memorandum that the 'Closed Sky Policy' restrictions on importation of TCNs began shortly after Government Decision No, 1141 on December 24, 2001, and that there was in fact a total ban on importation of new TCNs." Pl. Resp. 7. AAB cannot strengthen its case, however, by proving that its own attorney agrees with it. Moreover, Mr. Blecher's comments concerning this matter, and the exhibits upon which these comments are based, indicate little more than that, in January 1, 2002, the Ministry of Labor ("MOL") announced a policy that it described utilizing terms such as "borders will be closed" or "skies will be closed" to new foreign workers. Pl. Supp. App. 9, 13. These terms, in themselves, are figures of speech, and the cited documents do not explain precisely what they mean, especially in the context of the respective roles of the MOL and the MOI regarding foreign labor. Further, by citing the MOL announcement as the source of the "closed sky policy" of which AAB complains, AAB does what it elsewhere accuses the Government of doing. According to AAB,

> [o]ne of the most serious defects in the Government's argument is that it confuses the allocation of block visas by the Ministry of Labor with the actual issuance of employee-specific visas by the Ministry of Interior. . . . [A]n allocation of block visas by the Ministry of Labor provided a contractor with nothing more than a right to apply to the Ministry of Interior for visas for specific individuals. The amount of annual visas permitted by the Ministry of Labor . . . is wholly irrelevant to the true issues in this case. . . .

---

[5](...continued)
anything but the identification and authentication of the documents attached to it. However, should the declaration be deemed to constitute evidence of facts independent of the content of the documents, we are entitled to take Mr. Blecher's deposition before being called upon to respond to his assertions, since Mr. Blecher was not previously identified as a potential witness or as a person possessing knowledge of relevant facts.

Pl. Resp. 8. If this is so, then the policy announced by the MOL in January 1, 2002, is likewise irrelevant. This policy is all the more irrelevant in view of the undisputed fact that for 2002 and 2003, the MOL allocated to Arenson more foreign worker visas for use in the Nachshonim project than the number AAB stated in its proposal that would be needed at peak production. PFUF Response ¶ 19.

As for the MOI's policy concerning the entry of foreign workers, AAB does not directly controvert that it was as we described it in our moving brief. And, as we there demonstrated, as late as January 2003 – after the October 3, 2002 press release from the Prime Minister's office announcing a decision "not to allow the entry of additional foreign workers into Israel," Def. App. 13 – MOI issued a "Closed Skies Procedure," which provided, in section 13, for permission to bring foreign workers from abroad if the MOI could not meet the contractor's need for foreign workers from among those already in Israel. Def. Br. 8, 26-27; Def. App. 15-16, ¶ 13. Mr. Blecher infers that this possibility could not be realized in practice, based upon an argument that the Israeli Supreme Court attributed to a GOI attorney in its opinion in Danya Cebus, Ltd. v. The Government of Israel, High Court of Justice Petition No. 6755/03. Pl. Supp. App. 11. According to the referenced argument, the opportunity to import foreign workers under section 13 of the MOI's January 2003 Closed Skies Procedure was inconsistent with the policy announced by the prime minister's office and thus void. Significantly, however, the court rejected this argument, Pl. Supp. App. 32, and held:

> [T]he question whether Cebus, with proper effort, could have recruited the workers that it needed in Israel is in dispute. In any case, Cebus will need, in the proceeding that will take place at the Ministry of the Interior, to prove its claim in this regard, as stated in paragraph 13 of the protocol. If it is found that Cebus is indeed unable, with reasonable effort, to recruit the workers that it needs

> from among the foreign workers who are already present in Israel, the authorities will be required to allow it to bring workers from abroad, unless they find an important reason that is capable of revoking permits that have already been given.

Pl. Supp. App. 33.

Under this decision, the opportunity to bring foreign workers from abroad pursuant to section 13 was not, as Mr. Blecher claims, illusory. The right to bring foreign workers from abroad pursuant to section 13 turns largely upon the factual question of whether the contractor is "unable, with reasonable effort, to recruit the workers that it needs from among the foreign workers who are already present in Israel . . . ." Id. AAB may contend that it met this test, but this is a contention to be proved before the MOI, with judicial review in the Israeli courts, not this Court.[6] Nor is the contract provision upon which AAB relies a basis for turning issue of Israeli administrative law into a contract dispute to be resolved by this Court. Even if AAB is afforded all reasonable benefits of interpretation concerning SR-22, the provision that the "Contractor may arrange, through the appropriate Government of Israel office, to bring into

---

[6] A related issue is whether the restrictions on importing TCNs, even assuming that they were as AAB alleges, prevented AAB from performing on schedule, in view of the fact that these restrictions did not apply to the hiring of foreign workers already in Israel or Israeli construction workers. This issue is separate from the issue whether there was a breach of warranty, and we addressed it in our response to AAB's motion because AAB argued, in support of its motion, that the alleged TCN restrictions delayed its performance. In its response, AAB accuses us of distorting the record concerning this issue, insofar as we cited Mr. Arenson's deposition testimony as stating that there was no difference in terms of quality or speed or cost between the work of Israeli construction workers and foreign workers. AAB cites Mr. Arenson's supplemental declaration as explaining that the referenced deposition testimony pertained to the time of the deposition, 2006, not the time allegedly affected by the TCN restrictions, and that Israeli contractors trained many Israelis in the construction field in the interim. Pl. Resp. 10-11. That many Israelis were in fact trained in construction by 2006, however, suggests that contractors such as AAB could have trained Israelis earlier, and that, for this reason among others, the delay that AAB wishes to have excused based upon TCN restrictions cannot be deemed to have resulted from events beyond AAB's control.

Israel US nationals and nationals of third countries" cannot be construed to insulate the contractor from the administrative processes of "the appropriate Government of Israel office."

Whether or not AAB made, as it claims, "Herculean efforts to overcome the obstacles placed in its way," Pl. Resp. 8, the record is devoid of any evidence that AAB made any efforts under or relating to section 13 of the MOI's January 2003 Closed Skies Procedure. Yet, according to the deposition testimony of Arenson's president, Avie Arenson, if Arenson had proved that it had exhausted all efforts to hire foreign workers already in Israel, and had resolved the problem of "deserters," it probably would have been able to utilize its allocation of 539 visas for the Nachshonim project, Def. App. 26-28, an allocation which, AAB has conceded, was more than the number AAB stated in its proposal would be needed at peak production. PFUF Response ¶ 19. AAB responds to this by dismissing Mr. Arenson's testimony in this regard as "obviously speculation and thus is not established as a material fact." PFUF Response ¶ 23. But, if this is speculation, it is AAB's own speculation. And, AAB bears the burden of proving that its failure to bring TCNs into Israel was a result of facts or conduct inconsistent with the alleged warranty, and not because AAB failed to do what was necessary in order to arrange with the MOI to bring TCNs into Israel. If this is a matter of speculation, then it is speculative for AAB to assert that the opportunity to so arrange with the MOI was illusory. And, if AAB can only speculate, but not prove, that this opportunity was illusory, then it cannot prove that the allege warranty was breached.

For similar reasons, there is no merit to AAB's contention that even if the GOI policy did not totally preclude the entry of foreign workers into Israel, this "goes to mitigation of damages, not liability." Pl. Resp. 9. To establish liability, AAB must establish that what the contract

assured bidders could be done in fact could not be done. Even if the contract is construed to have assured the contractor that it was not only contractually permissible but also factually possible to arrange with the MOI to bring TCNs into Israel, the contract cannot be construed as assuring that the contractor could make such arrangements without regard to the preconditions that the MOI would apply to contractors generally. If, as we have demonstrated, it was possible to bring TCNs into Israel upon meeting certain prerequisites, but AAB failed to meet those prerequisites, then the alleged warranty concerning TCNs was not breached.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in our moving brief, summary judgment should be entered in favor of the Government, dismissing AAB's claims concerning TCN labor.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

**s/Jeanne E. Davidson**
JEANNE E. DAVIDSON
Director

**Filed electronically**

OF COUNSEL:

PAUL CHEVERIE
Command Counsel
BRETT R. HOWARD
Assistant Command Counsel
Europe District
U.S. Army Corps of Engineers

**s/Shalom Brilliant**
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

January 7, 2008

CERTIFICATE OF FILING

I hereby certify that on the 7th day of January 2008, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT REGARDING THE 'THIRD COUNTRY NATIONALS' ISSUE" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**s/Shalom Brilliant**