# In the United States Court of Federal Claims

No. 04-1719 C, No. 05-114 C, No. 05-1172 C, and No. 06-49 C
(CONSOLIDATED)

(Filed: May 30, 2008)

| | | |
|---|---|---|
| **A.A.B JOINT VENTURE,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Contract Disputes Act; presentation of claim to contracting officer; accord and satisfaction; meeting of the minds; genuine issue of material fact. |

*Brian Cohen*, of Bell, Boyd & Lloyd, Washington, D.C., for Plaintiff. *Philip Clark Jones, Michael J. Schrier*, of Bell, Boyd & Lloyd, Washington, D.C., of counsel.

*Shalom Brilliant*, Senior Trial Counsel, with whom were *Jeanne E. Davidson*, Director, *Peter D. Keisler*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant. *Paul Cheverie*, Command Counsel, *Brett R. Howard*, Assistant Command Counsel, Europe District, U.S. Army Corps of Engineers, of counsel.

## OPINION

**DAMICH**, Chief Judge.

This government contract case is before the Court on a combined motion to dismiss and motion for partial summary judgment by Defendant, the United States ("the Government"). The motion regards only one of the four consolidated cases, No. 05-1172 C, though all four consolidated cases relate to the same contract between the Government and Plaintiff, A.A.B. Joint Venture ("Plaintiff" or "AAB"). The Government first seeks dismissal of Plaintiff's claim relating to the minimum bolt size allowed under the contract (the "bolt size" claim), on the basis that the claim was not properly presented to the contracting officer. The Government also

requests partial summary judgment in its favor on the bolt size claim (if the claim is not dismissed) and on Plaintiff's claim relating to the maximum panel deflection distance allowed by the contract (the "L/600 deflection claim"). As the basis for its motion for partial summary judgment, the Government asserts that the bolt size claim and the L/600 deflection claim are barred by the doctrine of accord and satisfaction.

The Government's motion to dismiss is GRANTED. Though Plaintiff's certified claim to the Government's contracting officer mentioned the parties' disagreement regarding permissible bolt size, the certified claim contained no clear and unequivocal statement giving the contacting officer adequate notice of the relief sought under the bolt size claim nor did it arise from the same set of operative facts that were presented to the contracting officer. As such, a jurisdictional requisite for suit under the Contract Disputes Act has not been met and Plaintiff's bolt size claim is dismissed.

The Government's motion for partial summary judgment is DENIED. A genuine issue of material fact exists as to whether a modification to the contract at issue constituted an accord and satisfaction of Plaintiff's L/600 deflection claim.

## I. Background

On June 5, 2001, Plaintiff was awarded Contract No. DACA90-01-C-0043 ("the Contract") by the U.S. Army Corps of Engineers-Europe ("USACE") to design and construct a storage and logistics base complex, known as the Nachshonim Military Storage Base, near Elad, Israel for use by the Israeli Defense Force. Am. Compl. ¶ 4, 6. Pursuant to the Contract, Plaintiff was to build approximately 200 buildings, 119 of which were "dry storage buildings" ("DSBs") for the storage of military equipment. Am. Compl. ¶ 5. The DSBs were designed to maintain a controlled climate to preserve the equipment stored inside. The Contract required the buildings to conform to a set of detailed building plans and to satisfy various pressure and humidity tests and a test for flex in the roof structure. Am. Compl. ¶¶ 12-14. Plaintiff was to construct a prototype DSB first and prove that it passed the required tests before beginning construction of the remaining 118 DSBs. Am. Comp. ¶ 15.

The Government's original solicitation for bids included a requirement that all bolts used in construction of the DSB roofs had to be 20mm or greater. Am. Compl. ¶ 47. However, as a result of pre-proposal questions submitted by bidders, USACE deleted the requirement for 20mm bolts from the Contract's General Description. Am. Compl. ¶ 48. Plaintiff was awarded the Contract based upon this description, and was issued a notice to proceed on June 19, 2001. Am. Compl. ¶ 3.

For about the rest of 2001, no construction took place, presumably because AAB was working on design and preliminary work. Def.'s App. at 60. While AAB was planning how to construct the prototype DSB, it seems that AAB realized that it was going to be difficult to meet all the pressure and humidity standards. For example, in October and November of 2001, AAB

sent letters to the contracting officer ("CO") complaining about the building specifications and the requirements regarding pressure, humidity and flex. *See* Am. Compl. ¶¶ 19, 43, 50; Def.'s App. at 22-23.

The Court gathers from these complaints that AAB thought that the way the building specifications required that the panels and frames be configured would make it impossible to achieve the required tests. AAB felt that the buildings were required to be unrealistically airtight and that the way the panels had to be attached on the exterior of the DSBs was not the norm for these types of buildings. Am. Compl. ¶¶ 16, 17; Def.'s App. at 22. Because of these two factors, AAB believed that the pressure test requirement was theoretically impossible to achieve. Def.'s App. at 22-23. This is the general gist of AAB's present "DSB pressure test" claim. Another test, the "L/600 deflection test" required that the components of the roof "structure" not flex more than 1/600th of their length. Am. Compl. ¶¶ 41-43. However, AAB discovered that the panels called for in the original roof design could not meet this requirement. Am. Compl. ¶ 42; Def.'s App. at 38-39. Thus, AAB complained that the flex requirement should be relaxed or simply deemed not to apply to roof panels. Am. Compl. ¶¶ 41-43; Def.'s App. at 38, 61, 91. During this time, the issue of whether 16mm bolts could be used instead of 20mm bolts arose again, despite the deletion of the 20mm requirement at the proposal stage. Am. Compl. ¶ 50. This was probably because the parties had been discussing panels and frames, and the 20mm bolts were depicted for the spatial frames in the "Specifications" section of the Contract, despite having been deleted from the Contract's "General Description."[1] *See* Am. Compl. ¶ 47. USACE did not agree to relax any of the pressure or humidity requirements and refused to allow 16mm bolts, although the reason for USACE's actions is not in evidence. Am. Compl. ¶ 51.

On December 13, 2001, the parties held a design issues meeting, at which the parties discussed both the minimum acceptable bolt size and the applicability of the L/600 deflection requirement, as well as other issues such as the dehumidification requirement and the pressure test requirement for the DSBs. Plaintiff's Proposed Findings of Uncontroverted Fact ("PPFF") ¶¶ 3-4. At the meeting, Plaintiff requested that it be permitted to use 16mm bolts, but USACE expressed its belief that 20mm bolts were clearly required and reserved for subsequent decision the issue of whether 16mm bolts could be acceptable. Am. Compl. ¶ 52.

USACE also stated at the design issues meeting that it read the Contract as requiring the maximum L/600 deflection in all roof structures, including roof panels, and would require adherence to this interpretation. Am. Compl. ¶ 43. Plaintiff stated its contention that roof "structure" did not include roof panels, but ultimately agreed to reconfigure the roof panels to strictly meet the L/600 deflection per the Government's interpretation. PPFF ¶¶ 4-5. At the conclusion of the meeting, however, Plaintiff was left with the impression that, in exchange for this adherence to the Government's interpretation of the L/600 deflection requirement, Plaintiff

---

[1] The Specification of the Contract evidently provided a design that used space frames based upon a particular spatial frame system which utilized a minimum 20mm bolt size. Am. Compl. ¶ 46.

would be afforded "lenience" with respect to the DSB pressure test. *Id.*

From December 2001 to May 2002, it seems that AAB was working on trying to get its DSB design to meet the pressure requirement and the deflection requirement (and possibly the humidity requirement). Def.'s App. at 24-25, 38. In May 2002, AAB finally redesigned the roof panels so that they would not flex more than 1/600 of their length, by adding additional supports known as "purlins." Am. Compl. ¶ 44; Def.'s App. at 38-39. But, although AAB met the deflection test, it still had not met the pressure test, with the result that AAB still could not proceed with construction of the other 118 DSBs. However, since AAB did prove that the panels and frames of the roof would meet the deflection test, AAB was able to release the design of these components for mass production. Def.'s App. at 25-26. In sum, the failure to meet the L/600 requirement was holding up release of the roof components for production and the failure to meet the DSB pressure test was holding up construction of the DSBs themselves. There is no indication in the record, however, that the 16mm bolt issue was holding up any of the contract performance.

On May 31, 2002, the CO for USACE, Mr. Blackburn, signed contract modification P00009. Def.'s App. at 3. This contract modification is the basis for the Government's "accord and satisfaction" defense, because it states that "the contract adjustement [sic] in this modification includes all costs for the change and all claims incidental therto [sic] have been satisfied." *Id.* In the modification itself, there is a page titled "Scope of Work," which has a heading "Reference USACE/AAB Design Issues Meeting of 13 December 2001. (Enclosure 1)." Def.'s App. at 4. Enclosure 1 to the modification is the meeting minutes of the December 13 design issues meeting. On the same page of the modification, it states that "The agreements reached in the referenced meeting are hereby incorporated into the contract, along with the clarification to the minutes as listed below." *Id.* The page then lists five bullet points which, to paraphrase, state that (1) 16mm bolts are acceptable, (2) the L/600 deflection requirement shall apply to all roof structure including panels, (3) foundation work can begin on the DSBs once the structural designs are approved, (4) a galvanized metal platform shall serve as the ground bus bar for the DSBs (not at issue in this case), and (5) the dehumidification system for all DSBs shall be as specified in the Contract. *Id.* In essence, the page of the modification seems to be nothing more than a formal statement of what the parties had already agreed to.

The meeting minutes include the key statement at issue for the L/600 "accord and satisfaction" defense, made by Mr. Roach, a representative of USACE who was participating with Mr. Blackburn: "If you reduce the deflection requirement and fail the pressure test, we will be much harder on [AAB] than if you follow the contract and the pressure test comes out at 1.5% or 2% infiltration."[2] Def.'s App. at 9. AAB apparently walked away from the meeting thinking

---

[2] This statement formed the basis for Plaintiff's belief that it would be given lenience on the DSB pressure test. The Contract originally specified that the infiltration rate for the pressure test should be 1.1%. Thus, according to Plaintiff, this suggestion of a 2% infiltration rate was significant – it represented an "80-90 percent less stringent requirement." Pl.'s Opp'n at 13.

that this meant they would be given a significant degree of leniency on the pressure test requirement in exchange for redesigning the roof panels to strictly meet the L/600 requirement.

From the time of the December 13, 2001 meeting until February 2003, AAB struggled to develop a DSB design that would actually meet the pressure requirement, performing multiple tests and constructing several building "mock-ups" in the process. Def.'s App. at 22-32 (detailing AAB's design efforts and communications with USACE). At various times during this 14 month period, USACE kept insisting that AAB had to strictly meet the DSB pressure test requirements and offered no leniency at all, despite internal USACE emails which show that engineers at USACE also knew the pressure test requirement was theoretically impossible to meet. *Id.* In February 2003, USACE finally suggested that the parties conduct pressure tests using a different method ("ASTM E-779" rather than "ASTM E-283"). Am. Compl. ¶ 33. It is unclear what the difference is between the testing methods, but since AAB's new design passed the second test and not the first, the Court surmises that the second test was more relaxed. Am. Compl. ¶ 35.

Once the pressure test was completed, it seems that construction of the remaining 118 DSBs went smoothly, as there is no further discussion in the complaint. On February 11, 2005, AAB submitted its certified claim to the CO, requesting about $11 million and a 299 day compensable time extension. Def.'s App. at 12.

## II. Motion to Dismiss the "Bolt Size" Claim for Lack of Jurisdiction

The basis of the Government's motion to dismiss the blot size claim is that it was never presented to the CO. This Court has subject matter jurisdiction over government contract disputes pursuant to the Contract Disputes Act ("CDA"), which requires that all claims by a contractor must first be submitted to, and denied by, the contracting officer before suit is filed here. 41 U.S.C. §§ 605, 609.

In deciding a motion to dismiss under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") for lack of subject matter jurisdiction, courts are to "test[] the sufficiency of the complaint as a matter of law, accepting as true all non-conclusory allegations of fact, construed in the light most favorable to the plaintiff." *Samish Indian Nation v. United States*, 419 F.3d 1355, 1364 (Fed. Cir. 2005). Plaintiffs bear the burden of proving the requisites for such subject matter jurisdiction. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).

Regarding jurisdiction under the CDA, Plaintiff's complaint states only that "[b]y letter dated February 11, 2005 [AAB] submitted its certified claim to the Government and requested a Contracting Officer's final decision." Am. Compl. ¶ 55. Thus, to determine its jurisdiction over Plaintiff's bolt size claim allegations, the Court will examine Plaintiff's certified claim directly, as the complaint contains only "conclusory allegations of fact" to establish jurisdiction. *Samish*, 419 F.3d at 1364.

### A. Sufficiency of Plaintiff's Certified Claim

#### 1. Language of the Certified Claim

The certified claim submitted to the CO only briefly and vaguely makes mention of the bolt size issue in the "Introduction" portion of the claim:

> All connections on site between steel parts were to be made with bolts only. The minimum bolt size of M20 (20mm diameter) was deleted by RFP specification amendment before contract execution, however, because the Government omitted this change in all specifications, it disagreed that this change was made. The Government first 'considered' reducing bolt size at the December 13, 2001 meeting; but did not finally issue Change Order (P00009) to reduce bolt size until 31 May 2002.

Def.'s App. at 15. The only other pertinent part of the certified claim which mentions the bolt size dispute states that, in reliance upon the amended RFP:

> [AAB] attempted to comply with the impossible specification with disastrous results, including the following: (1) a significant unanticipated research and development ("R&D") effort; (2) concession of other meritorious claims such as, (a) minimum air infiltration rate, (b) the L/600 panel deflection issue, and *(c) the minimum bolt size for the spatial frames;* and (3) significant delay to the project schedule and associated extended performance costs, and other resulting damages, before USACE belatedly relaxed the testing requirements so that the Pilot DSB could meet the test, and construction of the other DSB buildings could commence.

Def.'s App. at 17.

In the section of the claim where AAB sets forth what it believed it was due and why, there is no mention of bolt sizes. This section, called "Entitlement," has two sub-headings – one for the pressure test issue and one for the L/600 deflection issue. Def.'s App. at 33, 37. The sub-sections mention such theories as "defective specifications," "constructive change," "breach of the duty of good faith and fair dealing," and "economic duress" in regard to the pressure test and L/600 deflection test. *Id.* The certified claim concludes with a detailed cost breakdown, which attributes the $11 million requested damages to 12 specific line items. Def.'s App at 41-42. Most of the names of the line items are relatively vague (e.g., "JV Site Indirect Costs – Delay of the project due to R&D from 08 Mar to 23 Jan 03," or "Testing and Mockup Costs") and, again, there is no mention of a bolt size claim. *Id.*

#### 2. How Sufficiency Is Determined

The requirement that a contractor present its claims to the contracting officer before

jurisdiction can exist in this Court is intended as a means to force contractors to use specificity in their submissions to contracting officers so that contracting officers can give full consideration to all claims prior to any judicial review of disputes. *See Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984); *Dodson Livestock Co. v. United States*, 42 Fed.Cl. 455, 462 (1998). This, of course, promotes efficient resolution of disputes. Whether a court is considering the sufficiency of the initial presentation of a claim to the CO or the similarity between a claim in suit and a claim presented to the CO, the critical measure is whether the presentation of a claim before the court undermines the scheme of adjudication prescribed by the CDA by circumventing the statutory role of the CO to pass judgment on the contractor's entire claim. *Tecom,* 732 F.2d at 937; *see also ThermoCor, Inc. v. United States*, 35 Fed.Cl. 480, 489 (1996) (citing *Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 418 (1987)) (discussing principles behind "new" claim analysis).

The Court of Appeals for the Federal Circuit, however, has elaborated on this general principle by specifying two tests, which appear to be different criteria. In one test, the Court is directed to determine whether there is a "clear and unequivocal statement" of the claim before the CO. *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). The other test–basically–requires an inquiry into whether the claim before the Court arises from the "same set of operative facts" that were before the CO. Fully stated, the test is whether the claim arises from the same operative facts, claims essentially the same relief, and merely asserts differing legal theories for that recovery. *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003). Just looking at the formulation of the tests, one would conclude that the "operative facts" test is more lenient than the "clear and unequivocal statement" test.

The Court is presented with a choice between these two tests by the parties' arguments, as the Government framed its argument according to the "same set of operative facts" test which the Court applied in *AAB Joint Venture v. United States*, 74 Fed.Cl. 367 (2005) ("*AAB II*"), while in its response brief Plaintiff presented an argument that its presentation of the bolt size claim to the CO passes the "clear and unequivocal statement" test.[3] Def.'s Mot. at 5; Pl.'s Opp'n at 21. Both the "same set of operative facts" test and the "clear and unequivocal statement" test appear to have been used independently to determine whether the jurisdictional requirements of the CDA have been met. *See, e.g., ACE Constructors, Inc. v. United States*, 499 F.3d 1357, 1361 (Fed. Cir. 2007)*; Placeway Constr. v. United States*, 920 F.2d 903, 909 (Fed.Cir.1990)*; Contract Cleaning*, 811 F.2d at 592; *Reliance Ins. Co. v. United States*, 931 F.2d 863, 867 (Fed. Cir. 1991). However, the Court has not found any authority which gives unambiguous guidance on exactly when it is appropriate to use either or both of these tests.

---

[3] In light of the Court's observation that the "operative facts" test appears to be more lenient than the "clear and unequivocal statement" test, it is puzzling why the Government would rely on the former and the Plaintiff on the latter.

**i. Clear and Unequivocal Statement Test**

The "clear and unequivocal statement" test originated in *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586 (Fed. Cir. 1987). There, the Federal Circuit evaluated a series of informal letters written by the plaintiff to a CO, to determine whether the letters could be said to constitute a proper certified claim under the CDA. Even though the letters were not written as a formal demand, the court stated that:

> We know of no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.

*Id.* at 592 (citing *Tecom Inc.*, 732 F.2d at 936-37; *Metric Constr. Co. v. United States*, 1 Cl.Ct. 383, 392 (1983)). Probably because of this context, cases citing *Contract Cleaning* often use the "clear and unequivocal statement" test to determine whether a certified claim was minimally sufficient to support *any* claims or counts brought before the court, although there is no authority strictly limiting its application to such a context. *See, e.g., H.L. Smith, Inc. v. Dalton,* 49 F.3d 1563, 1565 (Fed. Cir. 1995); *Clearwater Constructors, Inc. v. United States*, 56 Fed.Cl. 303, 311 (2003) (finding that a series of letters from the contractor constituted a written demand expressing a clear and unequivocal statement of plaintiff's claim); *Kalamazoo Contractors Inc. v. United States*, 37 Fed.Cl. 362, 369 (1997) (finding that an invoice from a contractor did not provide adequate notification to the CO of the contractor's claim); *C.D. Hayes, Inc. v. United States*, 74 Fed.Cl. 699, 706 (2006) (finding that a letter from a contractor provided adequate support for some, but not all, of the alleged counts). From these cases, it seems that the "clear and unequivocal statement" test is suited at least for determining whether a communication between a plaintiff and a CO, though perhaps informal, rises to the level of a "claim" to satisfy the requirements of §§ 605 and 609 of the CDA for jurisdiction in this Court.

**ii. Same Set of Operative Facts Test**

The "same set of operative facts" test is generally applied in instances where a plaintiff did properly present some "claim" to the CO under §§ 605 and 609, but the complaint before this Court lists another claim or count which is not exactly the same as the claim presented to the CO. *See, e.g., ACE Constructors*, 499 F.3d at 1361; *Kiewit Constr. Co. v. United States*, 56 Fed.Cl. 414, 420-21 (2003). Courts have consistently held that a claim or count alleged before this Court must be the "same" as the claim presented to the CO. *Scott Timber*, 333 F.3d at 1365 (citing *Cerberonics*, 13 Cl.Ct. at 417). To be considered the "same," the claim or count brought before to this Court must arise from the "same set of operative facts" and must request the same type of relief as the claim presented to the CO, but may assert a different legal theory. *Id.* This test was developed to prevent plaintiffs from circumventing one of the underlying principles of § 609 of the CDA – that plaintiffs must present all their claims to the CO for decision and cannot bring

any "new" claims before this Court. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed. Cir. 1987); *ThermoCor*, 35 Fed.Cl. at 489. In at least one instance, the Federal Circuit has seemingly applied the "same set of operative facts" test independently of the "clear and unequivocal statement" test. *ACE Constructors*, 499 F.3d at 1361 (finding common set of operative facts and relief sought, but making no determination as to whether claim to CO was clear and unequivocal).

**iii. Conclusion**

The Court has found no binding authority which gives unambiguous guidance on the proper applicability of these two tests. It seems that in some instances, it is appropriate to apply both tests, *see, Scott Timber*, 333 F.3d at 1365-66, while in other instances it may be appropriate to apply only one of the two tests, *see Contract Cleaning*, 811 F.2d at 592, *ACE Constructors*, 499 F.3d at 1361. Although the Court has a certain amount of confidence that the "same set of operative facts" test is the more appropriate test in the circumstances of this case, caution dictates that the Court analyze the Government's motion to dismiss using both tests. Fortunately, the Court arrives at the same result using either test.

**3. Evaluation of Plaintiff's Bolt Size Claim Under the Same Set of Operative Facts Test**

A detailed discussion of the "same set of operative facts" test with respect to "new" claims was set forth in the Court's previous opinion in *AAB II*:

> The same set of operative facts has been found where the contractor submits additional evidence pertaining to damages to support the same factual claim, *Shea*, 4 Cl.Ct. at 55, or where the claim merely "augments the legal theories" underlying the certified claim, *Cerberonics*, 13 Cl.Ct. at 418-419; *ThermoCor, Inc. v. United States*, 35 Fed.Cl. 480, 489-490 (1996). In contrast, the same set of operative facts has not been found where the contractor files a different type of claim from that presented to the contracting officer, *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1570 (Fed.Cir.1993); *J. Cooper*, 47 Fed.Cl. at 285-286; *Metric Constr. v. United States*, 44 Fed.Cl. 513, 518-519 (1999); *Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 91 (1989), or where the facts require different kinds of proof, *Placeway Constr. v. United States*, 920 F.2d 903, 909 (Fed.Cir.1990); *Foley*, 26 Cl.Ct. at 940.

*AAB II*, 74 Fed.Cl. at 370.

Here, Plaintiff alleged in the complaint that the actions of USACE required Plaintiff "to perform additional work beyond that required by the contract and/or ... change its planned method or manner of performing the contract work." Am. Compl. ¶ 54 (emphasis added). The only specific detriment to contract performance mentioned in the complaint as being due to the delay in approval of 16mm bolts, was a delay in release of Plaintiff's "Pilot DSB spatial frame

for production." Am. Compl. ¶ 11. In contrast, the certified claim which Plaintiff submitted to the CO noted only that a disagreement on permissible bolt size existed, but did not mention the delay in release of the spatial frame. Def.'s App. at 15.

Thus, the Government argues that the certified claim discusses only background information related to the bolt size dispute, but does not contain all operative facts of the bolt size claim. Def.'s Mot. at 7. In response to the Government's argument, Plaintiff simply points to the language in the certified claim, quoted above, which states that the Government caused an inconsistency in the specifications regarding minimum bolt size and waited five and a half months before allowing the 16mm bolts. Somehow, Plaintiff believes that this recitation contains all the operative facts necessary to give the CO notice of the bolt size claim. Pl.'s Opp'n at 21.

Plaintiff overlooks the fact that the certified claim did not attribute a delay in release of the spatial frame to the dispute over bolt size, and did not mention any other "additional work" or "changed manner" of contract performance Plaintiff was forced to engage in, due to USACE's delay in approving 16mm bolts. Furthermore, Plaintiff's certified claim specifically attributed the delay in release of the Pilot DSB spatial frame for production to an entirely different cause: "panel deflection tests" conducted to prove adherence to the L/600 deflection requirement. Def.'s App. at 24. In fact, at no point in the certified claim, the Amended Complaint, or Plaintiff's briefing does Plaintiff clearly describe what "additional work" it was required to perform due to the delay in approval of 16mm bolts.[4] The Court cannot simply infer that damages resulted from the bolt size dispute. Similarly, because the certified claim did not state that any damages resulted from the bolt size dispute, the bolt size claim presented by AAB in the complaint cannot be said to present the same request for relief that was before the CO.

The bolt size claim is also not merely an augmentation of the L/600 deflection claim or additional evidence relating to damages under the L/600 deflection claim, because a claim relating to bolt size would require proof of different facts than a claim relating to a maximum deflection requirement. *Cf. J.F. Shea Co. v. United States,* 4 Cl. Ct. 46, 55 (Ct. Cl. 1983); *Cerberonics*, 13 Cl.Ct. at 418-419. Thus, the Court finds that the bolt size claim is not the "same" as a claim previously submitted to the CO, because it does not arise from the same operative facts, does not claim essentially the same relief, and does not merely assert a differing legal theory of recovery. *Scott Timber*, 333 F.3d at 1365.

---

[4] If anything, it seems that Plaintiff simply kept using 16mm bolts, instead of the supposedly-required 20mm bolts, until the Government formally approved 16mm bolts via contract modification P00009. *See* Pl.'s Opp'n. at 21; Compl. ¶ 53.

### 4. Evaluation of Plaintiff's Bolt Size Claim Under the Clear and Unequivocal Statement Test

The Federal Circuit held in *Contract Cleaning* that, in order for this Court to have jurisdiction over a contractor's claim, the contractor must have "submitt[ed] in writing to the contracting officer a clear and unequivocal statement that [gave] the contracting officer adequate notice of the basis and amount of the claim." 811 F.2d at 592. It appears that Plaintiff attempts to bypass the factual deficiency of its certified claim, discussed above, by arguing that precise statements of damages are not required in certified claims under this "clear and unequivocal statement" standard. Plaintiff quotes *H.L. Smith*, *Inc. v. Dalton,* 49 F.3d at 1565, stating that "the contractor need not include a detailed breakdown of costs ... [but rather,] may supply adequate notice of the basis and amount of the claim without accounting for each cost component." Pl.'s Opp'n at 19.

In applying this concept, Plaintiff argues that its certified claim does provide notice of an "amount" sought for its bolt size claim, per the requirement of *Contract Cleaning*, because the certified claim expressly requested costs totaling $11,239,552 and "compensable delay to the project's critical path [of] 299 calendar days."[5] Pl.'s Opp'n. at 22; Def.'s App. at 33. Plaintiff insists that this "summary statement of monetary and other relief is legally sufficient," because Plaintiff is not required "to provide a separate accounting for each cost component of its claim or allocate damages separately for the L/600, DSB Pressure Test, and M-20 bolt claims." Pl.'s Opp'n. at 22.

The Government counters, correctly, that Plaintiff's claim as submitted to the CO "did not seek any monetary or other relief in connection with the bolt size requirement." Def.'s Mot. at 7; Def.'s Reply at 4. The Government points out that, though the certified claim mentions the parties' dispute over minimum allowable bolt size, the only two claims specifically discussed in the certified claim as "entitlements" to some relief are the DSB pressure test claim and the L/600 deflection claim. *See* Def.'s App. at 33.

While it may be true, according to *H.L. Smith, Inc.*, that Plaintiff was not required to specifically allocate its total requested damages separately for each claim, Plaintiff still chose to do so by including a complete line item listing. 49 F.3d at 1565. Plaintiff's specific allocations of damages clearly relate solely to either the DSB pressure test claim or the L/600 claim. Def.'s App. at 41-42. Likewise, the 299 calendar day compensable time extension requested in the certified claim also does not relate to the bolt size claim. Plaintiff's certified claim clearly states that "the government's issuance of the defective/impossible/commercially impracticable

---

[5] Plaintiff does attempt to argue that the certified claim states that the Government breached its duty of good faith and fair dealing by not issuing a bolt size change order in a timely fashion. Pl.'s Opp'n at 21. However, upon review, it is clear that all the statements in the certified claim regarding good faith and fair dealing regard only the L/600 deflection claim. *See* Def.'s App. at 33, 36.

specifications pertaining to the *pressure test requirements* proximately caused a 299 calendar day compensable critical path delay to the project."[6] Def.'s App. at 41 (emphasis added).

In short, Plaintiff has referenced "damages" sections of the certified claim out of context, and has attempted to persuade the Court that the sections show, imprecisely, an amount requested for the bolt size claim, though they obviously do not. Even if imprecise statements of damages in certified claims can be a basis for jurisdiction in this Court, Plaintiff's certified claim does not include such a statement specifically with respect to the bolt size claim. Thus, Plaintiff's argument concerning *H.L. Smith* is unavailing.

### B. Conclusion

Plaintiff's bolt size claim was not properly certified to the contracting officer as required by 41 U.S.C. §§ 605, 609 for jurisdiction in this Court. The bolt size claim is not, under the same set of operative facts test, the "same" as any claim that was expressed to the contracting officer. In addition, aside from the "operative facts" inquiry, Plaintiff's bolt size claim was not clearly and unequivocally presented to the contracting officer. Thus, because the requisites for jurisdiction in this Court pursuant to the CDA have not been satisfied, the Government's motion to dismiss the bolt size claim is GRANTED.

## III. Motion for Summary Judgment that Plaintiff's Claims are Barred by an Accord and Satisfaction

As discussed above, Plaintiff initially contended that the L/600 deflection requirement should not apply to roof panels, but ultimately agreed to redesign the roof panels to meet the requirement with the understanding that USACE would be lenient with respect to the DSB pressure test requirement. Def.'s App. at 8. Because Plaintiff does not believe that it was afforded such lenience, Plaintiff now seeks, *inter alia*, an equitable adjustment for the extra panel redesign work it was forced to perform. Am. Compl. ¶45.

The Government argues that contract modification P00009, signed by both parties in May 2002, represents an accord and satisfaction of both the bolt size claim and the L/600 claim. Def.'s Mot. at 8. However, as the Court lacks jurisdiction over Plaintiff's bolt size claim, the Government's summary judgment arguments need be considered only in relation to the L/600 deflection claim. In the Government's view, Plaintiff agreed to strictly adhere to the L/600 requirement, as applicable to the roof panels, as part of modification P00009. Def.'s Mot. at 9. Because P00009 was supposedly the final resolution of all Plaintiff's claims, the Government argues that the doctrine of accord and satisfaction bars Plaintiff from now bringing its equitable

---

[6] Furthermore, the period from December 13, 2001, when Plaintiff requested the change in bolt size, until May 31, 2002, when the Government granted the change in bolt size, was only 169 days, not 299. Thus, the compensable delay request does not match Plaintiff's bolt size claim for this reason as well.

adjustment claim with respect to the L/600 issue. *Id.* The language in P00009 which forms the basis for the Government's argument is:

> This contract change is the final resolution of the issues and discussions included in the minutes referenced by the scope of work .... It is understood and agreed; pursuant to the above, that the contract amount remains unchanged; the contract time for performance remains unchanged; and the contract adjustement [sic] in this modification includes all costs for the change and all claims incidental therto [sic] have been satisfied.

and

> The maximum deflection of L/600 shall apply to all individual elements of the roof structure for each of the DSBs (Dry Storage Buildings), including the panels. Note, the maximum permissible vertical deformation in the center of the roof ... is not changed.

Def.'s Mot. at 10 (quoting Def. App. at 3, 4). Thus, the contract modification called for the deflection requirement to remain the same, but included some provisions changing a few other aspects of the Contract in favor of Plaintiff (permitting 16mm bolts instead of 20mm bolts and allowing Plaintiff to begin concrete foundation work before prototype DSB approval).

### A. The Doctrine of Accord and Satisfaction

"A claim is discharged by the doctrine of accord and satisfaction when 'some performance different from that which was claimed as due is rendered and such substituted performance is accepted by the claimant as full satisfaction of his claim.'" *Case, Inc. v. United States*, 88 F.3d 1004, 1011 n.7 (Fed. Cir 1996) (quoting *Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1581 (Fed. Cir. 1993)). The party asserting an accord and satisfaction defense must establish four elements: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds; and (4) consideration. *Brock & Blevin Co. v. United States*, 343 F.2d 951, 955 (Ct. Cl. 1965) (citing *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir. 1949). The parties do not dispute that the first two elements were present, and they agree that there was consideration, although they disagree over precisely what it was.[7]

---

[7] The parties do not appear to dispute that permission for Plaintiff to begin concrete foundation work ahead of schedule was part of Plaintiff's consideration. Def.'s Mot. at 11; Pl.'s Opp'n at 12. The Government argues that permitting 16mm bolts was also part of the consideration, though Plaintiff argues that it was already entitled to use 16mm bolts. Def.'s Mot. at 10. Plaintiff argues that leniency with respect to the DSB pressure test was part of the consideration, though the Government argues that there was no such agreement as to leniency. Pl.'s Opp'n at 15.

### 1. Meeting of the Minds

According to the Government, a meeting of the minds existed because (1) contract modification P00009 clearly stated that it was the "final resolution" of the parties' disputes, (2) P00009 states that the L/600 deflection requirement "is not changed," and (3) P00009 contained, as an enclosure, an explicit statement of work to which the parties agreed as a result of the modification. That statement of work, in turn, referenced an enclosure consisting of minutes, prepared by a representative of Plaintiff, of the December 13, 2001 meeting that led to P00009 being signed by both parties. Def.'s Mot. at 10.

Plaintiff asserts that it thought it was agreeing to strictly adhere to the L/600 deflection requirement as to all components of the roof in exchange for "leniency" with respect to the DSB pressure test.[8] Pl.'s Opp'n. at 13. Notably, the contract modification expressly stated that the L/600 deflection requirement would remain unchanged, but did *not* state that the DSB pressure test requirement would remain unchanged, leaving open the possibility that the parties may have contemplated that the DSB pressure test requirement might be altered to allow "lenience." Def.'s App. at 9. Plaintiff argues that the defense of accord and satisfaction must fail because either (1) the contract modification does not reflect a meeting of the minds (because the term "leniency" is not expressly used) or (2) there was a lack of performance of the "satisfaction" (because the Government was not subsequently lenient). Pl.'s Opp'n. at 15. Plaintiff relies upon the following statement from the contracting officer (included in the incorporated meeting minutes) as the primary basis for its assertion that "leniency" with respect to the DSB pressure test was a part of what Plaintiff thought was the true agreement:

If you reduce the [L/600] deflection requirement and fail the [DSB] pressure test

[8] Plaintiff also attempts to argue that the Government has waived its right to assert accord and satisfaction as a defense, because (1) the contracting officer did not mention accord and satisfaction in the final decision and (2) the Government has admitted that the bolt size claim and L/600 deflection claim are subsumed in the DSB pressure test claim, which was not finally resolved by contract modification P00009. Pl.'s Opp'n at 9-10. The fact that accord and satisfaction was not mentioned in the contracting officer's final decision does not constitute a waiver. *England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 850 n.4 (Fed. Cir. 2004) (failure of the contracting officer to consider a defense does not preclude a reviewing court from considering the defense). Further, the Board of Contract Appeals decisions cited by Plaintiff, which are not binding on this Court, hold only that failure of the contracting officer to assert an accord and satisfaction defense can be considered "evidence" that no such agreement was made. *See* Pl.'s Opp'n at 10. And, Plaintiff grossly mischaracterizes the Government's argument by attempting to impute an acknowledgment that the bolt size claim and L/600 deflection claim are subsumed in the DSB pressure test claim. The Government has taken much the opposite position, demonstrated by the fact that it has sought dismissal of the bolt size claim independently of the DSB pressure test claim. Thus, Plaintiff's argument for waiver has no merit.

> [requirement of 1.1% infiltration], we will be much harder on [AAB] than if you follow the contract and the pressure test comes out at 1.5% or 2%.

Pl.'s Opp'n. at 13. To support Plaintiff's view that it should have been entitled to leniency with respect to the DSB pressure test, Plaintiff also submits various exhibits extrinsic to the Contract. Most notably, Plaintiff submits contemporaneous emails and memoranda which tend to show (1) the Government was aware of reports that it was likely *impossible* for the prototype DSB design called for in the contract specifications to actually meet the DSB pressure test[9] and (2) that, internally, Plaintiff's officers did believe that they were to proceed with a more lenient expectation from USACE in regard to the DSB pressure test.[10]

Additionally, Plaintiff submits a declaration from Stephen Keeney, an officer of AAB. Mr. Keeney states that, during the December 2001 meeting that led to modification P00009, "Mr. Michael Roach, the contracting officer's representative, stated that if [AAB] complied with the L/600 requirement for the panels, the Government would show 'leniency'" in regard to the DSB pressure test. Mr. Keeney also states that, "during discussions with [Joseph Blackburn, Jr.] USACE ACO, a day or so before signing Modification No. P00009, Mr. Blackburn encouraged me to sign the modification by stating there was no need to worry about waiving my claims, as even after signing I would not be giving up all my rights to the claims, as the courts are often convinced there was no accord and satisfaction for many reasons and allow the contractor to make the claim." Pl. App. at 3. This is, of course, evidence that the parties did not come to a meeting of the minds that contract modification P00009 was to be a relinquishment or "satisfaction" of Plaintiff's L/600 deflection claim. However, the Government submits declarations from both Mr. Roach and Mr. Blackburn which directly contradict Mr. Keeney's account of these conversations.[11] Predictably, Mr. Roach and Mr. Blackburn state that the parties did intend for the contract modification to be a relinquishment of Plaintiff's claims.

---

[9] For example, Plaintiff cites an email in which a Government engineer involved in the project stated that he considered it theoretically impossible to achieve the DBS pressure test requirement and recommended relaxing the requirement considerably. Pl.'s App. at 10. Ultimately, the parties agreed to use a different, less-stringent pressure test, which Plaintiff satisfied in June 2003. Am. Compl. ¶¶ 22-35.

[10] For example, Plaintiff cites minutes of an internal AAB management meeting in which AAB employees discussed the leniency they would be afforded with respect to the DSB pressure test requirement. Pl.'s Supp. App. at 5.

[11] Mr. Blackburn's declaration states that: "At no time did I state to Mr. Keeney that his signing of Modification No. P00009 would not have the effect of waiving any claims. Nor did I state that Modification No. P00009 might not constitute an accord and satisfaction with respect to the claims referenced in the modification. Nor did I state anything concerning what the courts might conclude concerning Modification No. P00009 or any other accord and satisfaction." Def.'s Supp. App. at 4.

**i. Admissibility and Relevance of Extrinsic Evidence**

The Government first raised the issue of the parol evidence rule in its reply brief, stating that contract modification P00009 is unambiguous and that "evidence of extraneous dealings" cannot be considered in the interpretation of P00009. Def.'s Reply at 8.

In regard to the admissibility of these exhibits and declarations under the parol evidence rule, Plaintiff notes that contract modification P00009 (1) does not contain an "integration" clause, (2) omits a consistent additional agreed term: leniency with respect to the DSB pressure test, and (3) is ambiguous. Pl.'s Surreply at 3-4 (citing *David Nassif Assocs. v. United States*, 557 F.2d 249, 256 (Ct. Cl. 1977); *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1235-36 (Fed. Cir. 1997); *District of Columbia v. United States*, 67 Fed.Cl. 292, 339 (2005)). However, the lack of an integration clause, by itself, is not determinative of integration. *See McAbee Const. Inc. v. United States*, 97 F.3d 1431, 1434 (Fed. Cir. 1996). And, the fact that an additional term might be consistent is only relevant if it has already been found that the contract is not fully integrated. *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972).

The issue of whether a term should be read into the Contract is not before the Court on this motion. Rather, the affirmative defense of accord and satisfaction is the present issue. For purposes of determining whether there was a meeting of the minds, in the framework of an accord and satisfaction defense, courts generally can exercise greater latitude in considering "surrounding circumstances." *David Nassif Assocs.*, 557 F.2d at 256-57; *Texas Instruments Inc. v. United States*, 922 F.2d 810, 815 (Fed. Cir. 1990) ("Whether a legally enforceable contract has been formed by a meeting of the minds depends upon the totality of the factual circumstances"); *see also Massman Const. Co. v. United States*, 861 F.2d 729 (Fed. Cir. 1988) (finding true meeting of the minds not expressly stated in a contract modification); *S.E.R., Jobs For Progress, Inc. v. United States*, 759 F.2d 1, 4 (Fed. Cir. 1985) (finding that negotiations and payment of a sum did not effect an accord and satisfaction where some remaining ambiguity "preclude[d] a finding that any meeting of the minds took place"); *Jaynes v. United States*, 75 Fed.Cl. 218, 232 (2007) ("The parties' intent is the controlling factor in determining whether there has been a meeting of the minds"). However, when a written contract modification is at issue, "the contract modification represents the best source of evidence regarding intent." *McLain Plumbing & Elec. Service, Inc. v. United States*, 30 Fed.Cl. 70, 81 (1993) (citing *Black v. Denver United States Nat'l Bank*, 362 F.2d 38, 41 (8th Cir. 1966)); *accord SMC Corp. v. United States*, 675 F.2d 280, 284 (1982) (interpretation of an unambiguous contract requires no extrinsic evidence).

**ii. Evidence of Intent from the Modification Itself**

For the most part, the contract modification does not seem to be ambiguous, though it is relatively silent about whether the modification was intended to be a satisfaction of claims. The "Scope of Work" section states that the L/600 deflection requirement "is not changed," but does state that this requirement "shall apply to all individual elements of the roof structure." Def.'s

App. at 3. Neither party disputes that Plaintiff agreed to conform the roof structure, including all panels, to the L/600 deflection requirement. It is also clear that all claims incidental to any "changes" made in the modification "have been satisfied" by the modification, and that any unmentioned terms or conditions remain unchanged. Def.'s App. at 3 ("the contract adjustement [sic] in this modification includes all costs for the change and all claims incidental therto [sic] have been satisfied"). It is not entirely clear whether the "non-change" to the L/600 deflection requirement should be considered part of the "change" for which all incidental claims were satisfied by the contract adjustment. In addition, the statement of the contracting officer indicating that USACE would not be too hard on Plaintiff if the L/600 requirement was strictly followed, but the DSB pressure test still failed, is included in the attached minutes and is the only instance of such a discussion. *Id.*

Therefore, the issues left unresolved by the language of the modification itself are: (1) did the parties intend that the non-change to the L/600 requirement be considered a "change" for purposes of the claim relinquishment clause, and, if so, (2) did the parties intend the statement regarding leniency to be part of the "accord" by which Plaintiff would relinquish its L/600 claim?

### B. Genuine Issue of Material Fact Regarding Intent

When examining the circumstances surrounding execution of contract modification P00009, it appears that a genuine issue of material fact exists, precluding the grant of summary judgment. *See Dureiko v. United States*, 209 F.3d 1345, 1356-57 (if a release of claim is ambiguous as to its terms, the language is construed to effect the parties' intent at the time of execution, but summary judgment is not appropriate where "extrinsic evidence of intent ... raise[s] a question of material fact regarding contract interpretation") (citing *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988)); *see also Bechtel National, Inc. v. Roche*, 65 Fed. Appx. 277, 279-80 (Fed. Cir. 2003) (citing *Safeco Credit v. United States*, 44 Fed.Cl. 406, 419 (1999)).

Plaintiff and the Government have both submitted declarations regarding the intent of the parties with regard to P00009. These declarations are in direct conflict with each other. Def.'s Supp. App. at 1; Pl.'s App. at 1. According to the declaration submitted by Plaintiff, the contract modification was understood by AAB's representatives to be an exchange of DSB pressure test lenience for adherence to the L/600 deflection requirement, with a reservation of AAB's right to bring future claims. Pl.'s App. at 2-3. The declarations submitted by the Government generally state the opposite of these contentions. *See, e.g.,* Def.'s Supp. App. at 2 (Roach Dec.) ("At no time did I state that the 'Government would show leniency' if AAB failed to meet the pressure test.").

Moreover, if, at the time modification P00009 was executed, the parties already knew or suspected that the original DSB pressure test requirements were impossible to meet, it is even less likely that the parties would have mutually intended the modification to require strict adherence to this test. On consideration of a motion for summary judgment, such inferences are

to be taken in favor of the non-moving party. *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984) (summary judgment appropriate when, "viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in favor of the nonmovant, the moving party was entitled to judgment as a matter of law"). In other words, Plaintiff's contemporaneous evidence provides a reasonable inference that AAB believed the Government understood the impossibility of the DSB pressure test, and therefore offered leniency. *See* Pl.'s App. at 10.

The Government has failed to establish that no genuine issue of material fact exists in regard to whether there was a meeting of the minds. The paramount guide in determining whether a meeting of the minds existed is the intent of the parties. Here, beyond the contract modification itself, there is conflicting evidence regarding what the parties intended. As such, it is premature to find that P00009 was an accord and satisfaction of Plaintiff's claims. *See, e.g. District of Columbia*, 67 Fed.Cl. at 339-40 ("Although a factual inquiry into the dispute over the parties' alleged meeting of the minds is not appropriate at the summary judgment phase of this litigation [citations omitted], defendant would have to overcome the implications of these alleged facts to ... successfully assert that an accord and satisfaction was reached ... [in] further proceedings....").

**C. Conclusion**

The Government's motion for summary judgment that Plaintiff's L/600 claim is barred by the doctrine of accord and satisfaction is DENIED. Contract modification P00009 is not clear as to whether a non-change to the L/600 requirement was a "change" for which Plaintiff relinquished its right to bring future claims. In addition, the meeting minutes, which are referenced by the contract modification, contain a statement which suggests that lenience on the DSB pressure test was the *quid pro quo* for Plaintiff's agreement to strictly adhere to the L/600 requirement as applicable to all roof structures. Finally, there is a direct contradiction in declarations submitted by the parties as to what the parties intended with respect to lenience and claim relinquishment. Therefore, the issue of whether P00009 embodied an accord and satisfaction barring Plaintiff's L/600 claim is not properly decided on a motion for summary judgment.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge