# In the United States Court of Federal Claims

No. 04-1719 C, No. 05-114 C, No. 05-1172 C, and No. 06-49 C
(CONSOLIDATED)

(Filed: September 24, 2008)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**A.A.B JOINT VENTURE,**                 \*
                                         \*
                    Plaintiff,           \*
                                         \*
        v.                               \*
                                         \*
**THE UNITED STATES,**                   \*
                                         \*
                    Defendant.           \*
                                         \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Brian Cohen*, of Bell, Boyd & Lloyd, Washington, D.C., for Plaintiff.  *Philip Clark Jones*, of Bell, Boyd & Lloyd, Washington, D.C., of counsel.

*Shalom Brilliant*, Senior Trial Counsel, with whom were *Jeanne E. Davidson*, Director, and *Peter D. Keisler*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.  *Paul Cheverie*, Command Counsel, *Brett R. Howard*, Assistant Command Counsel, Europe District, U.S. Army Corps of Engineers, of counsel.

---

## OPINION

---

**DAMICH**, Chief Judge.

This consolidated government contract case is before the Court on the parties' cross-motions for summary judgment.  These motions regard only one of the four consolidated cases, No. 05-114C, though all four consolidated cases relate to the same contract between Defendant, the United States ("the Government"), and Plaintiff, A.A.B. Joint Venture ("AAB" or "the Joint Venture"), for the construction of a military base in Israel.

AAB contends that various representations in its contract with the Government, including

a statement that AAB "may arrange, through the appropriate Government of Israel offices, to bring [foreign workers] into Israel," as well as the circumstances surrounding formation of the contract, establish the existence of an express warranty that AAB would be able to import foreign workers into Israel, as necessary, to be utilized on the construction project.  Because the Government of Israel ("GOI") ultimately did not permit AAB to import foreign workers, AAB now requests a judgment as to liability for its breach of warranty claim.  In the alternative, AAB has requested an excusable, non-compensable time extension under the Default clause of the contract.

In its cross-motion for summary judgment, the Government seeks a determination that the contract does not contain an express warranty and that, therefore, the Government cannot be held liable for any actions by the GOI which may have hindered AAB's ability to import foreign workers.  In the alternative, the Government argues that, even if the language is held to be a warranty, it was not breached because the GOI did not completely ban the use or importation of foreign workers, but merely required contractors to document the repatriation of previously imported foreign workers before new visas would be granted.  Thus, because one of the joint venturers of AAB was unable to document the repatriation of a very large number of previously imported foreign workers, the Government argues that it should not be held liable because AAB's inability to import new workers was due to its own failure to document previously employed foreign workers.

The Court holds that the contract does not contain an express warranty that AAB would be able to import, as necessary, foreign workers for use on the construction project.  The contract uses the permissive phrase "may arrange" in mentioning the importation of foreign workers.  The Court finds that this phrase does not unmistakably assure the contractor of favorable action by the GOI on visa applications.  Additional portions of the contract and the circumstances surrounding its formation do not raise this permissive language to the level of a warranty.  As to whether AAB should be entitled to an excusable, non-compensable time extension, the Court holds that AAB has not met its burden of proof for summary judgment because AAB has not shown that it is entitled to an extension as a matter of law and because the Court finds that facts material to AAB's claim have not been proved.  Therefore, the Court DENIES AAB's motion and GRANTS the Government's cross-motion.

## I.      Background

### A.      The Wye River Accords

The contract in this case concerns a project that derives from a series of negotiations between the United States Government and the GOI known as the "Wye River Accords."  In connection with the Wye River Accords, the United States Government and the GOI executed a document in February 2000 titled Letter of Offer and Acceptance ("LOA").  *See* Pl.'s Mem. at 5; Pl.'s App. at Ex. 1 Attach. A.  A stated purpose of the LOA was to provide "for the relocation of military facilities for the GOI."  Pl.'s App. at 11, Ex. 1 Attach. A.  The LOA contained several

agreements between the Government and the GOI that are relevant to AAB's present claim:

> n.     The USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA. The GOI reserves the right, on the grounds of secrecy, security or public order, to limit access to designated security areas and to refuse entry into Israel or employment of specified individuals, or to require their departure from Israel, in accordance with Israeli law and practice.

Pl.'s App. at 14, Ex. 1 Attach. A at 6. The LOA also included a section dealing with tax exemptions for third country nationals:

> Third country nationals (non-U.S. or Israeli nationals) imported into Israel as work-force employees of contractor(s) and or subcontractor(s) to work exclusively on efforts covered by the provisions of this LOA shall be exempted by the GOI from liability for or payment of Israeli personal income tax on earnings resulting from such employment....

Pl.'s App. at 19, Ex. 1 Attach. A at 11.

### B.    Solicitation and Award of AAB's Contract

In October 2000, government contract DACA90-01-C-0043 was announced in a publication of Commerce Business Daily. Pl.'s App. at Ex. 3. The announcement described the contract as one with the U.S. Army Corps of Engineers' Europe Division ("USACE") for the design and construction of a storage and logistics base, to be known as the Nachshonim Military Storage Base, near Elad, Israel for use by the Israeli Defense Force. *Id.* The announcement further instructed prospective bidders that "[c]ontractors may bring into Israel nationals of the U.S. and third countries having diplomatic relations with Israel for the purpose of accomplishing the work." *Id.* A set of Instructions for Bidders, separately issued by USACE as part of the Request for Proposals, stated that all bidders should submit with their proposals a Third Country National ("TCN") Tax Plan, which was to include "(1) an estimate of the amount of TCN personal income and employment taxes expected to be incurred in performance of the contract," and "(2) a projected expenditure schedule showing when the contractor expects to incur these costs over the duration of the contract." Pl.'s App. at 30, Ex. 1Attach. B at 2. The Instructions for Bidders also warned, however, that "[s]ubmission of the plan and acceptance of the contractor's proposal by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor," and that "[a]n updated plan, along with justification for any changes, must be resubmitted by the contractor for Contracting Officer approval in the event of significant changes in expenditure levels or timing of TCN workers during the performance of the contract." *Id.*

### 1.    SR-22

On December 18, 2000, USACE issued Solicitation No. DACA90-01-R-0001 ("the Nachshonim contract").  Def.'s Proposed Findings of Fact ("DPFF") ¶ 1.  The Solicitation contained several "Special Contract Requirements," one of which, labeled SR-22, stated:

> Contractor may arrange, through the appropriate Government of Israel offices, to bring into Israel US nationals and nationals of third countries having diplomatic relations with Israel for purposes of employment in carrying out this contract work. ...
>
> Contractors shall be responsible for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses, or permits.  The contractor shall be responsible for the sponsorship of its employees and their dependents and shall process said permits directly with the appropriate GOI agency.

Pl.'s App. at 46, Ex. 1 Attach. G at 2.

### 2.    SR-13

Another Special Requirement of the Solicitation, SR-13, listed several items for which AAB was assigned "the sole responsibility ... to investigate, estimate as to cost, and assume the risk, as normally encountered by Contractors."  Pl.'s App. at 40, Ex. 1 Attach. E at 1.  SR-13, at subparagraph "b," states:

> [t]he Contractor shall be responsible for determining the effect of the following on his own cost of performance of the contract and for including sufficient amount in the contract price:
>
> ...
>
> - Entry and exit visas, residence permits, and residence laws applicable to aliens.  This includes any special requirements of the Host Government, including those required by local Labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.
>
> ...
>
> - Arranging to perform work in the Host Country, to import personnel, to employ non-indigenous labor....

*Id.*  During the bid process, a question regarding visas was posed to USACE which was reprinted

4

and answered in Solicitation Amendment No. 3 as follows:

> 32) Will the [Corps of Engineers] facilitate obtaining VISAS during the construction program?
>
> No.

DPFF ¶ 4; Def.'s App. at 5.

### 3.    SR-14

The Solicitation also contained several provisions and instructions at SR-14 relating to a tax reimbursement mechanism for TCN employees:

> 1.    General
> Contractors and subcontractors will be required to pay all taxes, duties or other charges levied by the Government of Israel (GOI) in accordance with Israeli law and regulations.  Certain expenditures for taxes, duties or similar charges will be reimbursable to the prime contractor as provided in this clause.  Bid prices shall not include the value of taxes for which the contractor will be reimbursed.
>
> ...
>
> 4.    Personal Income and Employment Taxes for Third Country Nationals:
>
> ...
>
> d.    The contractor and/or subcontractors shall not withhold personal income taxes from the wages of qualifying TCN employees.  The contractor and/or subcontractors will pay all income taxes required by Israeli law to the appropriate agencies/jurisdictions for qualifying TCN employees.
> e.    Income and employment taxes paid for qualifying employees of the contractor and subcontractors will be itemized on monthly contractor invoices to the U.S. Government. ... Invoices submitted more than 90 days after the taxes were paid by the contractor will not be reimbursed.
> f.    TCN personal income and employment taxes paid will be reimbursed in U.S. dollars to contractors as part of their regular periodic payments, after approval of invoices by the Contracting Officer.

Pl.'s App. at 43-44, Ex. 1, Attach. F at 2-3.

AAB submitted its bid package on April 9, 2001, including the required TCN tax plan. Compl. ¶ 5; Pl.'s Proposed Findings of Fact ("PPFF") ¶ 7.  AAB's TCN tax plan indicated that

AAB anticipated approximately one-third of its work force would be TCN employees and that AAB thus expected to be reimbursed $601,246 for income and employment taxes associated with the anticipated TCN labor.  PPFF at ¶ 7; Pl.'s App. at 31-32, Ex. 1 Attach. C.  AAB's bid package also included a section titled "Schedule and Mobilization," which detailed AAB's plans for hiring TCN labor and for the construction of a TCN camp to house the TCN employees. PPFF at ¶ 8; Pl.'s App. at 33-38, Ex. 1 Attach. D.  Based on its bid, AAB was awarded the Nachshonim contract on June 5, 2001.  PPFF ¶ 1.

### C.     GOI Policy on Foreign Workers

In the years immediately before and after award of the Nachshonim contract, the GOI frequently and substantially changed its policies on visas for TCN labor.  On August 22, 1999, prior to submission of AAB's bid, the GOI issued a "Government Decision" in which it set the limit on foreign worker permits for the construction industry for calendar year 2001 at 26,000, down from the quota of 34,000 which had been set for 2000.  DPFF at ¶ 5; Pl.'s App. at 229, Ex. 14 at 2.  On August 16, 2000, still prior to submission of AAB's bid, the GOI issued another decision in which it announced a new a policy of intensifying the enforcement of laws prohibiting foreign workers from remaining in Israel illegally.  DPFF at ¶ 6; Def.'s App. at 6.  On August 5, 2001, after AAB had bid on and been awarded the Nachshonim contract, the Government issued a decision amending the limits for foreign worker permits.  Def.'s App. at 8; Pl.'s App. at 229, Ex. 14 at 2.  The August 5, 2001 decision stated that 45,000 foreign worker permits for the construction industry would be allowed for calendar year 2001 and 40,000 would be allowed for calendar year 2002.  *Id.*  On December 24, 2001, the GOI announced that it was amending its quota of foreign worker permits for the construction and agricultural industries to be 45,000, combined, for calendar year 2002.  DPFF at ¶ 7; Pl.'s App. at 142, Ex. 5 Attach. A at 1.  On July 11, 2002, the GOI again decided to reduce the quota for foreign worker permits for calendar year 2002 such that "28,00[0] will be foreign workers in the agricultural industry and 30,000 instead of 45,000 in the construction industry."[1]  DPFF ¶ 9; Def.'s App. at 7.  A few days later, on July 30, 2002, the GOI issued another decision which stated that "the Minister of the Interior [will not] grant entry into Israel to anyone seeking to enter Israel for work purposes who are not 'foreign experts,'" but that this new ban on visas would not apply in the case of a foreign worker whose "entry into Israel is necessary for the purpose of replacing a foreign worker who worked in Israel lawfully and left it on the expiry of the entry into Israel visa granted to him."  DPFF at ¶ 11; Def.'s App. at 12.  The July 30, 2008 decision also set the quota for foreign worker visas in the construction industry for 2003 to remain at 30,000.  *Id.*

On October 2, 2002, the GOI issued a press release which stated that high-ranking

---

[1] The record does not reflect whether a GOI Decision issued between December 2001 and July 2002 which set the construction industry limit at 45,000 for 2002, or whether there was merely an inaccuracy in the text of the quoted GOI Decision.  For the purpose of this Opinion, however, it is sufficient to note that, at a minimum, the yearly limits on foreign worker permits for the construction industry in Israel fluctuated frequently and considerably.

officials of the GOI, including the Prime Minister and representatives of the Ministry of Labor, the Ministry of the Interior, and others, "decided not to allow the entry of additional foreign workers into Israel." DPFF at ¶ 12; Def.'s App. at 13.  This decision was put into effect by a Ministry of Labor announcement dated January 7, 2003, and titled "Closed Skies Procedure." Def.'s App. at 14.  In general, the announcement dictated a procedure by which employers could procure foreign workers, who had been detained as illegally residing in Israel, from the Ministry of Labor.  *See* Def.'s App. at 14-15.  The announcement also provided that, "[i]f the Ministry of the Interior is unable to offer an employer foreign workers from within Israel, in accordance with his unfilled quota, ... the Ministry shall consider the possibility of approving the bringing of foreign workers from overseas for such employer, provided that he has fully cooperated with the Ministry in each of the stages." *Id.* at 15-16.

### D.     AAB's Efforts to Obtain TCN Labor

On September 24, 2001, A. Arenson Ltd., one of the joint venturers of AAB, submitted to the GOI an application for a supplemental block of visas for 2001.  DPFF at ¶ 19; Pl.'s App. at 138, Ex. 5 ¶ 13.  A. Arenson Ltd. also submitted a request in January 2002 for a 2002 visa allotment.  *Id.*  Due to a labor strike by the employees of the Ministry of Labor, the GOI never approved A. Arenson Ltd.'s application for the 2001 supplemental block of visas and did not approve A. Arenson Ltd.'s 2002 application until July 2002.  A. Arenson Ltd. was granted a block of 784 visas for 2002, approximately 530 of which were specific for use in the Nachshonim Project.  *Id.*  This was more than the peak number of TCN employees which AAB's TCN plan had anticipated.  DPFF ¶ 19; *see also* Pl.'s App. at Ex. 1 Attach. C.

Despite being allocated the block of visas, AAB asserts that it was prevented from actually using the visas to import new TCN labor.[2]  The GOI's Ministry of the Interior contended that A. Arenson Ltd. had previously brought into Israel several hundred foreign workers who had left their employment with the company, yet had remained in Israel illegally.  DPFF at ¶ 20; Pl.'s App. at 138, Ex. 5 ¶ 14.  According to what the parties have called the "Deserters" policy, the Ministry of the Interior refused to permit AAB to use its block visas to import new TCN labor unless, allegedly, A. Arenson Ltd. could account for the repatriation of enough of these workers so that the number of undocumented deserters became less than the number of allocated visas. DPFF ¶ 20; Pl.'s App. at 138-39, Ex. 5 ¶¶ 14, 15.

Nevertheless, AAB made a number of attempts to obtain TCN labor or compensate for its inability to import new TCN labor.  *See* Pl.'s App. at 139, Ex. 5 at 16.  According to Avie Arenson of A. Arenson Ltd., AAB was able to transfer some TCN labor from other A. Arenson

---

[2] According to AAB, block visas were allocated by the Ministry of Labor for employers by industry.  After an employer was allocated a block of visas, the employer had to apply to the Ministry of the Interior for approval of visas for individual foreign workers.  Pl.'s Mot. at 14; Pl.'s App. at Ex. 5, ¶ 11.  When the individual visas were approved, the Israeli embassy in the workers' home countries would then issue the visas to the workers.  *Id.*

Ltd. projects to the Nachshonim project, and attempted to obtain TCN workers who were already in Israel. Pl.'s App. at 139-140, 171, Ex. 5 ¶¶ 16, 19, Ex. 6 at 37. Other alternatives AAB has pursued were to file a lawsuit seeking to compel the Ministry of the Interior to accept A. Arenson Ltd.'s visas (Pl.'s App. at 148, Ex. 5 Attach. E), to attempt to transfer A. Arenson Ltd.'s block of visas to the Joint Venturer itself, which did not have a documented problem with deserters (Pl.'s App. at 164-65, Ex. 6 at 30-31), and to attempt to train a domestic labor force (Pl.'s App. at 185, Ex. 6 at 129). Despite all these so-called "Herculean" efforts, AAB insists that, at no time during performance of the Nachshonim project, was AAB able to import even a single new TCN worker. Pl.'s Opp'n to Def.'s Cross-Mot. at 8. Thus, AAB now seeks an equitable adjustment for the costs it incurred as a result of, and an extension of time for the delay caused by, its inability to import new TCN labor from the start of contract performance through 2003. *See* Compl. ¶¶ 34, 35, 40.

## II.     Standard for Summary Judgment on Cross-Motions

When cross-motions for summary judgment have been filed, the Court is not necessarily required to grant judgment for one side or the other. *Prineville Sawmill Co., Inc. v. United States*, 859 F.2d 905, 911 (1988). Rather, summary judgment is only appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1243-44 (Fed. Cir. 2007). In other words, each cross-motion before the Court is to be considered, individually, in the same manner as any motion for summary judgment – as the moving party's claim that it alone is entitled to a judgment. *See, e.g., A Olympic Forwarder, Inc. v. United States*, 33 Fed. Cl. 514, 518 (1995) (citing *Prineville Sawmill*, 859 F.2d at 911; *Corman v. United States*, 26 Cl. Ct. 1011, 1014 (1992)).

## III.    Government Contract Interpretation and Express Warranties

"In essence a warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself. Thus, a warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 699 (1964). To be entitled to a recovery for a breach of warranty claim against the Government, a plaintiff must prove that: "(1) the Government assured the plaintiff of the existence of a fact, (2) the Government intended that plaintiff be relieved of the duty to ascertain the existence of the fact for itself, and (3) the Government's assurance of that fact proved untrue." *Kolar, Inc. v. United States*, 650 F.2d 256, 258 (Ct. Cl. 1981). The Court will not address the third element, as it finds that elements one and two are not established.

A.     **A warranty covering the actions of a third party cannot be held to exist in a government contract unless the terms of the alleged warranty are unmistakable.**

In instances where a warranty is alleged to encompass the actions of a third party, especially a sovereign foreign government, a plaintiff must establish that "the parties in unmistakable terms agreed to shift the risk of increased costs" due to the third party actions to the Government.[3]  *Oman-Fischbach Int'l v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002) (citing *Lenry, Inc. v. United States*, 297 F.2d 550, 553 (Ct. Cl. 1962); *Fort Sill Assoc. v. United States*, 183 Ct. Cl. 301, 309 (1968)); *Dale Constr.*, 168 Ct. Cl. at 698 ("It is, of course, settled that absent ... an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties.") (internal citations omitted); *see also Koppers/Clough v United States*, 201 Ct. Cl. 344, 362 (1973).[4]  Courts have traditionally applied a heightened standard in these instances because it is considered an "unusual assumption of responsibility" for the Government to guarantee performance of third parties.  *Franklin E. Penny Co. v. United States*, 524 F.2d 668, 675 (Ct. Cl. 1975) (citing *Paccon, Inc. v. United States*, 499 F.2d 162, 168 (1968)).

In *Oman-Fischbach*, the most recent Federal Circuit case to deal with alleged warranties

---

[3] AAB argues that, in establishing the existence of a warranty, the Government's assurance need not have even been "express," much less unmistakable.  Pl.'s Mot. at 27.  For this proposition, AAB cites *Blinderman Construction Co. v. United States*, 695 F.2d 552, 557 (Fed. Cir. 1982), an opinion which did not specifically address warranties and did not relate to actions of third parties.  Instead, *Blinderman* regarded whether certain contract language should be interpreted as imposing an affirmative obligation on the Government to ensure the plaintiff had access to Navy housing units to perform installation work.  *Id.* at 557-58.  The Court finds that *Oman-Fischbach* is more analogous than *Blinderman* to the present case, and that *Oman-Fischbach* sets forth the appropriate standard to be used when the alleged warranty covers the actions of third parties.

[4] It appears that the Federal Circuit in *Oman-Fischbach* intended that the "unmistakable terms" standard should apply to the overall determination of whether a warranty exists, rather than to any one particular element of a claim for breach of warranty, as set forth in *Kolar*.  First, the phrase "unmistakable terms" is applied in *Oman-Fischbach* to the parties' agreement to "shift the risk of increased costs," which parallels the general description of a warranty in *Dale Construction* as "a promise to indemnify the promisee for any loss if the fact warranted proves untrue."  *Compare Oman-Fischbach*, 276 F.3d at 1385 *with Dale Constr.*, 168 Ct. Cl. at 699.  In addition, the court in *Oman-Fischbach* seems to have derived the standard from the opinion in *Lenry*, which stated that the terms of broad warranties (such as those covering events the Government cannot control) should be specified "in clear and unmistakable language."  297 F.2d at 553.

covering actions of a third party, a government contract was awarded to the plaintiff for a construction project at the Lajes Air Base on Terceira Island in Portugal.  276 F.3d at 1382.  Part of the agreement required the plaintiff to remove waste from the construction site and dispose of it at one of three waste disposal sites.  *Id.*  When the plaintiff attempted to use one of the waste disposal sites, the plaintiff discovered it was inaccessible because the Portugese Armed Forces had closed a route through the air base.  *Id.*  The plaintiff sued to recover the additional costs it incurred as a result of being forced to use a less advantageous disposal site, arguing that the listing of the site at issue as one of the required disposal sites constituted an implied warranty of access to the site.  *Id.* at 1383.  Because the Portuguese government was not a party to the contract and the U.S. Government had no control over the Portuguese Armed Forces, the court held that any warranty covering actions of the Portuguese Armed Forces would have to be stated in "unmistakable terms."  *Id.* at 1385.  However, the contract did not contain any specific language about the availability of particular access routes to the disposal sites, but did contain clauses which assigned responsibility to the contractor to investigate all local conditions which could affect the cost for transporting and disposing of waste.  *Id.* at 1384.  Thus, the court found that the contract did not contain the unmistakable terms necessary to hold that the U.S. Government had agreed to a warranty that would encompass actions of a foreign government. Because the factual parallels between *Oman-Fischbach* and the present case are substantial, as discussed below, *Oman-Fischbach* requires that AAB must show that the Nachshonim contract contains a warranty in "unmistakable terms."

**B.     When a contract clause states merely that a contractor "may" utilize a resource, without more, the clause is generally presumed to be permissive.**

A comparison of three cases from the Court of Claims illustrates that courts should generally presume clauses in government contracts containing the word "may" to be permissive only, unless the contract contains additional, specific language that establishes a warranty.

In *Chris Berg, Inc. v. United States*, 389 F.2d 401 (Ct. Cl. 1968), the Court of Claims held that a contract for the construction of a replacement tramway system in Alaska did not contain a warranty because it used only permissive language.  The contract contained a clause which stated that "[t]he existing towers and tramway *may* be used in erecting the new towers and tramway."  *Id.* at 404 (emphasis added).  When the contractor arrived at the work site, however, the contractor found the existing tramway to be corroded and unusable.  Thus, in its suit for damages to cover its increased costs of construction, the contractor presented evidence to establish several factors consistent with the existence of a warranty:  the parties intended the tramway be used in performance of the contract, the contractor relied upon use of the tramway in computing its bid, and the contractor made no pre-award site investigation.[5]  *Id.* at 403.  In examining the language of the contract itself, the Court of Claims held that the phrase "may be

---

[5] As will be discussed below, AAB presents arguments based on several of these same factors.  For the same reasons these arguments were not persuasive in *Chris Berg*, they are not persuasive here.

used," without the co-existence of a Government Furnished Property clause (i.e., a recognized express warranty), referred merely to permissive use and was not a guarantee of suitability. *Id.* at 405 ("The use of the word 'may' has been held not to be a representation by the Government of the nature or quality of the property furnished."). The court thus determined that the contractor was simply given permission to use a resource, and that such use was "completely optional on the contractor's part." *Id.* at 405. Therefore, the court held that the contract contained no warranty or representation that the contractor would actually be able to use the tramway. *Id.*

The Court of Claims in *S. S. Mullen, Inc. v. United States*, 389 F.2d 390 (Ct. Cl. 1968), although it held that a particular clause using the term "may" was not merely permissive, did not deviate from the general rule. The court's conclusion was based on the fact that the "may" clause was encompassed by a Government Furnished Property clause, which is the kind of clause that is generally considered a warranty. *Id.* at 393, 398. The facts in *S. S. Mullen* were virtually identical to those of *Chris Berg*, with the exception that the contract in *S. S. Mullen* contained a Government Furnished Property clause. Both cases involved contracts that contained a clause stating that the contractor "may" use an existing tramway in performance of the contract. *Id.* As characterized by the court in *S. S. Mullen*, the Government Furnished Property clause provided that "[i]n case Government furnished material set forth in the specifications (this included the tramway) was not 'suitable for the intended use' the contracting officer was to make an 'equitable adjustment' under the 'Changes' article." *Id.* Though the contract required that the contractor investigate the project site, including the existing tramway, the court found that "if plaintiff had made an adequate site investigation it would have discovered nothing to show that its plan to use the existing tramway ... was not safe and feasible." *Id.* at 394. Therefore, the court in *S. S. Mullen* held that the subsequent unusable condition of the tramway constituted a breach of warranty because the Government Furnished Property clause encompassed by reference the portion of the contract discussing the tramway. *Id.* at 398. Thus, as applicable here, the *Chris Berg* and *S. S. Mullen* cases suggest that government contract clauses which state merely that a contractor "may" utilize some resource, without a more definite statement of guarantee, are generally presumed to be permissive, rather than assurances.[6]

---

[6] AAB apparently believes that the holdings in *Chris Berg* and *S. S. Mullen* are more complex than a simple presumption that a clause containing the term "may," without more, is presumed to be permissive. Pl.'s Opp'n to Def.'s Cross-Mot. at 13. AAB argues that "a representation to a contractor that it 'may' perform its work in reliance on a fact can constitute a warranty if there is actual reasonable reliance on a Government representation," but does not cite to specific portions of *Chris Berg* or *S. S. Mullen* which support this interpretation. *Id.* The Court is uncertain why AAB believes that reasonable reliance plays a part in the *Chris Berg* and *S. S. Mullen* analyses. The plaintiff in *S. S. Mullen*, the case in which a warranty was held to exist, had contractually agreed to conduct a site inspection, but did not do so, causing the Court to question what AAB believes it was that the plaintiff could have been reasonably relying upon. As set forth above, the Court believes *Chris Berg* and *S. S. Mullen* are more properly interpreted as holding that clauses containing the term "may" are presumed to be merely permissive, not assurances, unless the contract contains more explicit language establishing a warranty (such as a

In *Koppers/Clough v. United States*, 201 Ct. Cl. 344 (1973), a case more factually analogous to the present case, the Court of Claims clarified the rule from *Chris Berg* and *S. S. Mullen* by requiring that contractual language raising a permissive clause to the level of a warranty must be specific as to the scope of the warranty.  In *Koppers/Clough*, a contract for the construction of communication facilities for the Navy included a provision that a pier, which was still under construction at the time the contract was executed, "*may* be used by the contractor on a scheduled basis ... for the life of this contract." *Id.* at 349 (emphasis added).  When the contractor was unable to use the pier due to the on-going construction, the contractor sued to recover its costs for adopting a more expensive and time consuming means for bringing supplies to the site. *Id.*  Citing the discussion of warranties in government contracts from *Dale Construction*, *Chris Berg*, and *S. S. Mullen*, the court in *Koppers/Clough* noted that this contract clause, if considered by itself, should be construed merely as permissive, not a guarantee. *Id.* at 351.  Even when several other provisions of the contract which seemed favorable to the plaintiff were taken into account, the court still held that this language only required that the Government not act to hinder the plaintiff. *Id.* at 354-55.  The court gave two reasons for reaching its conclusion that there was no warranty.  First, the court characterized the particular contract language at issue as "too soft" to be a warranty. *Id.* at 361.  Second, the court felt it would be improper, "absent some 'express covenant,'" to place the burden of a warranty for use of the pier on the Government, since the pier was "being built by someone else, over whom the Government had far less than full control." *Id.* at 362.  The court found that the Government Furnished Property clause in the contract at issue was not such an "express covenant," and that it differed from the one in *S. S. Mullen*.  Specifically, the Government Furnished Property clause in *S. S. Mullen* stated that the tramway would be suitable and available for use in sufficient time for the contractor to meet all performance completion dates, yet the clause in *Koppers/Clough* merely stated that the contractor could receive an equitable adjustment for changes in property furnished but left out any mention of timely availability. *Id.* at 356.  Thus, in light of *Chris Berg* and *S. S. Mullen*, the holding in *Koppers/Clough* clarified that clauses which state that a contractor "may" use a resource are presumed to be permissive, and do not guarantee that the contractor will be able to use the resource *when needed* unless some other portion of the contract expressly addresses when the resource will be available.

## IV.    The Disputed Language in AAB's Contract

To determine whether a warranty exists in this case, the Court must determine whether the Nachshonim contract contains an assurance by the Government to AAB that AAB would be able to import TCN labor for use on the Nachshonim project and whether the Government intended that AAB be relieved of the duty to ascertain for itself the availability of TCN labor. *Kolar*, 650 F.2d at 258.  According to AAB, the existence of such a warranty is established by (1) an express representation in SR-22, (2) an implied representation in SR-14, and (3) "relevant surrounding circumstances." Pl.'s Mot. at 26-27, 31.  In its cross-motion, the Government contends that no warranty should be found to exist, because SR-22 is merely a permissive clause,

---

Government Furnished Property clause).

not an express representation, and SR-14, though perhaps an incentive to contractors to use TCN labor, does not imply anything about whether AAB would actually be able to successfully import TCN labor.  Def's Cross-Mot. at 17-18.

### A.    The language of SR-22 does not establish a warranty.

The key language of SR-22 provides that AAB  "may arrange, through the appropriate Government of Israel offices, to bring [TCN labor] into Israel" and that AAB is assigned the responsibility "for timely and complete submittal of the necessary information and forms directly to the appropriate GOI agency for the required customs clearances, passports, visas, licenses, or permits."[7]  Pl.'s App. at 46, Ex. 1 Attach. G.

The Government argues that SR-22 "does nothing more than <u>permit</u> the contractor to <u>request</u> authorization from the <u>GOI</u> to bring foreign workers into Israel," and does not constitute an assurance of a favorable decision by the GOI.  Def.'s Mot. at 18.  It may be argued, however, that if this clause is merely permissive, why is it in the contract at all?  The answer, according to the Government, is that by interpreting SR-22 to be a permissive clause, "AAB could expect the Government not to hinder AAB's efforts to make ... arrangements [for TCN labor], and not to prevent or prohibit AAB from employing TCNs on the Nachshonim project."  Def.'s Reply at 4 n.2.  Additionally, as the Government points out, the decision to grant visas to AAB for TCN labor was "a matter plainly within the sovereign authority of the GOI, and not a matter within the control of the United States or about which the United States could make promises."  *Id.* at 3.

AAB's arguments do not rebut the Government's position that SR-22 is permissive only and that it does not unmistakably establish a warranty.  For example, AAB does not specifically compare the language of SR-22 to the language of contract clauses which were held to constitute warranties in binding, precedential cases.  *See, e.g.,* Pl.'s Opp'n to Def.'s Cross-Mot. at 17 n.5 (merely string-citing cases in which a warranty was found).  AAB appears to simply assume that the phrase "may arrange to" is synonymous with "will be able to," and attempts to distinguish *Chris Berg,* one of the cases which held "may" to be permissive.  Pl.'s Opp'n to Def.'s Cross-Mot. at 2, 13.  Likewise, AAB simply declares that SR-22 "is exactly the sort of 'unmistakable language' that the courts and boards have required in order to find the existence of a contractual warranty," without supplying any reasoning to reach this conclusion.  Pl.'s Mot. at 30.  However, after stating that SR-22 does contain "unmistakable" language, AAB then argues in its brief in opposition to the Government's motion that *Oman-Fischbach,* the case which originated the "unmistakable terms" standard, does not apply here.  Pl.'s Opp'n to Def.'s Cross-Mot. at 16.

---

[7] Even if the Court held that this language constitutes a warranty, it would still not be entirely clear whether it was breached, as the language plainly requires AAB to submit all necessary information and documents to the GOI to obtain visas.  Under the so-called "Deserters" policy, AAB was asked to provide additional information to document the repatriation of formerly-employed TCNs in order to obtain new visas, but evidently could not sufficiently do so.

1.        The "unmistakable terms" standard of *Oman-Fischbach* applies here.

AAB argues that *Oman-Fischbach* is inapplicable here because the contract clause at issue there was one dealing with an issue over which the Government had no control (actions of the Portuguese Armed Forces), whereas here, SR-22 is a clause "reflective of a written commitment obtained in advance by the United States from Israel – prior to issuing any of the contracts for the Wye River Accords projects – that '[t]he USG and its contractors may bring into Israel nationals of the United States and third countries having diplomatic relations with Israel for employment in carrying out the work implementing this LOA.'"  Pl.'s Opp'n to Def.'s Cross-Mot. at 3, 14.

However, as demonstrated by the Court of Claims' opinion in *Koppers/Clough*, the fact that the Government may have agreed with a third party for the provision of a resource for a contractor is not a factor which is considered to weigh in favor of the existence of a warranty. 201 Ct. Cl. at 362.  In *Koppers/Clough*, the Government had contracted with a third party to build a pier specifically for use by the contractor in constructing a communication facility.  *Id.* at 348.  Even though the Government had contractually bound the third party to build the pier, the Court of Claims noted that the Government still, in reality, had little control over the actions of the third party.  *Id.* at 362.  In fact, the court found that the Government's lack of control over the third party, despite the existence of a contract, actually weighed against the existence of a warranty.   *Id.*  Thus, if there had been an agreement in *Oman-Fischbach* between the Government and the Government of Portugal, the Court doubts that the holding in *Oman-Fischbach* would have differed:[8]  the Court in *Oman-Fischbach* held that no warranty existed because the plaintiff failed to show that the contract unmistakably placed on the Government the risk of increased costs due to actions of the Portuguese Armed Forces, not because the Government lacked control over the Portuguese Armed Forces.  276 F.3d at 1385.

Therefore, AAB's argument (that SR-22 was an assurance of something over which the Government had control) does not persuade the Court that the "unmistakable terms" standard of *Oman-Fischbach* should not be applied here.  AAB does not present evidence that the Government here had any more control over the GOI than it did over the third party building the pier in *Koppers/Clough*.  In the Court's view, the only meaningful difference between the present case and *Oman-Fischbach* is that the Nachshonim contract contains a clause, SR-22, specifically mentioning the importation of TCN labor, whereas the contract in *Oman-Fishbach* only mentioned disposal sites, but did not specifically mention access routes to the sites.  Thus, the Court agrees with the Government that, for a warranty guaranteeing the availability of TCN labor

_____

[8] In addition, the Court presumes that the Government has or had some form of agreement with the Government of Portugal, if the Government was maintaining a military base on Portuguese soil.  *See Oman-Fischbach*, 276 F.3d at 1385 (mentioning the "Portugal Technical Agreement of 1984").  The existence of such an agreement would tend to make the facts of this case appear more analogous to those of *Oman-Fischbach*.  AAB did not discuss this point when it attempted to distinguish *Oman-Fischbach*.  Regardless, the Court believes that the analysis in *Koppers/Clough* sufficiently puts to rest AAB's argument.

(i.e., guaranteeing favorable action by the GOI) to be found based on SR-22, the terms of the warranty must be unmistakable. *See Oman-Fischbach*, 276 F.3d at 1385.

> **2.     Because SR-22 contains the word "may," it is not, by itself, an unmistakable assurance that TCN labor would be available, nor does it unmistakably relieve AAB of the duty to ascertain for itself the availability of TCN labor.**

The Court agrees with the Government that SR-22 cannot be read as a guarantee or assurance that AAB would be able to import TCN labor when needed. The clause states merely that AAB "may" arrange to import TCN labor. This language is closely analogous to the language of *Chris Berg* and *Koppers/Clough*, in that it states that the contractor "may" utilize a particular resource. As the court in both *Chris Berg* and *Koppers/Clough* held, however, such a statement, by itself, is not to be taken as a guarantee that the resource would be available when needed. *Chris Berg*, 389 F.2d at 405; *Koppers/Clough*, 201 Ct. Cl. at 351. Moreover, the language of SR-22 does not state that AAB "may import" TCN labor, but rather that AAB "may *arrange*" to import TCN labor. The clause literally is giving AAB permission to make arrangements for importing TCN labor. Thus, the language of SR-22 is even "softer" than the language used in *Chris Berg* and *Koppers/Clough*. *See Koppers/Clough*, 201 Ct. Cl. at 361-62.

A reading of SR-22 as permissive only would be consistent with additional portions of the Nachshonim contract. First, in Amendment #3 to the solicitation for bids, when asked whether the Government would "facilitate obtaining VISAS during the construction program," the Government unequivocally replied: "No." Def.'s App. at 5. This response should have at least caused bidders to doubt that, via SR-22, the Government intended to assume the risk of increased cost if TCN labor could not be imported.

The Nachshonim contract also contains SR-13, which sets forth several pertinent disclaimers:

> The following items are the sole responsibility of the Contractor to investigate, estimate as to cost, *and assume the risk*, as normally encountered by Contractors. The Contractor shall be responsible for determining the effect of the following on his own cost of performance of the contract *and for including sufficient amount in the contract price*:
> ...
>        - *Entry and exit visas, residence permits, and residence laws applicable to aliens.* This includes any special requirements of the Host Government, including those required by local Labor Offices, which the Contractor may have to fulfill before an application for a regular block of visas will be accepted.
> ...
>        - Strikes, demonstrations and work stoppages.
> ...
>        - Arranging to perform work in the Host Country, *to import personnel, to*

*employ non-indigenous labor....*

Pl.'s App. at 40, Ex. 1 Attach. E at 1 (emphasis added).  The italicized portions of SR-13 would be inconsistent with interpreting SR-22 as establishing a warranty.  As stated in *Dale Construction*, a warranty is "is intended precisely to relieve the promisee of any duty to ascertain the [warranted] facts for himself."  168 Ct. Cl. at 699.  Instead of unmistakably relieving AAB of the duty to ascertain whether TCN labor could be imported (as would be required if a warranty were to be found), SR-13 does much the opposite:  it mandates that AAB must "investigate ... and assume the risk, as normally encountered by Contractors," of "[a]rranging ... to import personnel [and] to employ non-indigenous labor."[9]  According to SR-13, AAB was clearly responsible for determining what effect the risk of not obtaining TCN visas would have on its cost of performance and, based on that determination, was instructed to include a sufficient amount in its bid.  Thus, Amendment #3 and SR-13 are consistent with a reading of SR-22 as merely permissive, not a warranty.[10]

**B.**     **The terms of SR-14 do not support a reading of SR-22 as a warranty.**

AAB argues that SR-14 constitutes an implied representation which supports an interpretation of SR-22 as creating a warranty.  Pl.'s Opp'n to Def.'s Cross-Mot. at 4.  As AAB characterizes it, SR-14 "obligated the Corps of Engineers to reimburse the Contractor for employment and income taxes paid to TCNs brought into Israel exclusively to work on the Nachshonim Project ... and expressly directed the Contractor to exclude said taxes from its bid."  Pl.'s Mot. at 31.  The language of SR-14 states at paragraph 4(d) that:

---

[9] AAB attempts to explain away the significance of SR-13 by focusing on the phrase "as normally encountered by Contractors."  Pl.'s Mot. at 33.  In essence, AAB argues that the Closed Skies and Deserters policies were not of the type an Israeli contractor would normally encounter, and thus, even taking into account the disclaimer of SR-13, the alleged warranty of SR-22 was still breached.  However, as discussed above, the GOI rules on TCN visas were known by contractors to change frequently and substantially and appear to have applied equally to all contractors in the construction industry.  *See* DPFF ¶¶ 5, 6.  At a minimum, it seems that Israeli contractors knew that the annual availability of TCN visas was far from predictable.  Thus, the Court is not convinced that the GOI policies on visas during the relevant time period were not of the type "normally encountered" by construction contractors in Israel.  AAB does not further elaborate on this point.  In addition, AAB has moved for a ruling that SR-22 is an all-encompassing warranty that AAB could utilize TCN labor "as necessary."  Pl.'s Mot. at 27, 34.  AAB does not qualify its arguments concerning the asserted warranty in regard to conditions "normally encountered" by contractors.  *See also* Compl. ¶ 40.  Thus, the Court is not persuaded by AAB's explanation that the disclaimer of SR-13 can be harmonized with an interpretation of SR-22 as a warranty that AAB could utilize TCN labor "as necessary."

[10] AAB also points to the Corps' initial bid announcement as supporting a reading of SR-22 as a warranty.  Pl.'s Mot. at 31.  However, the Corps' initial bid announcement also used the term "may," and is therefore consistent with a reading of SR-22 as permissive only.

The contractor and/or subcontractors shall not withhold personal income taxes from the wages of qualifying TCN employees.  The contractor and/or subcontractors will pay all income taxes required by Israeli law to the appropriate agencies/jurisdictions for qualifying TCN employees.

Paragraph 4(f) of SR -14 then states that:

TCN personal income and employment taxes paid will be reimbursed in U.S. dollars to contractors as part of their regular periodic payments, after approval of invoices by the Contracting Officer.

Pl.'s App. at 43-44, Ex. 1, Attach. F at 2-3.  According to AAB, the discussion of this reimbursement mechanism in SR-14 constitutes an implied representation that TCN labor would, in fact, be available.  Pl.'s Mot. at 31.  AAB characterizes SR-14 as a "credit" to the Government and reasons that, "to require a contractor to adjust its bid in anticipation of obtaining a benefit offered in a Government representation (i.e., SR-22), and then to later deny the contractor an equitable adjustment when the benefit becomes unavailable to the Contractor is directly contrary to the most fundamental principles underlying the concept of equitable adjustment."  Pl.'s Opp'n to Def.'s Cross-Mot. at 6.

It seems to the Court that the requirement in SR-14 that the contractor's bid not reflect the amount the contractor expected to be reimbursed is a reasonable way for USACE to require bids to be priced and is not necessarily a credit to the Government, as AAB asserts.  If, for example, the contractor expected its costs to perform the contract would be $60,000 of which $10,000 was anticipated income and employment taxes for TCNs, the Government would, in principle, wind up paying the contractor $60,000 regardless of whether the bid was $50,000 with a TCN tax plan estimating $10,000 in reimbursement or whether the contractor simply bid the full $60,000.  The only difference would be that, in the latter case, the Government would have been forced to calculate the regular periodic progress payments by subtracting the estimated reimbursement, based on the TCN tax plan, and dividing by the period of performance.[11]  Thus, it seems perfectly reasonable to the Court that the Government wanted the bids to separate portions of the contract price which would be paid out on different schedules.

Though it is possible that SR-14 would have been viewed by contractors as an incentive to use TCN labor rather than domestic labor, SR-14 also contains cautionary language which

_____

[11] The TCN tax reimbursement payments were to be paid out as the contractor submitted invoices showing when and how much TCN taxes were paid by the contractor.  It appears to the Court that the TCN tax reimbursement estimate was thus not to be paid out evenly over the course of contract performance as a fixed part of the periodic progress payments.  It was clear from the Nachshonim contract that TCN tax reimbursement would be paid to the contractor only as actual TCN tax costs were incurred.  See Pl.'s App. at 44, Ex. 1, Attach. F at 3 (requiring contractor invoices to be submitted to the contracting officer within 90 days of tax payment to the GOI).

prevents SR-14 from being considered to imply a warranty.  The parties dispute from an economic standpoint how SR-14 would have operated in practice, if AAB had been able to employ TCN labor.  At the very least, to the extent that any employment taxes would not ordinarily have been withheld from an employee's wage, SR-14 is an incentive to use TCN labor because the contractor would not have to pay such tax for a TCN employee but would have to pay such tax for a non-TCN employee.[12]  But, any incentive in SR-14 is balanced by a disclaimer which makes clear to contractors that the Nachshonim contract does not guarantee that the contractors' anticipated level of tax reimbursement will actually be received.   Specifically, SR-14 states at paragraph 6 that "[s]ubmission of the [TCN Tax] plan and acceptance by the Contracting Officer will not constitute agreement to a minimum level of reimbursement nor will it be a limitation on reimbursement to the contractor."  Pl.'s App. at 45, Ex. 1, Attach. F at 4.  This disclaimer appears to assign to the contractor the risk that the contractor's bid overestimated the level of TCN labor that would be used.

A comparison of *Everett Plywood and Door Corp. v. United States* and *Caffal Bros. Forest Products, Inc. v. United States* provides a good illustration of the difficulty plaintiffs face in attempting to prove that a mere estimate in a government contract of a benefit to be received by the contractor should be construed as implying a warranty, especially when the contract also contains a disclaimer.  In *Everett Plywood*, a contract was at issue for the clearing, cutting, and purchase of merchantable timber from a national forest.  419 F.2d 425, 426-27 (Ct. Cl. 1969). The contract specified the area of the forest from which the plaintiff would clear and cut the timber and recited an estimate of the amount of merchantable timber the Government anticipated that the contractor would obtain from the area (73 million board feet).  *Id.*  In holding that the estimate constituted a warranty that a particular amount of timber would be obtainable, the Court of Claims relied upon the fact that no documents provided by the Government contained any form of disclaimer or cautionary language regarding this number, and that it would have been practically impossible for the plaintiff to have conducted its own cruise of the forest to estimate the amount of obtainable timber.  *Id.* at 430-31 (citing *Dale Constr.*, 168 Ct. Cl. at 699).

In contrast, the Court of Claims did not hold that the timber contract in *Caffal Bros.* contained a warranty that the estimated amount of merchantable timber would be obtainable,

---

[12] The Government attempts to characterize SR-14 as providing a benefit only to the TCN employees and not to the contractors.  Def.'s Reply at 5.  The Government's argument, however, assumes that a contractor would simply give its TCNs higher-than-necessary wages.  Take, for example, a TCN laborer who would ordinarily have been willing to work for $700 a month (a $1000 wage minus $300 withholding).  The Government's argument assumes that the contractor would simply voluntarily give TCNs working on the Nachshonim project the full $1000 wage instead of negotiating a wage of $700 without any withholding – an unlikely bargain.  AAB asserts, on the other hand, that SR-14 only provides a benefit to contractors, as it would make TCN labor considerably less expensive.  Pl.'s Opp'n to Def.'s Cross-Mot. at 4.  Regardless of these economic considerations, for purposes of the Court's present decision, it is important only that SR-14 likely provided *some* incentive to contractors to hire TCN labor, at the very least insofar as contractors would not have to pay non-withheld employment taxes for TCNs.

because the contract had specific cautionary language.  678 F.2d 1071, 1074-75.  There, as in *Everett Plywood*, the contract contained an estimate of the amount of obtainable timber resulting from the clearing and cutting of a national forest pursuant to a government contract.  However, the contract in *Caffal Bros.* contained a disclaimer stating that "[t]he estimated quantities [of timber] are not to be construed as guarantees or limitations of the timber volumes to be designated for cutting under the terms of this contract."[13]  *Id.*  In addition to the estimation, the contract also contained a provision whereby the plaintiff was to build roads through the national forest while logging, and could apply its road construction costs as credits against the payments the contractor owed the Government for the timber.  *Id.* at 1077-78.  As it turned out, the actual volume of timber obtained from the forest was about 26% less than the estimated volume.  Because the volume of timber was so low, the plaintiff was unable to apply all of its road construction costs as credits against its payments – in essence the plaintiff wound up being partially uncompensated for the road construction.  *Id.*  The only way plaintiff could have applied all of its construction costs as credits against payments would have been if the recovered timber volume was substantially closer to the estimated volume.  *Id.*  Regardless of this payment-and-credit mechanism and its result, the Court of Claims still held that the contract did not warrant that a particular volume of timber would be available.  The court reasoned that:

> Plaintiff was necessarily aware of the contract limitations respecting use of earned purchaser credits, however, and the total estimated volumes stated were not guaranteed.  Moreover, there was obviously a clear possibility, if not a probability, from the very outset that the Skogi contract would result in a timber volume underrun.  It must be concluded, on this record, that plaintiff assumed the risk volume cutout might be insufficient to enable it to offset the purchaser credits it expected to earn through road construction against stumpage payments.... *That the risk materialized, and that plaintiff was thus not able to recover all of its earned purchaser credits, is not in itself a sufficient basis for holding that plaintiff is therefore entitled to recover damages for breach of warranty.*

*Id.* (emphasis added).  In other words, because the contract stated the benefit to the plaintiff (i.e., the volume of obtainable timber) in the form of an estimate and clearly cautioned that the estimate was neither a guarantee nor a limitation, and because the plaintiff was experienced enough to understand that timber estimates can be overstated, the court held that the contract did not contain a warranty.  The fact that the absence of a warranty would result in a financial burden being incurred by the contractor (i.e., being uncompensated for the road construction) was not enough, in light of the disclaimer, to persuade the Court to hold that the contract warranted an amount of obtainable timber.

Here, SR-14 is simply a clause which provides for the estimation of a benefit to be received by AAB – the reimbursement of income and employment taxes for TCNs – and does not support the existence of a warranty.  Like the contract in *Caffal Bros.*, and unlike the contract in

---

[13] The Court notes that this disclaimer is phrased quite similarly to the disclaimer in SR-14.  Pl.'s App. at 45, Ex. 1, Attach. F at 4.

*Everett Plywood*, the contract here contains a disclaimer stating that the estimate of TCN tax reimbursement is to be construed as neither a guarantee nor a limitation.  Pl.'s App. at 45, Ex. 1, Attach. F at 4.  If AAB priced its bid on the Nachshonim contract to discount for anticipated TCN income and employment tax reimbursement, but ultimately had to pay income and employment taxes for domestic workers due to the Closed Skies and Deserters policies, AAB may have experienced a financial burden in the sense that its bid was underpriced or in that AAB experienced delays.  However, as the court reasoned in *Caffal Bros*. with respect to the road construction credits, the fact that an estimated benefit proves to be overstated, resulting in a financial burden to a contractor, does not weigh in favor of holding that the contract warranted the estimated benefit.  678 F.2d at 1077-78.  This is especially the case when the contractor is aware of the clear possibility that the estimate may prove inaccurate.  Here, AAB was aware that the availability of TCN visas in Israel varied frequently and substantially, as A. Arenson Ltd. had engaged in Israeli public contract work using TCN labor for years.  *See* Compl. ¶ 11; Pl.'s App at 166-67; Ex. 6 at 32-33.  More importantly, AAB was intimately aware of the fact that the TCN estimate was simply an estimate, as *AAB generated the estimate, not the USACE*.  Pl.'s App. at 45, Ex. 1, Attach. F at 4.  This is in contrast to the situation in *Everett Plywood*, in which the plaintiff was unable to investigate for itself the accuracy of the estimate, a fact upon which the court relied in holding that the contract contained a warranty.  419 F.2d at 430-31.  Here, AAB itself prepared the estimate and was, therefore, necessarily privy to all information used in forming the estimate.  Thus, according to the reasoning of cases such as *Everett Plywood* and *Caffal Bros.*, the fact that AAB may have experienced increased cost by having to employ non-TCN labor (or through a delay in construction) does not mean that a warranty should be implied.  *Caffal Bros.*, 678 F.2d at 1077-78 ("That the risk [of not obtaining the full estimated benefit] materialized ... is not in itself a sufficient basis for holding that plaintiff is therefore entitled to recover damages for breach of warranty.").

In sum, SR-14 is not itself an assurance or assignment of risk which establishes a warranty, nor does it implicate or imply a warranty so as to raise other sections of the Nachshonim contract (i.e.,  SR-22) to the level of a warranty.  Though SR-14 may have presented some incentive to contractors to utilize TCN labor, SR-14 contains a disclaimer that the TCN tax plan, prepared and submitted by the contractor, will not be considered a guarantee of tax reimbursement.  Thus, AAB bid on the Nachshonim contract while fully aware that it may not receive the full level of tax reimbursement that it expected.  The fact that this business risk proved unfortunate to AAB is not a sufficient basis on which the Court can imply a warranty from SR-14.  The Court therefore does not find that SR-14 is an implied representation establishing or supporting a warranty.

### C.    Additional Arguments Presented by AAB

AAB's additional arguments concerning the circumstances surrounding award of the Nachshonim contract do not persuade the Court that SR-22 is more than merely permissive or that SR-14 implicates a warranty.

AAB argues that the Government's intent "that the Contractor be relieved of the duty to

ascertain" whether TCN labor could be imported is established from the LOA.  Pl.'s Opp'n to Def.'s Cross-Mot. at 2 ("[T]he United States Government ... obtained a written commitment from the Government of Israel upon which [the Government's] commitment to the Contractor was based.").  In support of this argument, AAB also submits the deposition testimony of Mr. John Jones, an official from the Washington headquarters of the Corps of Engineers.  Mr. Jones, who contributed to the negotiations resulting in the LOA stated that the Corps, by way of the LOA, wanted to preserve the right of contractors working for the Corps to utilize TCN labor.  Pl.'s Mot. at 6; Pl.'s App. at 87, Ex. 2 at 16.

The Court finds that the LOA does not evidence that the Government specifically intended to guarantee AAB's ability to import TCN labor.  As the Government appropriately points out, the LOA is not part of the Nachshonim contract and is not an agreement between AAB and the Government, so it is less persuasive than the terms of the contract itself.  Def.'s Reply at 4.  Even if the LOA was evidence of an intent by the Government that, under SR-22 and/or SR-14, AAB would not have to ascertain whether TCN labor could be imported, it would be contrary to the express language of the contract itself at SR-13:  that it was "the sole responsibility of the Contractor to investigate, estimate as to cost, and assume the risk [of] ... [a]rranging ... to import personnel [and] to employ non-indigenous labor."  *See Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965) (contract provisions should not be construed to conflict with another provision unless no other reasonable interpretation is possible).  Nevertheless, the LOA, like the Nachshonim contract, uses the permissive term "may" in regard to importation of TCN labor.  Pl.'s App. at 14, Ex. 1 Attach. A at 6.  Though this portion of the LOA dealing with TCN labor may evidence an intent by the Government that TCN labor would be used, it does not specifically evidence an intent by the Government that it would guarantee AAB's ability to import TCN labor as needed.

AAB also argues that a warranty should be found to exist because the Government had actual knowledge of AAB's "reasonable interpretation ... prior to the execution of the contract."  Pl.'s Mot. at 32 (citing *Cresswell v. United States*, 173 F.Supp. 805, 811 (Ct. Cl. 1959) for the proposition that "a party who enters into a contract with actual or imputed knowledge of the other party's reasonable interpretation of the contract terms is bound by that party's interpretation").  AAB's evidence in support of its argument, however, is incomplete.  AAB may be able to demonstrate that both it and the Government planned on the project being performed with the use of TCN labor,[14] but AAB does not proffer evidence that both it and the Government intended that the Government would bear the risk of increased costs if the work could not be

_____

[14] For example, AAB points to the Nachshonim contract announcement in Commerce Business Daily which stated that contractors "may" use TCN labor, to the Instructions to Bidders which required bidders to submit a TCN tax plan with their bid packages, and to AAB's bid package which included plans for building a TCN camp.  Pl.'s Mot. at 31-32.  The Court is given some pause by these facts.  However, while this type of evidence may indisputably show that the Government knew or anticipated that work would be performed using TCN labor, it does not establish an intent on the part of the Government, or an awareness of AAB's belief, that the Government would warrant the availability of TCN labor.

performed with the use of TCN labor.  In other words, AAB has not shown that the Government was aware that AAB believed the Nachshonim contract contained a warranty.  This failing is evident in AAB's own argument:  AAB states that "both parties contemporaneously interpreted the contract as promising [AAB] *freedom to use*" TCN labor.  Pl.'s Mot. at 32.  This is not the same as the parties contemporaneously interpreting the contract as a Government guarantee that AAB would *actually be able to import* TCN labor.  Instead, AAB's argument is consistent with the Court's interpretation of SR-22 as granting AAB permission, or "freedom," to arrange for the importation of TCN labor, without guaranteeing the success of such arrangements.

## V.    AAB's Request for an Excusable, Non-compensable Time Extension

As an alternative to a determination that the Government is liable for breach of warranty, AAB requests an excusable, non-compensable time extension, pursuant to the contract's Default clause.[15]  Pl.'s Mot. at 36-37.  AAB argues that delay caused by "the sovereign acts of a foreign government" is legally excusable when the contract is being performed in the foreign country, citing as authority a number of cases from the Civilian Board of Contract Appeals and the Armed Services Board of Contract Appeals to that effect.  *Id.*  Applying this standard to the facts of the present case, AAB simply concludes that "[t]he drastic changes of policies enacted by the Israeli Government were events that were unforeseeable and beyond the control and without the fault or negligence of [AAB]," meaning that AAB is entitled "to all *provable* excusable delay caused by its inability to utilize TCN labor."  *Id.* (emphasis added).

The Court cannot grant AAB's request, because AAB has not shown that it is entitled to an extension as a matter of law and because the Court finds that facts material to AAB's claim have not been proved.  First, it appears to the Court that AAB is asking simply for a ruling that AAB is "entitled" to an excusable, non-compensable time extension, the details of which it seems AAB intends to prove at some later time.  AAB has not specified in its briefing or its complaint what "delay" it believes is excusable and has not presented evidence or argument establishing that the delay was directly caused *by* the GOI's actions.[16]  Thus, AAB has not shown

---

[15] The Court finds AAB's argument on this issue to be poorly presented.  It occupies only about one page of the approximately fifty pages of argument AAB submitted to the Court, and includes only conclusions, without supportive reasoning.  In addition, AAB did not submit an exhibit with its motion which shows that the Default clause was actually included in the Nachshonim contract.  Instead, AAB simply cites FAR 52.249-10.  The Government does not seem to dispute that the contract does in fact contain the standard Default clause found at FAR 52.249-10.  For the purpose of the Court's analysis here, as the result will remain the same, the Court will assume that the contract does include the standard Default clause.

[16] In its appendix, AAB did attach a copy of its certified claim to the contracting officer, though AAB's argument for an extension makes no mention of the certified claim.  Pl.'s App. at 226, Ex. 14.  The certified claim includes, as an attachment, a chart which purports to show when the "excusable delay" occurred.  Pl.'s App. at 254, Ex. 14 Attach. 2.  However, the certified claim is no more specific than AAB's briefing or complaint as to how exactly the excusable

that, under FAR 52.249-10(b)(1), "[t]he delay in completing the work *arises from* unforeseeable causes beyond the control and without the fault or negligence of" AAB, and, therefore, has not shown that it is entitled to the extension as a matter of law.  (Emphasis added.)  Moreover, without knowing the circumstances surrounding the delay AAB alleges, the Court cannot conclude that no genuine issues of material fact exist.  At a minimum, the frequent and substantial changes in GOI policy concerning the importation of TCN labor raise a question as to what an Israeli contractor would have viewed as reasonably foreseeable or unforeseeable.  In sum, though it seems to the Court that AAB's claim for an excusable time extension could indeed have some merit, AAB simply has not argued or supported the claim in a manner which would make it appropriate for summary judgment.

In its briefing, the Government primarily argued that AAB had not met its burden for showing an entitlement to summary judgment, and therefore did not prove that the Government itself is entitled to a determination, as a matter of law, that AAB is foreclosed from receiving the excusable, non-compensable time extension.  Def.'s Cross-Mot. at 29-30.  As stated above, denial of one party's motion does not necessitate granting the opposing party's cross-motion.  *Prineville Sawmill*, 859 F.2d at 911.  Thus, to the extent that the Government's cross-motion seeks relief in this regard, the Government's motion also cannot be granted.

## VI.    Conclusion

The Court finds that there is no genuine issue of material fact as to any of the evidence relied upon above in determining that the Nachshonim contract does not contain the warranty alleged by AAB.  The parties do not dispute that the contract clauses, the LOA, the bid listing, and other documents before the Court were accurate.  In addition, the Court holds that the Government is entitled to judgment, as a matter of law, on the issue of whether the contract contains an express warranty that TCN labor would be available to AAB for use on the project. The Government has shown that the contract does not unmistakably contain an assurance by the Government that AAB would be able to import TCN labor as necessary for use on the Nachshonim project.  Therefore, the Court GRANTS the Government's cross-motion for summary judgment and DENIES AAB's motion for summary judgment on the warranty issue.

The Court further finds that summary judgment is not appropriate at this time on the issue of whether AAB is entitled to an excusable, non-compensable time extension under the Default clause.  Thus, the Court DENIES both parties' requests in this regard.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

---

delay was caused by the GOI's actions, as opposed to other factors.